1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         RICHMOND DIVISION

 3   _____
                                    )
 4   UNITED STATES OF AMERICA       )
                                    )
 5   v.                             )    Criminal Case No.:
                                    )    3:19 CR 104
 6   CHIKOSI LEGINS                 )
     _____)
 7                                       February 10, 2020
                                         VOLUME III
 8
          TRANSCRIPT OF OPENING STATEMENTS, ALL TESTIMONY, AND
 9          CLOSING STATEMENTS OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE DAVID J. NOVAK
10              UNITED STATES DISTRICT COURT JUDGE

11   APPEARANCES:

12   Thomas A. Garnett, Esquire
     OFFICE OF THE UNITED STATES ATTORNEY
13   919 East Main Street, Suite 1900
     Richmond, Virginia 23219
14
     Kathryn E. Gilbert, Esquire
15   UNITED STATES DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue NW, 4025 NYA
16   Washington, DC 20530

17           Counsel on behalf of the United States

18

19   Charles A. Gavin, Esquire
     CAWTHORNE DESKEVICH & GAVIN PC
20   1409 Eastridge Road
     Richmond, Virginia 23229
21
             Counsel on behalf of the Defendant
22

23

24               TRACY J. STROH, RPR
                OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
```

1                          **I N D E X**

2                          WITNESSES

3    Examination By:                                    Page

4                      BRANDON LEMAGNE
     Cross          –  MR. GAVIN                          11
5    Redirect       –  MS. GILBERT                        64
                       JOHNNY LAVENDER
6    Direct         –  MR. GARNETT                        75
                       STEVEN ARRANT
7    Direct         –  MR. GARNETT                        81
     Cross          –  MR. GAVIN                          93
8    Redirect       –  MR. GARNETT                        95
                       KARA GREGOR
9    Direct         –  MR. GARNETT                        96
     Cross          –  MR. GAVIN                         131
10   Redirect       –  MR. GARNETT                       158
                       RYAN MCLAUGHLIN
11   Direct         –  MR. GARNETT                       161
     Cross          –  MR. GAVIN                         182
12                     JOHNNY LAVENDER
     Direct         –  MR. GARNETT                       188
13   Cross          –  MR. GAVIN                         234
                       DARRYL STRAUSSER
14   Direct         –  MR. GARNETT                       242
     Cross          –  MR. GAVIN                         255
15   Redirect       –  MR. GARNETT                       257
     Recross        –  MR. GAVIN                         261
16   Further Redirect  –  MR. GARNETT                    263
                       LASHAWN RUFFIN
17   Direct         –  MS. GILBERT                       264
                       HARRY PARKER
18   Direct         –  MR. GARNETT                       270
     Cross          –  MR. GAVIN                         280
19   Redirect       –  MR. GARNETT                       281
                       TIMOTHY COLEMAN
20   Direct         –  MR. GARNETT                       282
     Cross          –  MR. GAVIN                         296
21                     DUANE FARMER
     Direct         –  MS. GILBERT                       302
22   Cross          –  MR. GAVIN                         325

23

24

25

3

1                                EXHIBITS

2    Exhibit          Description                          Page

3    Defendant
     No. 10           Affidavit of Brandon Lemagne            30
4    No. 11           E-mail dated 2/10/2019                  64

5    Government
     No. 18           Swab kit for Ronzell Jackson            78
6    No. 19           Swab kit for Chikosi Legins             80

7    Defendant
     No. 12           FBI Approved Standards for             134
8                     Scientific Testimony and Report
                      Language for Autosomal DNA
9                     Testing
     No. 13           Procedures for the One-Step Acid       138
10                    Phosphatase Spot Test

11   Government
     No. 16           May 10, 2018, memo from Officer        187
12                    Ryan McLaughlin
     No. 20           Audio recording of interview           189
13   No. 24           Daily Assignment Roster                222

14

15

16

17

18

19

20

21

22

23

24

25

1          (The proceeding reconvened at 9:24 a.m.)

2          THE CLERK:  Criminal matter 3:19 CR 104,

3  *United States of America v. Chikosi Legins.*  Mr. Charles

4  A. Gavin representing the defendant.  Mr. Thomas A.

5  Garnett and Kathryn E. Gilbert representing the

6  government.

7          Counsel, are we ready to proceed?

8          MR. GARNETT:  United States is ready,

9  Your Honor.

10          MR. GAVIN:  Defense is ready, Your Honor.

11          THE COURT:  All right.  We are going to start

12  off with a couple of preliminary issues.

13          Mr. Gavin, I need to address Ms. Legins.  I

14  think she's behind you.

15          Ms. Legins, do you want to rise?  Do you want to

16  come on up to the lectern?

17          Ms. Legins, it has come to my attention that

18  while the trial has been going on, you have been making

19  facial expressions or sighing or making noises or other

20  things that are expressing your displeasure about what's

21  going on with the testimony.  I just want to tell you,

22  look, I understand this is a difficult time for you.  I

23  know you love your son, but you can't do that.  I need you

24  to be like a sphinx.  Sit there.  Take it in.  The jury

25  will do what's right at the end of the day.  Let them do

1    their job.  I'll do my job, and you need to do your job.

2            MS. LEGINS:  Okay.

3            THE COURT:  Because if you do it again, I'm

4    going to have to kick you out of the courtroom.  I don't

5    want to do that.  I know you don't want to do that.  And I

6    know this is hard for you, but you've got to knock it off.

7            MS. LEGINS:  Uh-huh.

8            THE COURT:  Okay?  All right.  Why don't you

9    have a seat.  Okay?

10            All right.  The other issue I want to address,

11    before we get to the substantive issue, is it's come to my

12    attention that the first alternate who -- a young lady

13    indicated that she lived in Emporia, but it turns out she

14    actually -- that's her mother's address.  She's actually

15    been living in Virginia Beach.

16            Now, it's not affecting her commute because

17    we've put her in a hotel during this time period, and the

18    fact is that even though it's out of our division, it's

19    still within our district.  So I believe that she is still

20    within our jurisdiction to sit as a juror.  I don't think

21    there's an issue, but I wanted to let you all know.  And

22    if you think there's an issue, tell me now.

23            MR. GARNETT:  Thank you, Your Honor.  We have no

24    issue with that.

25            THE COURT:  All right.

1          MR. GAVIN:  No objection, Your Honor.

2          THE COURT:  All right.  So the last thing I

3    wanted to address is this.  Is the government still going

4    to put on the Rule 413 evidence?

5          MR. GARNETT:  Judge, we are -- they are

6    obviously here.  They're prepared to testify.  That's a

7    decision we haven't made yet in terms of absolutely

8    whether we're going to or not.

9          THE COURT:  So I would encourage you not to do

10   that.  I mean, I've already ruled to allow you to do that,

11   but I think you ought to think about that.  It seems to me

12   that the crux of what's going on is you've got a

13   surveillance video of the defendant and the inmate, and

14   you have -- I gather DNA evidence is coming.  Is that --

15         MR. GARNETT:  That's correct, Your Honor.

16         THE COURT:  All right.  To me, you're creating

17   an appellate issue when you don't need to do that, but

18   I'll leave it up to you.

19         But if you're going do that, I want you to give

20   me some notice, and I think what I should do is give an

21   instruction to the jury before we hear from those

22   witnesses.

23         Do you agree with that, Mr. Gavin?

24         MR. GAVIN:  Yes, sir.

25         THE COURT:  Because that's significant evidence.

1  We have given you a model jury instruction from the Eighth

2  Circuit that I would give the relevant parts of that when

3  we get to that point.  What do you say we answer by

4  lunchtime about whether or not you're going to go forward?

5  Does that -- will you have a better handle on what you're

6  doing then?

7           MR. GARNETT:  Your Honor, I'd ask for -- if we

8  could at least have until the end of the day to see how

9  the rest of our evidence comes in, I think that would be

10 reasonable.

11          THE COURT:  That's fine.  You're not going to

12 put them in today, though?

13          MR. GARNETT:  No, Your Honor.  It wouldn't be

14 until Tuesday.

15          THE COURT:  Well, that's fine.  That's a fair

16 deal.

17          MR. GARNETT:  Thank you, Your Honor.

18          THE COURT:  You can even -- well, that's fine,

19 yeah.  You tell me at the end of the day.  I'll give you a

20 chance to huddle.  What we'll do is we'll break at some

21 point.  I'll give you a couple minutes.  You and

22 Ms. Gilbert can chat about whether or not you want to do

23 that or not, and then you can report to me before we

24 adjourn for the night.  Does that sound fair?

25          MR. GARNETT:  That's fine, Your Honor.

1           THE COURT:  All right.  Is there anything else

2  you wanted to address before I bring the jury out?

3           MR. GARNETT:  Judge, just for -- just very

4  briefly.  Just so we don't put our foot wrong today.  If

5  we could just -- I wanted to make sure we were --

6           THE COURT:  So you don't what?

7           MR. GARNETT:  Put our foot wrong, Judge.

8           THE COURT:  Oh, we had enough of that.

9  Ms. Gilbert is not going to do that ever again.

10          MR. GARNETT:  Yes, Your Honor.  This would

11  probably --

12          THE COURT:  She's really smart.  She's learned

13  not to argue with me.

14          MR. GARNETT:  She's smarter than I am,

15  Your Honor.

16          We just wanted to -- on the convictions, I was

17  jotting things down rapidly.  But for Mr. Lemagne's

18  convictions, in terms of what defense counsel is allowed

19  to elaborate on, was it the length of time of the scheme?

20  If Your Honor could just go back over that so we know -- I

21  did not do as good a job of --

22          THE COURT:  This is the identity fraud one,

23  right?

24          MR. GAVIN:  It was the length of the time of the

25  scheme and the fact that there are multiple victims.

1        THE COURT:  Yeah.  All you can say is this crime

2   spanned approximately a year, and there were multiple

3   victims.

4        MR. GAVIN:  Yes, sir.

5        THE COURT:  The nature of the offense, the date

6   of the conviction.  That's it.

7        MR. GARNETT:  That's fine, Your Honor.  I

8   just --

9        THE COURT:  So I only added two things beyond

10   the stated rule.  And the reason for that, just to be

11   clear, is the statement of facts, as I looked over it,

12   that subsumed some bad acts, I think, about falsehood.

13   And I just think dealing with it that way accomplishes

14   both what -- the conviction issue, but also the bad act

15   issue.  It gives them a fair chance without creating any

16   issues.

17        Do you agree with that, Mr. Gavin?

18        MR. GAVIN:  Yes, sir.

19        THE COURT:  Do you understand what I'm doing?

20        MR. GARNETT:  Yes, Your Honor.  And my goal

21   really was just to clarify because I was not taking notes

22   as rapidly as I probably should have then.

23        THE COURT:  Yeah, but this is her witness, isn't

24   it?

25        MR. GARNETT:  Yes, Your Honor.

1          THE COURT:  You're not supposed to be tag

2  teaming.  She can speak for herself.

3          MR. GARNETT:  We talk frequently, though,

4  Your Honor.

5          THE COURT:  I found that out quite quickly.  All

6  right.

7          MR. GARNETT:  Thank you, Your Honor.

8          THE COURT:  All right.  Are we ready to go?

9  Hold on a second.  Let's bring out Mr. Lemagne, put him in

10 the box.

11          All right.  Do you want to bring the jury in?

12          All rise for the jury.

13          (The jury entered the courtroom.)

14          THE COURT:  All right.  Everybody can be seated.

15          Good morning, ladies and gentlemen.  I hope you

16 got some rest and you're ready to work here this week.

17 We're hoping to get this case to you by Wednesday.  I just

18 want to ask you again, has everybody heeded my

19 instructions about not talking to anybody else about the

20 case, not doing any Internet research or tweeting or

21 blogging or whatever else that stuff is called?  Everybody

22 behave?

23          A JUROR:  Yes.

24          A JUROR:  Yes, sir.

25          THE COURT:  Nobody has got anything to report to

1   me?  All right.  You're going to keep behaving?

2              A JUROR:  Yes, sir.

3              THE COURT:  All right.  We're going to get the

4   show on the road.

5              Mr. Lemagne, I am going to remind you that you

6   continue to be under oath, the same oath that you took on

7   Friday.  Do you understand that?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  All right.

10             Mr. Gavin, the witness is yours.

11             MR. GAVIN:  Yes, sir.  Thank you.

12                     **CROSS-EXAMINATION**

13  BY MR. GAVIN:

14  Q    Good morning, Mr. Lemagne.

15  A    Good morning.

16  Q    Mr. Lemagne, do you remember how many times you may

17  have met with the United States Attorney to prepare for

18  your testimony Friday?

19  A    Not offhand, but we met several times, yes.

20  Q    Was it more than five?

21  A    I don't believe, but we did meet several times.

22  Q    Did she prepare questions for you to answer?

23  A    What do you mean?

24  Q    Did she prepare written questions for you to review

25  prior to your answering them?

1  A    She discussed with me some things that she would

2  probably ask me on the stand, yes.

3  Q    I'd like to first look at your record.  She went over

4  that with you, but I had a couple questions.  So do you

5  agree that between 2007 and 2012, you had nine felony

6  convictions?

7  A    That's probably right, yes.

8  Q    And then another identity theft in 2013?

9  A    Yes.

10 Q    And then another felony conviction in 2017?

11 A    Yes.

12 Q    And then the conviction on which you are incarcerated

13 now; is that correct?

14 A    Yes.  Forgery, fraud conviction.

15 Q    The conviction on which you're incarcerated now,

16 Mr. Lemagne, does that involve one specific date or does

17 it span a course of time?

18 A    It spans the course over a couple of years.

19 Q    So there was a period of fraud that's in -- that was

20 at least greater than a year?

21 A    Yes.

22 Q    And did that fraud include one victim or multiple

23 victims?

24 A    It included multiple victims.

25 Q    Do you know a gentleman by the name of Ajibola

1  Erogbobo?

2          THE COURT:  I think you should spell that.

3          MR. GAVIN:  I'm going to try.  It's

4  I-M-A-J-A-L-E(sic).  Last name E-R-O-G-B-O-G-B-U(sic).

5  A    No, not offhand I don't.

6  BY MR. GAVIN:

7  Q    Do you remember him being in the transgender

8  community at Petersburg Medium?

9  A    Say his name again.  I'm sorry.

10 Q    We'll just call him Mr. Erogbogbo, Ajibola Erogbogbo.

11 A    Erogbogbo.

12 Q    Erogbogbo.  Maybe -- maybe I have it wrong, and maybe

13 you have it right.

14 A    I know exactly who you're talking about.  No, he's

15 not a member of the transgender community.

16 Q    He's not?

17 A    Not that I'm aware of.

18 Q    Was he a friend of yours?

19 A    He was an inmate on the compound.

20 Q    Would you be surprised to hear that he considered you

21 a best friend?

22 A    That's nice.  He's -- he's cool.  We're -- I mean,

23 I'm definitely associated with him.  He's an associate.  I

24 wouldn't describe him as a friend.

25 Q    Where did he work at the facility?

1  A     I'm not sure offhand.  I know he had a job at -- I

2  believe he worked in commissary.  He was -- yeah, he was

3  working in commissary.

4  Q     Did he ever work, to your knowledge, in the law

5  library?

6  A     No.

7  Q     Did he ever work, to your knowledge, in any library?

8  A     No.  I remember that he was employed at commissary.

9  Q     Are you familiar with a search tool called

10 LexisNexis?

11 A     I am.

12 Q     How did you find out about LexisNexis?

13 A     It's common knowledge within the FBOP.  If you want

14 to review your cases, you use LexisNexis.  If you want to

15 review other people's cases, you review -- I mean, that's

16 the only search engine that we have generally.  So it's

17 common knowledge.

18 Q     So using LexisNexis, you can then search existing

19 cases that have been ruled on online?  Or not online.

20 Strike that.  But through the website?

21 A     Basically.  I think that's the gist of it, yes.

22 Q     And I should strike that again because it's not

23 really a website because that implies you went out on the

24 web.  It's just a program that you can use to search these

25 things, correct?

Brandon Lemagne - Cross                    15

1   A    Yes.

2   Q    And is it your testimony that you never asked

3   Mr. Erogbogbo for assistance in researching LexisNexis?

4   A    I won't say that I've never asked him for assistance.

5   I've asked him how to do specific things.  "A.J., how do

6   you" -- in something like that, yes.

7   Q    So you called him A.J.?

8   A    Yes.

9   Q    All right.  So where did you ask him those questions?

10  A    In the library.

11  Q    But you don't remember that he was employed in the

12  library?

13  A    Being in the library doesn't mean that you're

14  employed there.  It just means that you're there.

15          My understanding was he had a job in commissary.

16  If he was in the library -- and he did spend a lot of time

17  in the library -- it was never my knowledge that he was

18  working there.  I don't know if that makes sense.  There

19  were dozens of people in the library every day.  It

20  doesn't mean that they have jobs there.  Last I remember,

21  he was working in commissary.

22  Q    All right.  So this gentleman that you referred to as

23  A.J., did he ever assist you with a LexisNexis search?

24  A    Yes, he did.

25  Q    And what were you searching?

Brandon Lemagne - Cross                16

1  A    Various things.  I remember that he had looked up

2  things and showed me in reference to Medicare fraud or a

3  case that his mother was supposedly involved in.

4  Q    Was this your request for a search on Medicare fraud

5  or was it his request for a search on Medicare fraud?

6  A    I told him that I was interested in starting a

7  medical care business for senior citizens, and he had

8  indicated to me that it would probably be hard because I

9  had been involved in writing checks.  And being as though

10 I had fraud charges, I wouldn't be able to do it.

11          He explained to me that his mother was -- had

12 worked with a lady previously who had started one of those

13 businesses and got in trouble in reference to fraud.  And

14 that's the case that he pulled up and showed me.

15 Q    Was it a criminal case?

16 A    It was a criminal case, I believe.

17 Q    So it would have been US or the state, or wherever it

18 was, against a person?

19 A    I don't remember the specifics.  I just remember that

20 the case involved Medicare fraud.

21 Q    So how do you believe that researching a criminal

22 case that involves Medicare fraud would help you gain an

23 understanding of how the industry works?

24 A    He pulled up a case that a lady that his mother knew

25 who ended up getting in trouble.  He pulled up the case to

Brandon Lemagne – Cross                    17

1  show me what he was talking about.

2         As far as how the industry worked, I had ordered

3  books and read about it, and I was interested in being

4  involved in the industry.  He was just pulling up the case

5  I guess to illustrate exactly what he was talking about in

6  reference to how people get in trouble dealing with

7  Medicare and other things like that.

8  Q    Was that the first search that you did?

9  A    No.

10 Q    Did you provide the search terms for Mr. A.J. or did

11 he provide them to you?  In other words, did you tell him

12 what to type in as far as the search goes or did he type

13 in something on his own?

14 A    He knew her name.  He knew the district that that

15 lady's case was in.  He knew this woman.  She was an

16 African woman with a really unique name.  There's no way

17 that I would have known how to spell that.  He pulled the

18 case up.

19 Q    My question to you, sir, is did you provide the

20 search term; for example, Medicare fraud?

21 A    No, I did not.  He knew the case.  He knew the

22 district.  He had read the case before.

23 Q    When, approximately, if you can recall, did this

24 happen?

25 A    I can't recall when it happened.

1  Q     Can you relate it in time to the March 16, 2018,

2  incident?

3  A     Months prior.  Like probably the year before, months

4  prior.

5  Q     Did you, at some point, do another search on another

6  day?

7  A     Prior to that, A.J. would make it a habit of pulling

8  up other people's cases.  We were on a stomp yard.  So

9  that's kind of what he would do in the library is pull up

10 other people's cases to see if they had molested children

11 or had raped people or if they just had those types of

12 charges.

13 Q     Did you ever tell A.J. that you wanted to explore and

14 investigate cases wherein an officer had been found guilty

15 or had been sued civilly in a case involving sexual abuse

16 between the officer and the inmate?

17 A     No.

18 Q     Ever remember looking at verdicts that may have

19 resulted in $300,000 rewards -- or awards to the inmate

20 that was sexually molested?

21 A     Quite honestly, I reviewed a lot of the cases like

22 that.  Did A.J. assist in that review?  No.  Did I ask him

23 for assistance in that?  No, because I was fairly familiar

24 with LexisNexis.

25 Q     So what were you looking for?  Were you looking for

Brandon Lemagne - Cross                    19

1  the disposition amounts?

2  A    No.  I was -- I think I explained in my testimony

3  Friday that I was having an issue at Petersburg with the

4  whole laundry incident.  So -- and to be honest with you,

5  I didn't really know where to go.  I didn't feel like I

6  had an asset or an ally in this, and I felt like nobody

7  was listening to me.  So, for me, yeah, I did look at

8  LexisNexis in reference to anything, in reference to that

9  type of abuse.  Any type of correctional officer acting

10 out sexually with an inmate.  I saw several cases where

11 awards were made, yes.  I didn't see any cases that were

12 specific to mine.

13 Q    But you were searching for awards in cases, not

14 necessarily procedure on a PREA violation?

15 A    If you're searching a case, the disposition is

16 generally there.  So I don't know what cases have awards

17 or what cases don't.  If I pull up a case and there's been

18 a disposition on it, the award is going to be there.  So,

19 no, I wasn't specifically searching for cases and awards.

20 I was, I guess, trying to find some guidance or figure out

21 what I needed to do in getting some relief from what I was

22 going through.

23 Q    Have you ever had any harsh words or problems with

24 Mr. A.J.?

25 A    Yeah.

Brandon Lemagne - Cross                    20

1  Q     Do you have any reason to think that he would lie

2  about what he would say if he were to testify against you?

3  A     Yeah, I do.

4  Q     What are they?

5  A     He may be trying to get some relief for his sentence.

6  I mean, a lot of people make it a habit of that, jumping

7  on cases, getting involved in things that they don't know

8  anything about.  It's prison.  People have a lot of time,

9  and people are looking for a way out.

10          So if he thinks that he knows something or if he

11  thinks that he's familiar with something, why wouldn't he

12  get involved in it?

13  Q     All right.  But he doesn't have any personal animus

14  with you?  You guys have never been in a fight, for

15  example?

16  A     I mean, he's never put his hands on me.  We've had

17  our disagreements.

18  Q     Well, it sounds like you know him a whole lot better

19  than what you said in the beginning.  How well do you know

20  him?

21  A     I said that we are acquaintances.  This is prison.  I

22  don't get to choose who I'm around.  Yeah, I know A.J.

23  Q     Do you know Richard Fornash?

24  A     No, I don't.

25  Q     Do you remember a conversation that you and others

Brandon Lemagne - Cross                    21

1  may have had around a softball diamond sometime prior to

2  the March 16, 2018, incident?

3          THE COURT:  I didn't hear what you said.

4  Conversations others had --

5          MR. GAVIN:  -- around the softball diamond.

6          THE COURT:  Softball diamond.

7  BY MR. GAVIN:

8  Q    Where you were talking about guards and conduct of

9  guards?

10 A    I don't, no.

11 Q    Do you ever remember having a conversation in which

12 you said that if you had the opportunity to sue a guard to

13 get money or to get time off your sentence, you'd do it in

14 a minute?

15 A    I go home in April, and no, I don't remember that

16 conversation.

17 Q    Okay.  All right.  I'm going to move forward to the

18 first incident that you said that Mr. Legins exposed

19 himself to you.  Did you tell officer -- or Special Agent

20 Lavender that that was February 17th when Mr. Legins saw

21 you in C-South?

22 A    I can't give you a specific date as to what day it

23 was.

24          MR. GAVIN:  Could you pull up 8, ma'am?

25 Ms. Taylor?

```
 1            THE COURT:  Are we okay here?
 2            MR. GAVIN:  It's not electronic.  It's physical.
 3 Do you have the government's paper exhibits?
 4            MS. TAYLOR:  Exhibit 8, physical Exhibit 8.
 5            THE COURT:  Is Exhibit 8 in that bunch?
 6            MR. GAVIN:  Mr. Spivey, I'm going to need 9 as
 7 well, if you're looking.
 8            THE COURT:  Why don't we give him 8 first.
 9            MR. GAVIN:  They are in the same bag.
10            THE COURT:  Okay.  Same bag.  He's got both 8
11 and 9 now.  He just didn't know it.
12 BY MR. GAVIN:
13 Q    Can I ask you to identify these again, Mr. Lemagne?
14 A    Those were the things that I had written down when I
15 was trying to figure out exactly what happened to me.
16 Q    All right.  So the first one, which is
17 Government's 8, do you recognize that document?
18 A    Yes.
19 Q    What does it say at the top?
20 A    It says "2:19 to 3:00 Legins entryway exposed."
21 Q    Now if you look at number 9 behind that?
22 A    Uh-huh.
23 Q    What's the date on that?
24 A    It says "Saturday compound."
25 Q    Is there a date on that?
```

1  A    It says "2" -- excuse me -- "2/17/18."

2  Q    So if you told Special Agent Lavender that the first

3  day that Mr. Legins exposed his penis to you was the day

4  in C-South, how could that have been two days after the

5  second date where you say he gave you cigarettes or

6  exposed himself to you in the compound office?

7  A    I'm not really sure what you're asking me.

8  Q    Well, Number 9 is dated 2/17.

9  A    Right.

10 Q    All right.  That's supposedly the second day.  It

11 says "compound."

12 A    Uh-huh.

13 Q    Exhibit 8 is 2/19.

14 A    Uh-huh.

15 Q    Well, that's the first day.  So the 19th is after the

16 17th, the second day that you say.  So I'm trying to

17 understand are those dates mixed up or do you just not

18 recall?

19 A    I'm not sure what those dates are.

20        What I can tell you was that I wasn't writing

21 things down as they happened.  So it wasn't a thing where

22 he would do something and I would make a note of it with

23 the intent to report it.  What happened was I went back

24 and did my best to recall dates and figure out exactly

25 what day he did what.  The result of me writing that down

1  over the course of a few days are these documents.  That's

2  why they are different color pens.  That's why it's

3  different color papers, because I was trying to figure out

4  what happened to me.

5           What dates are on there, whether the dates are

6  incorrect or whether -- I don't know if they're a few days

7  off.  I don't -- I can't explain that.  The only thing

8  that I can tell you is that I wrote those dates down to

9  the best of my recollection.

10 Q    When did you write them down?

11 A    I wrote the dates down after the first time he

12 assaulted me in the elevator.  I went back to my cell, and

13 just like I told you, my intent at that point was to turn

14 him in.  And I started trying to figure things out.  I

15 started trying to recall what days he had done what.  So

16 like I said, the result of that, over the course of the

17 next few days, I kind of went back and forth with myself

18 trying to figure out, you know, if I was actually going to

19 turn this guy in.  And the result of that, like I said,

20 were these papers.

21 Q    Did you tell Special Agent Lavender that, that it was

22 just an estimate?

23 A    I told him that I didn't know dates, and then I

24 explained to him that I had wrote everything down to the

25 best of my recollection as I could remember it.  That's

1  what I told him.

2  Q    But these dates were written down after the March 16,

3  2018, incident?

4  A    These dates were written down after the incident in

5  the elevator.

6  Q    So you don't really know, as you sit here today,

7  whether Mr. Legins exposed himself to you on 2/17 or 2/19,

8  frankly?

9  A    I don't have a Palm Pilot.  I don't -- I can't -- I

10  don't know the exact date.  What I know is that he exposed

11  himself to me.

12  Q    You testified Friday that on the date that you went

13  to the compound office, you went with the expectation of

14  getting cigarettes but that you didn't get any; is that

15  correct?

16  A    Correct.

17  Q    Did you tell Special Agent Lavender that on the date

18  that you went to the compound office you got cigarettes

19  from Mr. Legins?

20  A    Who is Special Agent Lavender?

21  Q    It's the gentleman seated right here.

22  A    The FBI.  Okay.  Thank you.  Chip.

23  Q    Did you tell him that?

24  A    Did I tell him that I expected to get cigarettes

25  from --

1  Q     No.   That you actually obtained cigarettes from

2  Mr. Legins when he was in the compound office.

3  A     I don't remember getting cigarettes from him that

4  day.

5  Q     I guess the question is do you remember telling

6  Special Agent Lavender that?

7  A     I remember telling him -- I can't say that I remember

8  telling him that.

9  Q     Did you double down on the date, Mr. Lemagne, by

10 giving reference to Special Agent Lavender of a particular

11 thing that entered your mind, that secured the date in

12 your mind?  In particular, cleats that were being ordered

13 by your roommate?

14         THE COURT:  Why don't you confront him with

15 exact -- I gather you have an FBI 302?

16         MR. GAVIN:  Yes, sir.

17         THE COURT:  Why don't you confront him.  I think

18 the appropriate way to do this is do you remember saying

19 to Agent Lavender the following.

20 BY MR. GAVIN:

21 Q     Do you remember telling Agent Lavender, Mr. Lemagne,

22 that you recall that date specifically the first time

23 because it's that day that your roommate ordered cleats

24 from the commissary?

25 A     I remember referencing cleats, yes.

Brandon Lemagne - Cross                                27

1  Q    I'm sorry?

2  A    I remember referencing cleats, yeah.  I remember

3  believing that Zell had ordered cleats on that particular

4  day.

5            Again, this is me trying to recall something

6  that had happened -- I didn't write down that date, the

7  day that it happened.  I didn't -- like I said, I went

8  back and I'm trying to piece things together.  So I

9  remember thinking that the day that Zell purchased cleats

10 was the day that that happened.  I remember that that was

11 one of his store days.  So, yeah, I was trying to figure

12 out what was going on.

13 Q    So that's what you used to provide credibility to

14 your memory that it was that particular day?

15 A    I guess you could say that.

16 Q    All right.  I'd like to move forward to the

17 March 16th incident.

18            MR. GAVIN:  Ms. Taylor, could you pull up that

19 time frame?

20            MS. TAYLOR:  Is that Exhibit 1 or Exhibit 2?

21            MR. GAVIN:  Let's watch and see.

22            THE COURT:  Can Officer Spivey take back

23 Exhibits 8 and 9?

24            MR. GAVIN:  Yes, he can.

25            It's 18:28:57.

Brandon Lemagne - Cross                28

1           THE COURT:  Are we going back to the

2  surveillance?

3           MR. GAVIN:  Just a small bit.

4           THE COURT:  So we're going to cross our fingers

5  and hope this thing works.

6           MS. TAYLOR:  Oops.  Sorry.

7           THE COURT:  Can we bring it up?

8           MR. GAVIN:  Let him set it before you start.

9  BY MR. GAVIN:

10  Q   Mr. Lemagne, on March 16 after the incident in the

11  elevator took place, you went down to Echo -- well, you

12  were in Fox North, correct?  You first went to Fox North?

13  A   I'm not sure what unit I started in.

14  Q   All right.

15           MR. GAVIN:  Let's play the video.  If you could

16  play it through 18:30:27 time.

17           THE COURT:  Nobody is seeing it.

18           THE CLERK:  It's up.  It should be --

19           MS. TAYLOR:  That's the projector.

20           THE COURT:  I can see it.

21           Is it on your monitors?

22           MR. GAVIN:  I can see it.

23           A JUROR:  No.

24           THE COURT:  All right.  It's not on their

25  monitors.  Will you all tell me if you can see it on your

Brandon Lemagne - Cross                    29

1  monitor?

2          MR. GAVIN:  Is that on?  Do we need to click

3  that off?

4          THE CLERK:  It's off.  It should be playing.  It

5  worked this morning.

6          THE COURT:  All right.  Here's what we're going

7  to do.  Ms. Garner is going to call our IT people to get

8  them up here.  While she's doing that, why don't you move

9  to a different area.  Then you can swing back to this,

10 because I don't want to waste time on this.

11         MR. GAVIN:  I understand.

12 BY MR. GAVIN:

13 Q    On March 16, Mr. Lemagne, that's the date that

14 Mr. Legins allegedly had you in the elevator and forced

15 you to you perform oral sex on him; is that correct?

16 A    Okay.

17 Q    And in your affidavit -- I'm going to hand you this,

18 Mr. Legins -- Mr. Lemagne, and see if you can identify it.

19         THE COURT:  Do you want to mark that as an

20 exhibit?

21         MR. GAVIN:  Yeah.  I have it marked as

22 Defense 10.

23         This was previously identified last week, but it

24 wasn't introduced.

25         THE COURT:  That's fine.

1  BY MR. GAVIN:

2  Q     Do you recognize that, Mr. Lemagne?

3  A     Uh-huh.  Yes, I do.

4  Q     And is that the affidavit that you provided to

5  Lieutenant McWilliams?

6  A     That was the affidavit that Lieutenant McWilliams

7  wrote.

8  Q     And did you initial -- are they your initials beside

9  each sentence?

10 A     I did.  Yes, I did.

11 Q     And then you signed it that day?

12 A     I believe I did, yes.

13 Q     And the last page indicates that that signature is

14 under oath.  Did you understand that that statement was

15 being made under oath?

16 A     Yes.

17           MR. GAVIN:  I'd like to admit that as D-10,

18 Your Honor.

19           THE COURT:  Is there any objection?

20           MS. GILBERT:  No objection, Your Honor.

21           THE COURT:  All right.  Admitted.

22           (Defendant Exhibit Number 10 was admitted.)

23 BY MR. GAVIN:

24 Q     If you look at paragraph 14 of your affidavit, can

25 you read the third sentence where it starts, "He came

Brandon Lemagne - Cross                        31

1  everywhere," from there to the end?

2  A    "He came everywhere."  Excuse me.  "He came

3  everywhere.  On my folder, all over the floor, on my

4  sweater.  It was gross.  I got back to the unit and felt

5  like he was not going to get away with this shit.  So I

6  put the sweater in a plastic bag."

7  Q    All right.  So the folder you're talking about, is

8  that the folder that you carried around to post flyers in

9  various units?

10  A    I believe so, yes.

11  Q    And did that folder, and the contents in the folder,

12  go all over the floor?

13  A    Yes.

14  Q    And in that folder, because it was all over the

15  floor, did you remember that Mr. Legins' ejaculate, for

16  lack of a better term, went all over your papers?

17  A    I remember there being papers scattered on the floor.

18  I remember your client coming all over my clothes, on my

19  face.  I can't -- I don't remember exactly where his semen

20  went.  No, I don't.

21  Q    Well, your affidavit just says it went all over your

22  papers.

23  A    I'm sure that there was probably some there.  It

24  went --

25  Q    When you left the elevator, what did you do next?

1  A    I remember walking out of the unit.  I remember

2  getting really upset.  I remember feeling really violated

3  and angry, and I remember going back into the elevator and

4  trying to clean it up.

5  Q    Do you remember stopping at the door at Fox North and

6  having to wait for a period of time before the officer of

7  that unit could let you out of the exit?

8  A    That probably happened.

9  Q    Do you remember that officer walking over to you and

10 actually looking at your entire file folder, opening it

11 up?

12 A    That may have happened as well, but no, I don't

13 remember that.  This was over two years ago.

14 Q    Did you tell the officer what had happened?

15 A    No, I did not tell the officer what had happened.

16 Q    Did the officer ask you anything about -- anything

17 strange about the folder?

18 A    Not that I can remember, no.

19 Q    Had you already been that day into Echo unit?

20 A    It's quite a possibility.  I have two jobs.  So, you

21 know, there may have been a chance that I had been in

22 there handing out information from education.  I --

23 Q    So whose idea was it to go into the elevator in the

24 first place?  Did you ask to go to the E unit?

25 A    What do you mean?

1  Q    On March 16th when you and Mr. Legins were in the

2  corridor, did you say, "I need to go to the E unit" or did

3  you -- or was that Mr. Legins' suggestion just to open the

4  elevator for no reason?

5  A    He -- I can't access the elevator.  Like, a staff

6  member has to access the elevator.  So he opened the

7  elevator and motioned for me to go in.

8  Q    Did you ask him to open the elevator door so you

9  could go to the lower unit?

10 A    No.  He did that.

11 Q    All right.  So when you went downstairs after you

12 exited Fox North, you went back into the lower unit Echo;

13 is that correct?

14 A    When I exited Fox North, I went -- when I exited Fox

15 North -- after he raped me in the elevator, I exited into

16 the unit across from him, which would be, I believe -- I

17 believe that's E-North or E-South.  I exited in the unit

18 across from him.

19 Q    And did you go into that unit?

20 A    Yes, I did.

21 Q    And you walked back to the elevator, the same one

22 that you had just evidently been raped in?

23 A    Yes.

24 Q    And why did you go back there?

25 A    I walked into the unit across from him.  I went out

1  of the unit across from him.  I went downstairs and then I

2  went back into the elevator.

3  Q    Why did you go back to the elevator?

4  A    Because I was very angry, and at that point my

5  intention was to say something about what had been

6  happening to me.  I was really fed up with everything that

7  was going on, and I was over it.  At that point my

8  intention was to turn him in.

9  Q    And I think you testified that you had a paper towel.

10 Where did you get the paper towel before you went to the

11 elevator?

12 A    There are 10 or 12 units on Petersburg, and I have 15

13 minutes to post a flyer in every unit.  So many times I

14 make it a point, because I have other things that I want

15 to do with my evening, to run that dash in 10 to 15

16 minutes.  So a lot of times I'll keep a paper towel in my

17 pocket.  I'll keep a rag in my pocket.  I'm sweating.  I'm

18 trying to post all of these flyers.  I'm up and down

19 stairs.  I'm running trying to get this done, basically.

20           So I usually have a paper towel or something in

21 my pocket to, you know, wipe my brow so that I can get

22 this done.  So I would assume that that's probably where I

23 got the paper towel.

24 Q    When you say you assume, are you sure or are you just

25 guessing?

Brandon Lemagne - Cross                    35

1  A    I keep a paper towel in my pocket when I'm running --

2  when I'm running errands.

3  Q    So -- this is a big day.  So you're thinking that you

4  pulled the paper towel out of your pocket to clean up the

5  semen in the elevator, but you're not sure?

6  A    I had a paper towel.  I had a piece of paper, yeah.

7  Q    All right.  So as I recall your testimony, you went

8  back and you took your sweatshirt off, and you preserved

9  it for purposes of evidence.  What did you do with the

10 paper towel?

11 A    To be honest with you, I have no idea where that

12 paper towel went after I decided that I wasn't going to

13 say anything about what happened to me.  I have no idea

14 where it went.  It could have been anywhere.

15 Q    Wouldn't that paper towel have been the best piece of

16 evidence that you could ever have if you wanted to

17 prosecute or report Mr. Legins?

18 A    I wasn't sure what was -- I didn't know -- I just

19 decided that I wasn't going to say anything about

20 Mr. Legins.

21 Q    Then why did you keep the sweatshirt?

22 A    The sweatshirt was already there and in the back of

23 my locker.  So the sweatshirt was hardly on my mind.  Like

24 I said, after that incident, over the course of the next

25 couple of days, I went back and forth about what I was

Brandon Lemagne - Cross                    36

1  going to do.  The sweater was already there.  The sweater

2  was already in my locker, and it wasn't necessarily

3  something that -- I wasn't thinking about the sweater.

4  Q    Is there any reason why you couldn't have put the

5  paper towel in the same bag with the sweatshirt if you had

6  wanted?

7  A    I don't -- I don't know what happened to that paper

8  towel.

9              MR. GAVIN:  Are we any closer?

10             THE COURT:  Is it working yet?  What else do we

11 have to do?

12             THE CLERK:  Can you switch to input 2?

13             MR. GAVIN:  Judge, I can keep moving.

14 A    I was under the --

15             THE COURT:  Hold on.  Don't talk.  We're trying

16 to fix it.

17             (Discussion off the record.)

18             THE COURT:  Why don't we do it real quick before

19 we lose it.  All right.

20             Do you know what you're doing, Ms. Taylor?

21             MS. TAYLOR:  Mr. Gavin, do you want me to play?

22             MR. GAVIN:  Yep.  Ready.

23             (Video Played.)

24             THE COURT:  Mr. Lemagne, is it on your screen,

25 too?

1          THE WITNESS:  It is.

2          THE COURT:  Okay.

3          (Video Played.)

4          MR. GAVIN:  I'm sorry, Your Honor.  This is --

5   this is not -- this is Fox South, and I need Fox North.

6   Same time frame.

7          MS. TAYLOR:  Okay.

8          MR. GAVIN:  That's it.

9          THE COURT:  Is that the one?

10          MR. GAVIN:  Yep.

11          (Video Played.)

12   BY MR. GAVIN:

13   Q    Mr. Lemagne, do you recognize yourself in that

14   picture, in the highlighted circle?

15   A    Uh-huh.  Yes, I do.

16   Q    This is after you had just been in the elevator with

17   Mr. Legins; is that correct?

18   A    Yes.

19          MR. GAVIN:  It jumped back to Fox South,

20   Your Honor.

21          THE COURT:  Well, what do you want to do here?

22   I'm not in charge of the --

23          MR. GAVIN:  I understand.

24          MS. TAYLOR:  I'm just playing the video.

25          MR. GAVIN:  Judge we'll have to -- we'll have to

Brandon Lemagne - Cross                    38

1  find a way to figure out the individual video.  What's

2  happened is the United States did a compilation that has

3  the same time frames with two different areas and theirs

4  keeps jumping back to Fox South instead of continuing on.

5         MS. GILBERT:  Mr. Gavin, we have all the

6  unedited videos if you know which one you need.

7         MR. GAVIN:  Yeah.

8         MS. GILBERT:  Which one?

9         MR. GAVIN:  It would be Fox North March 16th.

10 Common area.

11        MS. GILBERT:  Common area or exit door?

12        MR. GAVIN:  Both.

13        MS. GILBERT:  Which one do you want first?

14        MR. GAVIN:  Common area.

15        THE COURT:  Has that been introduced into

16 evidence yet or not?

17        MR. GARNETT:  They were all entered, Your Honor.

18 Government Exhibit 1 included both the compilation video

19 as well as a series of smaller videos that form that

20 compilation video.

21        THE COURT:  All right.  That's fine.  So it's

22 part of the Government Exhibit 1.

23        MR. GARNETT:  Yes, Your Honor.

24        (Video Played.)

25        MR. GAVIN:  Up to 18:28.

Brandon Lemagne - Cross                          39

1          MR. GARNETT:  Is that too far, Chuck?

2          MR. GAVIN:  No.  That's good.

3          THE COURT:  All right.  So we're at 18:28:15.

4   Okay.  What's your question?

5          (Video Played.)

6   BY MR. GAVIN:

7   Q    Mr. Lemagne, the video that's going to be in front of

8   you is going to be the same video that you just saw

9   wherein you identified yourself in a circle.  It's just

10  not quite there yet.

11         (Video Played.)

12  BY MR. GAVIN:

13  Q    Is that you walking down --

14  A    Yeah.

15  Q    -- the row of cells?

16  A    Yes.

17  Q    This is right after the elevator incident?

18  A    Uh-huh.  Yes, it is.

19  Q    Are you carrying your papers right there in your left

20  hand?

21  A    Yes.  I believe that's the folder.

22  Q    Mr. Lemagne, is that you standing outside of -- or on

23  the interior, actually, of the Fox North exit door?

24  A    Yes.

25  Q    And what are you doing there?

Brandon Lemagne - Cross                          40

1  A    The door looks like it's locked.  I'm waiting.

2  Q    Is that the folder in your left hand?

3  A    Uh-huh.

4         THE COURT:  Is that a yes?

5         THE WITNESS:  Yes, it is.

6         THE COURT:  For the record, we're at 18:29.  We

7  were at 10.

8         (Video Played.)

9  BY MR. GAVIN:

10 Q    Do you know Correctional Officer Mr. Farmer?

11 A    Yes, I know Farmer.

12 Q    Was he in control of this unit on that particular

13 day?

14 A    There he goes.  Yes.

15 Q    Is that him?

16 A    That's Farmer.

17 Q    Is that Mr. Farmer looking at all your paperwork?

18 A    No.  I think that was probably Farmer saying -- I

19 don't know.  He may have been asking what the movie was.

20 I saw myself open the folder and show him.

21 Q    Do you show Mr. Farmer any of the semen that went all

22 over your paperwork?

23 A    No.

24         MR. GAVIN:  That's all I have.  Thank you,

25 Ms. Taylor.

Brandon Lemagne - Cross                    41

1  BY MR. GAVIN:

2  Q    All right.  I'd like to move next to, Mr. Lemagne, to

3  the May 10th incident.  So you never ever reported

4  anything with respect to the March 16th incident, correct?

5  A    No.

6  Q    All right.  So on May 10th --

7            THE COURT:  Was there an answer?  I'm sorry.

8            THE WITNESS:  I said no.

9            THE COURT:  Okay.

10 BY MR. GAVIN:

11 Q    You're going back into the unit.  Did you know that

12 Mr. Legins would be working that particular day on

13 May 10th on the evening watch?

14 A    No.  I wasn't really thinking about or aware of

15 Mr. Legins.

16 Q    When you went in there and you saw Mr. Legins working

17 Fox South on the evening watch and he invited you to walk

18 through the corridor, you were just headed to the Fox

19 North side, correct?  That's what you thought?

20 A    Did I think that I was headed to the Fox North side

21 is what you're asking me?

22 Q    Yes, sir.  Was that the next move?  Is that where you

23 were headed?

24 A    I guess at that time I was probably assuming that

25 that's what would happen, but I remember when he motioned

Brandon Lemagne - Cross                    42

1  me, I remember thinking that he had a pack of cigarettes

2  for me.

3  Q    Was your next stop that you had planned to post

4  flyers Fox North?

5  A    This was two years ago.  I don't remember what unit I

6  planned to go into next to post flyers.

7  Q    Do you remember being fearful of going into that

8  corridor with Mr. Legins at all?

9  A    I had seen Mr. Legins more than half a dozen times

10 since the last time.  I had picked up cigarettes from him.

11 I had had conversations with him in that unit.  I had

12 conversations with him on the compound.  I had been with

13 him alone.  I had been with him in front of people.

14        Mr. Legins was back to being completely normal

15 and completely friendly, and I didn't have any reason to

16 be fearful.  I didn't have any reason not to go where he

17 was asking me to go.

18        MR. GAVIN:  All right.  Your Honor, if I could

19 show some of these pictures again.

20        THE COURT:  Do you want to give us exhibit

21 numbers?  All right.  Hold on a second.  Before they're

22 displayed, have they been already admitted?

23        MR. GAVIN:  Yes, sir.

24        THE COURT:  Okay.  That's fine.  Just give us

25 the exhibit number as they are displayed so there's a

1  record of what's going on.

2          MR. GAVIN:  Judge, all these exhibits are under

3  D-8?

4          THE COURT:  I'm sorry?

5          MR. GAVIN:  D-8.

6          THE COURT:  D-8.

7          MR. GAVIN:  And then there are letters

8  associated with them.

9          The first one I'm going to ask Ms. Brown to pull

10 up is D-8B.

11 BY MR. GAVIN:

12 Q    And do you recognize those doors, Mr. Lemagne?

13 A    They look like the doors headed into the counselor

14 area.

15 Q    That's the --

16         THE COURT:  Hold on.  You're not seeing

17 anything?

18         A JUROR:  No.

19         THE COURT:  Is everybody not seeing anything?

20         All right.  Cheryl, can you do something?

21         We're good now?  Okay.

22         MR. GAVIN:  All right, Ms. Brown.  If you could

23 pull down the picture just low enough to reflect the

24 exhibit sticker.  So that's D-8B.

25 BY MR. GAVIN:

44

1  Q    And these have already been introduced, Mr. Lemagne.

2  So if I represent to you that they are the doors that

3  enter the corridor from Fox South headed to Fox North,

4  does that refresh your recollection?

5  A    I -- I said that that's what they look like.

6  Q    All right.  So Mr. Legins would have had to have

7  opened those doors with a key, correct?

8  A    Correct.

9  Q    When he went to the other side of those doors, did he

10 close those doors back?

11 A    Yes.  They close automatically.

12 Q    They were closed.  Either through Mr. Legins or

13 automatically, they would be closed?

14 A    There's a spring on the doors.  The doors close, and

15 when an officer goes through a door, he turns around and

16 he locks it.

17 Q    All right.  So the door may have closed by a spring,

18 but Mr. Legins was still required to physically lock the

19 door?

20 A    I believe so, yes.

21       MR. GAVIN:  Ms. Brown, will you pull up D-8C?

22 BY MR. GAVIN:

23 Q    Does that fairly reflect the corridor, looking from

24 the outside of the doors all the way to the other side on

25 Fox North?

1    A    Yes.

2    Q    And the unit office, is that the door that you see up

3    there, the second door on the left where the exit sign is

4    located, the second exit sign?

5    A    Yes.

6    Q    So when you walked through these doors, Mr. Legins

7    would have had to relock the opening doors in the

8    corridor.  We've already established that.  Was the second

9    door also closed and locked?

10   A    The second door as in the door --

11   Q    The door to the office area.

12   A    I believe the office door was locked.  I can't

13   remember offhand whether he unlocked it or not.

14   Q    Have you ever been through that corridor where it has

15   not been locked?

16   A    Many times.

17   Q    With the door open?

18   A    I've been through that corridor many times, and, I

19   mean, there are probably six doors on this screen.

20   Sometimes the doors are unlocked.

21   Q    Do you remember on May 10th, whether the door was

22   locked on May 10th when you went through the corridor, the

23   office door area?

24   A    I can't remember whether that door was locked or

25   open.

1           MR. GAVIN:  Ms. Brown, can you go to D-8D?

2    A    Actually, I believe that door was open.

3    BY MR. GAVIN:

4    Q    What caused you to have that conclusion after your

5    prior testimony?

6    A    Because I remember walking through it.

7    Q    But you don't remember how it was opened?

8    A    I mean, I didn't live in that housing unit.

9           MR. GAVIN:  Ms. Brown, you can move forward

10   beyond this one to D-8E.

11   BY MR. GAVIN:

12   Q    Is that the door that we're talking about, the office

13   door?

14   A    Yes.

15          MR. GAVIN:  Ms. Brown, D-8F.

16   BY MR. GAVIN:

17   Q    Does D-8F recognize the view from the hallway into

18   the unit office area?

19   A    Yes.

20   Q    And that door that's open in the foreground, is that

21   the bathroom area?

22   A    Yes.

23          MR. GAVIN:  Ms. Brown, could you move to G?

24   BY MR. GAVIN:

25   Q    Is that the same unit office area with you being

1    inside and viewed back to the corridor hallway?

2    A    Yes.

3    Q    So that's where you and Mr. Legins were at this

4    point?

5    A    Yeah.  We eventually ended up in that room, yes.

6    Q    All right.  Do you remember Mr. Legins having to lock

7    that door back?  When I say "that door," I'm talking about

8    the door between the corridor and the office area.

9    A    Do I remember him locking the corridor or do I

10   remember him locking the office door?

11   Q    The office door.

12   A    After he raped me, I wasn't really paying any

13   attention to what he was locking.  I wasn't thinking about

14   whether or not he locked the counselor door.

15   Q    I'm just asking you, Mr. Lemagne, if you recall

16   whether or not he had to lock that door back after you

17   entered the room?

18   A    I -- like I said, after he raped me, I do not

19   remember him locking that door or whether he locked it or

20   not.  That was the furthest thing from my mind.

21        MR. GAVIN:  Ms. Brown, could you go to H?

22   BY MR. GAVIN:

23   Q    All right.  Is this a view from sort of the office

24   door back towards the back where the incident allegedly

25   took place?

1   A     Yes.

2           MR. GAVIN:   And, Ms. Brown, could you go to I?

3   BY MR. GAVIN:

4   Q     Do you recognize that picture?

5   A     Yeah, I do.

6   Q     All right.  So is that the area where you believe

7   that the incident took place?

8   A     Yes.

9   Q     And there's a pole on the right of the picture.  Is

10  that, in particular, the place that you allege it look

11  place?

12  A     Yes.

13  Q     All right.  So in regard to your testimony, you

14  indicated that you and Mr. Legins went into the room and

15  after the door was closed, he grabbed you from behind and

16  then pushed you back into this back area; is that correct?

17  A     He pushed me back right here where you see the pole

18  and the wall meet; that's the area that he pushed me to.

19  Q     And as he pushed you across the floor, you indicated

20  that you tried to walk away from him at least twice; is

21  that correct?

22  A     Not quite.  I indicated that he grabbed me by the

23  buttocks and kind of walked backwards with me.  When we

24  got to that area, yes, I tried to walk away from him

25  twice.

1  Q    So do you have any idea or recollection how much time

2  that took?

3  A    Less than 20 seconds.

4  Q    Did you ever tell anybody how much time that took?

5  Special Agent Lavender?  Anyone else?

6  A    I don't recall.

7  Q    What were you wearing that day in addition to your

8  shirt?

9  A    The same thing I wear every day.  I was wearing

10 grays.

11 Q    Were you wearing a poncho that day?

12 A    I was wearing a poncho, yes.

13 Q    Can you describe the poncho?  Was it a real poncho or

14 was it one of those throw-away ponchos that you get --

15 A    It's a plastic poncho.

16 Q    Just a very light plastic?

17 A    It's a clear plastic poncho.

18 Q    But is it a poncho, sort of like a clear plastic

19 poncho, a throw-away that you get at the amusement park

20 when it's raining and you didn't bring your umbrella or

21 your rain coat?

22 A    I'm not really familiar with that type of poncho.  I

23 just know that it's something that keeps the rain off of

24 you.

25 Q    Is it very, very thin?

1  A     It was a regular poncho.

2  Q     Did that get torn in this incident at all?

3  A     I didn't -- I don't remember whether it got torn or

4  not.  I know that it was just a regular poncho.

5  Q     But this poncho was over the short and the shirt that

6  you say was torn?

7  A     My poncho -- when he assaulted me, my poncho was

8  twisted.  I don't know if that makes sense.  Or my poncho

9  was arranged.  But my poncho was not in the way.  He

10  pulled my poncho.  Like the poncho wasn't obstructing my

11  body.

12  Q     All right.  Mr. Lemagne, the next thing you

13  indicated, that he forced you to perform oral sex and

14  asked you to squat; is that correct?

15  A     Yeah.

16  Q     And then you performed oral sex on him for a period

17  of time.  Do you have any idea how long that period of

18  time was?

19  A     After he pushed me down by my shoulders, I -- it was

20  a short period of time.  That's what I can tell you.

21  Q     Do you remember telling the nurse that he did it for

22  a while until he was done with that?

23  A     I may have said that, yes.

24  Q     So after that, you indicated that he pulled you up.

25  And then did he remove your pants or did you remove your

Brandon Lemagne - Cross                    51

1  pants?

2  A    He told me to turn around, and he pulled my pants

3  down.

4  Q    Did you resist at all?

5  A    After he snatched me back twice and ripped my shirt,

6  I didn't feel like I should resist anything.  He's

7  400 pounds.  I mean, I did exactly what he told me to do.

8  Q    And then, Mr. Lemagne, you indicated that Mr. Legins

9  used his own spit several times to provide lubrication

10 before he penetrated you; is that correct?

11 A    It sounded like he used his spit.  I remember him

12 spitting.  I remember him removing his hand out of my

13 mouth and, like, wetting my rectum area.  I wasn't really

14 turned around to, you know, see exactly what the

15 arrangement was.  He was raping me.

16 Q    And in your affidavit, you indicated that that was at

17 least five minutes long?

18 A    I indicated that when Lieutenant McWilliams wrote my

19 affidavit, it wasn't verbatim.  I was talking very fast.

20 And she's a lieutenant.  She's not a secretary.  So she

21 couldn't type nearly as fast as I was talking.  So while

22 this is generally what I said, it's not my words, and it's

23 not specific.

24 Q    Do you have any reason to think why Lieutenant

25 McWilliams would write in your affidavit that it lasted

1  like five minutes if you didn't say that?

2  A    The same reason why she wrote the date that I got

3  there as November 30th, 2016.  I didn't say that either,

4  but it's there.

5  Q    Did you ever tell anybody else -- Mr. Lavender, any

6  other agent -- that it lasted approximately five minutes?

7  A    I don't know how long it lasted.  It happened.

8  Whether it was five minutes, three minutes, two minutes,

9  it happened.

10 Q    So after it happened, you indicated that you sort of

11 just sat on the floor while Mr. Legins went to the

12 bathroom; is that correct?

13 A    After he raped me and he told me to turn around and

14 catch it, I remember watching him come in his hand.  And I

15 remember when he was finished ejaculating, I remember just

16 kind of being frozen there.  And I remember him turning

17 around, and I remember him going into the bathroom.  I was

18 still standing at the pole.

19 Q    All right.  So while he was in the bathroom, were you

20 just standing at the pole?

21 A    For a portion of that time.  And then after that, I

22 remember trying to get my poncho together and twist my

23 poncho back around, and I remember just trying to get

24 myself together and get out of the office.

25 Q    Was -- when you started retwisting or adjusting your

Brandon Lemagne - Cross                                        53

1   poncho, was that after Mr. Legins had exited from the

2   bathroom or before?

3   A    I remember when he was walking out of the bathroom, I

4   remember being kind of frozen there.  My clothes were

5   already arranged.  I just remember looking like -- I

6   didn't really know what to do.  I didn't know whether to

7   leave.  I didn't know whether to go.  I remember being a

8   bit frozen.

9   Q    Do you know how long he was in the bathroom?  You

10  indicated you heard water running.

11  A    I did hear water running.

12  Q    Was water running for a period of time by itself?

13  Just water running?

14  A    I remember him walking into the bathroom.  I remember

15  the water running.  I remember the water cutting off, and

16  I remember him exiting the bathroom.

17  Q    Was there any point in time that you heard a toilet

18  flush?

19  A    I did hear a toilet flush.

20  Q    Was that after the water had stopped running or was

21  that at the same time the water was running, if you

22  remember?

23  A    Would you remember?

24        THE COURT:  You just have to answer yes or no.

25  A    I don't remember whether he flushed -- I don't

1  remember what order the toilet flushed or the water

2  stopped running.  I remember that the toilet flushed, and

3  I remember that the water cut on, and I remember him

4  exiting the bathroom.

5  BY MR. GAVIN:

6  Q    When he told you to clean up, was that after he left

7  the bathroom or before?

8  A    This was before he walked into the bathroom.

9  Q    All right.  After that happens, you guys leave.  Do

10 you have to unlock the door that enters into the corridor

11 or was it already open?

12 A    The corridor was -- you're talking about the outer

13 door, not the office door, correct?

14 Q    I'm talking about the office door that leads into the

15 corridor door.

16 A    Uh-huh.

17 Q    Was that door closed while this incident was taking

18 place?

19 A    The door was closed.

20 Q    So did he have to unlock the door before you entered

21 back into the corridor?

22 A    When we exited, no.  I don't remember unlocking that

23 door.  I remember him opening the door and walking out.

24 And I remember him kind of holding the door open, and I

25 exited out after him.

1  Q     Did he lock the door back?

2  A     My back was turned to him, and I wasn't thinking

3  about that.  I was waiting for him to open the door in

4  front of me so that I can exit and get away from him.

5  Q     All right.  So that's when you went to the Fox North

6  door?

7  A     Correct.

8  Q     And that's where you exited, correct?

9  A     Correct.

10 Q     Then you went to -- later to the nurses station,

11 medical, there at the facility, correct?

12 A     Then I went where?  I'm sorry.

13 Q     To the medical facility at Petersburg Medium.  Do you

14 remember going to the medical person to see you after you

15 had reported the incident?

16 A     Well, I -- eventually I ended there.  A lot happened

17 between me leaving F-North and going to medical.  But

18 eventually I did go to medical.

19 Q     Do you remember being seen by a particular medical

20 technician there by the name of Ms. Ramsey?

21 A     I'm not sure what her name was.

22 Q     Do you remember telling her exactly what happened?

23 A     Yeah.  I remember talking to her.

24 Q     Do you remember telling her that he finished in me,

25 he ejaculated in me?  Do you remember telling her that?

1  A    No.

2  Q    Did you ever tell anybody else that?

3  A    No.  And I -- I do remember coming back into the room

4  after making a statement to Ms. Ramsey and her rewriting

5  an entire statement from her memory, from beginning to

6  end, because apparently when I left, something happened.

7  Somehow the statement got deleted.  And after I spoke with

8  Dr. Wolf and I came back into the room, she was trying to

9  retype the statement based off of her memory.

10  Q    So your belief is that if Ms. Ramsey wrote in her

11  note, "he finished in me, he ejaculated in me," that she

12  must have been mistaken what she heard from you?

13  A    I don't remember specifically verbatim saying that to

14  her, no, I don't.

15  Q    Did you ever tell Lieutenant McWilliams that same

16  story or version?

17  A    I told both of them the same story.  I told them what

18  happened to me.

19  Q    Do you remember telling the medical technician that

20  was recovering your clothes that you didn't want to sit

21  down because you were afraid that Mr. Legins' semen might

22  run out of you?

23  A    I do remember saying that.  I was also concerned

24  about his saliva and DNA in general.

25  Q    When you got to the hospital -- well, let me ask you

1    this.  Between the time that the incident happened and the

2    time that you went to the hospital, had you done anything

3    to wash yourself or did you follow their instructions

4    about you can't do anything, wash, shower, take a bowel

5    movement, anything like that?

6    A    Yes.

7    Q    And did you?

8    A    No.

9    Q    So you didn't wash.  You didn't have a bowel

10   movement.  All the fluids that would have been on you

11   would have still been there or recovered in evidence,

12   correct?

13   A    Correct.

14   Q    Mr. Lemagne, were you part of a conference call

15   sometime around December 21st, 2018, with the FBI and the

16   OIG?

17   A    I don't -- again, I'm in prison.  I don't necessarily

18   have dates.

19   Q    Do you remember a conference call at all?

20   A    I do.

21   Q    And what was the basis for that conference call?

22   A    Probably this case.

23   Q    Did they tell you that they had enough evidence to

24   prosecute Mr. Legins, that they were going to move

25   forward?

Brandon Lemagne - Cross                    58

1  A    Not in those words.

2  Q    In those general terms?

3  A    No.  They didn't mention evidence at all.

4  Q    Do you remember writing e-mails after that conference

5  call to lots of different lawyers?

6  A    I remember writing e-mails after that conference call

7  to lots of different lawyers, attorneys, organizations.  I

8  remember writing a lot of people at various times in

9  reference to my situation.

10 Q    Did you use the TRULINCS system?

11 A    Yes, I did.

12 Q    Did you include in the e-mails -- was it sort of a

13 broadcast e-mail or did you write every lawyer

14 individually?

15 A    I wrote a lot of different organizations on just

16 one -- one broad e-mail.  I may have wrote a couple of

17 individual organizations.  I'm not sure.

18 Q    In your e-mail, did you use some deceptive language

19 to avoid the detection through the TRULINCS system?

20 A    I don't know what you mean.

21 Q    In other words, did you understand that if you used

22 the word "rape" in your e-mail, that would be picked up

23 and screened by the administration?

24 A    My mail and my phone calls were already being

25 monitored.  So as far as them picking up rape and as far

1  as them picking up -- everything that I wrote and

2  everything that I communicated from the time of this

3  incident was being monitored, and I know that because the

4  investigative unit on the compound indicated to me that

5  that was the case.  So I was already very aware that my

6  phone calls and my e-mails were being monitored.

7  Q    All right.  But the question is did you use a

8  methodology to avoid detection?

9  A    I may have.  I may have spaced the words out.  I may

10 have, yes.

11 Q    Did you include in your e-mail a note that says, "The

12 spaces you are seeing in this document are not typos.  The

13 system flags certain words, trying to avoid detection"?

14 A    Yeah.

15 Q    Do you remember saying that?

16 A    Yeah.

17 Q    Why would you want to avoid detection?

18 A    I wouldn't want them reading or knowing about any of

19 my communications with organizations like the ACLU or GLAD

20 or attorneys or anything like that because I wouldn't want

21 to deal with the repercussions.  I wouldn't want to deal

22 with retaliation.

23 Q    Any of the lawyers that you contacted, were they

24 civil lawyers?

25 A    Yes.

Brandon Lemagne - Cross                          60

1    Q     Did you contact them because you believed that they

2    could represent you in a type of an injury case?

3    A     Yeah.  I contacted them.

4    Q     I'm going to ask you to identify one e-mail if you

5    could, Mr. Lemagne?

6               THE COURT:  Do you want to give it an exhibit

7    number?

8               MR. GAVIN:  Yeah.  It will be Defense 10.

9               THE COURT:  You seem to be marking everything

10   Defense 10.  And I --

11              MR. GAVIN:  Well, Defense 11.  I'm sorry.

12              THE COURT:  Okay.  All right.  But I still -- I

13   have your exhibit list, and I don't see anything about

14   a -- are you just kind of winging it here on the numbers?

15              MR. GAVIN:  Yeah.  This is just cross.

16              THE COURT:  All right.

17   BY MR. GAVIN:

18   Q     Mr. Lemagne, is this part of one of the e-mails that

19   you wrote?

20   A     Yes.

21   Q     All right.  The first paragraph where it says

22   "Brandon Jarome Lemagne, 2/10/2019" --

23   A     Uh-huh.

24   Q     -- was that authored by you?

25   A     No, it was not.

1  Q      You're saying somebody else wrote that e-mail?

2  A      No.  I'm saying the system wrote Brandon Jarome

3  Lemagne on 2/10/2019.  I authored what's under it.

4  Q      Okay.  Can you read that first paragraph?

5  A      "They stopped about eight pieces of outgoing legal

6  mail containing info in reference to me retaining counsel

7  for litigation.  That day I sent out your statement of

8  facts, I inquired with several attorneys.  I sent out

9  legal mail on the 7th as well.  A day later, I got your

10 e-mail confirmation that you did not get the statement of

11 facts.  Basically they know I'm trying to sue them and

12 they are trying to stop inquiries.  As I told you, I

13 received other legal mail opened and taped.  They have

14 returned things with no reason and no notification and

15 have simply not delivered others.  I do not have tracking

16 order confirmation on these items.  You see how they

17 treated the situation with you, the mail.  The open house

18 line is 12 to 15 people long every day.  They simply do

19 what they want in the mailroom.  I do not know what to do

20 at this point.  I'd suggest you possibly issuing them a

21 notification about legal mail procedures or possibly

22 contact SIS Lieutenant Moore.  He would be pretty

23 receptive.  They don't care what I say honestly."

24 Q      And do you remember to which particular lawyer this

25 e-mail was forwarded?

1  A     No.  I remember being really frustrated about them

2  retaliating against me and doing illegal things with my

3  legal mail.

4  Q     And who is "they"?

5        THE COURT:  By "they," are you referring to the

6  prison system?  Is that what you're --

7  A     I'm referring, yeah, to the prison system.  I'm

8  trying to communicate and basically talk to organizations

9  or get some relief for what happened to me, and they're

10 illegally opening my legal mail.

11       The messages that I was sending out would take

12 three or four days to go out because the SIS team is

13 reviewing it and probably copying.  And even though I was

14 aware of it, I really don't feel like I had anything to

15 hide by trying to get help for what I was going through.

16 BY MR. GAVIN:

17 Q     Then why would you use deceptive language to get an

18 e-mail through that wouldn't be detected?

19 A     Because that doesn't mean that I want to make it just

20 simply easy for them.

21 Q     When it says "they know I'm trying to sue them" --

22 A     Uh-huh.

23 Q     -- who is the "them"?

24 A     The FBOP.

25       MR. GAVIN:  May I have just a minute,

Brandon Lemagne - Cross                63

1   Your Honor?

2   BY MR. GAVIN:

3   Q    Mr. Lemagne, when you were being seen at St. Mary's,

4   you also told the nurse, did you not, that there was maybe

5   semen on your right hand?

6   A    Uh-huh.  Yes, I did.

7   Q    Where did that come from?  Do you remember where the

8   semen -- how the semen appeared on your right hand?

9   A    The semen came from your client.  I don't -- I

10  mean --

11  Q    Well, your affidavit indicates that he came in his

12  hand.  So how was it that the semen got from his hand to

13  your right hand?

14  A    What do you mean?

15  Q    You indicated that you believed that there was semen

16  on your right hand.

17  A    Uh-huh.

18  Q    You asked the med techs, did you not, to make sure

19  that they checked out your right hand?  Do you remember

20  that?

21  A    Correct.

22  Q    Do you remember the med tech actually put a latex

23  glove on your right hand to make sure that that semen

24  would be preserved?

25  A    I do remember that.

1  Q    All right.  So how was it that you remember that

2  semen got from Mr. Legins to your right hand?

3  A    I can't remember what happened specifically to make

4  me feel like there would possibly be semen on my right

5  hand, but I felt like there was a chance that there would

6  be semen.

7          MR. GAVIN:  Judge, I don't have any other

8  questions.

9          THE COURT:  All right.  Any redirect?

10          MS. GILBERT:  Yes.

11          MR. GAVIN:  Judge, I'd like to move my 11.

12          THE COURT:  Do you have any objection to it?

13          MS. GILBERT:  No objection, Your Honor.

14          THE COURT:  All right.  It will be admitted.

15          (Defendant Exhibit Number 11 was admitted.)

16                   **REDIRECT EXAMINATION**

17  BY MS. GILBERT:

18  Q    Mr. Lemagne, Mr. Gavin asked you some questions just

19  now about why, in May of 2018, you went back into the

20  hallway with the defendant.  You testified on Friday that

21  the defendant told you to go with him into the hallway,

22  correct?

23  A    Correct.

24  Q    In your experience, are inmates free to disobey

25  officers' orders and go wherever they want in the

1  facility?

2  A    Absolutely not.

3  Q    To your knowledge, what generally happens to inmates

4  who disobey officers?

5  A    It depends on the situation, but you're probably

6  going to get sent to the lieutenant's office, and you're

7  probably going to end up in the SHU for at least 30 days.

8  Q    What kinds of things can officers do to inmates who

9  anger them?

10 A    On the extreme end, beat them up, call a gang of

11 people to rough them up, drag them down, mace them.

12 Anything that they want.  You're in prison.  They can

13 retaliate by searching your cell, harassing you, throwing

14 away your personal property, spitting in your food if

15 you're in the SHU.  They can do whatever they want to you.

16 Q    You testified earlier that when the defendant wasn't

17 sexually abusing you, he acted like he was your friend.

18 What kinds of things did the defendant say to you when he

19 was in the mode of acting like your friend?

20 A    "You need anything?  What's your books looking like?

21 How's your mom?  How's the dialysis going?  What's up with

22 your sister?  Like, you know, are you all getting along?"

23 Just the types of things that somebody who was your friend

24 and somebody who knew about your life would ask you.

25           Me and my sister have an on-and-off

Brandon Lemagne - Redirect                    66

1    relationship.   My mother is on dialysis.   He knows that.

2    He knows that I'd like to get home to take care of my mom.

3    He knows a lot of personal things about me.   So the

4    conversations that you would have with your friend about

5    your life and your concerns, those were the things that he

6    would bring up to me.

7    Q    And so between the incident in March 2018 when the

8    defendant raped you in the elevator and the incident in

9    May 2018 when the defendant raped you in the unit team

10   secretary's office, were those the kinds of things that he

11   was talking to you about?

12   A    Yeah, absolutely.   And I -- I saw him many, many

13   times between those incidents.   I work in those units.   So

14   they are generally -- I mean, I can avoid him, but I

15   really can't avoid him.   I have to go into those units,

16   you know, to pass out educational paperwork.   I have to go

17   into those units to post flyers.   So, I mean, I --

18   generally because of my jobs, I pretty much came into all

19   of the officers on the compound that worked in the units.

20   Q    Mr. Gavin also asked you some questions about the

21   timing of what happened during the May 2018 rape.

22   A    Uh-huh.

23   Q    When the defendant was using his 375 or 400-pound

24   body to move you around the office, were you looking at a

25   clock?

1  A     No.

2  Q     When he was violently raping you, were you timing

3  that?

4  A     No.

5            MR. GAVIN:  Objection to the form of the

6  question.

7            THE COURT:  That's sustained.  Stop doing that.

8  BY MS. GILBERT:

9  Q    After the defendant orally and anally raped you, were

10 you focused --

11           MR. GAVIN:  Objection to the form of the

12 question.

13           THE COURT:  I just told you to stop doing that.

14           MS. GILBERT:  I'm sorry, Your Honor.

15 BY MS. GILBERT:

16 Q    After the incident in the office in May of 2018, were

17 you focused on whether the defendant was locking or

18 unlocking the doors of the office?

19 A    Absolutely not.

20 Q    Mr. Gavin also asked you some questions about why you

21 didn't report what the defendant -- after -- why you

22 didn't report what happened in the elevator of March 2018

23 when you interacted with an officer after that.  We talked

24 on Friday about why you feared that nobody would believe

25 you.  We don't have to go into that again.  What did you

Brandon Lemagne - Redirect

1  think would happen if you reported the defendant and no
2  one believed you in March of 2018?
3  A    All of the retaliation that I've been experiencing, I
4  thought that I would be moved.  I thought that I would be
5  chastised.  I thought that I would be harassed.  I thought
6  that my phone calls, my visits, my mail would be detained,
7  delayed and monitored.  I thought that it was going to be
8  very painful for me if I said something about it, and I
9  thought that I was going to look like I guess the person
10 that cried wolf, you know.  I already said something about
11 an officer in the laundry room doing something not only to
12 me, but to a lot of LGBT people, and nobody did anything
13 about it.  So it's like, okay, so now you're saying this.
14 Really, Lemagne?
15        It didn't seem smart to put myself in that
16 situation because even though I was in prison, I felt like
17 I had a lot to lose.  I was on my way up out the door.  I
18 was -- I'm about to go home, you know.  So for me, you
19 know, it was just like I didn't want to do anything to
20 disrupt everything that I had going on.  And I definitely
21 didn't want to do anything that was going to make my life
22 any more difficult in prison because it was difficult
23 enough.  So I was afraid of the retaliation and everything
24 that I've been going through.
25 Q    Mr. Gavin also asked you about some surveillance

1  footage that showed you waiting at F-North exit door and

2  he asked you about how you were acting in that footage.

3  In your experience as a prisoner, what happens to inmates

4  who act vulnerable in prison?

5           MR. GAVIN:  Judge, I don't know -- this is way

6  beyond the scope of my cross.

7           THE COURT:  No.  I'm going to overrule the

8  objection.

9  A    It's important in prison to have a poker face.

10 Whatever you're going through or whatever you got going

11 on, deal with it, because when you walk out of that cell,

12 you need to look like everything is fine.  If you're

13 feeling vulnerable and you're looking vulnerable, somebody

14 is going to take advantage of that.  If you're feeling

15 weak and you're looking weak, somebody is going to take

16 advantage of that, whether that be physically them taking

17 something from you, whether that be assaulting you.  You

18 need to look like you're good and you got it together.

19           So no matter what is going on, when that door

20 pops and I walk out of that cell, I'm fine.  I'm going to

21 look like I'm fine.  I'm going to act like I'm fine.  I'm

22 good, you know.  And that's how I was acting.  You know,

23 no matter what's going on, that's how I'm going to act

24 when I'm walking around that compound.  Nobody is ever

25 going to know anything that's going on with me.

Brandon Lemagne – Redirect                    70

1  Q    Mr. Gavin also asked you about some e-mails that you

2  sent to attorneys, and in particular, you testified that

3  you knew that your e-mails were being monitored as all

4  inmate e-mails are, but you still didn't want to draw

5  attention to writing e-mails about being raped.

6  A    No.

7  Q    Why was that?

8  A    Again, the retaliation.  There was a general belief

9  among officers that had been expressed to me that I was

10 lying.

11         MR. GAVIN:  Objection to the speculation there.

12 He's testifying about rumors from other officers.

13 A    I'm testifying about what other officers told me.

14         THE COURT:  Hold on.  I rule, not you.  It's

15 overruled.  He's explaining why he acted in a certain way.

16 So -- but are we almost done with this?

17         MS. GILBERT:  Yes, Your Honor.

18         THE COURT:  All right.  Why did you do it?  Why

19 did you act --

20 A    It had already been indicated to me that the general

21 belief was that I had lied on Officer Legins.  And

22 officers made it a point to chastise me and harass me and

23 review e-mails and do all sorts of things because of what

24 they knew happened to me at Petersburg.

25         THE COURT:  All right.  Do you have anything

1  else?

2         MS. GILBERT:  Just briefly, Your Honor.

3  BY MS. GILBERT:

4  Q    Mr. Gavin also asked you about an inmate who you

5  referred to as A.J.  His last name, I believe, is

6  Erogbogbo.

7  A    Correct.

8  Q    Mr. Erogbogbo, you said that he's not part of the

9  transgender community.  Is it your understanding that he's

10  gay?

11  A    I think he's gay.  I don't know if he thinks he's

12  gay.  I know that he's very into feminine people like me.

13  I don't know how he identifies personally, but I know he's

14  made it a point to approach and proposition everybody in

15  prison that's pretty much feminine.  So he's one of those

16  guys.

17  Q    Did you ever reject Mr. Erogbogbo sexually?

18  A    Yes, several times.

19  Q    Ms. Gavin also asked you some questions about your

20  prior conversations with me, other prosecutors and federal

21  investigators.  Mr. Lemagne, when I met with you and when

22  agents met with you, federal agents, did they or did we

23  ever tell you what to say?

24  A    No.

25  Q    Did we ever promise you anything in exchange for your

1  testimony?

2  A    No.

3  Q    Mr. Gavin also asked you regarding some e-mails with

4  attorneys, and you testified that -- about that on your

5  direct examination.  Have you filed a lawsuit in

6  connection with this case?

7  A    No, I have not.

8  Q    Why did you reach out to attorneys about what

9  happened with the defendant?

10 A    I was having some really bad issues with my mental

11 health, and I guess just trying to survive and function in

12 that environment, after everything that had happened to

13 me, and I was asking to go to a compound that had mental

14 health services to accommodate people that had the needs

15 that I had.  Because of timing and the fact that my time

16 was so short, they were indicating that they really -- was

17 not -- they weren't willing to transfer me into a trauma

18 program even though they had documented that I had severe

19 PTSD.

20        So I felt like the only way that I would

21 probably get some relief or some assistance was to get an

22 organization involved that helped me who were LGBT or to

23 get an organization involved that people help that had

24 mental health issues.  So, you know, for me, I had

25 communicated with them I need some help.  I need to go

Brandon Lemagne - Redirect                    73

1  somewhere else.  You guys don't have the staff here.  I

2  can't get up some mornings, and I really needed some help,

3  and I didn't feel like anybody was listening to me.  I

4  don't feel like anybody cared.  A lot of them didn't think

5  that anything had happened to me, and I was suffering, and

6  I needed some help.

7         So I reached out to every person that I could

8  possibly reach out to, whether that be an attorney that

9  had litigated a case similar to mine, whether that be an

10 organization, the ACLU, GLAD, Lambda Legal.  I needed some

11 help, and nobody was helping me.  I don't have a family

12 that's going to get on the phone and spend hours fighting

13 with these people.  I didn't have any assistance with

14 this.  I was kind of out there on my own trying to deal

15 with everything that had happened to me.

16        So I was on my own, and I was reaching out to

17 anybody that could possibly help me.  I wasn't making a

18 secret about it.  I had already been told that they were

19 monitoring my mail and my e-mail, and I didn't have

20 anything to hide.

21 Q   Mr. Lemagne, are you able to -- given that you feel

22 that you're not getting adequate mental health assistance,

23 do you feel able to talk to other inmates for some support

24 about what you've been through?

25 A    No.  Absolutely not.  A lot of -- the culture in

1   prison is if you say something like this about an officer,

2   that's going to be viewed as snitching.  If you say

3   something -- if you -- you -- even if it's a cop, it

4   doesn't matter, especially when you're talking about a cop

5   that is kind of cool with other inmates and a cop that's

6   viewed as the cool officer.  If you say something like

7   that, oh, you told.  We're going to beat you up.  You've

8   got to go up top.  Go ahead and check in.  You've got to

9   go to the hole.  Me discussing something like this with

10  inmates would have been horrible for me.

11          So it wasn't something that I can discuss.  It

12  wasn't something that I could seek support for.  It was

13  something that I had to deal with within myself.  The

14  people that were designated to discuss this with me, the

15  psychology staff, were not willing to assist me, which is

16  my reason for reaching out.

17          MS. GILBERT:  Thank you for your testimony,

18  Mr. Lemagne.  No further questions.

19          THE COURT:  All right.  Folks, I think this is a

20  perfect time for us to take our morning recess.  So what

21  we're going to do is we're going to recess until 11:15.

22  I'll give you a couple extra minutes there this morning.

23              All rise for the jury.

24          (The jury exited the courtroom.)

25          THE COURT:  All right.  You can take

Johnny Lavender – Direct                    75

1   Mr. Lemagne.

2              (Witness stood aside.)

3              (Recess from 10:58 a.m. until 11:17 a.m.)

4              THE COURT:  All right.  Do you want to bring the

5   jury in?

6              All right.  All rise for the jury.  Thank you.

7   At least somebody remembered.

8              (The jury entered the courtroom.)

9              THE COURT:  All right.  Everybody can have a

10  seat.

11             Everybody doing okay over there?

12             All right.  Do you want to call your next

13  witness?

14             MR. GARNETT:  Your Honor, the United States

15  would call FBI Special Agent Johnny Lavender.

16                      **JOHNNY LAVENDER,**

17     called by the government, first being duly sworn,

18                     testified as follows:

19             THE COURT:  Whenever you're ready, Mr. Garnett.

20             THE WITNESS:  Thank you.

21             CSO SPIVEY:  Yes, sir.

22                    **DIRECT EXAMINATION**

23  BY MR. GARNETT:

24  Q    Good morning, Agent Lavender.

25  A    Good morning.

1  Q    Would you please introduce yourself to the jury and

2  spell your first and last name for the court reporter?

3  A    Johnny, J-O-H-N-N-Y.  Lavender, L-A-V-E-N-D-E-R.  And

4  I'm a special agent with the FBI here in the Richmond

5  field office.

6  Q    How long have you been with the FBI?

7  A    In June, it will be 18 years.

8  Q    What kind of cases do you typically work at present?

9  A    Currently, human trafficking, crimes against

10 children, civil rights cases which incorporates color of

11 law cases.

12 Q    Were you involved in the investigation of this

13 particular case?

14 A    Yes.

15 Q    And as an FBI agent, are you familiar with the

16 process of collecting DNA samples?

17 A    I am.

18 Q    And does DNA sample collection often involve the

19 collection of what are known as buccal samples?

20 A    Yes.

21 Q    What's a buccal sample?

22 A    It's a swab that is very similar to a Q-tip,

23 approximately 6 inches in length, with a soft end that we

24 use to collect data, DNA data.

25 Q    And can you tell the jury just generally, how you

Johnny Lavender – Direct

77

1   collect a buccal sample?

2   A    When you're collecting a buccal sample, it comes in a

3   kit.  I take the kit with me to wherever I'm going to

4   collect the evidence.  I open it.  I put on gloves.  I

5   take out two swabs.  Again, they look like oversized

6   Q-tips.

7             I will go to the person that I'm collecting the

8   evidence from.  I will insert the swab into their mouth.

9   I will gently rub on the inside of a cheek.  You rub up or

10  down or twirl.  And after you finish with the first swab,

11  then you grab the second swab, and insert that into the

12  person's mouth and do the other cheek, same procedure.

13  Q    Do you seal those swabs up after they are taken?

14  A    After I've completed taking the two swabs, I put them

15  into a small cardboard box that comes with the kit.  I

16  close it up, and then I take a label that comes with the

17  kit, and I place it on top of the box.  I write my name,

18  my initials, date and where the sample was taken from.

19  Q    And once you've collected and labeled that sample,

20  does the FBI transport those samples to the FBI Laboratory

21  in Quantico, Virginia?

22  A    I take it to our office here in Virginia.  I enter

23  the information into the FBI computer system.  Then I

24  provide those samples to our evidence technician, and then

25  I do an electronic communication requesting that those

1    samples be submitted to the FBI Laboratory by the FBI

2    technician.

3    Q    During this investigation, did you collect a buccal

4    sample from an individual named Ronzell Jackson?

5    A    Yes, I did.

6    Q    Did you understand Ronzell Jackson to be Brandon

7    Lemagne's cellmate?

8    A    Yes.

9    Q    How did you collect -- I should say where did you

10   collect the buccal sample from Mr. Jackson?

11   A    At FCI Petersburg Medium.

12   Q    And did you follow the procedures that you mentioned

13   earlier in collecting that buccal sample?

14   A    I did.

15   Q    And was that sample eventually delivered to the FBI

16   Laboratory for testing?

17   A    It was.

18        MR. GARNETT:  Your Honor, if I could have

19   Officer Spivey show Special Agent Lavender what's been

20   marked as Government's Exhibit 18?

21        THE COURT:  Any objection to Exhibit 18?

22        MR. GAVIN:  No, sir.

23        THE COURT:  All right.  It will be admitted.

24        (Government Exhibit Number 18 was admitted.)

25   BY MR. GARNETT:

1  Q     You can go ahead and open that up, Agent Lavender.

2  Do you recognize what you're holding there?

3  A     I do.

4  Q     What is that?

5  A     It's the swab kit that I used to take the DNA from

6  Ronzell Jackson.

7          MR. GARNETT:  Your Honor, I think Your Honor

8  just admitted it, but I would move at this point if -- I

9  think it was just admitted.

10          THE COURT:  All right.  I'll double/triple admit

11  it.

12          MR. GARNETT:  Thank you, Your Honor.  I

13  appreciate that.  All right.

14  BY MR. GARNETT:

15  Q     Agent Lavender, you can go ahead and set that aside.

16  Did this investigation, did you also, on June 5th of 2018,

17  collect a DNA sample from the defendant, Chikosi Legins?

18  A     I did.

19  Q     And did you follow the procedures you described

20  earlier in taking that sample?

21  A     I did.

22          MR. GARNETT:  Your Honor, I'd ask to show the

23  government -- I'm sorry.

24          MR. GAVIN:  Admitted.  No objection.

25          MR. GARNETT:  -- Agent Lavender Government

Johnny Lavender – Direct

80

1  Exhibit 19.

2          THE COURT:  See, they's working so quickly,

3  they're agreeing to stuff before I even get a chance to

4  rule on it.  So Exhibit 19 will be admitted as well.

5          MR. GARNETT:  Thank you, Your Honor.

6          (Government Exhibit Number 19 was admitted.)

7  BY MR. GARNETT:

8  Q     Do you recognize that item there, Agent Lavender?

9  A     Yes, I do.

10 Q     And what is that?

11 A     It's the swab kit that I used to take DNA from

12 Mr. Legins.

13         MR. GAVIN:  And, Your Honor, I'd just note --

14 it's already been read into the record.  Just that the

15 joint stipulations, paragraph 1 regarding the physical

16 evidence chain of custody, paragraph 2 relating to

17 DNA/chain of custody.  Both have been entered and both

18 capture these two exhibits.

19         THE COURT:  In a nutshell, Mr. Gavin, you're not

20 challenging that any of these swabs were contaminated in

21 an fashion; is that right?

22         MR. GAVIN:  No, sir, I'm not.  No objection.

23         THE COURT:  All right.  That's fine.

24         MR. GARNETT:  Your Honor, that's all the

25 questions I have for Agent Lavender.  We would plan to

1   recall him later this afternoon.

2           THE COURT:  That's fine.

3           MR. GARNETT:  Thank you, Your Honor.

4           THE COURT:  Do you have any questions about

5   this?

6           MR. GAVIN:  No cross.

7           THE COURT:  All right.  Agent, you can step

8   down.  Thank you for your testimony.  Again, don't talk

9   about your testimony with anybody.

10          (Witness stood aside.)

11          THE COURT:  Do you want to call your next

12  witness?

13          MR. GARNETT:  The government would call

14  Lieutenant Steven Arrant, Your Honor.

15                    **STEVEN ARRANT,**

16     called by the government, first being duly sworn,

17                    testified as follows:

18          THE COURT:  Go ahead, Mr. Garnett.

19          MR. GARNETT:  Thank you, Your Honor.

20                  **DIRECT EXAMINATION**

21  BY MR. GARNETT:

22  Q    Lieutenant, could you please introduce yourself to

23  the jury and spell your first and last names for the court

24  reporter?

25  A    I am Lieutenant Steven Arrant.  First name

1  S-T-E-V-E-N.   Arrant, A-R-R-A-N-T.

2  Q    And how are you currently employed, Lieutenant?

3  A    I'm a supervisor at FCC Petersburg for the Bureau of

4  Prisons.

5  Q    And how long have you been with the Bureau of Prisons

6  there at Petersburg?

7  A    At Petersburg, it will be four years in April.

8  Q    I'm sorry.  Say again.

9  A    Four years in April here in Petersburg.

10 Q    And what did you do -- were you with the BOP before

11 coming to Petersburg?

12 A    Yes.  Ten years at FCI Sheridan in Oregon.

13 Q    And prior to those ten years at Sheridan, what kind

14 of employment did you have?

15 A    I was a county deputy primarily in the jail in Coos

16 County, Oregon.

17 Q    And your duties now at FCI Petersburg -- I identified

18 you as a lieutenant, but what are your duties at FCI

19 Petersburg?

20 A    A lot of duties.  Mainly, I work off shifts when the

21 administration staff are not there.  So I'm responsible

22 for a little bit more.  Generally, the movement of the

23 inmates, the programming, the feeding, the recreation, any

24 emergencies that may arise.

25 Q    Are you familiar -- or I should say prior to

Steven Arrant – Direct                    83

1  May 10th, 2018, were you familiar with an inmate named

2  Brandon Lemagne?

3  A    Yes, sir.

4  Q    And did you have any major disciplinary issues with

5  Brandon Lemagne prior to May 10, 2018?

6  A    No, sir.

7  Q    Did you know him well?

8  A    Not well.  Just in passing.

9  Q    Were you on duty at FCI Petersburg on the night of

10 May 10th, 2018?

11 A    I believe I was, sir.

12 Q    Do you recall what your assignment was that night?

13 A    The medium operations lieutenant.

14 Q    And what does that mean?  What's the operations

15 lieutenant at FCI Petersburg do?

16 A    The operations lieutenant oversees the activities of

17 the lieutenant, the separate departments, running the

18 programs, movements of the inmates, all the officers in

19 the housing units, special housing unit, any emergencies

20 that arise, anything that comes up out of the ordinary.

21 Q    After working hours, is the warden off the grounds of

22 the prison?

23 A    Usually, sir, yes.

24 Q    For all intents and purposes, is the operations

25 lieutenant in charge of the prison at that point?

1  A     The operations lieutenant, when the warden or

2  associate warden is not there, is the warden until they

3  arrive back, if needed.

4  Q     So back to May 19th, at some point that evening were

5  you approached by Brandon Lemagne?

6  A     Yes, sir.

7  Q     And do you recall what you were doing at that time?

8  A     I was sitting at my desk in my office.  I believe I

9  was on the phone speaking with somebody.  I can't remember

10 what the conversation was.  It wasn't anything important.

11 Q     And how did Brandon Lemagne introduce himself?

12 A     Well, normally before someone comes in the office,

13 they'll knock and wait to be told to come in.  He just

14 came in and walked up to my desk, looked straight in my

15 face and stated, "Your officer raped me."

16 Q     And do you recall what his demeanor was at this

17 point?

18 A     It was strangely kind of no demeanor.  Just kind

19 of -- kind of blank.

20 Q     When Brandon Lemagne told you that -- I'm sorry.  Can

21 you say again what Brandon Lemagne told you?

22 A     Say again, sir.

23 Q     Can you say again what Brandon Lemagne told you?

24 A     He came straight to my -- about four feet in front of

25 my desk, looked at me and stated that my officer had raped

1  him.

2  Q    Did you ask him who had raped him?

3  A    Yes.  At first, it kind of took me by surprise, and

4  it took me a second to soak that in, and I asked him who

5  had raped him.

6  Q    And did he tell you?

7  A    He said -- he didn't state a name at that time.  He

8  explained the officer that was in the unit and gave a

9  general description of him.

10  Q    Did he say what unit he had been in?

11  A    I believe it was Fox South.

12  Q    Did Brandon Lemagne specify a location within

13  Fox South?

14  A    He said in the middle.

15  Q    And what's in the middle of Fox South housing unit?

16  A    The way the units are broke up between the north and

17  south sides, in between connecting them is a hallway with

18  elevator and a doorway going into the unit team office

19  areas, bathroom, secretary, unit manager, case manager

20  office.

21  Q    During the day, is that area staffed by personnel,

22  then?

23  A    During the day during the week it is.  On off-shift

24  hours, it's usually nobody there.

25  Q    Are there any cameras located in the unit team area?

Steven Arrant - Direct                        86

1  A    I believe out in the unit showing the entrance doors
2  to the hallway is it.  I don't believe there's one in the
3  unit team area.
4  Q    So if someone were to enter the unit team area, once
5  those doors closed, would they be visible on a
6  surveillance camera?
7  A    I don't believe so, no, sir.
8  Q    Okay.  Do you recall exactly or approximately what
9  time Brandon Lemagne entered your office?
10 A    No, sir.  It was mid evening.
11 Q    Would the unit team area have been empty of personnel
12 at that point?
13 A    Normally, unless somebody was working late.  And I
14 don't think anybody was working late that night.
15 Q    So as the operations lieutenant, was there a good
16 reason that you were aware of for an officer to have an
17 inmate in the unit team area in that locked cameraless
18 corridor?
19 A    Absolutely no reason, sir.
20 Q    Would that be concerning to you as the operations
21 lieutenant?
22 A    A little.  If he was transferring one inmate from one
23 side to the other, that would be normal.  Going into the
24 center office areas, there's no reason for the inmate to
25 go in there.

Steven Arrant - Direct                87

1  Q    Would it be even more concerning if that correctional

2  officer was the only officer assigned to monitor a housing

3  bay full of inmates?

4  A    That would include that he would have to abandon his

5  post and abandon his unit to go in there with another

6  inmate.

7  Q    So at this point Brandon Lemagne -- Inmate Brandon

8  Lemagne has entered your office.  He's told you what just

9  happened.  Is it fair to say that at this point,

10  Lieutenant Arrant, your inclination was to hope that he

11  was not telling the truth?

12  A    Absolutely.

13  Q    And after Brandon Lemagne -- and why is that?

14  A    You -- you would hope that none of the staff that you

15  worked with or your subordinates would do something like

16  that.  And typically, inmates manipulate and make

17  accusations.  So it's not unheard of to hear something

18  like that, but you never want it to be true.

19  Q    So once Brandon Lemagne made that statement, did you

20  begin any protocols at that point?

21  A    Yes, sir.  We began -- I safeguarded the inmate,

22  started our PREA, Prison Rape Elimination Act protocols,

23  safeguarded the inmate.

24  Q    If I could stop right there, Lieutenant.  You

25  mentioned PREA, the Prison Rape Elimination Act.  Can you

Steven Arrant - Direct                    88

1  briefly describe what kind of protocols are involved in

2  that process?

3  A     As far as when an inmate makes an allegation, whether

4  staff or another inmate, our first thing that we do is

5  safeguard the inmate.  We're going to separate the inmate

6  from who he says the assailant is.  We're not going to

7  leave that inmate alone.  We're going to escort him to

8  medical to have a medical assessment done on them.

9         And if there's -- if it's needed, he'll be sent

10 to the contract hospital that we send to to collect

11 evidence.  We will make notification.  Psychology will

12 come in and speak with the inmate.  They'll allow the

13 inmate to receive a phone call from a -- I believe a

14 victim counselor of some kind.  I can't remember the name

15 of it, and we go from there.

16        And the investigation gets -- the inmate will be

17 usually interviewed -- usually by our SI staff or somebody

18 appointed by the PREA coordinator to do that, because the

19 operational lieutenant still has an institution to run.

20 This is important.  It needs to be done.  So usually

21 another lieutenant will come in and do the interview.

22 Q     And did you follow those protocol steps in this case?

23 A     Yes, sir.

24 Q     Okay.  Did you arrange for Brandon Lemagne to be

25 separated from the officer who he said had raped him?

1  A    Yes, I did.

2  Q    Did you arrange for an on-call psychologist to

3  interview Brandon Lemagne?

4  A    I did.  I called the on-call psychologist.  And I

5  can't remember what her name was, but I know she came in

6  and spoke with the inmate.

7  Q    Did you also arrange for Lieutenant McWilliams to

8  interview Brandon Lemagne?

9  A    I called our special investigation service

10 supervisor, Mr. Norman, who called Lieutenant McWilliams

11 to come in and do it.

12 Q    So is it fair to say that on FCI Petersburg at this

13 moment there's been sort of a flurry activity?

14 A    Yes, sir.

15 Q    Do you recall, though, in the midst of this activity

16 whether Officer Chikosi Legins began expressing an

17 interest in Brandon Lemagne's whereabouts?

18 A    I received a couple phone calls and overheard quite a

19 few radio calls to medical from Officer Legins trying to

20 track down this inmate.

21 Q    Are you familiar with Officer Legins?

22 A    Yes, sir.

23 Q    Okay.  You worked with him for how long?

24 A    A couple of years.

25 Q    Do you see him here in the courtroom today?

1    A    Yes, I do.

2    Q    Could you please identify him by something he's

3    wearing and where he's seated?

4    A    He's the tall gentleman with the dark suit.

5            MR. GARNETT:  Your Honor, I'd ask the record

6    reflect that Lieutenant Arrant has identified the

7    defendant.

8            THE COURT:  So noted.

9    BY MR. GARNETT:

10   Q    So you said you heard calls from the defendant to the

11   medical office; is that right?

12   A    Yes, sir.

13   Q    Okay.  And could you hear what the defendant was

14   saying in terms of why he needed to contact the medical

15   department?

16   A    He was trying to locate, I believe, Inmate Lemagne.

17   Q    To your knowledge, was Inmate Lemagne assigned to

18   Officer Legins' area of responsibility that night?

19   A    He was not, sir.

20   Q    At some point did the defendant call your office, the

21   lieutenant's office?

22   A    Yes, sir, he did.

23   Q    Okay.  And what did he ask you about or what did he

24   discuss with you?

25   A    He asked if Lieutenant(sic) Lemagne was in medical.

Steven Arrant - Direct

1  Q    Did this strike you as concerning?

2  A    It striked me as odd.

3  Q    Okay.  Would there be any reason for a housing unit

4  officer to inquire as to the location of an inmate not

5  assigned to their housing unit?

6  A    If he had a program or a call-out or something where

7  he was supposed to, for some reason, go to another unit or

8  another area.  But that wasn't the case that night.

9  Q    Did you tell the defendant where Brandon Lemagne was?

10 A    No, sir.  I just told him that -- that the inmate --

11 that --

12 Q    Do you recall --

13 A    I think -- I believe I told him I hadn't seen Inmate

14 Lemagne.

15 Q    At any point in this call did the defendant ask you

16 if you could give him an aspirin for a headache?

17 A    I don't remember that, sir.

18 Q    Did he make any complaint of any kind of medical

19 issue that would need medical treatment?

20 A    Not at all, sir.

21 Q    Did you hear the defendant call medical again after

22 you had spoken to him?

23 A    Yes, sir.

24 Q    Now, you said that the defendant asked -- the

25 defendant was calling medical, correct?

1   A    Yes, sir.

2   Q    Is it fair to say that correctional -- I should ask

3   you.  Are correctional officers trained in the PREA

4   protocols just as lieutenants are?

5   A    Yes, sir, very well trained in it.

6   Q    So is it fair to say that correctional officers would

7   know that a standard part of the PREA protocol would be a

8   trip to medical?

9   A    Yes, sir.  Every staff member is taught that this

10  first step is to safeguard separate -- separate and

11  safeguard the victim, alleged victim, and that they will

12  be taken to the lieutenant's office, who will get them to

13  medical for an assessment.

14  Q    So in speaking to the defendant, Officer Legins, on

15  the phone that evening and listening to his repeated calls

16  to the medical department, was it your impression that the

17  defendant was generally concerned about Inmate Brandon

18  Lemagne's physical well-being?

19  A    I didn't get that impression, sir.  I just got the

20  impression that it was strange that after the inmate told

21  me what he told me, the officer would be trying so hard to

22  find out where this inmate was.

23  Q    And earlier in your testimony here today, Lieutenant,

24  you said that your initial reaction had been to hope that

25  Brandon Lemagne was not telling the truth; is that right?

Steven Arrant - Cross                    93

1   A     That's correct, sir.

2   Q     By the end of the evening, had you come to a

3   different assessment of the situation?

4              THE COURT:  I'm going to sustain that.

5              MR. GAVIN:  Objection to the relevance.

6              THE COURT:  That's totally inappropriate.

7   Move on.

8              MR. GARNETT:  Yes, Your Honor.

9              Your Honor, I have no further questions for

10  Lieutenant Arrant.

11             THE COURT:  All right.  Go ahead, Mr. Gavin.

12                     **CROSS-EXAMINATION**

13  BY MR. GAVIN:

14  Q     Good morning, Lieutenant.

15  A     Good morning, sir.

16  Q     Do you remember testifying in front of the grand

17  jury?

18  A     Yes, sir.

19  Q     And was your testimony before the grand jury under

20  oath?

21  A     Yes, sir.

22  Q     Do you remember being placed under oath?

23  A     Yes, sir.

24  Q     Do you remember being asked the question:  "Okay.

25  Did you know Inmate Lemagne prior to this incident"?

1   A     I don't really remember that question, sir.  I'm sure

2   it was asked, though.

3   Q     Do you remember making this statement:  "I didn't

4   know him well, but he had become a little bit more --

5   needed a little bit more guidance and correction"?

6   A     There's a lot of inmates like that, sir.

7   Q     Well, you indicated earlier in your testimony you'd

8   never had any problems with him.

9   A     No, sir.  I said I never had any major disciplinary

10  problems with him.

11  Q     So what did you mean in here about "he had become a

12  little more -- needing a little bit more guidance and

13  correction"?

14  A     Well, sir, some of the inmates sometimes require --

15  they want a little bit more attention so they'll do

16  something to get an extra pat-down or just a little

17  attention from somebody that's not another inmate.

18  Q     Do you remember also being asked the question whether

19  or not you had made any observations about Mr. Lemagne's

20  appearance?

21  A     Mr. Lemagne, like most of the transgenders that I've

22  had experience with, tend to alter their issued clothing

23  to be tighter than the policies allow.

24  Q     Do you remember answering the question you can't

25  really remember what he was wearing?

1  A    I'm not sure, because sometimes he alters his issued

2  clothing.   Sometimes he would alter his commissary

3  purchased clothing.

4  Q    So do you agree that you testified that you couldn't

5  remember what he was wearing, but you could testify to

6  what you remember as to his demeanor?

7  A    His demeanor was -- he was kind of blank.

8  Q    You testified about different facility items,

9  including cameras.   Are there cameras outside the compound

10  office that monitor entrance and exit to the compound

11  office?

12  A    There's one that shows the compound yard.   I'm not

13  sure if it actually shows the compound door or not.

14  Q    But there is specifically a camera that shows the

15  compound yard?

16  A    Yes.   It shows a great distance from close to very

17  far out.

18          MR. GAVIN:   No other questions.

19          THE COURT:   Any redirect?

20          MR. GARNETT:   Very briefly, Your Honor.

21                    **REDIRECT EXAMINATION**

22  BY MR. GARNETT:

23  Q    Lieutenant Arrant, is it fair to say that your

24  understanding of the disciplinary issues that Brandon

25  Lemagne had was limited to clothing wear issues?

1  A    They were minor, sir.  Yes.

2            MR. GARNETT:  That's all I have, Your Honor.

3            Thank you, Lieutenant Arrant.

4            THE COURT:  All right.  Lieutenant, thank you

5  for your testimony.  You can step down.  I'm going to

6  instruct you not to talk about your testimony with anybody

7  until the trial is over.  Okay?  Thank you.

8            THE WITNESS:  Thank you, sir.

9            (Witness stood aside.)

10           THE COURT:  Do you want to call your next

11 witness?

12           MR. GARNETT:  Yes, Your Honor.  The

13 United States would call Kara Gregor.

14                    **KARA GREGOR,**

15     called by the government, first being duly sworn,

16                  testified as follows:

17           THE COURT:  All right, Mr. Garnett.

18           MR. GARNETT:  Thank you, Your Honor.

19                 **DIRECT EXAMINATION**

20 BY MR. GARNETT:

21 Q    Good morning, Ms. Gregor.

22 A    Good morning.

23 Q    Could you please introduce yourself to the jury and

24 spell your first and last name for the court reporter?

25 A    Yes.  My name is Kara Gregor.  My first name is

Kara Gregor - Direct                97

1   spelled K-A-R-A, and my last name is spelled G-R-E-G-O-R.

2   Q    Ms. Gregor, how are you employed?

3   A    I'm employed by the FBI Laboratory located in

4   Quantico, Virginia, and I am a forensic examiner in the

5   DNA case work unit.

6   Q    What are your responsibilities as a forensic examiner

7   in the DNA case work unit?

8   A    As a forensic examiner in the DNA case work unit, it

9   is my job to manage a case when we receive it at the FBI

10  Laboratory.  And I will review the incoming paperwork that

11  is received and use that incoming paperwork to determine

12  what items to test and which tests to perform on those

13  items.

14           I then direct a team of biologists, who will

15  perform those tests in the laboratory.  And once their lab

16  work is complete, I will review the results.  I will then

17  interpret the data and write a report that outlines my

18  findings and conclusions and then sometimes testify in

19  court to those conclusions.

20  Q    And how long have you been working for the FBI?

21  A    I've been working for the FBI Laboratory since April

22  of 2016.  So it will be four years this April.

23  Q    And to become a forensic examiner for the FBI,

24  Ms. Gregor, did you have any specialized training?

25  A    Yes.  I had an extensive training program at the FBI

1  Laboratory that lasted approximately 27 months.  So that

2  was a little bit over two years.  And my training

3  consisted of learning the serology, DNA interpretation,

4  population genetics and statistics.  I also took a written

5  practical and oral exercises in those areas.  I also was

6  performing case work under a qualified examiner and also

7  participated in moot court exercises.  And at the end of

8  my training program, I took a competency test.  And this

9  test is similar to a final examination to -- so it could

10  show that I could perform case work independently.

11  Q    How were you employed before coming to the FBI?

12  A    Prior to the FBI, I worked at Bode Cellmark Forensics

13  in Lorton, Virginia, and I was there very briefly.  And

14  then prior to Bode Cellmark Forensics, I worked at the

15  Massachusetts State Police crime laboratory for

16  approximately six years, and I was employed in their DNA

17  unit as well as their crime scene response unit.

18  Q    Was your employment in the crime scene response unit

19  there, was that helpful for your current -- was that

20  helpful experience to garner for your current position?

21  A    Yes.  So my job duties in the crime scene response

22  unit involved going to crime scenes and performing testing

23  out in the field, along with collecting evidence and

24  bringing it back to the laboratory to be tested.  And it

25  taught me the different types of items that could be

1   collected and where to swab on those items.

2           So, for example, if I was to collect a cup from

3   a crime scene, I would want to swab the rim and mouth of

4   that cup for DNA.

5   Q    And what's your educational background.

6   A    I have a bachelor of science degree in biochemistry

7   and molecular biology from the University of

8   Massachusetts, with a minor in chemistry.

9   Q    Have you testified as an expert witness in the field

10  of DNA analysis before?

11          MR. GAVIN:  Judge, I'm not challenging her

12  qualifications.

13          THE COURT:  All right.  Then she'll be -- she's

14  testifying as an expert in her area regarding DNA.  So as

15  an expert, she's going to be able to give you her own

16  opinion of certain things that she has analyzed, unlike a

17  normal witness.  So expert witnesses are treated a little

18  bit differently than standard witnesses.

19          At the end of the case, I'm going to give you

20  some specific instructions about this, but you'll see that

21  we're going to treat her a little bit differently because

22  she's going to be able to give some opinions now.  Okay?

23          And she's an expert in what are you offering her

24  as?

25          MR. GARNETT:  DNA analysis, Your Honor.

Kara Gregor – Direct                    100

1          THE COURT:  All right.  She's accepted, then, as

2   an expert in DNA analysis.

3          MR. GARNETT:  Thank you, Your Honor.

4   BY MR. GARNETT:

5   Q    Ms. Gregor, you mentioned earlier when you were

6   talking through your training there was something called

7   serology.  What is forensic serology?

8   A    So serology is the characterization and

9   identification of bodily fluids on items of evidence.

10  Q    And what kind of bodily fluids might you expect to

11  find on evidence?

12  A    Some bodily fluids that we could find on evidence or

13  what we test for at the FBI Laboratory is for blood and/or

14  semen.

15  Q    How does the FBI Laboratory perform serological

16  testing?

17  A    So we have two types of tests that we perform for

18  serological testing.  The first test is called a

19  presumptive test.  And this is a color changing test.

20  It's a quick color changing test where we would swab the

21  item of evidence and see if it changes into a pink to

22  purple color.  And this is where if it's a positive

23  result, then semen and/or blood is indicated on that item.

24          We also have a second test that we perform

25  called a confirmatory test, and this is where we're able

1  to identify blood and/or sperm on an item.

2  Q     And when you're conducting that confirmatory test,

3  what are you looking for to confirm the presence of semen?

4  A     For the confirmatory test of semen, we're looking

5  under a microscope for the presence of sperm cells.

6  Q     And if you're unable to identify the presence of

7  sperm cells, does that conclusively determine, then, that

8  the substance at issue is not semen?

9  A     If we're not able to identify sperm cells, that

10  doesn't mean that sperm cells isn't on that item.  It's

11  just that it's below the detection level of our test.

12  Q     If an individual were to have low sperm count, for

13  instance, would that lower the possibility that a

14  confirmatory test would find the presence of sperm cells?

15  A     Yes.  That could affect it, yes.

16  Q     What are typical reasons for a low sperm count?

17  A     One reason for a low sperm count would be radiation

18  or chemotherapy of an individual.

19  Q     So this will form a lot of your testimony,

20  Ms. Gregor.  What is DNA?

21  A     So DNA stands for deoxyribonucleic acid, and it's the

22  fundamental building blocks of all living organisms.  And

23  it contains all the information for things you can see,

24  such as whether a person has blond hair or brown hair,

25  blue eyes or brown eyes, and whether a person is tall or

1  short.

2  Q    Where would you find DNA in the human body, I should

3  say?

4  A    So DNA is found in cells of the body.  And if you

5  were to think of an egg as a cell, the yolk of that egg

6  would be a nucleus, and that is where the DNA is found.

7  Q    Is there DNA present in individuals' hair?

8  A    Some sources of DNA include hair, but also semen,

9  blood, saliva.

10 Q    And is DNA unique to each particular individual?

11 A    A person's DNA profile is unique to every individual

12 with the exception of identical twins.

13 Q    So when you're looking at DNA, how do you determine

14 between particular individuals?  How do you tell who's DNA

15 belongs to which person?

16 A    So what I look at in the DNA is what is called short

17 tandem repeats, or STRs, and this is what is differing

18 from individual to individual, with the exception of

19 identical twins.  And these are just pieces of DNA that

20 are repeated over and over again.

21 Q    And how is DNA testing performed, very generally, at

22 the FBI Laboratory in Quantico?

23 A    So for the DNA testing process, we have a five-step

24 process.  The first step is called collections, and this

25 is where we will take a cutting from an item of evidence

1   or a swabbing, which is similar to a Q-tip, and rub it on

2   an item of evidence.  And we will put the swabbing or

3   cutting into a tube.

4           The second step of the process is called

5   extraction.  And what we do is we will add chemicals to

6   that tube that contains the evidence to break up those

7   cells to release the DNA.

8           The third step of the process is called

9   quantitation, and quantitation is where we're trying to

10  estimate how much total human DNA we have, but also how

11  much male DNA we have in the sample.

12          From there, the fourth step of the process is

13  called amplification, and this is where we're taking that

14  DNA and making millions and millions of copies of those

15  short tandem repeats that I mentioned earlier that differ

16  from individual to individual and making millions of

17  copies of those.  So it's similar to a Xerox machine.

18          And the last step of the process is separation

19  and detection, and this is where we take those amplified

20  pieces of DNA and we put it on an instrument, and then

21  we'll separate the DNA by its size.  And based on the size

22  or the length of those DNA pieces, it is given a number,

23  and those numbers make up the DNA profile.

24  Q    Is the DNA profile unique, again, to each particular

25  individual?

1  A    Yes.  Again, it's unique to every individual with the

2  exception of identical twins.

3  Q    As a forensic examiner working at the FBI working

4  criminal cases, are you often provided with DNA samples of

5  known individuals?

6  A    Yes.  So we can receive a known DNA profile, and what

7  that is is either a buccal sample, which is a swabbing or

8  Q-tip from the inside of a person's cheek, and we can also

9  receive a blood sample from an individual, and that will

10  be the known DNA profile that we use for comparisons.

11  Q    And what's the point of collecting those known DNA

12  samples to use in your testing?

13  A    So we want the known DNA samples collected and sent

14  to the laboratory so we can perform comparisons to the

15  questioned DNA samples that we have in a case.

16  Q    So when you generate a DNA profile from testing the

17  DNA samples provided to you and you compare that DNA

18  profile to your known DNA profiles, what are the possible

19  results the laboratory will reach?

20  A    Well, there are two main conclusions that we have.

21  So if the numbers or the DNA profile from the known

22  individual is consistent with the questioned DNA profile,

23  then that means the person could have been a contributor

24  and is either included or it's a match.

25           And the second possibility is that the numbers

Kara Gregor – Direct                    105

1  or the DNA profiles are different between the known DNA

2  profile and the questioned sample, and that is when the

3  person of interest could not have been a contributor to

4  the DNA evidence profile.

5  Q    So focusing on that first category, the inclusion,

6  the match I think you called it.  How do you determine,

7  once you've got an inclusion, how strong that match is?

8  A    So we calculate a statistic to give weight to the

9  evidence, and that statistic is called a likelihood ratio,

10  or LR.  And what that is is it's comparing the probability

11  of the evidence under two opposing scenarios.  One of

12  those scenarios is if the person of interest is a

13  contributor to the DNA evidence profile, and the other

14  scenario is if an unknown, unrelated individual is a

15  contributor to the DNA evidence profile.

16  Q    And is that likelihood ratio, is that a statistical

17  number?

18  A    Yes.  The likelihood ratio is a number, yes.

19  Q    And does the FBI use a verbal scale to sort of

20  provide a word corollary to that quantitative number?

21  A    Yes.  So in addition to that likelihood ratio number,

22  we have a verbal scale.  And what that verbal scale is is

23  it's a word equivalency, and it's just words to describe

24  or give meaning or context to what that likelihood ratio

25  number means.

1  Q     When you have a DNA sample -- or I should say when

2  you're testing DNA samples, is it possible to come across

3  samples of DNA profiles of more than one individual?

4  A     Yes.  So if there's a DNA profile from more than one

5  individual, then we call that a mixture profile, or a DNA

6  profile from more than one individual.

7  Q     How many DNA profiles can be present in one sample

8  where the FBI Laboratory can still make a conclusion as to

9  which profiles are involved?

10  A     At the FBI Laboratory, we can only interpret DNA

11  profiles or DNA mixtures up to four individuals.

12  Q     How do you know, Ms. Gregor, that the results that

13  you get at the FBI Laboratory in Quantico are reliable?

14  A     So I know that the results are reliable that I get

15  because we have an extensive quality system in place.  So

16  we have biologists that perform the testing in the

17  laboratory, and they're taking extra precautions to

18  prevent contamination, such as wearing PPE, which is

19  personal protective equipment, such as face masks, gloves

20  and lab coats.  They also open up one item at a time.

21         We also have a review process in place for all

22  of our case work where my file will undergo a technical

23  review, which is where another examiner will review my

24  file and see if they agree with my conclusions.

25         The second review is an administrative review

1  where another examiner will look at my file for any

2  grammatical or spelling typos.

3           And we also are audited externally by another

4  agency where they review our standard operating

5  procedures, which are our step-by-step protocols, and it's

6  similar to following a recipe in a cookbook.  And because

7  of all this, I know that the results are reliable.

8  Q    Is the FBI Laboratory accredited?

9  A    Yes.  The FBI Laboratory is accredited by ANAB, which

10  stands for the American National Standards Institute,

11  National Accreditation Board.

12  Q    And lastly, is your unit, the DNA case work unit, is

13  it held to any particular heightened standards?

14  A    Yes.  In addition to that, we are held to the QAS, or

15  the quality assurance standards, for DNA forensic testing

16  laboratories.  And some of the requirements in this

17  document, we have to meet certain requirements for our

18  training and our background, but also, it tells us that we

19  have to take two proficiency tests per year.

20  Q    So, Ms. Gregor, let's talk now about the DNA testing

21  you performed in this particular case.  So you're here

22  testifying in the case of the *United States v. Chikosi*

23  *Legins*.  Did you receive evidence pertaining to this case?

24  A    Yes.

25  Q    Did that evidence include swabs collected from a

Kara Gregor – Direct                          108

1  forensic exam?

2  A     Yes.

3  Q     Did it include a sweatshirt?

4  A     Yes, it did.

5  Q     Did it include other items of clothing, to include a

6  jock strap and shorts?

7  A     Yes.

8  Q     And did you test each of these categories of evidence

9  at different times?

10  A     Yes.

11  Q     Did you generate a report following each of those

12  tests with your conclusions as to the DNA testing

13  processes?

14  A     Yes, I did.

15  Q     Okay.

16          MR. GARNETT:  Your Honor, at this point I would

17  go ahead and ask to -- we've already published again

18  stipulations 1 and 2, but I'd ask to read joint

19  stipulation 3 into evidence, Your Honor.  It's in regards

20  to the testimony of biologist-forensic examiner Kara

21  Gregor.

22          THE COURT:  That's fine.

23          MR. GARNETT:  Thank you, Your Honor.

24          "The FBI Laboratory at Quantico, Virginia,

25  employs a DNA testing procedure that involves an

1  assignment coordinator, who assigns a particular DNA

2  testing task; biologists, who prepare and process the DNA

3  samples; and an analyst, who completes the actual DNA

4  analysis and comparison.  The analyst is involved and

5  directs the laboratory's DNA testing process and then

6  completes the analysis on the test results that the

7  process generates.  The FBI analyst assigned to this

8  particular investigation, Forensic Examiner Kara R.

9  Gregor, is accordingly able to provide testimony as

10  regards both the FBI Laboratory's DNA testing process and

11  her subsequent analysis of the DNA testing results."

12            Thank you, Your Honor.

13            THE COURT:  All right.  Folks, it's just like

14  every other stipulation.  You can accept that as proven.

15  Okay?

16            Go ahead, Mr. Garnett.

17            MR. GARNETT:  Thank you, Your Honor.

18  BY MR. GARNETT:

19  Q    Ms. Gregor, during this investigation, were you

20  provided with a DNA sample from the defendant in this

21  case, Chikosi Legins?

22  A    Yes.

23            MR. GARNETT:  And if I could go ahead,

24  Your Honor, and show the witness Government Exhibit 19?

25            THE COURT:  Has that been admitted yet?

1          MR. GARNETT:  It has, Your Honor.

2  BY MR. GARNETT:

3  Q    And you can reach inside there, Ms. Gregor.  Do you

4  recognize that item, Ms. Gregor?

5  A    Yes.

6  Q    What is that?

7  A    It is a buccal sample from Mr. Legins.

8  Q    And is that the sample that you used to create a

9  known profile for the defendant, Chikosi Legins?

10  A    Yes.

11  Q    And you can set that aside, ma'am.

12          MR. GARNETT:  And, Officer Spivey, could I ask

13  you to present the witness with what is Government

14  Exhibit 18.  Thank you.

15  BY MR. GARNETT:

16  Q    Do you recognize that item, Ms. Gregor?

17  A    Yes.

18  Q    What is that?

19  A    This is a buccal sample from Mr. Jackson.

20  Q    And did you use that buccal sample to create a known

21  profile for Ronzell Jackson?

22  A    Yes.

23  Q    So we're going to work in chronological order here,

24  Ms. Gregor.  Did you complete a DNA laboratory report on

25  November 15th, 2018, that contains your findings or

1  described your findings as to the first category of

2  evidence that you tested, which was a series of swabs?

3  A    Yes.

4  Q    All right.

5        MR. GARNETT:  And, Your Honor, I'd ask to go

6  ahead and show the witness what's been marked as

7  Government Exhibit 15.

8        THE COURT:  All right.  Any objection from the

9  defense?

10        MR. GAVIN:  No, sir.

11        THE COURT:  All right.  Do you want to introduce

12  it?

13        MR. GARNETT:  I was going to create a little bit

14  more foundation, Your Honor, but we will eventually.

15        THE COURT:  Well, he just said he doesn't object

16  to it.  So is there any reason why I can't introduce it

17  now?

18        MR. GARNETT:  I'd move Government Exhibit 15

19  into evidence.

20        THE COURT:  It will be admitted.  And then you

21  can ask whatever you want to ask.

22        MR. GARNETT:  Thank you, Your Honor.

23  BY MR. GARNETT:

24  Q    Ms. Gregor, I believe you have an identical copy of

25  Government Exhibit 15 in your binder; is that right?

1  A    Yes, I do.

2          MR. GARNETT:  Your Honor, I'd ask the witness be

3  allowed to review that as opposed to --

4          THE COURT:  Of course.

5          MR. GARNETT:  Thank you.

6  BY MR. GARNETT:

7  Q   You can open that up, Ms. Gregor, to your

8  November 15th, 2018, report.

9          MR. GARNETT:  Your Honor, at this point I'd also

10 move to publish -- actually, it's already been published

11 as well.  We'd just note, Judge, that the three reports

12 that Ms. Gregor will be testifying here to today,

13 Government's Exhibit 15, 16 and 17, were all noted in the

14 authenticity stipulation, paragraph 6 of the parties'

15 joint stipulations.

16         MR. GAVIN:  That's correct.

17         THE COURT:  Well, he's -- you're not objecting

18 to any of these coming in, right?

19         MR. GAVIN:  No, sir.

20         THE COURT:  So 15, 16 and 17, those reports will

21 be admitted.

22         MR. GARNETT:  Thank you, Your Honor.

23         THE COURT:  And now you can just ask her what

24 the reports mean.

25         MR. GARNETT:  Thank you, Your Honor.

Kara Gregor – Direct                    113

1        THE COURT:  Fifteen we have on the screen right

2   now for the folks, right?

3        MR. GARNETT:  I believe we did do, Your Honor.

4   Okay.

5        THE COURT:  All right.  So why don't you ask her

6   what all this stuff means.

7        MR. GARNETT:  Yes, Your Honor.

8        Your Honor, if I could go ahead and have the --

9   Officer Spivey, could you please present the witness with

10  Government Exhibit 4?

11  BY MR. GARNETT:

12  Q    If you could just reach into that, Ms. Gregor --

13  thank you -- and pull that out.  Do you recognize that

14  box, Ms. Gregor?

15  A    Yes.

16  Q    And what is that box?

17  A    This is a sexual assault kit that was collected from

18  Mr. Lemagne.

19  Q    Okay.  And can you open that box up, please?  Can you

20  confirm, Ms. Gregor, that box contains a series of small

21  envelopes marked as Government's Exhibit 4-A through 4-H?

22  A    Yes.

23  Q    Are these the items that you tested and that your

24  November 15th, 2018, report references?

25  A    Yes.

1  Q    Can you turn specifically to Exhibit 4-H of those

2  envelopes, Ms. Gregor?  What is Exhibit -- I'm sorry --

3  Government Exhibit 4-H, Ms. Gregor?

4  A    This is the dried blood sample from Mr. Lemagne.

5  Q    Did you use that dried blood sample as the known

6  profile sample for Brandon Lemagne?

7  A    Yes.

8  Q    So let's turn now, Ms. Gregor, to Government

9  Exhibit 4-C, that envelope.  And what is that exhibit,

10 Ms. Gregor?

11 A    This exhibit is the anorectal swabs collected from

12 Mr. Lemagne.

13 Q    And in your report, did you mark that -- what we have

14 marked as Government Exhibit 4-C, is that item number 5 in

15 your November 15th report?

16 A    Yes.

17 Q    So let's talk specifically about that item,

18 Ms. Gregor.  And you can set that aside, Ms. Gregor.  I

19 know your desk is getting sort of crowded there.

20         Did you submit that anorectal swab -- or those

21 anorectal swabs to serological testing?

22 A    Yes, I did.

23 Q    Okay.  What were the results?

24 A    So the anorectal swabs was examined for the presence

25 of semen.  However, none was detected.

1  Q     All right.  Did you also submit that -- those

2  anorectal swabs for DNA testing?

3  A     Yes.

4  Q     Okay.  And did you form a conclusion as to those

5  tests?

6  A     Yes.

7  Q     And before you start there, Ms. Gregor, is your

8  conclusion noted at the top of page 2 of your report?

9  A     Yes.

10          MR. GARNETT:  Ms. Taylor, if I could ask you

11  just to pull up page 2.  I'm sorry.  The bottom of that

12  report.  If you could pull up the -- or blow up the bottom

13  portion of that screen there.

14  BY MR. GARNETT:

15  Q     Thank you, Ms. Gregor.  I cut you off there.  But

16  could you please walk the jury through your conclusion as

17  to the anorectal swabs?

18  A     Sure.  So I examined the anorectal swabs for DNA

19  testing, and male DNA was obtained from this item.  I then

20  interpreted the DNA profile as originating from two

21  individuals, one of whom is Mr. Lemagne.

22          I then compared Mr. Legins' DNA known profile to

23  this evidence sample, or profile, and determined that he

24  was included.  And the DNA results from the anorectal

25  swabs are 29 sextillion times more likely if Mr. Lemagne

Kara Gregor – Direct                                116

1   and Mr. Legins are contributors than if Mr. Lemagne and an

2   unknown, unrelated person are contributors.  And this

3   provides very strong support for inclusion that Mr. Legins

4   is a contributor to the DNA evidence profile obtained from

5   the anorectal swabs.

6           I then compared the known DNA profile from

7   Mr. Jackson to the evidence sample, and he was excluded as

8   a potential contributor to the anorectal swabs.

9   Q    Okay.

10          MR. GARNETT:  Ms. Taylor, if you could pull up

11   page 4 of that report.

12          THE COURT:  Just so we're clear, so we know what

13   we're talking about, item 5 is the anorectal swab that was

14   taken from Brandon Lemagne?

15          THE WITNESS:  Correct.

16          MR. GARNETT:  And, Ms. Taylor, if you could blow

17   up what follows behind footnote 5 there, up to the top of

18   the screen there.

19   BY MR. GARNETT:

20   Q    Ms. Gregor, you talked about that verbal scale.  Is

21   this the verbal scale that you referenced earlier?

22   A    Yes.  So when we calculate a statistic and what that

23   likelihood ratio number is, we have a verbal scale, or a

24   word equivalency, to give context to what that likelihood

25   ratio number means.

1 Q    Is there a category of confidence the FBI uses that's

2 greater than very strong support for inclusion?

3 A    No.  The highest level that we have for our

4 inclusions is very strong support for inclusion, and that

5 is when the likelihood ratio number is greater than or

6 equal to 1 million.

7 Q    And the number that you referenced, the likelihood

8 ratio was 29 sextillion; is that correct?

9 A    Yes.

10 Q    Are you aware of the approximate population of the

11 earth at present?

12 A    We have approximately 7 billion people on -- or in

13 the world, yes.

14 Q    And behind that 7 for 7 billion, how many zeros

15 follows?

16 A    For 7 billion, it is 9 zeros.

17 Q    So to go back to the number that you referenced in

18 your chart, 29 sextillion, how many zeros would fall after

19 the 29 there.

20 A    So it would be 29, followed by 21 zeros.

21 Q    Now, Ms. Gregor, in regards to the serological

22 testing that you noted you performed on item number 5,

23 those anorectal swabs, your report notes that you did not

24 detect any semen on the anorectal swabs; is that right?

25 A    Correct.

1  Q    If an individual were to have ejaculated outside of

2  Brandon Lemagne, say catching semen in their hand, would

3  you expect to find any of that individual's semen on

4  anorectal swabs from Brandon Lemagne?

5  A    I would not -- that would be my expectation, no.

6  Q    So, Ms. Gregor, let's go ahead and turn to what's

7  marked as --

8        MR. GARNETT:  If I could pull what's marked as

9  Government's Exhibit 16, Ms. Taylor.

10 BY MR. GARNETT:

11 Q    If you look at the screen there, Ms. Gregor.  I'll

12 let you turn to your report here in just a second.  Do you

13 recognize this, what's on the screen there?

14 A    Yes.  This is a copy of the report that I made.

15 Q    Okay.  And what's the date of that report?

16 A    The date is December 13th, 2018.

17 Q    And do you have a corresponding copy of that report

18 in your binder there?

19 A    Yes.

20 Q    Okay.  Please feel free to turn to that.

21        MR. GARNETT:  And, Your Honor, I ask that we

22 provide -- I'm sorry.

23        Ms. Taylor, could you please pull up what's been

24 entered as Government's Exhibit 10-A?

25 BY MR. GARNETT:

1  Q    Ms. Gregor, this has already been entered into

2  evidence.  It's a photograph of the contents of Government

3  Exhibit 10.  Do you recognize the item depicted in this

4  photograph?

5  A    Yes.  This is the gray sweatshirt that was sent in

6  that we performed testing on.

7  Q    And, Ms. Gregor, what item number did the FBI assign

8  this particular government exhibit?

9  A    It was item number 20.

10 Q    And when this item arrived at your laboratory up

11 there in Quantico, Ms. Gregor, did you submit this item to

12 black light testing?

13 A    Yes.  So part of our serological screening process,

14 we have what is called an alternate light source.  And

15 this is similar to using a black light or a flashlight in

16 a dark room to see if there's any areas that will

17 fluoresce.

18 Q    And what kind of items would fluoresce under a black

19 light, Ms. Gregor?

20 A    So, for example, if there was semen or blood on an

21 item, those particular body fluids would fluoresce under

22 that light.

23 Q    Did the black light testing you performed on item

24 number 20, the sweatshirt Brandon Lemagne was wearing, did

25 any of the items on that sweatshirt fluoresce?  I'm sorry.

Kara Gregor – Direct                    120

1    Did any of the areas in that sweatshirt

2  fluoresce?

3  A    Yes.

4  Q    And how did you indicate -- or I should say did you

5  indicate the areas that had stains that fluoresced on that

6  sweatshirt?

7  A    So the areas that fluoresced and gave results were

8  circled or outlined by the biologist in the laboratory,

9  and that line was the blue coloring.

10       MR. GARNETT:  And, Ms. Taylor, if you could blow

11  up the left half of that sweatshirt as we see it on the

12  screen.  Thank you, Ms. Taylor.

13  BY MR. GARNETT:

14  Q    Ms. Gregor, as you're looking there at what's

15  decently large size enough, do you see any black circles

16  enclosed within the blue markings that the FBI Laboratory

17  put on there?

18  A    Yes.

19  Q    And what did you understand those black markings to

20  be, those black circles?

21  A    I understood that these markings were performed or

22  done by Mr. Lemagne.

23  Q    Is it important for you to know so you know which

24  areas to test as well?

25  A    No.  We will test the whole sweatshirt to examine to

Kara Gregor – Direct                    121

1   see if any other areas will fluoresce and if there's any

2   other staining.

3   Q    So based on the black light results that you got on

4   this sweatshirt, Ms. Gregor, did the lab then conduct

5   serological testing on the sweatshirt?

6   A    Yes.

7   Q    Okay.

8           MR. GARNETT:  And, Ms. Taylor, if you could go

9   back to Government Exhibit 16 now?

10  BY MR. GARNETT:

11  Q    And what were the results of the serological testing

12  on that sweatshirt, Ms. Gregor?

13  A    So the sweatshirt, we performed a chemical test for

14  the possible presence of semen, and that was positive on

15  the sweatshirt.  However, the presence of semen was not

16  confirmed.

17  Q    All right.  Did you also conduct DNA testing on this

18  particular item?

19  A    Yes.

20  Q    Okay.  And is that -- are your conclusions noted at

21  the top of page 2 of your report?

22  A    Yes.

23           MR. GARNETT:  Ms. Taylor, could you blow those

24  up for me, please, the very top of the screen?

25  BY MR. GARNETT:

1  Q    And what were your conclusions, Ms. Gregor, as to the

2  DNA testing results on that sweatshirt?

3  A    So we took a swabbing from the stain on the outside

4  right sleeve and the inside cuff of that sweatshirt, and

5  male DNA was obtained from that item.  I interpreted the

6  DNA profile as originating from three people, and I then

7  compared the known DNA profile from Mr. Lemagne and

8  determined that he was included.  And the DNA results from

9  item 20, stain 1, are 78 octillion times more likely if

10 Mr. Lemagne and two unknown, unrelated people are

11 contributors than if three unknown, unrelated people are

12 contributors.  So this provides very strong support for

13 inclusion of Mr. Lemagne as being a contributor to the DNA

14 evidence profile obtained from this item.

15        I then compared Mr. Legins' DNA known profile to

16 this sample and determined that he was also included.  And

17 the DNA results from this item, or item 20, stain 1, are

18 66 quintillion times more likely if Mr. Legins and two

19 unknown, unrelated people are contributors than if three

20 unknown, unrelated people are contributors.  And this

21 provides very strong support for inclusion of Mr. Legins

22 being a contributor to the DNA profile obtained from this

23 item.

24 Q    All right, Ms. Gregor.  So quintillion is a different

25 number than sextillion.  How many zeros would follow the

1  66 in 66 quintillion?

2  A    For 66 quintillion, it's 66 followed by 18 zeros.

3  Q    Let's move on, Ms. Gregor, now to Government

4  Exhibit 17.  Did you eventually test additional evidence

5  in this case in the following year, in the spring of 2019?

6  A    Yes.

7  Q    And did you also prepare a report documenting your

8  conclusions as to that testing?

9  A    Yes.

10  Q    Okay.  And looking at your screen there, do you

11  recognize what has been entered as Government Exhibit 17?

12  A    Yes.

13  Q    What is that?

14  A    This is a copy of my report.

15  Q    And you, again, have a corresponding copy of that

16  report in your binder?

17  A    I do.

18  Q    Please feel, again, free to reference that.

19         MR. GARNETT:  Ms. Taylor, if I could show the

20  witness Government Exhibit 12-A.

21         And this has already been entered into evidence,

22  Your Honor.

23  BY MR. GARNETT:

24  Q    Ms. Gregor, this photograph was entered into evidence

25  already, but it's a photograph of the contents of a bag of

1  evidence.  Do you recognize the items depicted in this

2  photograph?

3  A    Yes.  This photograph contains two of the items that

4  were -- that I tested for DNA.

5  Q    Okay.  And what items were those?

6  A    It was the jock strap and also the shorts.

7  Q    And what item numbers -- looking at your July 10th

8  report here, what item numbers did the FBI Laboratory

9  assign to those two items?

10 A    So item number 21 was the jock strap, and item 22 was

11 the shorts from Mr. Lemagne.

12        MR. GARNETT:  Your Honor, I'd just note at this

13 point that the stipulations note that the Government

14 Exhibit -- Government Exhibit 12 correlates to item number

15 21 in the FBI's numbering system, and Government

16 Exhibit 13 correlates to item number 22, the shorts.

17        MR. GAVIN:  No objection.

18        THE COURT:  Okay.

19        MR. GARNETT:  Thank you, Your Honor.

20 BY MR. GAVIN:

21 Q    So, Ms. Gregor, did you subject -- let's start

22 with -- we'll work our way left to right here.  Starting

23 with item number 21, that jock strap, did you subject that

24 item to serological testing -- I'm sorry to black light

25 testing?

1   A      Yes.

2   Q      And did the black light testing -- and did any of

3   these stains on that item fluoresce?

4   A      Yes.  The biologist looked with the flashlight, or

5   the black light, and there were areas that fluoresced.

6   Q      So based on those positive black light results, did

7   you then submit that item for serological testing?

8   A      Yes.

9   Q      And what were the serological testing results for

10  that item?

11  A      For item 21, the jock strap, semen was indicated on

12  that item.

13  Q      Did you then perform a confirmatory test?

14  A      Yes.

15  Q      And was the confirmatory test able to confirm the

16  presence of semen on that item?

17  A      No.  It was negative.

18  Q      Okay.  Did you also conduct DNA testing on item

19  number 21, the victim's jock strap?

20  A      Yes.

21  Q      Okay.  And what were your conclusions -- actually,

22  let me pull this up here, Ms. Gregor.  Did you reach

23  conclusions as to that jock strap?

24  A      Yes.

25  Q      Okay.  And are those conclusions noted on page 2 of

1  your report?

2  A    Yes.

3          MR. GARNETT:  And, Ms. Taylor, if we can go back

4  to Government Exhibit 17 and blow up that chart there in

5  the middle.  Thank you.

6  BY MR. GARNETT:

7  Q    So, Ms. Gregor, can you walk the jury through your

8  findings as to the DNA found on that jock strap?

9  A    So we took a cutting of the stain from the inside

10  back crotch region of the strap junction of the jock strap

11  and performed DNA analysis on it.  And male DNA was

12  obtained from this item.  And I interpreted the DNA

13  profile as originating from two individuals, one of whom

14  is Mr. Lemagne.  I then compared Mr. Legins' known DNA

15  profile this sample and determined that he was included.

16          And the DNA results from item 21, stain 1, are

17  1.3 quadrillion times more likely if Mr. Lemagne and

18  Mr. Legins are contributors than if Mr. Lemagne and an

19  unknown, unrelated person are contributors.  And this

20  provides very strong support for inclusion that Mr. Legins

21  is the potential contributor to the DNA evidence profile

22  obtained from this item.

23          I then compared Mr. Jackson's known DNA profile

24  to this sample, and he was excluded as a potential

25  contributor to the cutting of the stain from the inside

1  back crotch region at the strap junction of the jock

2  strap.

3  Q    Okay.  Looking at that number, the 1.3 quadrillion,

4  how many zeroes would fall after the 1.3 there on

5  quadrillion?

6  A    So it's 1.3, followed by 14 zeros.

7           MR. GARNETT:  Ms. Taylor, I apologize for making

8  you jump around.  Go back to the photograph there,

9  Government Exhibit 12-A.

10  BY MR. GARNETT:

11  Q    All right.  Looking at the item there in the middle,

12  Ms. Gregor, that gray pair of shorts, did you also subject

13  that pair of shorts taken from Brandon Lemagne to black

14  light testing?

15  A    Yes.

16  Q    And did anything on that pair of shorts fluoresce?

17  A    Yes.

18  Q    So based on that fluorescing, did you then submit

19  those shorts to serological testing?

20  A    Yes.

21  Q    And what were the results of that serological

22  testing?

23  A    For item 22, the shorts, semen was indicated on that

24  item.

25  Q    And did you then confirm -- I'm sorry -- prepare --

Kara Gregor – Direct                    128

1  I'm sorry -- conduct confirmatory testing on that item as

2  well?

3  A    Yes, but it was negative.

4  Q    Did you also conduct DNA testing on that pair of

5  shorts?

6  A    Yes.

7  Q    Okay.  And did you reach conclusions?

8  A    Yes.

9  Q    Okay.  And are these indicated at the top of page 3

10  of your report?

11  A    The bottom of page 2 and top of page 3, yes.

12  Q    All right.  You're ahead of me.

13         MR. GARNETT:  Ms. Taylor, if you could just blow

14  up the chart.  I think it's fine.  Thank you.

15  BY MR. GARNETT:

16  Q    All right.  Ms. Gregor, could you please walk the

17  jury through your findings as to the DNA profiles found on

18  Brandon Lemagne's shorts?

19  A    So we took a cutting of the stain from the outside

20  back of the shorts and processed that for DNA testing.

21  And male DNA was obtained from that item, and I

22  interpreted the DNA profile as originating from two

23  individuals, one of whom is Mr. Lemagne.

24         I then compared Mr. Legins' known DNA profile to

25  the sample and determined that he was included.  And the

1   DNA results from item 22, stain 1, are 52 quadrillion

2   times more likely if Mr. Lemagne and Mr. Legins are

3   contributors than if Mr. Lemagne and an unknown, unrelated

4   person are contributors.  And this provides very strong

5   support for inclusion that Mr. Legins is a contributor to

6   the DNA evidence profile obtained from this item.

7           I then compared Mr. Jackson's known DNA profile

8   to this sample, and it was determined that he was excluded

9   as a potential contributor to this item.

10  Q    Thank you.

11          MR. GARNETT:  Ms. Taylor, could you please pull

12  up Government Exhibit 11-A?

13  BY MR. GARNETT:

14  Q    Ms. Gregor, this photograph has already been entered

15  into evidence as Government Exhibit 11-A, and it depicts

16  the contents of Government's Exhibit 11.  Do you recognize

17  the items depicted in this photograph?

18  A    Yes.

19  Q    And did you test any of the items in this photograph?

20  A    Yes.  In this photograph, the poncho was tested for

21  DNA.

22  Q    Okay.  Just because that's not what I would picture a

23  poncho looking like, can you just circle there on the

24  screen where the poncho is located?

25  A    Whoops.

1   Q      Thank you.  All right.  Did you perform serological

2   testing on this poncho?

3   A      Yes.

4   Q      Okay.  And what did the serological testing results

5   come back on on that poncho?

6   A      Semen was indicated on item 29, which was the poncho.

7   Q      Okay.  And were you able to perform DNA testing on

8   this item?

9   A      Yes.

10  Q      And what were the results of the DNA testing?

11  A      So we took a swabbing from the stain from the inside

12  back upper left of the poncho, and that was submitted for

13  DNA testing.  And there was no DNA or sex typing results

14  obtained from this item.  Therefore, no comparisons can be

15  made.

16  Q      And is that kind of result possible when there's

17  simply not enough DNA to permit testing?

18  A      Correct.

19  Q      So, Ms. Gregor, looking at --

20          MR. GARNETT:  Well, we can -- actually, let's go

21  back to Government Exhibit 12-A, Ms. Taylor.

22  BY MR. GARNETT:

23  Q      So, Ms. Gregor, looking at Exhibit 12-A, you

24  mentioned that you tested two of the items located in this

25  photograph; is that right?

1   A    Yes.

2   Q    Okay.  The photograph shows that those items arrived

3   in the same packaging.  Is that something, as a forensic

4   examiner, that raises concerns to you about something

5   called cross-transfer?

6   A    That is a possibility that can occur where DNA can

7   transfer from one item to another if they are packaged in

8   the same packaging.  But the preferred method is to have

9   each individual item packaged separately.

10  Q    In this case, the fact that those two items were

11  packaged together, does the possibility of cross-transfer

12  in any way undermine your confidence in the statistical

13  results you reached as to the DNA profiles you found?

14  A    No.  Again, for DNA testing, I can't say how DNA got

15  on an item of evidence.  We simply just process those

16  items and obtain a DNA profile and perform comparisons and

17  state those comparisons in the report.

18              MR. GARNETT:  Thank you, Ms. Gregor.

19              THE COURT:  All right.  Any cross?

20              MR. GAVIN:  Yes, sir, unless you want to do

21  lunch now?

22              THE COURT:  No.  Let's keep moving.

23              MR. GAVIN:  Okay.

24                      **CROSS-EXAMINATION**

25  BY MR. GAVIN:

1  Q     Good morning.

2  A     Good morning.

3  Q     Ms. Gregor, you have testified countless times for

4  the FBI, correct?

5  A     Yes.

6  Q     And because of that, you would be familiar --

7            MR. GAVIN:  Mr. Spivey, if I could show you

8  this.

9            THE COURT:  Do you want to tell us what the

10 exhibit number is?

11           MR. GAVIN:  It would be Number 13(sic).

12           THE COURT:  Okay.  Is this in your book or not?

13           MR. GAVIN:  No.  This is just for

14 cross-examination.

15           THE COURT:  Okay.  Go ahead.  You can show it to

16 the witness.

17 BY MR. GAVIN:

18 Q     You would be familiar with standards set forth from

19 the FBI about how you can testify at trial, correct?

20 A     Yes.

21 Q     Okay.  Can you turn over to paragraph 5 of that

22 document?

23           THE COURT:  Do you have a copy for me?

24           MR. GAVIN:  For --

25           THE COURT:  All right.  Go ahead.  We'll see if

1   I need it.  It's more important that you all have it.  If

2   there's an issue, I'll take a look at it.

3   BY MR. GAVIN:

4   Q    Can you read the title to the document first,

5   Ms. Gregor, on the front page?

6   A    So on page 4 of 6, for 5 it says, "Statements not

7   approved for FBI Autosomal DNA Testimony and/or Laboratory

8   Reports."

9   Q    All right.  So what's 5.1 say?

10  A    5.1 says, "Absolute identification."  And then

11  followed by, "An examiner may not state or imply that a

12  match provides an absolute identification of the

13  individual from whom the biological material originated."

14  Q    So is it my understanding that you're not trying to

15  say that as any part of any opinion you've rendered?

16  A    Correct.

17  Q    What about 5.2?

18  A    For 5.2, it says, "Reasonable Degree of Scientific

19  Certainty," followed by, "An examiner may not state or

20  imply that any conclusion is to a reasonable degree of

21  scientific certainty unless required by a judge or

22  applicable law."

23  Q    So just so we're clear, you're not saying that any of

24  your conclusions are to a reasonable degree of medical or

25  scientific certainty?

Kara Gregor - Cross                    134

1  A      Correct.

2  Q      Could you read number 5.4?

3  A      5.4 says, "Zero Error Rate," followed by, "An

4  examiner may not state or imply that the procedures used

5  to perform the interpretation and comparisons of

6  autosomal-based DNA testing have a zero error rate or are

7  infallible."

8  Q      Could you flip to the front page and just read into

9  the record what the title of this protocol is?

10  A      Yes.  The title of this standard operating procedure

11  is the "FBI Approved Standards for Scientific Testing and

12  Report Language for Autosomal DNA Testing."

13          MR. GAVIN:  Judge, I'd like to admit that as

14  my 12.

15          THE COURT:  Any objection to that?

16          MR. GARNETT:  No objection.

17          (Defendant Exhibit Number 12 was admitted.)

18          THE COURT:  Let me just ask you this,

19  Ms. Gregor.  Is that the reason why you use those terms,

20  though, exclusion, limited support, uninformative, limited

21  support, moderate support, strong support, very strong

22  support?

23          THE WITNESS:  That is part of the reason, yes.

24          THE COURT:  Okay.

25          MR. GARNETT:  Your Honor, just very briefly, I

Kara Gregor - Cross                    135

 1  think we might already have a Defense Exhibit 12.  We

 2  might want to --

 3          MR. GAVIN:  Your Honor --

 4          THE COURT:  I'll tell you what we're going to do

 5  is at the end of the day -- I'm not taking these folks'

 6  time up.  We're going to fix all your numbering, because I

 7  think -- we need a mathematical course for you, Mr. Gavin.

 8          MR. GAVIN:  I understand.

 9          THE COURT:  Unfortunately, you went to law

10  school, but --

11  BY MR. GAVIN:

12  Q    Ms. Gregor, I'd like to hand you another document, if

13  I could.  Could you read -- do you recognize that

14  document, first?

15  A    Yes, I do.

16  Q    Is that an FBI-approved document?

17  A    Yes.

18  Q    And what's the title of that document, Ms. Gregor?

19  A    So this is your standard operating procedure or the

20  step-by-step instructions that the biologist will follow

21  for testing, and the title of this document is "Procedures

22  for the One-Step Acid Phosphatase Spot Test."

23  Q    All right.  So tell the jury a little bit about the

24  one-step acid phosphatase spot test?  Is that the test

25  you're talking about when you say that the semen was

1  indicated?

2  A    Yes.  So this is the standard operating procedure for

3  the presumptive test of semen.  So if we receive a

4  positive result for this presumptive test for semen, then

5  that means that semen is indicated on an item.

6  Q    So every time you've told the jury that semen was

7  indicated, you're referring them to a positive result

8  based on this test?

9  A    Yes.

10  Q    All right.  I'd ask you to flip over, if you could,

11  to paragraph 10.1 of this same document.  Could you read

12  aloud the contents of paragraph 10.1?

13  A    So 10.1 says, "A positive result, (i.e., a pink to

14  purple color) with the AP spot test solution provides a

15  presumptive indication that semen may be present on an

16  item, but it does not constitute an identification of

17  semen.  A confirmatory testing procedure is required to

18  identify the presence of semen in a questioned stain."

19  Q    So every time you've told the jury that semen was

20  indicated, it was never confirmed, was it?

21  A    Correct.  It was only indicated on the item and not

22  confirmed.

23  Q    So none of your opinion includes a conclusion on your

24  part that there was actually semen on any of the tests

25  that you conducted?

1  A    That is correct.  I can only state that semen was

2  indicated on those items.  However, it was not identified

3  on those items.

4  Q    How does the acid phosphatase test work?  What's it

5  based upon?

6  A    So it is a color-changing test where we take a

7  swabbing and rub it against an item of evidence, and we

8  will add the acid phosphatase, which is a chemical, to

9  that swab, and if it turns pink to purple color, then that

10 is giving a positive result for the presumptive testing of

11 semen.

12 Q    But isn't the fundamental function of the test to

13 test to see whether a particular enzyme is present?

14 A    Yes.  We are -- so what the test is for is detecting

15 semenogelin, which is part of semen, and that is what it's

16 looking for.

17 Q    What's it also part of?

18 A    So the presumptive test is not a conclusive

19 identification of semen because it can react with other

20 fluids and give a positive result.

21 Q    So it could test positive if, for example, sweat was

22 the origin of the fluid?

23 A    I wouldn't say sweat.  There are other fluids that it

24 will give a positive result for, such as vaginal fluid.

25 Q    There are no other fluids?  You're saying there are

Kara Gregor - Cross                    138

1   no other fluids that would contain the same enzyme?

2   A     No, I'm not saying that.  That's just one of the

3   examples.  The other example would be male urine.  That's

4   another example where it could be a positive result.

5   Q     All right.  I'd like to move forward to your

6   particular test.

7             MR. GAVIN:  Judge, and I will endeavor to get

8   the numbers correct, but I'd like to move that particular

9   exhibit in as the next exhibit into evidence.  Whatever

10  that number --

11            THE COURT:  Any objection?

12            MR. GARNETT:  No objection, Your Honor.

13            MR. GAVIN:  -- may ultimately be.

14            THE COURT:  We'll figure the numbers out later

15  on today.

16            (Defendant Exhibit Number 13 was admitted.)

17  BY MR. GAVIN:

18  Q     Ms. Gregor, if I could refer you to Government's

19  Exhibit 15, which you just testified about.  Let me know

20  when you're ready.  Are you ready?

21  A     Yes.

22  Q     There's several items on Government's Exhibit 15; is

23  that correct?

24  A     Yes.

25  Q     Did you test all of those items on the front page,

1  which are not in numerical order, but they start at item 1

2  on the top and item 62 at the bottom of the page?

3  A    Yes.  Those are all the items that were tested.

4  Q    So out of all these items on this page, is there only

5  one item that indicated initially for the presence of

6  semen through the AP test?

7  A    Of all the samples that were tested in this report,

8  they were all examined -- well, not all, but some of the

9  items were examined for the presence of semen.  However,

10 none was detected, and there was no positive presumptive

11 result.

12 Q    So that would include the oral swabs that are

13 indicated as item 9 on this report?

14 A    Yes.  So the oral swabs, item 9, was examined for the

15 presence of semen.  However, none was detected.

16 Q    Was any DNA detected on the oral swabs?

17 A    Male DNA was detected on the oral swabs, meaning the

18 sex typing results.  So we can tell whether a DNA profile

19 is from a male or female from three locations that we look

20 at.  However, no DNA typing results unlike Mr. Lemagne was

21 obtained from the oral swabs.  Therefore, no comparisons

22 were made to Mr. Legins and Mr. Jackson.

23 Q    If Mr. Lemagne had been forcibly orally raped, would

24 you typically expect to see DNA in the oral swab of the

25 victim?

1   A     It's possible, yes.

2   Q     There were also swabs taken from the lips area of

3   Mr. Lemagne, item 11; is that correct?

4   A     Yes.

5   Q     And did you conduct testing on item 11?

6   A     Yes.   Item 11, the swabs from the lips and the lip

7   area from Mr. Lemagne, were tested for the presence of

8   semen.   However, none was detected.   And also underwent

9   DNA testing, and male DNA was obtained from the lip swab

10  or lip area.   And no DNA typing results unlike Mr. Lemagne

11  were obtained from that item.   Therefore, no comparisons

12  were made to Mr. Legins and Mr. Jackson.

13  Q     Ms. Gregor, if Mr. Lemagne had been forcibly orally

14  raped and nothing had happened to him by way of washing

15  his face, washing his lips, brushing his teeth, anything

16  else that would eliminate the presence of a particular

17  sample, would you expect that DNA to be recovered from the

18  lip swabs from somebody that had been orally raped?

19  A     It could be possible, yes.

20  Q     Ms. Gregor, did you look at the rape kit to determine

21  whether or not the nurse withdrew samples from the right

22  hand?

23  A     Yes.

24  Q     Would the rape kit analyst take samples from anywhere

25  or would they take samples from where they believe that

1  semen or DNA would exist?

2  A    It would be my expectation that they would collect

3  from areas of interest.

4  Q    So it appears that they collected two swabs from the

5  right hand of Mr. Lemagne at St. Mary's when he went in

6  for his rape kit; is that correct?

7  A    Yes.

8  Q    Did you test those items?

9  A    Yes.

10  Q    What did you find?

11  A    So that item was item 13, which was the swabs from

12  the right hand of Mr. Lemagne, and that was submitted for

13  DNA testing.  And male DNA was obtained from the swabs

14  from the right hand.

15           I then interpreted the DNA profile as

16  originating from two individuals, one of whom is

17  Mr. Lemagne.  I then compared Mr. Legins' DNA -- or known

18  DNA profile to that sample.  And the DNA results from

19  item 13, which are the swabs from the right hand, are two

20  times more likely if Mr. Lemagne and an unknown, unrelated

21  person are contributors than if Mr. Lemagne and Mr. Legins

22  are contributors.  And this provides limited support for

23  exclusion that Mr. Legins -- of Mr. Legins.  I then --

24  Q    Based on the scale that you referred to, where does

25  limited support for exclusion come in?

1  A    So limited support for exclusion is when we obtain a

2  statistic or a likelihood ratio of greater than 1 to 100

3  to .5.

4  Q    So that's almost -- the second to lowest category.

5  It's only one above absolute exclusion; is that correct?

6  A    Correct.

7  Q    There were thigh and external genitalia swabs taken

8  from Mr. Lemagne which were reflected as item 3 on this

9  report; is that correct?

10 A    Yes.

11 Q    The same thing.  Did you find any DNA or semen on the

12 thigh or the external genitalia swabs of Mr. Lemagne?

13 A    The item 3, which was the thigh and external

14 genitalia swabs, underwent serological examination for

15 semen, and the -- it was examined for the presence of

16 semen.  However, none was detected.

17        It then underwent DNA testing, and male DNA was

18 obtained from the thighs, external genitalia swabs, and

19 there was no DNA typing results unlike Mr. Lemagne that

20 were obtained -- that was obtained from this item.

21 Therefore, no comparisons were made to Mr. Legins and

22 Mr. Jackson.

23 Q    Ms. Gregor, there were also numerous other samples

24 that were submitted for your evaluation; is that correct?

25 A    Yes.

1  Q    All right.  On that same document, Government's

2  Exhibit 15, it references, about two-thirds of the way

3  down the page, items 57 through 26, which appear to be

4  swabs taken from an elevator.  Are you familiar with those

5  swabs?

6  A    Yes.

7  Q    And do they continue on the next page from items 63

8  to 65?

9  A    Yes.

10 Q    And are they swabs that were taken from the elevator

11 related to the March 16th, 2018, incident?

12 A    Yes.

13 Q    And do you know how those swabs were taken?

14 A    No.  I wasn't present.

15 Q    Is there anything from any of those swabs that

16 confirmed that Mr. Legins' DNA or semen was in the

17 elevator?

18 A    Those swabs were not tested.

19         THE COURT:  Are you going to move on to the next

20 report?

21         MR. GAVIN:  Yes, sir.

22         THE COURT:  I think what we're going to do is

23 we're going to break now for lunch.

24         MR. GAVIN:  Okay.

25         THE COURT:  So, folks, we're going to break now.

1   I'm going to give you an extra five minutes.  So we'll

2   break until 1:45 for lunch.

3                So all rise for the jury, please.

4                (The jury exited the courtroom.)

5                THE COURT:  Ms. Gregor, you can step down.  Do

6   not discuss your testimony with anybody over the lunch

7   break.  Okay?

8                (Witness stood aside.)

9                THE COURT:  Everybody can be seated because I

10  want to discuss a couple of housekeeping matters here

11  before we break, and that's this.

12               So I had asked the government about the 413

13  evidence of the other two inmates.  Here's what I'm going

14  to do.  I've gone back and I've looked at my opinion that

15  I issued before.  Now having heard the evidence, what I'm

16  going to do is this.  I'm going to reverse my decision.

17  I'm going to preclude that evidence under Rule 403,

18  finding that the probative value of that evidence, in the

19  government's case in chief, does not outweigh the

20  prejudice that would occur to Mr. Legins.

21               However -- and this is the part of it where

22  you're going to have to get involved.  If the -- you put

23  on evidence such that the testimony of other inmates would

24  be appropriate in rebuttal, I'm going to reconsider it

25  then.  So what I'm doing is I'm striking the evidence of

1  the other two inmates for the case in chief.  But

2  particularly -- I don't know if your client is going to

3  testify or not, but if he were to testify and be

4  cross-examined, have you ever had sex with an inmate at

5  FCC Petersburg or any other institution --

6          MR. GAVIN:  I understand.

7          THE COURT:  -- he says no, they're going to get

8  to put this on.  Because having looked back at the facts

9  and heard what were proffered before and now hearing the

10  evidence, which I think has gone in quite cleanly, I just

11  think the probative value is such that we're not going to

12  put it in.  So I'm taking a decision away from you,

13  government, is what I'm telling you.

14          Now, having said that, I'd like to have a handle

15  on -- he's going to cross-examine this expert.  I gather

16  you have the agent yet on the false statements.  I gather

17  that is Agent Lavender again, right?

18          MR. GARNETT:  Yes, sir.

19          THE COURT:  What else are we going to have?  I'm

20  just trying to get a handle on what's going on here -- or

21  an idea of what's going on here.

22          MR. GARNETT:  Yes, Your Honor.  We've got

23  several additional employees of the Bureau of Prisons.

24  Several additional correctional officers that will testify

25  as to the defendant's behavior that evening following

1    the --

2              THE COURT:  Okay.  So who are those folks?

3              MR. GARNETT:  That will be -- and, Your Honor,

4    this is out of order for me.  So --

5              THE COURT:  I'm just getting a general idea.

6              MR. GARNETT:  Yes, sir.  That will be Officer

7    Ryan McLaughlin.

8              THE COURT:  Okay.

9              MR. GARNETT:  Officer Timothy Coleman, Officer

10   Harry Parker and Officer Duane Farmer.  Then Your Honor --

11             THE COURT:  And then what else you got?

12             MR. GARNETT:  Yes, Your Honor.  After that,

13   we -- I shouldn't say after that.  We additionally have,

14   Your Honor, a technology manager, Darryl Strausser, who

15   will testify to computer access, which is part of the

16   defendant's alibi.

17             THE COURT:  Okay.

18             MR. GARNETT:  We also have EMT Sarah Ramsey,

19   Your Honor.  That's the individual who treated the victim

20   immediately after the assault at FCI Petersburg.

21             THE COURT:  Okay.

22             MR. GARNETT:  We also have Nurse LaShawn Ruffin.

23   She's a commander with the US Public Health Service,

24   Judge.  She treated or examined the victim, Brandon

25   Lemagne, at FCI Butner after he arrived there following

1 his transfer from FCI Petersburg.

2        THE COURT: And the value of that again was

3 what?

4        MR. GARNETT: The value of that, Your Honor, is

5 she discovered bruising on the defendant -- I'm sorry, on

6 the victim.

7        THE COURT: In what area? I mean, you put Nurse

8 Womble on, who said there was no injuries whatsoever.

9        MR. GARNETT: Nurse Womble also testified, Your

10 Honor, that bruising can take some time to develop and

11 that it can remain on an individual sometime after the

12 trauma.

13        THE COURT: That's fair enough. So it sounds

14 like you're going to be done in the morning?

15        MR. GARNETT: Judge, one more witness -- I'm

16 sorry. I just want to make sure I don't leave the Court

17 with false hopes.

18        THE COURT: Right.

19        MR. GARNETT: Dr. Wolf Walker is a clinical

20 psychologist who interviewed Brandon Lemagne very shortly

21 after the May 10th incident.

22        THE COURT: What's -- I mean, she wrote a report

23 or something like that, right?

24        MR. GARNETT: She did write a report,

25 Your Honor.

1        THE COURT:  Are you going to try to impeach your

2   own witness or what are you going to try to do here?

3        MR. GARNETT:  Your Honor, we have her listed as

4   one of our experts, Your Honor.  She is to testify as to

5   her conclusions, her familiarity with -- well, she's a

6   clinical psychologist, Your Honor, and some of that

7   informs -- I'll defer to my co-counsel who, who actually

8   will be directing that witness.  But she'll be testifying

9   as to her understanding of both her interview and her

10  findings.

11       THE COURT:  All right.  So you'll be done in the

12  morning.

13       Here's what I'm going to do.  At the end of the

14  day, I'm going to colloquy the defendant about whether or

15  not he wants to testify.  So I want you to discuss this

16  with him as to whether he wants to do it.

17       Now, if he changes his mind tomorrow, we'll deal

18  with it, but I want to go over this today because I want

19  to give an idea to the jury about how much time we're

20  talking about.  It sounds like they're going to be done in

21  the morning at some point before lunch.

22       MR. GAVIN:  Yes, sir.

23       THE COURT:  How much are you envisioning?

24       MR. GAVIN:  If those two 413 witnesses are

25  removed --

1          THE COURT:  Yeah, they're --

2          MR. GAVIN:  -- my case will be significantly

3    shorter, and I should be done by the afternoon.  I should

4    be done by mid afternoon.

5          THE COURT:  Okay.  All right.  Is there anything

6    else I need to know about this?

7          MR. GAVIN:  Judge, as only a matter of

8    housekeeping, we introduced a lot of the records that I

9    was going to use in my case that were specifically

10   directed towards the 413 witnesses.  So they have been

11   introduced already, but they'll be irrelevant now, but

12   they are admitted as part of my case.  So I don't want the

13   Court to think that I'm trying to set that in my case.

14         THE COURT:  Look, I just reversed myself.

15         MR. GAVIN:  Yep.

16         THE COURT:  So I understand.  Here's what we're

17   going to do is if there is no reason to call those inmates

18   in rebuttal, we'll withdraw those exhibits --

19         MR. GAVIN:  Yes, sir.

20         THE COURT:  -- before they go to the jury --

21   we'll use tomorrow -- late tomorrow afternoon when we're

22   done to finish the jury instructions, depending on whether

23   or not your client decides he wants to testify.

24         MR. GAVIN:  Yes, sir.

25         THE COURT:  And any other things I need to fix,

1  we'll do that, and then you're going to go over the

2  exhibit list to make sure that we know exactly what

3  exhibits are going to the jury and which ones are not.

4  And then -- then we'll finish it up on Wednesday morning.

5           MR. GAVIN:  Yes, sir.

6           THE COURT:  All right.  My worry was that you're

7  all going to be done in the morning.  Like, if you're

8  resting your case and both of you are resting and there's

9  no case by lunchtime, I'm not going to wait until

10 Wednesday morning.  I mean, we're going to do closings

11 tomorrow afternoon.  But if you're going into after the

12 lunch break, you know, that's a different story.  I would

13 just stop early, and that's it.  But I'm not going to

14 waste a half a day of the jury's time.

15          MR. GAVIN:  Yes, sir.

16          THE COURT:  So -- is that -- everybody on the

17 same page on that?

18          MR. GARNETT:  Yes, Your Honor.  The only thing

19 that I'd ask, Your Honor, is that in light of the fact the

20 defendant could always have a change of heart regardless

21 of what his response to Your Honor's colloquy is this

22 afternoon, that we not excuse those 413 witnesses until

23 the defense has well and truly rested and he's been

24 colloquied --

25          THE COURT:  They're not.  I did want to ask --

1    I'm glad we brought that up, though.  Can we excuse

2    Mr. Lemagne?  Because the marshals are holding him.  I

3    told him to stay.  Is there any reason that we need to

4    keep Mr. Lemagne for either one of your cases?

5              MR. GAVIN:  Not on behalf of the defense.

6              MR. GARNETT:  Not for the government, Your

7    Honor.

8              THE COURT:  So I can direct the marshals they

9    can return him to wherever they want to return him to by

10   agreement?

11             MR. GARNETT:  That's correct, Your Honor.

12             MR. GAVIN:  Yes, sir.

13             THE COURT:  Okay.  I'll tell him to hold on to

14   the 413 witnesses, and we'll make that final decision

15   after I see what the defense's evidence is okay?  All

16   right.

17             Is there anything else we need to do before we

18   break for lunch?

19             MR. GAVIN:  No, sir.

20             MR. GARNETT:  No, Your Honor.

21             THE COURT:  Okay.

22             (Recess from 12:49 p.m. until 1:50 p.m.)

23             THE COURT:  All right.  We're going to bring the

24   jury in.  All rise.

25             (The jury entered the courtroom.)

1          THE COURT:  All right.  Everybody can be seated.

2          All right.  Do we have Ms. Gregor?

3          Everybody doing okay over there?

4          A JUROR:  Yes.

5          A JUROR:  Yes.

6          THE COURT:  All right.  Ms. Gregor, I'm going to

7  remind you you continue to be under oath.

8          THE WITNESS:  Yes.

9          THE COURT:  Why don't you have a seat.  Make

10  yourself comfortable.

11          Mr. Gavin.

12          MR. GAVIN:  Thank you, Judge.

13  BY MR. GAVIN:

14  Q    Good afternoon, Ms. Gregor.

15  A    Good afternoon.

16  Q    Ms. Gregor, when we left off, we had just discussed

17  your first lab and we were moving on to the second lab,

18  which was Government's Exhibit 16 that includes the

19  sweatshirt; is that correct?

20  A    Yes.

21  Q    And the same thing as before.  The initial test

22  tested positive for semen, but you could never confirm it;

23  is that correct?

24  A    That is correct.

25  Q    I'm going to move to the next report, which is your

1  July 10th, 2019, report.  Do you have that in front of

2  you?

3  A    Yes, I do.

4  Q    And is that Government's 17?

5  A    Yes.

6  Q    And what, if anything, tested positive for semen on

7  that report?

8  A    So item 21, the jock strap, semen was indicated on

9  that item.  And then also item 22, the shorts, semen was

10 indicated on that item.  And item 29, the poncho, semen

11 was indicated on that item.

12 Q    And none of -- in none of the three was there semen

13 confirmed, correct?

14 A    Correct.

15 Q    Matter of fact, the poncho would be a perfect example

16 of why you need to do that confirmatory test, would it

17 not?

18 A    It was not performed on this item of evidence.

19 Q    So that's -- you tested positive for semen on the

20 acid phosphatase test, but nothing else was ever

21 confirmed, including DNA or semen?

22 A    The presumptive test for semen was performed on the

23 poncho.  However, the confirmatory test was not conducted

24 on this item.

25 Q    There's really nothing we can gather from the poncho?

1   A    Well, it was taken forward for DNA, and there are DNA

2   results.

3   Q    Ask you to identify one more item, Ms. Gregor.

4          MR. GAVIN:  This will be another exhibit when I

5   get my exhibits.

6          THE COURT:  Just -- what is it marked right now?

7   Because what we're going to do it we're going to put on

8   the record -- the court reporter has got a transcript, and

9   right now, she's referencing exhibit numbers, but we'll

10  correlate that at the end --

11         MR. GAVIN:  We'll mark it 15.

12         THE COURT:  -- so that her transcript -- Number

13  15?

14  BY MR. GAVIN:

15  Q    Ms. Gregor, do you recognize that document?

16  A    Yes, I do.

17  Q    What is that document?

18  A    So this is a document that we provide in our case

19  file, and it is the case report, meaning it is a list of

20  all the evidence items that we receive at the FBI

21  Laboratory.

22  Q    So this list includes, does it not, items 1 through

23  69; is that correct?

24  A    Yes, and additional items on the additional pages.

25  Q    Other than the four items that I've highlighted,

1  which were testified about, are there any items in there

2  that reflect either Mr. Legins' semen or his DNA?

3  A    You didn't highlight item number 29, the poncho,

4  which was also tested that -- semen was indicated on that

5  item.

6  Q    You're correct.  My mistake.  On the back page,

7  there's several items that appear to be documents entitled

8  "Parenting Class, Financial Seminar."  What's your

9  understanding of what those documents were?

10  A    I'm sorry.  Can you repeat that?

11  Q    Yes, ma'am.  On the second page, beginning at

12  item 32 -- actually, it starts on the beginning page --

13  the prior page at item 31.  But item 31 through item 39

14  appear to be papers entitled "Parenting Class."  Do you

15  remember what they were?

16  A    No.  Those weren't received in the DNA case work

17  unit.

18  Q    Do you know what they -- where they came from?

19  A    I do not know.

20  Q    All right.  So you didn't test either of those, the

21  parenting class documents or the financial seminar

22  documents?

23  A    They were not tested, and they were not received in

24  the DNA case work unit, but they were received at the FBI

25  Laboratory.

1  Q     Item 66 and item 67 reflect that you conducted tests

2  for trace evidence.  Can you explain what trace evidence

3  is?

4  A    So trace is another unit that does testing at the FBI

5  Laboratory, and I'm not a qualified trace examiner.

6  However, it is items that is marked as trace hair fiber,

7  secondary evidence, and that is something that they have

8  to put in and document as evidence.

9  Q    So as part of your case file, not only was DNA

10 evaluated, but trace fibers like hair, pubic hairs,

11 anything that would be outside of the realm of DNA was

12 also tested, to your knowledge?

13 A    I can't speak to what was tested by the trace

14 evidence unit because I'm not a trace evidence unit

15 examiner.

16 Q    Are you aware of any positive results from the trace

17 evidence that would link Mr. Legins to any piece of

18 evidence discovered in the trace investigation?

19 A    No, I'm not aware.

20          MR. GAVIN:  12-A, Ms. Taylor.

21 BY MR. GAVIN:

22 Q    Ms. Gregor, this is one exhibit that I cannot screw

23 up because it was already admitted by the government.  Can

24 you pull up 12-A?  I think you just testified to that as

25 well.

1  A     What was Government Exhibit 12-A?

2  Q     I think it's coming up.  Do you recognize that?

3  A     Yes.

4  Q     What is that?

5  A     That is a picture of a couple evidence items that was

6  tested by my unit, the DNA case work unit.

7  Q     And they came to you like this?

8  A     Not like that.  There are additional markings that

9  are marked by the biologist who's performing the testing

10 in the laboratory.

11 Q     That was a bad question.  Did they all come together

12 in one package?

13 A     Yes.

14 Q     All right.  So they weren't individually wrapped, as

15 you suggested might be the proper procedure, when they

16 came to you?

17 A     Correct.  They were packaged together.  But it is the

18 preferred method to separate each individual item into

19 separate packaging.

20 Q     So you can't really say with certainty whether the

21 DNA that was found on 1 came from 2 or the DNA that was

22 found on 2 came from 1.  Is that fair?

23 A     That is correct.  There's a possibility for transfer

24 to occur, and I can't say how the DNA got there.

25 Q     Did you test either the lip balm on the right or the

1  tissue paper on the right?

2  A    No.

3  Q    So, Ms. Gregor, it really comes down to how can you

4  transfer DNA?  If I touch you, can my DNA transfer to you?

5  A    Yes.  So there are different types of transfer.  So,

6  for example, there is primary transfer, which is where if

7  I were to touch the desk and then swab the desk where I

8  just touched, I would expect my DNA profile, and that

9  would be primary transfer.

10           For secondary transfer, if I was to touch this

11  cup that was originally touched by this gentleman over

12  here and I was to swab this cup, I would expect to get a

13  profile of my DNA and also his DNA.

14  Q    So the DNA not only would be on the cup, but it would

15  transfer to the swab?

16  A    Correct.

17  Q    And the swab would then be transferred to your

18  testing, I guess, site?

19  A    It would be what the results would be from the DNA

20  testing, yes.

21           MR. GAVIN:  Ms. Gregor, thank you very much.  I

22  have no other questions.

23           THE COURT:  Any redirect?

24           MR. GARNETT:  Very briefly, Your Honor.

25                    **REDIRECT EXAMINATION**

1  BY MR. GARNETT:

2  Q    Ms. Gregor, talking about the transfer there, and

3  just briefly here, you said you would expect to find a DNA

4  profile somewhere.  When you say "expect," do you mean is

5  it possible that you would find a DNA profile?

6  A    Yes.

7  Q    Because is it fair to say that contact with something

8  does not automatically transfer DNA?

9  A    That is correct.  So each person -- each person sheds

10 a different amount of skin cells, and so, therefore, if I

11 was to quickly touch something and then swab it, I may not

12 exactly get a DNA profile from myself.  It also depends on

13 how long that contact was for.

14 Q    So Mr. Gavin also mentioned that there were a number

15 of items received by your DNA case work unit.  Some of

16 those included elevator swabs; is that right?

17 A    Yes.

18 Q    Okay.  Why didn't you test the elevator swabs,

19 Ms. Gregor?

20 A    The swabs from the elevator were not tested because

21 it was mentioned to me from Special Agent Johnny Lavender,

22 in this case, that the elevator was cleaned.  And also, an

23 elevator contains DNA -- or I would expect DNA from a

24 mixture of individuals or innocent individuals who have

25 been in that elevator before.

Kara Gregor – Redirect                    160

1  Q    Okay.  So is it fair to say that a common area, like

2  an elevator or a restroom, would be a spot you would

3  expect to find a mixture of DNA with more than four

4  profiles?

5  A    Yes.  That is my expectation.

6  Q    And a mixture with more than four individuals in that

7  DNA mixture is not something your lab would be able to

8  sort out and ascertain the individual profiles?

9  A    Correct.  We can't interpret or do comparisons to

10 mixture DNA profiles that have five or more people.

11            MR. GARNETT:  That's all.  Thank you, Your

12 Honor.

13            Thank you, Ms. Gregor.

14            THE COURT:  All right.  Ms. Gregor, thank you so

15 much for your testimony.  You're excused.  I'm going to

16 ask you not to talk about your testimony until the trial

17 is over with anybody else.  Okay?  Thank you.

18            THE WITNESS:  Thank you.

19            (Witness stood aside.)

20            THE COURT:  All right.  Do you want to call your

21 next witness?

22            MR. GARNETT:  Yes, Your Honor.  The

23 United States would call Officer Ryan McLaughlin.

24            MR. GAVIN:  Judge, I saw that Ms. Gregor was

25 pregnant.  So I didn't know if we wanted to excuse her if

1   she wasn't necessary.

2          THE COURT:  Do you want to permanently excuse

3   her?  That's fine with me.

4          MR. GARNETT:  That's fine for the government,

5   Your Honor.

6          THE COURT:  You agree with that?

7          MR. GAVIN:  Yes, sir.

8          THE COURT:  All right.  She'll be permanently

9   excused.  You can let -- Ms. Ulmet can let her know.

10         MR. GARNETT:  Thank you, Your Honor.

11         THE COURT:  Are you ready?

12         MR. GARNETT:  Thank you, Your Honor.

13                    **RYAN MCLAUGHLIN,**

14      called by the government, first being duly sworn,

15                   testified as follows:

16                 **DIRECT EXAMINATION**

17  BY MR. GARNETT:

18  Q    Good afternoon, Officer.

19  A    Hi.

20  Q    Could you please introduce yourself to the jury and

21  state your -- I'm sorry -- spell your first and last name?

22  A    Yeah.  My name is Ryan McLaughlin.  R-Y-A-N,

23  M-C-L-A-U-G-H-L-I-N.

24  Q    And how are you currently employed, Officer?

25  A    I'm a senior officer at FCC Petersburg.

1    Q    How long have you been there?

2    A    Roughly 11 years.

3    Q    Have you been with other jobs -- have you had other

4    employment prior to joining the Bureau of Prisons?

5    A    Yes, I have.

6    Q    What were those?

7    A    I worked at Riverside Regional Jail.  I was an

8    exhibits and information technology specialist.  I was

9    also a juvenile correctional officer.

10   Q    And as a correctional officer at FCI Petersburg --

11            MR. GARNETT:  Thank you, Officer Spivey.

12   BY MR. GARNETT:

13   Q    -- what are your duties there?

14   A    I'm sorry.  Can you repeat the question?

15   Q    What are your duties at FCI Petersburg?

16   A    Maintain the safety and security of the inmates in

17   the institution.

18   Q    What would you say is your bottom-line responsibility

19   as a federal correctional officer?

20   A    Keep the inmates safe.

21   Q    Officer McLaughlin, were you on duty at FCI

22   Petersburg on the night of May 10th, 2018?

23   A    Correct.

24   Q    At some point that night were you contacted by

25   Lieutenant Arrant?

1  A     Yes, I was.

2  Q     And what did you understand Lieutenant Arrant -- what

3  role did you think he was filling that evening?

4  A     He was asking me to take an inmate out to get a rape

5  assessment done.

6  Q     Is Lieutenant Arrant the operations lieutenant, to

7  your understanding?

8  A     He would be the operational lieutenant.

9  Q     I'm sorry I made you go back.  What did Lieutenant

10 Arrant ask you to do?

11 A     To take an inmate out on a medical escort trip for a

12 rape assessment.

13 Q     What does a medical escort trip involve from your

14 perspective as a correctional officer?

15 A     We have special training to take the inmates out to

16 local hospitals.  And we take them out for numerous

17 things.  One of them being the rape kits.  One of them

18 being if they're sick or anything like that.

19 Q     Did you leave your post in order to go start that

20 assignment?

21 A     Yes, I did.

22 Q     Where did you go first?

23 A     First, I went to the lieutenant's office and -- as

24 far as going from there.  After that, lieutenant's office,

25 they told me where I needed to go.  Then from there, I

1   went to the medical housing area, and that's where the

2   inmate was at that time.

3   Q     What inmate was present in the medical housing unit

4   when you arrived?

5   A     Inmate Lemagne.

6   Q     Was there anyone else present in the room with Inmate

7   Lemagne?

8   A     Yes.  Nurse Ramsey.

9   Q     Were you familiar with Brandon Lemagne prior to this

10  incident?

11  A     Not really, no.

12  Q     Did you speak with Brandon Lemagne at this point to

13  ask him what had happened?

14  A     Yes, I did.

15  Q     Okay.  And what would be the reason to ask an inmate

16  what had happened to them prior to starting a medical

17  escort trip?

18  A     To kind of figure out where the inmate's head is at

19  that point, what's going on.  Not only do I want to keep

20  the inmate safe, I also want to keep me and the other

21  officer that would be going out with me safe at that

22  point.

23  Q     So if you've got a situation -- you said the

24  Lieutenant Arrant told you you were going to the hospital

25  for a rape evaluation?

1    A    Yes.

2    Q    So if the purpose of the medical escort was the rape

3    evaluation, would you need to know who the alleged

4    assailant was?

5    A    Yes.

6    Q    And would that be in order to keep the victim safe?

7    A    That's correct.

8    Q    So did you ask Brandon Lemagne what had happened to

9    him?

10   A    Yes, I did.

11   Q    And what were the basic facts that he gave you?

12   A    I asked Lemagne, I said, you know -- I asked him if

13   he was raped.  He said yes.  I asked was it by another

14   inmate, which that's the normal at where we work at.  Not

15   the normal as far as it happening a lot, just that would

16   be the average of what would happen.  He said no.  I said

17   was it a counselor.  He said no.  I said was it staff.  He

18   said yes.

19   Q    Did you ask Brandon Lemagne at this point which staff

20   member he was alleging raped him?

21   A    No, I did not.

22   Q    What did you do after hearing this from Brandon

23   Lemagne?

24   A    I went to our SIS department, which stands for

25   Special Investigative Services, and told them what Lemagne

1  said.

2  Q    Why did you feel the need to immediately go to the

3  special investigation section?

4  A    That was above me at this point.

5  Q    What do you mean it was above you?

6  A    It was -- when you have staff involved with

7  something, then that would be -- somebody higher up needs

8  to be associated with that besides me.

9  Q    Did you return to the medical observation room after

10 passing that report?

11 A    Yes, I did.

12 Q    And while in the medical observation room, did you

13 assist with evidence recovery?

14 A    Yes, I did.

15 Q    During that process -- is Brandon Lemagne still

16 there?  I should go back.

17 A    Yes.

18 Q    During the process of the evidence collection, did

19 Brandon Lemagne say anything?

20 A    Yes.  He said -- I asked him -- because he kept

21 standing up, and I asked him, I said, "You can sit down if

22 you want."  He didn't want to sit down.  I asked him why

23 he didn't want to sit down.  He said he didn't want any of

24 it to leak out.

25 Q    Did he say anything about semen in particular or just

1  that phrase?

2  A    That was that phrase.

3  Q    Okay.  Did Mr. Lemagne say anything in regards to a

4  T-shirt?

5  A    Yes.  He said when the -- his T-shirt was ripped in

6  the back.

7  Q    Did -- at this point -- up to this point in the

8  conversation, you still had not asked Brandon Lemagne who

9  he was alleging assaulted him, correct?

10 A    Correct.

11 Q    Did Brandon Lemagne explain to you where this assault

12 had taken place?

13 A    Yes, he did.  It was in the Fox South unit team area,

14 which that would be where the secretary's office is.

15 Q    Have you done time in the housing units as a

16 correctional officer?

17 A    Yes.

18 Q    Are you familiar with the unit team area in Fox

19 South?

20 A    Yes, I am.

21 Q    And what does that area -- just quickly for the jury,

22 what does that area look like?

23 A    You have a Fox South unit and you have a Fox North

24 unit.  In between the two units, you're going to have a

25 corridor, like a hallway area.  In that hallway area,

1  you're going to have a few offices on the right-hand side,

2  but the main one would be when you go into the left side.

3  And that would be -- if you're going from the Fox South

4  area, that would be where the secretary's office is.

5  Q    During the day, are there staff there, secretaries?

6  A    In the daytime, there are.

7  Q    Okay.  What about in the evenings?

8  A    Rarely not.

9  Q    Okay.  Are there cameras, to your knowledge, in the

10 unit team area?

11 A    No.

12 Q    So you've been a correctional officer, I think you

13 said, for ten years.  Would it be your practice to take an

14 inmate into the unit team area after hours?

15 A    No.

16 Q    Shortly after you had this exchange with Brandon

17 Lemagne, did you sit down and draft up a very brief

18 statement?

19 A    Yes, I did.

20 Q    Okay.  And was the purpose of that statement simply

21 to describe what you had observed in the observation room?

22 A    Yes.

23 Q    Later that evening, Officer McLaughlin, did you draft

24 up a second memorandum that covered the entire evening?

25 A    Yes, I did.

1  Q    So after the evidence collection process is finished,

2  did you escort Brandon Lemagne back to the lieutenant's

3  office?

4  A    Yes, I did.

5  Q    And what does that walk look like for the jury?

6  A    If you're -- when you leave the medical unit, as

7  you're -- you're going to leave the unit.  You're going to

8  take a left, and there's going to be a -- two doors on the

9  left-hand side as you're walking, but basically, it's

10 about a 50- to maybe 70-yard walk.  You're going to go by

11 a compound door and what is our R&D door.

12          And once you go past those doors, it's pretty

13 much a wide open spot until you get to the actual

14 lieutenant's office.

15 Q    And, Officer McLaughlin, I did you a disservice there

16 because we actually have a large demonstrative there.

17          MR. GARNETT:  Your Honor, can I request

18 permission to go ahead and display the government exhibit

19 that depicts the compound area?

20          THE COURT:  Of course.

21          MR. GARNETT:  Thank you.

22          I'm sorry, Officer Spivey.  I should have asked

23 about that earlier.

24          THE COURT:  I think we introduced this before

25 already; is that right?

Ryan McLaughlin – Direct                    170

1          MR. GARNETT:  We did.  I'm not sure which

2    exhibit it was.

3          THE COURT:  What's the exhibit number there,

4    Officer Spivey?  On the bottom corner, what's the exhibit

5    number?

6          MS. TAYLOR:  Seven.

7          MR. GARNETT:  It's Government Exhibit 7,

8    Your Honor.

9          THE COURT:  Exhibit 7.  I just wanted the record

10   to reflect what's going on.  Thank you.

11   BY MR. GARNETT:

12   Q    And, Officer McLaughlin, I'm guessing you can project

13   your voice far enough to get to the jury.

14         MR. GARNETT:  Your Honor, could he step down and

15   just point to a few spots on this?

16         THE COURT:  Sure.  But the more important --

17   while the jury is important, the court reporter is also

18   important.

19         MR. GARNETT:  Yes, Your Honor.

20         THE COURT:  She picks up through the microphone.

21   So when you're standing up, just stand up on this side of

22   the chart and speak towards that microphone in a loud

23   voice.  Okay?

24   BY MR. GARNETT:

25   Q    So, Officer McLaughlin, if you could go ahead and

Ryan McLaughlin - Direct                          171

1  show us where the lieutenant's office is located first.

2  A    Yes.  The lieutenant's office, I believe, if I'm

3  looking at this correctly, is going to be in this area

4  right here.

5  Q    And where would the medical office be located?

6  A    It's going to be back here.

7            THE COURT:  Hold on a second.  We need to put in

8  the record what he's saying.  So he's pointing.  So when

9  you point, I'd like you to tell me what area you're

10 pointing to.

11           THE WITNESS:  Okay.

12           THE COURT:  Okay?  So let's go back.  So the

13 first question was which?

14           MR. GARNETT:  The lieutenant's office,

15 Your Honor.  And I realize there are numbers in the chart

16 hopefully would --

17           THE COURT:  Yeah.  That's what I was thinking he

18 could do.  He could correspond.

19           MR. GARNETT:  Yes, Your Honor.

20           THE COURT:  Go ahead.

21           THE WITNESS:  May I scoot this back, because

22 there's no way you're going to be able to hear me?

23           THE COURT:  Yeah.  That's fine.

24 A    All right.  Your medical office is going to be

25 roughly about in this area right here.  You're going to

1  have a compound --

2          THE COURT:  Is there a number there?

3          THE WITNESS:  It's going to be in segment -- I'm

4  assuming would be segment 37.

5          THE COURT:  Okay.

6  A    And then you're going to have a compound office in

7  segment 23.  And then directly beside the compound office,

8  you're going to have an R&D door, which is going to be

9  also in segment 23.

10         You're going to walk from the actual segment 37,

11 past 23, all the way down to around this corner right

12 here.  And -- I don't -- that corner doesn't have a

13 segment as far as a number.

14         THE COURT:  Is that in the direction of the

15 compound, basically?

16         THE WITNESS:  This would be in the direction of

17 the compound, going past the compound and the R&D door,

18 going into the lieutenant's office.  It's all in the same

19 route.

20         THE COURT:  Okay.  And the lieutenant's office,

21 is it between number 24 and number 23?

22         THE WITNESS:  No.  The lieutenant's office is

23 going to be in the -- yeah, I guess you would say that.

24 It's going to be in between 24 and 23.  That's on the --

25 it's actually on the corner of -- it's in the same area as

Ryan McLaughlin - Direct                    173

1   segment 23, but just on the corner of it.

2            THE COURT:  Okay.

3            MR. GARNETT:  Thank you, Your Honor.

4   BY MR. GARNETT:

5   Q    So, Officer McLaughlin, as you're leaving the medical

6   office, are you walking along a sidewalk that parallels

7   building 23, we'll call it?

8   A    Yes.

9   Q    Okay.  And is that sidewalk -- I know we're in the

10  evening now.  Is that sidewalk illuminated by floodlights

11  or some other kind of lighting?

12  A    Yes, it is.

13  Q    And from your experience at the compound, is that

14  sidewalk, when you step out of the medical office, is that

15  visible from the housing units that are arranged at the

16  top --

17  A    Yes.

18  Q    -- of that diagram?

19  A    Yes, it is.

20  Q    So as you walk down that sidewalk -- you can go ahead

21  and have a chair again, Officer McLaughlin.  Thank you.

22            After you left the medical office and you were

23  walking down that sidewalk, are you escorting Brandon

24  Lemagne?

25  A    Yes, I did.

1  Q    Did you hear anything at this point coming from the

2  direction of the housing units?

3  A    Yes, I did.

4  Q    What did you hear?

5  A    It sounded like, "You've got to be kidding me."

6  Q    Were you able to make out everything that was being

7  said?

8  A    It was from a distance, but it sounded exactly like

9  that to me.

10 Q    And you said the phrase was "you've got to be kidding

11 me"?

12 A    Yes.

13 Q    Did that phrase ring any bells in your head?  Did it

14 sound familiar?

15 A    It did.

16 Q    And why did it sound familiar?

17 A    It was something that I've heard Legins say before.

18 Q    And when you say "Legins," who are you speaking of?

19 A    Officer Legins.

20 Q    You're talking about Officer Chikosi Legins?

21 A    Yes.

22 Q    How long have you worked with Officer Chikosi Legins?

23 A    I've worked with him for a few years.  The exact

24 number I really don't know.

25 Q    Okay.  Do you see him here in the courtroom today?

Ryan McLaughlin - Direct                    175

1   A     Yes, I do.

2   Q     Okay.  Could you please identify him to the jury by

3   something he's wearing and where he's seated?

4   A     Purplish colored tie, black suit.

5           MR. GARNETT:  Your Honor, I'd ask the record

6   reflect that Officer McLaughlin has identified the

7   defendant.

8           THE COURT:  So noted.

9   BY MR. GARNETT:

10  Q     Officer McLaughlin, at this point -- until this point

11  in the evening, has anyone mentioned the phrase Officer

12  Chikosi Legins to you?

13  A     No.

14  Q     Now, did you previously note, when discussing this

15  incident, that you were not 100 percent confident --

16  A     Yes.

17  Q     -- it was the defendant?

18  A     Correct.

19  Q     What would it take for you to say that you were

20  100 percent confident in something like that?

21  A     I'd have to actually see him say it.

22  Q     You'd have to see the words coming out of his mouth?

23  A     Yes.

24  Q     All right.  So jumping ahead slightly, Officer

25  McLaughlin, later that night, you mentioned that you had

176

1  prepared a second memorandum describing sort of the

2  overall happenings of that evening.

3  A    Correct.

4  Q    In that memorandum, did you note that you weren't

5  able to make out everything that was said?

6  A    Yes.

7  Q    Okay.  Why did you phrase it that way?

8  A    The actual -- from where it was coming across the

9  compound and me not being able to see exactly who it was,

10 I just -- I'm not 100 percent sure if he actually said

11 those words or not.  I'm only going by what I heard, where

12 the actual sound was coming from from across the compound.

13 So --

14 Q    Did you believe that you had recognized the

15 defendant's voice, though?

16 A    Yes.

17 Q    Now, again, as you're walking down that sidewalk

18 there, Officer McLaughlin, is there anything that's taking

19 place between you and Brandon Lemagne that would, from the

20 housing units, be observable as some kind of a crisis or

21 some need for alarm?

22 A    No.  No.

23 Q    It would not have appeared that Brandon Lemagne was

24 struggling with you?

25 A    No, not at all.

1  Q    Or trying to break away?

2  A    No.

3  Q    So from your experience as a housing officer and a

4  correctional officer having worked in housing units, would

5  there be any reason you could think of for an officer to

6  verbally accost an inmate in the custody of another

7  correctional officer across the width of the compound?

8  A    No.

9  Q    After you reached the lieutenant's office, Officer

10 McLaughlin, where did Brandon Lemagne go at that point?

11 A    After we reached the lieutenant's office?  Is that

12 what you said?

13 Q    Yes, sir?

14 A    He -- Lieutenant McWilliams pulled him into one of

15 the offices that were inside the actual lieutenant's

16 office.  I went into the -- the lieutenant's office area

17 where their room is.

18 Q    Did you remain in the lieutenant's area -- I'm

19 sorry -- lieutenant's office?

20 A    I'm sorry.  I couldn't hear you.

21 Q    Did you remain in the lieutenant's office?  I'm

22 sorry.

23 A    Yes, I did.

24 Q    Okay.  At some point after Brandon Lemagne left your

25 presence, did you start to observe phone calls coming in

1  to the lieutenant's office?

2  A    Yes, I did.

3  Q    And without discussing what was said during those

4  phone calls, did those calls increase your level of

5  concern about whether the defendant might pose a threat to

6  Brandon Lemagne?

7  A    Yes, they did.

8  Q    Who answered these telephone calls?

9  A    Operations Lieutenant Arrant and Lieutenant Kalwalski

10  answered the second one, I believe.

11  Q    So these are separate phone calls?

12  A    Yes.  There was two separate phone calls --

13  Q    Did these lieutenants -- I'm sorry.  I cut you off.

14  A    At the time I was there, it was two separate phone

15  calls.

16  Q    Did these two lieutenants indicate who was on the

17  line or who had called?

18  A    Yes.

19  Q    And who did they say had called?

20  A    Legins.

21  Q    Did the --

22  A    Officer Legins.

23  Q    I'm sorry.  I keep cutting you off there.

24  A    No.  You're fine.

25  Q    Did either of the lieutenants give you an explanation

Ryan McLaughlin - Direct                    179

1   as to why the defendant had called the office?

2   A    One of the times was he was looking for an inmate

3   that we did not have at our facility.  He gave a name that

4   was not on the actual roster.

5   Q    If you were a correctional officer, Officer

6   McLaughlin -- well, you are.  Let's say you were a housing

7   unit officer again.  If you were trying to locate an

8   inmate, where would you -- what spot in the prison would

9   you call to try to track that person down?

10  A    Control.

11  Q    And what's the control office?

12  A    The control office is what actually controls the

13  actual prison itself.  And they have -- they know who's

14  coming out and who's coming in to the actual facility.

15  They would know more who would be coming in and out than

16  the lieutenants would.

17  Q    What was your reaction to hearing these two calls

18  come in from Officer Chikosi Legins at this point?  Did

19  you decide to do anything as a result of learning that?

20  A    Yes, I did.  After the second phone call came in, I

21  told McWilliams that I would like to leave as soon as

22  possible.

23  Q    And why was that?

24  A    If -- at that point, if somebody is calling like

25  that, you don't know where their mind is at, if

Ryan McLaughlin - Direct                    180

1   allegations are true, and --

2          MR. GAVIN:  Judge --

3          THE COURT:  I'm going to sustain the objection.

4   Let's move on.

5          MR. GAVIN:  Speculation.

6          THE COURT:  Disregard that response.

7   BY MR. GARNETT:

8   Q    Did you leave FCI Petersburg for the hospital shortly

9   after this?

10  A    Yes, I did.

11  Q    Okay.  And did you drive with Brandon Lemagne on the

12  drive to the hospital?

13  A    Yes, I did.

14  Q    Were you able to observe his demeanor during this

15  trip?

16  A    Yes, I was.

17  Q    And how would you describe it?

18  A    Distraught, not saying a lot, looking out the window,

19  just staring out the window.

20  Q    Okay.  Did you also drive Brandon Lemagne back to FCI

21  Petersburg after the medical exam?

22  A    Yes, I did.

23  Q    And you explained earlier, Officer McLaughlin, that

24  one of your responsibilities is the safety of the

25  inmates --

1  A    Yes, sir.

2  Q    -- in your custody at the prison; is that right?

3  A    Yes.

4  Q    Do they remain -- or does it remain part of your

5  responsibility to ensure their safety when they're outside

6  the prison?

7  A    Of course.

8  Q    So during this medical escort trip, when you were

9  exiting St. Mary's Hospital, did you take any steps to

10 protect Brandon Lemagne and your fellow officers?

11 A    Yes, I did.

12 Q    What did you do?

13 A    When we left the actual -- going through the hospital

14 and going out to the parking lot, you have to scan to make

15 sure that there was no -- nobody going to ambush us, you

16 know, at that point.

17 Q    Did you screen your fellow officers --

18          MR. GAVIN:  Objection to the relevance.

19          THE COURT:  What's the relevance of this?

20          MR. GARNETT:  Your Honor, he's been a

21 correctional officer for ten years.  His level of concern

22 as to what he had observed I think is relevant to --

23          THE COURT:  Well, that goes to his mindset.  I'm

24 going to sustain the objection.  It's stricken.  Let's not

25 go into this.  Let's just go into what he saw.

1          MR. GARNETT:  Understood, Your Honor.

2   BY MR. GARNETT:

3   Q    Did you, in fact, return Brandon Lemagne to FCI

4   Petersburg?

5   A    I did.

6   Q    Okay.

7          MR. GARNETT:  Those are all the questions I

8   have, Your Honor.

9          THE COURT:  Any cross?

10         MR. GAVIN:  Yes, sir.

11                    **CROSS-EXAMINATION**

12  BY MR. GAVIN:

13  Q    Good afternoon, Officer.

14  A    Hey.  How you doing?

15         MR. GAVIN:  Ms. Taylor, could you pull up 5-B

16  for the government?

17  BY MR. GAVIN:

18  Q    Do you recognize that area --

19  A    I sure do.

20  Q    -- Officer McLaughlin?

21  A    Yes, I do.

22  Q    All right.  So the area right by the shrubs, is that

23  the sidewalk where you were walking Mr. Brandon Lemagne?

24  A    Yes.  That would be where we would turn at.

25  Q    So the building way in the back that has F-South, can

1  you circle that on the screen?

2  A    Yes.

3  Q    All right.  So you're saying that the voice you heard

4  came from that area?

5  A    Yes.

6  Q    But you don't know who it was?

7  A    Because of who was working there -- Officer Legins

8  has a distinctive way he voices things, as far as where

9  he's from.  He's from, what I would assume, in the New

10 York area, you know.  That's how you can kind of tell of

11 who is speaking.  But like I said, I did not see him

12 actually say it so I am not 100 percent, but I'm high up

13 there in the percentage it was him.

14 Q    All right.  So you were walking side by side with

15 Mr. Lemagne, correct?

16 A    No.  He's in front of me.  I'm behind him.

17 Q    How far is he in front of you?

18 A    I would say maybe -- maybe about a foot.

19        What's going on is I'm actually holding him.  So

20 he's still -- you know, he's still in custody.  So I'm

21 holding him, but I'm like a step behind as I'm holding

22 him.

23 Q    So you were close enough to hear everything that he

24 would have heard?

25 A    Yes.

1  Q    Did you ever hear anything that sounded like, "Don't

2  believe that guy"?

3  A    I didn't hear that part of it.  But when he did yell

4  out, or whoever yelled out at that point, which I'm pretty

5  sure I'm not too far off, I told Inmate Lemagne at that

6  time to look to the left of the building and look straight

7  ahead of him.  Do not look to the right.

8  Q    All right.  So was there only the one voice that you

9  heard that one time?  There weren't multiple yellings,

10 just the one, correct?

11 A    There were not multiple yellings from what I heard.

12 There was one voice.

13 Q    All right.  Could I ask you to take a look at this?

14         MR. GAVIN:  Judge, I'm going to mark this as

15 Defendant's 16?

16         THE COURT:  Okay.

17 BY MR. GAVIN:

18 Q    I think this -- well, first of all, do you recognize

19 that?

20 A    Yes.

21 Q    Is that a report that you generated?

22 A    That would be a report I generated.

23 Q    And to whom was it addressed?

24 A    As far as to all concerned.

25 Q    All concerned.  So who would have been the all

1   concerned?  Who would have gotten copies of this report?

2   A    All concerned would have been our lieutenants.

3   Q    So all -- everybody --

4   A    Or captains.

5   Q    Everybody that's above you, lieutenants, captains.

6   Everybody would receive this report?

7   A    Yes.

8   Q    All right.  And this report was generated after you

9   had taken Mr. Legins(sic) to the hospital, correct?

10  A    Yes.

11  Q    All right.  By that time, were you aware that

12  Mr. Lemagne was accusing Mr. Legins of what happened?

13  A    I wasn't 100 percent sure on anything at that point.

14  Q    All right.  So --

15  A    I had speculations because of what the phone calls

16  were and what had transpired at that point because that's

17  out of the ordinary for somebody to yell across the

18  compound and then call like that after something has

19  happened like that.  And when Lemagne said staff and then

20  you put everything together, you kind of figure out what's

21  going on.

22  Q    Are there cameras on the compound?

23  A    Yes, there are.

24  Q    Are there cameras that reflect entry and exit to the

25  compound office?

1   A     Yes.

2   Q     Are there cameras on the buildings?

3   A     Yes, there are.

4   Q     On the unit buildings?

5   A     Yes.

6   Q     So there's cameras on the corner of the building Fox

7   South --

8   A     Uh-huh.

9   Q     -- and Fox North?

10  A     Yes.

11  Q     I highlighted something in this document that you

12  wrote.  It's right in front of you.

13  A     Yes.

14  Q     Do you see that?

15  A     Yes.  It says, "I couldn't" -- "I could not make out

16  what is being said at the time" -- "what is being said."

17  Q     "I couldn't make out what was being said."  That's

18  what you said?

19  A     Yes.

20  Q     And that's what you reported to all your lieutenants

21  and all your captains?

22  A     Yes.

23           MR. GAVIN:  Judge, I'd like to move that as

24  my 15(sic).

25           THE COURT:  Any objection?

Ryan McLaughlin – Cross                     187

1           MR. GARNETT:  No objection, Your Honor.

2           THE COURT:  All right.  Admitted.

3           (Defendant Exhibit Number 16 was admitted.)

4           MR. GAVIN:  I have no other questions.

5           THE COURT:  Any redirect?

6           MR. GARNETT:  No, Your Honor.

7           THE COURT:  All right.  Officer, thank you so

8  much for your testimony.  You can step down.  I'm going to

9  instruct you not to talk about your testimony with anybody

10 until this trial is over.  Okay?

11          THE WITNESS:  Correct.

12          THE COURT:  All right.  Thank you.

13          (Witness stood aside.)

14          THE COURT:  Do you want to call your next

15 witness?

16          MR. GARNETT:  Yes, sir.  We'd call Special Agent

17 Johnny Lavender, Judge.

18          THE COURT:  This is the last time he's

19 testifying, right?

20          MR. GARNETT:  Yes, sir.

21          THE COURT:  You're not going to call him a third

22 time is what I'm telling you.

23          MR. GARNETT:  No.

24          THE COURT:  I'll give you twice, but I'm not

25 giving you three times.

Johnny Lavender – Direct                188

1           All right.  Special Agent Lavender, you've been

2  sworn before.  You're still under oath.  Do you understand

3  that?

4           SPECIAL AGENT LAVENDER:  Yes, Your Honor.

5           THE COURT:  Just state your full name and spell

6  your last name one more time.

7           SPECIAL AGENT LAVENDER:  Johnny Lavender,

8  L-A-V-E-N-D-E-R.

9           THE COURT:  All right, Mr. Garnett.

10          MR. GARNETT:  Thank you, Your Honor.

11                    **JOHNNY LAVENDER,**

12     called by the government, first being duly sworn,

13                  testified as follows:

14                **DIRECT EXAMINATION**

15  BY MR. GARNETT:

16  Q    Agent Lavender, during your investigation, did you

17  interview the defendant, Chikosi Legins?

18  A    Yes.

19  Q    Did you interview him on June 5th of 2018?

20  A    Yes, I did.

21  Q    And where did that interview take place?

22  A    FCI Petersburg Medium.

23          THE COURT:  What was that date?  I'm sorry.

24          MR. GARNETT:  I'm sorry, Judge?

25          THE COURT:  When was the interview?

Johnny Lavender – Direct                                189

1        MR. GARNETT:  June 5th, Judge, was the witness'

2   response.

3        THE COURT:  Of this year or last year?

4        MR. GARNETT:  2018, Judge.

5        THE COURT:  Go ahead, Mr. Garnett.

6   BY MR. GARNETT:

7   Q    Was that interview audio recorded?

8   A    Yes, it was.

9   Q    And have you subsequently reviewed the audio

10  recording of that June 5th interview?

11  A    Yes, I have.

12  Q    Was the recording an accurate and complete recording

13  of that June 5th interview?

14  A    Yes, it was.  With one note that my name was

15  misspelled.  The last letter is an E instead of an A.

16  Q    With the exception of your last name, was it an

17  accurate and complete recording, then?

18  A    Yes.

19        MR. GARNETT:  Your Honor, I would move at this

20  point to introduce Government Exhibit 20.

21        THE COURT:  No objection; is that correct?

22        MR. GAVIN:  No, sir.

23        THE COURT:  All right.  It will be admitted.

24        (Government Exhibit Number 20 was admitted.)

25  BY MR. GARNETT:

1   Q    Agent Lavender, did you also review a transcript of

2   that recording?

3   A    Yes, I did.

4   Q    And did you compare that transcript to the audio

5   recording that you listened to?

6   A    Yes, I did.

7   Q    And was that transcript a complete and accurate

8   transcription of the June 5th interview?

9   A    Yes, it is.

10           MR. GARNETT:  Your Honor, at this point I move

11   to introduce Government Exhibit 20-A only for

12   demonstrative --

13           THE COURT:  As an aid; is that right?

14           MR. GARNETT:  I'm sorry?

15           THE COURT:  You're only using the transcript as

16   an aid.

17           MR. GARNETT:  That's right, Judge.  Just as an

18   aid for the jury.

19           THE COURT:  All right.  So it's not admitted

20   into evidence.  It's just an aid for the jury.

21           MR. GARNETT:  Yes, sir.

22           THE COURT:  Are you going to ask that it be

23   distributed to the members of the jury?

24           MR. GARNETT:  Judge, what we're planning to do

25   is actually play the audio clip.  As that plays, the

Johnny Lavender – Direct                    191

1   jurors will be able to see the transcript scrolling and

2   sync with the audio.

3          THE COURT:  That's fine.

4          So, folks, what we're going to do -- you just

5   heard Mr. Garnett say they're going to play the audio, but

6   at the same time, if our tech works, you're going to get

7   to see the transcript going on.

8          What I'm telling you, though, is the actual

9   evidence is the recording, not the words that you see on

10  the screen.  The words are there just to help you see

11  what's going on, but the true evidence that you weigh is

12  what you hear on the recording.  Does everybody understand

13  that?  All right.

14         MR. GAVIN:  Judge, if I may.  I think there's

15  some excerpts from the recording.

16         THE COURT:  Okay.

17         MR. GAVIN:  And I think that the way the

18  government has done it is to highlight the portions that

19  are going to be read but not highlight the portions that

20  are not going to be read.  So I would just ask the Court

21  to instruct the jury that the unhighlighted portions

22  shouldn't be considered, then, because they are not aiding

23  at all the transcript.  The transcript is narrowed down.

24         THE COURT:  All right.  Do you agree with that

25  assessment?

Johnny Lavender – Direct                192

1          MR. GARNETT:  I do, Judge.  And I think the way

2   this is set up -- and I think the Court will see it here

3   in a second -- Mr. Gavin as well -- you really can only

4   see the portion that's being played.  So there's not --

5   the jury doesn't have the option or the ability to scroll

6   below what's actually being played.

7          THE COURT:  All right.  Folks, you just heard

8   what they said.  The key is what you hear.  Whatever the

9   portion is, focus on what you're listening to.  That's the

10  key point.  All right?  Are you ready to roll?

11         MR. GARNETT:  Yes, Judge.

12         THE COURT:  All right.

13  BY MR. GARNETT:

14  Q    Agent Lavender, were there any other individuals

15  present during this interview?

16  A    Yes, there were.

17  Q    And who was there?

18  A    Special Agent from DOJ OIG Orloff, and Mr. Legins,

19  and a representative from the union for Mr. Legins.

20  Q    Was the defendant in custody during this interview?

21  A    No, he was not in custody.

22  Q    Was he informed that the interview was entirely

23  voluntary?

24  A    Yes, he was.

25  Q    And was the defendant advised throughout the

1  interview of the consequences of providing false

2  information to federal law enforcement officers?

3  A     Numerous times.

4  Q     So we're going to play portions of that recording,

5  Agent Lavender, and the jurors will be able to follow

6  along on that corresponding transcript.

7            THE COURT:  Well, before you do that.  What

8  exactly did you tell him about what are the consequences

9  for somebody that gives false information to a federal

10 agent?

11           THE WITNESS:  We went over the false statements,

12 the 1001 charge at least four to five times with him.

13           THE COURT:  Okay.  And I know what you're

14 talking about, but they don't.  So I need you to explain

15 what it is that you told him precisely about the

16 consequences of not saying something truthful to a federal

17 agent.

18           THE WITNESS:  Yes, Your Honor.  We explained to

19 Mr. Legins that honesty was paramount and that if he lied

20 to us during the course of this interview, that he could

21 face additional charges, meaning a 1001 charge, which is

22 providing a false statement to myself.

23           THE COURT:  Okay.  Thank you.

24 BY MR. GARNETT:

25 Q     And was the defendant placed under oath at the

1  beginning of the interview?

2  A    Yes.

3  Q    At the beginning of this interview, Agent Lavender,

4  was the defendant asked whether he knew the victim,

5  Brandon Lemagne?

6  A    Yes.

7  Q    And did the defendant say anything about whether he

8  knew anything about Brandon Lemagne's sexual identity?

9  A    Yes.  He described him as being transgender.

10 Q    And how did the defendant describe his views as to

11 the transgender community at Petersburg?

12 A    He saw them as potential victims.

13 Q    Did the defendant describe his relationship with

14 Brandon Lemagne as encompassing only conversation?

15 A    First, he said he had no relationship, and then

16 stated that it was a purely -- just conversations.

17           THE COURT:  Well, are you going to play it?

18           MR. GARNETT:  I am, Your Honor.  I'm just moving

19 us up to the spot where we're going to play it.  We don't

20 want to play the entire recording, Your Honor.  It's quite

21 lengthy.

22           THE COURT:  Right.

23           MR. GARNETT:  So I'm trying to play excerpts.

24 And so I'm leading the jury up to the excerpt.

25           THE COURT:  Okay.  I mean, the defendant's words

Johnny Lavender - Direct                    195

1    is what controls here.

2              MR. GARNETT:  Yes, Your Honor.

3              THE COURT:  Instead of him summarizing, I'd

4    rather have you just play the relevant areas.  Okay?

5              MR. GARNETT:  Yes, Your Honor.

6              Ms. Taylor, can we play audio clip 3?

7              (The following transcript is an excerpt from the

8              video transcribed by Deposition Services, Inc.:)

9              "MR. ORLOFF:  Great.  Great.  Okay.  Well, we're

10             here to discuss activities that you had with

11             Brandon Lemagne.  Is that name familiar to you?

12             MR. LEGINS:  It is.

13             MR. ORLOFF:  Okay.  I have a picture of him,

14             just to, so you, in case you need to, like, a

15             recollection of what he looks like.

16             MR. LEGINS:  Mm-hmm.

17             MR. ORLOFF:  When do you first remember meeting

18             Mr. Lemagne?

19             MR. LEGINS:  I don't remember when I, um, I

20             don't remember when I officially met him.  I

21             remember seeing him, you know.  But I don't

22             remember.  I was, I don't remember the exact

23             time I met him.  I'm sorry.

24             MR. ORLOFF:  Like, early on, you said you

25             started about 2014 here?

Johnny Lavender – Direct                    196

1    MR. LEGINS:  I started in 2014.  But I don't

2    remember when, exactly, he popped on the scene.

3    MR. ORLOFF:  Okay.

4    MR. LEGINS:  You know, I, like I said, I do a

5    lot of overtime.  I see a lot of people.  I

6    didn't really pay attention to him.

7    MR. ORLOFF:  Okay.  What type of relationship

8    did you have with Lemagne?

9    MR. LEGINS:  I didn't have a relationship with

10   him.

11   MR. ORLOFF:  Mm-hmm.

12   MR. LEGINS:  I, um, he's a transgender inmate. I

13   tried to make the transgender inmates or/and the

14   homosexual inmates understand that, you know,

15   they can have somebody to talk to.  So I

16   socialize.  You know, good morning, how are you

17   doing.  You know, like that.  You know, small,

18   casual, professional conversations.  So that

19   they know it -- because I see them as potential

20   victims, perhaps.

21   MR. ORLOFF:  Okay.

22   MR. LEGINS:  You know.  And I think that was

23   probably my downfall getting, you know, too --

24   MR. ORLOFF:  Yeah.

25   MR. LEGINS:  -- talkative too much.  But the

1     reason for that is because I have experience.

2     Well, my son is homosexual.  He chose the

3     homosexual life, despite our religion.  And I

4     think because of that I try to treat everyone

5     the way I want someone to treat my son, so.

6     MR. ORLOFF:  And I mean, was it known that he's

7     in -- like, how do you know --

8     MR. LEGINS:  He's --

9     MR. ORLOFF:  -- if --

10    MR. LEGINS:  -- a transgender?

11    MR. ORLOFF:  -- he's homosexual or transgender?

12    Is it like they --

13    MR. LEGINS:  All right.  It's, you know, you can

14    pretty much see it on him.  And then --

15    MR. ORLOFF:  Yeah.

16    MR. LEGINS:  -- he didn't hide it.  You know,

17    and, uh, like most of the transgender, they try

18    to wear clothing that's just not really

19    appropriate.  You know?  Which makes them

20    potential victims, to everybody else.  But, you

21    know, that, you know, he didn't -- and then he

22    never really hid the fact that he, you know,

23    chose the homosexual lifestyle."

24    (End of transcript.)

25    MR. GARNETT:  Ms. Taylor, can we go ahead and

1  play clip 5?

2            MS. TAYLOR:  Five?

3            MR. GARNETT:  Yes, please.

4  BY MR. GARNETT:

5  Q    Actually, before we start playing this, at this point

6  in the interview had the defendant been cautioned again

7  about the 1001 false statements you referenced, the

8  consequences of providing false information to federal

9  agents?

10 A    Yes.

11           MR. GARNETT:  You can go ahead and play it,

12 Ms. Taylor.

13           (The following transcript is an excerpt from the

14           video transcribed by Deposition Services, Inc.:)

15           MR. LEGINS:  So, I don't, I don't lie.  There's

16           no need to lie.  What happened was, I went into

17           the Fox-South.  I entered through the Fox-South.

18           I did stop at unit team and made an attempt to

19           log onto the system.  The system was taking too

20           long to log on.  It wouldn't allow me to put in

21           my PIN number.  I learned later that the numbers

22           lock was on, which is why it wasn't doing it.

23           But in any case, it was taking too long.  I

24           pulled the card out.  Locked the door back, and

25           escorted the inmate to the north side, where I

Johnny Lavender - Direct          199

1     told the officer that he was on the unit.  And I

2     left him there.  That's it.  Besides

3     conversation, there was nothing else that went

4     on in that office.

5     MR. ORLOFF:  Explain to me why you would do that

6     while he's in there?

7     MR. LEGINS:  You know --

8     MR. ORLOFF:  Well, you have day to --

9     MR. LEGINS:  Yeah.

10    MR. ORLOFF:  -- open these --

11    MR. LEGINS:  It was just to --

12    MR. ORLOFF:  -- doors and do things yourself.

13    MR. LEGINS:  -- complacency.  And I was rushing.

14    And I just thought I'd do more than -- you know,

15    I'd just multitask.  But I've never, in --

16    actually, that day on the 10th, I had just found

17    out earlier that day that I had -- the surgery

18    was successful as far as removing the cancer in

19    my jaw, and that radiation treatment was soon to

20    start. I was over-happy about that. I was just

21    on a high.

22    I never would've done that under any other

23    circumstances.  Never have done that on any

24    other circumstances.  It was just, I wasn't

25    thinking.  I fell to complacency.  Um, and I

1    never will do that again.  But that was straight

2    complacency.

3    I thought I would multitask. I thought I would

4    do, you know, I thought I could log on and while

5    it's logging on, take him to the north side.  By

6    the time I come back, I'm up.  I print the

7    documents, and I move out.  Mind you, the whole

8    time that's going on I have a day room full of

9    inmates.  I have a day room full of inmates.

10   MR. ORLOFF:  So here are pictures of the room.

11   MR. LEGINS:  Okay?

12   MR. ORLOFF:  So you're telling me you came into

13   this room.

14   MR. LEGINS:  Uh-huh.

15   MR. ORLOFF:  Usually someone's here during the

16   day, right?

17   MR. LEGINS:  Yes.

18   MR. ORLOFF:  Okay. So this person's gone for the

19   day?

20   MR. LEGINS: Uh-huh.

21   MR. ORLOFF:  So, where is this printer that you

22   were trying -- you were trying to log onto this

23   system?

24   MR. LEGINS:  Right.  So, that's the computer, of

25   course, you see.  And the little PIV card thing

Johnny Lavender – Direct                          201

1     is right there.  The printer, itself, is right

2     there.  And that's the only printer we have in

3     the unit.

4           MR. ORLOFF:  Okay.  Where's Lemagne during this

5     whole time?

6           MR. LEGINS:  We're talking and joking.  And

7     he's, like, walking around this area right here.

8     And just talking about the unit, itself.  He's

9     not out of sight.

10          MR. ORLOFF:  Here's --

11          MR. LEGINS:  I kept sight --

12          MR. ORLOFF:  -- another picture.

13          MR. LEGINS:  -- on him the whole time.

14    Yeah.  So, he was walking, you know.  We, I'm

15    right here.  And I'm trying to log onto the PIV.

16    That's the card, right there.  And he's just

17    walking around.  I didn't really pay no real

18    attention to him, because we're talking and I'm,

19    once again, complacent and stupid.  And he's

20    just walking around.  He's just, he's not doing

21    -- he didn't leave my sight.  He didn't go

22    anywhere that made me say, hey, what are you

23    doing.

24          MR. ORLOFF:  Okay. So you're telling me, you're

25    telling us, there is nothing, no sexual activity

Johnny Lavender - Direct                202

1        that occurred in that room?

2            MR. LEGINS:  There was no sexual activity that

3        occurred in that room.

4            MR. ORLOFF:  Okay. And you're going to keep to

5        that statement?  There is absolutely 100 percent

6        no sexual activity that happened in that room

7        May 10th between 6:09 and 6:16 p.m.?

8            MR. LEGINS:  Nothing concerning me.  Nothing

9        concerning me.

10           MR. ORLOFF:  Okay."

11           (End of transcript.)

12           MR. GARNETT:  Ms. Taylor, if we could please

13  play tape 6, and could you pause at page 33, line 7?

14           (The following transcript is an excerpt from the

15        video transcribed by Deposition Services, Inc.:)

16           "MR. ORLOFF:  And you're telling me there was no

17        sexual activity.  On the other hand, um -- why

18        don't we get into that sexual activity.  So, did

19        you move Lemagne to the corner of this room,

20        grab him, move him to the corner of this room,

21        right here?

22           MR. LEGINS:  I didn't grab him at all.  And no,

23        I didn't move him to any part of the room.  My

24        focus was that computer.  And then after that

25        computer we moved out.

Johnny Lavender - Direct                    203

1     MR. ORLOFF:  What were you trying to print,

2     again?

3     MR. LEGINS:  Copouts.  It's an inmate request

4     form.  You know, they -- a couple of people in

5     the unit needed it.  They didn't have it.  After

6     that, after I didn't, wasn't able to print it

7     out, I just simply went to the north side.  Went

8     and talked to the officer.  I noticed he had

9     some.  Took some of his.  Gave them to my

10    inmates.

11    Let me also, um, let me also tell you, another

12    reason why it's impossible for me to have done

13    it is I suffer from a multitude -- I mean, I

14    know I look healthy.  But I suffer from a

15    multitude of illnesses.  One of them, for years

16    now, is erectile dysfunction.  I not only cannot

17    get a hard-on without medications, but I have no

18    sexual desire.  And that's all in my records.

19    You know, I've been dealing with this for at

20    least six years, five, six years.  I take a

21    series of medications in an attempt to help me.

22    Everything from testosterone replacement therapy

23    to, to everything.  You know, so without the

24    medication, I won't even get an erection, let

25    alone wanting to have sex.

1    You know, I just -- and then, you know, with

2    everything going on, under normal circumstances,

3    I don't think sex is something that be on my

4    mind.  You know, right now what's on my mind is

5    I may not live the next 10 years.  You know?

6    That's what's on my mind not -- and how can I

7    prepare my family.  Not having sex with a man.

8    You know?  I have nothing against the

9    transgender/homosexual community.  Like I said,

10   my -- I have nothing against it.  It's just that

11   that's not me.  That's not me.

12   MR. ORLOFF:  Okay.  So you did not manipulate,

13   force, or move him to the corner of the room at

14   any point?

15   MR. LEGINS:  No.

16   MR. ORLOFF:  Was he trying to leave, at any

17   point?

18   MR. LEGINS:  He could've left any time he wanted

19   to leave.  I wasn't blocking the door or

20   stopping him from going anywhere.

21   MR. ORLOFF:  Okay.

22   MR. LEGINS:  We wasn't --

23   MR. ORLOFF:  How big are you?  What's your

24   height and weight?

25   MR. LEGINS:  6'4".  I was 370.  I'm 328 now.

1      MR. ORLOFF:  Big guy.

2      MR. LEGINS:  Yes.

3      MR. ORLOFF:  What is, what's his, about,

4      height/weight?

5      MR. LEGINS:  Probably about, I don't know, 5'7".

6      Um, maybe 190 pounds.  I don't know.

7      MR. ORLOFF:  Okay.  Um, do you recall ever

8      saying to him, what's up, squat?

9      MR. LEGINS:  No.  There was no conversation

10     about squatting, you know.  I probably said,

11     what's up when I first seen him.  But there was

12     never a conversation about squatting.  Nothing

13     dealing with squat, bent, none of that.

14     That's --

15     MR. ORLOFF:  Okay. So you never made Lemagne --

16     you never forced Lemagne to perform oral sex on

17     your penis?

18     MR. LEGINS:  No.  Did -- no.

19     MR. LAVENDAR:  Can I clarify that a little?

20     MR. ORLOFF:  Yeah, go ahead.

21     MR. LAVENDAR:  Because asking a good question,

22     so I didn't want to interrupt.  But the question

23     was did you ever force him.  Did you ever have

24     any consensual sex --

25     MR. LEGINS:  No --

Johnny Lavender - Direct                    206

1          MR. LAVENDAR:  -- with --

2          MR. LEGINS:  -- consensual sex with Mr. Lemagne.

3          MR. LAVENDAR:  -- with him --

4          MR. LEGINS:  With no --

5          MR. LAVENDAR:  -- or anyone else --

6          MR. LEGINS:  -- with no one.

7          MR. LAVENDAR:  -- in this prison?

8          MR. LEGINS:  In this prison, at all.  No one.

9          MR. LAVENDAR:  Okay.  Consensual or forced?

10         MR. LEGINS:  Or forced, yes.

11         MR. LAVENDAR:  Okay.

12         MR. ORLOFF:  Yeah, thanks for clarifying.

13         MR. LEGINS:  Mm-hmm.

14         MR. ORLOFF:  So no consensual anything, you're

15    saying?

16         MR. LEGINS:  Nothing."

17         (End of transcript.)

18 BY MR. GARNETT:

19 Q    At this point in the interview did the defendant

20 explain precisely how he had tried to log into his BOP

21 computer account in the unit team office?

22 A    Yes, he did.

23         MR. GARNETT:  You can go ahead and play it,

24 Ms. Taylor.

25         (The following transcript is an excerpt from the

Johnny Lavender – Direct                    207

1       video transcribed by Deposition Services, Inc.:)

2       "MR. LAVENDAR:  So, with that statement, again,

3       with what you're telling us now, you're telling

4       -- and you're telling us that on that day,

5       you've explained that you went into that room to

6       try to print off on the printer.  You tried to

7       log into the printer, am I correct?

8       MR. LEGINS:  Yes, I did.

9       MR. LAVENDAR:  Okay.

10      MR. LEGINS:  And to the machine.

11      MR. LAVENDAR:  To the machine.

12      MR. LEGINS:  The computer.

13      MR. LAVENDAR:  Okay.  If I -- do you recall, how

14      many times did you try to log on?  Is it

15      multiple times? One time?

16      MR. LEGINS:  No, just once.

17      MR. LAVENDAR:  Okay.

18      MR. LEGINS:  I was trying to put the PIN in, but

19      it wasn't going in.  It was taking long.

20      MR. LAVENDAR:  Is there a PIN issued to you, or

21      just in general for all the --

22      MR. LEGINS:  Just, we all have our individual

23      PINs.

24      MR. LAVENDAR:  Okay.

25      MR. LEGINS:  Yeah.

Johnny Lavender - Direct                    208

1     MR. LAVENDAR:  And when you were entering it,

2     what was said?  Because I don't know.  Sometimes

3     -- I'm not a computer guy.  So --

4     MR. LEGINS: Mm-hmm.

5     MR. LAVENDAR:  -- please understand I'm not

6     trying to --

7     MR. LEGINS:  That's okay.

8     MR. LAVENDAR:  But when you tried to enter the

9     PIN, did it say, invalid PIN?  Uh, what did it

10    say?

11    MR. LEGINS:  Nothing. There wasn't, the, so you

12    know on the right-hand side you have the number

13    lock.

14    MR. LAVENDAR:  Right.

15    MR. LEGINS:  So I'm trying to push my PIN in.

16    And it's not, not going in.

17    MR. LAVENDAR:  So the numbers never were in it,

18    so.

19    MR. LEGINS:  Right, because --

20    MR. LAVENDAR:  Okay.

21    MR. LEGINS:  -- the number lock was, I found out

22    later on, the number lock was on.  You know what

23    I mean?  But um, I believe, yeah, it had to be

24    the numbers lock.  But it was just taking too

25    long.  And --

Johnny Lavender – Direct                    209

1    MR. LAVENDAR:  Okay.

2    MR. LEGINS:  -- we just moved out.  Now, mind

3    you, on both sides I have everyone out.  We have

4    an officer on the north side.  We have -- who

5    routinely go back and forth.  Who routinely

6    uses, you know, that area as well, because the

7    restroom was in there.  There's no way that that

8    would've been a suitable spot to do anything

9    sexual with so many people moving around and

10   walking around and so much going on.  It's not a

11   dead area.  It's a very active area.

12   MR. LAVENDAR:  Okay.

13   MR. LEGINS:  You know what I mean?

14   MR. LAVENDAR:  So it's an active area you were

15   going through.  You're saying you put your

16   numbers in.  But it -- because sometimes, like,

17   my computer when I work, if I type in the wrong

18   number it will tell me, you did something wrong.

19   And there's --

20   MR. LEGINS:  Mm-hmm.

21   MR. LAVENDAR:  -- and it tells me I entered an

22   incorrect number.  You're saying you never got

23   to that point.

24   MR. LEGINS:  I said --

25   MR. LAVENDAR:  And just, you're just hitting and

1      nothing was coming up?

2      MR. LEGINS:  Well, so once you put in your BOP

3      number then it requests for your PIN number.

4      MR. LAVENDAR:  Did you put your BOP number in?

5      MR. LEGINS:  I put the BOP number in.

6      MR. LAVENDAR:  You put your BOP number in.

7      MR. LEGINS:  Right.  The PIN number, like I

8      said, it wasn't --

9      MR. LAVENDAR:  Okay. So you got to the point

10     where you entered your BOP number?

11     MR. LEGINS:  Right.

12     MR. LAVENDAR:  And then your PIN, you were not

13     able to enter?

14     MR. LEGINS:  Right.

15     MR. LAVENDAR:  Because the number locks were on?

16     MR. LEGINS:  I believe the number lock was on.

17     MR. LAVENDAR:  Okay.  That's what you had said.

18     MR. LEGINS:  Yeah.

19     MR. LAVENDAR:  Okay.

20     MR. LEGINS:  When I thought about it.  Yeah.

21     MR. LAVENDAR:  And you're saying that at no

22     point during that, uh, that time period, or in

23     general, you said, at all, but specifically that

24     time period, there was no interaction between

25     you and the inmate, sexually?

Johnny Lavender - Direct                    211

1        MR. LEGINS:  Just -- nothing sexual.

2        MR. LAVENDAR:  Just conversation.

3        MR. LEGINS:  Yeah, just conversation.

4        MR. LAVENDAR:  Just straight conversation.  And

5        when I say sexual, oral, any type of, you know,

6        anal, any type of sexual interaction?

7        MR. LEGINS:  Mm-hmm?

8        MR. LAVENDAR:  And we were specifically

9        mentioning that day on May 10th.

10       MR. LEGINS:  Mm-hmm?

11       MR. LAVENDAR:  But you made the statement, to

12       make sure I'm clear, there has been no sexual

13       contact between you and any inmate during your

14       time period at this institution?

15       MR. LEGINS:  That's right.

16       MR. LAVENDAR:  Okay.

17       MR. LEGINS:  That's right.

18       MR. ORLOFF:  You have a printer in your office

19       outside this little walkthrough, correct?

20       MR. LEGINS:  That's the only printer.

21       MR. ORLOFF:  That's the only printer?

22       MR. LEGINS:  Mm-hmm.  That's the only one for

23       the whole Fox unit.  There's no other printer."

24       (End of transcript.)

25       MR. GARNETT:  You can stop it there, Ms. Taylor.

1  Thank you.

2  BY MR. GARNETT:

3  Q    Agent Lavender, have you reviewed the video

4  surveillance footage in this case?

5  A    I have.

6  Q    In reviewing the footage of May 10th, at any point do

7  you see the defendant approach another correctional

8  officer and retrieve paperwork from him?

9  A    I did not.

10         MR. GARNETT:  Ms. Taylor, can we go ahead and

11  play clip 7?

12         (The following transcript is an excerpt from the

13         video transcribed by Deposition Services, Inc.:)

14         "MR. ORLOFF:  All right.  Let's go to a previous

15         incident.  And that's the thing.  If this

16         wasn't -- if this was the only incident, but

17         it's not, right.  There's another incident on

18         March 16th.  Basically, a sexual encounter took

19         place between you and Lemagne on Friday, March

20         16th, on an elevator between F-South and

21         F-North.  So you see here, that's the, you know

22         where the elevator is, right?

23         MR. LEGINS:  Yeah.

24         MR. ORLOFF:  You come in here.

25         MR. LEGINS:  Uh-huh.

Johnny Lavender – Direct                    213

1    MR. ORLOFF:  Do you remember ever bringing him

2    on an elevator?

3    MR. LEGINS:  No, I do not.  I do not.  March

4    16th?  That's way back there.  I don't --

5    MR. ORLOFF:  It's about three months ago.

6    MR. LEGINS:  There's no way to remember that.

7    I know that I was never on an elevator alone

8    with him, if that's the question.  If, for some

9    reason, he needed to go down to a lower level,

10   it was never uneasy for me to notify the bottom

11   rangers that he was going, someone was coming

12   down the elevator.  I would've allowed him to

13   use the elevator going down.  But I would've

14   never put him on an elevator with me.  I wasn't

15   in an elevator with him.

16   MR. ORLOFF:  So you've never been alone with

17   Lemagne on an elevator?

18   MR. LEGINS:  No, I have not.  I have not.  No.

19   And it, it's only been very few times that I

20   even escorted him from one side to another.  You

21   know, there's been other times when I escorted

22   him from one end to the other.  I don't know why

23   he picked this time to be, you know.  But it was

24   never a situation.  I got complacent.  I

25   would've never, you know.

Johnny Lavender - Direct                    214

1          That's not uncommon for us to escort inmates

2          from one side to the other.  I just never

3          assumed that, you know, he would make an

4          accusation like that.  I didn't even see that

5          coming.

6          MR. ORLOFF:  So, on March 16th, you're saying

7          that Lemagne never performed oral sex on your

8          penis?

9          MR. LEGINS:  No, he did not.

10          MR. ORLOFF:  Even consensual?

11          MR. LEGINS:  No sexual acts, at all."

12          (End of transcript.)

13          MR. GARNETT:  Ms. Taylor, if we could actually

14  go back to page 6.  I apologize.  I think I actually cut

15  things off.  And if we could fast-forward to page 38,

16  line 21.

17          THE COURT:  You can replay it if -- I don't want

18  to mess up the computer again.

19          MS. TAYLOR:  That's okay.  We're okay.

20          MR. GARNETT:  If we can get to page 38, line 20.

21          I apologize, Your Honor.  I got lost in my notes

22  there.

23          THE COURT:  That's fine.

24          (The following transcript is an excerpt from the

25          video transcribed by Deposition Services, Inc.:)

Johnny Lavender – Direct                    215

1      "MR. LAVENDAR:  And any inmate during your time

2      period at this institution?

3      MR. LEGINS:  That's right.

4      MR. LAVENDAR:  Okay.

5      MR. LEGINS:  That's right.

6      MR. ORLOFF:  You have a printer in your office

7      outside this little walkthrough, correct?

8      MR. LEGINS:  That's the only printer.

9      MR. ORLOFF:  That's the only printer?

10     MR. LEGINS:  Mm-hmm.  That's the only one for

11     the whole Fox unit.  There's no other printer.

12     MR. ORLOFF:  So, right out here, you come

13     through here.  There's that little board.  And

14     you have your office.

15     MR. LEGINS:  Right.

16     MR. ORLOFF:  Is your printer in that office?

17     MR. LEGINS:  No, it's not.

18     MR. ORLOFF:  Okay. So let's get back to that May

19     10, 2018.  You said you'd not, uh, Lemagne did

20     not perform oral sex on your penis.  Did you

21     ever try to pull Lemagne's pants down?

22     MR. LEGINS:  Never.

23     MR. ORLOFF:  Did you spit on your hand and

24     penetrate Lemagne's anus with your fingers?

25     MR. LEGINS:  No, I did not.

Johnny Lavender – Direct                          216

1           MR. ORLOFF: Did you penetrate Lemagne's anus

2           with your penis?

3           MR. LEGINS:  I did not.

4           MR. ORLOFF:  Did you ejaculate?

5           MR. LEGINS:  I -- no, I did not.

6           MR. ORLOFF:  So, if there's semen found in this

7           room, or on clothing, or on Lemagne, how would

8           you explain that?

9           MR. LEGINS:  I wouldn't be able to explain that.

10          It -- I wouldn't be able to explain it."

11          (End of transcript.)

12  BY MR. GARNETT:

13  Q    At this point did the defendant then offer an

14  explanation for why his semen might have been present at

15  the prison?

16  A    Yes.

17          MR. GARNETT:  Ms. Taylor, can we go ahead and

18  play clip 8 at this point?

19          (The following transcript is an excerpt from the

20          video transcribed by Deposition Services, Inc.:)

21          "MR. ORLOFF:  Again, if there's evidence or

22          semen on clothing --

23          MR. LEGINS:  Why --

24          MR. ORLOFF:  -- what would be your explanation?

25          MR. LEGINS:  Not --

Johnny Lavender - Direct                    217

1    MR. ORLOFF:  If you said, hey, Steve, it was

2    consensual, I made a mistake, I didn't force

3    him, I didn't block him from leaving the

4    elevator, like, okay.  But I mean, the evidence

5    is not going to lie.  So --

6    MR. LEGINS:  I understand.

7    MR. ORLOFF:  -- and like I said earlier, like,

8    if you're honest with us and we leave here

9    today, and we go back to, you know, the guy

10   actually was truthful with us, instead of the

11   18 U.S.C. 1001 where, if the evidence comes back

12   and today you've been lying about everything,

13   false statements to federal investigators, I

14   mean, they're not going to give you the benefit

15   of the doubt.

16   MR. LEGINS:  I understand.

17   MR. ORLOFF:  So, I mean, if you need to clarify

18   anything, like, now is the time to do it.  And,

19   and, listen, I know you're going through a lot.

20   I know.

21   MR. LEGINS:  The only -- there was nothing with

22   Lemagne.  There was not sexual activity with

23   him.  There was never a time when I engaged in

24   any sexual acts with Lemagne.

25   So, I've been dealing with cancer for a while.

1    I've been stressed out.  I've been ignoring my

2    family.  I've been ignoring my wife.  As I said

3    previously, I, I, uh, take medication for an

4    erection.  I haven't been intimate with my wife

5    in some time since then.  In fact, my wife, my

6    family didn't even know I had cancer.  They

7    didn't know until the surgery.

8    On the 9th, which was my first day back to work

9    prior to my, uh, me finding out the conclusion

10   of the, of the thing, I had taken some

11   medication in hopes to have sex with my wife

12   before I came to work.  I wanted to surprise

13   her.  Did the house up real nice.  I wanted to

14   surprise her.  She was on her cycle.

15   I came to work.  The medication has me get an

16   erections.  Okay?  So, I didn't want to get an

17   erection around inmates.  So, later on that day,

18   on the 9th, not the 10th, or no other time

19   before that, I did go in the bathroom and

20   relieve myself.  Because, like I said, I kept

21   getting an erection.  That's the only time that

22   I've ever done anything like that, but I had to

23   do it because it kept giving me erections while

24   I was dealing with other inmates.  And I

25   didn't -- that's not cool.  That's it.

Johnny Lavender – Direct                    219

1           MR. ORLOFF:  So, what, would it be in this

2           bathroom?  In --

3           MR. LEGINS:  It would --

4           MR. ORLOFF:  -- that office?

5           MR. LEGINS:  -- yeah, that's the only bathroom

6           up there.  So, that's the only.  And then I

7           clean up after myself.  And then the detail from

8           the north side goes in the next day and cleans

9           it, too, so.  That's it.  That's, there is no

10          other way.  There is nothing."

11          (End of transcript.)

12 BY MR. GARNETT:

13 Q    Did you then ask the defendant about any other

14 details of that night, May 10th?

15 A    Yes.

16 Q    Was the defendant specifically asked about making

17 phone calls to the medical office?

18 A    Yes.

19 Q    And what did he say his reason for calling the

20 medical office was?

21 A    He stated that he had a headache and wanted to get

22 some aspirin.

23          MR. GARNETT:  If we could play clip 12,

24 Ms. Taylor.

25          (The following transcript is an excerpt from the

1    video transcribed by Deposition Services, Inc.:)

2    "MR. LAVENDAR:  But you have a medical facility

3    here.  Do you go there for treatment for any of

4    your --

5    MR. LEGINS:  Medical facility where?

6    MR. LAVENDAR:  Don't you have a medical

7    treatment facility?

8    MR. ORLOFF:  Yeah, there's some medical

9    professions here.

10   MR. LAVENDAR:  All right.

11   MR. LEGINS:  Yeah, but it's for the inmates,

12   primarily.  They can't even give me aspirin.

13   MR. ORLOFF:  Okay. So you can't -- okay.  So you

14   don't get treatment here --

15   MR. LEGINS:  No, I don't.

16   MR. LAVENDAR: -- for any of your issues that are

17   going on?  Okay.

18   MR. LEGINS:  I asked them for aspirin one day,

19   because I had a -- they couldn't even give me

20   aspirin.  So --

21   MR. LAVENDAR:  Oh, you asked them for aspirin?

22   MR. LEGINS:  Aspirin, because I had a really bad

23   headache, you know.  I had a really bad

24   headache.  And --

25   MR. ORLOFF:  When was that?

Johnny Lavender – Direct                221

1          MR. LEGINS:  I don't remember the exact date.

2      But, um --

3          MR. ORLOFF:  Could it possibly have been on the

4      evening of May 10th?

5          MR. LEGINS:  I'm not exactly -- I can't remember

6      the date.  I just know that they couldn't do it,

7      you know.  And I had a really bad headache. Just

8      a lot of pressure.  A lot of stress.  There's a

9      lot going on in my time, right now."

10         (End of transcript.)

11 BY MR. GARNETT:

12 Q   Special Agent Lavender, during the course of your

13 investigation, did you obtain a work -- I'll call it a

14 work schedule for FCI Petersburg for the date of May 10th,

15 2018?

16 A   Yes.

17         MR. GARNETT:  Your Honor, I'd ask to show the

18 witness what's been marked as Government Exhibit 24.

19         THE COURT:  Any objection?

20         MR. GAVIN:  No, sir.

21         THE COURT:  You're asking that it be admitted?

22         MR. GARNETT:  I will be momentarily, Judge.  I'd

23 also note that there's a stipulation that deals with the

24 authenticity of this particular document.

25         THE COURT:  Why don't you publish the

1   stipulation and then I'll admit it.

2          MR. GARNETT:  Yes, sir.

3          So, ladies and gentlemen, this is paragraph 6 of

4   the parties' joint stipulations.  Actually, I'm sorry,

5   Judge.  There's not a stipulation as to this one.  This

6   was a late-breaking exhibit.  I apologize.

7          THE COURT:  They're not objecting anyhow.  So

8   I'm admitting it.

9          MR. GARNETT:  Thank you, Your Honor.

10          (Government Exhibit Number 24 was admitted.)

11          MR. GARNETT:  Ms. Taylor, can you go ahead and

12   pull up -- actually, pull up the top half of that so Agent

13   Lavender can read it?  Can you include the top box there?

14   I'm sorry.

15   BY MR. GARNETT:

16   Q    Agent Lavender, do you recognize that as the work

17   schedule for May 10th?

18   A    Yes.

19   Q    Okay.

20          MR. GARNETT:  If we can close that out right

21   now, Ms. Taylor.

22   BY MR. GARNETT:

23   Q    Agent Lavender, did the defendant tell you at this

24   point that he had been directed to call medical that

25   evening by a lieutenant?

Johnny Lavender – Direct                    223

1   A     Yes.

2              MR. GARNETT:  And Ms. Taylor, can we go ahead

3   and play clip 13 now?

4              (The following transcript is an excerpt from the

5              video transcribed by Deposition Services, Inc.:)

6              "MR. LAVENDAR:  You're saying you tried to log

7              on to print something off because you were being

8              too complacent.  You're saying that at some

9              point, maybe within the day before you had

10             masturbated in the bathroom and cleaned up.  So

11             if there's DNA in there, that's why it's in

12             there.  And then you're saying that you did call

13             the medical facility --

14             MR. LEGINS:  At some point.

15             MR. LAVENDAR:  -- and this same day.

16             MR. LEGINS:  Okay.

17             MR. LAVENDAR:  It's documented.  It's the same

18             day.

19             MR. LEGINS:  Okay.

20             MR. LAVENDAR:  Following this alleged assault.

21             MR. LEGINS:  Okay.

22             MR. LAVENDAR:  So, and you know that you can't

23             get anything there.  You've never called there

24             before, is my understanding, in all the years

25             that you've been here.  So the day of this

Johnny Lavender - Direct                224

1    alleged assault, you have a headache.  You call

2    in there to ask for an aspirin.  You happen to

3    have masturbated the day beforehand.  And you

4    happened to try to log into the computer.

5    There's a lot of things going on here that don't

6    really -- as you know, there's things that,

7    there seems to be a lot of rationalization of

8    things that went on.  I had a headache, so I had

9    to call medical.  You've never done that before.

10   MR. LEGINS:  But before that I called the

11   lieutenant's office.

12   MR. LAVENDAR:  And he told you to call medical?

13   MR. LEGINS:  He told me he doesn't have one for

14   me, to try to call medical.

15   MR. LAVENDAR:  Okay.

16   MR. LEGINS:  It was his idea for me to call

17   medical, not --

18   MR. ORLOFF:  Who's your lieutenant?

19   MR. LEGINS:  -- my own.

20   MR. ORLOFF:  Who's the lieutenant?

21   MR. LEGINS: That was, um, I want to say

22   Lieutenant Clenments (phonetic sp.).  I'm not

23   exactly sure who was working.  It would've --

24   MR. ORLOFF:  Do you know how to spell it?

25   MR. LEGINS:  Uh, L-E, uh, L-E, uh, tenant.  Um,

Johnny Lavender – Direct                          225

1            C-L-E-N-M-E-N-T-S.  And as a matter of fact,

2            after medical told me that they couldn't give

3            me, um -- uh, a thing, I called other units to

4            see if they had it, as well.  It wasn't that I

5            specifically needed to call medical.  I just

6            went -- I just had a headache.  That was it."

7            (End of transcript.)

8            MR. GARNETT:  Ms. Taylor, can you pull back up

9   Government Exhibit 24?  If we can we blow up the top half

10  of that?

11  BY MR. GARNETT:

12  Q    Agent Lavender, looking in the -- we'll call it the

13  third column.  It has a 2.  It's the 06 to 14:30 shift.

14  Do you see what time Lieutenant Clement would have been

15  working that evening -- or that day at FCI Petersburg?

16  A    Give me one moment, please.

17  Q    Sure.

18  A    Yes.

19  Q    And what shift was Lieutenant Clement working on

20  May 10th, 2018?

21  A    6 to 14:30.

22  Q    So is that 6:00 a.m. to 2:30 p.m.?

23  A    Yes.

24            MR. GARNETT:  Okay.  Ms. Taylor, if we can back

25  out of that zoom view and blow up the -- call it the

Johnny Lavender – Direct                    226

1   right-hand side of the screen and scroll -- okay.

2   BY MR. GARNETT:

3   Q    So, Agent Lavender, the far column there in terms of

4   the shifts that are available for May 10th, 2018, at FCI

5   Petersburg, the far shift is the 1600 to midnight shift;

6   is that right?

7   A    Yes.

8           MR. GARNETT:  Ms. Taylor, can you scroll down

9   that column?  Is that possible or do you need to back back

10  out?  All right.  You can stop right there.

11  BY MR. GARNETT:

12  Q    Looking about an inch above in that 6:00 p.m. to

13  midnight shift, what shift did defendant Chikosi Legins

14  work that day, May 10th?

15  A    Mr. Legins is working into the midnight shift.

16  Q    And what time would he have started his shift?

17  A    4:00 p.m.

18  Q    And what time did Lieutenant Clement's shift end?

19  A    2:30.

20  Q    So would Lieutenant Clement have been on duty at the

21  time that Chikosi Legins arrived for his shift?

22  A    No.

23  Q    Agent Lavender, you mentioned earlier that you

24  reviewed surveillance video surrounding the May 10th

25  incident at FCI Petersburg.  Is it accurate to say that

Johnny Lavender – Direct                    227

1   the defendant returned to Fox South from the unit team

2   area after escorting Brandon Lemagne into that area at

3   approximately 6:15 p.m.?

4   A    Yes.

5   Q    Okay.  And in observing that surveillance footage,

6   did you observe whether the defendant returned to the unit

7   team area at approximately 6:30 p.m.?

8   A    Yes.

9   Q    Did you ask the defendant about his reason for

10  returning to that area?

11  A    Yes.

12          MR. GARNETT:  Can we go ahead and play clip 10,

13  Ms. Taylor?

14          (The following transcript is an excerpt from the

15          video transcribed by Deposition Services, Inc.:)

16          "MR. ORLOFF:  Is there a reason you went back

17          into that room, 6:30, 6:30ish, after you

18          escorted Lemagne out?  What were you doing back

19          in there afterwards?

20          MR. LEGINS:  I had to have a bowel movement.

21          But when I went in there, um, the other officer

22          and his guy was in there, so I left, because I

23          didn't want to have a bowel movement with them

24          in there.  That's why I went in there.  If you

25          look, I know I came right back out, because they

Johnny Lavender - Direct                    228

1         was in there doing whatever, you know, shredding

2         paper or whatever they was doing, I don't know.

3         But they were in there.  There was an officer

4         and an inmate already in there.  So, I left out.

5         MR. ORLOFF:  Okay.  And then the previous night

6         you said you went and relieved yourself.  But

7         how does that work?  You do it over the toilet?

8         You did it in paper towels?  You go --

9         MR. LEGINS:  Oh my goodness.

10        MR. ORLOFF:  -- to the bathroom?

11        MR. LEGINS:  Um --

12        MR. ORLOFF:  I think it's important because,

13        like I said, if the scene was processed --

14        MR. LEGINS:  Yeah, that's just in the bathroom.

15        That was the bathroom.  It was no other place

16        but the bathroom.  And, um, I think I was, um,

17        standing up.  God.  I think I was standing up.

18        You know, and of course I used a paper towel.

19        And of course I cleaned myself off, you know,

20        accordingly."

21        (End of transcript.)

22        MR. GARNETT:  And, Your Honor, this might be a

23 bridge too far, but, Ms. Taylor, can we go to Government

24 Exhibit 2, the video?

25        (Video Played.)

Johnny Lavender – Direct                    229

1          MR. GARNETT:  And could you stop it right there?

2     Could you scroll to the 7:41 mark of that clip?

3          MS. TAYLOR:  7:41 in the bottom?

4          MR. GARNETT:  Yes, please.

5          THE COURT:  What time is that going to be on

6     military time?

7          MR. GARNETT:  Your Honor, I'll note that it's --

8     the time is 18:15:59 --

9          THE COURT:  Okay.

10         MR. GARNETT:  -- at the top.

11         Go ahead and play it, Ms. Taylor.  Thank you.

12         (Video Played.)

13         MR. GARNETT:  Go ahead and pause it, Ms. Taylor.

14    BY MR. GARNETT:

15    Q    And, Agent Lavender, is this the defendant returning

16    to the unit team area at approximately 18:30?

17    A    Yes.

18    Q    I think the video showed 18:30:05.  And the defendant

19    indicated to you that he had returned after seeing another

20    officer in that area?

21    A    He did.

22         MR. GARNETT:  You can go ahead and hit play,

23    Ms. Taylor.

24         (Video Played.)

25         MR. GARNETT:  Thank you, Ms. Taylor.

1  BY MR. GARNETT:

2  Q    Special Agent Lavender, what's the time at the top of

3  the screen after the defendant returned right back out?

4  A    18:31:14.

5  Q    Special Agent Lavender, during the course of this

6  interview, did agents discuss the presence of surveillance

7  cameras at FCI Petersburg?

8  A    We did.

9           MR. GARNETT:  Ms. Taylor, can we play clip 16,

10 please?

11          (The following transcript is an excerpt from the

12          video transcribed by Deposition Services, Inc.:)

13          "MR. ORLOFF:  So, I guess, when it comes down

14          to, if your DNA is found on his clothing, or

15          other areas, I mean, how would you explain that?

16          I mean, is that just --

17          MR. LEGINS:  I --

18          MR. ORLOFF:  -- is there a way to explain that?

19          MR. LEGINS:  You said this like 20 times, so you

20          must have some type of -- I don't, I don't know

21          where my DNA -- my DNA shouldn't be nowhere near

22          him.  The only time that I did whatever I did

23          was that one day, period.  For, you know, for

24          the whole entire time, I've never done that

25          before.  And I had to do that because, like I

Johnny Lavender – Direct                    231

1           said, I was, you know, getting erections while I

2           was working.  Um, so --

3           MR. ORLOFF:  What about exposing yourself to

4           Lemagne?  Has that ever happened?

5           MR. LEGINS:  There was never a situation where I

6           was out of camera view, unless I walked him from

7           one point to another.  There was never a point.

8           There's cameras everywhere.  Unless I walked him

9           -- and then, the only time where I didn't walk

10          him from one point directly to the other was the

11          10th, because I stopped off at unit team, which

12          I've never done.

13          So, there was never a time period where he was

14          in there for the couple of seconds it takes to

15          walk across.  If there was ever a time when I

16          had to put him on an elevator, I would've

17          notified the officers downstairs and said, hey,

18          one's coming down on your back elevator door.

19          And that would've been it.  That would've been

20          it.  It wouldn't have been, no."

21          (End of transcript.)

22  BY MR. GARNETT:

23  Q    Agent Lavender, by the end of the interview, had the

24  defendant attempted to explain to you and Agent Orloff how

25  his DNA could possibly have been recovered?

Johnny Lavender – Direct                232

1   A     No.

2   Q     I'm sorry.  Possibly recovered from Brandon Lemagne?

3   A     No.

4   Q     Did he continue to claim that he had never had sexual

5   contact with any inmate at any time?

6   A     Yes.

7               MR. GARNETT:  Ms. Taylor, can we play clip 17?

8               (The following transcript is an excerpt from the

9               video transcribed by Deposition Services, Inc.:)

10              "MR. LEGINS:  But I don't understand how my DNA

11              would come -- I don't understand how he would

12              obtain my DNA.

13              MR. LAVENDAR:  Okay.

14              MR. LEGINS:  The only time, like I said, was the

15              day before.  But I cleaned up and --

16              MR. LAVENDAR:  Okay.

17              MR. LEGINS:  -- and everything like that, so.

18              MR. LAVENDAR:  All right. So this, and again,

19              I'm just, I'm giving you the last opportunity

20              here to make any corrections or any type of --

21              MR. LEGINS:  Right.

22              MR. LAVENDAR:  -- maybe clarifications.  We call

23              it, we call it a, uh, you know, basically, a

24              last call for any type of information you think

25              might be important.  Because once I take this,

Johnny Lavender – Direct                    233

1          I'm going to stay with that with your

2          statements.

3          MR. LEGINS:  Right.

4          MR. LAVENDAR:  And again, a 1001 charge, lying

5          on top of everything else, it --

6          MR. LEGINS:  I really appreciate you.

7          MR. LAVENDAR:  Okay. So --

8          MR. LEGINS:  Yeah.

9          MR. LAVENDAR:  -- at this point we're going to

10         go with you're stating that there was never any

11         sexual contact, consensual or non-consensual,

12         with Mr. Lemagne or any other inmate --

13         MR. LEGINS:  Right.

14         MR. LAVENDAR:  -- at that, at this facility?

15         MR. LEGINS:  Yes, that's exactly what I'm

16         saying.

17         MR. LAVENDAR:  Okay."

18         (End of transcript.)

19         MR. GARNETT:  That's all the questions I have,

20    Your Honor.  Thank you.

21         THE COURT:  All right.  I think what we'll do is

22    this is a perfect time for our afternoon break.  So we'll

23    break until 3:25 and then we'll pick back up.

24         All rise for the jury.

25         (The jury exited the courtroom.)

1          THE COURT:  Anything we need to take up?

2          MR. GAVIN:  No, sir.

3          THE COURT:  Agent Lavender, remember not to talk

4    about your testimony with anybody.  You're still on the

5    witness stand.

6          SPECIAL AGENT LAVENDER:  Yes, Your Honor.

7          (Recess from 3:09 p.m. until 3:26 p.m.)

8          THE COURT:  All right.  We're going to bring the

9    jury in.  So why don't you just -- everybody remain

10   standing.

11         (The jury entered the courtroom.)

12         THE COURT:  All right.  Everyone can have a

13   seat.

14         Everybody doing okay over there?

15         A JUROR:  Yes.

16         THE COURT:  By the way, if you all want to

17   stretch, you can stand up at any point during the

18   testimony as well.

19         All right.  Mr. Gavin.

20         MR. GAVIN:  Yes, sir.

21                       **CROSS-EXAMINATION**

22   BY MR. GAVIN:

23   Q    Good afternoon, Special Agent Lavender.

24   A    Good afternoon, sir.

25   Q    Special Agent Lavender, as I understand, Count Five

1  includes false statements that includes two different

2  false statements which you allege were made under the

3  indictment, the first being that he didn't have sex with

4  Mr. Lemagne when he, in fact, did, both anal and/or oral

5  on one of two dates; is that right?

6  A    That's my understanding.

7  Q    And the second is that he lied to you about

8  attempting to log into the computer system to print out

9  something in the office; is that correct?

10  A    That's my understanding.

11  Q    All right.  Did he ever tell you that he actually

12  logged in or did he just tell you that he tried to log in?

13  A    He said he attempted to log in.

14  Q    And with respect to the sex, if the jury were to

15  believe that he's not guilty of having sex with the

16  defendant, are there other lies out there that would be

17  encompassed by Count Five under that first provision?

18  A    Excuse me, sir.  Could I ask you to repeat that,

19  please?

20  Q    Sure.  If the jury were to conclude that there were

21  no other sex acts established between Mr. Legins and

22  Mr. Lemagne, are there any other statements under Count

23  Five that you would believe would have been materially

24  false?

25           THE COURT:  I think what he's asking is this.

Johnny Lavender - Cross                    236

1   Put the sex aside, right.

2              THE WITNESS:  Okay.

3              THE COURT:  Let's say, hypothetically, that the

4   false statement that's alleged in Count Five says -- the

5   second one -- that the defendant falsely stated that on

6   May the 10th, 2018, he attempted to use the computer and

7   the printer while he was engaged in, quote, just

8   conversation with inmate B.L. when they were alone in an

9   unattended office with no surveillance cameras.

10             THE WITNESS:  Okay.

11             THE COURT:  I think what he's asking you -- and

12  you'll correct me if I'm wrong -- one of the issues of

13  false statements is whether something is material.  And

14  absent the allegation about the unlawful sexual assault,

15  would any false statement about using a computer be

16  material?

17             Is that what you're asking?

18             MR. GAVIN:  Yes, sir.

19             THE COURT:  Would the -- something false about

20  the computer have -- be material without the sexual

21  background is what I think his point is.

22             MR. GARNETT:  Judge, if I could object.  I'm not

23  sure that he's qualified to testify to materiality.  I

24  think that's a jury finding as to whether or not something

25  is --

Johnny Lavender - Cross                     237

1           THE COURT:  Well, he can talk about the impact

2  upon the investigation.  That's what I think he's --

3  that's what he can testify to, and that alone.  They'll

4  get a jury instruction about materiality.

5           But is there anything important about whether or

6  not he made a false statement about the computer other

7  than his connection to the sexual activity?

8           THE WITNESS:  Your Honor, I'm not trying to be

9  difficult.  I'm just trying to make sure I'm answering

10  this correctly.

11          THE COURT:  I understand.

12          THE WITNESS:  You're asking me if we -- pose it

13  one more time again.  I just want to make sure I'm

14  answering this correctly.

15          THE COURT:  Okay.  Absent the allegation that

16  there's illegal sexual assault here, right, would there be

17  anything material about -- a false statement about the

18  defendant using the computer in the way that's alleged in

19  the indictment, in terms of your investigation -- like

20  let's say hypothetically -- and I'm not saying this is

21  true -- if the government proved that he did lie about

22  using the computer but there is no evidence to prove that

23  he had sexual conduct with Mr. Lemagne, would that still

24  have a material impact on your investigation?

25          Because that's what 1001 is about, right?

1            THE WITNESS:  Yes, sir.  Yes, Your Honor.

2            THE COURT:  Would that still affect your

3    investigation?

4            Is that what your question is?

5            MR. GAVIN:  Yes, sir.

6            THE COURT:  Okay.

7            THE WITNESS:  Your Honor, again, I'm not trying

8    to -- I'm just trying to make sure I answer this because

9    it seems to be an issue for Mr. Gavin here.  But if you're

10   asking to separate the sex acts from the computer logging

11   on, if the -- you're asking me if the sex acts aren't

12   supported, does it have any bearing upon the computer?

13           THE COURT:  Let me ask it a different way.  Are

14   they necessarily tied together?  That's what I think his

15   point is.

16           MR. GAVIN:  Yes, sir.

17           THE WITNESS:  In my opinion, it is.

18           THE COURT:  Okay.  That's all he wanted to ask.

19           All right.  You can have a seat, Mr. Garnett.

20           MR. GARNETT:  Thank you, Your Honor.

21   BY MR. GAVIN:

22   Q    So what is the significance of the computer to the

23   sex acts?

24   A    The significance is -- I don't want to say anything

25   out of line, but the significance is your client lied

1  about being on a computer to cover up the sex acts.

2  Q     But he never stated he was on a computer.

3  A     He --

4           THE COURT:  Hold on a second.

5  BY MR. GAVIN:

6  Q     Did he ever say he was on a computer?

7           THE COURT:  The evidence speaks for itself.

8  You're not going to comment on that.

9           MR. GAVIN:  Sorry.

10 BY MR. GAVIN:

11 Q     Did he ever state that he was on the computer?

12 A     Yes, he did.

13 Q     I thought you just testified that he said he

14 attempted to get on the computer.

15 A     Well, in order to attempt to get on a computer,

16 you're on a computer.

17 Q     Okay.  Special Agent, you made significance to the

18 fact that Mr. Legins came out of the corridor and then

19 went back in for a period of time, and it was allowed to

20 play.  And is that the time that you're referring to as

21 the time in which he went back in and he told you that he

22 was going to have a bowel movement in the bathroom but

23 there was another gentleman back in there, along with an

24 inmate, at the same time?

25 A     I believe so, yes.

1  Q    Did you go back and look at the Fox North tape to see

2  if somebody had entered the corridor from the Fox North

3  side, including the unit office?

4  A    No.

5  Q    Wouldn't that have been the easiest way to figure out

6  if what he was telling you was correct, whether or not

7  there was footage from the Fox North side, along with

8  another inmate, going into the unit office?

9  A    Repeat your question to make sure I'm answering

10 correctly.

11 Q    Wouldn't it have been easy to look at the Fox North

12 tape to see if whether the Fox North unit officer and an

13 inmate had entered the corridor from the Fox North side at

14 the same time Mr. Legins said he was going back in there

15 to have a bowel movement?

16 A    Yes, we could have looked at that.  But your client

17 said he turned around and came right back out, indicating

18 that there was no reason to look because he went in and

19 came straight back.

20 Q    So how do you know that was part of the lie if the

21 footage on the other side would have confirmed that he was

22 telling you the truth?

23 A    Your client said he walked in and came right back

24 out, and that was 70 seconds.  So I didn't find it

25 necessary to go and check because of that time frame of 70

Johnny Lavender – Cross                    241

1    seconds for a 15-foot walk.

2    Q    But you don't know whether he was lying or not.

3    A    I know he took 70 seconds to go approximately 15 feet

4    and said he came right back out.

5    Q    Okay.  But his excuse to you was that he went in to

6    use the bathroom and there was somebody else already in

7    there, the officer from Fox North, along with an inmate

8    from Fox North, doing something, shredding paper, doing

9    whatever in the office, correct?

10   A    Yes.  His excuse was that.

11   Q    Okay.  So the question, then, is did you do anything

12   to verify or corroborate what he was telling you by

13   looking at the Fox North tape to find out if the Fox North

14   officer had, in fact, entered the corridor with an inmate

15   to go into the office and shred paper?

16   A    I can't say that video doesn't exit, but I did not

17   see it.

18              MR. GAVIN:  I don't have any other questions.

19              THE COURT:  All right.  Any redirect?

20              MR. GARNETT:  No redirect, Your Honor.

21              THE COURT:  All right.  Agent, you can step

22   down.  Again, don't talk about your testimony with anybody

23   until the trial is over.

24              THE WITNESS:  Thank you, Your Honor.

25              (Witness stood aside.)

Darryl Strausser – Direct                    242

1        THE COURT:  Do you want to call your next

2   witness?

3        MR. GARNETT:  Yes, Your Honor.  The

4   United States would call Darryl Strausser.

5                   **DARRYL STRAUSSER,**

6     called by the government, first being duly sworn,

7                   testified as follows:

8        THE COURT:  All right.  Mr. Garnett.

9        MR. GARNETT:  Thank you, Your Honor.

10                  **DIRECT EXAMINATION**

11  BY MR. GARNETT:

12  Q    Good afternoon, Mr. Strausser.

13  A    Good afternoon.

14  Q    Could you please introduce yourself to the jury, and

15  spell your first and last names for the court reporter

16  here?

17  A    My name is Darryl Strausser.  It's D-A-R-R-Y-L,

18  S-T-R-A-U-S-S-E-R.

19  Q    Mr. Strausser, are you currently employed?

20  A    No, sir.

21  Q    Where are you currently employed?

22  A    I was the IT manager at FCC Petersburg.

23  Q    And when did you leave that position?

24  A    It would have been June of 2018.

25  Q    And how long did you hold that position at FCI

Darryl Strausser - Direct                    243

1    Petersburg?

2    A    That would have been from August of 2009 until that

3    point when I retired.

4    Q    And what did you say your title was again?  I'm

5    sorry.

6    A    IT manager for the entire complex.

7    Q    And you say "complex."  What kind of facilities are

8    on FCC Petersburg?

9    A    Medium, where my office was, the low, and the camp.

10   Q    What were your duties as the IT services manager?

11   A    Basic network security and network -- local area

12   network management.

13   Q    Okay.  Prior to August 2009 when you arrived at

14   Petersburg, were you employed by BOP at a different

15   location?

16   A    Yes.  Previous to that, I was at FCI Memphis.

17   Q    And what was your position there?

18   A    Went there in April of '98 as an IT specialist and

19   left there in August of 2009 as an IT manager.

20   Q    So were you promoted while at Memphis?

21   A    Yes.  I was there -- came there as a GS7 and left as

22   a GS12.

23   Q    And your training for the jobs that you held I guess

24   at end of your Memphis tenure and then for the duration of

25   your Petersburg tenure as the IT services manager, what

1  kind of training did you receive for that position?

2  A    Mainly annual training, information security training

3  and technology training at the training facility out in

4  Aurora, Colorado.

5  Q    Did you receive annual training as well, you said?

6  A    Yes.

7  Q    Did you supervise training for the staff at FCI

8  Petersburg?

9  A    Yes.

10 Q    And did you stay, to the best of your ability,

11 current in updates in that field, information technology?

12 A    Yes.

13         MR. GARNETT:  Your Honor, at this point I'd move

14 to qualify Mr. Strausser as an expert in the field of

15 Bureau of Prisons information technology procedures.

16         THE COURT:  Do you have any objection?

17         MR. GAVIN:  No, sir.

18         THE COURT:  All right.  So accepted.  He's

19 another expert.  You've heard me say that experts can give

20 opinions, and I'll give you more instructions at the end

21 of the trial about their testimony.  Okay?

22         MR. GARNETT:  Thank you, Your Honor.

23 BY MR. GARNETT:

24 Q    Mr. Strausser, let's talk a little bit about the

25 information technology set up there at FCC Petersburg.  Do

Darryl Strausser - Direct                    245

1  prison staff on the prison complex use computers in the

2  regular course of their duties?

3  A     Yes, they do.

4  Q     Would that include correctional officers?

5  A     Yes.

6  Q     Let's talk about how computer access would work for

7  those employees.  Do employees -- are they issued a

8  personal ID card or a PIV card?

9  A     Yes.

10 Q     What is that, Mr. Strausser?

11 A     That's a -- a means of identification, also another

12 level of security where they would use that card to log

13 into the computers.

14 Q     Does a PIV card have a personal identification number

15 assigned to it?

16 A     Yes.  It's associated with their user ID and other

17 personal information that's on -- that reside on the chip

18 on that card.

19 Q     Is the PIN number essentially sort of a passcode?

20 A     Yes.

21 Q     So we'll talk a little bit more about BOP employee

22 numbers in a second.  But for the time being, is every BOP

23 employee assigned a unique Bureau of Prisons employee

24 number?

25 A     Yes.

1  Q     And what would that number look like?  What was your

2  BOP employee number, for instance?

3  A     It was the letters BOP, followed by a randomly

4  generated four numbers.

5  Q     Four numbers?

6  A     Or five numbers.

7  Q     And is the BOP employee number that an employee is

8  assigned, is that linked to their PIV card?

9  A     Yes, it is.

10 Q     To log onto a computer at FCI Petersburg, does that

11 involve a multistep process?

12 A     Yes, it does.

13 Q     Could you walk the jury through what that process

14 would look like from start to finish?

15 A     First, the employee would sit down at the computer

16 and take their PIN -- their PIV card out of their holder

17 and insert it into the PIV card reader.  And then they

18 would press the control-alt-delete button simultaneously,

19 which would bring up a dialogue box where they would be

20 able to insert their BOP ID number, which we were just

21 talking about.  BOP followed by four numbers.

22         And then they would be -- after they clicked

23 okay on that, they would be prompted to enter in a PIN

24 number, which they had to generate themselves, and only

25 themselves would know that PIN number, and then

Darryl Strausser – Direct                    247

1  acknowledge that.  And then that would allow them access

2  into not only the local computer but the network resources

3  that are attached to that computer.

4  Q    So just to be clear, to get to the part of the log-in

5  process where your PIN code would be entered, you would

6  have already had to successfully enter your BOP number?

7  A    That's correct.

8  Q    Are you familiar with FCC Petersburg's information

9  technology records?

10  A    Yes.

11  Q    Okay.  When an employee at FCC Petersburg accesses a

12  computer, does the computer automatically generate records

13  of that access attempt?

14  A    That's correct.

15  Q    Okay.  And are those records retained by the Bureau

16  of Prisons?  In other words, can those records be

17  retrieved after the fact?

18  A    Yes.

19  Q    All right.  And are those records retained by the

20  Bureau of Prisons in the ordinary course of business?  In

21  other words, it is BOP's procedure to retain these

22  electronic records?

23  A    Yes.

24  Q    In June of 2018, Mr. Strausser, were you directed to

25  perform a computer record search to determine whether a

1  specific computer within FCI Petersburg was accessed

2  during a certain time range?

3  A    Yes.

4  Q    And what computer were you specifically directed to

5  search access database records for?

6  A    The secretary's computer in the housing unit.

7  Q    Was that assigned a particular number?

8  A    Yes.

9  Q    Okay.  Did you draft a memorandum of your assignment

10 and your search?

11 A    Yes, I did.

12 Q    Okay.  Give me one second here, Mr. Strausser.  Would

13 it help you to be able to reference that report when

14 you're testifying here today?

15 A    Yes, please.

16 Q    Okay.

17           THE COURT:  Do you have any objection to him

18 reviewing that report, Mr. Gavin?

19           MR. GARNETT:  No, sir, I don't.

20           THE COURT:  I gather you've given a copy of this

21 before to Mr. Gavin?

22           MR. GARNETT:  This was provided in discovery

23 earlier, Your Honor, but --

24           MR. GAVIN:  I've seen it.

25           THE COURT:  Okay.

Darryl Strausser – Direct                    249

1       MR. GAVIN:  Thank you, Officer Spivey.

2       It's just a series of long computer numbers,

3  Judge, that --

4       THE WITNESS:  Thank you.

5       CSO SPIVEY:  Yes, sir.

6  BY MR. GARNETT:

7  Q    Mr. Strausser, do you recognize that document?

8  A    Yes, I do.

9  Q    And what is that document?

10  A    That is the memorandum that I provided Mr. Bruce

11  Norman, the SIA, on June 8th, 2018.

12  Q    And does that memorandum capture the assignment you

13  were given in terms of what computer to search for?

14  A    Yes.

15  Q    And what computer were you specifically directed to

16  search access database records for?

17  A    That would be the F unit secretary office computer.

18  Q    Okay.  Did that computer come with a specific

19  designator?

20  A    Yes.

21  Q    And what designator was that?

22  A    It was the number UNT-0114103583.

23  Q    And when you get a number like that, Mr. Strausser,

24  that UNT and then a long stretch of numbers, are you able

25  to go to your records and determine where precisely that

Darryl Strausser - Direct                    250

1  computer would be located at FCI Petersburg?

2  A    Yes.

3  Q    And in this case, did you locate that computer in the

4  FCI Petersburg database inventory?

5  A    Yes.

6  Q    And after locating that computer, did you then go to

7  the physical location that the database inventory

8  indicated that computer was stored at?

9  A    Yes.

10 Q    And where was that particular computer, that UNT --

11 that long number you listed, where was that computer

12 located?

13 A    I did confirm that it was in the F unit secretary's

14 office.

15 Q    Was there any other computer located in that

16 secretary's office?

17 A    No.

18 Q    Now, you mentioned earlier that you had searched for

19 access records for that particular computer for a certain

20 date range.  What dates were you directed to search for?

21 A    That would have been May 9th of 2018 and May 10th of

22 2018.

23 Q    All right.  And were you also directed to search for

24 access attempts to that computer by a specific BOP

25 employee number?

Darryl Strausser - Direct                    251

1   A     Yes.

2   Q     And what specific BOP employee number was that?

3   A     That was BOP 52312.

4   Q     And does FCI Petersburg maintain records indicating

5   which employee is assigned which employee number?

6   A     Yes.

7   Q     Okay.  Which employee was assigned BOP number 52312?

8   A     That would have been Mr. Legins.

9   Q     Did you know Chikosi Legins prior to receiving this

10  search assignment?

11  A     Not personally.

12          MR. GARNETT:  Ms. Taylor, if you could go ahead

13  and pull up what's been marked as Government's Exhibit 21.

14          THE COURT:  Any objection?

15          MR. GAVIN:  No, sir.

16          THE COURT:  Do you want to admit it?

17          MR. GARNETT:  Yes, please.

18          THE COURT:  It's admitted.

19          MR. GARNETT:  Thank you, Your Honor.  And,

20  Your Honor -- just for the record, Your Honor, I'd note

21  that Government Exhibit 21 is referenced in paragraph 6 of

22  the parties' joint stipulations, which goes to the

23  authenticity of that record.

24          THE COURT:  Did we already publish that one?

25          MR. GARNETT:  Yes, sir.

Darryl Strausser – Direct                    252

 1            THE COURT:  That's fine.  All right.

 2   BY MR. GARNETT:

 3   Q    So, Mr. Strausser, this is probably sort of small

 4   here.

 5            MR. GARNETT:  Ms. Taylor, can you go ahead and

 6   blow up the top half of that report?

 7   BY MR. GARNETT:

 8   Q    Mr. Strausser, have you seen this document before?

 9   A    Yes.

10   Q    And what is this document?

11   A    That was the document referenced in the memorandum

12   that directed me to search log-in attempts on that

13   particular computer.

14   Q    So to be clear, the record search you ran, did it

15   capture all access attempts on this computer or only

16   access attempts by the defendant's BOP number?

17   A    All access attempts.

18   Q    In reviewing the access records for this computer,

19   did you determine whether there were any log-on attempts

20   by the defendant -- so BOP number 52312 -- on the date of

21   May 9th, 2018?

22   A    Yes.

23   Q    When did that log-on take place?

24   A    9:04 p.m.

25   Q    Did your record search for this computer locate any

Darryl Strausser - Direct                    253

1  log-on attempts by the defendant for May 10th, 2018?

2  A    No, it did not.

3  Q    So take a step back here.  If an employee were able

4  to complete the full log-on process, Mr. Strausser -- you

5  mentioned that --

6  A    Yes.

7  Q    -- process there from inserting your PIV card, to

8  hitting control-alt-delete, to BOP employee number, to

9  successfully entering their PIN number, would that create

10 an access log that would indicate which specific BOP

11 employee number accessed the computer?

12 A    Yes.

13 Q    Okay.  If an employee wasn't able to get to that last

14 step, let's say that the PIN number, for whatever reason,

15 wasn't entered successfully, would the access logs be able

16 to tell you which BOP employee number tried to access that

17 computer?

18 A    No.

19 Q    I'm sorry.  No?

20 A    No.

21 Q    But to take a step back here, you said earlier that

22 the computer access records captured all access attempts

23 on this computer and not just access attempts linked to a

24 certain BOP employee number; is that right?

25 A    That's right.

1   Q    Okay.  In other words, did the computer database

2   search you ran tell you whether there were any access

3   attempts?

4   A    Yes.

5   Q    Let alone who attempted to access the computer, just

6   whether there were any access attempts on that computer on

7   May 9th and May 10th?

8   A    Yes.

9   Q    Okay.  In reviewing those records, did you determine

10  whether anyone, not just the defendant's BOP number,

11  whether anyone attempted to access this computer at any

12  point after 6:00 p.m. on May 10th, 2018?

13  A    Could you repeat that time?

14  Q    Sure.  Were you able to find any access attempts by

15  anyone on this computer after 6:00 p.m. on May 10th of

16  2018?

17  A    No, I did not.

18  Q    So, Mr. Strausser, is it fair to say that you're

19  familiar with a computer keyboard?

20  A    Yes.

21  Q    And this might sound like pretty basic in terms of

22  questions, but what keys would an employee use to enter

23  their BOP employee number?  Letters, numbers or both?

24  A    Both.

25  Q    Okay.  What keys would they need to enter their PIN

1   number?

2   A     Numbers.

3   Q     All right.   How long, after entering a BOP employee

4   number and clicking the arrow, would it take for the PIN

5   code box to pop up on the screen?

6   A     Anywhere from immediately to a few seconds.

7   Q     And can you think of any reason why an employee would

8   be able to successfully enter a series of numbers for

9   their BOP employee number and then seconds later be unable

10  to enter any numbers for a PIN number?

11  A     No.

12        MR. GARNETT:   That's all the questions I have,

13  Your Honor.

14        THE COURT:   All right.   Mr. Gavin.

15        MR. GAVIN:   Yes, sir, thank you.

16                    **CROSS-EXAMINATION**

17  BY MR. GAVIN:

18  Q     Mr. Strausser, good afternoon.

19  A     Good afternoon.

20  Q     This is a computer question so there's no reason why

21  you'll believe that I'm confused.   But I'm trying to

22  understand your report, and as I understand your testimony

23  or your statement to Special Agent Lavender, there are

24  three things that have to happen before a person can

25  actually access the system, correct?

1    A    Correct.

2    Q    You have a PIV card.  You plug that in, right?

3    A    Yes.

4    Q    Then you have to go to the computer.  You put in your

5    BOP number.

6    A    Yes.

7    Q    Then you have to do a third function, which is to

8    type in a PIN number.

9    A    Yes.

10   Q    And once all three of those things are done, then

11   your system would generate a record.

12   A    Right.

13   Q    Until that point, does your system generate a record?

14   A    Yes.

15   Q    When does it start generating the record?  Does it

16   start generating the record when you put in the PIV card?

17   A    Yes, I believe.  Yes.

18   Q    Are you sure about that?

19   A    Well, it -- it -- in all the records, there are

20   records in the report that show no associated -- no

21   associated account number.  So there are many services

22   that are called upon every step of the process.

23   Q    So if somebody put in a PIV card but they didn't put

24   in their next number, which is their user name, would you

25   be able to identify who entered the PIV card into the

1  system?

2  A    I don't believe.

3  Q    All right.  So if the person put in the PIV card but

4  then he could not type in his BOP number because he either

5  didn't understand the computer keyboard, the number lock

6  was on, the number lock was off, would that show that this

7  defendant actually tried to access the system?

8  A    It wouldn't show specifically because it wouldn't --

9  because he wouldn't have entered in a PIN, which at that

10  point is accessing the SAM database, which checks to see

11  if the correct ID and the correct PIN was entered.

12             MR. GAVIN:  I don't have any other questions.

13             THE COURT:  Do you have any redirect?

14             MR. GARNETT:  Just very briefly, Your Honor.

15                    **REDIRECT EXAMINATION**

16  BY MR. GARNETT:

17  Q    So, Mr. Strausser, in order for the records to

18  indicate that a particular BOP employee number was the

19  particular BOP employee to utilize the computer, that

20  individual would need to successfully enter not just their

21  BOP employee number, but their PIN code number as well?

22  A    Yes, or unsuccessfully.  Successfully or

23  unsuccessfully.

24  Q    But they have had to enter a PIN number --

25  A    Yes, they would have to enter in something.

Darryl Strausser - Redirect                    258

1    Q    Okay.  But if they weren't able --

2              THE COURT:  I'm sorry.  "Something" referring to

3    the PIN number?

4              THE WITNESS:  Yes.

5              THE COURT:  So if somebody puts in their PV

6    card, right, or whatever, PIV card --

7              THE WITNESS:  Yes.

8              THE COURT:  -- and then they put in the accurate

9    BOP number --

10             THE WITNESS:  Yes.

11             THE COURT:  -- right, but they type their wrong

12   PIN number --

13             THE WITNESS:  Right.

14             THE COURT:  -- that would have still been

15   captured in your audit that you ran?

16             THE WITNESS:  Yes.  Yes.  And -- and because it

17   was -- it would be -- come back as a success or a failure,

18   an audit success or an audit failure.

19             THE COURT:  Okay.

20             THE WITNESS:  But the only thing that I had

21   provided was -- was any instance that was tied to that BOP

22   ID, since my direction was to search to see if any access

23   by that BOP ID took place on those dates.

24             THE COURT:  So are you saying, then, you did not

25   search the situation that I described, which is somebody

Darryl Strausser - Redirect                    259

1  puts in their -- was it PIV?  Is that --

2            THE WITNESS:  Yes.

3            THE COURT:  -- PIV card, puts in their right BOP

4  number but puts in a wrong PIN number, you didn't search

5  that situation?

6            THE WITNESS:  Yes.  I -- it was all -- all

7  instances, whether the attempt was successful or not

8  successful.

9            THE COURT:  So you did search that?

10            THE WITNESS:  Yes.

11            THE COURT:  Okay.  And does it show any input by

12  Mr. Legins after 6:00 on May the 10th?

13            THE WITNESS:  No, it does not, not specifically

14  for that BOP account.

15            THE COURT:  All right.  Does that clear it up?

16            MR. GARNETT:  It does, Your Honor.  What I want

17  to go ahead and do and take a step backwards, though --

18            THE COURT:  You can, but I -- Mr. Gavin, I'll

19  give you an additional round of cross-examination just

20  because we're getting this cleared up.

21            MR. GAVIN:  Thank you, Your Honor.

22  BY MR. GARNETT:

23  Q    So, again, just to clarify, your record search -- you

24  were searching for all access records; is that correct?

25  A    Right.  That's correct, on those dates.

1  Q     The access attempts captured by that record wouldn't

2  be able to record what BOP employee number was making the

3  access attempt unless that BOP user entered the PIN

4  number, correctly or incorrectly?

5  A    That's -- that's correct.  So -- so the SAM database

6  is a database that has -- that contains the password

7  and/or PIN.  So it can give access to the local area

8  computer, which -- the local computer, which, in turn,

9  gives access to the whole network, which would be --

10 include Internet access and so forth.

11           So that SAM database residing on the computer is

12 what checks -- what makes the check of what he entered

13 into the keyboard versus what is -- what is the correct ID

14 and PIN in the database.

15 Q    But, again, just to go back to the very beginning of

16 the process.  So putting aside the PIN thing --

17 A    Right.

18 Q    -- again, on the hypothesis that in a particular

19 instance, an individual might not be able to enter a PIN

20 at all.

21 A    Right.

22 Q    So putting aside that piece, the computer access

23 records would have captured that evening -- or the report

24 you got would have captured anything that happened after a

25 BOP slapped their PIV card into that machine and hit

Darryl Strausser - Recross                261

1  control-alt-delete; is that correct?

2  A    That's correct.  Yes.

3  Q    And you were not able to find any access attempt --

4  A    No.

5  Q    -- regardless of who the computer was able to

6  confirm, after 6 p.m. that evening; is that right?

7  A    My recollection was before that, yes.  It was the

8  last record of -- that just showed no -- no account tied

9  to it.

10         MR. GARNETT:  Thank you, Your Honor.

11         THE COURT:  Do you have any follow-up questions?

12         MR. GAVIN:  Yes, sir.

13                    **RECROSS-EXAMINATION**

14  BY MR. GAVIN:

15  Q    Three steps, right?

16  A    Yes, sir.

17  Q    PIV, user name, PIN code?

18  A    (Nodding head.)

19  Q    A person puts their PIV statement and is

20  unsuccessful, for whatever reason, in putting in their

21  user name because they screw up the keyboard, can't type,

22  whatever --

23  A    Right.

24  Q    -- would they ever gain access to the system?

25  A    They would not gain access.

1  Q    Would your system have picked it up at that point --

2  A    Yes.

3  Q    -- that somebody was actually trying to put in their

4  user name and put it incorrectly?  Not the PIN number, the

5  user name.

6  A    Not -- well, it would not -- it would not come back

7  for -- for what I searched, it would not come back as

8  unsuccessful because there was no PIN attempt.

9  Q    All right.  So if they took one step and two step and

10 went to the third step and screwed up the third step,

11 you'd have a record of that?

12 A    Yes.

13 Q    If they went one step, two step, three step and did

14 it correctly, you'd have a record of that?

15 A    Yes.

16 Q    But if they did it one step, two step and didn't

17 complete step 2 correctly, you would not have a record of

18 that?

19 A    If -- the -- the -- it would show -- if they had the

20 two-step, which would be the BOP, and the PIN?

21 Q    No.  The first step is the PIV card.

22 A    Oh, okay.  Okay.

23 Q    So if they put in the PIV card but they're

24 unsuccessful in putting in their user name, is that going

25 to be recorded anywhere?

1  A     Not on the SAM database.

2  Q     They never get to step two -- to complete step two.

3  A     Not on the SAM database because it would -- they're

4  not -- they're not looking at the unsuccessful --

5  Q     Okay.

6              MR. GAVIN:  No other questions, Your Honor.

7              THE COURT:  Do you have a redirect on that?

8              MR. GARNETT:  Yes, Your Honor.

9              **FURTHER REDIRECT EXAMINATION**

10 BY MR. GARNETT:

11 Q     I think we're confusing the issue, or at least we're

12 confusing the process here.  So, Mr. Strausser, the

13 computer access database check you ran --

14 A     Yes.

15 Q     -- captured all access attempts, right?

16 A     Right.  Successful or unsuccessful, yes.

17 Q     Thank you.  When a BOP employee puts their PIV card

18 in and hits control-alt-delete, would that have been

19 captured in the access database records you ran?

20 A     Just the PIV card and no entry?

21 Q     They hit -- PIV card and hit control-alt-delete to

22 move to the BOP employee number screen?

23 A     It would have been -- it would have been -- here's

24 the difference is that it would have been captured as a --

25 an action, but it would not have been associated with an

LaShawn Ruffin - Direct

1  account.

2  Q    Right.  Did you identify any such actions after

3  6:00 p.m. that evening?

4  A    None.

5          MR. GARNETT:  All right.  Thank you, Your Honor.

6          THE COURT:  All right.  Mr. Strasser, thank you

7  for your testimony.  You can step down.  I'm going to

8  instruct you not to talk about your testimony with anybody

9  else until our trial is over.  Is that okay?

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  All right.  Thank you.  You're

12 excused.

13         (Witness stood aside.)

14         THE COURT:  All right.  Do you want to call your

15 next witness?

16         MS. GILBERT:  Your Honor, the government would

17 call LaShawn Ruffin.

18                 **LASHAWN RUFFIN,**

19   called by the government, first being duly sworn,

20                testified as follows:

21                **DIRECT EXAMINATION**

22 BY MS. GILBERT:

23 Q    Good afternoon.

24 A    Good afternoon.

25 Q    Could you please state and spell your name for the

1   record?

2   A     My first name is LaShawn, L-A-S-H-A-W-N.  Last name

3   Ruffin, R-U-F-F-I-N.

4   Q     Ms. Ruffin, who is your employer?

5   A     United States Public Health Service.

6   Q     And where do you work?

7   A     Butner, North Carolina, at the Federal Bureau of

8   Prisons.

9   Q     What is your title?

10  A     Nurse practitioner.

11  Q     What are your duties as a nurse practitioner at the

12  federal correctional institute in Butner, North Carolina?

13  A     So primarily, I see inmates on a daily basis for sick

14  call reasons, new patients that come into the facility,

15  for chronic care visits.  I see patients annually or

16  biannually or as needed.

17  Q     On May 21st, 2018, did you examine an inmate named

18  Brandon Lemagne?

19  A     Yes.

20  Q     What was the purpose of that examination?

21  A     It was called a 14-day evaluation, which we primarily

22  do when inmates transfer in from a new facility.  And the

23  primary reason for those particular visits is that the

24  inmate may have chronic conditions.  So we kind of do an

25  overview of those chronic conditions to see what's

LaShawn Ruffin - Direct                    266

1  particularly going on with the inmate medically.

2  Q    Did you observe any injuries in Mr. Lemagne's body?

3  A    During that particular physical, I did observe a

4  bruise on his body.

5  Q    And where was the bruise that you observed?

6  A    I would actually have to see my clinical notation

7  because I don't recall at the moment.

8  Q    That would refresh your recollection?

9  A    Yes.

10             THE COURT:  Do you have it marked?

11             MS. GILBERT:  I do not, Your Honor.

12             MS. TAYLOR:  Twenty-six.

13             MR. GARNETT:  It would be 26, Your Honor.

14             THE COURT:  All right.  We'll mark it

15  Government's Exhibit Number 26.

16             Mr. Gavin, do you have any objection to her

17  showing that exhibit to the witness?

18             MR. GAVIN:  I don't, other than I can't find it.

19             THE COURT:  Do you want to just show it to him

20  real quick?

21             MS. GILBERT:  Certainly, Your Honor.  And for

22  what it's worth, we don't intend to move for its

23  admission.  It will just be used to refresh the witness,

24  but --

25             THE COURT:  Right.  But he still has a right to

1  see what it is, see if he wants to object to it.

2  BY MS. GILBERT:

3  Q    Once you've had an opportunity to review and your

4  memory is refreshed, Officer Spivey can bring that back to

5  me.

6  A    Okay.  So according to my clinical notation here, it

7  states that during the physical exam, I did observe a

8  bruise below the right eye and a bruise to the right upper

9  arm.

10 Q    In your experience as a nurse practitioner, how long

11 can it take for bruises to form on the body after contact?

12             MR. GAVIN:  Judge, I think that would require an

13 expert opinion.

14             THE COURT:  Yeah.  Do you want to qualify her?

15             MS. GILBERT:  Your Honor, we did not notice

16 Nurse Ruffin because we were planning to just ask her

17 about her experience as a nurse practitioner.

18             THE COURT:  All right.  Well, her testimony,

19 then, is going to be she saw a bruise on Mr. Lemagne's

20 right eye and right upper arm on May the 21st.

21             MS. GILBERT:  Okay.  Thank you, Your Honor.

22             THE COURT:  Do you have any other questions?

23             MS. GILBERT:  No further questions for this

24 witness.

25             THE COURT:  Do you have any cross?

LaShawn Ruffin - Direct                    268

1          MR. GAVIN:  No, sir.

2          THE COURT:  Okay.  Ma'am, thank you so much for

3  being here and testifying.  I'm going to ask you -- you're

4  going to be excused.  I'm going to ask you not to talk

5  about your testimony until our trial is over.  All right?

6  Thank you again.

7          THE WITNESS:  Okay.  Thank you.

8          (Witness stood aside.)

9          THE COURT:  All right.  Do you want to call your

10 next witness?

11         MR. GARNETT:  Your Honor, the United States

12 would call Officer Harry Parker.

13         Your Honor, Officer Parker appears to be in the

14 restroom.

15         THE COURT:  I'll tell you -- here's what we're

16 going to do.  We're going to take an extra five-minute

17 break just for the jury while we track him down in the

18 bathroom.  I need to address a legal issues with the

19 lawyers anyhow.  So I'm going to give you an extra five

20 minutes here.  How does that sound?

21         So everybody is going to rise for the jury.

22         (The jury exited the courtroom.)

23         (Mr. Parker entered the courtroom.)

24         THE COURT:  We'll just have him step outside for

25 a second.

LaShawn Ruffin - Direct

1          (Mr. Parker exited the courtroom.)

2          THE COURT:  So after Mr. Parker, where are you

3    heading to next?  This is the lock specialist.  Where are

4    you headed to next?

5          MR. GARNETT:  That's right, Your Honor.  So,

6    Your Honor, after Officer Parker, we have two additional

7    officers, an EMT -- I'm sorry -- a paramedic and then

8    tomorrow, Your Honor, Dr. Wolf Walker.

9          THE COURT:  All right.  I'll tell you, the

10   reason I wanted to just talk for a second is about

11   Dr. Wolf Walker.  But we could do that when the jury is

12   done, then, right?  You're not going to get to her today?

13         MR. GARNETT:  No, Your Honor.  I don't expect

14   to.

15         THE COURT:  So -- I'll tell you what.  She's not

16   sitting outside, is she?

17         MR. GARNETT:  No, sir.

18         THE COURT:  Okay.  So if we get through

19   everybody else, we're going to stop no matter what time it

20   is.  Okay?  And then I'm going -- Ms. Gilbert, I think

21   this is your witness.

22         MS. GILBERT:  Yes, Your Honor.

23         THE COURT:  I'm going to ask you for a specific

24   proffer about exactly what that witness is going to say

25   just because I don't want to get any more issues like what

1  just happened, and I'm -- I don't want you overplaying

2  your hand and causing a problem here at the end of the

3  trial is what I'm telling you.  Okay?

4          So I'll tell you what.  I'll give you -- since I

5  gave them five minutes, I'll give you each, I guess, five

6  minutes.  We'll come back out at 4:10, and then we'll

7  finish up the rest of your witnesses.  And whenever you're

8  done today, we're going to stop, then.  Okay?

9          MR. GARNETT:  Yes, sir.

10          THE COURT:  Other than for Dr. Walker.

11          (Recess from 4:06 p.m. until 4:11 p.m.)

12          THE COURT:  We'll all rise for the jury, and

13  we'll bring the jury in.

14          (The jury entered the courtroom.)

15          THE COURT:  All right.  Everybody can be seated.

16          Everybody okay over there?  We're running ahead

17  of schedule.  You should be glad about that.  All right.

18          Do you want to call your witness?

19          MR. GARNETT:  Your Honor, the United States

20  would call Officer Harry Parker.

21                          **HARRY PARKER,**

22      called by the government, first being duly sworn,

23                      testified as follows:

24                      **DIRECT EXAMINATION**

25  BY MR. GARNETT:

1  Q     Good afternoon, Officer.  Could you please introduce

2  yourself to the jury and spell your first and last name

3  for the court reporter?

4  A     My name is Officer Parker, Harry Parker.  H-A-R-R-Y,

5  P-A-R-K-E-R.

6  Q     And how are you employed, Officer?

7  A     I'm a lock security specialist at FCC Petersburg.

8  Q     And how long have you been with FCC Petersburg?

9  A     This year it will be 15 years.

10 Q     So that's a different type -- what's a lock security

11 specialist do at FCI Petersburg?

12 A     I repair all the locks in the institution.

13 Q     Do you also man the arsenal?

14 A     Yes.  I man the arsenal as well.

15 Q     I should say, what's the arsenal?

16 A     Basically what I do is I prepare all the weapons:

17 9 millimeters, M16s, shotguns.  Also, I issue out the

18 emergency equipment, like medical trips and stuff like

19 that.

20 Q     Are officers at FCC Petersburg required to be armed

21 when they take inmates off the grounds of the -- or the

22 complex?

23 A     Yes.  It all depends what custody they're in.  Like

24 cabinet inmates, you don't have to, but medium and low,

25 yes.

1  Q    Do inmates(sic) come to you to draw the weapons for

2  those trips?

3  A    I'm sorry.

4  Q    Do inmates(sic) come to you, to the arsenal, the

5  armory, to draw the weapons for their trip?

6  A    The officers, yes, they do come to the armory to draw

7  their weapons for medical trips.

8  Q    So prior to being the lock and security specialist,

9  Mr. Parker, what were your previous duties at FCC

10 Petersburg?

11 A    I was a correctional officer.  I was a tool room

12 officer, and then I was -- now I'm a lock security

13 specialist.

14            You're talking about prior to me coming to

15 Petersburg or just my duties there?

16 Q    While at Petersburg.  So -- let me narrow it down a

17 bit.  While at FCC Petersburg, have you worked as a

18 housing unit officer?

19 A    Yes, I have.

20 Q    How long would you say you were a housing unit

21 officer?

22 A    Probably about five years.

23 Q    Okay.  And the location of the lock, the location

24 where you were, where is that located on the complex?

25 A    I'm outside.  I'm over at the low institution.  My

1  location at the armory where I work at is outside the

2  institution.

3  Q    So you're not located somewhere where officers from

4  the medium institution could just walk up to your office?

5  A    No.  Where I issue weapons, I'm stationed at the low.

6  You have the low, and you also have the medium.  I'm over

7  at the low -- between the low and the camp.

8  Q    So how often would you say you interact with officers

9  from the medium institution?

10 A    It all depends.  It could be every day.  It all

11 depends if they come get a weapon to take an inmate out

12 for a medical trip, or something like that, or if they

13 happen to be working in the housing unit where I'm

14 actually preparing or fixing a lock.

15 Q    When officers -- actually -- all right.  So let's

16 talk about June 6th of 2018, Officer Parker.  Do you

17 recall interacting with Officer Chikosi Legins on that

18 date?

19 A    Yes.

20 Q    And were you familiar with Officer Legins prior to

21 that date?

22 A    Yes.

23 Q    Okay.  How long had you worked with him for?

24 A    I was there -- I was actually there to give him his

25 IF class when he came in.  At the time, I was thinking I

1  was tool control class at the time.  So I met him when he

2  first came in.  I can't remember what year it was.

3  Q    Sure.  And just to break down the acronyms, what's an

4  IF class?

5  A    Institution familiarization.  When officers first

6  come inside the institution, we give them courses on

7  telling them what needs to be done, what classes or what

8  key control is, what tool control is, stuff like that.

9  Q    Okay.  Do you see Chikosi Legins here in the

10 courtroom today?

11 A    Yes.

12 Q    Could you please identify him by where he's seated

13 and what he's wearing?

14 A    He has a blue suit on, blue tie, white shirt.  It's

15 the gentleman right there.

16         MR. GARNETT:  Your Honor, I'd ask the record

17 reflect that Officer Parker has identified the defendant.

18         THE COURT:  So noted.

19         MR. GARNETT:  Thank you.

20 BY MR. GARNETT:

21 Q    Without going into -- I should say did you have a

22 conversation with the defendant that day, June 6th?

23 A    Yes.

24 Q    Without going into detail on that conversation, at

25 least not yet, did you end up reporting that conversation

1  to law enforcement?

2  A    I reported it to the SIA lieutenant, Norman, yes.

3  Q    And what is that, the SIA lieutenant?

4  A    He's like a special investigator of the institution.

5  Q    Okay.  Why did you feel you needed to report that

6  conversation to SIA Norman?

7  A    I was uncomfortable about it when I heard it.

8  Q    So let's talk about the conversation you had with the

9  defendant on that date.  Did you notice when the

10 defendant -- I should say why did the defendant come to

11 your location that date?

12 A    He was going on a medical trip.

13 Q    And so why would he need to come see you?

14 A    Because I issue him the weapons for him to go out on

15 the trip.

16 Q    Did you notice anything about the defendant, Officer

17 Parker, when he approached?

18 A    Yeah.  He -- he's just -- he wasn't himself.  He

19 didn't look -- he looked, like, in a state of confusion.

20 Q    Noticing that, did you ask him whether anything was

21 going on or how he was doing?

22 A    Yes.

23 Q    Okay.  Why would you typically ask another officer

24 that in the course of your duties?

25 A    Because I issue weapons out to officers that can be

1   used for us or actually to hurt us or something like that.

2   So I really want to know their best state of mind people

3   are in when I actually give them a weapon.  Also, I'm

4   typically concerned about how they're doing as well.

5              MR. GARNETT:  Can the jury hear Mr. Parker

6   pretty well?  You can?  Okay.  Thank you.

7              THE COURT:  I think you should ask me that, and

8   I'll ask them.

9              MR. GARNETT:  I'm sorry, Your Honor.

10             THE COURT:  Okay.

11             MR. GARNETT:  I apologize.

12             THE COURT:  Go ahead.

13  BY MR. GARNETT:

14  Q    All right.  What did the defendant tell you when you

15  asked him how he was doing?

16  A    He had told me that have I heard any rumors going on

17  around about the institution and stuff about him and

18  stuff.  I told him I don't really worry about what's going

19  on out there.  I just focus on my job and my family and

20  stuff.  And --

21  Q    Did he say what kind of rumors he was talking about?

22  A    Yeah.  He said he was being under investigation for

23  alleged sexual assault.

24  Q    Did he say anything else about the sexual assault or

25  the rumors about the sexual assault?

1  A    Yeah.  That the OIG and FBI came in and subpoenaed

2  his DNA.

3  Q    All right.  Did you say anything when the defendant

4  told you that they had taken his DNA?

5  A    Yeah.  I told him that's a good thing, I said,

6  because DNA could prove your innocence.

7  Q    And what did the defendant say in response to that?

8  A    He said -- well, then he started going on and telling

9  me that -- you know, that he had went into a room to

10  masturbate and that's the only way the inmate could get

11  his DNA and stuff.

12         He said -- he had told me that he had came in

13  and that him and his wife was supposed to have sex that

14  day, he had erectile dysfunction, and he had took Viagra

15  that day.  And he came in, and it was -- before it started

16  acting up, he went into the back in the unit team and

17  masturbated.

18  Q    Did he say anything about observing any inmates in

19  that unit team area right after that?

20  A    Yeah.  He said that's the only way that the inmate

21  can probably possibly get his DNA, because he seen that in

22  the -- that particular inmate that he was being accused of

23  and another inmate in that bathroom prior -- after that

24  incident had happened.  I don't know.

25  Q    Okay.  So as a correctional officer at FCI Petersburg

1  for almost 15 years now, were there aspects of this story

2  that struck you as hard to believe?

3          MR. GAVIN:  Objection to the conclusion.

4          MR. GARNETT:  Your Honor, Officer Parker can

5  testify as to what's normal behavior for a federal

6  correctional officer.  I think that's highly relevant.

7          THE COURT:  Well, how can he do that?

8          MR. GARNETT:  What's that, Your Honor?

9          THE COURT:  Is he an expert in that?

10          MR. GARNETT:  Your Honor, he's been a

11  correctional officer.  He can testify to his experiences

12  and what's normal as a correctional officer at FCI

13  Petersburg.

14          THE COURT:  Was it an unusual story?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  All right.  That's it.  Let's move

17  on.

18          MR. GARNETT:  Your Honor, there are -- I'm

19  sorry.  There are aspects of what --

20          THE COURT:  Listen, I said -- I'm going to say

21  the same thing to you that I said to her.  We're not

22  debating this.  Move on.

23  BY MR. GARNETT:

24  Q    Officer Parker, are you familiar with the unit team

25  area?

1   A    Yes, sir.

2   Q    Okay.  Are you familiar with the unit team area in

3   the Fox South housing unit?

4   A    Yes.  They're all the same.

5   Q    Okay.  And is that an area that is off limits to

6   inmates?

7   A    Yes, unless you're orderly.

8   Q    Would an inmate be back in the unit team area without

9   an officer escort?

10  A    No.

11  Q    Okay.  Would an officer -- would you see two inmates

12  typically back in the unit team area without an escort?

13  A    No.

14  Q    Are inmates allowed to access the restroom in the

15  unit team area?

16  A    No.

17  Q    Would you, as a correctional officer -- as a housing

18  unit officer, if you observed inmates accessing that unit

19  team area without a visible escorting officer, would you

20  have taken some kind of action?

21  A    There's no way an inmate would be able to get back

22  there because the doors are locked on both sides.  In

23  order to get back there, they have to be unlocked for them

24  to get back there.

25  Q    So if you did observe inmates in the unit team area

1   restroom, what would you do as a correctional office?

2   A    I would definitely call for assistance because you

3   had no business being back there.  You have files --

4   inmates files and stuff back in that area.

5   Q    Had you and the defendant ever discussed matters such

6   as masturbation before?

7   A    No.

8   Q    Had you ever discussed matters that you would call

9   deeply personal before?

10  A    No.

11        MR. GARNETT:  That's all the questions I have,

12  Your Honor.

13        THE COURT:  All right.  Mr. Gavin.

14                    **CROSS-EXAMINATION**

15  BY MR. GAVIN:

16  Q    Good afternoon, Officer.  You indicated that it is

17  possible for an orderly to be back in that unit office if

18  he's under supervision of a guard; is that correct?

19  A    If he's under the supervision of the unit team, yes.

20  Q    So if an orderly went back into that room under the

21  supervision of a guard, what would they be doing?  Would

22  they be cleaning the bathroom?  What does an orderly do?

23  A    Whatever the unit team assigned him to do as far as

24  cleaning, dumping trash, something like that probably.

25  Q    Shredding paper?

1  A    No.

2  Q    So not shredding paper, but taking out trash,

3  cleaning the bathroom?

4  A    Mainly cleaning the bathroom, because, you know, the

5  papers are confidential.  So they have their own

6  shredders.

7           MR. GAVIN:  No other questions.

8           THE COURT:  Any redirect?

9           MR. GARNETT:  Just very briefly, Your Honor.

10                    **REDIRECT EXAMINATION**

11  BY MR. GARNETT:

12  Q    Officer, you mentioned that an inmate orderly

13  assigned to that job might be present in the unit team

14  area restroom to clean it; is that right?

15  A    If they have an orderly assigned to it.  That's the

16  only reason why I could think of.

17  Q    So the job of cleaning bathrooms in the unit team

18  area, would that be an assigned job that an inmate would

19  have?

20  A    It would be if they were back there, yes.

21           MR. GARNETT:  Thank you, Your Honor.

22           THE COURT:  All right.  Mr. Parker, thank you so

23  much for your testimony.  You can step down.  I'm going to

24  instruct you not to talk about your testimony with anybody

25  until the trial is over.  Okay?

Timothy Coleman – Direct                    282

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.  Thank you.

3          THE WITNESS:  Thank you.

4          (Witness stood aside.)

5          THE COURT:  All right.  Do you want to call your

6   next witness?

7          MR. GARNETT:  Your Honor, the United States

8   would call Officer Coleman.  Officer Timothy Coleman,

9   Your Honor.  I apologize.

10         THE COURT:  That's fine.

11                  **TIMOTHY COLEMAN,**

12    called by the government, first being duly sworn,

13                 testified as follows:

14         THE COURT:  All right.  Mr. Garnett.

15         MR. GARNETT:  Thank you, Your Honor.

16                **DIRECT EXAMINATION**

17  BY MR. GARNETT:

18  Q    Good afternoon, Officer.  Could you please introduce

19  yourself to the jury, and spell your first and last name

20  for the court reporter?

21  A    Timothy Coleman.  T-I-M-O-T-H-Y, C-O-L-E-M-A-N.

22  Q    And how are you currently employed, Mr. Coleman?

23  A    By the Federal Bureau of Prisons as a correctional

24  officer.

25  Q    And how long have you been -- I should say where are

Timothy Coleman – Direct                                    283

1   you currently located?

2   A    FCC Petersburg.

3   Q    How long have you been located at FCC Petersburg?

4   A    A little over seven years now.

5   Q    So that's less than you've been with the BOP.  Have

6   you been at a previous institution?

7   A    Yes.

8   Q    Which location was that?

9   A    FCI McDowell in West Virginia.

10  Q    And what's your official title?  I apologize if you

11  already said that.

12  A    Senior officer specialist.

13  Q    All right.  What were your duties at FCI Petersburg

14  in May of 2018, Officer?

15  A    Housing unit D-North, unit officer.

16  Q    And --

17            MR. GARNETT:  Actually, Your Honor, if I could

18  ask to utilize Government Exhibit 7 briefly just to show

19  where D-North is.

20            THE COURT:  Sure.

21            MR. GARNETT:  Thank you.

22            Your Honor, I think they might want to rotate it

23  just slightly, Your Honor.  It's catercorner more

24  towards --

25            THE COURT:  Okay.  Folks, can you see it or not?

Timothy Coleman - Direct                    284

1    No.

2              A JUROR:  The chair.

3              THE COURT:  The chair is in the way?

4              Can you move the -- Mr. Gavin or Mr. Spivey.

5              How's that?  Are you okay now?

6              A JUROR:  Thank you.

7              THE COURT:  All right.  Thank you.

8              MR. GARNETT:  Thank you, Your Honor.

9              THE COURT:  Okay.

10   BY MR. GARNETT:

11   Q    Officer Coleman, can you indicate where D-North is

12   located on the complex there?

13   A    Do you want me to stand up and --

14   Q    Yes, please.  If you can just point to it.

15             THE COURT:  Just speak loudly, and when you

16   point, if you could tell us what -- the nearest number

17   that you're pointing to, that would be helpful.

18   A    Number 33, in this building.

19   BY MR. GARNETT:

20   Q    And is it the right side of number 33 as I'm looking

21   at it?

22   A    It's -- yes, this side, the right side.

23   Q    And is D-North, is that a first-story or second-story

24   unit?

25   A    That's a second-story unit.

Timothy Coleman - Direct                        285

1   Q      Okay.  Thank you.  You can have a seat.

2              Typically, Officer Coleman, how many inmates are

3   present in a housing unit?

4   A      Anywhere between about 115 and 130.

5   Q      So as the D-North housing unit officer in May of

6   2018, what were your responsibilities?

7   A      Make sure there were no fights or anything like that,

8   the inmates got to where they needed to go, when they

9   needed to be there, they had everything that they needed

10  to have, what they were supposed to have, and ensure the

11  orderly running of the housing unit.

12  Q      How do inmate movements -- you mentioned inmate

13  movements.  How often are inmates usually permitted to

14  move around the complex?

15  A       It's normally at the top of every hour.  And they are

16  allowed to move for ten minutes, just to go to, like, the

17  recreation department or commissary, food service,

18  depending on what's open at the time.

19  Q      So during -- is there a particular term you use for

20  that, those movement times?

21  A      Activities move.

22  Q      Activities move.  So during these activity moves, is

23  it fair to say there's a large number of prisoners moving

24  all at once?

25  A      Yes.

Timothy Coleman – Direct                        286

1  Q    Are inmates who have particular jobs, such as a

2  recreational orderly, would they be allowed to move around

3  a little more freely?

4  A    Yes.

5  Q    During your tenure at FCI Petersburg, Officer

6  Coleman, did you ever work with an officer named Chikosi

7  Legins?

8  A    Yes, I did.

9  Q    Do you see him here in the courtroom today?

10 A    Yes, I do.

11 Q    Can you please indicate where he's seated by an

12 article of clothing and where he's seated?

13 A    Right there in the blue suit jacket.

14         MR. GARNETT:  Your Honor --

15         THE COURT:  The record will reflect he

16 identified the defendant.

17         MR. GARNETT:  Thank you, Your Honor.

18 BY MR. GARNETT:

19 Q    Do you remember receiving a phone call from the

20 defendant on the evening of May 10th, 2018?

21 A    Yes, I do.

22 Q    And where were you at that point?

23 A    I was in the office in the housing unit D-North.

24 Q    Do you know an individual named Brandon Lemagne,

25 Officer?

1   A    Inmate Lemagne, sir.

2   Q    Was Inmate Brandon Lemagne assigned to your housing

3   unit, D-North, at the time?

4   A    Yes, he was.

5   Q    And where was the defendant working at this time?

6   A    In Foxtrot South unit.

7   Q    And is Foxtrot South adjacent to Delta North, or

8   D-North?

9   A    It's building 34, where the 34 is actually written.

10  That's where that would be.

11  Q    So that's on the left-hand side of that sort of

12  two-pronged housing unit as you're looking at it?

13  A    Correct.

14  Q    Do you remember what time you received a call from

15  the defendant?

16  A    It was approximately 20 minutes after 7.

17  Q    And what did the defendant ask you at that time?

18          THE COURT:  This is in the evening, right?  In

19  the evening?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Okay.

22          MR. GARNETT:  Thank you, Your Honor.

23  BY MR. GARNETT:

24  Q    And what did the defendant say to you at that time?

25  A    He asked me if Inmate Lemagne was still in his

1   housing unit or if he was back in mine.

2   Q    He asked if Inmate Lemagne was still in his own

3   housing unit?

4   A    Correct.

5   Q    What did you respond to Officer Legins?

6   A    That he was passing out flyers at the time and that

7   he was not in my housing unit.

8   Q    Okay.  Had you ever received a call from Officer

9   Legins about an inmate's location before?

10  A    No, I have not.

11  Q    Okay.  Would it be unusual for a correctional officer

12  to try to find an inmate not assigned to his housing unit?

13  A    Yes.

14  Q    To try to be locating, I should say.

15  A    Yes, it would.

16  Q    Okay.  As a correctional officer, was it concerning

17  to you that Officer Legins did not appear to know who was

18  in his unit at the time?

19  A    At the time, I didn't think much about it, but

20  afterwards, I was wondering why he was wondering if

21  somebody was still in his unit or not.

22  Q    Did you observe Brandon Lemagne return to your unit

23  later that evening, Officer?

24  A    Yes, I did.

25  Q    And do you remember approximately what time that was?

1  A      That was during the 8:00 activities move.  So

2  probably about 8:05 p.m.

3  Q      And where were you standing at this time?

4  A      Outside of the entrance to the Delta North unit on

5  the first landing as you go down the stairs to -- on the

6  outside stairs.

7  Q      Were there a fair number of inmates going past you

8  into your housing unit?

9  A      Probably between 15 and 20 during that move.

10 Q      Did you get the chance to observe Brandon Lemagne

11 closely at that time?

12 A      No.

13 Q      Shortly after this, Officer Coleman, were you

14 approached by Brandon Lemagne and his cellmate?

15 A      Yes, I was.

16 Q      Who was his cellmate at this time?

17 A      Ronzell Jackson.

18 Q      Did either of them speak to you?

19 A      Yes.  Inmate Jackson.

20 Q      Okay.  Without going into what Inmate Jackson said,

21 what did you do as a result of that conversation?

22 A      I called the operations lieutenant to see if it was

23 okay to send Inmate Lemagne to talk to him about whatever

24 he had to talk about.

25 Q      And did you then send Brandon Lemagne to the

1  lieutenant's office?

2  A     Yes, I did.

3  Q     Now, did you see those two -- the two inmates who

4  approached you that evening, Jackson and Lemagne, did you

5  see those two on a regular basis as the housing unit

6  officer?

7  A     Every day I worked.

8  Q     So did you have a chance to observe their typical

9  demeanor day in and day out?

10 A     Yes.

11 Q     How would you describe Ronzell Jackson's typical

12 demeanor?

13 A     Very friendly, happy, outgoing.

14         MR. GAVIN:  Objection to the relevance.  This

15 is --

16         THE COURT:  Overruled.

17 BY MR. GARNETT:

18 Q     And -- I'm sorry.  Can you go ahead and finish your

19 answer there?

20 A     That was all.

21 Q     Okay.  Thank you.  How would you describe Ronzell

22 Jackson's demeanor at the time that he approached you?

23 A     Very reserved, seemed a little bit worried, and just

24 not himself.

25 Q     Did you have the chance to observe Brandon Lemagne on

1  a regular basis?

2  A    Yes.

3  Q    Okay.  How would you describe Brandon Lemagne's

4  day-to-day demeanor in your using unit?

5  A    Also friendly and happy.

6  Q    And when Brandon Lemagne -- you said he didn't talk

7  to you, but as you observed him, did you notice anything

8  different about him that evening?

9  A    He had like a very blank look on his face.

10 Q    Did you happen to see Brandon Lemagne again later

11 that evening, Officer Coleman?

12 A    Yes, I did.

13 Q    And do you recall what the circumstances of that were

14 and approximately what time this was?

15 A    It was approximately -- probably during the 8:30

16 recall, and he was walking what appeared to be from the

17 lieutenant's office towards the medical department.

18 Q    And at this point -- so how far away is that from

19 you?

20 A    Oh, I'd say probably about 80 yards or so.

21 Q    Can you go ahead and indicate on that map there,

22 Officer Coleman, approximately where you saw Brandon

23 Lemagne and the other correctional officer walking?

24 A    It would have been approximately through here.

25          MR. GARNETT:  Your Honor, let the record note

1  that Officer Coleman touched the sidewalk area above

2  unit 23, or building number 23.

3           THE COURT:  So noted.

4           MR. GARNETT:  Thank you, Your Honor.

5  BY MR. GARNETT:

6  Q    Thank you, Officer.  You can sit down.

7           Approximately how far would you say it is from

8  Delta North, from D-North, to that sidewalk area where you

9  observed Brandon Lemagne?

10 A    I would say approximately 80 yards.

11 Q    Okay.  Were you confident that the individual you

12 observed was, in fact, Brandon Lemagne?

13 A    Yes.

14 Q    Is that a well-lit area?

15 A    Yes.

16 Q    Now, as you watched Brandon Lemagne appear to walk,

17 you said, towards the medical office, did you hear

18 anything?

19 A    I heard some shouting.

20 Q    And what did you hear?  What did the shouting voice

21 say?

22 A    "What are you doing?  Where are you going?"

23 Q    Were you able to observe who was shouting?

24 A    No, I was not.

25 Q    Okay.  Was there an officer nearby you who was able

Timothy Coleman – Direct                    293

1    to observe who was shouting?

2    A    Yes.

3    Q    And where was that person located?

4    A    He was downstairs in the area in between Delta -- or

5    C and D units.

6    Q    And did you observe that officer move to observe --

7    or move to a position where they could observe shouting?

8    A    Yes.  He walked down to the edge of the walkway where

9    he could look and see where the shouting was coming from.

10   Q    Did you later discuss that incident with that

11   officer?

12   A    Yes.

13   Q    Okay.  And after speaking to that officer, did you

14   become confident that you had recognized the voice?

15   A    Yes.

16   Q    And what voice did you believe that to be?

17   A    Officer Legins.

18            THE COURT:  I'm going to sustain the objection.

19            MR. GAVIN:  Objection.

20            THE COURT:  You're going in the back door what

21   you can't do in the front door.  That's sustained.

22            MR. GARNETT:  Yes, Your Honor.

23   BY MR. GARNETT:

24   Q    So, Officer Coleman, as you observed Brandon Lemagne

25   walking, was he doing anything that was concerning to you

1  from a security standpoint?

2  A    Not at all.

3  Q    Okay.  In your experience as a senior officer

4  specialist, is it unusual for officers to shout across the

5  compound at other people?

6  A    Yes, it is.

7  Q    Let's talk about your relationship with the defendant

8  here briefly, Officer Coleman.  How would you describe

9  your relationship with the defendant when you were

10 officers?

11 A    Acquaintances.

12 Q    Okay.  As a senior officer specialist, are you

13 familiar with the areas of FCI Petersburg that are

14 generally off limits to inmates?

15 A    Yes, sir.

16 Q    Okay.  Are you familiar with the layout of F-South?

17 A    Yes.

18 Q    Is it laid out essentially identically to the D unit?

19 A    Yes.

20 Q    Are you familiar with the location, then, of the unit

21 team office in that building?

22 A    Yes.

23 Q    And are unit team offices generally off limits to

24 inmates?

25 A    Yes.

1  Q     Okay.  Would an inmate be able to get back there

2  without an escort by a guard?

3  A     No, sir.

4  Q     Okay.  When might an inmate be allowed back there

5  with a guard during working hours?

6  A     If there's unit team staff back there and they call

7  for the inmate, the case manager, counselor or secretary.

8  Q     What if they were an orderly assigned to clean a

9  restroom?

10 A     They would have to be escorted also by unit team

11 staff.

12 Q     And if you're an inmate and you're assigned the job

13 as a restroom orderly, would that be your official job in

14 the institution?

15 A     Yes.

16 Q     If you observed inmates -- as a housing unit officer,

17 if you observed inmates unescorted using a bathroom in the

18 unit team office, would that be something that would

19 concern you?

20 A     Definitely.

21 Q     Would that be something that a correctional officer

22 should investigate?

23 A     Definitely.

24 Q     Are you familiar with the areas of the housing units

25 that are not covered by surveillance cameras?

Timothy Coleman - Cross                    296

1    A    Yes.

2    Q    And why would officers be familiar with the areas

3    that are not covered by surveillance cameras?

4    A    Just to know that we would not want to be in those

5    areas in case something happened.  We'd want the backup

6    from the camera.

7    Q    So is it a safety issue?

8    A    Correct.

9    Q    Are there cameras in the unit team area?

10   A    No, sir.

11   Q    In your experience, have you taken inmates by

12   themselves into the unit team area after hours when no

13   staff are present?

14   A    No, sir.

15   Q    As a senior officer specialist, would you be

16   concerned if you heard about an officer who did this?

17   A    Yes.

18   Q    Would it be more concerning to you if, at the same

19   time, that correctional officer was the only housing unit

20   officer responsible for a bay full of inmates?

21   A    Yes.

22        MR. GARNETT:  No further questions, Your Honor.

23   Thank you.

24        THE COURT:  All right.  Mr. Gavin.

25                    **CROSS-EXAMINATION**

 1  BY MR. GAVIN:

 2  Q    Good afternoon, Officer.

 3  A    Hello.

 4  Q    If there was ever a situation where you were

 5  escorting an inmate from one side to the other through the

 6  corridor -- let's back up.

 7           Do you do that occasionally, from one side of

 8  the corridor to the other, just straight through?

 9  A    Not unless they're going over there for a specific

10  purpose.

11  Q    Like posting flyers or something like that?

12  A    Correct.

13  Q    All right.  So as I understand your testimony, that

14  if you were walking through that corridor and you needed a

15  paper clip from the office and the inmate was in your

16  sight, in your view, you couldn't even open the door to go

17  to the secretary's office to pick up a paper clip?

18  A    Could you rephrase that?  I don't understand.

19  Q    If you were going from one corridor side to the other

20  corridor side and you had the inmate with you walking

21  through the corridor, are you saying that there's never

22  been a circumstance or situation, to your knowledge, where

23  the guard that's escorting that person through the

24  corridor could open the secretary's office, get a paper

25  clip if he needed it, close the office door and continue

1   on his way?

2   A    That would be possible, but unwise.

3   Q    If you could look at this.

4            MR. GAVIN:  May I approach the witness?

5            THE COURT:  Sure.

6   BY MR. GAVIN:

7   Q    You're in Delta, correct?

8   A    Correct.

9   Q    So you're in 33 on this side?

10  A    Yes, sir.

11  Q    So this is the front of the building?

12  A    Correct.

13  Q    All right.  So the voice --

14           THE COURT:  Hold on one second.  Hold on one

15  second, Mr. Gavin.

16           Can the court reporter hear him?

17           THE COURT REPORTER:  Yes.

18  BY MR. GARNETT:

19  Q    So this building 34 is Fox?

20  A    Yes.

21  Q    All right.  So you believe Mr. Legins' unit was here,

22  Fox South?

23  A    Yes.

24  Q    All right.  So you were on this walkway.

25  A    In the stairwell above that walkway.

Timothy Coleman - Cross                    299

1  Q    So whatever you would have heard would have been all

2  the way around, like --

3  A    Correct.

4  Q    -- out of your vision?

5  A    Yes.

6            MR. GAVIN:  Can you pull up 5-B, Ms. Taylor?

7  BY MR. GAVIN:

8  Q    Can you look at your monitor?  Do you see Delta North

9  in that picture, Officer?

10  A    Yes, I do.

11  Q    Can you put your finger on the screen and circle it,

12  where you were?

13           So is it fair to say, Officer, from where you

14  were there, you can't even see around to the other side of

15  Fox South?

16  A    That is correct.

17  Q    Do you remember testifying before the grand jury?

18  A    Yes, I do.

19  Q    Do you remember being placed under oath there?

20  A    Yes, I do.

21  Q    And do you remember being asked a question in the

22  grand jury about whether you heard what was said?

23  A    During the shouting?

24  Q    Yes, sir.

25  A    Yes.

Timothy Coleman - Cross                    300

1          THE COURT:  Confront him with the question and

2   then the answer.

3   BY MR. GAVIN:

4   Q    And is it -- did you say what you said today, "Where

5   are you going"?

6   A    I believe so.

7   Q    Did it sound anything like, "You've got to be kidding

8   me"?

9          THE COURT:  Listen, I want you to read the

10  question and read the answer from the grand jury

11  transcript.

12         MR. GAVIN:  It's not consistent because it's

13  consistent with what he said at the --

14         THE COURT:  I'm not asking you whether it's

15  consistent.  The jury decides that.  I'm asking you to

16  read the question and read the answers explicitly that

17  you're confronting him with.

18         MR. GAVIN:  Yes, sir.

19  BY MR. GAVIN:

20             "QUESTION:  So you heard a voice, and do you

21             remember exactly what the voice said?

22             "ANSWER:  It was, 'Where are you going?  What

23             are you doing?'"

24         Was that your testimony?

25  A    Today, yes.

 1  Q    All right.  But that's --

 2            THE COURT:  Is that what he said back in the

 3  grand jury?

 4            MR. GAVIN:  Pardon?

 5            MR. GARNETT:  Is that -- did you read what it

 6  said back in the grand jury?

 7            MR. GAVIN:  Yes, sir.

 8            THE COURT:  Well, that's consistent with what he

 9  just said.

10            MR. GAVIN:  I understand.  That's why I was

11  saying -- the follow-up question to that was, "Did it

12  sound anything like, 'Don't believe anything he has to

13  say?'"

14            THE COURT:  I don't understand what you're doing

15  here.  You can't impeach him.  He said the same thing he

16  said before.

17            MR. GAVIN:  I understand.  I'll withdraw the

18  question.  I understand.  No other questions.

19            THE COURT:  Do you have any redirect?

20            MR. GARNETT:  No, Your Honor.

21            THE COURT:  Okay.  Officer, thank you for your

22  testimony.  You can step down.  I'm going to instruct you,

23  you're not to talk about your testimony with anybody until

24  the trial is over.  Okay?

25            THE WITNESS:  Yes, sir.

Duane Farmer – Direct

1        THE COURT:  All right.

2        (Witness stood aside.)

3        THE COURT:  Mr. Garnett, do you have another

4   witness?

5        MR. GARNETT:  Your Honor, the United States

6   would call Officer Duane Farmer.

7        THE COURT:  Everybody okay over there?  Okay.

8   We might just go a couple minutes past 5 because I'm on a

9   mission right now.  Okay?

10        CSO SPIVEY:  Are you going to need that exhibit

11  again?

12        MR. GARNETT:  We might, Officer Spivey.  I'm not

13  sure.  Thank you.

14        THE COURT:  I'm sorry.  What happened?

15                        **DUANE FARMER,**

16     called by the government, first being duly sworn,

17                      testified as follows:

18        THE COURT:  All right.  Ms. Gilbert.

19        MS. GILBERT:  Thank you, Your Honor.

20                      **DIRECT EXAMINATION**

21  BY MS. GILBERT:

22  Q    Good afternoon, Officer.

23  A    Good afternoon.

24  Q    Could you please state and spell your name for the

25  Court?

Duane Farmer – Direct

1  A     Duane Farmer.  D-U-A-N-E, F-A-R-M-E-R.

2  Q     Where do you work, Officer Farmer?

3  A     FCC Petersburg, Bureau of Prisons.

4  Q     What's your job there?

5  A     Correctional officer.

6  Q     How long have you worked at FCC Petersburg?

7  A     January 25th will be my five years.  So just five

8  years.

9  Q     Where at FCC Petersburg do you ordinarily work?

10 A     Based on my seniority, I'm only working inside of the

11 units.

12 Q     Is that the housing units?

13 A     Housing units.

14 Q     What are your duties as an officer working in a

15 housing unit?

16 A     Supervise inmates, ensure their safety,

17 accountability.

18 Q     Is one of your duties also looking out for

19 contraband?

20 A     Yes.

21 Q     Are cigarettes contraband?

22 A     Yes.

23 Q     What can inmates do with cigarettes, in your

24 experience as a correctional officer?

25 A     Basically, you have about maybe 20 -- I believe 20

Duane Farmer - Direct

1  cigarettes in a pack of cigarettes.  And the going rate

2  for a cigarette is in between 20 and $25.  So you times

3  that by 20 cigarettes.  So now you got roughly $400 for --

4  Q    I'd like to turn your attention back to the evening

5  of May 10, 2018.  Where were you working that night?

6  A    North side unit, Foxtrot North --

7  Q    Do you recall --

8  A    -- housing unit.

9  Q    I'm sorry to interrupt you.  Do you recall who was

10 working that night on F-South?

11 A    F-South?  Officer Legins.

12 Q    Do you know Officer Legins?

13 A    Yes.

14 Q    How do you know him?

15 A    From work.

16 Q    Did you ever talk with Defendant Legins at work?

17 A    Yes.

18 Q    What kinds of things would you guys talk about?

19 A    Talked about work, talked about family, talked about

20 sports.

21 Q    I'm sorry.  I interrupted you again.  Please finish

22 your answer.

23 A    The job.

24 Q    Did you ever talk with the defendant about gay or

25 transgender inmates?

305

Duane Farmer - Direct

1   A    Yes.

2   Q    What did the defendant say about gay and transgender

3   inmates?

4   A    I guess we both talked about it, you know, trying to

5   get an understanding.  You know, I mean working in the

6   Bureau of Prisons, you know, the environment for me was

7   kind of new, and we have a large influx of gay inmates.

8           So just really, I guess, learning, discussing,

9   talking about inmates, their behavior, to try to get a

10  pulse of how -- how to better supervise them.

11  Q    Did you ever notice the defendant spending a lot of

12  time with any particular group of inmates?

13  A    Yes.

14  Q    What group of inmates was that?

15  A    It would be the gay -- inmates that I would call gay.

16  Q    So far as you know, was the defendant a smoker?

17  A    Yes.

18  Q    Did you ever see the defendant smoke at work?

19  A    Yes.

20  Q    Where are officers allowed to smoke at FCC

21  Petersburg?

22  A    They have designated smoking areas.

23  Q    And when you saw the defendant smoking, was he always

24  smoking in the designated smoking areas?

25  A    No.

Duane Farmer – Direct

1  Q    Where else did you see him smoking?

2  A    The stairwell outside of the units.

3  Q    So talking about the night of May 10th, 2018, did you

4  see the defendant that night?

5  A    Yes.

6  Q    When was the first time you saw the defendant that

7  night?

8  A    I believe the first time I saw him that night -- I

9  might have saw him earlier in the day, but I do remember

10  seeing him enter into my unit, calling my name.

11  Q    And what did he say when he was calling your name?

12  A    He was telling me that he had an inmate that was

13  posting some material in the inmate bulletin board area

14  and that he escorted him to my side.

15  Q    What was that inmate's name, if you know?

16  A    Inmate Lemagne.

17  Q    Did you know Mr. Lemagne?

18  A    Yes.

19  Q    How did you know Mr. Lemagne?

20  A    I also worked his unit from time to time, and I got

21  to know him through talking to him.

22  Q    Why did you talk to Mr. Lemagne?

23  A    I knew that he was one of the -- one of the gay

24  inmates, but he was also an inmate that was, you know,

25  easy to talk to, always polite to the officers.  So he was

Duane Farmer - Direct

1  one of the inmates that I selected that I can perhaps

2  better understand that type of population so I can -- it

3  would aid me in how I would supervise.

4  Q    You said earlier that the defendant shouted out to

5  you and was with Mr. Lemagne.  Do you know what

6  Mr. Lemagne was doing that evening?

7  A    That particular evening -- I knew he worked in

8  recreation, but I was told that -- by Officer Legins that

9  he was -- he escorted the inmate to my side of the unit to

10 post something in the bulletin board.

11 Q    Do you know where they came from when they came into

12 your unit?

13 A    From the south side housing unit.

14 Q    How do you get from the south side housing unit to

15 the north side housing unit?

16 A    If you think in terms of a house that has a

17 Jack-and-Jill bedroom and you have a bathroom between each

18 bedroom, well, it's a corridor in the unit from the south

19 side to the north side.  It's approximately maybe 20 feet

20 apart in the hallway, going from north side to the south

21 side, and he entered from the south side unit into my

22 unit, which is the north side.

23 Q    Is that part of the facility sometimes referred to as

24 the unit team area hallway?

25 A    Yes.

Duane Farmer – Direct

1          MS. GILBERT:  Ms. Taylor, I'd like to please

2   play what's been previously admitted.  This is the F-North

3   common area video from May, which I think is 2-A.  If you

4   could please hit play and then stop right away.

5          (Video Played.)

6          MS. GILBERT:  Oh, I'm sorry.  It's -- it's the

7   F-North.  So I think it is maybe 2-B.

8          (Video Played.)

9          MS. GILBERT:  Yes.  Thank you.

10  BY MS. GILBERT:

11  Q    Officer Farmer, do you recognize that video?

12  A    Yeah.  That's the unit I was working that night.

13  Q    That's the F-North housing unit?

14  A    Yes.

15  Q    Do you recognize anyone in this video?

16  A    Me.

17  Q    And where are you, Officer Farmer?

18  A    Right here.

19  Q    Can you actually circle on the screen?  If you put

20  your finger on it, it will make a little mark.

21  A    That's me.

22          MS. GILBERT:  And let the record reflect that

23  the video is paused at 18:15:15, and Officer Farmer has

24  circled the individual to the far left side of the screen

25  when you're facing it.

Duane Farmer - Direct

1  A    I mean, you --

2  BY MS. GILBERT:

3  Q    I'm sorry?

4  A    You can't really see the -- part of the video, but

5  I'm standing right next to the entrance and exit door of

6  my unit.

7  Q    Okay.

8        MS. GILBERT:  And, Ms. Taylor, if you could

9  please play the video until 18:15:24.

10        (Video Played.)

11  BY MS. GILBERT:

12  Q    Officer Farmer, do you recognize anyone else in this

13  video at this point?  We are paused at 18:15:24.

14  A    Okay.  Down here, that area right here, we have

15  Officer Legins and then Inmate Lemagne.

16  Q    And what did Officer Legins do in the portion of the

17  video that we just watched, if you can just tell?

18  A    I remember him calling my name right there.  He

19  escorted -- well, he came through the unit team area,

20  entered my unit, which is the north side, with Inmate

21  Lemagne.  And he called out to me, telling me that he

22  escorted him through the corridor area to post some

23  material on the bulletin board.

24        MS. GILBERT:  Ms. Taylor, if you could please

25  play a few more seconds until 18:15:31.

                        Duane Farmer – Direct
1                    (Video Played.)

2    BY MS. GILBERT:

3    Q    I cleared that a little bit late, but, Officer

4    Farmer, could you see where Officer Legins went after he

5    signaled to you?

6    A    Right here.  He went back through that door that will

7    direct him back to the south side.

8    Q    Is that into the unit team area?

9    A    Yes.

10   Q    Officer Farmer, what reason would an officer have, in

11   your experience, for taking an inmate into the unit team

12   office area at that time of night after the unit team has

13   gone home?

14   A    Okay.  It looks like it's like 6:00, 6:15.  Unit

15   team, they're gone.  They're not working.  So you really

16   don't have any reason to go through that particular

17   hallway.

18          But, you know, this particular inmate, Lemagne,

19   he worked as a recreation orderly.  So recreations orderly

20   do, from time to time, have to post material inside of the

21   units.  There is a stairwell on the outside that they can

22   enter in, but officers do, at times, walk inmates through

23   to go from one side of the unit to the other.  It's a

24   little bit quicker.  But we should escort the inmate out

25   of the entrance door and let them hit the stairwell and go

311

Duane Farmer - Direct

1   to the adjacent side.

2   Q    Okay.  And what about the office area that's attached

3   to that unit team area hallway?  In your experience, what

4   reason would an officer have for taking an inmate into the

5   unit team secretary's office that's off of that hallway?

6   A    Okay.  At 6:00 in the evening, there's no reason to

7   do that.

8   Q    I'd like to play for you what's been previously

9   admitted as Government Exhibit 2-C.

10           MS. GILBERT:  Ms. Taylor, if you could please

11   play the video until 18:16:22.

12           (Video Played.)

13           MS. GILBERT:  Thank you.

14   BY MR. GARNETT:

15   Q    So that was from 18:16:01 to 18:16:22.  Officer

16   Farmer, what does this video clip show?

17   A    That shows me monitoring my door, talking to an

18   inmate, and witnessing Inmate Lemagne exit my unit.

19   Q    Did you notice anything about Mr. Lemagne as he

20   walked past you?

21   A    If you can back the video up a little bit to where

22   he's right in front of me, prior to him exiting the

23   door -- a little bit more -- you'll notice that you'll

24   look and see I look up at the Inmate Lemagne, and I

25   glanced at his face.

Duane Farmer - Direct

1    Q    Okay.  So we're at 18:16:07 .

2            (Video Played.)

3            MS. GILBERT:  If you could pause there,

4    Ms. Taylor.  And we're paused at 18:16:21.

5    BY MS. GILBERT:

6    Q    So, Officer Farmer, you said that during that video

7    we just watched, you looked at Mr. Lemagne's face?

8    A    Yes.

9    Q    What, if anything, did you notice about Mr. Lemagne's

10   face?

11   A    It were just blank, like -- I talk to him.  He's

12   always -- you know, he always speak to me, just real

13   pleasant, but that -- just that particular day, he was

14   just stoic and kept walking.

15   Q    Okay.  So the defendant walked Mr. Lemagne into your

16   unit.  Mr. Lemagne walked out the exit door here.  And we

17   saw in the earlier clip the defendant walked back into the

18   unit team area.  Did the defendant come back into your

19   unit later that night?

20   A    Yes.

21   Q    When was the next time you saw the defendant later

22   that night?  What happened?

23   A    Maybe 45 minutes later, Officer Legins came in my

24   unit.  I was in my office.  And he asked me about the --

25   if I knew whether or not that the unit team area was

Duane Farmer - Direct

1  blocked off.  I remember, you know, working earlier that

2  day, and it wasn't blocked off.  So we both walked back

3  there, and it was all taped off with, like, police barrier

4  tape.

5  Q    And what else, if anything, did he say to you?

6  A    Well, you know, he said -- he told me that -- that he

7  escorted Inmate Lemagne to my side of the unit to post

8  some material in the bulletin board so I hope they don't

9  be tripping, I didn't do nothing but escort the inmate to

10 post some material on your bulletin board.

11 Q    At that point, what was the defendant's demeanor like

12 when he said, "I hope they don't be tripping"?

13 A    I would say just overly nervous.  And the reason why

14 I'm saying that --

15 Q    Oh, I'm sorry.

16 A    -- is because if you escort an inmate from one unit

17 to another unit, it's not that serious, especially if you

18 have an inmate that's an orderly.  You know what I mean?

19 It's not that serious.

20 Q    Did you see the defendant again that night?

21 A    Yes.

22 Q    What happened when you saw him a second time?

23 A    We basically had further discussions about, you know,

24 trying to figure out -- have some understanding as to why

25 is this area taped off, what's going on.  And it was like,

314

Duane Farmer - Direct

1  I had no clue, he appeared to have no clue.  So we just

2  had short conversations about that.

3  Q    And did he say anything else?

4  A    At that particular time, no, I don't think so.

5  Q    What was the defendant's demeanor like that time he

6  came over to your unit?

7  A    Just pretty much the same, you know, just -- to me,

8  just a bit overly concerned about -- curiosity.  I mean,

9  if you come to work -- my shift starts on the north side.

10  I started at 1400, 1430.  South side starts at 1600, you

11  know.  So it was just coming to work -- coming to work, it

12  wasn't taped off.  Now it's about 17 -- I mean 1900 hours,

13  and it's taped off.  I mean, we had discussions trying to

14  figure it out.

15  Q    Before we move on and talk about your conversations

16  with the defendant after that night, I have a few more

17  questions for you about that night, May 10th, 2018.  Did

18  the defendant ever ask for cop-outs on that night?

19  A    No.

20  Q    Did you give him any cop-outs that night?

21  A    No.

22  Q    And just briefly, what are cop-outs?

23  A    Say you have an inmate and he's looking for a job.

24  He want to get a job working in the dining hall or he want

25  to change jobs.  So it's basically like an inmate request

Duane Farmer - Direct

1  form.  They submit it through the unit team.

2  Q    When did you next talk with Officer Legins after that

3  night?

4  A    I believe the -- the next night he wasn't working the

5  south side unit.  And the following night, he was working

6  the south side unit, and we talked again.

7  Q    What did the defendant say on that occasion?

8  A    We talked a little bit more about that, and he -- he

9  wanted me to write some kind of statement saying that

10 he -- that I knew that he just walked the inmate to my

11 side and that was it.

12 Q    Did you know that the defendant just walked the

13 inmate to your side and that was it?

14 A    What I know is that he came into my unit from his

15 side.  That's what I know.  The amount of time that he was

16 back there, I don't know.

17 Q    Because you didn't see him enter the other side?

18 A    Exactly.

19 Q    But the defendant asked you to write a statement

20 saying that the defendant just walked the inmate through

21 to your unit and that was it?

22 A    Yes.

23 Q    Did the defendant ask you anything else that night?

24 A    I don't think so, if I --

25 Q    Did he ask --

Duane Farmer - Direct

1  A     I don't think so.  He may have.

2  Q     Did he ask you whether you had taken inmates into the

3  unit team office before?

4  A     Something to that effect.  And I was like -- I was

5  like -- now I was getting, like, kind of concerned about

6  why is -- where is this going with this, you know.  Like,

7  write a statement saying I was -- I just escorted an

8  inmate in or you know you bring people back here.

9              I was just getting uncomfortable with that

10 whole -- that whole set-up.

11 Q     Officer Farmer, can I ask you to explain further what

12 the defendant said about taking inmates into the unit team

13 office?

14 A     You know -- can you, like, give me that question

15 again?

16 Q     Sure.  So we were talking about the conversation that

17 you had with the defendant approximately two days after

18 May 10th, 2018.  And I'm asking you what, if anything, the

19 defendant said about whether you, Officer Farmer, had

20 taken inmates alone into the unit team secretary's office

21 before.

22 A     I don't think we -- I don't think that we had that

23 kind of -- that specific conversation.  It was maybe more

24 so about that's something that we do.  But I never talked

25 to him.  I don't believe I ever talked to him and said

Duane Farmer - Direct

1  that I do that, no.

2  Q    So just so I can clarify.  The defendant said to you

3  that's something we -- correctional officers -- do is take

4  inmates into the unit secretary's office alone after

5  hours?

6           MR. GAVIN:  Objection.  Leading.

7           THE COURT:  Why don't you explain to us --

8           THE WITNESS:  Okay.

9           THE COURT:  -- what it is -- the discussion

10  between you and the defendant was about this topic.

11           THE WITNESS:  I'm talking about having a

12  discussion about whether or not we can bring him from one

13  side to the other side.

14           THE COURT:  Right.  Did you talk about that with

15  the defendant?

16           THE WITNESS:  Yes, about going from one side to

17  the other side.  Not about that we bring them into the

18  secretary's office or unit team member's office.  Just

19  from going from one side -- the north side to the south

20  side or vice versa.

21  BY MS. GILBERT:

22  Q    What did the defendant say about that?

23  A    That's the conversation I remember.  I don't remember

24  him -- if I can have, like, my statement that I wrote to

25  refresh my memory.  Because I remember having a

Duane Farmer - Direct

1   conversation with Legins about that we walk inmates from

2   one side of the hallway to the other side of the hallway.

3           As far as us walking inmates into the unit team

4   area or to the secretary's area and we both agreed on

5   that, no.

6   BY MS. GILBERT:

7   Q    Okay.  And you also said that you and the defendant

8   continued, at that point, talking about the taped off

9   office area --

10  A    Yes.

11  Q    -- and the evidence collection?

12  A    Yes.

13  Q    You also said that the defendant asked you to write a

14  statement; is that correct?

15  A    Yes.

16  Q    Who did the defendant want you to write a statement

17  to?

18  A    I took it as me writing a statement to support what

19  happened, and me, you know -- I have no knowledge even who

20  to give that statement to, if I wrote it.  So I didn't

21  think that deep in it because I wasn't going to do it.

22  Q    So the defendant didn't tell you -- did the defendant

23  tell you who he wanted you to write the statement to?

24  A    No.

25  Q    What did he say he wanted you to write in the

Duane Farmer - Direct

1  statement?

2  A     That he knew -- that I knew that he just walked the

3  inmate through that corridor and he was only in there for

4  a minute.

5  Q     And you said that you did not write that statement?

6  A     Correct.

7  Q     Why did you not write that statement?

8  A     Because I don't -- I didn't have knowledge of how

9  long he was in there.

10 Q     Did the defendant -- did you talk to the defendant

11 again after this conversation?

12 A     I know we talked at least three or four times, yes.

13 And it was basically just going over the same thing, but I

14 also -- one particular day I received a phone call from

15 Officer Legins.  I was at work.  He was not working the

16 south side, and I believe the call came from outside the

17 institution.

18 Q     So the defendant called you at work.  What did he say

19 when he called you?

20 A     The conversation started in reference to as an

21 officer, we had to pack up inmate property, and, you know,

22 secure it, tag it and turn it in.  Say if an inmate get in

23 trouble.  So it can be moved to a special housing unit.

24 So he called me in reference to some inmate property.

25 Q     In your training and experience, is it typical for an

Duane Farmer - Direct

1  officer to call from outside the facility to ask you about

2  inmate property when you're working?

3  A    I just thought it was kind of awkward or not normal.

4  I mean, when you get off work, working in the prison,

5  you're not thinking about no inmate property.  I'm not.

6  Q    During that conversation, did the defendant also ask

7  you about the investigation into what was going on in that

8  unit team area?

9  A    This is my opinion.  I think it was kind of like a

10  lead-in to probably -- you know, because the conversation

11  switched to, you know, what's going on at work in

12  reference to, you know, because you got a lot of FBI.  You

13  know, you got a lot of talking going on about the area

14  being blocked off, and he was curious about what was going

15  on at work.

16  Q    After that telephone conversation, did you hear at

17  all from the defendant again on any medium?

18  A    I guess you have to -- like the social media,

19  Facebook.  I received, like, a text message-type message

20  in the Facebook.  I don't really do Facebook.  But, you

21  know, in the message it was basically, you know, hey, how

22  you doing, you know, and he talked a little bit about life

23  and, you know, having second chances and, you know, value,

24  you know, where you are and who you are because, you know,

25  you don't get -- you know, second chances type thing are

Duane Farmer – Direct

1  hard to come by.  Something to that effect.

2          But I never responded to the message.  At this

3  point I was just trying to get my distance.

4  Q    Officer Farmer, do you remember testifying before the

5  grand jury?

6  A    Yes, ma'am.

7  Q    And if I showed you your grand jury transcript, would

8  that help you remember what you said to the grand jury

9  about your conversation to the defendant?

10 A    Yes, sir.

11         MS. GILBERT:  May I ask Officer Spivey to bring

12 this up?

13         THE COURT:  Do you want to mark it?

14         MS. GILBERT:  Sure.  We'll mark this for

15 identification as Government Exhibit 27.

16         Would you like to take a look, Mr. Gavin?

17         MR. GAVIN:  No.

18 BY MS. GILBERT:

19 Q    I'll just give you a second to read that, Officer

20 Farmer.

21 A    Which page?

22 Q    It's down towards the bottom half of the page.

23         MR. GAVIN:  I'm sorry, Ms. Gilbert.  What page?

24         MS. GILBERT:  I don't know.  I'm sorry.

25         MR. GAVIN:  Did you say 27?

Duane Farmer – Direct

1          MS. GILBERT:  I marked it as 27.

2   BY MS. GILBERT:

3   Q    And I'm sorry, Officer Farmer.  What page are you

4   looking at there?

5   A    Thirty-seven.

6          Yeah.  Okay.

7   Q    Did that help you remember what you said before the

8   grand jury?

9   A    Yeah.  Because it was like -- I guess -- I guess, you

10  know, I got kind of ticked off because in the

11  conversation, it was like he was trying to get me to admit

12  that I also go inside the unit team area with inmates.

13  You know what I mean?  Like I mean not in the unit --

14  yeah, in the unit team area where, like, you have a

15  bathroom in there.  You've got a secretary's office.  You

16  got, like, a break room area back there.

17          And he was trying to get me to say that I, too,

18  also do that.  And you can -- you can -- you can escort an

19  inmate from the north side to the south side.  I have done

20  that, but not take them inside of that other area.

21          THE COURT:  "That other area" being the

22  secretary's area?  Is that what you're --

23          THE WITNESS:  Yes, sir.

24  BY MS. GILBERT:

25  Q    Officer Farmer, so -- you said that you've never

Duane Farmer - Direct

1  taken an inmate alone into the unit secretary's office

2  after the unit team has left for the day; is that correct?

3  A    If you -- you can -- if you take an inmate inside of

4  the unit team area where the secretary is -- this is the

5  way I do it.  If it's prior to 4:00, right -- so let's say

6  it's 12:00.  You got staff back there.  It will be the

7  secretary, possibly unit team, right.  But the inmate

8  lives in your housing unit, but that inmate might be the

9  orderly that cleans up that area back there.

10           So I -- I have took them back there when unit

11  team was in there to take them and say, "Unit team, are

12  you ready for your orderly cleanup?"

13           And they'll say yeah.  They'll assume

14  responsibility, right.

15           And then I leave.  Now they got the inmate.

16           But if they're -- at 1800 hours, they're not

17  there.  So you don't need to take an inmate inside of that

18  area.

19  Q    So that night, Officer Farmer, did you go into the

20  unit secretary's office with an inmate --

21  A    No.

22  Q    -- to shred paper?

23  A    No.

24  Q    Last set of questions for you, Officer Farmer.  How

25  would an inmate get into the unit team hallway without an

Duane Farmer - Direct

1  officer?

2  A    It's no way you can get into that area unless the

3  door is unlocked or the inmate have a key.  Now, we are

4  trained to have that area -- going into that area, or any

5  door, you lock it behind you.  If you have a key that fit

6  that lock, you lock it behind you.

7  Q    How would an inmate get into the bathroom inside the

8  unit secretary's office --

9  A    You can't --

10  Q    -- inside the hallway without an officer?

11  A    You can't even get to the bathroom because the

12  bath- -- you have an outer door that has a lock.  All

13  right.  So you can't even get to the bathroom door because

14  you've got to get through that first door with the lock.

15  You can't even get to the bathroom.

16  Q    And I'm sorry to ask you this question, Officer

17  Farmer, but would you ever leave your post to go into that

18  bathroom to masturbate while you're supposed to be

19  working?

20              MR. GAVIN:  Objection to the relevance.

21              THE COURT:  I'm going to sustain that.

22              MS. GILBERT:  No further questions for this

23  witness.

24              THE COURT:  You don't have to answer that.

25              Folks, everybody okay?  We're going to finish up

1    the cross-examination before we go home today.  Okay?

2            Go ahead, Mr. Gavin.

3            MR. GAVIN:  Thank you.

4                         **CROSS-EXAMINATION**

5    BY MR. GAVIN:

6    Q    Officer Farmer -- good afternoon.  Officer Farmer, so

7    I understand that it's not ideal for you to take an inmate

8    from one side to the other side through that corridor, but

9    I think I understand to say that it happens occasionally;

10   is that correct?

11   A    From the south side to the north side?

12   Q    Correct.

13   A    Yes.

14   Q    Now, would that be -- just going from the south side

15   to the north side -- a basis to write up a corrections

16   officer for misconduct?

17   A    Can you repeat that?

18   Q    Sure.  If you were to have taken an inmate from Fox

19   South through the corridor to your side on Fox North and

20   go straight through, would that be a basis to write up an

21   inmate(sic) for misconduct for any type of employment

22   violation?

23   A    Based on my experience, all right -- we have a policy

24   that we follow.  So I'm going to paint a picture.  Okay?

25            From the north side to the south side in any

Duane Farmer - Cross                    326

1  unit, in the housing unit at the medium prison, the inmate

2  can get from the north side to the south side -- an inmate

3  that work an orderly, they know that they can use the

4  stairwell to go from one side to the other side.  It's

5  convenient for an officer to escort an inmate from the

6  north side to the south side.  It might be -- it might be

7  two minutes before a move take place.  "A move" meaning

8  that you have to unlock your front door and allow inmates

9  to go out for a ten-minute move.  But you might have an

10 orderly need to post something like that particular night.

11 It's convenient to do that.

12            Now, have I done that?  Yes.  Is that in

13 violation to where I would get fired?  I don't think that

14 is in violation of me being fired, but it's not the way I

15 was trained.

16 Q   All right.  So let's take it a step further.  If you

17 were to escort an inmate from one side -- Fox South, for

18 example -- to your side, Fox North, but you stopped at the

19 unit team office to get a paper clip, to get a notepad

20 while the inmate was there with you, would that be

21 something that you think that might create a violation, if

22 it was after hours and the unit team area wasn't there?

23 A   I can't really think -- I can't really -- I never

24 thought that deep on that because I never been in that

25 situation.

1  Q    Is there a policy out there that you're aware of that

2  would make that essentially prohibited conduct on behalf

3  of an officer?

4  A    I would answer that by saying that, you know, I'm a

5  correctional officer.  I'm not a lieutenant.  I'm not a

6  captain.  I'm a correctional officer.  And I perform my

7  duties, and I try to stay within the scopes of my duties.

8  I don't think in terms of hypotheticals, would that be

9  this or would that be that.

10  Q    I understand.  So, Officer Farmer, when Mr. Legins

11  was talking to you afterwards, was it your belief that

12  Mr. Legins, based on his demeanor and his conversation

13  with you, was more concerned about his job?

14  A    Which particular time?

15  Q    In the conversations that he had with you after this

16  happened on May 10th, when he said, "I don't" -- "I hope

17  they don't be tripping," things like that, was it your

18  impression that he was worried about getting fired from

19  his job?

20  A    His concern, based on, you know, my -- me looking at

21  him and reflecting on the conversations that we had, I

22  thought he was overly concerned about doing something like

23  that, you know, escorting an inmate from the south side to

24  the north side, especially being an inmate that is an

25  orderly.  That's one of the inmate's primary duties is to

Duane Farmer - Cross                   328

1   go in the unit, post materials, something like that.  It's

2   like a basic function.

3           And to be that overly concerned, that's what I

4   was -- that's what drew my attention.  Not whether or

5   not -- I didn't think in terms of him thinking he was

6   going to get fired, but the depth of his concern got my

7   attention.

8   Q    All right.  Thank you.

9           MR. GAVIN:  I don't have anything else,

10  Your Honor.

11          THE COURT:  All right.  You don't have any

12  redirect, do you?

13          MS. GILBERT:  No.  Thank you, Your Honor.

14          THE COURT:  All right, Officer.  Thank you so

15  much for your testimony.  You're excused.  I'm going to

16  instruct you not to talk about your testimony with anybody

17  until our trial is over.  Okay?

18          THE WITNESS:  Yes, sir.  Just leave that there?

19          THE COURT:  Just hold on one second there.

20          Folks, I'm going to give you the rest of the day

21  off.  See, I gave that extra five-minute break and now I

22  took it all back from you, right.  So I'm going to remind

23  you again that you're not to be influenced by anything on

24  the outside.  Don't talk to folks.  Don't go on social

25  media.  We hate Facebook.  You heard him talking about

1   that.  We don't want anything like that.  Okay?  Just

2   remember your instructions.  I'll look forward to seeing

3   you tomorrow.

4              This case is going to be yours pretty soon.  So

5   you just hang in there with me.  Okay?  All right.

6              Everybody rise for the jury.

7        (The jury exited the courtroom.)

8              THE COURT:  All right.  You all can be seated.

9   We're going to talk about a couple things.  So --

10             MS. GILBERT:  Your Honor, can Officer Farmer --

11             THE COURT:  Oh, I'm sorry.  Officer Farmer, you

12  can be excused.  I'm sorry about that.

13             THE WITNESS:  That's fine.

14        (Witness stood aside.)

15             MR. GAVIN:  Judge, we actually might need

16  Officer Farmer for one more issue.  If he could wait

17  outside for a second.

18             THE COURT:  Yeah.  Do you want to just step in

19  the hallway, then?

20        (Mr. Farmer exited the courtroom.)

21             THE COURT:  Do you want to tell me what that is?

22             MR. GAVIN:  Judge, I have actually designated

23  Officer Farmer on my witness list as well.  The reason

24  being that on the March 16th incident, he was the officer

25  that was at the door that looked at the folder that

1  Mr. Lemagne opened.  So I was going to call him in my case

2  to ask him whether or not he recalled seeing anything, but

3  I don't think there's any evidence that he did.

4         So if the United States could stipulate that

5  that was, in fact, Officer Farmer, then I don't need him

6  as a witness tomorrow.

7         THE COURT:  All right.  Do you want to stipulate

8  to that?

9         MR. GARNETT:  So we would stipulate, Your Honor,

10  that Officer Farmer was the officer that interacted with

11  Brandon Lemagne on March 16th.  I don't know that we've

12  ever actually asked him whether he observed anything on

13  the folder.  So I'd be reluctant to -- I don't know what

14  his answer would be.  Again, there's no evidence I have

15  that he did see anything, but that's not a question I

16  think we ever asked him.

17         THE COURT:  So what do you want to put forward,

18  now?  So on March the 16th --

19         MR. GAVIN:  On March 16th --

20         THE COURT:  -- he was the officer that was

21  where?

22         MR. GAVIN:  He was at Fox North exit door.

23         THE COURT:  And what are you asking -- okay.

24  The next question, then, is what?

25         MR. GAVIN:  Mr. Lemagne came through.  So

1   Mr. Lemagne is at the exit door where you had control

2   over.  Did you see anything with his folder, because he

3   pulled it out and looked at it.  And the folder is the

4   folder that's after the elevator incident where Mr. Legins

5   evidently ejaculated all over the folder, among other

6   things.

7           THE COURT:  So you want him to stipulate just

8   that he was the officer on the --

9           MR. GAVIN:  Just that he was the officer, yep.

10          THE COURT:  But nothing beyond that?

11          MR. GAVIN:  Well, they don't have any evidence

12   from Mr. Farmer that that was, in fact, you know, anything

13   on the folder, that he observed anything.  So, you know,

14   I'd -- I'd just as soon have the negative inference.  But,

15   I mean, I can call him for that just to say did you see

16   anything on the folder.  He's going to say no, I'm sure.

17          THE COURT:  Well, let me see what they say.

18          MR. GARNETT:  Your Honor, I think we'd prefer

19   that we just call Officer Farmer.  Again, I'm not sure

20   that Officer Farmer can recall what --

21          THE COURT:  All right.  Do you want to bring --

22   I wish we had just done this all at the same time.

23          Do you want to bring Officer Farmer back in

24   here?

25          MR. GAVIN:  I was just trying to save his

1    appearance tomorrow.

2                (Mr. Farmer entered the courtroom.)

3                THE COURT:  Officer, it seems that I was a

4    little premature in telling you you're excused.  We're

5    going to need you to come back tomorrow morning because I

6    think the defense is going to recall you as a witness for

7    a different point.  So I apologize for inconveniencing

8    you, but I'm going to ask that you be here no later than

9    9:30 tomorrow.  Okay?

10               MR. FARMER:  Yes, sir.

11               THE COURT:  All right.  But I am going to remind

12   you, please don't talk about your testimony with anybody.

13   Okay?  You have a good night.

14               (Mr. Farmer exited the courtroom.)

15               THE COURT:  All right.  Let's talk about a

16   couple things here.  So you have the paramedic, Ramsey,

17   left and then you have Dr. Walker; is that right?

18               MS. GILBERT:  I believe that professionally, she

19   also goes by Dr. Wolf, and I apologize for the ambiguity

20   in our notice.

21               THE COURT:  Dr. Wolf.  All right.  That's okay.

22   But that's it, right?  That's all you have?

23               MS. GILBERT:  Yes, Your Honor.

24               THE COURT:  All right.  Do you want to give me a

25   proffer about exactly what Dr. Wolf is going to testify

1  to?  Because I don't want to have -- I've had enough drama

2  from you guys.  I don't want any more drama here.

3          She's a licensed clinical psychologist, works at

4  the BOP.  I got that.  So take it from there.

5          MS. GILBERT:  Correct, Your Honor.  And so as

6  Mr. Garnett alluded to in opening, when he was talking

7  about how Dr. Wolf will testify that Mr. Lemagne described

8  to her a course of conduct that, in her training and

9  expertise, as someone who's worked extensively with

10 victims of sexual abuse and also with sexual offenders,

11 that those behaviors are consistent with grooming for

12 sexual abuse.  She'll explain how grooming for sexual

13 abuse works and why she wrote a report identifying

14 grooming as an issue in the course of conduct here.

15         She will testify about her examination of

16 Brandon Lemagne that night.  She can testify about his

17 demeanor because she knew him from before this incident

18 and how his demeanor compared to her previous observations

19 of him.  She can testify about how his demeanor compares

20 in terms of people who have alleged sexual assault.  And I

21 understand that I cannot elicit whether it's consistent or

22 whether it's inconsistent, but simply that there's a range

23 of reactions to sexual assault that she's been trained on.

24         THE COURT:  You know your nurse Womble said

25 there's nothing consistent.  It was actually the opposite

1  of what you said you were going to do here.  Do you

2  remember that?  Ms. Womble said -- I think you went back

3  to her -- I can't remember if it was you or Mr. Garnett,

4  but asked if there's, you know, consistent thing --

5  consistent pattern of behavior.  And she said there's no

6  consistent behavior.  It's -- people act in all kind of

7  different ways, which undermines this whole thought.

8           MS. GILBERT:  If that wasn't clear, Your Honor,

9  I apologize.  I think that is exactly what we're trying to

10 elicit.  In other words, it might be conventionally

11 understood that victims of sexual assault would be, for

12 example, weeping, and we were attempting to elicit that

13 actually victims of sexual assault react in all different

14 ways.  And so Mr. Lemagne's demeanor, which some witnesses

15 had described as blank or stoic, would be in that sense --

16          THE COURT:  I'm not going to allow that.  And I

17 think you've achieved what you need to achieve.  So I'm

18 precluding you from going into that discussion.

19          MS. GILBERT:  The demeanor discussion.

20          THE COURT:  The demeanor discussion.

21          I want to talk to you about the grooming thing.

22 Is she an expert in grooming of sexual victims?

23          MS. GILBERT:  She has received education and

24 training around that.  She's worked in facilities where

25 everybody in the facility is a sexual abuse victim.  She's

1  also worked in facilities where everybody is a sexual

2  offender.  So it is something she has a lot of experience

3  and expertise with.

4            THE COURT:  But is there such an area of

5  expertise -- I've never heard of that, in terms of

6  Daubert.  Is there an expertise in the grooming of sexual

7  victims?  We should have probably had a Daubert hearing on

8  this.

9            MS. GILBERT:  Your Honor, I wasn't aware that

10  defense counsel was objecting at all to our designation of

11  her or to that issue.  She did write a report where she

12  talked about the grooming behaviors.

13            THE COURT:  But what I'm asking, though, is --

14  look, I've been in this world -- the criminal world for an

15  awfully long time, tried rape cases myself.  I'm not

16  familiar with an expertise in grooming.  And I'm asking

17  you, is there a scientific expertise in this area?

18            MS. GILBERT:  Yes.  In the field of psychology,

19  it is a known term.  This is a term that she was

20  explicitly trained on and has received education on.

21            THE COURT:  All right.  Mr. Gavin, do you have

22  anything to say about this?  I'm more than a little

23  nervous about this.

24            MR. GAVIN:  Yeah.  Judge, I agree.  Grooming is

25  unique.  It's a term of art, essentially.  I'm more

1  familiar with it in possession of child pornography cases

2  or, you know, child exploitation cases.  Not so much in a

3  case like this, for one.  But for two, I do agree that she

4  was an expert because she was not only -- she was an

5  expert both factually because she saw the defendant --

6           THE COURT:  Right.

7           MR. GAVIN:  -- but she also could testify about

8  perhaps the PTSD and the symptomatology that he showed

9  there.  I don't remember that -- frankly, that grooming

10 was part of the designation.  I would certainly say that

11 if grooming was a term of art, it probably ought to have

12 been in the designation.  And I don't -- when I heard it

13 in opening, I thought that might be an issue.

14          THE COURT:  It strikes me -- your case has gone

15 in extremely well.  Why do you want to push the envelope

16 on stuff like this?  I mean, I think you have -- I just

17 don't see why we need to do that.

18          What you've essentially done, though, is you've

19 laid a factual predicate through Mr. Lemagne's testimony

20 about what was going on.  You could make argument that

21 just by the facts presented by the alleged victim, that

22 that's what he was doing without needing to go that extra

23 step for an expertise that I'm not familiar with.

24          We probably should have had a Daubert issue.

25 And it seems to me the safer thing for you to do here is

1  not to move forward with the expert testimony.  You can

2  put on the testimony.  She had the contact afterwards.

3  She witnessed him, saw his demeanor, although I think

4  you're beating a dead horse.  I think everybody knows that

5  his behavior was incredibly unusual, right.  And I think

6  that's it.  I think we're going to leave it at that.

7          So none of the expertise about grooming, none of

8  the expertise about consistent with it.  Just have her

9  testify about the way he acted.  And you've had all these

10 corrections officers saying, you know, he was an

11 effervescent guy and all the sudden, boom, everything

12 changes, right.  I think you're pushing way too hard for

13 something you don't need.  So that's going to be my ruling

14 on that.

15         Okay.  So it strikes me that -- your EMT is not

16 going to be that long either, right, your paramedic?

17         MS. GILBERT:  No, Your Honor.  We don't

18 anticipate that she'll be very long at all, and we are

19 considering whether we actually need to call her at all.

20         THE COURT:  I was thinking that, you know.  You

21 might want to just start getting to the end of the line

22 here, getting it over with, right?

23         All right.  So it strikes me -- they're going to

24 be done by 9:15 -- or 10:15.  What are you looking like

25 tomorrow?  And I'm going to colloquy the defendant here in

1  a second.

2        MR. GAVIN:  I think it's very possible,

3  Your Honor, that I could be done by lunch.

4        THE COURT:  All right.

5        MR. GAVIN:  We have been in -- I've been in

6  contact with Mr. Trevillian about having our witnesses

7  here by no later than 9:30.

8        THE COURT:  So your witnesses are inmate

9  witnesses?

10        MR. GAVIN:  Three of them are.

11        THE COURT:  Okay.  So that's how many witnesses

12  you expect.  We're going to address the defendant here in

13  a second.

14        MR. GAVIN:  Okay.

15        THE COURT:  Is that what you're expecting?

16        MR. GAVIN:  Those three and two others.  Five

17  total.

18        THE COURT:  All right.  So let me say to both of

19  you, if we're done by lunch, we're closing tomorrow.

20  Okay?  I'm going to limit you each to no more than an

21  hour.  Government -- who's doing what?  Ms. Gilbert, I

22  know, is doing one of the closings.

23        MS. GILBERT:  I'll be closing, Your Honor.

24        THE COURT:  But who's doing the rebuttal?  Are

25  you doing the rebuttal too?

1          MS. GILBERT:  I will be doing rebuttal.

2          THE COURT:  All right.  So you've got an hour.

3  You'll portion it amongst yourself.  That way you're not

4  stealing from Mr. Garnett.  So you've got an hour.

5          You've got an hour to work with.  Then we'll

6  kind of go from there.

7          MR. GAVIN:  Yes, sir.

8          THE COURT:  What I might do is -- if you do take

9  the full hour, I'm going to see how long she goes.  I

10  might break before each argument -- well, at least between

11  the -- her argument, your argument and then your rebuttal,

12  which will probably be shorter.  Then might go straight

13  into the instructions.  We'll see how it goes.  Because I

14  want to focus on what you're doing here.  So -- all right?

15          MR. GAVIN:  Yes, sir.

16          THE COURT:  All right.  Mr. Legins, do you want

17  to rise?

18          So, Mr. Legins, you heard me reference this

19  before.  You have a constitutional right to testify if you

20  wanted to.  Nobody can tell you not to.  Nobody can tell

21  you to do it.  It is up to you and you alone.  I asked

22  your lawyer to discuss this with you before now, and I'd

23  like to know from you whether or not you would like to

24  exercise your constitutional right to testify tomorrow.

25          THE DEFENDANT:  No, Your Honor, I'm not

1  testifying tomorrow.

2          THE COURT:  All right.  Has anybody threatened

3  you or made any promises or tried to coerce you in any way

4  for you not to exercise your right to testify?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  And is it your decision and your

7  decision alone not to testify?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  So what I'm going to do is just as a

10  precaution, in case you change your mind overnight, after

11  your case is put in by your lawyer, I'm going to check

12  back one more time and just ask you again tomorrow if

13  you've changed your mind at all, and that's it.  Because

14  this is such an important decision.  I want to make sure

15  you've made it on your own.  Okay?

16          THE DEFENDANT:  Thank you, Your Honor.

17          THE COURT:  All right.  Is there anything else

18  we need to do here?

19          Assuming he's not testifying, we would strike, I

20  guess, from the jury -- you can have a seat, Mr. Legins.

21  Thank you.

22          We would -- oh, there's something else I want to

23  talk about, and that's this.  Now, I ruled before about

24  the other inmates testifying.  Then I changed my mind.

25  Okay?

1          During the materiality debate that we had with

2    officer -- or with Agent Lavender, I went back and I

3    looked at the count again.  It says Count Five,

4    specifically that defendant falsely denied that he engaged

5    in a sexual act with any inmate at any time at FCI

6    Petersburg.  Technically speaking, you could call those

7    other two witnesses.  I think we ought not to do that, but

8    I'll give you a chance to be heard if you want to argue

9    right now.  If you want to step outside and discuss with

10   each other, you can do that.  I think it would be a

11   mistake, but I'll give you a chance to be heard.

12          MR. GARNETT:  We appreciate that, Your Honor.

13          Your Honor, we will not be calling them absent

14   the defendant's testimony.

15          THE COURT:  Okay.  It would only be -- okay.

16   Now, here's the other thing.  I'm not so sure if he -- if

17   the defendant were to be acquitted on all the sexual

18   conduct, I'm not so sure that that second false statement

19   stands as being material.

20          What we're going to do is this.  We're going to

21   let the jury decide this, and if for some reason -- and

22   remember, we did a special verdict form that they would

23   answer on both questions anyhow, right.  If by chance -- I

24   don't see this happening, but if he's acquitted on all the

25   sexual conduct and they were to find not proven on the

1  first alleged lie but convicts on the second lie, I would

2  let you all brief whether or not it would sustain

3  appellate review or not.  I think it might, but I'll deal

4  with that down the road.  Just -- you know, I think that's

5  an unusual -- I think it's all or nothing here.  That's

6  kind of what I think is what's going to happen.  So -- but

7  I just want you to know that's what we're going to do.

8  Okay?

9              MR. GARNETT:  Yes, Your Honor.

10             THE COURT:  All right.  So let's go to the jury

11 instructions here real quick.  Do you have the jury

12 instructions here?

13             MR. ROSENDAHL:  They should be in the trial

14 binder.

15             THE COURT:  They are in the trial binder?

16             All right.  I think we strike number 17, then,

17 the credibility of witnesses.  The defendant as a witness.

18             MR. GAVIN:  No objection.

19             MR. GARNETT:  I'm sorry, Your Honor.  Could you

20 repeat that?  I missed the first part.

21             THE COURT:  Instruction Number 17 entitled

22 "Credibility of witnesses."  "The defendant as a witness."

23 He's not testifying.  I think we remove that.

24             MR. GARNETT:  That's fine.

25             THE COURT:  Okay.  I have no other changes to

1    the instructions that we dealt with before, but if you all

2    do, now is the time to tell me.

3           MR. GAVIN:  None on behalf of the defendant.

4           MR. GARNETT:  No changes from the United States,

5    Your Honor.

6           THE COURT:  All right.  So depending on when

7    you're done, if it's -- if it's -- if it's in the

8    mid-afternoon, if it's like 2:00, 2:30, I'm just going to

9    stop and let you guys start the next day.  But if it's

10   before noon, I might give them an extended break until we

11   get everything together, and then we'll be rolling with

12   the closing arguments and then the instructions.  Okay?

13          MR. GAVIN:  I have one more thing.

14          THE COURT:  Sure.

15          MR. GAVIN:  My now infamous pictures that I was

16   going to try to introduce --

17          THE COURT:  Right.

18          MR. GAVIN:  -- the government and I, we still

19   need to reach a stipulation on that.  So what -- to avoid

20   the pictures.

21          THE COURT:  Right.

22          MR. GAVIN:  So how do you want us to do that?  I

23   mean, how much detail should we go into for the purpose of

24   the stipulation?

25          THE COURT:  I think you should -- the

1  stipulation should say, "The parties agree that the

2  defendant, when fully erect, approximately the measurement

3  of his penis is 7 inches long."

4        I'll tell the jury that a photograph was

5  submitted to me.  I saw it, but I'm going to spare them

6  from the picture, and they should accept it as true.

7        MR. GAVIN:  Thank you.

8        THE COURT:  Although I've got to tell you, I

9  don't know what the relevance is in light of Nurse Womble,

10 who said size has no impact on -- you know that.

11       MR. GAVIN:  It may be relevant with my expert.

12       THE COURT:  With your expert.  All right.

13       Okay.  What else do we have to do?  Anything

14 else?

15       MR. GARNETT:  Nothing else, Your Honor.

16       THE COURT:  All right.  No shenanigans tomorrow.

17 You're playing too close to the vest.  I'm going to remind

18 you, both of you, you represent the United States of

19 America.  You work for the Department of Justice.  These

20 cute questions at the end are starting to get on my

21 nerves, but more importantly, it's beneath the position

22 that you both hold, which I hold in high regard.  All

23 right.  See you tomorrow.

24       (The proceeding adjourned at 5:39 p.m.)

25

1                    REPORTER'S CERTIFICATE

2        I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

3   the Commonwealth of Virginia at large, and whose

4   commission expires September 30, 2023, Notary Registration

5   Number 7108255, do hereby certify that the pages contained

6   herein accurately reflect the stenographic notes taken by

7   me, to the best of my ability, in the above-styled action.

8        Given under my hand this 20th day of February 2020.

9

                          _____
10                             /s/
                          Tracy J. Stroh, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25