# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:19-cr-00104 |
| ) | |
| CHIKOSI LEGINS, ) | |
| ) | |
| *Defendant*. ) | |

## UNITED STATES' OPPOSITION
## TO DEFENDANT'S MOTION TO SET ASIDE VERDICT

The United States responds to the Court's Order of February 12, 2020 (Dk. No. 126), and files this response in opposition to the defendant's Motion to Set Aside Verdict pursuant to Fed. R. Crim. P. 29(c) (Dk. No. 135). The evidence presented at trial was more than sufficient to sustain the jury's guilty verdict, and the defendant's motion should be denied.

## FACTUAL BACKGROUND

On May 10, 2018, B.L., an inmate at the Federal Correctional Institution Petersburg (FCI Petersburg) reported that the defendant had raped him in an unmonitored, unstaffed office area earlier that night and on a separate occasion approximately two months prior.

On June 5, 2018, agents from the Federal Bureau of Investigation (FBI) and the Department of Justice Office of the Inspector General (OIG) interviewed the defendant about B.L.'s allegations. The defendant categorically denied having had any kind of sexual contact with B.L. The defendant admitted taking B.L. into the office area on May 10, 2018, but denied sexually assaulting B.L. Instead, the defendant said that he and B.L. were merely in "conversation" while the defendant was in the office attempting to use a computer and printer. Specifically, the defendant explained that in attempting to log on to the computer in question, he placed his (PIV)

1

card into the computer; then entered his Bureau of Prisons (BOP) number into the computer; but was then unable to subsequently enter his personal identification number (PIN) because the number lock on the keyboard was activated. *See* Trial Tr. Feb. 10, 2020 at 198, 209–10.

On July 24, 2019, a grand jury returned a five-count indictment charging the defendant with sexual offenses in Counts 1 through 4, and in Count 5, with lying to federal agents during their investigation into those alleged offenses. (Dk. No. 3.) Specifically, Count 1 charged the defendant with, on or about May 10, 2018, while acting under color of law, willfully violating B.L.'s right to be free from cruel and unusual punishment by using his penis to penetrate B.L.'s mouth and anus against B.L.'s will. Count 2 charged the defendant with aggravated sexual abuse for using force to knowingly cause B.L. to engage in a sexual act during the May 10 incident, while Count 3 charged the defendant with sexual abuse of a ward for using his penis to penetrate B.L.'s mouth and anus while B.L. was under the defendant's disciplinary authority during the May 10 incident. Count 4 charged the defendant with sexual abuse of a ward on or about March 16, 2018 for using his penis to penetrate B.L.'s mouth while B.L. was under the defendant's custodial, supervisory, and disciplinary authority.

Count 5 charged the defendant with knowingly and willfully making false, fictious, or fraudulent statements to federal agents in relation to these incidents in violation of 18 U.S.C. § 1001. Specifically, Count 5 charged the defendant with (1) falsely denying "that he engaged in a sexual act with any inmate at any time at Federal Correctional Institution, Petersburg" (referred to hereinafter as "the sexual-act lie") and (2) falsely stating "that on May 10, 2019, he attempted to use a computer and printer while he was engaged in 'just conversation' with inmate B.L. when they were alone in an unattended office with no surveillance cameras" (referred to hereinafter as "the computer lie"). *Id.*

The case proceeded to trial on February 6, 2020. At the Court's request, the parties prepared a special verdict form requiring the jury to specify which lie supported their guilty verdict on Count 5, if they reached such a verdict. (Dk. No. 123.) The jury instructions advised the same. (Dk. No. at 45.) On February 12, 2020, the jury returned not-guilty verdicts on Counts 1 through 4 and found the defendant guilty of Count 5. *Id.* The verdict form reflected that the jury found that the defendant guilty of making both false statements. *Id.* Also on February 12, 2020, the Court revoked the defendant's conditions of release and remanded him to custody until his sentencing on June 9, 2020. Trial Tr. Feb. 12, 2020 at 8–9.

