IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

     v.                                                            Criminal No. 3:19cr104 (DJN)

CHIKOSI LEGINS,
    Defendant.

**MEMORANDUM OPINION**

On July 24, 2019, a grand jury returned an indictment against Defendant Chikosi Legins

("Defendant"), charging Defendant with five offenses, including four counts related to alleged

sexual acts between Defendant — a correctional officer — and an inmate at the Federal

Correctional Institution, Petersburg ("FCI Petersburg"), and one count of knowingly and

willfully making materially false, fictitious or fraudulent statements to agents of the Federal

Bureau of Investigation ("FBI") and the Department of Justice, Office of the Inspector General

("OIG") during the investigation of those alleged offenses in violation of 18 U.S.C. § 1001.  On

February 12, 2020, after considering all of the evidence presented during trial, a jury returned a

verdict of not guilty on the first four counts and a verdict of guilty on the § 1001 count, Count

Five.  (ECF No. 123.)  Based on the jury's verdict, the Court found Defendant guilty of the

allegations in Count Five and remanded him to the custody of the United States Marshals Service

pending his sentencing hearing on June 29, 2020.  (ECF No. 125.)

This matter now comes before the Court for sentencing on the First Amended

Presentence Investigation Report ("First PSR") (ECF No. 155), the Second Amended

Presentence Investigation Report ("Second PSR") (ECF No. 173) and the parties' positions,

objections and motions filed in response to both PSRs (ECF Nos. 157, 159-60, 163-67, 174-76,

178).  The Court held two sentencing hearings on June 29, 2020, and July 14, 2020, during

which the Court heard evidence and arguments from both sides.  Based on the parties' arguments

and the evidence presented, and for the reasons stated from the bench and set forth below, the

Court ADOPTS the guidelines calculation in the Second PSR (ECF No. 173), OVERRULES the

Government's and Defendant's Objections (ECF Nos. 174, 176) to the Second PSR, GRANTS

IN PART the Government's Motion for an Upward Variance (ECF No. 175), DENIES

Defendant's Motions for a Downward Variance (ECF No. 164, 176) and SENTENCES

Defendant to 54 months' imprisonment, with credit for time served, three years of supervised

release and a $100 special assessment.  As a condition of Defendant's supervised release, for the

reasons set forth below, Defendant shall participate in a sex offender treatment program, as

determined by his probation officer.  Defendant shall also be subject to the standard conditions of

release in this District, except for mandatory substance abuse testing, though Defendant's

probation officer may require him to submit to random substance abuse testing as needed.

## I.     BACKGROUND

### A.     Procedural History

On July 24, 2019, a grand jury returned an indictment against Defendant, charging him

with five offenses.  Specifically, in Count One, the Indictment charged Defendant with depriving

the alleged victim, B.L., "of the right, secured and protected by the Constitution and laws of the

United States, not to be subjected to cruel and unusual punishment" while acting under color of

law in violation of 18 U.S.C. § 242, by subjecting B.L. to aggravated sexual abuse and attempted

aggravated sexual abuse that resulted in bodily injury. (Indictment (ECF No. 3) at 2.)  Count

Two charged Defendant with aggravated sexual abuse and attempted aggravated sexual abuse in

violation of 18 U.S.C. § 2241(a), alleging that Defendant used force and attempted to use force against B.L. to penetrate B.L.'s mouth and anus with his penis. (Indictment at 2.)

In Counts Three and Four, the Indictment charged Defendant with sexual abuse of a ward in violation of 18 U.S.C. § 2243(b) for two separate incidents involving Defendant and B.L., namely: (1) a May 10, 2018 incident in which Defendant allegedly penetrated B.L.'s mouth and anus with his penis; and, (2) a March 16, 2018 incident in which Defendant allegedly penetrated B.L.'s mouth with his penis. (Indictment at 3.) Finally, Count Five charged Defendant with making two materially false, fictitious or fraudulent statements to FBI and OIG investigators in a matter within the jurisdiction of those agencies, specifically: (1) falsely denying that he engaged in sexual acts with any inmate at any time at FCI Petersburg; and, (2) falsely stating that on May 10, 2018, he attempted to use a computer and printer while engaged in "just conversation" with B.L. when they were alone in an unattended office. (Indictment at 4.)

Trial on these charges began with jury selection on February 6, 2020, (ECF No. 109), and continued until closing arguments on February 11, 2020, (ECF Nos. 118-19, 121), when the jury retired for deliberations. The jury returned a verdict on February 12, 2020. (ECF No. 122.)

After considering the evidence presented during trial and the Court's Final Instructions (ECF No. 127-1), the jury returned a verdict of not guilty on Counts One, Two, Three and Four and a verdict of guilty on Count Five of the Indictment. (Verdict Form ("Verdict") (ECF No. 123).) Importantly, in finding Defendant guilty on Count Five, the jury marked that both statements alleged in the Indictment supported its verdict. (Verdict at 3.)

Based on the jury's verdict, the Court found Defendant guilty of the allegations in Count Five. (ECF No. 124.) The Court also revoked Defendant's conditions of release and remanded Defendant to the custody of the United States Marshals Service pending sentencing. (ECF No.

125.) The Court initially scheduled Defendant's sentencing hearing for June 9, 2020, but later rescheduled the hearing to June 29, 2020.

