1

```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                        RICHMOND DIVISION
```

```
  _____
                                     )
  UNITED STATES OF AMERICA           )
                                     )
  v.                                 )     Criminal Case No.:
                                     )     3:19 CR 104
  CHIKOSI LEGINS                     )
  _____)
                                           July 14, 2020
```

```
                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE DAVID J. NOVAK
                UNITED STATES DISTRICT COURT JUDGE
```

APPEARANCES:

```
Thomas A. Garnett, Esquire
OFFICE OF THE UNITED STATES ATTORNEY
919 East Main Street, Suite 1900
Richmond, Virginia 23219
```

```
Kathryn E. Gilbert, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW, 4025 NYA
Washington, DC 20530
```

```
          Counsel on behalf of the United States
```

```
Charles A. Gavin, Esquire
CAWTHORNE DESKEVICH & GAVIN PC
1409 Eastridge Road
Richmond, Virginia 23229
```

```
          Counsel on behalf of the Defendant
```

```
                    TRACY J. STROH, RPR
                  OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
```

```
 1                (The proceeding commenced at 11:02 a.m.)

 2                THE CLERK:  Criminal matter 3:19 CR 104,

 3   United States of America v. Chikosi Legins.  Mr. Thomas

 4   Garnett and Kathryn Gilbert representing the

 5   United States.  Mr. Charles Gavin representing the

 6   defendant.

 7                Counsel, are we ready to proceed?

 8                MR. GARNETT:  The United States is ready,

 9   Your Honor.

10                MR. GAVIN:  Defense is ready, Your Honor.

11                THE COURT:  All right.  We're going to continue

12   to proceed as I indicated last time.  If you -- when you

13   speak, stand up, take the mask off, put the mask back on

14   when you're done, and then sit down.  Okay?

15                All right.  Just to recap where we were from the

16   last time on June 29th, which I then codified in the order

17   that I issued on June 30th, I had found that the

18   government had established by a preponderance of the

19   evidence that as to the March 16th, 2018, incident, that

20   the government had established a violation of the sexual

21   contact under section 2244(a)(4).

22                I also found, also due to the jury's verdict,

23   that the government had proven by a preponderance of the

24   evidence that as to the May 10th, 2018, incident, that the

25   defendant had engaged in abuse of -- sexual abuse of a
```

1  ward by performing a sexual act in B.L.'s anus, in

2  violation of 2243(b).

3          Now, Mr. Gavin, in your most recent filing,

4  you've objected to that, citing other facts, including the

5  piece of toilet paper.  I'm going to overrule your

6  objection, believing that my findings are appropriate for

7  the reasons I've said.

8          MR. GAVIN:  Yes, sir.

9          THE COURT:  All right.  I have also, in light of

10  the jury's verdict, found that the government has not

11  proven beyond a preponderance as to the aggravated sexual

12  abuse, the rape, essentially, the use of force, which

13  other than the government's objection that's based on the

14  *Greer* case, results in a level 18, Criminal History

15  Category I.  That's a range of 27 to 33 months.

16          We're going to get to the *Greer* issue here in a

17  second, but before we get to that, did you have any other

18  objections on the guidelines, Mr. Gavin, other than what

19  I've already addressed?

20          MR. GAVIN:  No, sir.

21          THE COURT:  Okay.

22          Mr. Garnett, did you have any other objections,

23  other than the *Greer*?  You're going to get to argue your

24  *Greer* issue here in a second.

25          MR. GARNETT:  Other than *Greer*, no, Your Honor.

4

```
 1              THE COURT:  All right.

 2              MR. GARNETT:  Well, I should say Greer and the

 3  other cases we've cited in our brief, Your Honor.

 4              THE COURT:  Well, I call it the Greer issue

 5  because that's what --

 6              MR. GARNETT:  Yes, sir, the Greer issue, then.

 7  Yes, sir.

 8              THE COURT:  That's what you're leading with.

 9  So -- okay.

10              All right.  So what we're going do now is we're

11  going to turn to the Greer issue.

12              Ms. Gilbert, are you going to argue that again?

13  I will say that I'm glad you brought this up, and I'm glad

14  we did more briefing on it.  This issue had more legs on

15  what I thought it originally did.  So I'm glad we're

16  giving it more scrutiny.  It doesn't mean I agree with

17  you, but I want to give you a chance to be heard.

18              Are you arguing this?

19              MS. GILBERT:  Yes, Your Honor.

20              THE COURT:  Do you want to come up?

21              MS. GILBERT:  Thank you, Your Honor.  As

22  Your Honor has noted, we have led with the Greer case

23  primarily because it is factually similar to the present

24  case, and also because its statement of the law is a

25  correct and accurate statement of out-of-circuit
```

1  precedent, but we think that Fourth Circuit precedent

2  supports the same position.  The same rationale that

3  supports the outcome of the *Dickerson* case, the published

4  Fourth Circuit case supports the United States' rationale

5  here.  In other words, the correct cross-reference is to

6  the offense that was under investigation, the prosecution

7  investigation, which was obstructed.  Because were the

8  rule otherwise, effectively that rule would reward

9  effective construction.  And so in the same ways the

10 *Dickerson* case explains that there need not be a

11 conviction for the underlying offense, there need not be a

12 showing by a preponderance.

13         THE COURT:  Well, let's take it one step at a

14 time here.  There is a difference from *Greer* to *Dickerson*.

15 *Greer* basically says on all occasions where there is some

16 level of obstruction, perjury, whatever, you immediately

17 go to the highest offense.  The concept behind it is is

18 that a defendant should not profit from lying, basically,

19 right?

20         *Dickerson*, which I'm bound to follow, and which

21 I also don't believe is the better rule, doesn't do the

22 per se.  I think what it says is essentially in the

23 majority of cases, that's where you're going to land, but

24 it requires the district court to make factual findings

25 about what the true offense is.  And the example that they

1   cite, which is not -- it doesn't apply here, but the

2   example that they use is when prosecutors overcharge in

3   order to get leverage -- plea leverage, right.   That's

4   certainly not what happened here.   But the idea is that a

5   judge is to give scrutiny to see what is the true offense,

6   right.   So that's my responsibility.   Okay?   So a couple

7   things jump out at me on that.

8           And by the way, going back to that policy

9   provision, I certainly agree with that, right.   A

10  defendant should not escape further punishment by lying,

11  right.   We don't want to incentivize that, right.   I'm not

12  so sure what happened here, though.   So if you go -- and I

13  say that for two reasons.   One is I went back and I looked

14  at the transcript that you provided to us.   The opening

15  statement to the defendant when he was interviewed on

16  page 3 by, I guess, Mr. Orloff, who was with Agent

17  Lavender, said, "Mr. Legins, we are here today to

18  interview you as a subject to answer questions in an

19  official joint OIG-FBI investigation regarding sexual

20  abuse of an inmate at FCI Petersburg."   That is the count

21  that I have found is the most serious offense by the

22  preponderance.   So, number one, they told him.   Okay?

23          Now, there are discussions within the

24  interview -- mainly, the defendant uses the word rape

25  himself a couple times.   He brings it up.   The agents do

1  not, from my recollection of the reading -- of the

2  interview.  But they do mention a couple times using

3  force, right, which would equate to your aggravated sexual

4  abuse; is that right?

5          MS. GILBERT:  Yes, Your Honor.

6          THE COURT:  All right.  So essentially what I

7  think what you're saying, then, is because there's

8  mentioning of that, that elevates it to the most serious

9  offense.  Is that what your point is?

10          MS. GILBERT:  I would go farther, Your Honor,

11  and say that there was no debate in this case that the

12  defendant understood that the initial allegation and,

13  therefore, the investigation that spun out from it was of

14  a forcible, nonconsensual rape.  But that is great

15  evidence that they were talking about aggravated sexual

16  abuse, the repeated questions about force and, as

17  Your Honor has already pointed out, the defendant's own

18  words.

19          THE COURT:  I think that's actually fair.  I

20  think I agree with what you're saying.  Okay?

21          But I have -- I have two reasons that I disagree

22  with what your application are, but I want to give you an

23  opportunity to respond.

24          Number one is the policy, the policy of the

25  defendant lying to escape the most serious punishment.  I

1  don't believe that's what happened here.  I believe -- and

2  I think I told you this the last time -- that the evidence

3  that you put forward, all your grooming evidence that you

4  wanted to put on -- that you did put on and you wanted to

5  put on more, suggests grooming to consent.  And I think

6  the problem with your case was that you didn't tell the

7  injury an inmate can't consent.  I told you that the last

8  time, right.  But that's the crux of the case.

9          And then the evidence that you put on at the

10 last hearing on June 29th, G.L., supported that, right,

11 that -- essentially what your evidence about him was is

12 that he was replaced by B.L., he got transferred out, that

13 originally the defendant started a relationship with him,

14 he groomed him, had consensual sex, and then he was

15 replaced by B.L.  Now, I know your view is is that B.L.

16 was raped, but the jury rejected that.  They clearly did,

17 and I have found that you have not proven by a

18 preponderance of the evidence that.

19          So, to me, the policy is not applicable.  In

20 other words, the defendant has not benefited by -- he

21 clearly lied.  Not once, but twice, by the way.  The jury

22 has found that.  We have kind of focused all on the lying

23 about the sex.  We've forgot about lying about the

24 computer, right, although they're somewhat connected.  He

25 clearly lied, but I don't think he profited from that.

1    That's my first point.  Do you want to respond to that or

2    do you want to wait until my second point?

3              MS. GILBERT:  Whatever order Your Honor prefers.

4              THE COURT:  Go ahead.  I'll let you go.

5              MS. GILBERT:  I know that I haven't -- we're not

6    resting purely on a policy argument.  The policy that

7    underlies actually the plain terms of the guidelines and

8    that underlies the rationale of *Dickerson* was what I was

9    trying to connect, those out-of-circuit cases, which are

10   uniform in their holding that, as *Arias* says, they're not

11   aware of any court, actually, that has approved looking at

12   whether the government has proven by a preponderance that

13   the offense actually occurred.  But the policy underlies

14   the plain terms of the guidelines, which instruct courts

15   to look to the offense of investigation or prosecution.