## ARGUMENT

### I. The Evidence Was Sufficient to Sustain the Verdict

#### A. *The Evidence as to the Sexual-Act Lie Was Sufficient*

The Court should not set aside the jury's guilty verdict as to the sexual-act lie, because, "viewed in the light most favorable to the prosecution, substantial evidence support[ed] a guilty verdict." *United States v. Zelaya*, 908 F.3d 920, 925 (4th Cir. 2018) (citing Fed. R. Crim. P. 29), *cert. denied sub nom. Gavidia v. United States*, 139 S. Ct. 855 (2019). The government presented ample evidence sufficient for a reasonable jury to find proof of the sexual-act lie beyond a reasonable doubt. *See id.*[1] Among other evidence the jury may have considered to conclude that the defendant in fact engaged in a sexual act with an inmate at some point at FCI Petersburg, contrary to his statement that he never did so, the government presented:

- The victim's testimony that the defendant repeatedly exposed his penis to the victim, masturbated in front of the victim, orally raped the victim on one

---

[1] The defendant has not challenged the sufficiency of the evidence for other elements of Count 5—namely, that the defendant made this false statement willfully, knowing that the statement was false; that the statement was made in a matter within the jurisdiction of the executive branch of the government of the United States; and—as to the sexual-act lie—that the statement was material to federal agents—and so we do not address them here. (Dkt. No. 98 at 45); *see also, e.g.*, *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012). The materiality of the computer lie is discussed *supra.*

occasion, and orally and anally raped the victim on another occasion, *see, e.g.*, Trial Tr. Feb. 7, 2020, at 206–10, 227–29, 250–55;

- The FBI DNA analyst's testimony and reports reflecting that the defendant's DNA was recovered from a swab of the victim's anorectal area and from several items of the victim's clothing, including the inside of the victim's jock strap and shorts, *see, e.g.*, Trial Tr. Feb. 10, 2020, at 115–16, 126–29;

- The testimony of BOP lieutenants that, in their experience as correctional supervisors, the defendant taking the victim into the unmonitored, unstaffed area in question for over five minutes on the night of May 10, 2018, was "inappropriate," Trial Tr. Feb. 7, 2020, at 137; and that the defendant's behavior after the alleged assault was "strange," Trial Tr. Feb. 10, 2020, at 92;

- The testimony of a BOP correctional officer that there was no reason for the defendant's shouting at B.L. and the correctional officer across the prison compound shortly after B.L. had reported being sexually assaulted, Trial Tr. Feb 10, 2020, at 176–77; and that the defendant had called the Lieutenant's Office multiple times shortly afterwards, once for the purportedly reason of "looking for an inmate that we did not have at [FCI Petersburg]. He gave a name that was not on the actual roster." Trial Tr. Feb. 10, 2020, at 178–79;

- The testimony of a second BOP correctional officer that, in his experience, there was "no way" aspects of the defendant's story to that officer about how the defendant's DNA could have been recovered during the investigation were true, Trial Tr. Feb. 10, 2020, at 277, 279; or

- The testimony of a third BOP correctional officer, a housing unit officer, who explained that he had received a phone call from the defendant shortly after the time of the alleged assault on May 10, 2018; that the defendant claimed to be trying to determine whether B.L. was still present in the defendant's own housing unit; that the officer had never received such a call from the defendant before; that it was unusual for a housing unit correctional officer (i.e., the defendant) to attempt to locate an inmate not assigned to his housing unit; and that the officer would have been concerned to learn of a correctional officer escorting an inmate, alone, after hours, into the camera-less Unit Team Area when no other staff were present. Trial Tr. Feb. 10, 2020, at 287–88, 295–96.

The defendant nevertheless argues that there was insufficient evidence to support the jury's verdict as to the sexual-act lie, because "it was irrational for the jury to find the defendant guilty for falsely denying that he engaged in a sexual act, when the same jury held that Legins had not

4

engaged in any sexual act at all as defined by the Indictment and the Instructions." Def. Mot. at 5.[2]

First, and as the defendant apparently recognizes, the verdicts were not inconsistent. *See id.* ("It may be that the verdict was based on the jury's belief that the 'sexual act' under Count Five could have been based on some other unknown or other suspected sexual act outside of the Indictment, or a separate act outside of the definition of 'sexual act' provided in the Instructions insofar as Count Five did not have a definition for 'sexual act.'"). For example, the jury may have concluded that the sexual acts in question occurred, but that some other element of Counts 1 through 4 —such as lack of consent, force, or custodial or supervisory authority—was not met. Where "there are a number of reasonable explanations for the verdicts," the verdicts are not inconsistent. *United States v. Louthian*, 756 F.3d 295, 305 (4th Cir. 2014).