### B.    The First PSR

Pursuant to the Court's Sentencing Guidelines Order (ECF No. 124), on May 12, 2020, the Probation Officer filed his initial PSR (ECF No. 154), and, after receiving objections from counsel, the Probation Officer filed the First PSR (ECF No. 155) on June 12, 2020. In the First PSR, the Probation Officer outlined his calculation of the appropriate range for Defendant's sentence based on § 2J1.2 of the Guidelines, which the Court directed the Probation Officer to use after finding in its March 20, 2020 Memorandum Order (ECF No. 150) that the eight-year statutory maximum under § 1001 applied to Defendant's conviction. (Presentence Investigation Report ("First PSR") (ECF No. 155) at 4-5.)

The Probation Officer first determined Defendant's offense level under § 2J1.2, which resulted in a base offense level of 14. (First PSR at 4.) The Probation Officer then added a four-level enhancement, because Defendant made the false statements sustaining his conviction in a matter that related to a sex offense under chapter 109A of title 18 of the United States Code. (PSR at 4.) This resulted in a total offense level of 18 under § 2J1.2. (First PSR at 4.)

Because § 2J1.2 includes a cross reference to § 2X3.1 (Accessory After the Fact), with the highest offense level under either provision controlling, the Probation Officer then proceeded to calculate Defendant's offense level under § 2X3.1, using Defendant's aggravated sexual abuse charge in Count Two of the Indictment as the underlying offense. (First PSR at 4-5.) Under § 2X3.1, Defendant's offense level equals the offense level for the underlying offense minus six. (First PSR at 5 (citing USSG § 2X3.1(a)(1)).) Using this guideline, the Probation Officer determined that Defendant's aggravated sexual abuse charge resulted in a base offense level of

4

30 pursuant to § 2A3.1(a)(2) of the Guidelines. (First PSR at 5.) Because the aggravated sexual abuse charge involved conduct proscribed in 18 U.S.C. § 2241(a) or (b), the Probation Officer included an additional four-level enhancement. (First PSR at 5 (citing § 2A3.1(b)(1)).) And the Probation Officer added a two-level enhancement, because the victim of the abuse, B.L., was in the custody, care or supervisory control of Defendant at the time of the offense. (First PSR at 5 (citing § 2A3.1(b)(3)).) This resulted in an offense level of 36, for a final offense level of 30 under § 2X3.1. (First PSR at 5.)

Because the offense level under § 2X3.1 exceeded the offense level under § 2J1.2, the Probation Officer concluded that Defendant's offense level under § 2X3.1 controlled, which, with no further adjustments, resulted in a total offense level of 30. (First PSR at 5.) The Probation Officer then determined that Defendant has a criminal history category I, which resulted in a guidelines calculation of 97-121 months' imprisonment. (First PSR at 6, 13.) The Probation Officer capped this range at the statutory maximum for Defendant's offense — eight years, or 96 months. (First PSR at 13.)

C.    **Defendant's Objection to the First PSR and the Court's Preliminary Findings**

On June 16, 2020, Defendant filed his Objection (ECF No. 160) to the First PSR. In his Objection, Defendant raised two primary challenges: (1) a challenge to the use of any acquitted conduct to calculate his guidelines range or determine his final sentence; and, (2) a challenge to the use of the aggravated sexual abuse charge in Count Two to calculate his offense level under the § 2X3.1 cross reference. (Objs. to the PSR ("Def. Obj.") (ECF No. 160) at 2-3.) On June 29, 2020, the Court held a hearing on Defendant's Objection, during which the Court heard evidence and offered its preliminary findings on the appropriate guidelines range calculation.

Specifically, for the reasons stated from the bench during the June 29 hearing and set forth in the Court's June 30, 2020 Memorandum Order (the "Preliminary Order") (ECF No. 171), the Court sustained Defendant's Objection (ECF No. 160) insofar as the Probation Officer used the aggravated sexual abuse charge in Count Two to calculate Defendant's offense level under the § 2X3.1 cross reference. (June 30, 2020 Mem. Order ("Prelim. Order") (ECF No. 171).) The Court first rejected Defendant's objection to the use of acquitted and uncharged conduct to calculate his guidelines range, noting that the Supreme Court and Fourth Circuit have both affirmed that sentencing courts may use acquitted and uncharged conduct to determine a sentence, so long as the Government has proven such conduct by a preponderance of the evidence. (Prelim. Order at 7-11 (citing *United States v. Watts*, 519 U.S. 148, 157 (1997) and *United States v. Grubbs*, 585 F.3d 793, 798-99 (4th Cir. 2009)).)

Based on the evidence adduced during trial, the Court then determined that the Government had proven by a preponderance of the evidence that Defendant committed two offenses, namely: (1) abusive sexual contact with B.L. in violation of 18 U.S.C. § 2244(a)(4) on March 16, 2018, in the Fox Unit elevator at FCI Petersburg (the "March offense"); and, (2) sexual abuse of a ward in violation of 18 U.S.C. § 2243(b) on May 10, 2018, in the Fox Unit secretary's office at FCI Petersburg (the "May offense"). (Prelim. Order at 11-18.) Relevant here, the Court found that the Government had not proven that Defendant used force against B.L. during the May offense, as charged in Count Two of the Indictment. (Prelim. Order at 14-15.) Accordingly, the Court found that the aggravated sexual abuse charge in Count Two did not constitute the underlying offense for purposes of the § 2X3.1 cross reference and directed the Probation Officer to instead rely on the sexual abuse of a ward charge in Count Three to determine Defendant's offense level. (Prelim. Order at 18.) The Court also directed the

6

Probation Officer to address the effect, if any, of Defendant's uncharged abusive sexual contact on the guidelines calculation pursuant to the grouping rules outlined in §§ 3D1.1, *et seq.* (Prelim. Order at 18.)