16             So however much he profited from it, whatever

17   his goals were in lying, the guidelines say, look, if

18   somebody is lying about a more serious crime, that's just

19   necessarily more serious obstruction, whatever actually

20   happened.  And he knew what the allegations were here.  He

21   knew that he was lying about the most serious order of

22   crimes, of forcible, nonconsensual rape of someone who was

23   in his custody and care.  And that's why the guidelines

24   instruct that the offense to look at is the offense of

25   obstruction, not the offense that happened, not the

1   offense that was proven to a jury or to anyone else.

2          THE COURT:  Well, that goes to my second point

3   about what the offense is, but I want to -- address my

4   policy issue, right.  Because I think there's two things

5   going on.  One is what is the offense, which was going to

6   be my second point.  But two is the underlying policy

7   behind this.  And I'm agreeing what the policy is.  I just

8   don't think it's applicable in this case.

9          MS. GILBERT:  And if I'm understanding

10  correctly, Your Honor doesn't think it's applicable in

11  this case because --

12         THE COURT:  I don't think he profited by the

13  lying is what I'm telling you.

14         MS. GILBERT:  And I think what the guidelines

15  would say -- the rule that -- you know, that has led to

16  the guidelines being what they are does consider to what

17  extent a defendant might profit.  But in any case in which

18  you're looking at the cross-reference, to a certain

19  extent, the defendant has not profited because, obviously,

20  he's been convicted of obstruction.  And so in that sense,

21  Your Honor is absolutely correct that he hasn't profited

22  in the fullest sense.

23         THE COURT:  No.  He has profited to some extent,

24  though, actually.  I disagree with you.  This is actually

25  to your benefit.  I believe that had he told the truth,

1  according to what the jury found, and said, when he was

2  interviewed by the agents, yes, I had consensual sex with

3  B.L. -- not did he force me, but I had consensual sex, he

4  would have been convicted of the sexual abuse.  I can't

5  remember what count -- was it Counts Three and Four of

6  that?

7             MS. GILBERT:  Yes, Your Honor.

8             THE COURT:  If he had been honest about that.

9  And I can't remember what the statutory maximum is, but I

10 gather it's more than eight years, right?

11            MS. GILBERT:  Yes.  I think that's right,

12 Your Honor.

13            THE COURT:  Right.  So -- I think it's either 10

14 or 20 years.  I can't remember off the top of my head.

15 But he did profit to some extent.  I mean, we go back to

16 this issue about you all not telling them about an inmate

17 can't consent, but that's water under the bridge.

18            Let's go to my second point, though.  So my

19 second point, though, is really what the offense is.

20 Because I think generally your statement from the

21 out-of-circuit case law is accurate, right.  You should

22 turn to the more serious one because the defendant knows

23 that's what's going on.  But this circuit says different.

24 There are going to be outlier cases, right.  And you have

25 to look at it -- they use the example of overcharging to

1   get plea leverage, but there also could be other reasons.

2   And this is what I'm kind of focused on.  So let me ask

3   you this.

4         If B.L. had reported to -- first to the prison

5   and then later to OIG and your agent not that he was

6   raped, that if he said instead Officer Legins, the

7   defendant, had groomed him, had offered him cigarettes,

8   and that they had a consensual relationship, you know, on

9   both occasions, okay, would the interview have been the

10  same?

11        And I suspect that answer is no.  I think what

12  they -- the agent would have said is, Mr. Legins, we

13  understand you had a consensual relationship with B.L,

14  that you plied him with cigarettes and you essentially

15  romanced him during that time period to get him to do

16  that, and there would have been no mention of force

17  whatsoever.

18        And the reason I think that is important here,

19  because I've thought about this as you do the deep dive on

20  *Dickerson*, is what you're saying is is that the

21  questioning drives the application of -- to the highest

22  level of offense, right.  The question is why is the

23  questioning about the aggravated sexual abuse here as

24  opposed to just a sexual abuse issue.  And that's all

25  driven by the victim, right.  If the victim -- what the

1   jury has discredited about the rape, in other words -- so

2   if the victim -- and, again, I'm relying on the jury's

3   verdict, right.  If I had been the fact finder, I might

4   have reached a different conclusion, but I'm going to

5   stick with the jury.  So the jury has rejected the notion

6   of force here, right.  So I think two things -- that means

7   two things in the context of this interview.  One is there

8   would have been no discussion about force because the

9   victim would have never said there was force, and I don't

10  think the victim's statement -- later not accepted by the

11  jury -- should drive it.

12          But number two is his lies are not -- the lie is

13  about the sexual activity, not about the force.  So there

14  are different questionings throughout the interview,

15  right.  There is one specific question I recall where the

16  agents say did you engage in any sexual activity.  He says

17  no.  That's clearly a lie, the jury has found.  But

18  there's other discussions about -- questions about did you

19  use force to move him and stuff like that.  According to

20  the jury's verdict, that was a truthful statement.  So the

21  offense, in my view, should be the sexual abuse.

22          Do you understand what I'm saying?

23          MS. GILBERT:  I think so, Your Honor.  And I

24  think that the guidelines didn't intend for the inquiry to

25  be quite as -- honestly, as sophisticated as this.  I

1    think that the guidelines contemplate someone might be

2    convicted only of obstruction, and so they say what's the

3    obstruction about?  You know, what was this investigation

4    about?  And the investigation in this case was

5    indisputably about aggravated sexual abuse.  I think

6    the --

7              THE COURT:  But why?  Because of the victim.  My

8    point is just like in *Dickerson*, the charging was based

9    upon what the prosecutor wanted to do, other objectives,

10   right.  And, again, you all have properly charged this.

11   I'm not suggesting anything wrong.  I want that to be

12   clear.

13             What I'm saying is is that while a defendant

14   should not profit from his lies, he also should not be

15   penalized because of an investigation driven by a victim

16   that's not been fully credited.  Does that make sense to

17   you?  You're going to, by the way, be the first lawyer to

18   ever say I'm being overly sophisticated.

19             MS. GILBERT:  It does make sense, Your Honor.

20   But I would argue that actually as a factual matter, it's

21   not purely the victim's allegation that is outcome

22   determinative here.

23             If the victim had alleged a forcible rape, but

24   let's say that it was on surveillance and investigators

25   were able to review that surveillance right at the outset

1  and they knew that this was never going to be a rape case,

2  they believed from watching the surveillance, then their

3  investigation would have been of sexual abuse of a ward

4  even though the victim had alleged something more serious.

5       So I think the obstruction guideline is

6  contemplating look at what the investigators were looking

7  at, and in this case, the investigators credited enough

8  the victim's statement to investigate it seriously and to

9  conduct the investigation that resulted in the aggravated

10  sexual abuse and other charges in this case.

11       THE COURT:  Actually, I think agree with your

12  point, okay, but the problem I have is this.  What is the

13  other evidence that exists other than the victim's

14  statements that he was raped?  There is no other evidence.

15  That's what the problem is.  That's why I made the

16  findings that there's not a preponderance.

17       Essentially what it boils down to -- because

18  there's no physical evidence that you all introduced,

19  right.  Your first witness, Nurse Womble, said there was

20  no bruising or anything like that.  You then, I think,

21  would rely on prompt complaint that he said it, right, but

22  Nurse Womble knocks that out because you asked her, do all

23  victims act the same?  That answer is no.  And even on

24  prompt complaint, it's his words, right.

25       There's not one other piece of evidence --

1  because I looked at this as to whether or not I should

2  apply beyond a preponderance, right.  To me, there's not

3  one other piece of evidence that supports rape.  There's

4  lots of other evidence that supports the consensual

5  contact.  And, again, I go back to -- I feel like I'm

6  rubbing it in.  I don't intend to do that, but your case,

7  in my view, was about grooming and consent, not so much

8  about rape.

9           And you'll recall that you put Nurse Womble on,

10  right.  Then later on down the road you were going to call

11  the nurse from the Bureau of Prisons -- I think Butner --

12  who was going to say that, I gather, bruising sometimes

13  doesn't happen right away.  But you didn't give notice of

14  that so that evidence didn't come in, right.

15           So my recollection, from going through the

16  record, is that there's no other evidence other than his

17  words that support the rape.  Am I right about that?

18           MS. GILBERT:  No, Your Honor.

19           THE COURT:  Well, tell me why I'm wrong.

20           MS. GILBERT:  The evidence of the bruising did

21  come in.  So that nurse from FCI Butner was able to

22  testify, under Your Honor's evidentiary rulings, that she

23  observed bruises on Brandon Lemagne.  The step that we

24  were not able to take was to further say, "And is it

25  possible that those bruises could have been" --

1          THE COURT:  Okay.  You're right.  Actually,

2    you're right.  I'm sorry.

3          MS. GILBERT:  So that would be additional

4    evidence of force, in addition to the -- the consistent

5    outcry testimony that Your Honor has already identified

6    and the statements of medical -- for medical treatment

7    that were also admitted.

8          THE COURT:  Is there anything else you want to

9    say on this point?

10          MS. GILBERT:  I would point Your Honor --

11          THE COURT:  I actually think this is a difficult

12    issue, to be honest with you, you know, but I think that

13    the rule of levity is when it's a close call, you break to

14    the defendant.

15          MS. GILBERT:  I would point Your Honor also to

16    the unpublished cases, which while not precedential and

17    not binding, show the logic that applies.  That's *Yancey*

18    and *Dadaille*.  I'm not sure if I'm pronouncing that

19    correctly.  *Yancey* cites *McQueen*, one of the

20    out-of-circuit cases.  And, again, there is no published

21    case that I'm aware of, or unpublished case, going the

22    other way, saying that the proper inquiry is to go look at

23    what actually happened by a preponderance.

24          If we're thinking about what the jury found and

25    delving too far into the jury's verdict and in the jurors'

1   minds is a complicated and sophisticated inquiry.  And

2   that's why I think the guidelines don't require the Court

3   to do that.  They simply require the Court to say by a

4   preponderance, what was this investigation about?  When

5   the defendant lied, what was he obstructing?  And the

6   evidence supports the conclusion.  There's no question.

7   And really, the defendant doesn't argue otherwise that his

8   obstruction offense was in a rape investigation.

9           So I think the briefing collects the primary

10  cases, but the same logic that's followed in those

11  unpunished cases is very helpful, especially in *Dadaille*.

12  In that case, the defendant was charged with offenses that

13  related to obstruction, but then also offenses that -- the

14  substantive counts he was not convicted of -- and I think

15  it had to do with money laundering -- and so he was

16  acquitted of those counts.