More fundamentally, "it is well-settled that a defendant cannot challenge his conviction merely because it is inconsistent with a jury's verdict of acquittal on another count." *Id.* (internal quotation marks omitted); *see also, e.g.*, *United States v. Green*, 599 F.3d 360, 369 (4th Cir. 2010) ("[I]t has long been settled that inconsistent jury verdicts do not call into question the validity or legitimacy of the resulting guilty verdicts."). The well-established rule that inconsistent verdicts do not merit reversal stems from courts' recognition that an inconsistent verdict "does not show that [the jury was] not convinced of the defendant's guilt" on the count(s) of conviction. *United States v. Powell*, 469 U.S. 57, 64–65 (1984) (internal quotation marks omitted). As the Supreme Court has explained, "[i]t is equally possible that the jury, convinced of guilt, properly reached its

---

[2] When a defendant challenges the sufficiency of the evidence where there is one valid theory of guilt and another invalid theory of guilt, the conviction is upheld. *Griffin v. United States*, 502 U.S. 46, 60 (1991) ("[I]f the evidence is insufficient to support an alternative legal theory of liability," the district court's failure to remove that theory from the jury's consideration "does not provide an independent basis for reversing an otherwise valid conviction."); *United States v. Pinson*, 860 F.3d 152, 170 (4th Cir. 2017) (same); *United States v. Moye*, 454 F.3d 390, 399-400 (4th Cir. 2006) (en banc) (same).

5

conclusion on the [offense of conviction], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [acquitted counts]." *Id.* at 65. In other words, "it is unclear whose ox has been gored," and given the government's inability to correct the jury's error through appeal, inconsistent verdicts are unreviewable. *Id.* at 65–67.

B. *The Evidence as to the Computer Lie Was Sufficient*

Ample evidence also supported the jury's conclusion that the defendant violated 18 U.S.C. § 1001 by falsely stating "that on May 10, 2019, he attempted to use a computer and printer while he was engaged in 'just conversation' with inmate B.L. when they were alone in an unattended office with no surveillance cameras." (Dkt. No. 3.) That evidence included the testimony of computer expert Daryl Strausser, who testified that he examined the records of the specific computer the defendant told federal agents he had attempted to use and that, contrary to the defendant's statement, *no individual even attempted* to log into the computer in question on the night of the incident. *See, e.g.*, Trial Tr. Feb. 10, 2020, at 259, 260–61, 263–64.

Strausser additionally testified that there would be no reason an employee would be able to enter a series of numbers for their BOP employee number and then, seconds later, be unable to enter numbers for a PIN, the scenario specifically described by the defendant. *Id.* at 255.[3]

The defendant nevertheless argues that the evidence was insufficient to support the jury's verdict as to the computer lie because "it is just as plausible" that the defendant was telling the

---

[3] Defense counsel accordingly misremembers the testimony of Mr. Strausser. *See* Def. Mot. at 6–7 ("As defense counsel recalls, the United States own expert testified that if the actual PIN number had never been properly inserted and accepted, there would not have been a way to determine whether a guard did, or did not, attempt to log on to the system."). While Mr. Strausser testified that an officer's unsuccessful attempt to enter a PIN number would not alone create a computer record, *see* Trial Tr. Feb. 10, 2020 at 257, the preliminary steps an officer must take to attempt to enter a PIN number—*i.e.*, inserting a PIV card, holding the control-alt-delete keys to get to the BOP employee number screen, and entering the BOP employee number—*would* create a record of the access attempt, *see id.* at 260–61, 263–64. Mr. Strausser went on to testify that he searched for *any* access attempt, regardless of who made such an attempt, after 6:00 p.m. on May 10, 2018. Strausser confirmed that the computer records reflected that *no one* had inserted a PIV card and entered control-alt-delete to bring up the BOP employee number input screen – steps the defendant told federal agents he had completed that evening – let alone the PIN number input screen that would follow the successful entry of a BOP employee number. *See id.* at 263–64.

6

truth about attempting to use the computer and printer. Def. Mot. at 6. First, it is not "just as plausible" the defendant was telling the truth as lying, because there is no evidence in the trial record that supports the defendant's assertion to federal agents he had entered his PIV card into the computer, successfully entered his BOP employee number, but then was stymied by a sudden inability to enter his PIN numbers when that screen prompted him to do so. To the contrary, and as explained above, the evidence at trial established that *no one* even *attempted* to log into the computer at the time the defendant told federal agents he had. Second, to the extent the defendant concedes that the jury's verdict on this count is "plausible," he concedes that the Rule 29 standard is not met. "[A]ssess[ing] the evidence in the light most favorable to the government, [] the jury's verdict must stand unless . . . no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013).