### D.    The Second PSR

Following the Court's instructions in the Preliminary Order, on July 1, 2020, the Probation Officer filed the Second PSR (ECF No. 173), which calculated Defendant's guidelines range using the sexual abuse of a ward charge in Count Three as the underlying offense. Specifically, the Probation Officer determined that Defendant's offense level under § 2J1.2, as before, equaled 18. (2d Addendum to the PSR ("Second PSR") (ECF No. 173) at 17.) The Probation Officer then cross-referenced to § 2X3.1, using the sexual abuse of a ward charge as the underlying offense. (Second PSR at 17-18.) Employing § 2A3.4, Defendant's sexual abuse of a ward charge yielded an offense level of 14. (Second PSR at 17-18.)

The Probation Officer then proceeded to calculate the effect, if any, of Defendant's abusive sexual contact on the offense level. (Second PSR at 18.) Using the grouping rules, the Officer increased the offense level for Defendant's underlying offenses from 14 to 16. (Second PSR at 18.) Pursuant to § 2X3.1, the Probation Officer subtracted 6 levels from the combined offense level for both offenses, yielding a total offense level of 10. (Second PSR at 18.) Because the § 2X3.1 cross reference resulted in a lower offense level than the offense level under § 2J1.2, the Officer applied the offense level under § 2J1.2 — 18 — which, together with Defendant's criminal history category I, yielded a guidelines range of 27-33 months, a $10,000-$100,000 fine and 1-3 years of supervised release. (Second PSR at 18.)

### E.      The Government's Objection to the Second PSR

In response to the Second PSR, on July 6, 2020, the Government filed its Objection and
Motion for a Variance. (U.S.' Objs. to Alt. Sentencing Guideline Calculations & Mot. for
Upward Variance ("Gov't Obj.") (ECF Nos. 174-75).) In support of its Objection, the
Government argues that the proper inquiry when applying the § 2X3.1 cross reference is not
whether the Government has proven by a preponderance that the underlying offense occurred,
but instead whether the Government has proven by a preponderance that Defendant obstructed
the investigation of the underlying offense. (Gov't Obj. at 3-8.) Citing to excerpts from
Defendant's interview with FBI and OIG investigators on June 5, 2018, in which Defendant
described the allegations against him as "rape," the Government contends that the aggravated
sexual abuse charge clearly fell within the scope of the investigation that Defendant obstructed,
requiring the Court to use that charge as the underlying offense. (Gov't Obj. at 2-8.)

Alternatively, assuming the Court overrules the Government's Objection, the
Government moves for an upward variance to 96 months from the amended guidelines
calculation of 27-33 months. (Gov't Obj. at 8-21.) Specifically, the Government argues that the
§ 3553(a) factors justify an upward variance to reflect the seriousness and nature of Defendant's
offense, his past sexual misconduct and the need to protect the public and afford adequate
deterrence. (Gov't Obj. at 11-21.)

### F.      Defendant's Objection to the Second PSR

On July 6, 2020, Defendant filed his own Objection and Motion for a Variance in
response the Second PSR. (Resp. Pursuant to Mem. Order ("Def. 2d Obj.") (ECF No. 176).)
Specifically, Defendant objects to the Court's finding that the Government has proven by a
preponderance of the evidence that Defendant engaged in consensual sex with B.L. during the

8

May offense in violation of 18 U.S.C. § 2443(b).  (Def. 2d Obj. at 1-2.)  In support of this

contention, Defendant asserts that other evidence adduced during trial tends to demonstrate that,

at most, Defendant engaged in inappropriate sexual contact.  (Def. 2d Obj. at 2.)  Nonetheless,

Defendant concedes that this argument would not alter the 27-33 months guidelines calculation.

(Def. 2d Obj. at 3.)

Defendant further contends that a downward variance to 15 months' imprisonment

proves appropriate, because "all that has been established is that some type of sexual consensual

contact occurred," which under the Guidelines provision for abusive sexual contact (§ 2A3.4)

results in a total offense level of 14 and a guidelines range of 15-22 months based on

Defendant's criminal history category.  (Def. 2d Obj. at 4.)  And Defendant challenges the

Court's consideration of an upward variance based on Defendant's past similar conduct, arguing

that the Court should credit neither the secondhand testimony of Special Agent Johnny Lavender

that Defendant engaged in a consensual sexual relationship with another transgender inmate at

FCI Petersburg, G.L., nor an investigatory report detailing accusations that Defendant behaved

inappropriately toward a female inmate while working as a sheriff's deputy in 2008.  (Def. 2d

Obj. at 5-6.)

On July 14, 2020, the Court conducted a hearing on the Second PSR and the parties'

positions, objections and motions filed in response, during which the Court entertained additional

arguments and ruled on the parties' objections and motions before imposing Defendant's final

sentence.  The Court now recites and supplements its reasoning for those rulings below.

## II.    STANDARD OF REVIEW

In sentencing a defendant, a sentencing court must:  (1) "properly calculate the sentence

range recommended by the Sentencing Guidelines;" (2) "determine whether a sentence within

that range and within statutory limits serves the factors set forth in § 3553(a) and, if not, select a sentence that does serve those factors;" (3) "implement mandatory statutory limitations;" and, (4) "articulate the reasons for selecting a particular sentence, especially explaining why a sentence outside of the Sentencing Guideline range better serves the relevant sentencing purposes set forth in § 3553(a)." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). Ultimately, a sentencing court "shall impose a sentence sufficient, but not greater than necessary" to satisfy the factors outlined in 18 U.S.C. § 3553(a).