17          But the Fourth Circuit said, yeah, but that's

18  what the investigation was about.  It was about money

19  laundering.  There was no analysis of what the jury must

20  have found, the fact that the jury actually found that he

21  wasn't guilty of those substantive offenses.  Rather, you

22  just look to the substantive counts for the

23  cross-reference because that's what the investigation was

24  about.

25          THE COURT:  Well, there really wasn't much

1   analysis, though, in that opinion.  They just -- I think

2   it was like a paragraph, and it went straight to the

3   point.  They didn't really go through the *Dickerson*

4   analysis.

5          Look, I think this is the outlier case that

6   *Dickerson* was talking about.  Because what is different

7   from these other cases that you've cited is is that you

8   have -- really what I'm saying in my mind is two levels of

9   sex, right.  You have the consensual sex, and then you

10  have the forcible sex, right.  You have a jury verdict

11  rejecting the force, right, but you have the jury verdict

12  finding the consensual, necessarily, because they found

13  the sexual act.  And because of that, they necessarily

14  rejected the victim's story, which is what prompts the

15  investigation into rape, right.  And that's kind of where

16  I'm at on that.

17         Actually, the more interesting question is is

18  there a basis -- so assuming I'm ruling against you, which

19  it sounds like the wind is blowing against you right now,

20  right.  If I rule against you, is there a basis for me to

21  do a variance saying that even though I'm applying

22  *Dickerson* in this manner, that I could do a grounds for an

23  upward variance would be that, yes, the victim said that,

24  but it was still a part of this -- there was some overall

25  discussion?  Maybe you want to address that?

1          MS. GILBERT:  Yes, Your Honor.  And Mr. Garnett

2    will also be discussing grounds for variance.  But yes, I

3    think there would be.

4          And I don't want to belabor the point.  I

5    understand Your Honor's rationale, but I would say when

6    looking to the jury verdict, did the jury find that this

7    investigation was not about aggravated sexual abuse?  No.

8    I think that they understood, as we understood and as --

9    as the agents understood, that's what this case was always

10   about.  And that's why the guidelines for obstruction ask

11   you to look at obstruction.  They don't ask you to engage

12   in this other complicated inquiry that requires you to

13   parse what the jury was doing, and especially in a case

14   like this one, actually, where the verdict, while perhaps

15   understandable to the points that Your Honor has made, is

16   difficult to understand or reconcile.  As the defendant

17   has alleged, it's an inconsistent verdict.

18         And I think -- I understand Your Honor's point

19   about *Dickerson*.  Certainly it recognizes that there are

20   exceptions to the rule.  And, in fact, the government's

21   position in that case that courts absolutely must apply

22   the highest offense is one that the Fourth Circuit rightly

23   rejected, that there -- of course, courts have to have

24   discretion to decide what the offense is by a

25   preponderance.  But the narrow circumstances that they

1   recognized, they didn't talk about the world of

2   inconsistent verdicts, which especially with obstruction

3   offenses, is not a small universe.  There are other

4   examples of these types of cases where the jury convicts

5   on obstruction but not on a civil rights offense or on a

6   sex offense like what happened here.  So really --

7        THE COURT:  What they focused on was the

8   overcharging because that was perjury, I think, in the

9   context of a trial, right?

10        MS. GILBERT:  Yes, Your Honor.  That's right.

11        THE COURT:  So what I'm saying to you is in that

12   case, the reason for the overcharging was to get leverage,

13   right.  What I'm saying is the over-investigation here was

14   because of what the victim said.  And I don't think a

15   victim who was later found on this point not to be

16   credible should penalize a defendant, right.  That if he

17   had -- according to the jury, that if he had been

18   honest -- and, again, I'm just sticking with what the jury

19   said was -- I had a consensual relationship, that's all

20   the investigation would have been about.  And since the

21   jury has rejected that, I don't think the defendant should

22   be punished.  That's how I interpret *Dickerson*, and maybe

23   you can take it to the Fourth Circuit and work this out.

24   But that's -- look, I want to tell you, at first blush,

25   when I went back and read all this stuff, I thought, you

1  know, I was wrong on this and you were right about it.

2          But as I've done a deep dive in *Dickerson*, I

3  think it breaks the other way.  But I think you have

4  something to work with, and if you want to go to the

5  Fourth Circuit, you can tell them.

6          I think the more interesting issue is whether or

7  not it can be a grounds for a variance, which I'm going to

8  ask Mr. Gavin.  Because Mr. Gavin is, right now, agreeing

9  with everything I just said to you.  So we'll see if he

10  agrees about the variance.

11          MS. GILBERT:  Thank you, Your Honor.

12          THE COURT:  All right, Mr. Gavin.  Do you want

13  to agree it's a grounds for a variance?  I gather you

14  agree with my reasoning, I suspect?

15          MR. GAVIN:  I do.  I do.  I maybe inartfully put

16  it in my last paper, but that's what I was trying to say

17  at least.

18          THE COURT:  What do you think about it being a

19  grounds for an upward variance, that the context -- look,

20  your client clearly was thinking about -- during the

21  questioning, about it being a rape.  There's no question

22  about that.

23          MR. GAVIN:  But the Court has still found that

24  they didn't prove that the underlying offense was proven

25  beyond a reasonable doubt.

1            THE COURT:  Right.

2            MR. GAVIN:  So that's --

3            THE COURT:  But the point, though, is is that --

4    and I think one of the cases says this.  It might have

5    been the *Greer* case.  Lying in a murder case has more

6    consequence than lying in a speeding case, basically.  So

7    the question is what he believed, right.  And, look, I

8    think this is a close call.  I think the government has

9    something to work with here, but as I look at *Dickerson*,

10   for the reasons I said, I think I'm going to break in your

11   way on that, but it might be grounds for a variance.

12           MR. GAVIN:  Well, Your Honor, if it is, I think

13   they would have to have some more rationale other than

14   just the fact that he said, you know, if I raped this guy,

15   hypothetically, then, you know, this or that.  I would

16   never do that because I believe in Jehovah.  We don't have

17   to really question, in my opinion, what they were

18   investigating because they told him right from the outset.

19   They told him.  And it's not like you have to make a

20   finding on what they were investigating or not because

21   they told him, and they said it was for sexual abuse.

22           So from his perspective, you have to assume that

23   what he is sitting there answering questions about is

24   sexual abuse, not rape.

25           THE COURT:  Yeah, but the impact -- their point,

1   and I think it's well taken, is what is the impact on the

2   investigation, right.  So let's say the defendant was --

3   I've been harsh on the victim here based upon the jury's

4   verdict.

5           MR. GAVIN:  Right.

6           THE COURT:  But, again, taking the jury's

7   verdict and applying it to the defendant, and the

8   defendant is answering the questions of Agent Lavender and

9   Orloff and says, You know what.  I did have sex with him.

10  I'm sorry.  But it was all consensual.  I never forced

11  him.  I had it on two occasions.  Would that have impact

12  on the investigation?  That answer is yes.

13          Now, would Agent Lavender have just said, you

14  know, I'm going to take your word for it?  No.  I'm sure

15  he would have gone back to B.L. and said, Hey, the

16  defendant is admitting that he had sex with you but says

17  it wasn't rape.  Tell me why should I believe you, B.L.,

18  instead of Officer Legins about the rape since he's

19  admitting the sex.  Or they would give greater scrutiny

20  maybe to some of the other evidence, you know, and then,

21  frankly, they would have put their case on differently

22  maybe going forward, right.  So it did impact the

23  investigation, right, which is what their point is, I

24  think, on these other cases.

25          MR. GAVIN:  Yes, sir, I understand.  And my

1 point previously raised to that is that this was somewhat

2 of an afterthought, in my opinion, just because they

3 already had most of the evidence that they needed to

4 present their case, in looking at the facts and how they

5 were laid out and the progression of the investigation.  I

6 really still believe that they were looking for a

7 confession from Mr. Legins, and that's really all they --

8 it was sort of the last thing they needed before they went

9 to the grand jury was an attempt to get a confession.

10          THE COURT:  Well, I'll agree with that.  I'm

11 sure that's what they wanted.

12          MR. GAVIN:  Yeah.

13          THE COURT:  All right.  Well, here's what I'm

14 going to do.  I'm going to overrule the government's

15 objection on this for the reasons I've said, and I'm going

16 to then retain the offense level at 18.  Criminal History

17 Category I remains at a range of 27 to 33 months.  I'll

18 let the government decide whether or not they want to

19 argue it's a basis for a variance.

20          Now, just so we're all on the same page, because

21 I'm going to let you argue your variance motion first, I

22 think we're all in agreement that the grouping rules

23 really have no impact here, right?

24          MR. GAVIN:  That's correct.

25          THE COURT:  So essentially now under that

1  ruling, that what he's being penalized for is being lying

2  about the May incident, right?

3         MR. GAVIN:  Right.

4         THE COURT:  Because that's the most serious

5  incident.

6         MR. GAVIN:  Correct.

7         THE COURT:  He's really not being punished for

8  the March incident, then?

9         MR. GAVIN:  Correct.

10         THE COURT:  Okay.  All right.  So now I'm going

11  to give you -- Mr. Gavin, I've -- give you your

12  opportunity to go over the -- your reasons for a variance.

13         I want to say, before you start addressing it,

14  I've read everything that you've submitted, considered

15  everything.  I've considered the very many letters that

16  have been written by his family members, friends, those

17  that he goes to church with.  I think there was another

18  fellow employee when he was down in Petersburg.  I've read

19  them all and considered them all, and it's clear that his

20  family believes him to be a loving family member in pretty

21  powerful terms.  So my point is I've read everything,

22  considered everything, but I'll give you a chance to be

23  heard.

24         MR. GAVIN:  Judge, I'm going to rely on my

25  papers.  We've briefed this, these arguments, over and

1    over again.  The Court is well aware of all the facts and

2    circumstances, the characteristics as we assert them to be

3    of the defendant.

4          The basis for my most recent variance was the

5    fact that there really was only two sexual contacts

6    established, not the May 10th incident.  So it would

7    require you to have to reverse your ruling on the May 10th

8    incident.  So I understand that that's a -- probably a

9    losing battle, but I'll submit it.

10          THE COURT:  Well, you've also -- look, I just

11    want to go over it just to make sure I got the list right

12    because I'm required to address all the grounds --

13          MR. GAVIN:  Yes, sir.

14          THE COURT:  -- and I want to make sure I'm not

15    missing anything.

16          Your first argument was that you believed there

17    was just evidence of sexual contact, not the sexual abuse.