The defendant alternatively argues that the computer lie was not material, because the defendant's statement "had no bearing on the conclusions reached by the government in indicting the defendant." Def. Mot. at 8. Even if this assertion *were* factually true, "[i]t is well established law in this Circuit that a finding of materiality is not dependent upon whether the fact finder was actually influenced by a defendant's false statements." *United States v. Sarihifard*, 155 F.3d 301, 307 (4th Cir. 1998). The jury in this case was properly instructed that the defendant's statement was material if it had "the natural tendency to influence a governmental action or [was] capable of influencing a governmental action." (Dk. No. 98 at 48.); *see also, e.g.*, *United States v. Raza*, 876 F.3d 604, 616 (4th Cir. 2017) (citing *Neder v. United States*, 527 U.S. 1, 16 (1999)).

The alibi defense the defendant provided to federal agents during the interview—*i.e.*, that at the time of the other crimes alleged in the indictment, he was attempting to use a computer instead of committing the charged crimes—had the natural tendency to influence the federal

7

criminal investigation, because the defendant's false statement could have "jeopardized the accuracy of the [investigating agents'] determinations and delayed the [investigation]." *Sarihifard*, 155 F.3d at 307–08.  In *Sarihifard*, the defendant argued that because prosecutors immediately recognized that his grand jury testimony was false, his false testimony could not possibly have influenced the grand jury's indictment decision and was thus immaterial.  *Id.* at 307.  The Fourth Circuit rejected that argument, reasoning that even obviously false testimony "may impede [the fact-finder's] capacity to attain an accurate and prompt resolution of the matter under consideration."  *Id.*  The defendant's false alibi defense in this case was material for the same reasons, and because "[i]f the agents believed [the subject's] initial statement, then the investigation could have ceased because the [elements of the crime(s) under investigation] would not be satisfied."  *United States v. Lopez*, 689 F. App'x 732, 735 (4th Cir. 2017).

The government presented ample evidence from which the jury may have concluded that the computer lie was material.  As the case agent testified at trial, "the significance [of the computer lie] is [that the defendant] lied about being on a computer to cover up the sex acts."  Trial Tr. Feb. 10, 2020 at 238–39.  The defendant nevertheless argues that even if the computer lie was material at one point, the jury's verdicts "in reality, made the statement inmaterial [*sic*]" at a later point.  Def. Mot. at 8.  But a false statement's materiality under § 1001—in other words, the statement's capacity to influence the criminal investigation—"must be measured at the point in time that the statement was uttered," not at some later point, such as after the jury returns its verdicts.  *Sarihifard*, 155 F.3d at 307.  When the defendant lied to federal agents about what he was doing at the time of the crimes they were investigating, that lie had the potential at that time to slow, divert, or derail their investigation and thus was material.  *See id.*; *Lopez*, 689 F. App'x at 735.

8

## II. The Court's Detention Determination Should Not Be Disturbed

The Court appropriately ordered the defendant remanded to custody, Trial Tr. Feb. 12, 2020 at 7–9, and the defendant failed to produce clear and convincing evidence that he was not a flight risk or danger to the community. *See* 18 U.S.C. § 3143(a)(1); *United States v. Goode*, 487 F. App'x 813 (4th Cir. 2012) (explaining 18 U.S.C. § 3143(a)(1)). The defendant's motion does not argue otherwise. The defendant should remain detained until sentencing.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion for acquittal and leave its detention determination intact.

Respectfully Submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By: /s/
Thomas A. Garnett
Assistant United States Attorney
Virginia Bar No. 86054
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: 804-819-5400
Fax: 804-771-2316
Email: Thomas.A.Garnett@usdoj.gov

/s/
Kathryn E. Gilbert
Trial Attorney
Civil Rights Division

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2020, I electronically filed the foregoing motion using the Court's CM/ECF system, which will send an electronic notification of such filing (NEF) to all counsel of record.

                                                /s/
                                        Thomas A. Garnett
Assistant United States Attorney
Virginia Bar No. 86054
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia  23219
Phone: 804-819-5400
Fax:    804-771-2316
Email: Thomas.A.Garnett@usdoj.gov