Whatever the sentence chosen, the sentencing court must explain its reasoning, providing "an individualized assessment of the facts presented," "applying the relevant § 3553(a) factors to the specific circumstances of the case" and "stating in open court the particular reasons supporting its chosen sentence." *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009); *see also United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014) (noting that the court's explanation "need not be exhaustive"). Moreover, when either "the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence than that set forth in the advisory Guidelines, a [sentencing court] should address the party's arguments and explain why [it] has rejected those arguments." *Id.*

## III.   ANALYSIS

During the July 14, 2020 sentencing hearing, the Court addressed four outstanding issues: (1) whether the Second PSR properly calculated the guidelines range for Defendant's sentence; (2) whether a basis for a variance from the guidelines range, either upward or downward, exists; (3) if so, the degree of variance the Court should impose; and, (4) the appropriate sentence under the § 3553(a) factors. The Court will address each issue in turn.

10

A.     **The Second PSR Properly Calculated Defendant's Guidelines Range as 27-33 Months Based on the Underlying Offense of Sexual Abuse of Ward.**

As mentioned, the Government objects to the guidelines calculation in the Second PSR, arguing that the Court need not inquire into the sufficiency of the evidence supporting an underlying offense to use that offense under the § 2X3.1 cross reference. (Gov't Obj. at 3-8.) Instead, the Government contends that the Court need only consider whether the underlying offense fell within the scope of the investigation that Defendant obstructed, which, in this case, the Government asserts includes the aggravated sexual abuse charge. (Gov't Obj. at 3-8.)

Defendant responds that the controlling law in this Circuit — namely, the Fourth Circuit's decision in *United States v. Dickerson*, 114 F.3d 464 (4th Cir. 1997) — does not mandate that the highest offense charged in an investigation always constitutes the underlying offense for an obstruction conviction, but instead requires the Court to consider what offense(s) the evidence of record support. (Resp. Pursuant to Order No. 169 (ECF No. 178) at 1-2.) The Court agrees with Defendant and overrules the Government's objection to the amended guidelines calculation.[1]

The Government's objection relies primarily on the Sixth Circuit's decision in *United States v. Greer*, 872 F.3d 790 (6th Cir. 2017). In *Greer*, the defendant, Willie Greer — an officer accused of forcing a woman to perform oral sex on him incident to a traffic stop of her

---

[1]     As mentioned, Defendant separately objects to the guidelines calculation in the Second PSR based on his assertion the evidence adduced during trial does not prove, even by a preponderance, that he and B.L. engaged in a consensual sexual act during the May offense. (Def. 2d Obj. 1-3.) However, the evidence cited by Defendant in support of this objection fails to overcome the overwhelming evidence that Defendant penetrated B.L.'s anus with his penis during the May offense, as outlined in the Court's Preliminary Order, including evidence that testing of swabs taken from B.L.'s anus on the evening of the May offense provided "very strong support" for the inclusion Defendant's DNA. (Prelim. Order at 14-18.) Therefore, the Court overrules Defendant's objection to the Second PSR and adopts its findings in the Preliminary Order (ECF No. 171).

vehicle — was charged with a civil rights violation based on aggravated sexual abuse, witness tampering (for lying to investigators) and possession of a gun during a crime of violence. 872 F.3d at 792. Greer pled guilty to witness tampering as part of a plea agreement in which the Government agreed to dismiss the sexual abuse and gun possession charges. *Id.*

As with Defendant's § 1001 conviction here, Greer's witness tampering charge fell under § 2J1.2 of the Guidelines. *Id.* at 793. Based on § 2J1.2, the probation officer cross-referenced to § 2X3.1 using the civil rights violation charge as the underlying offense. *Id.* This yielded a base offense level of 27, which, with a criminal history category I, yielded a guidelines range of 70-87 months' imprisonment. *Id.*

During sentencing, Greer argued that the sentencing court could not cross-reference to § 2X3.1 using the civil rights violation charge as the underlying offense, because insufficient evidence existed to prove that Greer had committed aggravated sexual abuse to sustain that charge. *Id.* Instead, Greer asserted that, at most, the Government had proven "an inappropriate but consensual sexual rendezvous." *Id.* The sentencing court rejected Greer's arguments, finding that the probation officer properly relied on the civil rights violation as the underlying charge, and Greer raised the same objections on appeal. *Id.* at 794.

On appeal, the Sixth Circuit affirmed the sentencing court's decision, rejecting Greer's argument that the Government must prove by a preponderance of the evidence that the underlying offense actually occurred. *Id.* at 794-96. In so holding, the Sixth Circuit distinguished Greer's case from its previous decision in *United States v. Shabazz*, 263 F.3d 603, 610 (6th Cir. 2001), in which the court stated that § 2X3.1 could be applied only using conduct that the Government has sufficiently proven. *Id.* at 796-97. The Sixth Circuit reasoned that *Shabazz* evaluated only the extent to which an accessory after the fact could be punished for the

specific offense characteristics of the principal that he assisted, not whether sentencing courts can rely on uncharged or acquitted conduct within the scope of an investigation to determine the guidelines range for an obstruction charge. *Id.* at 797.