18    I've overruled that one already --

19          MR. GAVIN:  Yes, sir.

20          THE COURT:  -- because I think the jury has

21    found otherwise on that.

22          The positive attributes of the defendant as

23    described by his family and friends, which is clear.  I

24    mean, there's no question that the letters were

25    compelling.  I intend to factor that in the 3553(a)

1    factors down the road.  I don't think it's a grounds for a

2    variance.

3              MR. GAVIN:  Yes, sir.

4              THE COURT:  You discussed the fact that the

5    defendant didn't know his father until age 18, was raised

6    in a lower income working environment.  But as he

7    acknowledged, he had an excellent childhood.  He also has

8    been, by all accounts, a good husband and father,

9    including to his stepson, who refers to him as dad.

10   There's no step into it, as I recall the son saying.  And

11   he did participate in Army service.  I believe it was

12   Kuwait and Panama, as I recall.

13             MR. GAVIN:  Yes, sir.

14             THE COURT:  Again, I don't think those are

15   grounds for a variance.  I think those are factors in

16   3553(a) that I can certainly consider.

17             He successfully combated cancer in 2018, and

18   other health issues.  That goes into, again, the 3553(a)

19   factors.  And according to you, his lies had little impact

20   on the investigation.  I differ for the reasons that was

21   said to you.

22             MR. GAVIN:  Yes, sir.

23             THE COURT:  So for those reasons, I'm going to

24   deny the variance.  I'm going to factor those into 3553(a)

25   factors when I figure out what the ultimate guideline is,

1  because I do think there's a basis for an upward variance,

2  but I'm going to give the government a chance to be heard

3  on that first.

4             MR. GAVIN:  Yes, sir.

5             THE COURT:  And then I'll give you a chance to

6  respond to that.

7             MR. GAVIN:  Thank you.

8             THE COURT:  Mr. Garnett.

9             MR. GARNETT:  Thank you, Your Honor.  And,

10  Your Honor, my -- we are moving for an upward variance, as

11  Your Honor noted.

12             Judge, our motion for a variance is intertwined

13  with the 3553(a) factors.  So my intent had been just to

14  sort of present the 3553(a) factors in the context of a

15  motion for an upward variance.

16             THE COURT:  Well, that's fine.  But I do have

17  one question for you.  And I asked this of both of you in

18  the order, and that is this.  When you ask for the

19  variance, as I understand the law, you're supposed to tell

20  me how you quantify it.  You moved to ten levels just

21  because you want that 96 months, and that got you to 96

22  months, but you didn't give me any rationale as to how you

23  calculated the ten months.  I mean, there's a basis for an

24  upward departure -- or upward variance here, but the

25  question is how much, right.  How did you get to the ten

1  months other than your end game of 96 months?

2          MR. GARNETT:  Your Honor, candidly, we believed

3  that a sentence of 96 months, the statutory maximum, was

4  warranted.  And I think there's sort of an artificiality

5  to sort of quantifying the extent of a variance that a

6  prosecutor or defendant requests, because there is no sort

7  of mathematical rubric the way you might have with a

8  departure.

9          THE COURT:  Well, there can be, though.

10          MR. GARNETT:  And there can be, Your Honor.  For

11  instance, for understated criminal history, I have sort of

12  applied -- I have applied sort of a mathematical rubric

13  where three more convictions would equal two more criminal

14  history points, and you go up sort of that segmented way.

15          THE COURT:  Well, but how here?  I mean, it

16  seems to me that there are a number of reasons for the

17  variance.  Okay.  One is it's not one event.  It's two,

18  right.  And under the guideline calculation now that I've

19  adopted, contrary to what you all have asked me to do, is

20  he's not being penalized for the first incident in March,

21  right.

22          MR. GARNETT:  In terms of the grouping analysis,

23  Your Honor, that's correct.  We didn't -- yes, Your Honor.

24          THE COURT:  Well, in terms of anything, right.

25  Because the grouping doesn't apply, it goes to a level 18.

1   That is going to the most serious offense of the sexual

2   abuse.  Essentially, then, the only punishment for the lie

3   of the sexual act is of the May incident, right.  And so

4   there's no additional punishment in the guideline

5   calculation for the March incident.  Am I not right about

6   that?

7              MR. GARNETT:  Yes, Your Honor, I would agree

8   that there's no -- the guidelines do not break out by

9   incident sort of what the cross-reference would be to,

10  which is why you would fall back to the total obstruction.

11  So here, you're just looking at the fact of obstruction,

12  as opposed to sort of singular instances that prove up why

13  the obstruction was relevant.

14             THE COURT:  Right.  But my point is is that

15  somebody that commits a crime twice, as opposed to once,

16  should be punished more than the singular offender; is

17  that right?

18             MR. GARNETT:  Yes, Your Honor.  And I -- I don't

19  want to cut Your Honor off at all, especially in this

20  vein, but that is something that we would rely upon in our

21  motion for an upward variance is --

22             THE COURT:  Right.  Okay.  I think he says that.

23  Okay.  So my point -- here's what my point is.

24             MR. GARNETT:  Yes, sir.

25             THE COURT:  I'm going to let you argue the rest

1    of this.

2            I do think there's a way you can quantify,

3    right.  So the question is is what is the value of that

4    additional crime, right.  Well, you can look at -- the

5    guideline calculation for that March offense is level 14.

6    With a Criminal History Category I, that comes out to a

7    range of 15 to 21 months.  If you add that 15 to 21 months

8    to this 27 to 33 months, that puts you at 42 to 54 months,

9    which is slightly more than a level 22.  It puts you,

10   instead, at -- which is 41 to 51 months.

11           My suggestion is that the appropriate level here

12   of a variance is five levels, not ten.  Because number

13   one, it would take into consideration that other offense,

14   right that he's not being punished for under this, as well

15   as some of your other arguments.

16           So my point to you is I think you can quantify

17   it.  The law tells me to try to quantify it, and that's

18   what my thought is, but I'm going to give you a chance to

19   be heard on that.

20           MR. GARNETT:  Yes, Your Honor.  And I don't

21   dispute that there's a sort of a -- I see the advantage to

22   that, Your Honor, of sort of quantifying and reaching

23   those five levels upward.  I would argue that there's --

24   the 3553(a) factors militate in favor of a variance beyond

25   that because that -- the addition there, Your Honor, the

1    five level upward variance, that would sort of encompass

2    sort of the nature and circumstances of the offense,

3    Your Honor, in terms of the fact that it dealt with

4    multiple instances of sexual abuse within FCI Petersburg.

5              But that -- again, that would be predicated,

6    Your Honor, on the March 2018 and the May 2018 incidences.

7    I think -- that's a fine basis, Your Honor, for an upward

8    variance, but I think that if you look at the overall

9    nature of the defendant's offense conduct and you look at

10   his history and characteristics and you look at the need

11   for deterrence, the need for a sentence to reflect the

12   seriousness of the offense, to protect the public, I think

13   that takes you beyond that five level upward variance that

14   would really sort of focus on the duality of the sexual

15   abuse that involved Brandon Lemagne, if that makes sense,

16   Your Honor.

17             THE COURT:  Go ahead.

18             MR. GARNETT:  In that regards, Your Honor --

19   Your Honor sort of took the wind out of my sails there in

20   terms of --

21             THE COURT:  I've got a habit of doing that.

22             MR. GARNETT:  It's probably not as hard as it

23   looks, Your Honor. -- in regards to talking about sort of

24   the fact that there were multiple offenses here.

25             But I want to get back a little bit, Your Honor,

1   to the obstruction itself, the nature of the obstruction,

2   because that is -- that's what we start out with at the

3   2J1.2, I believe it is.

4           THE COURT:  By the way -- and I think we've lost

5   this in all the briefing.  The jury actually found two

6   lies, two discrete lies.

7           MR. GARNETT:  Yes, sir.

8           THE COURT:  And that second lie has really been

9   dwarfed by the first lie, right, because of the impact.

10  If it -- thank God we had a special verdict form, too, by

11  the way.

12          MR. GARNETT:  It turned out to be providential,

13  Your Honor.

14          THE COURT:  But let's say that there was no

15  finding on the first one, right.  We would be -- he'd be

16  getting penalized probably under the five-year statute,

17  right.

18          MR. GARNETT:  I'm sorry, Your Honor.  Say it

19  again, please.

20          THE COURT:  Under the five-year statute, not the

21  eight-year statute.

22          MR. GARNETT:  I would dispute that, Your Honor,

23  because the nature of the investigation still involved

24  offenses under chapter 109(a).  So I understand the --

25  certainly the briefing --

1              THE COURT:  You might be right.  Actually,

2    you're right.

3              My point, though, is there's a standalone

4    finding from the jury that he did it twice, right.

5              MR. GARNETT:  Yes, sir.

6              THE COURT:  Then you make a point that he lied

7    to other people too, right.  Fellow prison guards, tried

8    to call the nurse with the lie about the Tylenol and all

9    that kind of stuff too, right.  This is not an isolated,

10   hey, I just lied on one occasion.

11             MR. GARNETT:  Yes, Your Honor.  I think that --

12   when you get to the nature of the obstruction, Your Honor

13   is noting just how broad it is.

14             I know defense counsel obviously did a great job

15   in this case, but he's sort of pigeonholed this lie as

16   just a -- it was sort of a rebuff of the government's

17   attempt to get a confession.  But, Judge, this is a course

18   of obstructive conduct that literally began moments after

19   the defendant realized that there were sort of --

20   literally and figuratively, sort of Alarm Klaxons going

21   across FCI Petersburg.  Something had happened.  Brandon

22   Lemagne had walked into a lieutenant's office and all hell

23   had just broken loose.

24             So, Judge, the defendant, right at a moment,

25   right then -- not when he's talking to federal agents more

1   than a month later -- he's already gone into full

2   obstructive mode.  He starts rehearsing, Judge, exactly

3   what he thinks is going to be his best way to get out of

4   this mess.  So he goes up to Officer Farmer, and he starts

5   rehearsing what he's going to say, I hope they don't be

6   tripping.  I just escorted him.  He's already thinking

7   through, Judge, what would this look like.  What are the

8   holes?  What did I do?  What can I cover up right now?

9           He tries to solicit Officer Farmer.  Your Honor

10  met Officer Farmer.  He's a straight shooter, Your Honor.