As to the latter, unanswered question, the Sixth Circuit rejected the argument that the commentary supporting § 2X3.1 required the Government to prove that an underlying offense occurred by a preponderance of the evidence. *Id.* at 797-98. Specifically, the Sixth Circuit determined that the United States Sentencing Commission did not intend for a defendant found guilty of obstruction to avoid punishment merely because he successfully prevented his conviction on the underlying offense. *Id.* at 798. Rather, the Sixth Circuit held that "the Guidelines intended that the obstruction of a criminal *investigation* is punishable even if the prosecution is ultimately unsuccessful or even if the investigation ultimately reveals no underlying crime." *Id.* (emphasis supplied).

By way of example, the Sixth Circuit juxtaposed a murder investigation with a trespass investigation, reasoning that obstructing of the former requires "more severe punishment to discourage such obstruction, regardless of whether either investigation results in prosecution or conviction." *Id.* This is because "a murder investigation itself is a very serious thing and its obstruction cannot be tolerated." *Id.* Therefore, the Sixth Circuit found no error in the sentencing court's reliance on the civil rights violation to calculate Greer's offense level. *Id.*

In addition to *Greer*, the Government also relies heavily on the Fourth Circuit's decision in *United States v. Dickerson*, in which the Fourth Circuit similarly held that the Government need not prove that an underlying offense occurred by a preponderance of the evidence for a sentencing court to use that conduct to calculate the guidelines range for a perjury conviction. 114 F.3d at 466-67. However, the Fourth Circuit in *Dickerson* introduced an important caveat to

13

this general rule by refusing to require that sentencing courts always rely on the highest offense charged as the underlying offense when applying the § 2X3.1 cross reference. *Id.* at 467-68. Instead, the Fourth Circuit held that the "[d]etermination of the proper underlying offense is a factual inquiry for the district court in the first instance." *Id.*

As further guidance, the Fourth Circuit instructed that the § 2X3.1 cross reference for perjury convictions does not require that a defendant be convicted of the underlying offense, because if such were the case, "perjurers would be able to benefit from perjury that successfully persuaded a grand jury not to indict or a petit jury not to convict." *Id.* at 468. At the same time, the Fourth Circuit advised that the highest offense charged does not always constitute the underlying offense either, because prosecutors often use charges to pressure a defendant into pleading guilty and also because "the defendant's actual conduct (*that which the prosecutor can prove in court*) imposes a natural limit upon the prosecutor's ability to increase a defendant's sentence." *Id.* at 469 (emphasis supplied) (internal quotations and citation omitted). In other words, to use the highest charged crime to calculate the guidelines in every instance would cede too much power to the charging discretion of the prosecutor.

Ultimately, the Fourth Circuit held that whatever offense constitutes the underlying offense "must be supported by the evidence," with the pertinent question being what criminal offense the defendant obstructed the investigation or prosecution of, as proven by a preponderance of the evidence, with the offense level for the highest such offense controlling the guidelines calculation. *Id.*

Although the Government interprets *Dickerson* as supporting the Sixth Circuit's ruling in *Greer* with only limited exceptions, the Court understands *Dickerson* to require more than a robotic application of the highest offense charged in every case. Instead, *Dickerson* recognizes

14

that, while in the majority of obstruction cases the underlying offense will be the most serious

offense within the scope of the investigation so obstructed, sentencing courts have a duty to

inquire into the offenses charged to ensure that a prosecutor's discretion does not result in the

undue punishment of a defendant.  And although *Dickerson* uses the example of a prosecutor

overcharging a defendant to obtain leverage for a plea agreement, which the Court finds did not

occur here, *Dickerson* does not limit the circumstances under which a lesser offense might

constitute the proper underlying offense to only such an example, thereby recognizing that other

outlier cases may exist.  Based on its review of the record, the Court finds the instant matter to be

one such outlier case, requiring the Court to use the lesser offense of sexual abuse of a ward to

determine Defendant's offense level under the § 2X3.1 cross reference.

  For one, the policy reasons underlying *Greer* and *Dickerson* do not apply to the same

extent to Defendant's conviction.  Specifically, *Greer* and *Dickerson* both rely on the principle

that someone who obstructs the investigation or prosecution of an offense should not benefit

from his obstruction by requiring the Government to prove that the underlying offense occurred.

*Dickerson*, 114 F.3d at 468.  However, Defendant did not benefit from his obstruction in the

same sense.  That is, although Defendant clearly made false statements, his statements did not

specifically relate to a denial of nonconsensual sex.  Rather, the Indictment charged Defendant

with, and the jury convicted Defendant of, lying about engaging in "a sexual act with any inmate

at any time at [FCI Petersburg]."  (Indictment at 4; Verdict at 3.)  Therefore, the jury's verdict

supports only a finding that Defendant obstructed the investigation into whether he engaged in

sexual acts with inmates; sexual acts which, by necessary implication of the jury's verdict, the

Government proved beyond a reasonable doubt to have occurred.[2]  In that sense, Defendant did

not benefit from his obstruction by avoiding culpability for the act(s) that the Government

ultimately proved beyond a reasonable doubt to a jury.  And although the Government could

have proven beyond a reasonable doubt that Defendant forcefully raped B.L. had Defendant

confessed to such a rape, as detailed in the Court's Preliminary Order, the evidence adduced

during trial fails to demonstrate that Defendant used force against B.L., even by a preponderance,

belying any assertion that Defendant avoided culpability by lying to investigators.  (Prelim.

Order at 14-15.)