11  He's someone who's candid with the Court.  Tried to

12  solicit Officer Farmer to draft a false statement, Judge,

13  saying that what the defendant had done was not, on its

14  face, deeply suspicious.  As every other officer had said,

15  Your Honor -- or testified, that's really concerning.

16  When an officer goes back into that locked officers' only

17  area after hours, something is not right.

18          So the defendant goes -- he knows that, of

19  course.  So he goes to Officer Farmer, and he says,

20  Officer Farmer, Duane, I need you to draft something that

21  says that I, too, have also done this deeply questionable

22  behavior.

23          And Officer Farmer, thank goodness, says no.  I

24  don't know what you're involved in.  I want no part of it.

25  And, Judge, I have no doubt that if Officer Farmer have

1  caved to that pressure, the defendant would have

2  incorporated that into the statement that he gave federal

3  investigators.  He was trying to backstop.  He was trying

4  to buttress.  And, Judge, this is moments after the report

5  goes out.

6          And then, Judge, we move forward.  We move now

7  to the -- I want to say June 5th, and I apologize if I'm a

8  day or two off there.  The June 5th interview with those

9  federal agents, the defendant -- he doesn't walk into that

10 room, Your Honor, the way that a lot of folks walk into

11 rooms with FBI agents and OIG agents.  He walks in there,

12 Judge, fully committed to lie.  He doesn't necessarily

13 know exactly how he's going to do it, but boy, he starts

14 out consistent, Judge, and he stays with that the entire

15 way through.  And he throws --

16         THE COURT:  Well, he starts pivoting as the

17 evidence mounts.  When he finds out about the DNA, he

18 comes up with the ridiculous "masturbating in the

19 bathroom, somebody cleaned it up" routine.

20         MR. GARNETT:  Exactly, Your Honor.  A

21 defendant -- an individual less committed to deception

22 probably would have been stymied at that point.  Because

23 when you bring up DNA, a lot of folks stop and think,

24 well, shoot, it's going to be hard to argue with that.

25         Judge, the defendant doesn't -- he doesn't miss

1   a beat.  He just pivots down that utterly ludicrous story
2   because he knows he's got to cover up that hole.

3           And, Judge, the day afterwards, after he goes
4   ahead and tells the agents that, again, ludicrous story,
5   he knows, too.  He's not -- he's pretty practiced at this,
6   Judge.  He's lied before.  He knows he's got to fill up
7   this hole because the masturbation story only gets you so
8   far, right.  You know, the tree falls in a forest, right.
9   It doesn't have any impact.  So he has to go to some other
10  poor officer, the lock and key office -- the armory, I
11  should say, and he tries to rope this individual in and
12  says, I actually remembered when I was telling the agents
13  about masturbating at a federal prison.

14          At this point -- Judge, I think you recall the
15  officer, Officer Parker, is almost literally backpedaling.
16  He doesn't want to hear this, but he has to because the
17  defendant has decided he needs to buttress his false alibi
18  with the presumably objective testimony of another
19  officer.  So he sits there and he makes Officer Parker
20  listen to how he observed Brandon Lemagne -- I'm sorry --
21  in an officers' only restroom with another inmate,
22  unescorted, just -- I think less than a day after he had
23  masturbated, again, adding another level of --
24  sophisticated is probably the wrong word here, but another
25  level of falsity to that alibi.

1        And, Judge, if you just go back and look at the

2   statements he gave the agents, he threw everything but the

3   kitchen sink at them, Your Honor.  He couldn't have done

4   anything because of his religion.  He couldn't have done

5   anything because of his physical inabilities.  Okay.

6   Well, then there's medication that maybe would have made

7   that possible.  Well, then again, Chikosi Legis doesn't

8   lie.  He pivots again and again and again.  Judge, this

9   isn't someone just telling a one-off.  This isn't someone

10  who's panicked by a gun and a badge.  This is someone who

11  knows what he did, knows that it was wrong and has been

12  thinking like heck for the last six weeks how he's going

13  to be able to get out of this -- I'm sorry, the last two

14  or three weeks.  Judge, it's a long course of obstructive

15  conduct, and he was willing to bring down other federal

16  correctional officers with him.

17        THE COURT:  Well, isn't it also true, though, in

18  terms of the commission of the underlying offense?  This

19  was not a spur of the moment sexual act, right.  First of

20  all, I have found that there were two, right.

21        MR. GARNETT:  Yes, sir.

22        THE COURT:  That he took the victim in locations

23  where they were alone and picked locations where there

24  were no cameras, which indicates substantial planning and

25  premeditation as to the underlying crime that he lied

1  about.  But what you're also saying is is there's also

2  substantial planning about the lying afterwards.

3          MR. GARNETT:  That's correct, Your Honor.

4          THE COURT:  My point is is that there's two

5  parts of a calculated crime here, and the defendant should

6  be treated differently than when they just all of a sudden

7  make a mistake.  Because we all make mistakes, right.

8          MR. GARNETT:  Yes, sir.

9          THE COURT:  So the question is when you're

10 planning to make that mistake, you should be punished more

11 harshly.  So --

12         MR. GARNETT:  Yes, Your Honor.

13         THE COURT:  I want to add one other thing here.

14         MR. GARNETT:  Yes, sir.

15         THE COURT:  You all put on, at the last hearing,

16 the testimony of Agent Lavender about --

17         MR. GARNETT:  Yes, sir.

18         THE COURT:  -- the interview of G.L.  I want the

19 record to reflect what I'm going to find about that,

20 because you've mentioned that in your papers about the

21 variance.

22         I'm going to find some but little weight to

23 that, and the reason I'm going to give it little weight is

24 because G.L. was available to testify at trial.  You all

25 elected not to call him.  He was -- he's within your

1    control now.  You could produce him, as you indicated the

2    last time.

3            And while I certainly credit Agent Lavender, I

4    have not had an opportunity to view G.L. myself to assess

5    his credibility, which is very important in these cases.

6    And perhaps more importantly, Mr. Gavin, who we've all

7    known now to be a very good cross-examiner, didn't have a

8    chance to cross-examine G.L.

9            So when I say "little weight," all that I'm

10   going to do is say this.  I think that that testimony is

11   supportive of the grooming, consensual aspect of both

12   incidents, that it wasn't a one-off, that this defendant

13   was grooming B.L., started off with the sexual contact in

14   March.  Even though I've only found sexual contact, I

15   actually believe that B.L. was right.  It was oral sex.

16   But I don't think there's enough supporting evidence that

17   I'm going to go beyond the jury's verdict on that.  And

18   then culminating in the anal sex in May, which, to me, is

19   beyond any dispute with the DNA.

20           So I want the record to be clear about what I'm

21   finding about that.  So I'm giving it little weight

22   because of the lack of my opportunity to assess and the

23   lack of opportunity to cross-examine for somebody who was

24   within your full control.

25           MR. GARNETT:  I understand that, Your Honor.

```
 1              THE COURT:  Anything else you want to say?

 2              MR. GARNETT:  Yes, Your Honor.  So I think what

 3   Your Honor touched on in terms of, again, those two

 4   different instances involving B.L., Your Honor noted how

 5   that took extensive planning.  It took forethought, right.

 6   It took actual -- sort of cunning to figure out how best

 7   to accomplish what he wanted to accomplish.  Again, I

 8   think that's a solid ground for an upward variance here,

 9   Your Honor.

10              My point in talking about the sort of cunning,

11   the forethought, the deliberation that went into the

12   obstruction, I think that's another independent basis for

13   an upward variance.  I think the five level upward

14   variance --

15              THE COURT:  I agree with you.

16              MR. GARNETT:  Okay.  Thank you.

17              THE COURT:  I'm agreeing with you.

18              MR. GARNETT:  I just wanted to make sure that

19   was --

20              THE COURT:  What I'm saying is it's the same

21   type of thing, though.  It's -- it's substantial planning

22   on both aspects, the crime and the cover-up both.

23              MR. GARNETT:  Yes, Your Honor.  And, Judge, I

24   think that segues sort of neatly into what I think is

25   another independent basis for an upward variance, which is
```

1   the defendant's history and characteristics.

2           And what I'm referring to here, Judge, is the

3   fact that the defendant had prior practice with being a

4   prison guard, in a position of authority, and wanting

5   something sexually from those individuals that he was

6   entrusted to protect.  And we can go back to 2008,

7   Your Honor.  I understand that defense counsel has said,

8   look, that's a decade in the past, you've just got to

9   leave that alone, it's not just relevant.

10          Judge, I think that it's a weigh point in

11  walking up to where we were with Brandon Lemagne.  I think

12  the G.L. testimony, Your Honor, I completely agree; I

13  think it's another weigh point.  It's the defendant's

14  interactions and abuse of authority leading up to, I

15  think, the ultimate betrayal of that authority.

16          THE COURT:  Well, it also puts the defendant on

17  notice that this conduct is not acceptable.

18          MR. GARNETT:  Judge, I think that's -- I agree,

19  Judge.  I think it's -- if there was any doubt at all,

20  Your Honor, that as a prison guard, he wouldn't know that

21  he couldn't sexually harass young female inmates.

22          THE COURT:  Well, I'm sure the Bureau of Prisons

23  trains its officers -- your best witness, by the way, was

24  your second witness, which was the supervisor, the female

25  officer.  I can't remember --

1          MR. GARNETT:  Lieutenant McWilliams, Your Honor.

2          THE COURT:  Right.

3          MR. GARNETT:  Yes, sir.

4          THE COURT:  And I think she made clear that this

5   conduct is just not acceptable in the prison system, and I

6   don't think there's any question that a guard knows that.

7          MR. GARNETT:  No, Judge.  I think once the

8   Prison Rape Elimination Act, the PREA that we heard so

9   much about, once that was passed, Your Honor, they said

10  essentially every wall of the prison is going to have

11  something on there.  It is drilled into them annually, but

12  really on a daily basis, Judge.

13         THE COURT:  But that's why he took B.L. into

14  areas where he was alone and where there were no

15  cameras --

16         MR. GARNETT:  Yes, Your Honor.

17         THE COURT:  -- because he knew it wasn't

18  acceptable.

19         MR. GARNETT:  Yes, Your Honor.  And, Judge, I

20  would say that in Richmond City, he knew it wasn't

21  acceptable, too.  And that's why, Judge, as a result of

22  that investigation, you'll note that the investigation --

23  again, he was suspended -- noted that he was specifically

24  cited for, quote, giving untruthful or misleading

25  statements or partial truths during a legal proceeding,

1   internal investigation or administrative proceeding.