    Beyond policy reasons, the factual record also supports the use of the lesser sexual abuse

of a ward charge to calculate Defendant's offense level.  Indeed, the Fourth Circuit in *Dickerson*

emphasized that "the defendant's actual conduct (*that which the prosecutor can prove in court*)

imposes a natural limit upon the prosecutor's ability to increase a defendant's sentence."  114

F.3d at 469 (emphasis supplied) (internal quotations and citation omitted).  Here, as the Court

---

[2]    Although the jury found Defendant not guilty of committing any sexual acts with B.L., as
noted in the Court's Preliminary Order:

> [T]he Court believes that the jury's inconsistent verdict resulted primarily from
> the Government's failure to argue to the jury and seek a jury instruction that the
> Government need not prove the use of force by Defendant or the lack of B.L.'s
> consent to sustain a conviction on Counts Three and Four, the sexual abuse of a
> ward counts.  Because Counts One and Two included an instruction that the
> Government needed to prove a lack of consent or use of force, (Instr. Nos. 25, 28-
> 31), and because the Government never mentioned the role of consent or force in
> Counts Three and Four, the jury most likely assumed that Counts Three and Four
> required proof of a lack of consent.  Considering that the Government introduced
> no evidence that Defendant engaged in sexual acts with an inmate other than B.L.,
> this explains why the jury found Defendant guilty beyond a reasonable doubt of
> lying about engaging in sexual acts with "any inmate" while finding him not
> guilty of engaging in even consensual sexual acts with B.L. under Counts Three
> and Four.

(Prelim. Order at 11 n.3.)

explained in its Preliminary Order, the Government's evidence that Defendant used force against B.L. relied nearly exclusively on B.L.'s testimony and statements to others, (Prelim. Order at 14-15 (detailing relevant testimony from the trial transcript)); otherwise, the only independent corroboration of B.L.'s account came from the testimony of Nurse LaShawn Ruffin that she observed bruising below B.L.'s right eye and on B.L.'s right arm eleven days after the May offense, which proves insufficient to establish the use of force, even by a preponderance, (Tr. Vol. III (ECF No. 137) at 266:2-267:9). Moreover, the jury clearly discredited B.L.'s testimony to the extent that he alleged nonconsensual sex by finding Defendant not guilty of both Counts One and Two, which required the Government to prove that Defendant used force against B.L. (Verdict at 1-2.) Indeed, the Government elicited testimony that Defendant in fact groomed B.L. into consenting by complimenting him and providing him with cigarettes, which directly contradicts any use of force by Defendant during the May offense. (*See, e.g.*, Tr. Vol. II at 199:7-204:15 (testimony of B.L. describing Defendant's grooming behavior, including providing cigarettes to B.L. and complimenting him).) And during the June 29, 2020 sentencing hearing, the Government elicited testimony from Special Agent Johnny Lavender, who testified that another inmate at FCI Petersburg, G.L., engaged in consensual sexual acts with Defendant in exchange for cigarettes, further corroborating the consensual nature of Defendant's conduct with B.L. Considering the Government's own contradictory evidence and the jury's clear rejection of B.L.'s allegations of nonconsensual sex, the record places a "natural limit" on what constitutes the underlying offense in this case.

To be sure, the Court does not find that the Government overcharged Defendant despite what the evidence that it introduced could prove; however, the Government's investigation into nonconsensual sexual acts relied nearly exclusively on B.L.'s allegations of force, which the

jury's verdict and the independent evidence of record do not support. Therefore, although during his interview with federal investigators, Defendant acknowledged that the investigation involved allegations of rape, (*see, e.g.*, Ex. A to Gov't Obj. ("Interview Tr.") (ECF No. 174-1) at 65:2-3 (Defendant: "[H]e [B.L.] wouldn't be the first to say that he was raped and get a rape kit going on."), 67:6-7 (Defendant: "So for the first time in my life, I'm going to try to rape another man?")), that the investigation included such allegations in the first place relied on a victim's account that the jury wholly discredited. Out of principles of lenity and fairness, the Court will not penalize Defendant for obstructing an investigation whose scope relied on a now-discredited account of what occurred.

Moreover, although Defendant described the allegations against him as "rape" allegations, the Government began its interview of Defendant by informing him that the investigation involved only allegations of "sexual abuse" and asked Defendant about the possibility that he engaged in consensual sexual acts with B.L. (*See, e.g.*, Interview Tr. at 3:16-21 (notifying Defendant that he was being investigated for "sexual abuse"), 32:11-25 (questioning Defendant about having consensual sex with B.L.).) Consequently, the Government told Defendant that the interview would be about consensual sex, not rape.

Ultimately, because the policy reasons underlying the general rule that courts should apply the highest offense charged within the scope of an obstructed investigation do not apply with the same rigor to Defendant's conviction, and because the evidence of record places a "natural limit" on the Government's charging discretion in this case, the Court will rely on the lesser offense of sexual abuse of ward, as charged in Count Three, to calculate Defendant's guidelines range. Accordingly, the Court overrules the Government's Objection (ECF No. 174)

and adopts the guidelines calculation in the Second PSR as the proper guidelines range for Defendant's sentence, resulting in a range of 27-33 months.