2           You only lie about something, Judge, if you

3   think you shouldn't have done it, right.  So he was lying

4   to the Richmond City Sheriff's Office back in 2008 about

5   sexually harassing inmates.  He was found out.  Other

6   officers did their job.  They said what they saw, and he

7   was disciplined for that.  And the defendant -- Richmond

8   City Sheriff's Office, said, well, you're also going to be

9   cited for violating a code of conduct that goes to being

10  truthful with investigations.

11          So, Judge, a decade before Brandon Lemagne

12  walked into his crosshairs, he had already been in this

13  same spot.  It's dismaying, but it probably shouldn't be

14  surprising, Your Honor, that he was able, sitting across

15  from two federal agents, to pivot and squirm and find an

16  answer to every new question they posed to him, because

17  he's been doing this, Your Honor, for a decade.  That's

18  just who he is.

19          And I'll take a moment to note, Judge, I read

20  the letters that the defendant had submitted on his

21  behalf, and I would submit, Judge, there's nothing less

22  surprising that an individual like the defendant would be

23  able to convince friends and family that the public-facing

24  Chikosi Legins, the Sunday morning Chikosi Legins, is a

25  good person, an upstanding father and husband.

1          Judge, it's what you do in the shadows.  It's
2  what you do in a locked unit secretary's office.  It's
3  what you do in the bottom level of the Richmond City
4  sheriff's jail.  When you think no one is watching, that's
5  who you are, Judge.  Not who you are on Sunday mornings.
6  Not who you are on Father's Day mornings, Judge.  It's
7  what you do when you think no one is watching.
8          THE COURT:  No.  Human beings are more complex
9  than that.  More sophisticated, as some would say.  There
10 are different components of somebody.
11         Sentencing -- a trial is about what somebody did
12 in a particular incident, as you say, in the rooms within
13 the jail.  Sentencing is about somebody's whole life.  You
14 can do -- good people can do bad things, right.  And
15 that's what the 3553(a) factors are about.  You can be a
16 good husband, you can be a good father and still do bad
17 things, right.  And then my job, under 3553(a), is to
18 weigh those.  It's not one or the other.  Things aren't
19 black-and-white.
20         MR. GARNETT:  They aren't black-and-white,
21 Your Honor.  But, again, that's why I would point out that
22 those letters are a black-and-white representation of
23 Chikosi Legins.  They show a Chikosi Legins that they saw
24 only, again, in those sunny moments, in those
25 public-facing moments.  As Your Honor noted, there's

1    another half of Chikosi Legins.  That half, again, is why

2    we went through a trial.  That half is why we're standing

3    here today.

4            I don't dispute that there are probably positive

5    moments of Chikosi Legins' life.  I don't dispute that he

6    had some positive interactions with his fellow church

7    members, Your Honor, but I would argue what's most

8    relevant to the Court is what he did when he thought no

9    one was looking.

10           So, Judge, I don't want to belabor the point.  I

11   know I've been talking to Your Honor for a while.  I just

12   think that every single 3553(a) factor we look at, Judge,

13   militates in favor of an upward variance.

14           When we talk about the ten years of sort of

15   escalating conduct, Judge, those weigh points to Brandon

16   Lemagne, I think that gets to deterrence, Your Honor.

17   This is an individual who has not been deterred.  From

18   interaction after interaction, from discipline, from

19   formal findings, he just wasn't deterred.  He didn't step

20   away from the correctional officer position and think, you

21   know what.  Maybe I'm just not suited to balance this kind

22   of authority.  Maybe I should recognize that my sexual

23   urges and inclinations are not the best fit for a position

24   where I have almost untrammeled control over these people.

25   But he didn't do that, Judge.  He looked for that kind of

1  job.  He looked for that kind of person.

2          THE COURT:  Let me ask you, you talk about the

3  lack of control.  One of the things I was thinking about,

4  in addition to the standard conditions of supervision --

5  or supervised release term, is that I require him to

6  submit to sexual offender treatment, believing that the

7  evidence demonstrates that he has a lack of control and

8  there's clearly some kind of issues that are going on

9  here.  What's your position on that?

10         MR. GARNETT:  Judge, I think that's a logical --

11 it makes sense to me, Your Honor.  I'm not sure, candidly,

12 standing up here right now, if there's some sort of legal

13 predicates that would sort of trigger that ability --

14         THE COURT:  The only predicate is is that I have

15 to have a factual basis for the implementation of any

16 requirement for supervised release.

17         I believe that there's a factual basis created

18 that he has a problem with his sexuality in a manner that

19 harms other people such that treatment would help him deal

20 with those issues.

21         MR. GARNETT:  Judge, if it's simply a factual

22 basis by the presiding court that there's need for this,

23 there's cause for this, then I think that that's been

24 abundantly demonstrated, Your Honor.  There's not just a

25 need.  There's an urgency.  There's a necessity for this.

1    Yes, Your Honor.

2              THE COURT:  All right.

3              MR. GARNETT:  Judge, I would just close with

4    noting, Judge, the protection of the public, which is just

5    the sentence the Court delivers today, the government is

6    asking for 96 months.  I think that there's abundant

7    support for an upward variance to those 96 months, to the

8    statutory maximum.  Whatever sentence the Court gives him,

9    Your Honor, even eight years, Chikosi Legins is going to

10   walk back out on the street, still a relatively fit

11   individual.  He's not going to be an aged individual.

12   Judge, he's still going to be someone who's standing

13   six-foot-five.  He's still going to be someone with law

14   enforcement experience.  He's still going to be someone

15   familiar with the way the law enforcement operates and

16   practices, Judge.  An individual like that, the public

17   deserves protection to the utmost, Judge.  Because when

18   the defendant is in a position of control, when he has the

19   ability to operate unchecked, unobserved, Judge, he visits

20   harm on people who can't stop him.

21             THE COURT:  Well, when he was on release, he

22   abided by the conditions.

23             MR. GARNETT:  Judge, he would not be,

24   presumably, under house arrest following his removal from

25   prison.

1        THE COURT:  No, but he would be under the

2   supervision of a probation officer.

3        MR. GARNETT:  He would be, Your Honor, and I

4   hope that would be sufficient.  But I think that the way

5   to protect the public, Judge, the way to demonstrate the

6   severity of his criminal actions in this case, Judge, is a

7   sentence of 96 months.

8        THE COURT:  Okay.

9        MR. GARNETT:  Thank you, Your Honor.

10       THE COURT:  All right, Mr. Gavin.  This is your

11   opportunity to respond to the upward departure -- or

12   upward variance.  Excuse me.

13       MR. GAVIN:  Judge, I just want to pose a

14   hypothetical to the Court, which is that what if what

15   happened in that office was really nothing more than a

16   sexual contact?  That doesn't mean that he would not have

17   gone to Farmer.  It would have meant he would have lost

18   his job.  Why wouldn't he go to Farmer?  Or why wouldn't

19   he yell out across the yard to say, Don't believe him or

20   what's going on?  Or why wouldn't he call the nurse?

21       I mean, he could have had the exact same conduct

22   and made the exact same path that he was doing if it had

23   only just been a sexual contact and not a rape, which is

24   what the government is still dead set on having the Court

25   believe.

1          THE COURT:  Well, no.  No.  Okay.  First of all,

2  we're past the rape.  And I've already found that, and

3  I've made that clear.

4          Even if it was just sexual contact like I have

5  found on the first incident, he would still be in

6  violation, subject to prosecution, for 2244, right?

7          MR. GAVIN:  Yes, sir.

8          THE COURT:  So it's not that he would just get

9  fired.  He would be facing punishment for that.

10         MR. GAVIN:  He would be --

11         THE COURT:  And, of course, he could have said

12  that.  I mean, he had the choice about what -- he could

13  have said, You know what.  There is DNA because I had

14  sexual contact with him.

15         MR. GAVIN:  Right.

16         THE COURT:  I didn't have sex in the anus.  I

17  didn't have sex in the mouth.  But to use your

18  masturbation defense, he could have said that, right.  He

19  didn't.  He didn't deny any sexual activity.

20         MR. GAVIN:  I understand.  And I agree that he

21  could be prosecuted for that, in addition to the

22  obstruction count.

23         But when the government argues that he had this

24  mindset that he was going to premeditatedly obstruct

25  justice by creating these different stories and recruiting

52

1    people to lie on his behalf, if it was only with regard

2    to, in his mind, what could have been hypothetically

3    sexual conduct -- or contact, not a rape, then that sort

4    of takes the wind out of the sails of the United States in

5    that it wasn't quite as egregious as they made it out to

6    be.

7              THE COURT:  You're missing the middle ground

8    that the jury found, which is sexual abuse of an inmate.

9              MR. GAVIN:  Right.

10             THE COURT:  And once the -- I mean, the evidence

11   was clear.  Once B.L. reported it, the defendant panicked,

12   started reaching out to all kinds of people.  Remember the

13   nurse about the headache, yelling from the courtyard, all

14   that kind of stuff, talking to Officer Farmer.  So --

15             MR. GAVIN:  But the defendant would not have

16   known what had been reported.  He would have just known

17   that someone -- B.L. -- had gone to the clinic,

18   essentially.

19             THE COURT:  He knew that he had sexual

20   intercourse with B.L.

21             MR. GAVIN:  Or contact.

22             THE COURT:  Well, no.  It's sexual intercourse

23   in terms of the act because the jury found that.

24             MR. GAVIN:  Okay.

25             THE COURT:  I mean, the jury explicitly found

53

1   that he lied about a sexual act.  That means that they

2   found a sexual act occurred.  That's not sexual contact.

3   That's sexual act.  And that's a big difference here in

4   this case.

5          MR. GAVIN:  Yes, sir.

6          With respect to the variance and the Court's

7   methodology, my only argument to that would be that the

8   Sentencing Commission has already taken into account the

9   fact that multiple offenses arising out of the same

10  indictment can be grouped, and if they can be grouped,

11  then they've taken that into account.  So the Court

12  shouldn't just apply a separate offense date as an upward

13  variance because the Sentencing Commission has taken into

14  account of that.

15         THE COURT:  But that didn't happen here, though,

16  right, because the grouping had no effect.

17         MR. GAVIN:  Right.

18         THE COURT:  So that was my initial point.  He's

19  really not being punished for that second offense.