### B.     Sufficient Grounds Exist for an Upward Variance

Having determined that the Second PSR properly calculated Defendant's guidelines range as 27-33 months, the Court will proceed to consider whether grounds exist for any variances.  To that end, as mentioned, Defendant moves for a downward variance to 15 months, asserting that the Government has in fact proven only that Defendant engaged in abusive sexual contact in violation of 18 U.S.C. § 2244(a)(4), even during the May offense, which results in a guidelines range of 15-22 months.  (Def. 2d Obj. at 3-4.)  During the July 14, 2020 sentencing hearing, Defendant also argued for a downward variance based on his history and characteristics, including the letters of support submitted on his behalf.  The Court rejects both arguments as grounds for a variance.  Indeed, the Court finds no reason to alter its previous finding that the Government has proven by a preponderance that Defendant engaged in consensual anal sex with B.L. during the May offense, which constitutes sexual abuse of a ward in violation of § 2243(b).  And Defendant's arguments regarding his background and letters of support are most relevant to the degree of any variance that the Court might impose.

Instead, the Court agrees with the Government that grounds exist for an upward variance, though not to the degree requested by the Government.  For one, Defendant concedes that the guidelines calculation under the Second PSR accounts only for his obstruction of the investigation of the May offense, without accounting for Defendant's abusive sexual contact with B.L. during the March offense.  Indeed, the Second PSR relied only on Defendant's offense level for his obstruction, because his offense level under § 2J1.2 exceeded his offense level under the § 2X3.1 cross reference, even after accounting for the March offense under the grouping

19

rules. (Second PSR at 18.) Therefore, an upward variance proves necessary to account for Defendant's related conduct.

The Guidelines also fail to capture the extent of Defendant's obstructive conduct. Indeed, the jury's verdict found beyond a reasonable doubt that Defendant made two false statements to federal investigators, namely: (1) denying that he engaged in sexual acts with any inmate at any time at FCI Petersburg; and, (2) stating that on the night of the May offense, he and B.L. engaged in "just conversation" while he attempted to login to a computer in the Fox Unit secretary's office. (Verdict at 3.) The Guidelines consider only one of these false statements.

Further, during trial and sentencing, the Government introduced evidence that Defendant engaged in other obstructive conduct. For example, the Government elicited testimony from Nurse Sarah Ramsey that when B.L. arrived at the prison's medical facility for an examination following the May offense, Defendant called her to ask for medicine despite never having called her before and despite the prison's policy against providing nonemergency medical care to staff. (Tr. Vol. IV (ECF No. 138) at 18:23-21:13.) And Officer Ryan McLaughlin recounted other examples of Defendant's obstructive conduct that same evening. (*See* Tr. Vol. III at 174:1-175:8 (testimony of Officer McLaughlin that on the night of the May offense he heard someone who sounded like Defendant shout "you've got to be kidding me" as he escorted B.L. across the prison complex to the lieutenant's office), 177:24-178:20 (testimony of Officer McLaughlin that once he and B.L. arrived at the lieutenant's office, Defendant called the office twice for suspicious reasons).)

Defendant's obstruction also continued beyond the night of the May offense. Most notably, during his June 5, 2018 interview with federal investigators, Defendant concocted an

elaborate explanation for how his semen ended up on the clothing retrieved from B.L., stating that he had taken erectile dysfunction medication the day before the May offense in hopes of having sex with his wife but ended up not having sex and instead masturbated in the Fox Unit secretary's bathroom to relieve his erection, leaving semen in the bathroom that B.L. must have obtained while working on a cleaning detail. (Interview Tr. at 43:2-44:13.) A few days later, Defendant repeated the same story to a colleague, Officer Harry Parker, adding that he had in fact seen B.L. cleaning the bathroom while unattended — a violation of prison policy that Officer Parker testified would not be allowed under any circumstance. (Tr. Vol. III at 277:7-24.)

As these examples demonstrate, Defendant did not simply obstruct the FBI and OIG investigation through mere denials or offhanded remarks, but instead developed a premeditated plan and continually evolving narrative to escape culpability. When faced with counterevidence, Defendant adapted his story, resulting in an unbelievable explanation that defied both common sense and the clear evidence. The Guidelines do not capture the extent or premeditated nature of Defendant's obstructive conduct, which justifies an upward variance.

Moreover, Defendant's premeditation extended to his sexual misconduct with B.L. Indeed, B.L. testified that, in the months leading up to the March and May offenses, Defendant gave him cigarettes — a valuable commodity in the prison system — complimented B.L. on his appearance and engaged with B.L. in a way that prison guards ordinarily do not engage with inmates. (Tr. Vol. II at 199:7-204:15.) During sentencing, the Government also elicited secondhand testimony from Agent Lavender that Defendant engaged in similar grooming behavior with another transgender inmate at FCI Petersburg, G.L., which corroborates the Government's evidence that Defendant targeted and groomed the transgender inmate

21

population.[3] And the objective evidence provides further proof that Defendant planned how he would avoid detection during both the March and May offenses by escorting B.L. into an unattended hallway where he knew there would be no surveillance cameras. (*See* Gov't Exs. 1-2 (surveillance footage from the time period of the March and May offenses showing Defendant escorting B.L. into the unattended hallway with no surveillance cameras for approximately five to six minutes).) This evidence establishes that Defendant not only acted with premeditation in obstructing the investigation of his sexual misconduct, but also acted with premeditation in committing the underlying offenses, further justifying an upward variance.