20         Well, you tell me, then, how to quantify this.

21  I mean, look, I do think an upward variance is

22  appropriate.  I think the government is reaching just to

23  hit their magical 96 number, and I don't think that --

24  that's the statutory maximum.  And by doing that, that

25  ignores the other positive attributes of the defendant.

1            And I -- I also just don't think that's what

2    happened here with the jury verdict, right.  So -- so

3    they're just coming up with that, I believe, because

4    that's the number that they want, but I don't think that's

5    what the case law tells me I'm supposed to do.  I'm

6    supposed to have some kind of rational explanation as to

7    the amount of it, not whether I should give a variance.

8    Not just that I should give a variance, because I do

9    believe a variance is appropriate, but then how much.

10   Tell me how much, if I believe it's -- I know you want as

11   little as possible.

12            MR. GAVIN:  Yes, sir.

13            THE COURT:  Tell me the method -- I asked you

14   both.  Tell me the methodology to figure this out.

15            MR. GAVIN:  If the basis for the variance is

16   that he's basically not being punished for a different

17   incident which the Court established beyond a

18   preponderance --

19            THE COURT:  That's one aspect of it.

20            MR. GAVIN:  One of them. -- then the Court's

21   calculation, I guess, is something that could be

22   considered.  That's a reasonable basis to figure out what

23   the guideline range is and then add it on top of the base

24   as computed currently.  I'm not sure that there's another

25   one, off the top of my head, that would give as a good

1   reasoning.

2         THE COURT:  Well, I'll tell you what I'm going

3   to do is I'm going to make my findings on the variance.

4   I'm going to still give you -- and they've also argued

5   their 3553(a) factors, but I'll give you a chance to

6   argue, then, too, once I figure out what the variance

7   amount is, right.

8         MR. GAVIN:  Yes, sir.

9         THE COURT:  And then, of course, I want to give

10   a defendant to a chance to allocute.

11         Are you satisfied with that?

12         MR. GAVIN:  Yes, sir.

13         THE COURT:  All right.  So I'm going to grant

14   the government's motion for a variance on the following

15   grounds, finding, first of all, that the defendant was

16   convicted of two separate lies to the FBI and the OIG.  We

17   have focused on the first one, which is whether he engaged

18   in a sexual act with an inmate at FCI Petersburg, but also

19   there is a second one, and that is is that the defendant

20   stated that on May the 10th of 2018, he attempted to use

21   the computer and a printer while engaged in, quote, just

22   conversation with B.L. while in an unattended office.

23         The import of that goes to Mr. Garnett's

24   argument that there are, of course, other lies that he did

25   to other members of FCI Petersburg that show that this is

1  a one-off, isolated event, that it was a planned,

2  deliberate, lying scheme to come up -- to cover up.

3          Secondly, as I've noted, the guidelines are not

4  penalizing him for the March incident, and somebody that

5  does two sexual offenses should be punished more than one.

6  That is supported by the G.L. testimony, as I've said.

7  I'm giving it little weight, only to underscore the point

8  about the defendant grooming B.L. and engaging in what the

9  jury found to be a consensual relationship.  That's also

10 supported, by the way, by the sheriff's office -- Richmond

11 Sheriff's Office's finding that he attempted to do the

12 same in that setting, was disciplined, and certainly was

13 put on notice then that this conduct is not acceptable.

14 It's clear to me, though, from the trial testimony that he

15 knew that from the Bureau of Prisons.

16         But I also think an important aspect to this is

17 the substantial planning of premeditation into the crime.

18 We've got substantial planning and premeditation as to the

19 lie.  But as to the underlying sexual offenses, both of

20 them, the defendant did this in a calculated manner.  He

21 took B.L. to locations where they were alone, not just so

22 that others couldn't see him, but also that there would be

23 no cameras, no evidence to record his transgressions.  And

24 somebody that engages in substantial planning and

25 premeditation should be punished more than somebody who

1   commits a crime on a spur of the moment.

2           Also, as the defendant identified in his

3   statement, the victim was more likely to be victimized due

4   to his transgender status.  The government has not brought

5   that up, but the defendant brought that up in his

6   statement to OIG.  Now, he said in the interview he tried

7   to protect folks when it was actually -- of that sexuality

8   when it was actually the opposite.  He tried to exploit a

9   more vulnerable group, a more vulnerable group that he

10  describes as normal.  And as I said before, that the

11  repeated lying not just to the investigators but to the

12  others as part of the cover-up warrant a variance.

13          The question then becomes what is the amount.  I

14  don't agree with the government just picking ten levels to

15  get to the 96 months.  I think it has to be tethered to

16  something, and the best way that I could tether it to

17  something is to say a five level variance to level 23.

18  The way that I get there is adding the months from the --

19  what would be the March incident that is not being

20  factored in.  For a level 14, Criminal History Category I,

21  as I said, is 15 to 21 months.  If you add that to the 27

22  to 33 months for the level 18, you come up with 42 to 54

23  months, which is a little bit more than a level 22, which

24  is 41 to 51 months.  A little bit short of level 23.

25          I think we should use level 23, though, for

1  those other reasons that I said: the substantial planning

2  and premeditation as to both the amount of lies and the

3  original crime, the victimization of the transgender

4  inmate.   The -- what occurred in the Richmond Sheriff's

5  Office and G.L.'s testimony support a level 23.   So I'm

6  going to find that the appropriate guideline range now is,

7  for a level 23, Criminal History Category I, 46 to 57

8  months.

9          And I'll ask Mr. Gavin if you want to -- they're

10 already argued the 3553(a) factors as to where I should

11 sentence him within that range.   Did you want to say

12 anything about that?

13         MR. GAVIN:   Judge, briefly, because I've already

14 submitted a lot in my paper.   I would only say that to

15 counter the United States' arguments, if you read those

16 letters, that's just not a Sunday morning activity kind of

17 guy.   I mean, he's around constantly.   People are at his

18 house.   It's a 24/7 more characterization of what they

19 believe at least Mr. Legins to be.

20         THE COURT:   I agree with that, actually.   I

21 thought the letters were powerful.   Not just in terms of

22 the substance, but the number from different parts of his

23 background.

24         MR. GAVIN:   Yes, sir.

25         THE COURT:   I also think that his military

1    service -- people that serve our country -- it's important

2    to our country, and at some point in your life you get to

3    draw on that.

4              MR. GAVIN:  Yes, sir.

5              THE COURT:  Now, while he wasn't in combat in

6    Kuwait and Panama, that was something that he did, and I

7    think he gets to draw on that.

8              I didn't ask you about this.  First of all, did

9    you go over the standard conditions of supervision for our

10   court with the defendant before I came out?

11             MR. GAVIN:  I did.

12             THE COURT:  Do you have any objections to them?

13             MR. GAVIN:  No.

14             THE COURT:  You're well versed with those.  But

15   I was thinking about adding, as you heard me say to the

16   government, the sexual offender treatment.  There's

17   clearly something going on here with him.  Do you have

18   objection to that?

19             MR. GAVIN:  Based on the conviction, which is

20   lying about the sex offense, I'm not sure that that

21   shouldn't serve as a basis to order the sexual offender

22   evaluation.  If he had been convicted of any of the other

23   three or four, I would say yes.  But if the Court has made

24   a finding already, and it has, that it's warranted, then

25   my objection wouldn't have any merit.  So --

1          THE COURT:  Well, I think -- I found by a
2  preponderance of the evidence that he engaged in illegal
3  sexual contact in March with B.L. and then the sexual
4  abuse of an inmate in May.  That, to me, finds that that's
5  a factual predicate for the treatment.  The treatment, of
6  course, is designed to help him, right.

7          MR. GAVIN:  Right.

8          THE COURT:  Essentially, Mr. Garnett is arguing
9  just lock him up as long as you can because he's a danger
10 forever, right.

11         MR. GAVIN:  Right.

12         THE COURT:  And I don't think that's the way
13 this works, right.  And your -- under 3553(a), I'm
14 supposed to give the sentence that is sufficient but not
15 greater than necessary to comply.

16         MR. GAVIN:  To better answer the Court's
17 question, I'm not aware of anything that says you cannot
18 do that.

19         THE COURT:  Well, I'll tell you what.  I think
20 I'm going to do that.  If you come up with any reason, you
21 could come back to me right away, but I think that's what
22 I'm going to do.

23         So let me ask you this.  I'm going to give the
24 defendant a chance to allocute.

25         MR. GAVIN:  Yes, sir.

1        THE COURT:  But before I do, do you have any

2 procedural objections to the way I've conducted the

3 sentencing?  I know you have some substantive

4 disagreements.

5        MR. GAVIN:  Yes, sir.

6        THE COURT:  Those have been noted, and they're

7 preserved.  Do you have any procedural objections to the

8 way I've handled the sentence?

9        MR. GAVIN:  No, sir.

10        THE COURT:  I'll ask the government.  Do you

11 have any -- I know that you have substantive objections,

12 but do you have any procedural objection to the way I've

13 proceeded?

14        MR. GARNETT:  No, sir.

15        THE COURT:  All right.

16        So, Mr. Legins, do you want to rise?  You can

17 take your mask off.  Mr. Legins, this is your opportunity

18 to say anything that you want before I sentence you.

19        THE DEFENDANT:  Your Honor, I would like to say

20 that I have always done the best I could at being worthy

21 to stand before Jehovah.  I have never done anything --

22 I'm human.  I sin like everybody else, but I've never

23 done anything to where -- I would never have to answer for

24 an act of homosexuality before Jehovah.  I understand what

25 the Court is saying as far as what they believe I did, but

1   my conscience is clear.

2           I served my country.  I served in my profession

3   as far as law enforcement for not just over two decades,

4   but I served also in the military and in law enforcement.

5   That comes to 24 years.  Of course, I've made mistakes as

6   far as an argument, but it was never ever, in my entire

7   career, anything relating to sex.  I don't have an issue

8   with controlling myself.

9           My profession, in fact, requires me to be in top

10  control of myself as I deal with violent offenders.  Every

11  day, all day.  I've never been in a position where my

12  integrity was questioned, with the exception of 2008 when

13  I got into the argument.  And like I said, when I stand

14  before Jehovah, I won't have to answer for any acts of

15  indecency as far as homosexuality.  Thank you.

16          THE COURT:  Well, Mr. Legins, regardless of the

17  sentence that I give you, at some point you're going to

18  get out, right.  You're going to get out as a young man.

19  The letters that have been sent to me by your family and

20  loved ones, many who are here today, and they have been

21  here at other hearings, as I have noticed them.  It is

22  clear that they treasure you, right.