Finally, Defendant's past conduct provides additional grounds for an upward variance. Specifically, Defendant does not dispute that, in 2008, the Richmond Sheriff's Office investigated allegations of Defendant's inappropriate behavior towards female inmates while Defendant served as a sheriff's deputy. In that incident, a female inmate alleged that Defendant made several inappropriate comments, including asking the inmate to show him "something" in a suggestive manner. (Ex. A to Gov't Pos. ("Sheriff's Rep.") (ECF No. 157-1) at 2-3.) Defendant had also been found in areas of the facility where "male deputies generally do not go," including female-only housing. (Sheriff's Rep. at 4.) Based on their investigation, Sheriff's Office investigators reprimanded Defendant for unbecoming conduct, dishonesty and failure to comply with lawful directives. (Sheriff's Rep. at 5.) This investigation provides further support for an

---

[3]    During the July 14, 2020 sentencing hearing, the Court afforded Agent Lavender's testimony some, but little, weight, because the Government had the opportunity to call G.L. during both trial and sentencing but elected not to. Because the Government did not call G.L. to testify directly, the Court could not adequately assess G.L.'s credibility, nor could Defendant's counsel cross-examine her. Accordingly, the Court credits Agent Lavender's testimony only insofar as G.L.'s statements provide further corroboration to the evidence that Defendant acted methodically in targeting and grooming B.L. to engage in consensual sexual acts.

upward variance, as it demonstrates a pattern of inappropriate sexual conduct by Defendant and, most notably, a history of lying to investigators to avoid culpability for his wrongdoing.

      For these reasons, the Court finds that sufficient grounds exist for an upward variance.

### C.    Variance Calculation and Final Sentence

      The question then becomes the extent of the upward variance that the Court should impose. Indeed, "[i]n the event [a] sentencing court decides to impose a variance sentence . . . the sentencing court 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). In deciding the degree of a variance to impose, sentencing courts need not adhere to rigid mathematics but must instead consider the "uniqueness of the individual case" together with the § 3553(a) factors. *Gall*, 552 U.S. at 52. That said, the Guidelines represent "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and therefore provide a starting point in deciding the degree of variance to impose. *Id.* at 46.

      To that end, because Defendant's guidelines range does not capture his related conduct from the March offense — namely, abusive sexual contact in violation of 18 U.S.C. § 2244(a)(4) — the Court will use the guidelines range for such conduct as a starting point for the degree of variance to impose. Pursuant to § 2A3.4, Defendant's abusive sexual contact results in a base offense level of 12, with a two-level enhancement, because B.L. was under Defendant's supervisory control at the time of the offense, resulting in a total offense level of 14. Together with Defendant's criminal history category I, this yields a guidelines range of 15-21 months for the March offense.

To account for the March offense, as well as the nature and circumstances of Defendant's extensive obstruction, premeditation and past similar conduct, the Court finds that the combined range for Defendant's crime of conviction and the March offense (42-54 months) appropriately captures the degree of variance that should be imposed. Notably, this combined range falls within the ranges for both offense level 22 and offense level 23 under Defendant's criminal history category, but the Court will utilize the range for offense level 23 (46-57 months), as the higher range better accounts for the seriousness of Defendant's offense and related conduct.

Within that range, for the reasons stated from the bench during the July 14, 2020 sentencing hearing, the Court finds that a final sentence of 54 months' imprisonment with three years of supervised release proves sufficient but not greater than necessary to comply with the § 3553(a) factors. Such a sentence captures the seriousness of Defendant's conduct and the manner in which he committed his crime of conviction, while also accounting for the significant role that Defendant has played in his family, his history of service to our country and his contributions to his religious community. The sentence also affords adequate deterrence to Defendant and other correctional officers who commit similar acts in violation of their positions of trust. And a term of three years of supervised release proves necessary to protect the public, as Defendant's repeated incidences of sexual misconduct demonstrate a greater chance of recidivism.

In the same vein, the Court will require Defendant to undergo sex offender treatment while on supervised release, as directed by his probation officer, to ensure that Defendant receives effective correctional treatment, because the evidence presented demonstrates that Defendant has engaged in a pattern of sexual misconduct that likely will continue without treatment. *See United States v. Douglas*, 850 F.3d 660, 666 (4th Cir. 2017) (affirming that

sentencing courts may impose sex offender treatment as a condition of supervised release when the evidence presented "permit[s] the rational inference that [the defendant] present[s] a recidivism risk" (internal quotations and citations omitted).) The Court will also impose the standard conditions of release in this District, except for mandatory substance abuse testing, which the Court waives in light of the absence of any evidence that Defendant has abused drugs or alcohol, though Defendant's probation officer may subject Defendant to random testing as needed. And the Court will impose the $100 special assessment mandated under 18 U.S.C. § 3013(a)(2)(A).

## IV.   CONCLUSION

Based on the parties' arguments and the evidence presented, and for the reasons stated from the bench and set forth above, the Court ADOPTS the guidelines calculation in the Second PSR (ECF No. 173), OVERRULES the Government's and Defendant's Objections (ECF Nos. 174, 176) to the Second PSR, GRANTS IN PART the Government's Motion for an Upward Variance (ECF No. 175), DENIES Defendant's Motions for a Downward Variance (ECF No. 164, 176) and SENTENCES Defendant to 54 months' imprisonment, with credit for time served, three years of supervised release and a $100 special assessment. As a condition of Defendant's supervised release, for the reasons set forth above, Defendant shall participate in a sex offender treatment program, as determined by his probation officer. Defendant shall also be subject to the standard conditions of release in this District, except for mandatory substance abuse testing, though Defendant's probation officer may require him to submit to random substance abuse testing as needed.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date: July 20, 2020