23          And so when you get out, you're going to be

24  under my supervision, first of all, and if we have any

25  drama, you've got to come back in front of me.  That's not

1  a good thing.  I think you know that already, right.

2        But number two is you still will have a long

3  life to be productive, to do things to support your family

4  as you have done and to be a role model to your children.

5  Do you understand that?

6        THE DEFENDANT:  I do.  But, Your Honor, if I may

7  say, with all due respect, I've been battling a series of

8  health issues for some time.  At the age of 41, I'm

9  already worse off than someone 50.  I don't know what my

10  state will be when I get out, but because I believe in

11  Jehovah, I know that I'll be the best -- whatever I'll be,

12  I know I'll be okay --

13        THE COURT:  Well, what you do --

14        THE DEFENDANT:  -- because of my faith of

15  Jehovah.

16        THE COURT:  Well, what you do is you make the

17  best of your circumstance and --

18        THE DEFENDANT:  Well --

19        THE COURT:  -- you prepare for when you're

20  released.  But my point is is that the sentence doesn't

21  end your life.  There's another part on the other side of

22  it, and I think you're different than a lot of folks that

23  come here.  Because normally the pews are empty, right.

24  And you clearly have a supportive group of folks who care

25  about you.  And I'm factoring that into the sentence, by

1   the way, because I've read the letters.  And it wasn't one

2   or two, and they were all -- you could -- you could tell

3   the sincerity and the level of conviction that were in the

4   letters.  It wasn't just one line, I support Chikosi

5   Legins.  Do you know what I'm saying to you?

6           I've read every one of them, and they had a

7   powerful impact on me.  But that should have a powerful

8   impact on you as well when you're released because it's

9   not the end.  Do you understand what I'm saying?

10          THE DEFENDANT:  I've never been an issue at any

11  point in my life as far as public safely or at my job.

12          THE COURT:  All right.

13          THE DEFENDANT:  Never.

14          MR. GAVIN:  Chikosi.

15          THE COURT:  Is anything else you want to say?

16          THE DEFENDANT:  No, Your Honor.  Thanks for --

17          THE COURT:  Ma'am, you don't get a chance to --

18  somebody is raising their hand back there.  You don't get

19  a chance to raise your hand.  I'm sorry.

20          Is there anything else you want to say?

21          THE DEFENDANT:  Only that I will continue to be

22  a positive contribution to my country, to my area, to my

23  neighborhood.  I've never been anything other.

24          THE COURT:  All right.  Well, I'm going to count

25  on you to live up to that, particularly while you're on my

1  supervision.

2          All right.  It's now time to turn to the factors

3  in section 3553(a).  Section 3553(a) commands that I

4  should impose a sentence that is sufficient but not

5  greater than necessary to comply with the factors that are

6  then set forth, starting with number 1, the nature and

7  circumstances of the offense and the history and

8  characteristics of the defendant.  And really, there's a

9  real dichotomy here.  On one side, we have a very serious

10 crime.  Lying about the sexual abuse of inmates is

11 significant.  It constitutes an abuse of power.  To me,

12 there's no question about the jury's verdict in terms of

13 the lying.  And so on one hand, there was lying about the

14 victimizing of somebody that was charged to the

15 defendant's care.  And it was multiple acts, as I've

16 pointed out.

17         On the other hand, I've pointed out that the

18 defendant has clearly got a side to him that is caring to

19 his family.  The letters show that he is a caring, loving

20 husband, father, son and friend, as well as involved with

21 his religious community.  And he served honorably in the

22 Army in both Kuwait and Panama.

23         And as he's just indicated, the defendant has

24 significant medical issues, although I do note the

25 defendant committed these crimes after having these

1   medical conditions.  So he kind of knew what he was

2   getting himself into.

3           The next factor, number 2, is the need for the

4   sentence to promote -- or sentence to reflect, A, the

5   seriousness of the offense, promote respect for the law,

6   and provide just punishment.  This is, obviously, a

7   serious crime.  Our corrections officers are charged with

8   the responsibility of watching over others.  It is a

9   position of trust.  Anybody who is employed by the

10  United States Government, whether they're a prosecutor,

11  whether they're a judge, whether they're a guard, is held

12  with greater respect in the community and, therefore, it

13  comes with greater responsibility, and the defendant here

14  let down all of us when he did that.

15          And we need to send a message to sentence other

16  inmates to -- I'm sorry -- other guards to ensure that

17  they know it's not acceptable for them to lie when

18  interviewed by other government officials, and it's

19  certainly not acceptable to victimize the inmates that

20  they're charged with guarding, also to afford the

21  effective deterrence to criminal conduct really to others.

22  The government has talked about the defendant essentially

23  warehousing him.  I'm not -- that's not something I do.  I

24  think we can reach an appropriate sentence here without

25  doing that.  But also to deter others, particularly other

 1   guards from doing this.  And then, C, to protect the

 2   public from the crimes of the defendant.  The sentence

 3   will do that, reflecting both the good and the bad of his

 4   attributes.

 5         D says to provide the defendant with needed

 6   educational or vocational training, medical care or other

 7   correctional treatment in the most effective manner.

 8   That's why I'm going to add an additional requirement to

 9   the supervision that the defendant receive some type of

10   sexual offender treatment to deal -- he's clearly got some

11   kind of issue for the reasons I've cited.  But I'm going

12   to leave the type of treatment up to the probation officer

13   to determine what is appropriate when he is released.

14   That will be in addition to the standard conditions of

15   supervision.

16         Subfactor 3.  I've considered the kinds of

17   sentences available.  A term of imprisonment here is

18   certainly warranted, and I've looked at the other factors,

19   4, 5, 6 and 7.  Restitution doesn't apply.  I don't think

20   there's anything else that's really applicable.

21         So with that in mind, pursuant to the Sentencing

22   Reform Act of 1984, it is the judgment of the Court that

23   the defendant, Chikosi Legins, is hereby committed to the

24   custody of the United States Bureau of Prisons to be

25   imprisoned for a term of 54 months on Count Five.  He

1   shall receive credit for any time served.  The defendant

2   is hereby remanded to the custody of the United States

3   Marshal to begin serving his sentence.

4            Upon release from imprisonment, the defendant

5   shall be placed on supervised release for a term of three

6   years, as I said, on Count Five.  Within 72 hours of

7   release from custody of the Bureau of Prisons, the

8   defendant shall report in person to the probation office

9   in the district to which the defendant is released.  While

10  on supervision, the defendant shall not commit any other

11  federal, state or local crime, shall not unlawfully

12  possess a controlled substance, and shall not possess a

13  firearm or destructive device.

14           The defendant shall comply with the standard

15  conditions that have been adopted by this court.  Before I

16  came out, we put a copy on defense counsel's desk, and as

17  Mr. Gavin indicated, he had reviewed those with the

18  defendant.  There are no objections.

19           I'm going to add also, though, that the

20  defendant, as I indicated, shall receive sexual offender

21  treatment as directed by the probation officer, finding

22  that's appropriate for the reasons I've said before.  As

23  reflected in the presentence report, the defendant

24  presents a low risk of future substance abuse, and,

25  therefore, the Court hereby suspends the mandatory

1   condition for substance abuse testing as defined by

2   section 3583(d) of Title 18.  However, this does not

3   preclude the probation office from administering drug

4   tests as they deem appropriate.

5           The defendant shall also provide the probation

6   officer with access to any financial information that's

7   requested.  The Court has considered the defendant's net

8   worth and liquid assets, his lifestyle, financial needs as

9   reflected in the presentence report, his earning potential

10  and those who rely on his support.  The Court, therefore,

11  finds the defendant is not capable of paying a fine, and

12  none shall be imposed.

13          Accordingly, the defendant shall pay the

14  following total penalties.  As to Count Five, the

15  defendant shall pay a special assessment in the amount of

16  $100.  Payment of that shall be due and payable

17  immediately.  Any balance remaining unpaid and a special

18  assessment at the inception of supervision shall be paid

19  by the defendant in installments of not less than $25 per

20  month until paid in full.  The payments shall commence 60

21  days after defendant's supervision begins.  The payment of

22  any unpaid balance shall become a special condition of

23  supervised release.  There's no forfeiture or restitution

24  that's applicable here so none will be ordered.

25          So, Mr. Legins, I have now sentenced you, then,

1    to 54 months.  You'll be on supervision for three years

2    thereafter.  You have 14 days from today's date to appeal

3    the sentence of the Court.  If you want to appeal, it must

4    be in writing, and Mr. Gavin will do it for you.

5              Do you understand that?

6              THE DEFENDANT:  I do, sir.

7              THE COURT:  All right.  Mr. Gavin, is there

8    anything else that we need to do?

9              MR. GAVIN:  Judge, I'm not sure if the Court has

10   control, but he, obviously, has a strong family presence

11   here in the Petersburg area.  If the Court could recommend

12   that he be housed as close as possible to Petersburg based

13   on the security clearance.

14             THE COURT:  Well, I don't know if he can be

15   housed in Petersburg since he was a guard there.  I'll

16   leave it to the discretion of the Bureau of Prisons.  I

17   will recommend that they house him as close as they deem

18   appropriate --

19             MR. GAVIN:  Yes, sir.

20             THE COURT:  -- to his family, who are all here

21   and clearly supportive.

22             MR. GAVIN:  Yes, sir.  Thank you.

23             THE COURT:  We'll indicate that in the JNC.

24             Is there anything else from the government?

25             MR. GARNETT:  No, sir, Your Honor.

1          THE COURT:  All right.  Mr. Legins, I'm going to

2    wish you well.  Good luck.  Okay?

3          Mr. Gavin, when you have time -- I gather you

4    have to talk to the family and to the defendant.  Whenever

5    you have time, I have to talk to you about another matter

6    unrelated to this case --

7          MR. GAVIN:  Yes, sir.

8          THE COURT:  -- if you can come back to my

9    chambers.

10          (The proceeding concluded at 12:23 p.m.)

11                REPORTER'S CERTIFICATE

12     I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

13    the Commonwealth of Virginia at large, and whose

14    commission expires September 30, 2023, Notary Registration

15    Number 7108255, do hereby certify that the pages contained

16    herein accurately reflect the stenographic notes taken by

17    me, to the best of my ability, in the above-styled action.

18     Given under my hand this 23rd day of July 2020.

19

20                    /s/
                 Tracy J. Stroh, RPR

21

22

23

24

25