1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF VIRGINIA
2         RICHMOND DIVISION

3    _____
                                    )
4    UNITED STATES OF AMERICA       )
                                    )
5    v.                             )    Criminal Case No.:
                                    )    3:19 CR 104
6    CHIKOSI LEGINS                 )
     _____)
7                                        February 7, 2020
                                         VOLUME II
8
         TRANSCRIPT OF OPENING STATEMENTS, ALL TESTIMONY, AND
9          CLOSING STATEMENTS OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE DAVID J. NOVAK
10               UNITED STATES DISTRICT COURT JUDGE

11   APPEARANCES:

12   Thomas A. Garnett, Esquire
     OFFICE OF THE UNITED STATES ATTORNEY
13   919 East Main Street, Suite 1900
     Richmond, Virginia 23219
14
     Kathryn E. Gilbert, Esquire
15   UNITED STATES DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue NW, 4025 NYA
16   Washington, DC 20530

17            Counsel on behalf of the United States

18

19   Charles A. Gavin, Esquire
     CAWTHORNE DESKEVICH & GAVIN PC
20   1409 Eastridge Road
     Richmond, Virginia 23229
21
              Counsel on behalf of the Defendant
22

23

24            TRACY J. STROH, RPR
              OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT

1                        **I N D E X**

2                           WITNESSES

3   Examination By:                                    Page

4                      SUSAN WOMBLE, RN
    Direct    - MS. GILBERT                          33
5   Cross     - MR. GAVIN                             62
    Redirect  - MS. GILBERT                           69
6                   HEATHER MCWILLIAMS
    Direct    - MS. GILBERT                           72
7   Cross     - MR. GAVIN                            148
    Redirect  - MS. GILBERT                          182
8                   BRANDON LEMAGNE
    Direct    - MS. GILBERT                          185
9

10                          EXHIBITS

11  Exhibit      Description                          Page

12  Government
    No. 3        St. Mary's Hospital forensic          42
13               nurse examination records
    No. 6        Diagram of F-South and F-North        42
14               housing units
    No. 7        Diagram of FCI Petersburg Medium      42
15  No. 15       DNA report dated 11/15/2018           42
    No. 16       DNA report dated 12/13/2018           42
16  No. 17       DNA report dated 7/10/2019            42
    No. 21       Computer records search              42
17  No. 22       BOP Health Services Clinical          42
                 Encounter Record on 5/10/2018
18  No. 23       BOP Psychology Services Sexual        42
                 Abuse Intervention
19  Defendant
    No. 1        BOP housing records for G.L.          42
20  No. 2        BOP housing records for D.N.          42
    No. 3        BOP housing records for S.T.          42
21  No. 4        BOP work history for Chikosi          42
                 Legins
22  No. 5        BOP commissary report for R.J.        42
    No. 6-A      Specific Post Orders for              42
23               7:40 a.m. to 4:10 p.m.
    No. 6-B      Specific Post Orders for              42
24               4:00 p.m. to 12:00 a.m.
    No. 6-C      Specific Post Orders for              42
25               11:50 p.m. to 7:50 a.m.
    No. 7        Cell search history for D.N.          42

Government

| No. 4 | DNA specimen collection swabs and blood sample collected from B.L. on 5/10/18 | 56 |
|---|---|---|
| No. 8 | Line paper note recovered from B.L.'s cell on May 10, 2018 | 58 |
| No. 9 | Paper towel note recovered from B.L.'s cell on May 10, 2018 | 58 |
| No. 10 | Sweatshirt recovered from B.L.'s cell on May 10, 2018 | 58 |
| No. 11 | Shirt recovered from B.L. on May 10, 2018 | 58 |
| No. 12 | Jock strap recovered from B.L. on May 10, 2018 | 58 |
| No. 13 | Shorts recovered from B.L. on May 10, 2018 | 58 |
| No. 14 | Poncho recovered from B.L. on May 10, 2018 | 58 |
| No. 18 | Buccal sample from R.J. | 58 |
| No. 19 | Buccal Sample from Chikosi Legins | 58 |
| No. 20 | Audio recording of Chikosi Legins interview June 5, 2018 | 58 |
| No. 4-A | Penile swabs | 60 |
| No. 4-B | Thighs/external genitalia swabs | 60 |
| No. 4-C | Anorectal swabs | 60 |
| No. 4-D | Perianal/buttocks swabs | 60 |
| No. 4-E | Oral swabs | 60 |
| No. 4-F | Swabs from lip/lip area | 60 |
| No. 4-G | Swabs from back of right hand | 60 |
| No. 4-H | B.L. blood sample | 60 |
| No. 5-A | Photograph | 90 |
| No. 5-B | Photograph | 90 |
| No. 5-C | Photograph | 90 |
| No. 5-D | Photograph | 90 |
| No. 5-E | Photograph | 90 |
| No. 5-F | Photograph | 90 |

Defendant

| No. 8-A | Photograph | 90 |
|---|---|---|
| No. 8-B | Photograph | 90 |
| No. 8-C | Photograph | 90 |
| No. 8-D | Photograph | 90 |
| No. 8-E | Photograph | 90 |
| No. 8-F | Photograph | 90 |
| No. 8-G | Photograph | 90 |
| No. 8-H | Photograph | 90 |
| No. 8-I | Photograph | 90 |
| No. 8-J | Photograph | 90 |
| No. 8-K | Photograph | 90 |
| No. 8-L | Photograph | 90 |

4

```
 1  Government
    No. 1          Compilation of video 1-A through    124
 2                 1-E from 3/16/2018
    No. 1-A        Surveillance video from 3/16/2018   124
 3  No. 1-B        Surveillance video from 3/16/2018   124
    No. 1-C        Surveillance video from 3/16/2018   124
 4  No. 1-D        Surveillance video from 3/16/2018   124
    No. 1-E        Surveillance video from 3/16/2018   124
 5  No. 2          Compilation of video 2-A through    124
                   2-E from 5/10/2018
 6  No. 2-A        Surveillance video from 5/10/2018   124
    No. 2-B        Surveillance video from 5/10/2018   124
 7  No. 2-C        Surveillance video from 5/10/2018   124
    No. 2-D        Surveillance video from 5/10/2018   124
 8  No. 2-E        Surveillance video from 5/10/2018   124
    No. 10-A       Photograph of sweatshirt            239
 9  No. 11-A       Photograph                          265
    No. 12-A       Photograph                          266
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

 1               (The proceeding reconvened at 9:25 a.m.)

 2               THE CLERK:  Criminal matter 3:19 CR 104,

 3   *United States of America v. Chikosi Legins*.  Mr. Charles

 4   A. Gavin representing the defendant.  Mr. Thomas A.

 5   Garnett and Kathryn E. Gilbert representing the

 6   United States.

 7               Counsel, are we ready to proceed?

 8               MR. GARNETT:  The United States is ready,

 9   Your Honor.

10               MR. GAVIN:  Defense is ready, Your Honor.

11               THE COURT:  All right.  We're going to take up a

12   couple matters before the jury gets in the box.  And this

13   is going to be our standard operating procedure.  So

14   everybody be ready to go by 9:20 every morning just in

15   case we have an issue that comes up because I want to deal

16   with these issues not on the jury's time.

17               Mr. Gavin, I was more than a little surprised to

18   go through your defense exhibits last night and see your

19   client's penis.  That's not what I planned on doing last

20   night.  Do you want to tell me why I'm looking at his

21   penis in the defense exhibits?

22               MR. GAVIN:  Should I approach?

23               THE COURT:  Yeah.  Just do it -- you can just be

24   on the side here.

25               MR. GAVIN:  Okay.

6

1          THE COURT:  Just speak into the mic.

2          MR. GAVIN:  Judge, it's relevant, and it's

3   relevant because there's a forensic nurse examination.

4   There's a rape kit that was done.

5          THE COURT:  Right.

6          MR. GAVIN:  Part of the analysis of that is that

7   the rape kit showed no result at all.  No tears, no

8   bruising, no abrasion, even under microscopic view.

9          And part of the experts -- I think on both

10  sides -- are saying that part of the rationale that you

11  have to examine when you're looking at a rape kit and the

12  results from it include multiple things, including the

13  lubricant that was used, the size of the defendant, the

14  size of the penis involved.

15         THE COURT:  Sure.

16         MR. GAVIN:  So it's not something that I

17  necessarily take great pride in trying to admit, but I

18  think it's relevant because it establishes that.

19         THE COURT:  The issue is not the fact.  The

20  issue is how we're going to do that, right.

21         MR. GAVIN:  Right.

22         THE COURT:  It seems to me -- I looked at

23  several pictures there, and one of which had a ruler on

24  there, right.

25         MR. GAVIN:  Yes, sir.

1          THE COURT:  So it seems to me that the

2   underlying premise is that the expert would say, one of

3   the factors, as I understand it, if fully aroused, the

4   defendant measures approximately 7 inches, right?

5          MR. GAVIN:  Yes, sir.

6          THE COURT:  Okay.  Why is it that that fact

7   cannot be stipulated to?

8          Are you contesting the size of his penis?

9          MR. GARNETT:  No, Your Honor.

10          THE COURT:  I didn't think so.

11          So why is it that we can't stipulate -- and I'll

12   tell you what.  I'll even let you go one step further,

13   which is you can have the expert say I've looked at a

14   photograph, and it is, indeed, fully aroused, 7 inches,

15   and I will tell the jury that I've seen a photograph.  But

16   I'm not putting in the record a picture of his penis.

17          MR. GAVIN:  That's fine.

18          THE COURT:  Okay.  That's how we are going to do

19   this.

20          MR. GAVIN:  I think it's important though, for

21   them, the jurors, to see the size, but I understand the

22   Court's ruling.

23          THE COURT:  I think they're going to accept my

24   version of it.

25          MR. GAVIN:  Okay.

8

1          THE COURT:  Let's put it that way.  And they're

2    not contesting it.  And we have any argument about -- if

3    they start arguing about the size of his penis, then I'll

4    revisit the issue.  But we're not having a trial about the

5    size of his penis.

6          MR. GAVIN:  It wasn't intended to be.

7          THE COURT:  Okay.  Did you have anything else

8    you wanted to bring?

9          MR. GAVIN:  I did, Judge.  It's going to come up

10   in cross-examination of Mr. Lemagne -- and I've shared

11   this with the United States.  The conviction on which

12   Mr. Lemagne has become incarcerated is a fraud scheme

13   conviction.  And even though that's one conviction, it

14   appears that this conviction was based on multiple counts,

15   including almost 25 victims at least that I see just in

16   the statement of facts alone.

17          So -- and the conviction is based on a very

18   complicated scheme where false IDs were produced, where

19   false corporations were produced.  And it's very involved

20   and it's very complicated and would have required a lot of

21   scheme on the part of Mr. Lemagne to effectuate the

22   scheme.  So to just say that it's one conviction sort of

23   belittles the actual crime, but I don't want to go into

24   the facts of the conviction further than the Court would

25   allow.

1          THE COURT:  So what do you propose to do?

2          MR. GAVIN:  Well, I'd like to have some

3    latitude, Your Honor, on exploring sort of the underlying

4    facts of the conviction, more than just that it's a

5    conviction and what he was charged with, credit card fraud

6    or a scheme to steal mail that involved multiple victims.

7          THE COURT:  I'll tell you what I'm going to do.

8    I think the rule says it's just the conviction here, but

9    because his credibility is so much at stake here, here's

10   what I'm going to let you do.  You can introduce the

11   conviction.  You can say the conviction spanned a period

12   of time of X -- what is it? -- a year, approximately one

13   year, and had multiple victims.

14         MR. GAVIN:  Okay.

15         THE COURT:  That's it.

16         MR. GAVIN:  Okay.  Thank you.

17         THE COURT:  Nothing more.

18         MS. GILBERT:  If I may, Your Honor.  I'm not

19   aware of any case law that would support defense counsel's

20   approach in terms of getting into the details of these

21   offenses merely because they occurred over a certain span

22   of time or had numerous victims or anything else about

23   them.  They were the result of a plea.  There were three

24   convictions.  And so far as I'm aware, only the fact of

25   the conviction, the jurisdiction, the nature of the

1  conviction can come in.  So we would oppose getting into

2  any details.

3          THE COURT:  I think I just told you kind of

4  how -- what I'm going to do here.  So -- that's all he's

5  going to be allowed to do, but he's going to be allowed to

6  do these two things.

7          Look, credibility is a major issue here.

8  However, as I said before at the final pretrial

9  conference, if you're betting your case on just the

10  testimony of this inmate, we're all in trouble.  It seems

11  to me that you have a lot of corroboration here dealing

12  with DNA, prompt complaint, other guards.  That's what's

13  going to carry the day.  So I'm going to let him bring out

14  those two additional points, but no more, which is time

15  period and multiple victims.  And that's it.  Nothing

16  further.

17          MR. GAVIN:  Yes, sir.

18          THE COURT:  Okay?

19          So -- all right.  Do you have -- is there

20  anything else we need to deal with before we bring the

21  jury in?

22          MR. GARNETT:  We do, Your Honor.  There are a

23  number of smaller issues.

24          THE COURT:  We're on the clock here.  I want to

25  bring the jury in.  So --

1          MR. GARNETT:  Yes, Your Honor.  But I think

2    these are things that I wanted to give Your Honor a

3    heads-up about before we actually got started.

4          First, Your Honor, in regards to the

5    government's exhibit list, we had 20-A, which is a

6    transcript of an audio recording listed as what would

7    appear to be substantive evidence.  I just want to let the

8    Court know.  We discussed this with defense counsel.

9    We're not planning to admit that as substantive evidence

10   that would go back with the jury at the close of the

11   trial, merely as an aid for the jury as they review -- as

12   they listen to --

13          THE COURT:  Well, that's what the law is.

14          MR. GARNETT:  Yes, Your Honor.

15          Your Honor, we also -- Your Honor issued the

16   rule on witnesses yesterday in regards to anyone who's

17   listed, obviously, on the defense or government witness

18   list.  One of the individuals listed on the defense

19   witness list is Special Agent Steve Orloff of the

20   Department of Justice, Office of Inspector General.  He's

21   one of our two case agents, Your Honor.  He's been

22   involved in this case from the beginning.  He was at FCI

23   Petersburg literally the day after the May 10th assault.

24          We've discussed with Mr. Gavin.  He has no

25   objection to Mr. Orloff remaining in the courtroom during

1  the entirety of the proceedings.  There would be no

2  practical reason, really, to exclude him, Judge.

3          THE COURT:  Well, if they're not objecting,

4  that's fine.

5          MR. GAVIN:  I'm not objecting so long as they

6  don't intend to call him as a witness.

7          MR. GARNETT:  He's not on our witness list,

8  Your Honor.

9          THE COURT:  All right.  But you intend to call

10 him, though, right?

11         MR. GAVIN:  I listed him out of an abundance of

12 caution because he was the case agent, and he was integral

13 in a lot of the underlies and the 302s.  But I don't

14 intend to call him.  So if they don't intend to call him,

15 I have no objection to him being here.

16         THE COURT:  So you're not putting in the

17 statement, defendant's statement to -- I thought you had a

18 transcript of the interview of --

19         MR. GARNETT:  We do, Your Honor.

20         THE COURT:  -- with Orloff.

21         MR. GARNETT:  But Special Agent Lavender, who's

22 seated at counsel table, he'll be the witness who will be

23 discussing that interview.

24         THE COURT:  Okay.  All right.  If there's no

25 objection, that's fine.

1             Have you all gone over with your other witnesses

2  the rule on witnesses?

3             MR. GARNETT:  Yes, Your Honor.

4             THE COURT:  And everybody is sequestered

5  already?

6             MR. GARNETT:  Everyone is back there right now,

7  Your Honor.

8             THE COURT:  Okay.  All right.

9             MR. GARNETT:  Your Honor, also, the government

10  intends to recall two of our witnesses.

11             THE COURT:  Do we have to do this right now?  I

12  mean, it's after 9:30.

13             MR. GARNETT:  Your Honor, if we can address it

14  at the time, Your Honor.

15             THE COURT:  I mean, this is stuff we should have

16  done yesterday afternoon.  I'm not wasting the jury's

17  time.  We need to get moving.  Is this something you're

18  going to deal with this morning?

19             MR. GARNETT:  This will be something that will

20  come up probably early in the afternoon, Your Honor.  I'm

21  happy to address it then.

22             THE COURT:  All right.  We'll deal with it at

23  the first break here.

24             MR. GARNETT:  Thank you, Your Honor.

25             THE COURT:  I'll give them a couple extra

1   minutes this morning for break.  Is there anything else

2   you need to do before --

3           MR. GARNETT:  Not prior to opening.

4           THE COURT:  -- between now and the 11:00 --

5           MR. GARNETT:  Not prior to opening and the first

6   witness, no, Your Honor.

7           THE COURT:  Okay.  All right.  Are you going to

8   open to the jury now?

9           MR. GAVIN:  Yes, sir, just briefly.

10          THE COURT:  All right.  We're going to bring in

11  the jury.

12          All rise for the jury.

13          (The jury entered the courtroom.)

14          THE COURT:  You all can have a seat.  They're

15  standing for you.  They're trying to show you some

16  respect.  All right.

17          All right.  Everybody can be seated.

18          Good morning, folks.

19          A JUROR:  Good morning.

20          THE COURT:  I already owe you two minutes.  I'm

21  two minutes behind schedule here, but we'll get that under

22  control.  I hope everybody had a good morning and that

23  your drive in was not as adventurous as my drive in during

24  the monsoon here this morning.

25          I want to make sure, though, that everybody

1   abided by my instructions about not Googling and tweeting

2   and talking to anybody else.  Is everybody free from

3   outside interference?  You're going to find out I'm going

4   to ask you this question every morning because it's such

5   an important deal, and I'm going to remind you every night

6   before you go home that you have to heed that instruction.

7   Okay?

8            With that in mind, we're going to get started

9   with opening statements.  I believe the government is

10  ready to go forward.

11           Mr. Garnett.

12           MR. GARNETT:  Thank you, Your Honor.

13           THE COURT:  The show is yours.

14           MR. GARNETT:  Thank you, Your Honor.

15           Good morning, ladies and gentlemen.  This is a

16  case about a powerful person and a powerless person, and

17  it's about what that powerful person decided to use or how

18  he decided to use his authority and control over a person

19  that he believed had no power to stop him.

20           The defendant was a federal correctional officer

21  at the federal prison in Petersburg, Virginia, and every

22  day when he walked through those prison gates, he carried

23  the power and the responsibility entrusted to that

24  position.  Power because his fellow officers will tell you

25  a correctional officer has enormous control over the

1   day-to-day life of the inmates entrusted to him, and

2   responsibility because with that power, a correctional

3   officer is supposed to safeguard the inmates under his

4   custody.

5            What you'll hear over the course of this trial

6   is that to the defendant, those inmates must have appeared

7   potential prey and how, over the course of months, he

8   selected an individual.  He pursued an individual.  He

9   selected Brandon Lemagne.  And you'll meet Brandon Lemagne

10  later today.  And you'll understand why the defendant

11  chose to single out Brandon Lemagne.

12           Brandon is a transgender individual.  And what

13  that means for the defendant's purposes is that he was

14  different, that he stood out.  He was effeminate.  He

15  looked different than his fellow inmates.  He was someone

16  without a lot of friends, not a lot of potential

17  defenders.  And Brandon Lemagne is not a large individual.

18  He stood about five foot -- stands about 5 foot 9, weighs

19  less than 200 pounds, maybe 190 pounds.  And the defendant

20  is massive.  The defendant stands 6 feet 4 inches tall,

21  and in the spring of 2018, he weighed approximately

22  370 pounds.  It's not an exaggeration to say he was

23  literally almost twice Brandon Lemagne's size.

24           So to the defendant, Brandon Lemagne must have

25  appeared to be one of the more powerless people in that

federal prison in Petersburg.  And it may have appeared to
the defendant that he had picked someone who would be the
perfect prey.  And you'll hear how, over a period of
months, he began stalking that prey.  You'll hear from a
clinical psychologist who will describe the defendant's
actions as grooming behaviors.  Steady, deliberate steps.
Those steps consisted of, first, just conversation.  Then
a few gifts.  Maybe some cigarettes.  Then advancing the
comments about Brandon Lemagne's physical appearance.
Then escalating to the defendant furtively exposing
himself.  And finally, the sexual assault, to a sexual
assault in an elevator in March of 2016.  And then finally
in May of 2018, taking Brandon Lemagne into a locked
officer's only area of the prison and raping him.

          And that's why you're here today, because the
defendant has been charged with a number of crimes
relating to those assaults.  He's been charged with
violating Brandon Lemagne's civil rights.  Brandon
Lemagne's right not to be sexually abused while serving
out a court-ordered prison sentence.  He's been charged
with aggravated sexual abuse.  He's been charged with
having sex with an inmate, with a ward, because it is
never acceptable, it is never legal for a correctional
officer to have sexual relations with an inmate entrusted
to their care.  And finally, the defendant is charged with

1   lying to federal agents about what he had done.

2           At the end of the trial, we'll ask you to

3   compare two accounts as jurors are often asked to do.

4   We'll ask you to compare Brandon Lemagne's account, and

5   you'll see that it will be consistent with the evidence in

6   this case, and we'll ask you to compare it to the

7   defendant's account.  Brandon Lemagne will testify that it

8   all started with cigarettes, with conversation and

9   cigarettes, that at first he had thought the defendant was

10  a friendly prison guard, someone who showed interest in

11  actually getting to know Brandon, which would have been

12  unusual for a correctional officer.

13          And then as time passed, the defendant started

14  giving him little gifts, giving him some cigarettes.  And

15  you'll hear from the defendant -- I'm sorry.  You'll hear

16  from Brandon Lemagne that in prison, cigarettes are not

17  just cigarettes.  Cigarettes are currency.  They are

18  valuable.  Inmates use them to trade for things like

19  commissary funds.  So Brandon Lemagne wasn't going to

20  object to this, of course.  So as time passed, the

21  defendant escalated.  He began making comments about

22  Brandon Lemagne's physical appearance.  And Brandon

23  Lemagne will tell you that coming from a correctional

24  officer, this was disturbing but that as a transgender

25  inmate, you develop a thick skin in prison.  He said

1  nothing.   Silence.   And so the defendant, you'll hear,

2  escalated again.   He began exposing himself to Brandon

3  Lemagne.   And Brandon will testify that this was intensely

4  uncomfortable.   This was upsetting.

5          But what was concerning even more so than the

6  act itself was how confident the defendant appeared,

7  utterly assured that he thought no one would catch it.

8  And from Brandon Lemagne's perspective, who would believe

9  the word of an inmate over a federal correctional officer?

10 So Brandon Lemagne said nothing.   Silence.   No report, no

11 consequences.   And to the defendant, that would have

12 appeared confirmation that he had, indeed, selected the

13 perfect prey.

14          March of 2018.   March 16th.   Brandon Lemagne was

15 moving about the prison that evening.   His job -- most

16 people in BOP, Bureau of Prisons, have a job -- was a

17 recreational orderly.   Part of his duties entailed putting

18 up flyers around the prison to advertise upcoming events

19 and activities.   And to do that, he had to go from housing

20 unit to housing unit around the prison.   Eventually, he

21 reached the defendant's housing unit, the area of the

22 prison the defendant was responsible for monitoring.

23          So Brandon Lemagne walked into that housing

24 unit, hung up his flyers, and then the defendant beckoned

25 to him, indicated he would let Brandon Lemagne through a

corridor that connected the defendant's housing unit to
the adjacent housing unit, monitored by another
correctional officer.  A locked corridor, accessible only
by officers, only with a key, a corridor -- because it was
officers only -- without cameras.  So Brandon Lemagne
understood he was being offered a shortcut.  So he
followed the defendant into that corridor.  And you'll
hear that as he followed the defendant down that corridor
toward the double set of steal doors from the other
housing unit, the defendant suddenly stopped and went into
an elevator, motioned Brandon Lemagne to go into that
elevator.  And Brandon Lemagne obeyed.  He stepped inside.

          And he will tell you that once inside that
elevator, the defendant began moving up on him, nuzzling
him, he'll describe it.  And Brandon Lemagne reached out
to try to hit that elevator to move.  The defendant
smacked his hand down.  He says, "We don't have much time.
Give me head."  And Brandon Lemagne will tell you, he
tried to get out of that elevator.  He had no desire to do
what the defendant wanted him to do.  But getting past the
defendant, that's no easy fete.  And you'll hear the
defendant forced him to his knees, pinned his head to the
wall of the elevator and forced Brandon Lemagne to perform
oral sex.  When he was done, he ejaculated.  Some of that
semen landed on a sweatshirt the victim was wearing.

1         And you'll hear from Brandon Lemagne that he got

2    back to his cell.  And he was upset.  He was furious.  He

3    wanted to report the defendant.  But then he will tell you

4    that time passed, minutes passed, and he started

5    second-guessing himself, started thinking about, again,

6    who would believe the word of an inmate, someone who had

7    been convicted of crimes over the word of a federal

8    correctional officer, who would believe something like

9    this would happen in prison and the perpetrator would be a

10   guard.  And that if he did make that report, what would

11   the consequences be?  He'd be someone who tried to snitch

12   on a guard.  He'd probably have to leave a prison, leave a

13   place that he had come to become familiar with, people he

14   knew there.

15        So Brandon Lemagne will tell you despite his

16   better judgment, he stayed silent, but he did do one

17   thing.  He took that sweatshirt that he was wearing, and

18   he circled on it where he had seen some of the defendant's

19   semen land.  Rolled that sweatshirt up, shoved it under

20   his bed.  And the evidence in this case will show

21   consistency with Brandon Lemagne's account.  You'll see

22   surveillance camera footage consistent with Brandon

23   Lemagne's account.  Camera footage, ladies and gentlemen,

24   Brandon Lemagne would not have had access to.  And you'll

25   hear from a DNA forensic scientist at the FBI laboratory

1   in Quantico who will tell you that she tested that

2   sweatshirt and that she found the defendant's DNA on that

3   sweatshirt.

4           Back at the prison.  Two months have passed.

5   It's May 2018.  And the defendant will tell you that those

6   two months have been largely drama free, that there has

7   been no comments from the defendant, there's been no

8   furtive exposures.  Blessedly, there's been no contact.

9   Brandon Lemagne will tell you that he thought maybe it was

10  over.  But to the defendant, two months of silence would

11  have been something else entirely different.  It would

12  have meant no report, no consequences.  It would have been

13  further confirmation that he was pretty good at picking

14  inmates.

15          May 10th of 2018.  It was raining.  Brandon

16  Lemagne, that evening, put on a poncho, got a stack of

17  flyers and headed out to do his job, housing unit to

18  housing unit, until he reached the defendant's housing

19  unit.  Went inside, hung his flyer, and then the defendant

20  beckoned, indicated that he would let Brandon take a

21  shortcut.  Again, go through that corridor to the other

22  side, let him stay out of the rain.  Remember, two months,

23  no incidents.  Brandon Lemagne followed him into that

24  corridor.

25          And I'll tell you, they walked halfway down that

corridor and then the defendant stopped.  He turned to an
office, a doorway, a secretary's office, unlocked it and
motioned Brandon inside.  Brandon, not really sure what
was going on, stepped inside.  And he will tell you the
defendant moved on him, started walking him forcibly
backwards towards the back of that office.  And Brandon
Lemagne will tell you at this point he knew what was going
on.  He tried to get away.  He tried to circle around,
escape from the defendant.  But, ladies and gentlemen,
there was no getting away from that man-mountain of malign
intent that was the defendant on May 10th.  You'll hear
that he grabbed Brandon by the shoulder, ripping his
T-shirt, pushes him to the floor and forces him to perform
oral sex.  Then he pulls him back up, turns him around and
rapes him.

          Brandon Lemagne got back to his cell that night,
and he knew there was no more -- no more rationalizing.
He couldn't pretend anymore that he could go the rest of
his time at Petersburg without fearing the defendant,
couldn't pretend that things would ever go back to normal.
So he screwed up his courage -- because you'll hear that
he knew what the consequences of that report could be, and
he walked across the compound, walked into the
lieutenant's office, walked inside and blurted out what
had happened to him.  The rest of that night was a blur.

1    There was an exam at Petersburg.  There was a forensic

2    sexual assault, sexual assault exam at St. Mary's here in

3    Richmond.

4            And you'll see, ladies and gentlemen, that the

5    evidence, again, is consistent with that account, that the

6    surveillance camera footage will show Brandon Lemagne and

7    the defendant entering that corridor, the doors closing

8    behind them, and five minutes -- more than five minutes

9    elapsed.  You'll hear from the defendant's fellow

10   correctional officers, and they will tell you -- and as

11   you listen to them, you'll understand that from the

12   defendant's perspective, things had been going well.

13   Months of steady creeping success, abuse on abuse, no

14   consequences.  And when he realized that Brandon Lemagne

15   was suddenly across the compound, he realized he had

16   miscalculated, and he panicked.  So you'll hear from those

17   other officers.  They'll tell you that they heard the

18   defendant shouting across the compound at Brandon Lemagne

19   when he saw Brandon Lemagne leaving the medical office.

20           You'll hear from correctional officers, from

21   medical staff, from a clinical psychologist who will tell

22   you Brandon Lemagne was -- I'm sorry -- the defendant was

23   all over the radio that night, calling around the prison,

24   trying to find one particular inmate, an inmate who wasn't

25   assigned to his housing unit.  He was trying to find

1   Brandon Lemagne.

2          You'll hear the DNA in this case.  You'll hear

3   from Kara Gregor.  She'll tell you that the results of the

4   DNA test that she did on clothes Brandon Lemagne was

5   wearing the night of the assault -- a jock strap,

6   shorts -- that DNA recovered from those items of clothing

7   matched the defendant.  She'll tell you that she tested

8   swabs taken from a rape kit, from a rape exam taken of

9   Brandon Lemagne at St. Mary's Hospital here in Richmond

10  several hours after the assault, and that she found the

11  defendant's DNA on a swab taken from Brandon Lemagne's

12  rectum.  That's the victim's account.  That's Brandon

13  Lemagne's account.

14          What was the victim's(sic) account?  Well,

15  you'll hear in the months, the weeks that followed that

16  May 10th assault, the defendant advanced alibis, excuses,

17  arguments to his fellow correctional officers and to

18  federal agents trying to explain away the evidence he

19  realized was growing against him.

20          You'll hear that he approached another

21  correctional officer, Officer Duane Farmer, who was the

22  other officer on the side of the -- on the other side of

23  that corridor that night.  And he asked Officer Farmer to

24  write a report saying that I, Officer Farmer, know that

25  Officer Legins marched Brandon Lemagne directly through

that corridor.  Officer Farmer refused to do that.  He had no idea what happened behind those steel doors.

You'll hear the defendant told federal agents an account to try to explain away the surveillance footage that showed that he disappeared for five minutes.  He said, yes, well, I have gone into an office.  I did go into that secretary's office, and the reason I did that, though, was to use a computer to print out some forms.  So I pulled out my personal identification card, and I put it in the computer, and I started to log on.  Got part of the way through, and it was just taking too long.  So I pulled it out, and we moved on.

But you'll hear from an IT manager at the Petersburg prison.  He'll tell you that he reviewed the database records for that computer and that no one -- not the defendant, not anyone -- even tried to log onto that computer that evening.  You'll hear the defendant's alibi advance to federal agents just a few weeks after the assault in which -- part of the way through as you listen to the recording, you'll hear an agent suggest that perhaps physical evidence might have been recovered. Perhaps semen might have been recovered.  And you'll hear the defendant remember a detail that he had forgotten up until that point of the interview.  You'll hear him tell federal agents that on May 9th, the day before the

1 assault, he had taken a Viagra pill intending to have sex,

2 but it didn't work out.  And so he came to work, and he

3 was concerned that something he would see at work might

4 trigger an erection, and that would be unprofessional.

5       So what did he do?  Well, he told the agents he

6 walked into that corridor, walked into the unit

7 secretary's office, walked into a restroom in that office

8 and he masturbated.  He cleaned up, he told the agents,

9 but maybe that is how they would have come across his

10 semen.

11       That wouldn't explain, as the agents pointed out

12 in this interview, how his DNA would have ended up on

13 Brandon Lemagne.  And so you'll hear the next day the

14 defendant approached another correctional officer,

15 unprovoked, told that correctional officer he's remembered

16 an additional detail related to this, that he had, in

17 fact, seen Brandon Lemagne, an inmate, accessing that same

18 restroom shortly after the defendant had used it for his

19 purposes.

20       Now, the other officers you'll hear from will

21 tell you that's absurd, that an inmate wouldn't have

22 access to a locked officers only corridor.  Wouldn't have

23 access, unescorted access to a staff only office, wouldn't

24 have access unescorted to a restroom in that office,

25 wouldn't be allowed to leave that office -- that restroom

1  unmolested and go on his merry way.  But that's the

2  explanation the defendant offered to his fellow

3  correctional officer.

4          So you have two accounts, ladies and gentlemen.

5  You have Brandon Lemagne's account, which will be

6  consistent with the evidence, and you have the defendant's

7  account, his account to his fellow correctional officers,

8  the statement he gave to federal agents on June 5th.  And

9  you'll see that the defendant's account is contradicted.

10 You'll see that it's contradicted by surveillance video,

11 contradicted by DNA evidence, by computer records, by the

12 testimony of his fellow officers.

13         And you'll hear his alibi, his growing,

14 morphing, expanded alibi that had to keep growing to try

15 to keep pace with the evidence he knew that was growing

16 against him.  And at the end of this trial, my co-counsel,

17 Ms. Gilbert, will come before you, and she'll walk through

18 the evidence that you've seen and heard.  She'll ask you

19 to apply your common sense to that evidence.  She'll ask

20 you to return the verdict that matches that evidence, the

21 verdict that comports with your common sense.  She'll ask

22 you to return a verdict of guilty on all counts.

23         THE COURT:  All right.  Mr. Gavin.

24         MR. GAVIN:  Thank you.

25         Good morning, ladies and gentlemen.  The

elephant in the room is going to be the subject and the topic that we're going to have to discuss, and I'm going to apologize in advance because we're going to have to talk about penises.  We're going to have to talk about anal penetration.  We're going to have to talk about things that are not something you'd talk about at your dinner table, and we apologize for that.  It's not something we like to do, but we're going to have to do it. So we're going to have to open up our suitcases and get comfortable and plan that it's not going to be a short thing.  It's going to be a long thing, and we're going to have to settle in and listen to the evidence.

So, for example, if I were to suggest to you that Mr. Lemagne walked a particular way that didn't -- that wasn't necessarily consistent with somebody that had just been raped, who am I to say what a person should walk like or look like or talk like?  I can't do that.  But I have to ask you to rely on your common sense because you'll see the conduct and the demeanor of the victim in this case.  You'll have to decide whether or not it's consistent with somebody that was just sexually assaulted twice.

So backing up a bit, if you remember the judge's instructions to you, he said that what Mr. Garnett says and what I say is not evidence.  It's not.  We are engaged

1    in the art of persuasion.  That's what we try to do.

2    Mr. Garnett is very good at it.  And if you listened to

3    him and you nodded your head because you were listening

4    intently on what he said and how he described it, we could

5    pack our bags and go home right now because we wouldn't

6    need a trial.

7          But when he points and he calls him the

8    defendant, they're doing that to persuade you that he's

9    not necessarily a person, that he's a defendant.  I'm here

10   to tell you that that's Chikosi Legins.  He deserves your

11   attention.  He has rights, and he has the burden of proof

12   that is in his side.  It's not on our side to prove

13   anything.  It's on their side to prove.  He has a

14   presumption of innocence.

15         So let me sort of go through some of the things

16   that I think are important.  Because just like I said that

17   Mr. Garnett has the ability to persuade you, he just said

18   to you that there's semen on the sweatshirt, there's semen

19   everywhere.  His expert is not going to say that there's

20   semen everywhere.  His expert is going to say that there

21   was a test -- an initial test that tested positive for

22   semen, but they went to do a conclusive test on it, and

23   they couldn't.  On any of these items.

24         So you're going to see that there's DNA out

25   there, but who knows where it came from?  DNA can come

1   from anywhere.  It can come from hair.  It can come from

2   skin.  It can come from anything.  So when he says to you

3   there's semen there in a conclusory matter, that's just

4   not accurate.

5          So I want to talk with you about the indictment.

6   The indictment basically has four counts that involve a

7   sex act, One, Two, Three and Four.  They all involve a sex

8   act.  And all of the sex acts, or you'll hear in the

9   instructions, are defined mouth to penis or penis to anus.

10  So it's got to be one of those two for you to find

11  Mr. Legins -- that he was convicted of a sex act.  And

12  you'll get instructions on exactly what that is.

13         But, you know, there are some things that the

14  United States left out of its opening.  For example,

15  there's going to be evidence that a couple months prior to

16  these events taking place, Mr. Lemagne recruited the

17  assistance of a good buddy of his in the law library to do

18  some research on case law.  And he was researching fraud,

19  and he was researching how to sue officers that had been

20  engaged in sex acts, and how to get monetary judgments or

21  civil remedies against those officers, and that not long

22  after that, he continued to do research.

23         And you'll see that it doesn't necessarily add

24  up when you look at the facts of the case.  What I mean by

25  that is this.  On May 10th, Mr. Lemagne came into the

1   unit.  They went into the door.  You'll see the video.

2   They went into the door.  The doors have to be locked.  So

3   the officers have to lock a door on one side, have to

4   relock it on another side.  You had to go through another

5   set of doors.  You had to go through to the back where

6   this allegedly took place, where there was oral sex, where

7   there was anal sex, where they came back out.  There will

8   be evidence that Mr. Legins evidently went to the bathroom

9   during this process.  And on the other door, he exits the

10  other door in 5 minutes and 13 seconds from door-to-door.

11          So if you believe Mr. Legins, he not only had to

12  go through the doors -- all of those doors and be accosted

13  the way he said he was accosted, in two different ways,

14  both oral sex and anal sex, which Mr. Lemagne told all the

15  medical folks lasted five minutes by itself, and then exit

16  all within less than five minutes.  I'm going to have

17  evidence that will educate to you that just the time to go

18  from door-to-door, to the room, back to the door, to the

19  other exit takes at least 70 seconds by itself.  So you're

20  talking about everything that this gentleman says happened

21  had to have taken place in less than four minutes.  It's

22  virtually impossible for that to happen.

23          Same thing with the March 16th incident, right

24  around five minutes.  It is virtually impossible for those

25  things to happen.

1          So you need to sit back, dig in, listen to the

2  evidence.  I don't think it's going to prove to you at all

3  what the government thinks it's going to prove.  I think

4  it's, frankly, going to prove that they don't have a case.

5  I think their own evidence is going to prove that they

6  don't have a case versus that they do.  Thank you.

7          THE COURT:  All right.  We're going to turn the

8  lectern back to its normal position, and the government

9  will call its first witness.

10          Do we have a witness?

11          MS. GILBERT:  Your Honor, the government calls

12  Susan Womble.

13                    **SUSAN WOMBLE, RN,**

14      called by the government, first being duly sworn,

15                   testified as follows:

16                 **DIRECT EXAMINATION**

17  BY MS. GILBERT:

18  Q    Good morning.

19  A    Good morning.

20  Q    Would you please state and spell your first and last

21  name for the Court?

22  A    My first name is Susan.  It's S-U-S-A-N.  Last name

23  is Womble, W-O-M-B-L-E.

24  Q    If you would, Ms. --

25          THE COURT:  You either need to speak up louder

1  or we need to adjust the microphone a little bit.  I'm an

2  old guy so it's hard for me to hear.  Okay?

3           THE WITNESS:  Okay.

4  BY MS. GILBERT:

5  Q    And if you would, Ms. Womble, would you please tell

6  the jurors what you do for a living?

7  A    I'm a forensic nurse examiner for Bon Secours Mercy

8  Health.

9  Q    What is a forensic nurse examiner?

10  A    That is a registered nurse that's been specially

11  trained to take care of patients of abuse and neglect.  We

12  also do evidence collection, and then we do court

13  testimony as to the exam we performed.

14  Q    So where do you work in your capacity as a forensic

15  nurse examiner for Bon Secours?

16  A    I go to all the Richmond Bon Secours facilities.

17  Q    Does that include St. Mary's Hospital here in

18  Richmond?

19  A    It does.

20  Q    Do you have any certifications to do your job?

21  A    I have two national certifications.  I'm certified

22  for -- sexual assault nurse examiner for adults and

23  adolescents, and then I have a second certification for

24  pediatric patients.

25  Q    What is a sexual assault nurse examiner, as distinct

1  from a forensic nurse examiner?

2  A    So they're somewhat the same.  The main difference is

3  a sexual assault nurse examiner is specially trained to

4  take care of victims, patients that have been sexually

5  assaulted.

6  Q    What are the requirements for becoming a certified

7  sexual assault nurse examiner?

8  A    As a new employee, you receive a 40-hour didactic

9  training.  You spend three to four months with an

10  experienced forensic nurse examiner, and then we do

11  continuing education.

12  Q    And so did you receive all that training you just

13  described?

14  A    I did.

15  Q    In terms of your training to become a sexual assault

16  nurse examiner, what are some of the topics that training

17  covers?

18  A    It covers trauma-informed care of those patients.  It

19  covers basic anatomy of anogenital areas, head-to-toe

20  assessments, how to offer different modes of treatment

21  those patients would be qualified for, like STD testing,

22  prophylactic medications, pregnancy, pregnancy

23  prophylaxis, and HIV prophylaxis.

24  Q    You used a word there, anogenital.  And it's a word

25  that will probably come up again.  Can you explain what

1  that word means for the jury?

2  A    Yes.  That is a detailed exam of basically the

3  patient's private area, front and back.

4  Q    Did your training also address what sorts of physical

5  injuries would be typical after a sexual assault?

6  A    Yes, it did.

7  Q    Did your training also address what kinds of

8  emotional reactions a sexual assault victim might have to

9  a sexual assault?

10  A    Yes.

11  Q    What other licenses, if any, do you have to do your

12  job?

13  A    I'm a registered nurse in the state of Virginia.

14  Q    How many years have you been licensed as a registered

15  nurse?

16  A    Twenty-nine.

17  Q    And how long have you worked as a forensic nurse for

18  Bon Secours?

19  A    Three and a half.

20  Q    What did you do before that?

21  A    For 26 years, I was an emergency room nurse.

22  Q    What is your educational background?

23  A    I have a bachelor's of science in nursing.

24  Q    Are you a member of any professional organizations?

25  A    I'm a member of the IAFN, which is the International

1  Association of Forensic Nurses at the international and

2  the state level.

3          THE COURT:  Are you challenging her

4  qualifications to be an expert forensic nurse?

5          MR. GAVIN:  No, sir.

6          THE COURT:  All right.  We're going to accept

7  her, then, as an expert as a forensic nurse, and I think

8  we can get moving a little bit.

9          MS. GILBERT:  Thank you, Your Honor.

10 BY MS. GILBERT:

11 Q    Okay.  Let's talk a little bit about your work.  Do

12 you perform forensic examinations in sexual assault cases?

13 A    I do.

14 Q    In a sexual assault case, what is the goal of a

15 forensic examination?

16 A    The goal of the forensic exam in a sexual assault is

17 to provide care to the patient, to look for any injuries

18 and to offer them services that are available to them.

19 Q    Is one of your goals also to collect forensic

20 evidence?

21 A    If that's the patient's wishes, yes, ma'am.

22 Q    You just talked just now about the patient's wishes.

23 Can you explain the role that consent plays in the

24 performance of an exam?

25 A    So if a patient comes into an emergency department

Susan Womble – Direct                    38

1   and they state that they have been sexually assaulted, the

2   staff in the emergency department calls our department to

3   come down and see the patient.  We basically ask them a

4   timeline of when it occurred.  A lot of pieces of their

5   exam are time sensitive.  And then based on what they

6   report to us is the options that we offer them, and they

7   have the right to accept or decline any of those.

8   Q    About how many forensic examinations in sexual

9   assault cases have you performed in your career?

10  A    Between adults, adolescents and pediatrics, over 300.

11  Q    Just before we get --

12          MR. GAVIN:  Judge, I stipulated her

13  qualifications.

14          THE COURT:  Why are we doing this?  Let's get to

15  this case.  Okay?

16          MS. GILBERT:  Certainly, Your Honor.

17  BY MS. GILBERT:

18  Q    Let's turn to the evening of May 10th, 2018.  Were

19  you involved with the examination of an inmate from FCI

20  Petersburg that night named Brandon Lemagne?

21  A    I was.

22  Q    Was that examination documented?

23  A    It was.

24  Q    Why do you document these examinations?

25  A    We document them for medical as well as legal

Susan Womble - Direct                    39

 1  purposes.

 2  Q    How do you document them?

 3  A    We use a template.  At the time of the exam, we use

 4  paper, talk with the patient, examine the patient, and

 5  then we type our report afterwards.

 6  Q    Do you always document them in the same way?

 7  A    Yes.

 8  Q    Why is that?

 9  A    So that we don't leave anything out.

10           MS. GILBERT:  Laura, could I please ask you to

11  show this witness what's been marked for identification

12  purposes as Government Exhibit 3?

13           THE COURT:  I think from now on, she'll be

14  Ms. Taylor, if that's okay with you.

15           MS. GILBERT:  I'm sorry?

16           THE COURT:  She'll be Ms. Taylor from now on --

17           MS. GILBERT:  Oh.

18           THE COURT:  -- if that's okay with you.

19           MS. GILBERT:  Certainly, Your Honor.

20           THE COURT:  Okay.

21           CSO SPIVEY:  I'm sorry.  Eight?

22           MS. GILBERT:  Number 3.  And I think that

23  Ms. Taylor has pulled it up for the witness.  So we don't

24  need a physical exhibit.

25           CSO SPIVEY:  Okay.

Susan Womble – Direct                    40

1           MS. GILBERT:  Thank you, Officer Spivey.

2   BY MS. GILBERT:

3   Q    Ms. Womble, do you recognize this document?

4   A    Yes.

5   Q    What is this document that we're looking at?

6   A    It is the forensic exam.

7   Q    How do you recognize that document?

8   A    All I see so far is the initial page that we sent.

9   I'm assuming all the pages are attached to it.  But the

10  top page is the letter from our office saying that we have

11  sent the record and not the anogenital findings.

12          THE COURT:  Is there any objection to its

13  admission?

14          MR. GAVIN:  No, sir.

15          THE COURT:  It will be admitted.  Go ahead.

16          MS. GILBERT:  Thank you, Your Honor.

17          THE COURT:  Before you put it on the screen from

18  now on, we're going to make sure this is admitted.  I

19  don't want the jury seeing an exhibit unless we know it's

20  going to be admitted.  Okay?

21          MS. GILBERT:  Oh, yes, Your Honor.  My

22  understanding was that it was being shown to the witness

23  but not published yet to the jury.

24          THE COURT:  Okay.

25          Is that true?

1           Okay.  All right.  We can show it to the jury.

2  BY MS. GILBERT:

3  Q    Now that the jury can see what you're talking about,

4  Ms. Womble --

5           MS. GILBERT:  Let's go ahead and scroll down if

6  we could, Ms. Taylor, to page 5 of this document.

7           And just before I do that, Your Honor, you had

8  asked that government counsel read into the record

9  stipulations.  Would you like for me to read into the

10 record the stipulation on the authenticity of this and

11 other exhibits?

12          THE COURT:  Anytime you want to offer a

13 stipulation.  Do you want to do it now?

14          MS. GILBERT:  Yes, please, Your Honor.

15          THE COURT:  Folks, what we're talking about is

16 this.  Before this case began, the lawyers met and decided

17 whether or not they could agree on certain facts.  And if

18 they agree, that's called a stipulation, which the

19 lawyers, throughout time -- Ms. Gilbert is going to do

20 that right now -- if they publish it, you should accept

21 that fact as true.  It's not in dispute.  They agreed to

22 it beforehand just to save us time so we can go forward.

23 Do you all understand that?  Okay.

24          All right.  Go ahead.

25          MS. GILBERT:  Thank you, Your Honor.

1          "The parties jointly stipulate and agree that

2    there is no dispute as to the authenticity of the

3    following exhibits:  Government Exhibits 22, 23, 3" --

4    which is this exhibit -- "6, 7, 15, 16, 17 and 21, and

5    Defense Exhibits 1 through 7."

6               (Government Exhibit Number 3 was admitted.)

7               (Government Exhibit Number 6 was admitted.)

8               (Government Exhibit Number 7 was admitted.)

9               (Government Exhibit Number 15 was admitted.)

10              (Government Exhibit Number 16 was admitted.)

11              (Government Exhibit Number 17 was admitted.)

12              (Government Exhibit Number 21 was admitted.)

13              (Government Exhibit Number 22 was admitted.)

14              (Government Exhibit Number 23 was admitted.)

15              (Defendant Exhibit Number 1 was admitted.)

16              (Defendant Exhibit Number 2 was admitted.)

17              (Defendant Exhibit Number 3 was admitted.)

18              (Defendant Exhibit Number 4 was admitted.)

19              (Defendant Exhibit Number 5 was admitted.)

20              (Defendant Exhibit Number 6-A was admitted.)

21              (Defendant Exhibit Number 6-B was admitted.)

22              (Defendant Exhibit Number 6-C was admitted.)

23              (Defendant Exhibit Number 7 was admitted.)

24   BY MS. GILBERT:

25   Q    Okay, Ms. Womble.  So in terms of what the jurors are

Susan Womble – Direct                    43

1  now looking at, whose names are at the top of this page?

2  A    The patient's name that we saw, as well as my name,

3  and Heather Turner was a coworker that I worked with.

4  Q    Okay.  And from this report, Ms. Womble, can you tell

5  us how you came to examine Brandon Lemagne?

6  A    We got a call from one of the nurses in the emergency

7  department at St. Mary's saying that they had received a

8  call from Petersburg saying that they were bringing in an

9  inmate.

10  Q    Did Brandon Lemagne, in fact, come to the hospital?

11  A    He did.

12  Q    What did you do once he arrived?

13  A    We spoke with the medical provider to make sure that

14  the patient was medically cleared, which is our common

15  practice, and then from there, we went in and met the

16  patient.

17  Q    Was he with anyone?

18  A    He was.  He was with guards from the prison.

19  Q    How did you and Nurse Turner begin your examination?

20  A    Introduced ourselves, explained what we do for a

21  living, and offered our services to him.

22  Q    What options did you offer him?

23  A    We offered him to take a history of events as to what

24  occurred.  That helps guide us in our examination.

25  Q    And if I may pause you there.  How does the brief

1  history of events guide you in your examination?

2  A    It guides us so that we know what to offer him, and

3  then where to look for injuries and evidence collection

4  during that exam.

5  Q    Okay.  And what other options other than the brief

6  history of events did you offer to Brandon Lemagne?

7  A    We offered him a head-to-toe assessment.  We offered

8  him an anogenital exam, to take photographs during that

9  exam.  We offered evidence collection, STD testing.  We

10 offered to go ahead and prophylactically treat him with

11 antibiotics, and we offered HIV prophylactic medications.

12 Q    You mentioned an anogenital examination.  Can you

13 briefly describe the process of an anogenital examination?

14 A    It's a very intimate exam that we perform.  It is a

15 detailed, up-close, with photography, of his anogenital

16 area.

17 Q    So looking back at this report, and in terms of the

18 brief history of events, did you collect a brief history

19 of events from Brandon Lemagne?

20 A    My coworker, Ms. Turner, did.

21 Q    Okay.  And from this report, from pages 5 and 6 of

22 this report, I'd like to ask you to read aloud for the

23 jurors what Brandon Lemagne told you and Nurse Turner

24 happened to him that night.

25 A    He said he was out hanging flyers for a recreational

Susan Womble - Direct                    45

1   area.  That's better.  Hold on.

2            THE COURT:  What page are we on here?

3            MS. GILBERT:  Your Honor, we are at the -- it's

4   listed as page 1 on the exhibit, but it's actually, I

5   think, page 5 of the PDF, of the document.

6   A    He said, "I pass out flyers in the evenings for the

7   recreation department.  I was called into a room by an

8   officer."  FNE asked the patient the officer's name.  The

9   patient stated Officer Legins.  "He escorted me through

10  the back.  He walked behind me, unlocked the door, then

11  unlocked another door that led to an office area.  He

12  said, 'Let me holla at you.'  He spun around.  His back

13  was then towards the door.  He pushed me to the back of

14  the room, told me to squat and suck him off.  He

15  manhandled me.  I could tell this wasn't a situation where

16  I could say no.  I just knew it was not that kind of

17  situation.  So once he had had enough of that, he told me

18  to turn around.  He pushed my head towards the wall, and

19  he penetrated me."  FNE asked the patient to clarify.  The

20  patient stated, "Anal, with his penis."

21  Q    Okay.

22  A    The patient then -- the FNE asked the patient what

23  stopped the event.  The patient stated, "He came.  When I

24  turned around, he was ejaculating in his hand.  He told me

25  to clean up and get myself together."

1              MS. GILBERT:  Ms. Taylor, if I could just ask

2   you to page ahead to the next page, which is page 6 of the

3   exhibit.  And if you could just blow up the first part

4   there.  Thank you.

5   BY MS. GILBERT:

6   Q    And, Ms. Womble, could you just briefly describe the

7   end of the brief history of events?

8   A    He went back to his cell.  He told his cellie what

9   happened.  He told me that I had to tell the supervisor.

10  FNE asked the patient if there was anything else he would

11  like to add.  The patient stated, "No.  That's all."  The

12  history was concluded.

13  Q    Thank you, Ms. Womble.  Base on what Brandon Lemagne

14  described to Nurse Turner and that brief history of

15  events, how did that inform how you conducted the rest of

16  your examination?

17  A    It told me areas to look for as far as injuries and

18  evidence collection.

19  Q    What were the primary areas where you were looking

20  for injuries or evidence?

21  A    His mouth and his anus.

22  Q    Okay.

23              MS. GILBERT:  Ms. Taylor, if you could please

24  scroll to page 7, and if you could blow up the -- I'm

25  sorry -- the bottom half, the physical exam portion of the

Susan Womble - Direct                    47

1  document.

2  BY MS. GILBERT:

3  Q    Ms. Womble, what did Brandon Lemagne say, if

4  anything, about how he felt physically?

5  A    He said, "My rectum is sore."  He denied any

6  bleeding, but he was also complaining of a headache.

7  Q    What was Brandon Lemagne's demeanor during this

8  examination?

9  A    The patient was initially hesitant with the exam.  He

10  seemed nervous.  He became more calmer throughout the

11  exam.

12  Q    In your training and experience, Ms. Womble, what is

13  the typical demeanor of a sexual assault victim following

14  a sexual assault?

15  A    There is no typical demeanor.  Patients come in in

16  all types of emotions.  There is no stereotype.  Some of

17  them are crying hysterically, hovered up, don't want to be

18  touched.  Some of them are nervous and anxious.  Some of

19  them are laughing and giddy and to what some people would

20  seem inappropriate.

21  Q    In your training and experience, was anything about

22  Brandon Lemagne's demeanor inconsistent with someone who

23  had been sexually assaulted?

24         MR. GAVIN:  Objection, Judge.  I think we

25  covered this.

Susan Womble - Direct                           48

1           THE COURT:  I thought I ruled on that already.

2           MS. GILBERT:  Your Honor, my understanding of

3   your ruling -- should we approach?

4           THE COURT:  No.  I told you not to do this.  The

5   objection is sustained.

6           MS. GILBERT:  Your Honor, you -- my

7   understanding of your ruling was that I was instructed not

8   to ask if his behavior was consistent.  And then I asked a

9   follow-up question, which was whether I could ask if Nurse

10  Womble observed anything inconsistent with Brandon

11  Lemagne's account of events.

12          THE COURT:  Let's just go to what she observed

13  of his conduct.

14          MS. GILBERT:  Okay.

15  BY MS. GILBERT:

16  Q    Ms. Womble, overall, what were the results of the

17  physical examination also described here on page 7?

18  A    Physically, during the physical assessment, there

19  were no findings.  It was a normal exam.

20  Q    How long can bruises take to form on someone's body?

21  A    Everyone is different.  Some people get them

22  immediately.  Some people it takes days, it takes a week.

23  I mean, there is no normal for that.  It depends on skin

24  color, skin tone, overall medical health.

25  Q    One last question from this page, Ms. Womble.  What

1  was your patient wearing when he came into the hospital?

2  A    He was wearing a plastic jumpsuit.

3  Q    Have you ever seen a suit like that before?

4  A    I have.

5  Q    In your experience and training, did that suit

6  indicate anything to you?

7  A    It indicated that they had taken his clothing prior

8  to bringing him in.

9         MS. GILBERT:  Ms. Taylor, could you please

10  scroll to page 8?  Thank you.

11  BY MS. GILBERT:

12  Q    Ms. Womble, what did you do while Nurse Turner

13  examined Brandon Lemagne?

14  A    I performed his exam.

15  Q    Oh, I'm sorry.  Let me rephrase that.  What did you

16  do while Nurse Turner was conducting the brief history of

17  events interview with Brandon Lemagne?

18  A    I set up his evidence collection kit.

19  Q    What do you call the evidence collection kit?

20  A    It's called a PERK kit.  And in that kit, there are

21  some forms to fill out, and there are a lot of boxes and

22  Q-tips to label and put together.

23  Q    What does PERK stand for, if you know.

24  A    Physical Evidence Recovery Kit.

25  Q    Thank you.  So when you conducted the anogenital

1  examination of Brandon Lemagne, what did that involve?

2  A    Initially, he was lying on his back.  It was a

3  detailed exam -- examination, looking for any types of

4  injuries, fibers, fluids, anything that shouldn't be there

5  or could be there but we didn't know where they would have

6  come from.

7          We photograph, at that time, his whole penile

8  scrotal area, including perineum.  Then we asked him to

9  roll on his left side, to draw his right knee up.  It's a

10 separation of his buttocks and an up-close exam of his

11 anal area.  There were no injuries noted initially.

12         So then I put toluidine dye right around the

13 opening of his anus.  It is then sprayed off with cold

14 vinegar water.  So if there are not injuries that -- if

15 there are no injuries with my human eye, if there's

16 injuries, sometimes it can be detected with that dye

17 because it adheres to the nucleated cells that would then

18 be exposed.  And then all that was photographed.

19 Q    In your training and experience, what kinds of

20 anogenital injuries do you expect to observe on a sexual

21 assault victim?

22 A    I'm looking for breaks in skin.  I'm looking for

23 fluids, swelling, discoloration.  In his exam, there were

24 none.

25 Q    What is the most typical finding in terms of whether

1   there are anogenital injuries for a sexual assault victim?

2   A    Typically, there are no findings.

3   Q    Is that true for both male and female victims of

4   sexual assault?

5   A    It is.

6   Q    In your experience, what's more likely, vaginal

7   injuries or anal injuries?

8   A    That's really hard to answer, because there are lots

9   of things that affect.  Every case is totally different.

10  Q    But so that I understand, for both and female

11  victims, typically there are no physical injuries?

12  A    The majority of those cases have no injuries.

13  Q    Why is that?

14  A    There are lots of things that can contribute:  How

15  many times it has occurred before, number of occurrences,

16  lubrication, the use of lubricating fluids, saliva, sweat,

17  how long the -- how long the event occurred, the force

18  that was used or the willingness of the patient.

19  Q    When you say "the force that was used," are you

20  referring to the actual force used for penetration itself?

21  A    Yes.

22  Q    What are the most important factors in whether a

23  victim of a sexual assault might have physical injuries as

24  a result of that assault?

25  A    Say that one more time.

Susan Womble - Direct                    52

1   Q     What are the most important factors affecting whether

2   someone might have injuries after a sexual assault of the

3   factors you just described?

4   A     Usually it's the -- I would say lubrication,

5   willingness, and force.

6   Q     How would previous experience with anal sex affect

7   the results -- or affect the chances of someone who is

8   anally raped being injured in their anus?

9   A     It's like any other muscle.  There is muscle tone.

10  Q     Do your patients generally find the anogenital

11  examination uncomfortable?

12  A     Yes.

13  Q     One last question about the anogenital exam itself.

14  Do you use an anoscope as part of that examination?

15  A     In our practice at Bon Secours, we do not.

16  Q     What is an anoscope?

17  A     It is a -- it's a plastic -- figure out how to

18  describe it to you all.  It kind of looks similar to a

19  vaginal speculum.  It's plastic.  It's rounded at the end.

20  It's about 4 inches long.  It is inserted into the anus

21  and then the centerpiece is removed so that you can

22  visualize actually into the rectum itself.

23  Q     Why don't you use an anoscope at your practice?

24  A     In our practice, we go through symptoms with the

25  patient and then we do the external exam.  If there are

1   reasons to do an anoscope exam, then we go back to the

2   emergency department provider and have them perform that

3   exam.  As nurses, we do not.  The risks of causing more

4   injury is just not something that we do.

5   Q    If you had done an anoscope examination, could that

6   have revealed more injuries in this case that weren't

7   visible externally?

8               MR. GAVIN:  Judge, I think that would require

9   speculation.

10              MS. GILBERT:  I can rephrase, Your Honor.

11              THE COURT:  Okay.

12  BY MS. GILBERT:

13  Q    Generally, does using an anoscope sometimes reveal

14  internal injuries that are not visible to the eye outside

15  of the anus?

16              THE COURT:  Is that at issue here?  I mean,

17  since she didn't use it, is there an issue about this?

18              MR. GAVIN:  I'm not sure why it's being brought

19  up.

20              THE COURT:  So why are we talking about this?

21              MS. GILBERT:  I believe that it will be an

22  issue, Your Honor, based on the defendant's expert

23  disclosure and my understanding of what his expert witness

24  will testify to.

25              THE COURT:  All right.  Reask the question.  Let

Susan Womble - Direct                    54

1  me see if it makes sense.  Go ahead.

2  BY MS. GILBERT:

3  Q    When using an anoscope, is it possible that the use

4  of an anoscope can reveal internal injuries that are not

5  externally visible?

6  A    If injuries are inside, I can't see them from the

7  outside.

8          THE COURT:  So why don't you all use the

9  anoscope, then?

10          THE WITNESS:  So an anoscope is more of an

11  internal exam, and in our practice, we feel like that is

12  something that the medical provider, the physician, would

13  do.  Because it can cause more injury to the inside.  So

14  if it's a small break --

15          THE COURT:  Because you're penetrating,

16  essentially.

17          THE WITNESS:  It's a small break of skin.  And

18  you go in there with that piece of hard plastic, you could

19  rupture something and cause more damage.  So that's why if

20  we see symptoms or they have symptoms or we see enough

21  trauma on the outside, we'll escalate to that level, but

22  we do not routinely perform that on everybody.

23          THE COURT:  All right.  I think we've covered

24  this.

25          MS. GILBERT:  Thank you, Your Honor.

1        Ms. Taylor, if I could ask you to please scroll

2   down to the bottom of page 8 and the top of page 9, which

3   you've already done.

4   BY MS. GILBERT:

5   Q    Nurse Womble, what labs did you take for Brandon

6   Lemagne?

7   A    We did sexually transmitted disease testing.  We

8   tested him for an RPR, which is a blood test for syphilis,

9   and then we tested him for gonorrhea and chlamydia.

10  Q    Why did you take those lab examinations?

11  A    In asking the patient if he wanted to be tested, he

12  consented to that.

13  Q    Let's return to the PERK, the Physical Examination

14  Recovery Kit, that you set up.  Did you collect physical

15  evidence during this examination?

16  A    I did.

17  Q    What physical evidence did you collect?

18  A    I collected swabs from inside of his mouth, swabs

19  from his lips, and then I collected swabs during the

20  anogenital exam.  It consisted of inside his thighs, his

21  external genitalia, his buttocks, the shaft and head of

22  his penis, as well as his rectal swabs.

23  Q    Of the areas you just described, where would be the

24  most typical place to find evidence where a victim was

25  anally raped?

Susan Womble - Direct                              56

1  A    The anal-rectal swab.

2           MS. GILBERT:  Your Honor, at this time I would

3  like to ask Mr. Spivey to please provide to the witness

4  the box marked for identification purposes as Government

5  Exhibit 4.

6           THE COURT:  Okay.  Do you have any objection to

7  this?

8           MR. GAVIN:  No.

9           THE COURT:  Did you want Exhibit 4 introduced or

10  do you want to just use the photos?

11          MS. GILBERT:  I am planning to introduce the

12  physical exhibit for this one.

13          THE COURT:  All right.  That's fine.  All right.

14  He has no objection.  It will be admitted.

15          (Government Exhibit Number 4 was admitted.)

16          MS. GILBERT:  I'm sorry, Officer Spivey.  I led

17  you awry.  It was in a bag.  I said box.  That's the right

18  thing, I think.  I'm just apologizing because I described

19  it poorly.

20          CSO SPIVEY:  It just looked like 9-B.  It's my

21  fault.

22  BY MS. GILBERT:

23  Q    Nurse Womble, could you please reach inside that bag

24  and take out what's inside?

25          Ms. Womble, do you recognize this box?

1  A     I do.

2  Q     What is it?

3  A     It is the PERK kit that we collected.

4          MS. GILBERT:  Your Honor, with the Court's

5  permission, and when the Court is ready, I'll read into

6  the record stipulation number 1.

7          THE COURT:  The show is yours.  Go ahead and

8  read it.

9          MS. GILBERT:  Thank you.  "There is a

10 stipulation by and between" --

11         THE COURT:  Why don't you turn to the jury when

12 you read it.

13         MS. GILBERT:  "There is a stipulation by and

14 between the parties that the items of physical evidence

15 collected in this case are, in fact, the actual items

16 collected at the respective crime scenes and collection

17 sites.  These items of physical evidence were maintained

18 through a proper chain of custody from the time of their

19 collection to the time they were introduced at trial.

20 There is no dispute as to the authenticity of these items.

21 These items include Government Exhibits 8 through 14,

22 4" -- which is what Nurse Womble is holding right now --

23 "and 18 to 20."

24         THE COURT:  Again, those facts should be

25 accepted by you going forward.

Susan Womble - Direct                           58

1                 (Government Exhibit Number 8 was admitted.)

2                 (Government Exhibit Number 9 was admitted.)

3                 (Government Exhibit Number 10 was admitted.)

4                 (Government Exhibit Number 11 was admitted.)

5                 (Government Exhibit Number 12 was admitted.)

6                 (Government Exhibit Number 13 was admitted.)

7                 (Government Exhibit Number 14 was admitted.)

8                 (Government Exhibit Number 18 was admitted.)

9                 (Government Exhibit Number 19 was admitted.)

10                (Government Exhibit Number 20 was admitted.)

11  BY MS. GILBERT:

12  Q    Ms. Womble, could you please open the box and take a

13  look inside?

14           Could you please describe for the jurors what

15  you see inside the box?

16  A    These are the swabs as we packaged them that night.

17  Q    So those were the swabs collected from Brandon

18  Lemagne?

19  A    Correct.

20  Q    And who collected those swabs?

21  A    I did.

22  Q    Nurse Womble, do you see that many of those envelopes

23  are marked with exhibit stickers?

24  A    Yes.

25  Q    Just to move things along, what do you see on top

1  there?  In terms of the exhibit stickers, what's on top?

2  A    The penile swab.

3  Q    Okay.  And can I ask you to just flip through them

4  and confirm that all of the swabs you took -- the penile

5  swabs, the thigh and external genitalia swabs, the

6  anorectal swabs, the buttocks swabs, oral swabs, swabs

7  from the lips, swabs from the hand, and the blood

8  sample -- are in there?

9  A    Yes.

10 Q    Thank you, Ms. Womble.

11       MS. GILBERT:  I will now read into the record

12 stipulation number 2.  This is a long one.  "There is a

13 stipulation by and between the parties that all

14 evidentiary items received by, examined, and tested in

15 this case by personnel at the FBI Laboratory in Quantico,

16 Virginia, are, in fact, the actual items seized or

17 collected at their respective crime scenes and collection

18 sites.  All items of evidence seized and delivered to the

19 FBI Laboratory for processing in this case were packaged,

20 labeled, and handled in a manner which prevented loss or

21 contamination.  Additionally, all evidentiary items, after

22 arriving at the FBI Laboratory, were stored, transferred

23 between and within various testing divisions, and

24 processed in a manner which preserved and maintained the

25 integrity of all biological specimens.  The parties

Susan Womble – Direct                    60

1  stipulate and agree that these evidentiary items have been

2  maintained through a proper chain of custody from the time

3  of their collection to the time introduced at trial.  The

4  parties stipulate that the FBI Laboratory in Quantico

5  specifically tested the following items, identified by

6  their exhibit number."  Government Exhibits 4-A through

7  4-H, 18, 19, 10, 12, 13 and 14.

8          Your Honor, I would like to move all of the

9  envelopes within the box into evidence as well.  Those are

10 Exhibits 4-A through 4-H.

11          MR. GAVIN:  No objection.

12          THE COURT:  I mean, they're part of Exhibit 4,

13 right?

14          MS. GILBERT:  Yes, Your Honor.

15          THE COURT:  So they're properly admitted.

16 That's fine.

17          (Government Exhibit Number 4-A was admitted.)

18          (Government Exhibit Number 4-B was admitted.)

19          (Government Exhibit Number 4-C was admitted.)

20          (Government Exhibit Number 4-D was admitted.)

21          (Government Exhibit Number 4-E was admitted.)

22          (Government Exhibit Number 4-F was admitted.)

23          (Government Exhibit Number 4-G was admitted.)

24          (Government Exhibit Number 4-H was admitted.)

25 BY MS. GILBERT:

1  Q      Thank you, Ms. Womble.

2  A      Uh-huh.

3  Q      Ms. Womble, what is the purpose of taking --

4              THE COURT:  Are you done with that?

5              MS. GILBERT:  Yes, Your Honor.

6              THE COURT:  Okay.  We'll move that to the side,

7  Officer Spivey.

8              MS. GILBERT:  Thank you, Your Honor, and thank

9  you, Officer Spivey.

10 BY MS. GILBERT:

11 Q      Nurse Womble, what is the purpose of taking DNA swabs

12 from a rape victim?

13 A      We are looking for any type of fluids that are

14 someone else's DNA other than the patient's.

15 Q      Did you personally perform the testing of the swabs

16 in this case?

17 A      I did.

18 Q      You collected the swabs.  Did you perform the DNA

19 testing of them later?

20 A      No.  They go to the state lab.

21 Q      So you have no personal knowledge of whose DNA, if

22 anyone's, was found in or around Brandon?

23 A      I do not.

24 Q      Nurse Womble, one other set of questions.  You

25 mentioned earlier photographs.  And what were the results

1  of your photographs in this case?

2  A    There were no findings in the photographs.  They were

3  a completely normal exam.

4  Q    Did the patient agree to have photographs taken right

5  away?

6  A    He did not.

7  Q    Over the course of the examination, he agreed to have

8  photographs taken?

9  A    Once we started the exam, he agreed to the

10 photographs.

11 Q    How common is it for patients to be reluctant to have

12 photographs taken of their genitals?

13 A    It's pretty common.  That's not a normal thing to go

14 to the doctor and have done.

15            MS. GILBERT:  Thank you.

16            THE COURT:  All right.  Mr. Gavin, questions.

17            MR. GAVIN:  Yes, sir.

18                    **CROSS-EXAMINATION**

19 BY MR. GAVIN:

20 Q    Good morning, Ms. Womble.

21 A    Good morning.

22 Q    So as I understand, we just took 30 minutes of

23 testimony to, in a nutshell, realize that there was no

24 findings of your exam at all that indicated any injury to

25 Mr. Lemagne's anus; is that correct?

1   A      There were no findings, yes, sir.

2   Q      And there's no evidence at all that you can testify

3   about today as to whether there was an injury inside

4   Mr. Lemagne's anus?

5   A      Correct.

6   Q      So there's a couple of things that you mentioned as

7   factors when you look at these exams.  And you said saliva

8   is one?

9   A      Uh-huh.

10  Q      All right.  Is saliva particularly slippery?  Does it

11  have any innate qualities that make it a proper lubricant?

12  A      Anything wet can be considered a lubrication.

13  Q      But does saliva have anything particularly innate to

14  it that provides slipperiness, for example?

15  A      Not necessarily.

16  Q      So it's just a wet fluid?

17  A      Okay.

18  Q      And would it dry fairly quickly?

19  A      It can.

20  Q      What about something else?  You said occurrence,

21  which would mean how many times -- that particular day or

22  was it your understanding of how long this event lasted?

23  A      No.  How many times in the past.

24  Q      Okay.  Was it your understanding that this was a

25  forceful event?

1  A    In the history that I obtained from the patient, he

2  said he did not resist.

3  Q    He did not resist?

4  A    That's what he said.

5  Q    Would the size of the alleged perpetrator's penis

6  have any factor in it?

7  A    I have not seen literature as to size.

8  Q    Would a 7-inch penis be something that you would

9  consider a factor in your exam?

10  A    In my previous history, I have not seen size as a

11  factor.

12  Q    Did you review any of Mr. Lemagne's statements other

13  than the one that you wrote, any other statements that he

14  may have given to anyone else?

15  A    No, sir.

16  Q    All right.  Prior to him coming to you, do you ask

17  him a series of questions about what has happened since

18  the event up to the time that you see him?

19  A    The only other questions that I ask him are on the

20  forms that go in the PERK kit, and they are in reference

21  to has he showered, has he had a bowel movement, has he

22  vomited.  That's it.

23  Q    And did you ask him those questions?

24  A    I did.

25  Q    And did he respond to your questions?

1   A    He did.

2   Q    Do you think he understood them?

3   A    He appeared to understand them.

4   Q    All right.  So the questions that you asked him are

5   has he had a bowel movement.

6   A    Correct.

7   Q    He said no?

8   A    Correct.

9   Q    Did you ask him if he had washed himself in any way?

10  A    I did.

11  Q    And his response?

12  A    No.

13  Q    Did he do anything or make any reference to anything,

14  any other action that he may have taken between the time

15  of the alleged incident and the time he came to you?

16  A    Not that I recall.

17  Q    All right.  I'd like to turn to your exhibit and

18  refer you to page 8.  Ms. Womble, if you look at this

19  section that's entitled "Male Exam."

20  A    Uh-huh.

21  Q    All right.  Is that the examination of Mr. Lemagne's

22  genitals?

23  A    It is.

24  Q    And that shows no evidence of any type of injury

25  whatsoever, correct?

Susan Womble - Cross                    66

1   A    Correct.

2   Q    And then if you move down next to the "Anal Exam," is

3   that your writing under -- the line under the "Anal Exam"

4   that says "Buttocks"?

5   A    It is.

6   Q    Could you read that to the jury?

7   A    Uh-huh.  It said he had a mound of flesh colored skin

8   noted at 9:00 in the left lateral recumbent position, and

9   there was white foreign material noted circumferentially

10  that was consistent with toilet paper.

11  Q    If you'd keep going.

12  A    And that we noticed no breaks in skin, swelling,

13  discoloration, pain or fluid.

14  Q    If you would look above that on the buttocks section,

15  what does that read?

16  A    "No breaks in skin, swelling, discoloration, pain or

17  fluid noted."

18  Q    All right.  So you when you say "pain," is that based

19  on your physical testing and a response from Mr. Lemagne

20  or what Mr. Lemagne is saying to you in response to what

21  you're doing?

22  A    So that would be subjective in responses to what I'm

23  doing.

24  Q    And there was no pain indicated?

25  A    That's correct.

1 Q    All right.  If you move further down the anal exam

2 portion of the test, news to me until this case, but can

3 you describe what the anal rugae is, sphincter tone?

4 A    So that is -- the anal rugae is internal.  That is

5 something that I did not visualize because we do not do

6 internal exams.

7 Q    Did you make a finding with respect to sphincter

8 tone?

9 A    Yes.  He did have sphincter tone.

10 Q    When you say he had sphincter tone, describe what you

11 mean by that to the jury.

12 A    That means when I separated his buttocks, that his

13 anus -- the muscle tone was tight.

14 Q    What is anal verge?

15 A    Anal verge is another part of the anatomy inside that

16 I did not visualize.

17 Q    And what is pectinate?

18 A    So that is where the rectum comes together with the

19 large intestine, and that was not examined during his

20 exam.  That's all internal.

21 Q    Now, if you look down into the next section below

22 that, "Alternative Forensic Techniques," did you pursue

23 those because you couldn't find something initially?

24 A    Say that one -- I'm not following you.

25 Q    With the alternative forensic techniques, did you

1   pursue alternative forensic techniques because the basic

2   techniques did not produce a result?

3   A    So even if I had seen visual findings, I would have

4   still applied the dye to make sure that there weren't more

5   injuries.  So that is a standard, because it was an

6   initial exam.  And then the photographs, we always offer

7   photographs.

8   Q    What is colposcope magnification?

9   A    So a colposcope is a camera and a microscope.  That

10  is what we use for most anogenital exams.  His exam was

11  done in the emergency department.  He wasn't taken

12  upstairs to our office because he declined the

13  photographs.  We had already started his evidence

14  recovery.  So we used a digital camera for his

15  photographs.

16  Q    Did it provide a level of magnification, though?

17  A    It's more suited for male than a female.

18  Q    What is toluidine dye?

19  A    So that is the blue dye that is applied to look for

20  injuries that you can't see with a naked eye.

21  Q    So the toluidine dye section that's under the

22  "Alternative Forensic Techniques" listed on page 8 of your

23  report is the dye you're talking about?

24  A    Yes, sir, that's the dye.

25  Q    All right.  And that dye would detect anything as

1  little as a broken cell?

2  A    It would.

3  Q    And you saw no broken cells?

4  A    Did not.

5  Q    Could you flip over to page 11 of your report?

6         Ms. Womble, this report indicates, as you

7  indicated, a white foreign material consistent with toilet

8  paper; is that correct?

9  A    It is.

10  Q    And there's an arrow from that document or from

11  that -- that diagram that points exactly to where that

12  piece of tissue paper is located; is that correct?

13  A    It is.

14  Q    And was that based on your observation at the time?

15  A    It was.

16         MR. GAVIN:  I have no other questions,

17  Your Honor.

18         THE COURT:  Do you have any redirect?

19         MS. GILBERT:  Just briefly, Your Honor.

20         Could I ask Ms. Taylor to please pull Exhibit 3

21  back up?  And we're shooting for page 5.  I think we are

22  looking for the bottom half again of that page.  If we

23  could please blow it up.  Thank you.

24                    **REDIRECT EXAMINATION**

25  BY MS. GILBERT:

Susan Womble – Redirect                    70

1  Q    Ms. Womble, earlier you were speaking with Mr. Gavin

2  about any amount of force used during this assault.  I

3  just wanted to direct your attention to six lines from the

4  bottom.  Did Brandon Lemagne describe any kind of force

5  used at some point during the course of behavior during

6  the assault?  I'm looking specifically at, "He manhandled

7  me."  Do you see that?

8  A    Uh-huh.

9       THE COURT:  Why don't you just read what it

10 says.  It will be a lot easier for all of us.

11 A    "He manhandled me.  I could tell this was a situation

12 where I could" -- "where I could say no.  I just knew it

13 was not that kind of situation."

14 BY MS. GILBERT:

15 Q    And is it your understanding where it says "where I

16 could say no," is that --

17 A    Right.  Right.

18 Q    Is your understanding that Brandon Lemagne was saying

19 that he could not say no to the defendant?

20 A    Correct.  He could not say no.  He felt like he had

21 no option.

22       THE COURT:  Just to be clear, the exact words

23 are, "I could tell this wasn't a situation where I could

24 say no."  I think it speaks for itself.

25       MS. GILBERT:  Thank you, Your Honor.

Susan Womble - Redirect                    71

BY MS. GILBERT:

Q    When you're conducting the brief history of events,
Ms. Womble, do you ask a patient to give every detail of a
sexual assault?

A    We do.

Q    And do you ask a patient to give every detail of
their relationship with the offender?

A    Not so much with the relationship of the offender,
no, ma'am.

Q    And is that because you're trying to get the details
you need to do the testing and examination you need to do?

A    We're more interested in the specific steps of what
occurred during the assault so that we know where to guide
our exam for evidence recovery and injury.

Q    And one last question, Ms. Womble.  Is it common to
find the remains of toilet paper on an anus during an
examination of the anus?

A    That's a frequently found finding.

          MS. GILBERT:  Thank you, Ms. Womble.

          THE WITNESS:  Uh-huh.

          THE COURT:  So, ma'am, thank you for your
testimony here today.  You're going to be excused.  I'm
going to instruct you, though, that you're not to talk
about your testimony with anyone until after this trial is
over.  Do you understand that?

Heather McWilliams – Direct                    72

```
 1                THE WITNESS:  Yes, sir.

 2                THE COURT:  All right.  Thank you again for

 3   being here.

 4                THE WITNESS:  Thank you.

 5                THE COURT:  You're excused.

 6                (Witness stood aside.)

 7                THE COURT:  Do you want to call your next

 8   witness?

 9                MS. GILBERT:  At this time the government will

10   call Lieutenant Heather McWilliams.

11                THE COURT:  Everybody okay over there?

12                    HEATHER MCWILLIAMS,

13       called by the government, first being duly sworn,

14                    testified as follows:

15                    DIRECT EXAMINATION

16   BY MS. GILBERT:

17   Q    Good morning.

18   A    Good morning.

19   Q    Would you please state and spell your full name for

20   the Court?

21   A    My name is Heather Ann McWilliams.  H-E-A-T-H-E-R.

22   Ann, A-N-N.  McWilliams, M-C-W-I-L-L-L-I-A-M-S.

23   Q    Would you please tell the jury who you work for?

24   A    I work for the Federal Bureau of Prisons.

25   Q    Could you please just briefly explain what the Bureau
```

1  of Prisons is?

2  A    Yes.  We are assigned to house wards of the court.

3  Q    And that's for federal cases?

4  A    That's correct.

5  Q    At which specific within the Bureau of Prisons do you

6  work?

7  A    FCC Petersburg Medium and Low facility.

8  Q    Okay.  So you used a few terms there I'm going to ask

9  you to define.  What does FCC stand for?

10 A    Federal Correctional Complex.

11 Q    You also said medium and low.

12 A    Yes.

13 Q    What does the word "medium" refer to?

14 A    So that houses medium security inmates.  The low

15 facility houses low security inmates.

16 Q    Is it correct that FCC Petersburg has both a medium

17 and a low security facility?

18 A    Yes, ma'am.

19 Q    What is your rank at FCC Petersburg?

20 A    I'm a lieutenant.

21 Q    How long have you worked for the Bureau of Prisons?

22 A    Since 2001.

23 Q    Have you been at Petersburg that whole time?

24 A    Yes, I have.

25 Q    So let's jump right in, Lieutenant McWilliams, and

1   talk about the evening of May 10th, 2018.

2   A    Yes, ma'am.

3   Q    What was your assignment back in May of 2018?

4   A    I was assigned to the SIS office.

5   Q    What does SIS stand for?

6   A    Special Investigative Services.

7   Q    Can you explain to the jury what that means?

8   A    Yes.  We are tasked with completing staff and inmate

9   cases for incidents that occur within the federal prison.

10  Q    In other words, you investigate those cases?

11  A    That's correct.

12  Q    What were you doing that night, May 10th, 2018?

13  A    I was at home.

14  Q    Were you scheduled to work that night?

15  A    No, I was not.

16  Q    Did you end up going to work?

17  A    Yes, I was.

18  Q    Why did you end up going to work?

19  A    I received a phone call from my supervisor,

20  SIA Norman.

21  Q    And what was your understanding of why you were being

22  called in to work?

23  A    He advised me that we had a PREA allegation case

24  involving a possible staff member and an inmate, and I

25  went into the institution to handle that case.

Heather McWilliams – Direct                    75

1   Q      Okay.  So what is PREA?

2   A      It is the Prison Rape Elimination Act.

3   Q      Without getting into all of the details of the law,

4   just briefly, what does it require of correctional

5   facilities?

6   A      So it was enacted in 2003, and that requires that we

7   follow certain protocol whenever we have an allegation of

8   rape, inappropriate touching or multiple cases of sexual

9   harassment.

10  Q      So when you were called into the facility for a PREA

11  complaint, what did that mean to you?

12  A      It was advising me that I needed to come in to look

13  into a matter that involved an inmate and either another

14  inmate or a staff member and that it involved possibly a

15  rape allegation or an inappropriate sexual touching.

16  Q      Why did you need to leave home and go into work

17  because of this PREA complaint?

18  A      Because I am a supervisor, and I'm required to handle

19  those cases.

20  Q      What are PREA protocols?

21  A      For the individual that is -- the first contact for

22  an individual, an inmate, the first thing they're going to

23  do is they're going to safeguard that inmate.  The second

24  part of that procedure is once that inmate is safeguarded,

25  we're going to notify the supervisor on shift, which would

Heather McWilliams – Direct                    76

1    be the lieutenant.  The lieutenant would then make proper

2    procedural phone calls, depending on the type of PREA

3    issue it is, and then they would call the supervisor for

4    SIS, which is Mr. Norman, and then he would defer to one

5    of us.

6    Q     Why are those PREA protocols important?

7    A     They are important because prior to the enactment of

8    the PREA protocol, there were many situations where

9    inmates would allege rape or sexual improprieties amongst

10   staff or inmates, and it was never reported.  So we were

11   required by policy, by law, to make sure that every matter

12   that is ever brought forth of that -- of that nature, that

13   they are addressed.

14   Q     Once you got to FCC Petersburg that night, where did

15   you go?

16   A     I reported to the lieutenant's office.

17   Q     Was that at the medium security facility?

18   A     Yes, it is.

19   Q     Who all was in the lieutenant's office when you got

20   there, if you remember?

21   A     I don't recall who was in there.  I do know that

22   lieutenant -- I mean, excuse me -- Inmate Lemagne came in

23   shortly thereafter.

24   Q     Did you observe anything about Inmate Lemagne's

25   appearance?

1  A      Yes.   He was wearing a Tyvek suit at that time.

2  Q      And what, if anything, did that indicate to you?

3  A      It indicates to me that my staff had already

4  initiated the PREA protocol, which is to safeguard any

5  items that the inmate was wearing at the time for evidence

6  preservation.

7  Q      Did you know Inmate Lemagne prior to this

8  interaction?

9  A      Yes.

10  Q      And how did you know Inmate Lemagne?

11  A      I've been there since 2001.  I interact daily with

12  the inmate population at the low and the medium

13  institution.  I was very familiar with Lemagne because,

14  quite honestly, the inmates utilize me as somebody who

15  looks out for them, especially when they identify as a

16  member of the LGBTI community.

17  Q      Can you define the term LGBTI?

18  A      Yes.  Those are individuals who identify as lesbian,

19  gay, bisexual, transgender, intersex, queer.

20  Q      Was Brandon Lemagne part of that community?

21  A      Yes, he is.

22  Q      Why is it important for officers to know whether an

23  inmate is part of the LGBTI community?

24  A      So members of that community are at higher risk of

25  victimization by other inmates and anyone that they come

1    in contact with.  Also, they have specific needs,

2    particularly if they identify as transgender.

3    Q    What did you do once you arrived at the lieutenant's

4    office?

5    A    As soon as I reported to the lieutenant's office, I

6    immediately opened an office.  I went into the captain's

7    office, and I was about to bring Inmate Lemagne in to do

8    an affidavit.

9    Q    Prior to that night -- and I'll come back to the

10   affidavit.  Prior to that night, what was Brandon

11   Lemagne's usual demeanor?

12   A    So Lemagne is an individual who -- actually, I always

13   thought that Lemagne identified as transgender.  He's very

14   effeminate, has a very vivacious spirit.  You know, when

15   you saw Lemagne come around, you could always tell that --

16             MR. GAVIN:  Judge, I guess I object to the

17   relevance.

18             THE COURT:  Yeah.  What's the point of this?

19             MS. GILBERT:  The next question I'm going to

20   ask, Your Honor, is what Brandon Lemagne's demeanor was on

21   this night, in contrast to his typical demeanor.

22             THE COURT:  That's fine.  Overruled.

23   BY MS. GILBERT:

24   Q    If you could please continue describing Brandon

25   Lemagne's typical demeanor.

Heather McWilliams – Direct                    79

1   A    So Lemagne would come up to me regularly and ask me

2   questions in the institution.  It was somebody that I

3   recognized, that I interacted with, that I enjoyed seeing

4   and being around.  Really had a very positive spirit.

5   Q    On that night, May 10th, 2018, what, if anything, did

6   you observe about Mr. Brandon Lemagne's demeanor?

7   A    When I saw Brandon Lemagne, he appeared defeated.

8   Q    What makes you say that?

9            MR. GAVIN:  Objection to the conclusion on that.

10  It's not an appearance.

11           THE COURT:  Instead of summarizing, just tell me

12  what you saw.

13  A    Brandon Lemagne was listless, didn't smile, seemed

14  very sad.

15  BY MS. GILBERT:

16  Q    Okay.  Without getting into what exactly Brandon

17  said, did you speak with Brandon Lemagne?

18  A    I did.

19  Q    What, if anything, did you do as a result of what

20  Lemagne told you?

21  A    I completed an affidavit with Inmate Lemagne, and at

22  that -- go ahead.

23  Q    And if I may pause you there.  Why did you take down

24  an affidavit?

25  A    An affidavit is a legal document that is completed.

1  It is the word of the individual that is part of that

2  affidavit, and then he signs that affidavit saying that it

3  is his actual legalized statement.

4           THE COURT:  Roughly what time is this happening?

5  Do you know?

6           THE WITNESS:  At the time that I took the

7  affidavit, sir?

8           THE COURT:  Yes, uh-huh.

9           THE WITNESS:  I would say approximately around

10  7:30.

11           THE COURT:  7:30 p.m.?

12           THE WITNESS:  That's correct.

13           THE COURT:  And is this before or after he went

14  to the hospital?

15           THE WITNESS:  This is before he went to the

16  hospital, sir.

17           THE COURT:  All right.  Go ahead.

18  BY MS. GILBERT:

19  Q    In your experience, Lieutenant McWilliams, what is

20  the purpose of an administrative affidavit in a sexual

21  assault allegation case?

22  A    Due to the seriousness of the nature of an

23  allegation, of a PREA allegation, we want to ensure that

24  the individual who is making the allegation, that we have

25  legal documentation, written documentation of their

1  statement.

2  Q     Without getting into any other details about what

3  Brandon said, Brandon Lemagne said, did he describe any

4  physical sensations he was experiencing at the time you

5  spoke?

6  A     Yes, he did.

7  Q     What did he describe?

8  A     He advised me his anus hurt.

9  Q     And without getting into any other details about what

10 Inmate Lemagne said, did he identify the person that he

11 said had sexually assaulted him?

12 A     Yes, he did.

13 Q     Who did he identify?

14 A     He identified Officer Chikosi Legins.

15 Q     Do you know Officer Chikosi Legins?

16 A     I do.

17 Q     How do you know him?

18 A     I was his supervisor.

19 Q     Do you see that person in the courtroom today?

20 A     I do.

21 Q     Could you please identify him for the record by

22 describing where he's sitting and what he's wearing?

23 A     Officer Legins is sitting to my left.  He appears to

24 be wearing a cream colored suit.

25           MS. GILBERT:  Let the record reflect that the

1   witness has identified the defendant.

2            THE COURT:  So noted.

3   BY MS. GILBERT:

4   Q    At some point did you also speak with Officer Ryan

5   McLaughlin in the lieutenant's office?

6   A    I did.

7   Q    Who is Officer McLaughlin?

8   A    He's another one of the officers that I supervise.

9   Q    What's your working relationship with him like?

10  A    We have a very good working relationship.  He's

11  someone I hold in very high esteem.

12  Q    What is Officer McLaughlin's demeanor typically like?

13  A    Very happy-go-lucky.  He's the type of individual

14  that lets a lot of things roll off his shoulders when we

15  have incidents in the institution, can always see the

16  half -- a half glass full of milk or something, full cup.

17  He just is a very positive individual.

18  Q    On the night of this incident, May 10th, 2018, and

19  without getting into what Officer McLaughlin said, did he

20  seem like his usual happy-go-lucky self?

21  A    He was not.

22  Q    How did he seem to you?

23  A    He was very upset.

24  Q    Without telling us what Officer McLaughlin told

25  you --

Heather McWilliams – Direct                    83

1          MR. GAVIN:  Judge, again, object to the

2    conclusion.  What does upset mean?  Is it an appearance?

3    Is it a description?  What did she see?

4          THE COURT:  What did you see?  Why do you think

5    he was upset?

6          THE WITNESS:  He asked to speak to me,

7    Your Honor.  He said that he was very upset.  He told me

8    upset.  He wanted to make me aware of something.

9          THE COURT:  He was in a serious mode, basically?

10          THE WITNESS:  He was.

11          THE COURT:  Okay.  We got it.  Let's move on.

12    BY MS. GILBERT:

13    Q    Did you take any actions based on what Officer

14    McLaughlin told you when you spoke with him?

15    A    Can you rephrase the question?  I'm sorry.

16    Q    Sure.  After speaking with Officer McLaughlin, did

17    you go about your affidavit any differently?

18    A    No, I did not.

19    Q    What were your primary concerns as you completed the

20    affidavit with Inmate Lemagne?

21    A    My primary goal was to get Inmate Lemagne medical

22    treatment.

23    Q    After you took Lemagne's affidavit, what happened

24    next?

25    A    Myself and two other staff members escorted Inmate

1   Lemagne to St. Mary's Hospital.

2   Q    Who were those other staff members?

3   A    Officer Joseph Green and Officer Ryan McLaughlin.

4   Q    Why did the three of you take Brandon Lemagne to

5   St. Mary's Hospital?

6   A    In the Federal Bureau of Prisons, most medium

7   security inmates go out with two staff members.  Although

8   Inmate Lemagne identifies as male, we wanted to make sure

9   that he had an advocate present with him that would be

10  there in the event that he was under any additional

11  distress.

12  Q    Who was that advocate?

13  A    Myself.

14  Q    And why in particular St. Mary's Hospital?  Why was

15  that the destination?

16  A    In the Federal Bureau of Prisons, at FCC Petersburg

17  component, we utilize St. Mary's Hospital to do rape kits.

18  Q    Why was it important for you to get Inmate Lemagne to

19  the hospital promptly?

20  A    Preservation of evidence.

21  Q    Who made the decision that Inmate Lemagne was to go

22  to the hospital?

23  A    It is part of our PREA protocol anytime we have an

24  alleged rape allegation.  So that is determined by the

25  procedures that we have in place.

1  Q    At the point that you took him to the hospital, had

2  he already been briefly evaluated in the medical unit at

3  Petersburg as far as you're aware?

4  A    Yes.

5  Q    Where did you go once you arrived at the hospital?

6  A    We were taken to a room in the hospital at

7  St. Mary's.

8  Q    What happened in that room?

9  A    We waited for an individual to come in to complete a

10 rape kit on Inmate Lemagne.

11 Q    Were you present for that examination?

12 A    No, I was not.

13 Q    Why not?

14 A    Because I'm female.

15 Q    Is that part of policy?

16 A    That is policy.

17 Q    What was Inmate Lemagne's demeanor like during this

18 examination?

19 A    Inmate Lemagne was sad.

20 Q    What happened after the examination?

21 A    We returned back to FCC Petersburg Medium.

22 Q    And without getting into what Brandon said, what was

23 Brandon Lemagne's demeanor on the way back to FCC

24 Petersburg?

25 A    Quiet, sad.

1   Q      Where did you take Lemagne when you got back to FCC

2   Petersburg?

3   A      We escorted Inmate Lemagne back to our special

4   housing unit in FCC Petersburg Medium component.

5   Q      What is the special housing unit?

6   A      That's where we house inmates for administrative

7   detention or disciplinary segregation.

8   Q      Why did you take Brandon Lemagne to the special

9   housing unit that night?

10  A      For his own safety and protection.

11  Q      Is that the typical practice to take people alleging

12  sexual assault to the special housing unit?

13  A      No, it is not.

14  Q      And why did you do that on this occasion?

15  A      He was involved in an alleged staff-related incident,

16  and for his protection against the alleged staff member,

17  we would safeguard that individual in the special housing

18  unit until we could move him out of the institution.

19  Q      What did you do once you had Lemagne safely back at

20  the facility?

21          THE COURT:  Why don't we start calling him

22  Mr. Lemagne.

23          MS. GILBERT:  Certainly, Your Honor.

24          THE COURT:  I think he deserves our respect.

25          THE WITNESS:  Yes.

Heather McWilliams – Direct                    87

1   BY MS. GILBERT:

2   Q    What did you do once you had Mr. Lemagne safely back

3   at the facility?

4   A    I went home.

5   Q    Did you get some sleep?

6   A    Yes.

7   Q    And what did you do the next day?

8   A    I was contacted by the captain, and he told me that I

9   would be transporting Inmate Lemagne to FCC Butner in

10  Butner, North Carolina.

11  Q    Why was Mr. Lemagne transferred to FCC Butner?

12  A    Mr. Lemagne was transferred to Butner for his own

13  safety.

14  Q    In your experience, how do inmates typically react to

15  being transferred to Butner?

16  A    It just depends on the circumstance.

17          MR. GAVIN:  Relevance.

18          THE COURT:  I don't see what's relevant about

19  this.  I mean, the point is they moved him from one prison

20  to another after he reported the attack.  Isn't that

21  what's going on here?

22          MS. GILBERT:  Yes, Your Honor.

23          THE COURT:  Do you have anything else?

24          MS. GILBERT:  I do, Your Honor.

25          THE COURT:  Let's --

1  BY MS. GILBERT:

2  Q    What was Brandon Lemagne's demeanor on the way to FCC

3  Butner?

4  A    Quiet and sad.

5  Q    Okay.  So let's take a step back from the events of

6  this case and talk a little bit about life at FCC

7  Petersburg.  Just briefly, can you tell the jury what it's

8  like going to work in a prison every day?

9  A    I usually give the example of going to Walmart,

10  except I know everybody in the institution is there

11  because they have been sentenced by the courts to be

12  there.

13  Q    At this point I'd like to show you some photographs.

14  But before I do, I'm going to read a stipulation to the

15  jury.

16          MS. GILBERT:  This is stipulation number 5.

17          THE COURT:  Okay.  Go ahead.

18          MS. GILBERT:  "Government Exhibits 5-A through

19  5-F are still photographs taken on May 11th, 2018, by a

20  Bureau of Prisons photographer of FCC Petersburg;

21  specifically, the unit team area of F-Unit, FCI Petersburg

22  Medium.  Defense Exhibit 8 consists of four still

23  photographs taken at the compound office located on FCI

24  Petersburg Medium.  There's no dispute as to the accuracy

25  and authenticity of these photographs."

Heather McWilliams – Direct                    89

1            And, Ms. Taylor, could we please pull up

2    Government Exhibit 5-A just for the witness?

3    BY MS. GILBERT:

4    Q    Lieutenant McWilliams, do you recognize what's in

5    that photograph?

6    A    I do.

7    Q    What does it show?

8    A    That is the administrative building at FCC Petersburg

9    Medium component.

10   Q    Is that a fair and accurate depiction of how it

11   looked back in May 2018?

12   A    Yes, ma'am.

13            MS. GILBERT:  I'd move to admit this exhibit and

14   publish it to the jury, Your Honor.

15            THE COURT:  That's fine.

16            You have no objection to any of these pictures,

17   right?

18            MR. GAVIN:  No, sir.

19            THE COURT:  All right.  They're all going to be

20   admitted, then.

21            MS. GILBERT:  Thank you.

22            THE COURT:  It's 5-A through what?

23            MS. GILBERT:  5-F, Your Honor.

24            THE COURT:  All right.  All these photos will be

25   admitted, then.  She's going to ask you what they are,

1  though.

2           THE WITNESS:  Yes, Your Honor.  Thank you.

3           MS. GILBERT:  I sure am.

4           (Government Exhibit Number 5-A was admitted.)

5           (Government Exhibit Number 5-B was admitted.)

6           (Government Exhibit Number 5-C was admitted.)

7           (Government Exhibit Number 5-D was admitted.)

8           (Government Exhibit Number 5-E was admitted.)

9           (Government Exhibit Number 5-F was admitted.)

10          (Defendant Exhibit Number 8-A was admitted.)

11          (Defendant Exhibit Number 8-B was admitted.)

12          (Defendant Exhibit Number 8-C was admitted.)

13          (Defendant Exhibit Number 8-D was admitted.)

14          (Defendant Exhibit Number 8-E was admitted.)

15          (Defendant Exhibit Number 8-F was admitted.)

16          (Defendant Exhibit Number 8-G was admitted.)

17          (Defendant Exhibit Number 8-H was admitted.)

18          (Defendant Exhibit Number 8-I was admitted.)

19          (Defendant Exhibit Number 8-J was admitted.)

20          (Defendant Exhibit Number 8-K was admitted.)

21          (Defendant Exhibit Number 8-L was admitted.)

22  BY MS. GILBERT:

23  Q    Could you please tell the jurors what this photograph

24  shows?

25  A    Yes, ma'am.  This is the administrative building at

1  the medium component.

2  Q    So when officers arrive to work at Petersburg, where

3  do they enter the facility?

4  A    They enter through the front doors underneath that

5  dark gray area, in between the American flag and the

6  Virginia flag.

7  Q    What kinds of things are officers allowed to bring

8  with them into the facility when they come to work every

9  day?

10 A    So you're authorized to bring a backpack.  If you --

11 God forbid you get drafted, you might want to bring some

12 snack items, food items.  You bring additional clothing,

13 such as jackets.  Personal items, medications.

14 Q    You used a term there.  What does it mean to be

15 drafted?

16 A    I apologize.  It means that you're required to work a

17 second shift.

18 Q    What kinds of things are officers not allowed to

19 bring into the facility?

20 A    So you're not allowed to bring weapons.  You're not

21 allowed to bring drugs that aren't issued to you by a

22 physician.  You're not allowed to bring drugs into the

23 institution, you know, like narcotics.  You're not

24 authorized to bring in contraband, hard contraband.

25 Q    What does the term "hard contraband" mean?

1  A     That would be, for example, escape paraphernalia,

2  drugs, weapons, cell phones.

3  Q     Are officers allowed to bring cigarettes with them

4  into the facility?

5  A     For their personal use.  We do have some areas where

6  they smoke.

7  Q     If an inmate has cigarettes, is that considered a

8  form of contraband?

9  A     Yes, it is.

10  Q     Would that be considered hard or soft contraband?

11  A     That would be hard contraband.

12  Q     In your experience as an officer at Petersburg, are

13  cigarettes a valuable commodity in prison?

14  A     Yes, they are.

15  Q     Why are they so valuable?

16  A     Because the inmate population are not allowed to

17  smoke.  It's a nonsmoking facility for them.

18  Q     Anything that they're not allowed to have inside is

19  valuable to them?

20  A     That's correct.

21        MS. GILBERT:  I'd like to please pull up,

22  Ms. Taylor, photograph 5-B.

23  BY MS. GILBERT:

24  Q     What does this photograph show?

25  A     This photograph represents, if you were standing on

1  the compound of the medium component with views of

2  Charlie -- or C and D unit and E and F unit.

3  Q     And so the units that are labeled there F and E and C

4  and D, what -- what goes on in those buildings?

5  A     So each unit is -- each building that you look at, it

6  actually has four housing units in it, and they house the

7  inmates.

8  Q     About how many inmates overall live in the medium

9  security facility?

10 A     As of right now, probably 1600 inmates.

11 Q     I'm going to circle an area on the photograph.  This

12 is the bottom half of the photograph.  What would you term

13 this area?

14 A     I would view it to be the compound.

15 Q     Are inmates allowed to walk around in that compound

16 area?

17 A     They are allowed to walk in the upper half by the

18 housing units, but they are not allowed to walk around the

19 center area off to your left or down below the bushes

20 without staff authorization.

21          THE COURT:  So they can basically walk on the

22 grass.  Is that what you're saying?

23          THE WITNESS:  No.  They're allowed to walk on

24 the grass.  I apologize.

25          THE COURT:  Oh, I'm just asking you.  You don't

1   have to apologize.

2   BY MS. GILBERT:

3   Q    Just to clarify, Lieutenant McWilliams, you were

4   describing the sidewalk areas that sort of bisect the

5   photograph there.

6   A    That's correct.

7   Q    That's where inmates are allowed to walk?

8   A    That's correct.

9   Q    When are inmates allowed to walk on those sidewalks?

10  A    At the medium component, it's going to be when we

11  have our open movements.  It's usually at the top of the

12  hours.

13  Q    Is that sometimes called an inmate move?

14  A    That's correct.

15  Q    When inmates are not in this area such as on a move,

16  does it appear basically as it does in this photograph?

17  A    Yes, it does.

18  Q    Okay.

19       MS. GILBERT:  I'd like to ask Officer Spivey to

20  please bring up what's been previously marked for

21  identification purposes as Government Exhibit 7, which is

22  the large diagrams that are over here?

23       THE COURT:  Let me ask you this, Ms. Gilbert.

24  How much longer do you plan to be with this witness?

25       MS. GILBERT:  A significant amount of time, Your

1  Honor.

2              THE COURT:  All right.  We're going to take our

3  morning recess, then.  We're going to take a recess for 15

4  minutes.  I promised you around 11:00.  As you noticed,

5  I'm two minutes behind on everything.  So we're going to

6  have a 15-minute break.

7              All rise for the jury.

8              (The jury exited the courtroom.)

9              THE COURT:  Lieutenant, you can also step

10  outside, but don't talk about your testimony with anybody.

11  Do you understand?

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  Ms. Gilbert, from now on, we're

14  going to make sure we call everybody by Mr. and Ms.,

15  everybody, going forward.  Are you with me on this?

16             MS. GILBERT:  Certainly, Your Honor.

17             (Recess from 11:05 a.m. until 11:21 a.m.)

18             THE COURT:  All right.  My law clerk said the

19  government wants to do something?

20             MR. GARNETT:  We do, Your Honor.  We just wanted

21  to bring something to the Court's attention in terms of

22  what we'll be doing a little bit later in this trial --

23  actually, is this now?

24             MS. GILBERT:  The next step.

25             MR. GARNETT:  All right.  So the next step, or

Heather McWilliams – Direct                    96

1  between now and lunch, Your Honor, we are going to be

2  playing a portion of the video that covers from the time

3  that the defendant and the victim walked into a corridor,

4  the door is closed, and there's a period of time that

5  elapses before anyone emerges back out of that corridor.

6            Our plan is to play that section of the video.

7  We are sensitive of the jury's time, but --

8            THE COURT:  All right.  How long is this going

9  to take?

10           MR. GARNETT:  Five minutes and 13 seconds,

11 Your Honor.

12           THE COURT:  That's fine.

13           MR. GARNETT:  Thank you, Your Honor.

14           THE COURT:  Is that it?

15           MR. GARNETT:  That's it, Your Honor.

16           THE COURT:  Okay.  Let's bring the witness back

17 in.

18           All right.  We are going to bring the jury back

19 in.

20           All rise for the jury.

21           (The jury entered the courtroom.)

22           THE COURT:  All right.  Everybody can be seated.

23           Everybody doing okay over there?

24           A JUROR:  Yes.

25           THE COURT:  All right.  Ms. Gilbert, you can

1    pick back up again.

2            MS. GILBERT:  Thank you, Your Honor.

3            At this time I'd like to ask Officer Spivey to

4    bring up to the easel what's been previously marked for

5    identification as Government's Exhibit 7.

6            THE COURT:  That's already admitted, though,

7    right?

8            MS. GILBERT:  I believe the authenticity has

9    been stipulated to.

10           THE COURT:  All right.  You have no objection,

11   right?

12           MR. GAVIN:  I don't.

13           THE COURT:  All right.  It's admitted.

14           MS. GILBERT:  Thank you, Your Honor.

15   BY MS. GILBERT:

16   Q    Lieutenant McWilliams, could you please explain to

17   the jurors what we're looking at?

18   A    Yes.  This is a picture of --

19           THE COURT:  Hold on one second.

20           MR. GAVIN:  Your Honor, permission to move so I

21   can see.

22           THE COURT:  Oh, yeah.  Go ahead.  You don't have

23   to ask.

24   BY MS. GILBERT:

25   Q    I'm sorry.  If I could pause you there Lieutenant

1  McWilliams.

2            MS. GILBERT:  Ms. Taylor, is it possible to

3  bring up on the screen for the jurors the --

4            MS. TAYLOR:  I'm sorry.  Which exhibits did you

5  say?

6            MS. GILBERT:  Seven, please --

7            MR. GAVIN:  If it's on the screen --

8            MS. GILBERT:  It might be a little easier for

9  everyone to see.  I know it's kind of far away, but --

10           THE COURT:  Feel comfortable to move around.

11 Whatever you need to do.  Don't worry about it.

12           MR. GAVIN:  Thank you.

13           MS. GILBERT:  Is it possible to --

14           MS. TAYLOR:  I'll work on it.

15           MS. GILBERT:  Okay.  Thank you, Ms. Taylor.

16 BY MS. GILBERT:

17 Q    Lieutenant McWilliams, what are we looking at here?

18 A    We are looking at a picture of the medium component.

19 Q    And so what's that structure sort of in the bottom

20 middle of the diagram?

21 A    When you're talking about the bottom middle, would

22 that be the 1M?

23 Q    Yes.

24 A    That's the administration building.

25 Q    Okay.  And then there are some structures that are

1   kind of at the top of the diagram in a half circle

2   formation.  What are those?

3   A    Are you describing 32, 33 and 34?

4   Q    I am.

5   A    Okay.  Those are the housing units.

6   Q    Okay.  So this is an overall image of the medium

7   security facility, correct?

8   A    That's correct.

9            MR. GARNETT:  Your Honor, if we could publish

10  this to the jury?  I'm sorry.  It appears it's not on the

11  screen.

12           THE COURT:  Yeah.  It's already admitted.  It's

13  ready to roll.

14           MS. TAYLOR:  It is admitted.  It's just not on

15  the screen.  The jury can't see it.

16           THE COURT:  Ms. Garner.

17           While she's bringing that up, Lieutenant, if you

18  want to stand and point to things, you can do it.  Just

19  make sure that you speak towards the microphone so we can

20  hear you.  But feel comfortable, if it's easier for you,

21  to stand and point.  Okay?

22           THE WITNESS:  Yes, Your Honor.  Thank you.

23           MS. GILBERT:  It looks like the Elmo --

24           THE CLERK:  Is it on your computer?

25           MS. GILBERT:  This looks to me like it's showing

Heather McWilliams - Direct                     100

1   the Elmo.

2           MR. GAVIN:  Do you want me to turn the Elmo off?

3           MS. GILBERT:  Okay.  So the -- what the jurors

4   are looking at -- can the jury see it?

5           THE CLERK:  One moment.  My system is blinking

6   on and off.

7           MS. GILBERT:  Your Honor, I just have one more

8   question about this exhibit.  If the jurors can see it

9   decently, we could probably move --

10          THE COURT:  I'll tell you what.  Here's what

11  we're going to do.  Okay.  Can you all see it or would you

12  rather have it moved closer to you?  Are you okay?  Can

13  you see it?

14          A JUROR:  Yeah.  We're fine.

15          THE COURT:  Okay.  If you can't see what's going

16  on, you let me know.  Okay?  We're going to do this old

17  school way, which is with an easel.

18          MS. GILBERT:  Thank you, Your Honor.

19  BY MS. GILBERT:

20  Q    Lieutenant McWilliams, just one more question.  What

21  you can see is number 34, but which the jurors probably

22  can't see.  If you don't mind getting up and pointing it

23  out.  Can you explain what that building is?

24  A    Building 34 is the one located towards -- furthest

25  towards the right.  It looks like a bow tie, an inverted

1  bow tie.  That would be E and F unit on the medium

2  component institution.

3  Q    And so when you're standing in the compound, which is

4  the yard area you described earlier and you're looking,

5  the F unit is off to your right?

6  A    That's correct.

7  Q    Can you explain how F and E unit relate to one

8  another?

9  A    Yes.  So E would be the bottom unit.  F would be the

10  top unit.

11  Q    And so the three housing units that are in that half

12  circle formation, is it correct that the first building

13  over there on the left side of the diagram is A and B,

14  then C and D, then E and F?

15  A    That is correct.

16  Q    Thank you, Lieutenant McWilliams.

17  A    You're welcome.

18        MS. GILBERT:  Officer Spivey, can I ask you to

19  switch out the diagram?  We just have one more.  We'll

20  move quickly through it.

21        THE COURT:  Which one do we have?

22        MS. GILBERT:  This is Government's Exhibit 6,

23  Your Honor.

24        THE COURT:  Any objection?

25        MR. GAVIN:  No, sir.

1           THE COURT:  Admitted.

2           MS. GILBERT:  Thank you.

3  BY MS. GILBERT:

4  Q    Lieutenant McWilliams, what does this diagram show?

5  A    Based on what is written on this diagram, it shows

6  that it is F housing unit first floor.

7  Q    Earlier you described one of the housing units as

8  being in kind of a bow tie shape.

9  A    That's correct.

10 Q    What are the two triangular areas that this diagram

11 depicts?

12 A    So the area to your left would be the south unit.  So

13 that would be F-South.  And the area to your right would

14 be F-North.

15 Q    What connects F-South to F-North?

16 A    The units, F-South and F-North, are connected by a

17 hallway.

18 Q    How would you refer to that hallway?

19 A    It would be the unit team area hallway.

20 Q    What are some of the -- the diagram depicts rooms or

21 structures located off of that hallway.  Can you describe

22 briefly what those rooms are?

23 A    Yes, ma'am.  If I was to enter from Foxtrot South

24 unit and enter into the hallway, to the left, the second

25 door to the left would be the unit manager's area and unit

1  secretary area.

2         THE COURT:  Can you point to that?

3  A    Yeah.  I was going to.  That would be right here.

4  That would be the unit secretary, and then this is unit

5  manager's area.  If we're on this hallway, to the right

6  that's going to be a case manager's office.  Here is an

7  elevator.  There's another case manager's office, and the

8  other rooms are utility closets.

9  BY MS. GILBERT:

10 Q    What is on either end of that hallway?  Are there

11 doors on either end of the hallway?

12 A    Yes, ma'am.  Egress areas.

13 Q    Are those doors typically locked?

14 A    Yes, they are.

15 Q    Just overall, can you explain how doors work in a

16 prison?

17 A    Yes.  In our federal prison, and all federal prisons,

18 based on the security levels of the institution, all doors

19 are secured.  So sometimes we utilize Folger Adam keys.

20 Otherwise we utilize keys that we commonly use for our

21 home or other areas.  They are smaller sets of keys.  So

22 every area inside a federal prison is secured with the

23 exception of areas not accessible to inmates.  So -- or

24 camp inmates may not have all the doors secured there.

25 Q    The camp is a lower security facility than the

1  medium?

2  A    Yeah.

3  Q    And so if you, as an officer, move into the unit team

4  area hallway, that area you described that connects the

5  housing units, would you unlock the door and then lock it

6  behind you; is that correct?

7  A    That's correct.

8  Q    My next plan was to bring up a photograph.

9          THE COURT:  Okay.  We're going to try.  See how

10 it works.  Okay.  Why don't we -- you can take that down.

11         THE CLERK:  IT.

12         THE COURT:  IT is coming up?

13         MS. GILBERT:  I can move to another area of

14 questions and come back to this, Your Honor.

15         THE COURT:  Yeah.  Why don't you do that here

16 until we figure this out.

17 BY THE COURT:

18 Q    Lieutenant McWilliams, let's talk about the inmates

19 who live in housing units like the one you just described.

20 Do inmates at FCI Petersburg have jobs?

21 A    Yes, they do.

22 Q    Is every inmate assigned a job?

23 A    Yes, they are.

24 Q    Does that mean that every inmate actually works?

25 A    No, it does not.

1  Q     Can you explain that?

2  A     Yes.  So if we have 1600 inmates in a prison, you may

3  have maybe 20 to 30 inmate details.  For example, they

4  would work on the compound, cleaning up the compound that

5  was shown earlier today.  They may work in the recreation

6  department.  They may work in facilities, but there isn't

7  always the ability for them to work four hours or eight

8  hours in a given time period.

9            So they may have to just come in, sign in saying

10  that they have shown up at that location, and then they

11  are gone for the day, and they are excused.

12  Q     Are there also educational opportunities for inmates

13  at Petersburg?

14  A     Yes, there are.

15  Q     What about legal research?  Is there a place for

16  inmates to do legal research?

17  A     Yes.  There's a law library.

18  Q     And what sort of Internet research is available in

19  that law library?

20  A     So they can view case law.  They can view appeals on

21  computers, but it's a very limited access.

22  Q     Can inmates use Google to look things up?

23  A     No, they cannot.

24  Q     What about e-mail?  Can inmates use e-mail?

25  A     Yes, they can.

1  Q      Does it cost money for inmates to use e-mail?

2  A      Yes, it does.

3  Q      Are those e-mails monitored?

4  A      Yes, they are.

5             THE COURT:  Hold on a second.  Are we okay?

6             THE CLERK:  No, sir.

7             THE COURT:  Go ahead.  I'm sorry.

8  BY MS. GILBERT:

9  Q    I'm going to jump around here a little bit to try and

10 keep moving without photographs.  Lieutenant McWilliams,

11 you were talking earlier about the LGBTI population there

12 at Petersburg.  Does Petersburg have a significant LGBTI

13 population?

14 A    Yes, we do.

15 Q    Do all BOP employees receive training on working with

16 those inmates?

17 A    Yes, we do.

18 Q    You also used the term transgender earlier.  How is

19 being transgender different than being gay or lesbian?

20 A    So our transgender population physically are men, but

21 they are individuals who identify as a different gender,

22 usually feminine, female.

23 Q    Can you explain to the jurors how it works that

24 Petersburg is a men's prison but houses transgender

25 inmates?

1   A     So the individual themselves determines who they

2   choose to be.  An individual, by all intents and purposes,

3   is born male, but if they feel they are female, we are in

4   no position to tell them otherwise, and we treat them as

5   if they are females.

6   Q     But if an inmate has male genitalia, that inmate will

7   be sent to a male facility; is that correct?

8   A     That's correct.

9   Q     Do the gay and transgender prisoners live with

10  everyone else at Petersburg?

11  A     Yes, they do.

12  Q     In your experience -- you mentioned earlier that

13  LGBTI prisoners are at risk of victimization.  Other than

14  that, how do they get along at Petersburg?

15  A     They get along quite well.  We are very much in

16  tune -- our psychology staff, our admission -- are very

17  much in tune to the needs of that population.  So when

18  they have issues, we make sure that it's addressed

19  immediately.

20  Q     Have you ever heard inmates refer to Petersburg as

21  Sweetersburg?

22  A     Yes, ma'am.

23  Q     What does that mean to you?

24              MR. GAVIN:  Objection to the relevance.

25              THE COURT:  Yeah.  What's the point of this?

1          MS. GILBERT:  Your Honor, the prison environment

2     is relevant to everything that happens in this case,

3     including the victim's credibility.

4          THE COURT:  So what's the nickname of the prison

5     have to do with this?

6          MS. GILBERT:  Sweetersburg?

7          THE COURT:  You've pointed out that he's

8     transgender.  We got that.  Okay.  And we understand that

9     they can be victimized.  We've established that.  I think

10    we need to move on.

11         Let me ask you this.  Do you want to go back to

12    the pictures?  And I know you're going out of kilter, and

13    I appreciate you doing that, but, you know, what we could

14    also do is this.  Do you have hard copies of the pictures?

15    Because we could circulate the pictures amongst the jury.

16    That's the way it used to be done in the old days, and we

17    could do that here.

18         MS. GILBERT:  But the other issue, Your Honor,

19    is that the next thing I was going to do is play some

20    surveillance footage with Lieutenant McWilliams.

21         THE COURT:  Well, I thought you were going to do

22    photos and then our IT thing fell apart.

23         MS. GILBERT:  I was.

24         THE COURT:  So what if we do this.  Let's do the

25    photos.

1          MS. GILBERT:  Sure.

2          THE COURT:  We can show them to the witness, and

3    then what we'll do is we'll circulate the photos to each

4    one of you.

5          MR. GARNETT:  I think, Your Honor, we could also

6    use that system over there.  I think that would

7    actually -- it looks like that would still work on the

8    screens possibly.

9          THE COURT:  Do you want to try that?

10         MR. GARNETT:  Yes, Your Honor.  I think that

11   would probably be easier --

12         THE CLERK:  Is that the evidence cart?

13         MR. GARNETT:  I'm sorry, Cheryl.

14         THE CLERK:  Do you want to use the evidence

15   cart?

16         THE COURT:  The Elmo.

17         THE CLERK:  Oh, Elmo?

18         MS. TAYLOR:  Yeah.

19         MR. GARNETT:  Or the evidence cart.  I'm not

20   sure which that is.

21         THE CLERK:  It's the evidence cart.  We can try

22   it.  He says that the computer is just looping and looping

23   and --

24         THE COURT:  Okay.  Hold on a second.

25         (Discussion off the record.)

1          THE COURT:  So let's see if we can get that

2    thing working over there.  If not, we'll circulate some

3    photos.  You might get a little bit of an earlier lunch.

4    So -- because I don't want to waste your time.  I'd rather

5    have them fix it while you're eating so we can keep

6    moving.  Not working?

7          THE CLERK:  Yes, sir.  It's not working.

8          THE COURT:  All right.  Here's what we're going

9    to do.  Do we have hard copies of these pictures?

10         MR. GARNETT:  We do, Your Honor.

11         THE COURT:  Okay.  Here's what you're going to

12   do.  You're going to show that photo to the witness.  The

13   witness is going to describe what it is.  We're going to

14   circulate the hard copy to each one of the jurors, and

15   after every one of them has seen it, we're going to go to

16   the next one.  Okay?  It might be a little bit slower, but

17   that's the way we're going to do it.  That's the way we

18   used to do it in the old days.  Okay?

19         MS. GILBERT:  Fortunately, it's just one more

20   paragraph, but then unfortunately, it's surveillance

21   footage time.

22         THE COURT:  All right.  We're going to do the

23   best we can.

24         MR. GARNETT:  Which one do you need?

25         MS. GILBERT:  I'm sorry.  It's 5-C, please.

1              May I approach the witness?

2              THE COURT:  Of course.  Just give it to Officer

3  Spivey.

4              All right.  This is Exhibit 5-C, for the record.

5              MS. GILBERT:  Yes.  Thank you, Your Honor.

6              THE COURT:  Okay.

7  BY MS. GILBERT:

8  Q    And, Lieutenant McWilliams, I'll ask you to hang on

9  to that for just a moment, and then we'll pass it around.

10 A    Yes, ma'am.

11 Q    Overall, what does this photograph show?

12 A    It appears to be the south side of a housing unit.

13 Q    Have you ever worked the housing unit personally?

14 A    Yes, I have.

15 Q    And who can access the concrete floored area to the

16 left side of the photograph?

17 A    The inmate population can -- once staff allow them --

18 to come out of their cells.

19 Q    So basically, in each housing unit there's sort of a

20 common area in the middle?

21 A    That's correct.

22 Q    You also see some cell doors around the periphery of

23 the housing unit?

24 A    Yes, ma'am.

25 Q    And so when inmates are allowed to move in that

1  common area, those doors are locked, correct?

2  A    When the inmates are out in the common areas, the

3  doors are unlocked.

4  Q    I'm sorry.  They're not locked at that time?

5  A    That's correct.

6  Q    There's an open door in that photograph, in the

7  middle of the photograph.  Can you see it?

8  A    Yes, I can.  It's very dark, though.

9  Q    It's not the best photograph.  What does that door go

10 to?

11 A    The open door is the door for the officers' station.

12 Q    And is that where the housing unit officer may go to

13 work during -- while they're assigned to work in the

14 housing unit?

15 A    Yes.  They have a computer in there and a desk.

16         MS. GILBERT:  I think at this point, Officer

17 Spivey, if you would, we could show the jury and pass it

18 around.

19 BY MS. GILBERT:

20 Q    What are the duties of --

21         THE COURT:  Hold on a second.  So we're not

22 going to do anything while it's circulating.  I want them

23 to focus on the picture.

24         MS. GILBERT:  Okay.

25         THE COURT:  So everybody will take a look at the

1  picture.  You'll pass it around.

2          All right.  So the record is clear, we're having

3  technical difficulties with displaying the photographs.

4  So what we've done is we've sent 5-C around.  I think

5  every one of the jurors have had an opportunity to observe

6  it.  So now we'll move forward.

7          MS. GILBERT:  Thank you, Your Honor.

8  BY MS. GILBERT:

9  Q    Exhibit 5-C shows a housing unit you were saying

10  earlier.  What are the duties of an officer assigned to

11  work in a housing unit?

12  A    Correctional officers are hired to provide safety and

13  security for the inmates that are held at our institution.

14  So they would be assigned to a housing unit.  They conduct

15  rounds in the housing unit.  They open doors.  They ensure

16  that inmates aren't dealing with any medical concerns, any

17  personal concerns.

18  Q    About how many inmates is an officer in a housing

19  unit overseeing at any time?

20  A    So in the particular unit that we discussed previous,

21  in Foxtrot South, you would have one officer in that unit.

22  Q    About how many inmates is that officer overseeing?

23  A    Anywhere between 75, in one of the program units, to

24  about 160.

25  Q    Okay.  Can correctional officers obtain background

1  information about inmates?

2  A    Yes.

3  Q    What kind of information can correctional officers

4  generally obtain about inmates?

5  A    It's determined by what access they have in our

6  computer systems.

7  Q    Okay.  And what are some of the things that they

8  might be able to access in your computer systems?

9  A    We have a system called SENTRY, which is a system

10 that compiles information regarding inmates' information

11 while they're incarcerated in the institution.  We call

12 that a PP44.  That would tell us what the inmate's

13 sentence is, and then it would tell us where they have

14 been housed, who their unit team members are, if they have

15 a security threat, group assignments.  There's something

16 called a PP-Go, which is accessible to most of the staff.

17 That would be that initial input information from the

18 court system into the Federal Bureau of Prisons.

19         And then we have other documentation that may

20 show movement from certain housing units or certain work

21 areas just in general.  So if somebody was assigned to

22 work on the compound and then they are moved to work in

23 recollection, it would show that in the database as well.

24 Q    I'm going to ask you a question about officers'

25 access to presentence reports, but before I do, would you

1  please let the jury know when a presentence report is?

2  A    Yes.  A presentence report is compiled by the

3  probation office, and it is -- it's like the story of an

4  individual that's incarcerated.  So it will discuss from

5  the time that they were young, their parents, any type of

6  crimes that they were involved in, if they have health

7  issues, medical issues.

8          MR. GAVIN:  Judge, may I object?  I object to

9  the relevance unless there's going to be some basis to tie

10  this into the fact to Mr. Legins may have actually looked

11  at any of these systems.

12          THE COURT:  Well, that's what she's going to get

13  to.  So it's overruled for now.

14  BY MS. GILBERT:

15  Q    Is it possible for a probation officer to read an

16  inmate's presentence report?

17  A    No, it is not.

18  Q    Who has access to presentence reports?

19  A    So unit team members have access to presentence

20  reports.  I would have access to presentence reports due

21  to the fact that I have to find intelligence sometimes in

22  them.  So people assigned to the SIS office.  It's a

23  need-to-know document.

24  Q    You mentioned unit team members, and earlier you

25  described the unit team office.  Who is the unit team?

1  A      So when I talk about the unit team, I'm talking about

2  the unit manager, the case manager, the unit counselor,

3  and the unit secretary.

4  Q      And just briefly, what do those folks do?

5  A      The unit manager oversees all of the actions that

6  occur in the housing unit, whereas correctional office

7  service, the department that I'm in, we oversee the safety

8  and security of the institution.  We're all correctional

9  workers first.  However, they have a very specific role.

10 So they're going to make sure that they are attentive to

11 the needs of the inmate in regards to when they get out of

12 prison, are they eligible to go to a halfway house, those

13 types of things.

14 Q      And during what hours is the unit team office area

15 that you described earlier typically staffed?  When are

16 the unit team members in there?

17 A      It's usually staffed anywhere from 6 a.m. to about 5

18 to 6:00 p.m.

19         MS. GILBERT:  Your Honor, at this point I have

20 sort of reached the end of the road before we get the

21 surveillance piece.

22         THE COURT:  Is there anything else you can put

23 on before the surveillance?

24         MS. GILBERT:  You know, there is one set of

25 questions I could ask.

1  BY MS. GILBERT:

2  Q    Lieutenant McWilliams, let's talk a little bit before

3  officer training.  As a correctional officer, have you

4  received training on sexual contact between correctional

5  officers and inmates?

6  A    I have received training on handling cases of that

7  nature, yes.

8  Q    To your knowledge, when does a Bureau of Prisons

9  correctional officer first receive training about the

10 policy regarding officer sexual contact with inmates?

11 A    When staff are initially hired in the Federal Bureau

12 of Prisons, we can go through institution familiarization.

13 It's a two-week class.  We have to sit down with the

14 staff, and we go through all of the policies within the

15 Federal Bureau of Prisons that apply to them in the

16 correctional setting.  And that would be included in that.

17 Q    In your experience, is there any repeat or refresher

18 for that topic and training?

19 A    Yes.  We use a lot of acronyms in the BOP, so I

20 apologize, but it's ART, which is Annual Refresher

21 Training.  And we go through that every year.

22 Q    To your knowledge, are all correctional officers at

23 Petersburg trained on the rules around sexual contact with

24 inmates?

25 A    Yes, we are.

Heather McWilliams – Direct                118

1   Q     Are there also posters around the facility reminding

2   officers of the rule?

3   A     Yes, there are.

4   Q     What is the basic rule, Lieutenant McWilliams, when

5   it comes to officers having sex with inmates?

6   A     The Federal Bureau of Prisons does not condone sexual

7   improprieties with the inmate population.

8             MS. GILBERT:  Now I'm a little bit stuck,

9   Your Honor.

10            THE COURT:  That's all you have other than the

11  surveillance?

12            MS. GILBERT:  Yes, Your Honor.

13            THE COURT:  All right.  Folks, here's what we're

14  going to do.  Obviously, we have a technical issue.  These

15  things happen in trials.  There's a snafu with everything.

16  What I'm going to do is this.  We're a little bit early on

17  the lunch routine, but I want to fix this while you're

18  eating so we can move forward.  So I'm going to give you

19  an hour and ten minutes for lunch.  Meaning we'll

20  reconvene at 1:00.  That should give our IT people ample

21  time to get this thing fixed, and then we'll have

22  appropriate breaks in the afternoon.  You might end up

23  having two breaks instead of one as we move forward to

24  5:00.  Does that make sense to you all?

25            Remember that you're not to discuss the case

1  even amongst each other during this time period.  Talk

2  about everything else.  Talk about how our IT system

3  stinks.  Talk about how bad the weather is.  Just don't

4  talk about the case.  Does that sound fair to you all?

5            All right.  All rise for the jury.

6            (The jury exited the courtroom.)

7            THE COURT:  Lieutenant, I am going to remind you

8  again not to talk about your testimony with anybody else

9  over lunch.

10           THE WITNESS:  Yes, Your Honor.

11           THE COURT:  I'm going to ask everybody to be

12  back at ten till because I want to make sure this thing is

13  functioning beforehand.

14           Perhaps, Ms. Taylor, you could eat a little bit

15  quicker than everybody else and come back early to make

16  sure that surveillance video works, because I know you're

17  a magician with that thing.  Okay?

18           (Recess from 11:50 a.m. until 12:52 p.m.)

19           THE COURT:  Okay.  We're just going to do a

20  quick test run.  We'll make sure this thing works, and

21  then we'll bring the jury in a couple minutes early.

22           Okay.  Is that what you want to do?

23           MS. GILBERT:  Yes, Your Honor.

24           THE COURT:  I gather you added the circles on

25  there?

1          MS. GILBERT:  Yes, Your Honor.

2          THE COURT:  All right.  And you have no

3  objection on that?

4          MR. GAVIN:  No, sir.

5          THE COURT:  Are you going to ask the witness who

6  those people are in the circles?

7          MS. GILBERT:  Yes, Your Honor.

8          THE COURT:  Okay that's fine.  All right.

9          THE CLERK:  I'm sorry, Judge.  My PC is not

10 working.

11         (Discussion off the record.)

12         THE COURT:  All right.  While they're fixing

13 that, Mr. Garnett, did you have something?

14         MR. GARNETT:  Yes, Judge.  I've already spoken

15 to Mr. Gavin about this.  But I was standing outside the

16 courthouse doors a little bit earlier during the lunch

17 break, and I observed an individual come up and stop in

18 front of them and couldn't figure out how to trigger the

19 automatic opening.  So I said "right there," and I pointed

20 to the right side.  And I realized after I had done it

21 that he was a juror.  We didn't exchange anything else.  I

22 just -- an abundance of caution.  Thank you, Judge.

23         THE COURT:  All right.  Thank you.  That's our

24 least problem right now.  We've got to get the IT going.

25         Okay.  Let me ask you this.  Other than the

Heather McWilliams – Direct                    121

1   surveillance video, do you guys have any other videos

2   you're going to play this afternoon?

3               MS. GILBERT:  Just the surveillance, Your Honor.

4   It is multiple surveillance videos.

5               THE COURT:  Okay.  All right.

6               And, Mr. Gavin, do you intend to have -- you're

7   going to cross after this?  If we play it one time is what

8   I'm asking, is that going to be --

9               MR. GAVIN:  I'm hoping that should be enough.

10              THE COURT:  Okay.  All right.  We're going to

11  roll with it.  We're going to do the best we can here

12  because we need to keep moving.

13              MS. GILBERT:  I appreciate that, Your Honor.

14              THE COURT:  Okay.  All right.  Do you want to

15  bring the jury in?

16              All rise, then, for the jury.

17              (The jury entered the courtroom.)

18              THE COURT:  All right.  Everybody can be seated.

19              Folks, we're winging it a little bit here with

20  the schedule, but we think the monitors are working.  At

21  least most of them.  Most importantly, your monitors.  If

22  your monitors don't work when we play this thing, you have

23  to let me know.

24              Secondly, somebody has a question about whether

25  or not you all can ask questions.  That answer is no.

Heather McWilliams – Direct                    122

1  It's up to the lawyers, and I'll chime in every now and

2  then just to clarify something, but you're going to have

3  to roll with us.  Okay?

4           Lastly, we're going to take two breaks this

5  afternoon.  We're just going to kind of make it up as we

6  go based upon where the witnesses fall and stuff like

7  that.  Okay?  Everybody else okay?  This is the way things

8  happen in trials.  It's not television.  So we have our

9  bumps in the road every now and then.

10          Do you want to bring the lieutenant back in?

11          All right.  Lieutenant McWilliams, I'm going to

12  remind you you continue to be under oath.  And did you

13  heed my instructions about not talking to anybody about

14  your testimony?

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  All right.  Ms. Gilbert, you can

17  continue.

18          MS. GILBERT:  Thank you, Your Honor.

19  BY MS. GILBERT:

20  Q    All right.  Lieutenant McWilliams, welcome back.

21  A    Thank you.

22  Q    Let's switch gears back to this investigation.  As

23  far as you know, was surveillance footage collected as

24  part of the investigation into Brandon Lemagne's

25  allegations?

1  A     Yes, it was.

2          MS. GILBERT:  Your Honor, at this time I will

3  read into the record stipulation number 4 regarding the

4  surveillance footage.

5          "Government Exhibits 1 and 2 are recordings of

6  surveillance video captured by surveillance cameras

7  maintained at FCC Petersburg March 16th" -- that's

8  Exhibits 1A through 1E -- "and May 10th" -- that's

9  Exhibit 2-A through 2-E -- "of 2018.  There is no dispute

10 as to the accuracy or authenticity of these videos or to

11 the accuracy of the date and time stamps contained

12 thereon."

13         THE COURT:  Do you want to address the issue

14 about the circles around people?

15         MS. GILBERT:  Certainly, Your Honor.

16         THE COURT:  You've added -- you're going to see

17 in the surveillance photos they added some circles around

18 two of the inmates just to draw your attention a little

19 bit, without any type of dispute.  I guess the lieutenant

20 is going to identify who those people are.

21         MS. GILBERT:  Thank you, Your Honor.

22         THE COURT:  That's the only change that's been

23 made to the videos, right?

24         MS. GILBERT:  And if I may, Your Honor, I

25 believe there are no objections to these exhibits.  So I

Heather McWilliams – Direct                    124

1   will move to admit them.

2              MR. GAVIN:  I'm not objecting.

3              THE COURT:  Yeah, they're admitted.

4              MS. GILBERT:  Thank you, Your Honor.

5              (Government Exhibit Number 1 was admitted.)

6              (Government Exhibit Number 1-A was admitted.)

7              (Government Exhibit Number 1-B was admitted.)

8              (Government Exhibit Number 1-C was admitted.)

9              (Government Exhibit Number 1-D was admitted.)

10             (Government Exhibit Number 1-E was admitted.)

11             (Government Exhibit Number 2 was admitted.)

12             (Government Exhibit Number 2-A was admitted.)

13             (Government Exhibit Number 2-B was admitted.)

14             (Government Exhibit Number 2-C was admitted.)

15             (Government Exhibit Number 2-D was admitted.)

16             (Government Exhibit Number 2-E was admitted.)

17             MS. GILBERT:  Ms. Taylor, may I ask you to

18   please pull up Government's Exhibit 2?  And at this point

19   could you please hit play and then pause it about five

20   seconds in at the time stamp on the upper left 18:09:09.

21             (Video Played.)

22             MS. GILBERT:  Thank you, Ms. Taylor.

23             Is everybody able to see the video?

24             THE COURT:  Can you all see it?

25             A JUROR:  Uh-huh.

1           THE COURT:  Okay.

2    BY MS. GILBERT:

3    Q    Lieutenant McWilliams, have you previously reviewed

4    this video?

5    A    Yes, I have.

6    Q    Are you able to see it over there on your screen?

7    A    Yes, I am.

8    Q    Okay.  Can you please tell the jurors, if you know,

9    who is the person in the circle on the video that appears

10   on the right side of the screen?

11   A    On the right side of the screen in the gray uniform

12   is Officer Chikosi Legins.

13   Q    And there's another person in a circle in the upper

14   middle portion of the screen where it's paused here at

15   18:09:09.  Do you recognize that person?

16   A    Yes, I do.

17   Q    Who is that?

18   A    That is Brandon Lemagne.

19   Q    Is he the same individual who reported a PREA

20   incident?

21   A    Yes, he is.

22   Q    For those of us who can't quite see in the video, is

23   there a size difference between the defendant and Brandon

24   Lemagne?

25   A    Yes, there is.

Heather McWilliams - Direct                126

1  Q     Based on your memory of the two individuals, how

2  would you describe that size difference?

3  A     Without having their -- their heights in front of me,

4  I can tell you that I am five foot ten.  Brandon Lemagne

5  is about five foot six, and Mr. Legins is taller than me.

6  Q     Okay.

7  A     Stature-wise, Mr. Legins, at the time, had a very

8  large stature.  Brandon Lemagne had a smaller stature.

9  Q     Thank you, Lieutenant McWilliams.  So returning to

10 this video, right at the beginning of the video you saw

11 the individual you identified as the defendant and the

12 individual you identified as Brandon Lemagne come through

13 a door.  Where were they coming from when they came in

14 that door?

15 A     That is an egress door to the compound area.

16 Q     In other words, that door goes outside?

17 A     That's correct.

18 Q     Okay.

19        MS. GILBERT:  Ms. Taylor, if I could ask you to

20 please play the clip another ten seconds or so and pause

21 at 18:09:19.

22              (Video Played.)

23 BY MS. GILBERT:

24 Q     Based on your observation of the video and your

25 knowledge of the set-up of the housing unit here, where

1  does it appear that Brandon Lemagne just went here where

2  the video is paused at 18:09:19?

3  A    According to what the video shows, Brandon Lemagne

4  looks as though he's off to the left.  That's an area that

5  we used to have our laundry equipment.  Now we have our

6  computer equipment for the inmates to send e-mails.

7  Q    And can you tell right now what he's doing?

8  A    No, I can't.

9         MS. GILBERT:  Ms. Taylor, could you play it for

10  a couple more seconds.

11         (Video Played.)

12         MS. GILBERT:  I'll ask you to pause it there.

13         We are paused at 18:09:36, for the record.

14  BY MS. GILBERT:

15  Q    Any more intel on what Brandon Lemagne is doing over

16  there?

17  A    According to the video, it looks as though Brandon

18  Lemagne is posting something on the bulletin board on the

19  left-hand side of the wall.

20  Q    So far as you know, what was Brandon Lemagne's job at

21  FCI Petersburg?

22  A    Brandon Lemagne worked in the recreation department,

23  and he was responsible for putting schedules up for events

24  that were going on in the recreation department.

25  Q    Okay.  And the circle around him has disappeared, but

1  the circle around the defendant, if you see it, what is

2  the defendant doing at this point, 18:09:36?

3  A    According to what the video shows, it shows that

4  Officer Legins is at the officer station area of the unit.

5            MS. GILBERT:  And we'll ask Ms. Taylor now to

6  please play the video until 18:10:09.

7            (Video Played.)

8            MS. GILBERT:  Thank you, Ms. Taylor.

9  BY MS. GILBERT:

10 Q    Lieutenant McWilliams, where did the defendant and

11 Brandon Lemagne go here where the video paused at

12 18:10:09?

13 A    According to what the video shows, Brandon Lemagne is

14 entering the unit team area with Officer Legins.

15 Q    You described the unit team area earlier.  Is that

16 the area that connects the two housing units?

17 A    Yes, it is.

18 Q    And based on the time stamp in the upper left corner

19 of the screen, which currently shows 18:10:09, would the

20 unit team area have been staffed at that time of night?

21 A    No, it would not.

22 Q    In your training and experience, what reason might an

23 officer have for going into that hallway by himself

24 without an inmate?

25 A    There is a printer in that area.  There are no

1  printers in the officers' station.  So if the officer

2  needed to print something, they would utilize the unit

3  secretary area.  There's also a restroom in that area that

4  is the staff restroom.

5  Q    Is that restroom used exclusively by officers?

6  A    Yes, it is.

7  Q    In other words, inmates are not allowed to use it?

8  A    That's correct.

9  Q    Can you describe where, back in that unit team area,

10 the restroom is?

11 A    Uh-huh.  When you enter the hallway, the second door

12 to your left is the unit secretary area.  As you enter the

13 unit secretary area, off to the left there is going to be

14 a staff restroom.

15 Q    So, in other words, the staff restroom is through two

16 sets of locked doors in that unit team hallway?

17 A    That's correct.

18 Q    In your training and experience, what reason would an

19 officer have for taking an inmate back into this area at

20 this time of night when the unit team is not in the

21 hallway?

22 A    There would be no reason to take an inmate into the

23 bathroom or unit secretary area at this time of night.

24 Q    While you worked in the housing unit, did you ever

25 take an inmate back into this staff area only at this time

1  of night when the unit team was not there?

2          MR. GAVIN:  Objection to the relevance.

3          THE COURT:  What's the relevance?

4          MS. GILBERT:  Your Honor, Lieutenant McWilliams

5  is describing the typical practices of officers.  She

6  testified earlier that she herself has worked in the

7  housing unit.

8          THE COURT:  Overruled.

9  BY MS. GILBERT:

10 Q   So the question was while you worked in the housing

11 unit, did you ever take an inmate back into the staff only

12 area at this time of night when the unit team was not

13 there?

14 A   No, I did not.

15         THE COURT:  To be clear, this is military time.

16 So this is 7:10 p.m.

17         THE WITNESS:  That is 6:10.

18         THE COURT:  Or -- I'm sorry.  6:10.  I'm sorry.

19 It's a good thing I asked you the question or I would've

20 had it wrong.

21         THE WITNESS:  I apologize.

22         THE COURT:  No.  I'm the one that owes you the

23 apology.  I had it wrong.

24         MS. GILBERT:  Thank you --

25         THE COURT:  You had testified earlier, generally

1    that area closes between 5 and 6, right, in the afternoon?

2           THE WITNESS:  Your Honor, you're asking me if

3    it's closed between 5 p.m. and 6 p.m.?

4           THE COURT:  Yeah.

5           THE WITNESS:  Yes.  The officer area is secured

6    by keys.

7           THE COURT:  Right.

8           THE WITNESS:  Only staff can access that area.

9    BY MS. GILBERT:

10   Q    And I should also note that the time stamps that I'm

11   referring to are the time stamps in the upper left and not

12   any time on the bottom scrolling part of the screen.

13          THE COURT:  That's fine.  I just messed it up

14   because I'm not in the military.

15          MS. GILBERT:  Okay.  At this point I'm going to

16   ask Ms. Taylor to let the video play for the next five

17   plus minutes until approximately 18:15:19 time.

18          (Video Played.)

19          THE COURT:  Is anything going to happen before

20   18:15?

21          MS. GILBERT:  No, Your Honor.

22          THE COURT:  I know you asked if you could play

23   the whole thing before, but maybe you ought to just speed

24   it up just a little bit.  Because nothing is going to

25   happen until then, right?

Heather McWilliams – Direct                    132

1      MS. GILBERT:  That's correct, Your Honor.  The

2   point of playing the video at this time is to show the

3   amount of time that the defendant and victim were in the

4   hallway together.

5      THE COURT:  All right.  Well, that's fine.

6      (Video Played.)

7   BY MS. GILBERT:

8   Q   Lieutenant McWilliams, at 18:15:19 the surveillance

9   video switched to a different camera view.  Based on your

10  experience of working at Petersburg and review of the

11  surveillance video, which housing unit are the jurors

12  looking at here?

13  A   They are currently in F-North unit.

14     MS. GILBERT:  I would ask Ms. Taylor to please

15  play the video for additional five seconds and pause at

16  18:15:24.

17     (Video Played.)

18     MS. GILBERT:  Thank you.

19  BY MS. GILBERT:

20  Q   At this point two figures have emerged from the staff

21  only hallway, the unit team area that you earlier

22  described, into the Fox North common area.  Based on your

23  review of this video and any information you learned

24  during this investigation, who are the two people who have

25  entered the Fox North common area from the staff only

Heather McWilliams – Direct                    133

1  hallway?

2  A    The individual on your right is Brandon Lemagne.  The

3  individual in the gray uniform is Officer Chikosi Legins.

4  Q    Are these two individuals the same people you

5  previously identified as entering the hallway from the

6  other side over five minutes earlier?

7  A    Yes, they are.

8            MS. GILBERT:  Ms. Taylor, I'd ask that you

9  please play the video for an additional five seconds and

10  pause at 18:15:29.

11           (Video Played.)

12           MS. GILBERT:  Thank you.

13  BY MS. GILBERT:

14  Q    Lieutenant McWilliams, one of the two figures just

15  went back into the hallway.  Can you tell who that was?

16  A    Yes.  It's Officer Chikosi Legins.

17  Q    Where does that hallway lead back to again?

18  A    That will lead to the unit team area, which will lead

19  him back to Foxtrot South.

20           MS. GILBERT:  Ms. Taylor, if you could please

21  play the video and pause at 18:16:20.

22           (Video Played.)

23  BY MS. GILBERT:

24  Q    Lieutenant McWilliams, who is the person who just

25  walked out the door in the video now paused at 18:16:20?

1  A     The individual exiting Foxtrot North unit is Brandon

2  Lemagne.

3           MS. GILBERT:  I'm going to ask Ms. Taylor to

4  continue playing the video.  And I will ask you to note

5  that the time stamp jumps backwards.  This is an edited

6  video.

7           (Video Played.)

8           MS. GILBERT:  If you could please pause it

9  there, Ms. Taylor.

10           THE COURT:  Just for the record, we're at

11  18:15:50.

12           MS. GILBERT:  Thank you, Your Honor.

13  BY MS. GILBERT:

14  Q    Lieutenant McWilliams, just so it's clear to the

15  jurors, we're talking about a lot of kind of spacial stuff

16  here.  Can you just remind them again what they're looking

17  at in this view?

18  A    This is Foxtrot South unit, or Fox South unit.

19  Q    This the area where the defendant and inmate Brandon

20  Lemagne started out; is that correct?

21  A    That's correct.

22           MS. GILBERT:  Ms. Taylor, if I could ask you to

23  play the video for another approximately eight seconds.

24           (Video Played.)

25           MS. GILBERT:  Thank you.

Heather McWilliams – Direct                   135

1  BY MS. GILBERT:

2  Q    And so, Lieutenant McWilliams, where is the defendant

3  going there?

4  A    According to the video, it appears as though Officer

5  Chikosi Legins is entering the officer station.

6            MS. GILBERT:  For the record, the next portion

7  of the video jump forward approximately 14 minutes to save

8  some time.

9            Ms. Taylor, if I could please ask you to play

10 the video for another five seconds or so?

11            (Video Played.)

12            THE COURT:  So we're starting at 18:30:02.

13            MS. GILBERT:  Thank you.

14            And pause it there, please.  And we are paused

15 at 18:30:05.

16 BY MS. GILBERT:

17 Q    Lieutenant McWilliams, what's happening at this point

18 in the video?

19 A    It appears as though Officer Chikosi Legins has

20 reentered the unit team area.

21 Q    And when the defendant went back in the hallway, was

22 there any officer supervising the inmates out here or were

23 they left on their own?

24 A    There was no officer in the housing unit at the time.

25            MS. GILBERT:  Now, Ms. Taylor, I'd ask that you

1  play the last video, the last portion, approximately a

2  minute and a half.

3              (Video Played.)

4              MS. GILBERT:  Please pause it there.

5  BY MS. GILBERT:

6  Q    And, Lieutenant McWilliams, what do you see there?

7              MS. GILBERT:  I'm sorry.  For the record, we're

8  paused at 18:31:17.

9  A    According to the video, it appears Chikosi Legins is

10 reentering F-South.

11             MS. GILBERT:  And, Ms. Taylor, if I could ask

12 you to roll it a little bit longer.

13             (Video Played.)

14             MS. GILBERT:  Pause it there, please.

15 BY MS. GILBERT:

16 Q    Lieutenant McWilliams, what does this portion of the

17 clip show?

18             MS. GILBERT:  We're paused now at 18:31:29.

19 A    Yes, ma'am.  It appears as though Officer Legins is

20 standing in front of the officer station doorway.

21 BY MS. GILBERT:

22 Q    I asked you earlier about your experience as a

23 correctional officer when you were working in the housing

24 unit.  You also testified that you were the defendant's

25 supervisor.  If you had seen someone you supervise take an

Heather McWilliams – Direct                137

1   inmate alone into that unmonitored, unstaffed area at that

2   time of night for over five minutes, what would your

3   reaction have been?

4           MR. GAVIN:  Objection to relevance.

5           THE COURT:  Overruled.  You can answer the

6   question.

7   A    I would view it to be inappropriate.

8           MS. GILBERT:  Ms. Taylor, I'd like to ask you to

9   pull up Exhibit 1-A from the March 16th, 2018,

10  surveillance footage.

11  BY MS. GILBERT:

12  Q    Lieutenant McWilliams, from the date and time stamp,

13  when is this video from?  I gave it away a little bit

14  there.

15  A    March 16, 2018, at 6:14 p.m.

16  Q    So this is from approximately two months before the

17  May video we watched earlier?

18  A    That's correct.

19  Q    And, again, what part of the video does this

20  surveillance depict?

21  A    It depicts a south side unit.

22          MS. GILBERT:  Ms. Taylor, if you could please

23  play the video until 18:14:42 and then pause it.

24          (Video Played.)

25          THE COURT:  We already admitted this, right?

Heather McWilliams - Direct                    138

1              MS. GILBERT:  I'm sorry.  I don't -- I think I

2   did admit all of them when I read the stipulation.

3              THE COURT:  They're all admitted.

4              MR. GAVIN:  I have no objection.

5              THE COURT:  All right.

6              MS. GILBERT:  Okay.  Thank you, Ms. Taylor.

7   BY MS. GILBERT:

8   Q    Do you recognize the individuals -- any of the

9   individuals on the screen, Lieutenant McWilliams?

10  A    Yes, I do.

11  Q    Who did you see walk into the unit?

12  A    The individual in the light gray shirt and shorts is

13  Brandon Lemagne.

14  Q    Anybody else you recognize in this video?

15  A    Yes.  The individual in the dark gray uniform is

16  Officer Chikosi Legins.

17             MS. GILBERT:  Ms. Taylor, if you could -- and

18  I'm sorry.  We're paused at 18:14:42.

19             Ms. Taylor, if you could please play the video

20  for a few more seconds until 46.

21             (Video Played.)

22  BY MS. GILBERT:

23  Q    Did you see where Inmate Brandon Lemagne went at that

24  point?

25  A    Yes.  He goes off to the right, which is where we

1  used to keep our microwaves when we had them.  And at that

2  point both Brandon Lemagne and Officer Chikosi Legins go

3  into the unit team area.

4  Q    I'm going to pause you there, Lieutenant McWilliams.

5  And let's just keep playing and see -- see if that's

6  right.  Are there bulletin boards back there to the right?

7  A    Yes, there are.

8           MS. GILBERT:  Ms. Taylor, I'm going to ask you

9  to keep playing the video and pause it at 18:14:58.

10          (Video Played.)

11 BY MS. GILBERT:

12 Q    Can you see where the defendant went there?

13 A    Yes.

14 Q    And where did the defendant go?

15 A    He went into the officer station area.

16 Q    So they have not quite gotten to the unit team area

17 yet?

18 A    That's correct.

19 Q    You've previously reviewed this video, correct?

20 A    Yes, I have.

21 Q    You're giving spoilers, then.

22          MS. GILBERT:  Ms. Taylor, can I ask you to

23 please scroll ahead to 18:20:11?

24          (Video Played.)

25          MS. GILBERT:  That's good.

1          (Video Played.)

2          MS. GILBERT:  18:20:09 is also good.  We can

3   start it there.

4          Okay.  Let's start, then, at the next clip you

5   were able to do.

6          THE COURT:  All right.  Hold on.  We need to put

7   it on the record, where are we going to start, and just

8   say it so that the record is clear.

9          MS. GILBERT:  Let's start from 18:19:49.  We'll

10  just play a little extra video.

11         (Video Played.)

12         MS. GILBERT:  Ask you to pause it there,

13  Ms. Taylor.

14  BY MS. GILBERT:

15  Q    Did you see -- can you describe what just happened in

16  the upper middle part of the video at that point?

17         MS. GILBERT:  We are paused at 18:20:26.

18  A    Yes, I can.

19  BY MS. GILBERT:

20  Q    What happened there?

21  A    It appears as though Brandon Lemagne has exited the

22  area where the bulletin boards are where we used to keep

23  the microwaves and has now entered the officers' office.

24         MS. GILBERT:  And, Ms. Taylor, if I could ask

25  you to play the video until approximately 18:21:41.

Heather McWilliams – Direct                    141

1           (Video Played.)

2           MS. GILBERT:  We seem to be having some

3   technical difficulties.

4           THE COURT:  Okay.  While she's trying to fix it,

5   what have we seen up to this point?

6           MS. GILBERT:  And for the record, the video is

7   at 18:20:57.

8           THE WITNESS:  What we are seeing is that Brandon

9   Lemagne is in that upper corner of the video, right by the

10  officers' station.  He's standing outside the officers'

11  station.  And Officer Chikosi Legins is walking towards

12  the egress area, which is the door that goes out to the

13  compound.  And that's going to be in your bottom right

14  corner.

15          MS. GILBERT:  I think we're trying to get back

16  to approximately -- I think this is a good point,

17  Ms. Taylor, if it will play from here, but it doesn't seem

18  to want to.

19  BY MS. GILBERT:

20  Q    From your earlier review of this video, Lieutenant

21  McWilliams, if you can answer, and if not, we can go back

22  and try and get the video working.  Do you remember what

23  happens after this point in the video?

24  A    Yes.  Officer Chikosi Legins is observed on video

25  allowing an inmate that resides in the housing unit

Heather McWilliams - Direct                    142

1  F-South to come inside the unit.  Officer Legins then

2  walks back over to the unit team area, and he and Brandon

3  Lemagne enter the unit team area.

4  Q    Lieutenant -- oh, are we back?

5           MS. TAYLOR:  I think so.

6           MS. GILBERT:  Okay.  So if we -- is it possible

7  to go back to approximately 18:21:30?  We can start there.

8           (Video Played.)

9           MS. GILBERT:  And I'm sorry.  We started at

10 18:21:11.

11          (Video Played.)

12          MS. GILBERT:  If we could pause it there,

13 Ms. Taylor.  So it's 18:21:40.

14 BY MS. GILBERT:

15 Q    Is this what you were describing earlier where the

16 defendant and Brandon Lemagne went into that unit team

17 area?

18 A    Yes, it is.

19          MS. GILBERT:  Ms. Taylor, I'm sorry.  I'm going

20 to have to ask you to scroll one more time, if we can.

21 Can you please scroll ahead to 18:26:14, if possible, or

22 somewhere in that neighborhood?

23          (Video Played.)

24          MS. GILBERT:  We're starting at 18:25:45.

25          (Video Played.)

Heather McWilliams – Direct                    143

1          MS. GILBERT:  If we could pause it there,

2    Ms. Taylor.

3          We are paused at 18:27:06.

4    BY MS. GILBERT:

5    Q    Lieutenant Williams, could you please describe what

6    you just saw in the portion from 18:25:45 to 18:27:06?

7    A    Yes.  It appears as though Officer Chikosi Legins

8    exited the unit team area and then reentered the unit team

9    area.

10   Q    Just to save the jury some time, Lieutenant

11   McWilliams, have you had a chance to review this video in

12   its entirety?

13   A    Yes.

14   Q    How many times do you count the defendant going back

15   into the unit team area from F-South?

16   A    From the initial time when Officer Chikosi Legins

17   entered the unit team area with Inmate Brandon Lemagne, it

18   was four times.

19   Q    Thank you, Lieutenant McWilliams.

20         MS. GILBERT:  At this point I'd like to ask

21   Ms. Taylor to please pull up Government Exhibit 5-D, which

22   is a photograph.

23   A    God bless you.

24   BY MS. GILBERT:

25   Q    Lieutenant McWilliams, can you tell what this

1  photograph shows?  Again, it's not the greatest

2  photograph.

3  A    Yes, I can.

4  Q    What is that?

5  A    It appears as though this is the close-up picture of

6  the egress area towards the unit team area of F-South, and

7  the door to the right that is open is the F-South officer

8  door -- office door.  Excuse me.

9  Q    Thank you.  And so are these the same doors that the

10 defendant and Brandon Lemagne walked through on the video?

11 A    Yes, they are.

12        MS. GILBERT:  And, Ms. Taylor, can I ask you to

13 please pull up government Exhibit 5-E?

14 BY MS. GILBERT:

15 Q    Lieutenant McWilliams, do you recognize what this

16 photograph shows?

17 A    Yes, I do.

18 Q    What does it show?

19 A    This is a photograph of the hallway -- the unit team

20 hallway going from F-South towards F-North.

21 Q    Are those windows usually marked off with paper?

22 A    No, they are not.

23 Q    Is there usually all that stuff you can see in the

24 hallway there?

25 A    No, there is not.

1  Q      Can you tell from what side of the hallway this

2  photograph was taken?

3  A      Yes.  It's taken from the F-South side of the

4  hallway.

5  Q      How could you tell that?

6  A      The -- by the way that the door is positioned and my

7  familiarity with the unit, and also the S on the door.

8  Q      And so the doors at the other end, are those the

9  doors back into F-North?

10 A      Yes.  That's correct.

11 Q      So this photograph shows the entire unit team area

12 hallway?

13 A      Yes.  It shows the hallway.

14 Q      Lieutenant McWilliams, would it ever be possible for

15 an inmate to get into this area, the unit team hallway,

16 without an officer letting him into that hallway?

17 A      No, it's not.

18 Q      If you, as an officer, found an inmate in this

19 hallway or in any of those other officer only areas

20 unattended, what would you do?

21 A      If I saw an inmate in that area, they are not

22 authorized to be there.  Only a staff member or someone

23 with keys can allow an inmate in that area.  It is a code

24 of conduct violation for a staff member to allow an inmate

25 into an area they're not authorized to be in.

1   Q     And so if you observed a code of conduct violation

2   like that, what, if anything, would you do?

3   A     If I was an officer, I would do a memorandum and

4   notify my supervisor.  Since I am a supervisor, I would do

5   a memorandum and then start looking at data, such as

6   camera footage, any other indicators as to why this may

7   have occurred.

8   Q     And if it was a correctional officer who observed

9   that code of conduct violation, in your training and

10  experience, what kind of documentation should the

11  correctional officer complete?

12  A     They should be notifying their supervisor because our

13  first duty is inmate accountability.  So we have to

14  account for all of our population.  So if you see an

15  inmate in an area they are not supposed to be in, you

16  should be notifying your supervisor, and then you would do

17  a memorandum.

18  Q     Should an officer complete a form referred to as a

19  583?

20  A     No.  The supervisor would create a 583.

21  Q     What is a 583?

22  A     That's a report of incident.

23  Q     Have you had an opportunity to review the 583 records

24  from around the time of May 10th, 2018?

25  A     Yes, I have.

1   Q    Is there one place where Petersburg keeps all of

2   those records?

3   A    Yes.  They are in a centralized database called

4   TRUINTEL.

5   Q    Did you find any record of a 583 filed by anyone

6   regarding inmates in that unauthorized area at that time?

7   A    Upon my review of all documentation from that day,

8   and multiple days prior to, there is no 583 documentation.

9   There are no memorandums.  There are no report of

10  incidents or incident reports documenting any inmate

11  being -- being in an area that's not authorized.

12  Q    Lieutenant McWilliams, how common is it for inmates

13  at FCI Petersburg, in your experience, to accuse

14  correctional officers of rape?

15  A    It is not common.

16          MR. GAVIN:  Objection to relevance.  How common

17  is it?

18          THE COURT:  Objection sustained.  You are to

19  ignore that answer.

20          MS. GILBERT:  No further questions for this

21  witness.

22          THE COURT:  Mr. Gavin, before you get started,

23  do you need us to replay the surveillance?

24          MR. GAVIN:  I do not.

25          THE COURT:  Okay.  What I'm going to do is I'm

1  going to let our IT people -- if you want to leave, that's

2  fine.  I don't think we need your services right now, but

3  we need you to come back at 5:00 at the end of the day to

4  repair the last portion here that's not working.  Okay?

5          MR. GAVIN:  Your Honor, Ms. Gilbert had

6  previously read the joint stipulations with respect to

7  several exhibits that I intend to introduce, which are

8  designated as Defendant's 1, 2, 3, 4, 5, 6 and 7.

9          THE COURT:  Do you want them all admitted?

10         MR. GAVIN:  I do want them all admitted, and I'd

11  just like to hand them in bulk to Lieutenant McWilliams.

12         THE COURT:  That's fine.  Any objection to the

13  admission?

14         MS. GILBERT:  No.  Thank you, Your Honor.

15         THE COURT:  All right.  They're all admitted.

16  Go ahead.

17         THE WITNESS:  Thank you.

18                 **CROSS-EXAMINATION**

19  BY MR. GAVIN:

20  Q    Good afternoon, Lieutenant McWilliams.

21  A    Good afternoon.

22         MR. GAVIN:  Ms. Taylor, could you pull up

23  Defense 1?

24  BY MR. GAVIN:

25  Q    Lieutenant McWilliams, as a preamble, as the

Heather McWilliams - Cross                    149

1  lieutenant at the facility, you're familiar with

2  records -- the records that the facility keeps?

3  A    Yes, I am.

4  Q    And does the facility keep records on where certain

5  inmates are housed at certain times?

6  A    Yes, they do.

7  Q    And is that reflected in what's called a quarters

8  report?

9  A    Yes, it is.

10 Q    All right.  Do you recognize the document that's on

11 the screen right now?

12 A    Yes, I do.

13 Q    And what is that document?

14 A    This is a PP37 roster that's generated from our

15 SENTRY system, and it is specific to quarters.  So it

16 would be a -- PP37 in the category, you would put QTR,

17 which would generate the quarters roster for the

18 individual in question.

19 Q    And this is a particular individual -- a gentlemen by

20 the name of Gregory Largent?

21 A    That is what the form says.

22 Q    And would this form represent or reflect, based on

23 your records -- or the facility's records, exactly where

24 Mr. Largent was housed in the facility at any given time?

25 A    May I?

1  Q     Yes.

2  A     According to the document in front of me, it appears

3  as though it does reference Largent's quarters assignments

4  from 2009 through January 24th, 2020.

5  Q     And is there a particular way to decipher this

6  document to determine exactly where they are located?

7  A     Yes.

8  Q     And how do you do that?

9  A     May I ask you to clarify?

10 Q     Yes.  For example, the letters under -- right under

11 where it says "Assignment," under "ASSI," there are

12 letters and numbers there.

13 A     ASSI.  I apologize.  I'm not seeing where you're

14 saying "ASSI."

15 Q     Well, where it says "Assignment Description" on the

16 form.  On the face of the form at the top left.

17 A     So just for clarification, on the left corner it

18 says, "FCL," and then "Assignment," and then

19 "Description"?

20 Q     Correct.

21 A     Okay.  Yes.

22 Q     So this particular form has A02, for example.

23 Further down it has B03, for example.  Can you explain how

24 those interpretations are deciphered?

25 A     Yes.  So you would do it in reverse.  So the location

Heather McWilliams - Cross                151

1   on the top, the "FCL" would identify the location of the

2   individual and where they were incarcerated in the Federal

3   Bureau of Prisons.  Specifically, on that first line it's

4   showing Atlanta.  It shows the bed assignment is A02-200L,

5   and then it spells it out as a description.  And then it's

6   going to show you the start date and end date of that

7   assignment.

8   Q    So for purposes of our form, this particular first

9   entry is for a cell that was in an Atlanta facility, not

10  Petersburg, correct?

11  A    That's correct.

12  Q    And is Petersburg, does it have a particular notation

13  or acronym?

14  A    Yes, it does.

15  Q    And what is that acronym?

16  A    It's going to be PEM.

17  Q    So on this form, when it says PEM, that would reflect

18  the housing history for this particular person while they

19  were at Petersburg specifically?

20  A    Yes.

21  Q    Thank you.  I'd like to move to the next one.

22  A    Yes, sir.

23  Q    This is Defense 2.  Lieutenant Williams, to move

24  along, is this the same type form for a different inmate?

25  A    Yes, it is.  It's for an individual identified as

1   Darnell Nash.

2   Q    And same thing.  Would this reflect where he was

3   located when he was at Petersburg during a particular

4   time?

5   A    Yes, it does.

6   Q    I'd like to call your attention to Defense Exhibit 3.

7   Lieutenant McWilliams, this is a similar report, is it

8   not?

9   A    Yes, it is.

10  Q    And is this a report for Inmate Shabazz Dyvine

11  Thompson?

12  A    Yes.  According to the document, it is.

13  Q    And does this reflect where Mr. Thompson would have

14  been residing while he was at Petersburg during his

15  incarceration at Petersburg?

16  A    Yes, it does.

17  Q    Lieutenant McWilliams, I'd ask you to take a look at

18  Defense Exhibit 4.  Do you recognize that document, ma'am?

19  A    Yes, I do.

20  Q    What is that document?

21  A    This is a document for Chikosi Legins' daily

22  assignments while working at FCC Petersburg complex.

23  Q    And if you go all the way to the end to page 45?

24  A    Yes, sir.

25  Q    Is that pretty close to when Mr. Legins started his

1  employment with Petersburg?

2  A    I don't know that this is the exact document because

3  it only shows seven days of IF training, and normally

4  staff have ten days of IF training.  But generally

5  speaking, this should be the beginning of when he got

6  hired.

7  Q    And at the very front page of the document, does that

8  show when he was suspended?

9  A    Yes, it does.  The first and second page.

10 Q    All right.  So if I look in this document -- and I'm

11 just going to pull one out for example.  If you would look

12 at page 22?

13 A    Page 22.  Yes, sir.

14 Q    All right.  There are several columns on this

15 document; is that correct?

16 A    That's correct.

17 Q    The column on the far left just shows the date that

18 we're talking about; is that correct?

19 A    That's correct, sir.

20 Q    And then the assignment, that's the third column

21 over, that has particular different assignments that have

22 markings.  Can you identify what they are?

23 A    Yes.  They are housing unit assignments within the

24 FCC Petersburg component.

25 Q    So in the first line, for example, where it says:

1  "F-South," does that mean that Mr. Legins would have been

2  assigned to F-South on that particular day?

3  A    Yes, it does.  Although according to the shift, he

4  only worked there from 7 to midnight.

5  Q    Okay.  Is that an unusual shift?

6  A    No, it is not.  If you'll review the page prior to,

7  on the 21st it shows that he was on overtime for a medical

8  escort trip.  He is a BPT certified staff member and,

9  therefore, reported late to his shift and was there from 7

10 to midnight.

11 Q    So if the document is saying E-South, that would mean

12 that he was working in the Echo unit south that day -- or

13 on a particular day?

14 A    That's correct.

15 Q    And over on the right column where it says "Shift"

16 underneath the "Shift," there are designations that are

17 E/W.  What does that stand for?

18 A    Evening watch shift.

19 Q    All right.  So does a designation for each assignment

20 have a designation for each shift?

21 A    I'm sorry.  Could you clarify that for me?

22 Q    I'm sorry.  That was a bad question.  Does each

23 assignment date have a coinciding shift to match the

24 assignment with the shift?

25 A    Generally speaking, evening watch shift would be

1  4 p.m. to midnight.  So it would not necessarily reflect

2  on the roster as a time stamp.  The only time you're going

3  to see a time stamp is if that staff member is moved from

4  one location to another on that same day.

5  Q    Is there a separate notation for the day shift?

6  A    Yes, there is.  It's going to be day/W.

7  Q    And is there a separate designation for the morning

8  watch?

9  A    Yes, there is.  M/W.

10  Q    So when we look at his work history, we should be

11  generally able to determine exactly which unit he was

12  working in and exactly which shift he was working in,

13  generally?

14  A    Generally speaking, yes, we can.

15  Q    I'd like to move to the next exhibit, Defendant's

16  Number 5.

17          Lieutenant McWilliams, do you recognize this?

18  A    Yes, I do.

19  Q    What is it?

20  A    So the system I referenced earlier when I said

21  TRUINTEL, this is another program under TRUACCESS.  It's a

22  TRUFACS report.  What this does is it allows us to see any

23  items which are controlled items that are purchased by an

24  inmate in our complex.

25  Q    And does this reflect the items that may have been

1  purchased by a gentleman by the name of Ronzell Jackson?

2  A    Unfortunately, I can't make that assumption.  All

3  they have here is a register number.  All inmates are

4  issued an eight-digit register number.  It does not have a

5  name.

6  Q    Would you look at this item and tell me if you can

7  determine whether or not any cleats were ordered or

8  purchased from this person, whoever it is, on around

9  February of 2018?

10 A    You said cleats?

11 Q    Yes, ma'am.

12 A    On February 2018?

13 Q    Yes, ma'am.

14 A    One second.

15          According to what I'm reading, I do not see that

16 on here.

17 Q    Lieutenant McWilliams, I ask you to move to

18 Exhibit 6-A for the defense.

19 A    Yes.

20 Q    Do you recognize that document?

21 A    Yes, I do.

22 Q    What is that document?

23 A    This document is -- are the specific post orders.  So

24 every officer that's assigned to a housing unit has post

25 orders.  Basically, these are the generalized duties of

1    officers assigned to specifically a south, Bravo South,

2    Charlie South, Delta South, Echo South and Foxtrot South,

3    between the hours of 7:40 a.m. and 4:10 p.m.

4    Q    So the F unit officer in the Fox South unit, that

5    would be the unit we're talking about in this particular

6    case?

7    A    Yes, on day watch shift.

8    Q    I'm looking at morning watch.  Do you have morning

9    watch or day watch?

10   A    According to this exhibit, A, this is day watch in

11   front of me.  7:40 a.m. to 4:10 p.m.

12   Q    Sorry, Lieutenant McWilliams.  It was operator error

13   on myself.

14   A    That's okay.

15   Q    So on a day watch, generally what are an officer's

16   responsibilities when he gets in first thing?

17   A    Okay.  Upon relieving the previous officer from --

18   this is a day watch roster.  So when they relieve the

19   officer from morning watch shift, the first thing that

20   they're going to do is they're going to account for their

21   equipment.  So officers are issued keys.  They're issued a

22   radio.  They have a detail pouch, flashlight.  They also

23   have a cabinet in the unit that's going to have things

24   like handcuffs and leg irons.  They've updated a little

25   bit because I think we have NARCAN in there now.

1    And so what will happen is that day watch

2  officer is going to account for that equipment.  They're

3  going to verify the count in the housing unit, make sure

4  that the count is correct as they pass it on.  And then

5  they're going to test their own equipment.  They'll call

6  the control center, verify that their equipment, their

7  body alarm, is working properly.  And then the officer

8  from the previous shift is going to let them know about

9  anything that's gone on in the unit from the previous

10  shift.

11  Q    Is that called passing it on?

12  A    I don't refer to it as that, but some people might.

13  A pass-on yeah.

14  Q    And is there a count that happens on the day watch?

15  A    So to answer your question, sometimes.  Weekends and

16  holidays we do a 10 a.m. stand-up count.  But during

17  normal working days, Monday through Friday, we do an a.m.

18  census and a p.m. census.

19  Q    Is the census the same thing as the count?

20  A    No, it is not.

21  Q    And what is the difference?

22  A    So you are accounting for your population, but you

23  are not calling the number in.  So for an official count,

24  you're going to have two people counting in the unit, one

25  watches while the other person counts.  You'll verify that

1   count together to ensure that you have the population

2   correct in your area.

3           With a census, it's one officer walking around

4   the unit, verifying that all the inmates are supposed to

5   be there, who's not supposed to be there and you're

6   accounting for that.  And then you're going to call the

7   control center, and you're going to state to the control

8   center that you have accounted for your population.

9   Q    And when does lunch start on the day shift?

10  A    It starts at 10:45, give or take.

11  Q    During that first part of the day shift, are things

12  fairly busy for the officers?

13  A    It can be.

14  Q    All right.  Does it ever slack up into the evening?

15  A    I don't know what you mean by that.

16  Q    Does it ever get easier?  Do the officers, in your

17  experience and training and knowledge of this facility,

18  ever have a lot of downtime?

19  A    So from my vantage point, when I was an officer, no.

20  Generally speaking, it's a prison setting.  So at any time

21  we are -- things happen all the time in a prison setting.

22  Every day is different.

23  Q    Lieutenant McWilliams, I'd ask you to flip to the

24  next document that's in front of you, and tell me which

25  watch that is.

1   A    Of the same document, sir?

2   Q    The next document.

3            THE COURT:  Can you give us an exhibit number?

4            MR. GAVIN:  6-B.

5            THE COURT:  Okay.

6   BY MR. GAVIN:

7   Q    Is that the evening watch?

8   A    Yes, it is, sir.

9   Q    Okay.  All right.  So in the evening watch,

10  Lieutenant McWilliams, when is there a lockdown?

11  A    So generally speaking, lockdown is prior to the 9:30

12  stand-up count, and the inmates would stay locked in their

13  cells.

14  Q    Is there anyone that's authorized to leave a cell

15  after lockdown?

16  A    Only if the supervisor authorized it or if we have a

17  food service move.

18  Q    So when does the lockdown begin and when does it end?

19  A    I need to clarify a little bit.  Because this is 4 to

20  12 shift, we do a count, a 4 p.m. stand-up count.  So when

21  that officer comes in on duty on evening watch, the

22  inmates should already be locked in their cells.  Then

23  they are unlocked.  Then they are placed back in their

24  cells prior to the 9:30 p.m. stand-up count.

25  Q    And that's an all-hands-on-deck stand-up count,

Heather McWilliams - Cross                    161

1  correct?  You have to count flesh?

2  A    So as far as all hands on deck, no.  It would be two

3  staff members accounting for those inmates.

4  Q    All right.  So is it possible for a correctional

5  officer to enter a cell to have sex with a particular

6  person, an inmate, during the lockdown section of the

7  night?

8  A    You're asking me if it's feasible for an individual

9  with keys to access an area that only inmates would be in

10 to have sex?

11 Q    I'm asking you whether or not it would be something

12 that -- well, how would it be allowed -- if they -- is

13 there only one person in the unit at night?

14 A    Yes, there's only one person in the unit at night.

15 Q    Okay.  And they're not allowed to go into a

16 particular cell unless they have somebody with them,

17 correct?

18 A    That's not correct.  So we have food service moves.

19 After hours, for example, on morning watch shift, the

20 officer would wake the inmates up.  And they open the door

21 and they'd let them out.

22        But once they're locked in at night, for

23 example, if a duress alarm is activated, indicating that

24 there might be a medical issue, most of the time they're

25 going to call a lieutenant over just for safety reasons.

1  Q    I'd like to move to the next exhibit that's left.

2  All right.  That's Defendant's 6-C.  Do you recognize that

3  document?

4  A    Yes, I do.

5  Q    All right.  To move it along, because they're pretty

6  much the same, do they do pretty much the same thing?

7  They check keys.  They get the pass-on information from

8  the prior shift.  Is that what happens?

9  A    At the beginning of the shift, yes.  And that's

10 discussed in the specific post orders.

11 Q    And this carries them all the way through when they

12 get out of lockdown?

13 A    This is morning watch shift.  So they are locked in

14 at the time when the staff members come through.  I mean

15 when the staff member comes in at 11:50, they are locked

16 in.

17 Q    And they're locked in until 6?

18 A    That's not correct.  According to these post orders,

19 it shows that there are times when they do food service

20 moves, and it's annotated in the post orders that they may

21 need to release food service workers at that time.

22 Q    Okay.  Thank you.

23      I'd like to move to Defendant's 8.  And I

24 apologize, Lieutenant McWilliams, because some of these

25 pictures you just identified, but I'm going to ask you to

Heather McWilliams - Cross                    163

1  take another look at them.

2  A    Okay.

3  Q    Do you recognize that?

4  A    Yes, I do.

5  Q    What is that?

6  A    This is -- this appears as though it is a south side

7  unit with an egress door to your right, which would

8  indicate that it can go to the compound.  Right past that,

9  it appears as though there are inmate cells, and then it

10 appears as though it is a south side officer's door that

11 is ajar.

12 Q    And my -- my picture is much clearer than the one on

13 the screen, but are they the corridor doors that lead from

14 Fox South to Fox North in the back of that picture, to the

15 best of your knowledge?

16 A    Yes, they are.

17        MR. GAVIN:  Can you move to the next picture,

18 Ms. Taylor?  This is Defendant's 5-B(sic).

19 BY MR. GAVIN:

20 Q    Are they actual doors that go into the corridor?

21 A    Yes, they are.

22 Q    And they have a big locking mechanism, as you can see

23 on the door.  Is that a key that you would carry around in

24 your pocket or is that a bigger key that would be required

25 to open that door?

1   A    Yes, sir.  These are Folger Adam locks, as I

2   described earlier.  That's going to be a larger key, and

3   that's going to be on a key chain.

4   Q    All right.  So in the video, when we see Officer

5   Legins reaching for a key on his belt, his utility belt,

6   is that what you believe he's reaching for?

7   A    I would have to review the footage again.  But, yes,

8   I believe so, because he opened the door.

9   Q    Let me ask you a different way.  Is the utility belt

10  where they would typically carry a key of that size?

11  A    Yes.  We're required by policy to have a chain that

12  attaches to our belt, and then the key is attached to the

13  belt as well.

14  Q    So to enter the corridor, he would have to unlock

15  this door first with that key off his utility belt?

16  A    That's correct.  Unless it was already open.

17  Q    Okay.  I'd ask you to move to the next exhibit,

18  number C, Defense D5-C(sic).  And I think you've already

19  identified this, but does this reflect a picture of both

20  of those doors are open going all the way over to the

21  doors on Fox North?

22  A    It appears as though this shows the south side doors

23  ajar, showing the unit team hallway.

24  Q    And the unit office area is the first door to the

25  left or the second door to the left?

1  A    Unit officer's office is not displayed in this photo.

2  Q    The entrance to it.

3  A    I'm sorry.  As you're coming out the other way?

4  Q    No.  If I'm going through these doors, what is the

5  second door up on the left?

6  A    That is the unit secretary door.  There is no officer

7  door in this area.

8  Q    All right.  So that's the unit secretary's door.

9         And I think you said that the counselor's door

10 is to the right?

11 A    No.  The case manager.

12 Q    Case manager?  Sorry.

13 A    Yes, sir.

14 Q    All right.  Ask you to look at the next picture.

15 A    Yes, sir.

16 Q    Does this appear to be a picture of inside the

17 hallway looking back towards the Fox South common area?

18 A    That's correct.

19 Q    Ask you to look at the next picture, D5-E(sic).  Does

20 this -- what does this appear to be, Lieutenant

21 McWilliams?

22 A    This appears to be the doorway.  It appears to be

23 secured due to the fact that it was a crime scene at the

24 time.  It says "Unit Manager" on it.

25 Q    So is this the office door where the incident

1  allegedly took place?

2  A    This is not the -- no, it didn't occur in the office

3  door.  It occurred inside the office.

4  Q    I understand.  Is this the door to the

5  office where --

6  A    Yes, sir.

7  Q    Okay.  And is it locked?  Does it appear to be

8  locked?

9  A    It's supposed to be locked, yes, sir.

10  Q    Does it have the same type of locking mechanism as

11  the exterior doors?

12  A    Yes, sir.  Folger Adams.

13          THE COURT:  When you're referring to the

14  incident, are you referring to the second incident or both

15  incidents?

16          MR. GAVIN:  The May 10th incident.

17  A    Okay.

18          THE COURT:  May 10th incident?

19          MR. GAVIN:  Yes, sir.

20          THE WITNESS:  Yes.

21  BY MR. GAVIN:

22  Q    Ask you to look at D5-F -- or D8-F.  I'm sorry.  Do

23  you recognize that picture?

24  A    Yes, I do.

25  Q    And is that with the -- that same door open?

1   A     Yes, it is.

2   Q     And does that show the office area where the alleged

3   incident took place?

4   A     Yes, it does.

5   Q     All right.  Ask you to look at the next exhibit, G.

6   Do you recognize that?

7   A     Yes, I do.

8   Q     And what is that?

9   A     That is a view of the opposite side of that same

10  door, from the inside of the office looking out.

11  Q     If I'm looking at that door, what is to my immediate

12  right?

13  A     To your immediate right is going to be a restroom.

14  Q     Ask you to look at the next picture, which is H.  Do

15  you recognize that picture?

16  A     Yes, I do.

17  Q     What is that picture?

18  A     As you first enter the unit manager's -- where we

19  first showed it, where they had the crime scene tape, as

20  you open up that door, you'll see a desk to your right.

21  That is the desk in question.  That's the unit secretary's

22  desk.  Off to your left that is not in view of the camera

23  is going to be a restroom.

24  Q     And that's going to be the left in this picture?

25  A     That's correct.

1   Q      Sort of right across from the chair that has the red

2   color --

3   A      Yes.

4   Q      -- on the opposite wall?

5   A      Yes, sir.

6   Q      And the door in the back that you see by the exit

7   sign, what is that door?

8   A      That's an egress door for emergency purposes only.

9   Q      Is that where the fire escape is?

10  A      That's correct.

11  Q      Is that the same layout for all of the units?  That's

12  where the fire escape is off that office?

13  A      Yes, it is.

14          And I apologize.  That is actually not a fire

15  escape door.  That's not -- that's -- we have fire escape

16  doors inside the housing units to the side.  This is an

17  area where they can access staff in the event that there's

18  an emergency in the housing units accessible from the

19  outside in.

20  Q      All right.  And this is the area that you alluded to

21  earlier that was generally manned by personnel between

22  generally 6 and 4, 6 and 5?

23  A      That's correct.

24  Q      And do you recognize the area in this picture where

25  this incident allegedly took place?

1  A    Yes.

2  Q    And where is it?

3  A    This is the unit secretary's area for Foxtrot unit,

4  or F unit.

5  Q    Do you recognize the particular place in this picture

6  where the event allegedly took place?

7  A    No, I don't.

8  Q    I'll ask you to take a look at the next picture.

9  This is Defense 8-I.  Do you recognize that area?

10  A    Yes, I do.

11  Q    And where is that area?

12  A    So right after you pass the desk, it would be the

13  equivalent of you making a right turn.  As you make a

14  right turn, on that right-hand side where there's that

15  gray door, that is going to be the conference room area.

16  In front of you, the other gray door is going to be a

17  supply room.

18  Q    All right.  Based on your investigation, Lieutenant

19  McWilliams, where do you believe the incident took place

20  in this picture?

21  A    I did not investigate where the incident occurred in

22  the housing unit.

23  Q    So you don't know where it took place in this

24  picture?

25  A    No, I don't.

Heather McWilliams - Cross                    170

1  Q     All right.  Move to the next one, D8-J.  Do you

2  recognize that, Lieutenant McWilliams?

3  A     Yes, I do.

4  Q     What is that?

5  A     It appears as though it is an egress door for a

6  housing unit from the unit team area.

7  Q     Is that the same office, just going back out?

8  A     So it appears as though it is -- there's an F in the

9  bottom corner.  So it appears as though it is.

10 Q     Ask you to look at the next picture, it's 8-K.  As

11 you're exiting that door to go back to the hallway, is

12 that the bathroom to which you referred on the right?

13 A     This would be the restroom in the unit secretary

14 area, inside the unit secretary area.

15 Q     Is that also a locked door or does that remain open

16 at all times?

17 A     It's a locked door.  Yes, that's a locked door.  It's

18 not a Folger Adam key, but there's also another type of

19 key that's in between a normal key you would use at home

20 and a Folger Adam.  And that's about 2 and a half inches

21 long, a little thicker.

22 Q     So to enter that bathroom, an officer would have to

23 unlock the door and then relock it when he exits?

24 A     That's correct.

25 Q     Ask you to look at the next picture.  That's D8-L.

1  Do you recognize that picture?

2  A    It appears to be a paper towel dispenser in a

3  restroom.

4  Q    Is that the same restroom that's in that unit office?

5  A    I'll be honest with you.  It's difficult for me to

6  discern that.  It appears, because it's matching with the

7  previous exhibit, I would probably say yes.

8  Q    All right.  Thank you.

9          MR. GAVIN:  Ms. Taylor, could you bring up

10 Defense 9?

11 BY MR. GAVIN:

12 Q    Do you recognize that area?

13 A    I do.

14 Q    And what is that area?

15 A    As you enter the compound, in the picture that we

16 discussed earlier, this is the compound office area where

17 the compound staff members work out of.

18 Q    So I'm changing gears on you.  I'm totally outside

19 the unit building now, right?

20 A    That's correct.

21         MR. GAVIN:  Could I ask you to pull up, sir, the

22 big exhibit?  Maybe 6?  Yeah.

23         I'm sorry, Mr. Spivey.  The first one.

24 BY MR. GAVIN:

25 Q    So the unit we talked about before, Lieutenant

Heather McWilliams - Cross                    172

1  McWilliams, was unit 34; is that correct?

2  A    That's correct, sir.

3  Q    And there's a big window almost with a semicircle at

4  the top, which is that sidewalk that goes in front of

5  those units?

6  A    Yes, sir.

7  Q    And where is the compound office in that particular

8  location?

9  A    In the lower right quadrant, you see number 23.

10 Q    Yes, ma'am.

11 A    The compound office would be right around here.

12 Q    Would there be any reason for an inmate to go from

13 the unit, which is either 32, 33 or 34, to building 23, to

14 the compound office unattended?

15 A    Yes.

16 Q    For what reasons?

17 A    It depends on the time of day.

18 Q    What about around lunchtime?

19 A    Yes.

20 Q    Who is generally in the compound office?

21 A    Compound officers.

22 Q    How many officers, generally, are in the compound

23 office?

24 A    Two to three.

25 Q    Is that pretty regular; that it would be always two

1  to three officers in the compound?

2  A    No.  It varies.  There's one, two, three.  Usually

3  three compound officers.

4  Q    Is the compound officer in charge of the lunch shift?

5  A    No, they are not.  The lieutenant is.

6  Q    All right.  Do the compound officers have to remain

7  in the lunchroom during the lunch shift?

8  A    They are not required to, but they're required to be

9  at main line.  So they stand either outside or inside main

10 line.

11 Q    Do you regularly see an inmate travel unattended from

12 a unit area or from the lunchroom area to the compound

13 office?

14 A    Yes, I do.

15 Q    What would be the reason for doing that?

16 A    Okay.  So during the day, during open movements, they

17 do the ten-minute move.  Inmates work in the compound

18 area, and they also have the ability to move from the

19 compound area to the opposite side of that semicircle, all

20 the way down to education.  Hence, the reason we have a

21 ten-minute move.  They may be -- they may need to see

22 medical.  Medical is adjacent to the compound office to

23 your right.

24 Q    Okay.  So if they don't have a specific reason to go

25 to the compound office, where are they generally prevented

1  from coming, on this side or the lower side of that

2  circle?

3  A    They are prevented from coming through the following

4  areas:  The inner semicircle and halfway through where 23,

5  just to the left of the 23, right before the compound

6  office, and to the right of 24.  They're not authorized to

7  go through there.

8  Q    Now, in looking back at D-9, is that the compound

9  office set-up?

10  A    Generally speaking, yes.

11  Q    And is it just one big room?  Are there any offices

12  off of the compound office?

13  A    So yes.  There are offices adjacent to that, but we

14  don't have access to them.

15  Q    And generally, do the officers sit at this desk

16  within the compound office?

17  A    Yes, they do.

18  Q    And how many desks are in that one building?

19  A    So there are three desks currently in there.  They

20  also have a clerk who does all -- assists with the inmate

21  pay for all the inmates on the compound.

22  Q    So when the compound officers have the compound

23  officer shift, are they doing anything related to the

24  units?

25  A    Yes, they are.

Heather McWilliams – Cross

1    Q      Are they going to the units?

2    A      Yes, they do.

3    Q      What would be the reason for going to a unit?

4    A      Well, there are multiple duties that they have.  So

5    one of the things, if we were in the middle of counting,

6    those officers are responsible for picking up count slips.

7    If there's any type of incident that occurs, such as a

8    fight or a medical emergency, those officers respond to

9    the housing units like the lieutenants do.  We all respond

10   for that show of force.

11           They are going to go drop off batteries.  If

12   officers find contraband, they're going to go get that

13   contraband and bring it to the lieutenant's office.

14   There's multiple things they do in the housing units.

15   Q      Would they ever be asked to go to a housing -- or

16   would they ever be allowed to go to a housing unit and

17   just hang out for 20 minutes?

18   A      There's nothing preventing them from doing so.

19   Q      Would they have to check in with somebody before they

20   did that?

21   A      No.  They're compound officers.  They are responsible

22   for conducting -- for conducting duties within the

23   institutional setting.  And if that includes to be in a

24   housing unit to conduct, say, additional rounds, we would

25   count that as additional rounds.

1  Q     All right.  If they were assigned to a housing unit

2  for their shift, day watch, morning watch, would they be

3  able to leave that unit and go to the compound office?

4  A     So what you're asking me is if they were assigned,

5  say, to F unit on morning watch shift, are they allowed to

6  leave the unit and go to a compound?

7  Q     Correct.

8  A     No, they're not.

9  Q     So inmates may move, like you're talking about, at

10 the top of the hour, but generally, the correctional

11 officers that are assigned to units are not allowed to

12 move; is that correct?

13 A     That's correct.

14 Q     All right.  When you initially spoke to -- I'm going

15 to change gears on you again.

16 A     No.  That's fine.

17 Q     When you initially spoke to Mr. Lemagne, did he have

18 the same version about what happened as was included in

19 the affidavit?

20 A     That's the only version I have, sir.

21 Q     Do you remember him telling you that Mr. Legins

22 ejaculated inside him?

23 A     Yes.

24 Q     Is that what he wrote in his affidavit?

25 A     Yes -- or no.  I'm sorry.  I know that he ejaculated.

1   I don't recall if he said he ejaculated inside of him.

2            MS. GILBERT:  Objection, Your Honor.  This is --

3            MR. GAVIN:  I'd like to show you this --

4            THE COURT:  Hold on a second.  What's your

5   objection?

6            MS. GILBERT:  This line of questions is hearsay,

7   eliciting --

8            THE COURT:  He's trying to impeach someone.

9   Overruled.

10  BY MR. GAVIN:

11  Q    When you took Mr. Lemagne's sworn statement, is that

12  it?

13  A    Yes, it is.

14  Q    All right.  And you actually typed that; is that

15  correct?

16  A    That's correct.

17  Q    And you typed that based on what Mr. Lemagne was

18  telling you, correct?

19  A    Yes.

20  Q    And you had him initial each line; is that correct?

21  A    That's correct.

22  Q    And that was a sworn statement that he swore to under

23  penalty of perjury; is that correct?

24  A    That's correct.

25           THE COURT:  Well, are you going to point to the

1   specific line that -- that's the whole reason I --

2          MR. GAVIN:  Yes, I am.

3          THE COURT:  -- I overruled the objection.

4          MR. GAVIN:  Yep.

5          THE COURT:  So let's have her read the line in

6   question, and then you can ask her if it's consistent or

7   not.

8   BY MR. GAVIN:

9   Q    Can you read the line in question --

10         MS. GILBERT:  Excuse me, Your Honor.  I'm sorry

11  just to interrupt.  Just to clarify, this affidavit is

12  describing statements that Brandon Lemagne made to

13  Lieutenant McWilliams.  It's not actually her statements.

14         THE COURT:  I know that.

15         MS. GILBERT:  Okay.

16         THE COURT:  I know what I'm doing.

17  BY MR. GAVIN:

18  Q    Could you read paragraph 8?

19  A    "I heard him exhale.  I know he came.  He stopped" --

20  comma -- "and I saw his erect penis, and he was catching

21  his semen."

22  Q    All right.  And you never heard him say before that

23  when you interviewed him that Mr. Legins ejaculated

24  actually inside him?

25  A    I don't recall.

1  Q    Did you ever tell Mr. Orloff or Mr. Lavender that?

2  A    I don't recall.

3         MR. GAVIN:  And, Judge, I'm not going to admit

4  this at this point.  I'd like to take it back.  Just have

5  it marked.

6         THE COURT:  That's fine.

7         Just to be clear, did you write down in that

8  affidavit what you believe that he told you?

9         THE WITNESS:  That's his statement in the

10 affidavit, Your Honor.

11        THE COURT:  That you wrote down?

12        THE WITNESS:  That I typed up.  Yes, sir.

13        THE COURT:  Okay.

14 BY MR. GAVIN:

15 Q    All right.  Lieutenant McWilliams, I'm sorry I'm

16 going to have to jump gears on you again, but you

17 testified to a lot.  So I have to go back and forth.

18 A    You're fine.

19 Q    When you saw Mr. Lemagne and you said that he was sad

20 and quiet, that's just your conclusion, correct?

21 A    Yes, it is.

22 Q    Are you familiar with another inmate at your facility

23 by the time of Erogbogbo?

24 A    No, I'm not.

25 Q    Are there cameras outside of the F-South?

1   A     Yes, there are.

2   Q     Where are they located?

3   A     I couldn't give you the exact locations off the top

4   of my head.  But generally speaking, they are -- you have

5   some cameras that are located on top of where the compound

6   office is, one above the lieutenant's office, one over by

7   education so that they could span out and look across the

8   compound to the housing units.  They have added some

9   additional cameras, but we also have some that come down

10  from the outside of the housing units and look down.

11  Q     Let me be more specific.  Is there a camera that

12  would have focused on Fox South exit or egress stairwell?

13  A     No, there would not be.

14  Q     There would be a camera, though, focused from the

15  inside to the Fox South exit door?

16  A     Yes.  There would be a camera inside focused into the

17  sally port area going out of Foxtrot South.

18  Q     All right.  You testified on direct that there were

19  several different mechanisms that officers could utilize

20  to research particular inmates; is that correct?

21  A     That's correct.

22  Q     Do you have any knowledge, as you sit here today,

23  that Mr. Legins researched, investigated or tried to find

24  information on Mr. Lemagne?

25  A     I have no evidence of that.

1  Q     The TRULINCS system that you were talking about --

2  A     Yes.

3  Q     -- that inmates can send out e-mails --

4  A     Yes.

5  Q     -- do you have features within that system that

6  detect certain buzz words like raped?

7  A     Yes.

8  Q     So if an inmate wanted to try to get an e-mail out to

9  the general public that didn't include those words, would

10 he have to use acronyms or symbols or other key strokes to

11 circumvent your system?

12 A     I'm not understanding what you're saying.

13 Q     If an inmate sent out an e-mail that included

14 language like rape and sex that would be typically picked

15 up, would it be picked up unless that inmate were to use a

16 different acronym or a different symbol on the keyboard to

17 circumvent that process?

18 A     Sure.  Just to let you know, the key words that are

19 usually picked up in the system are usually words that

20 would be inflammatory towards the government.  So an

21 inmate writing the word Trump in there would be a red

22 flag.

23         The terms rape or sex or anything like that

24 would not be red flags.  However, I could do a system

25 check for the word sex or the word rape, and I could get

Heather McWilliams – Redirect                    182

1    all data from all inmates sending out any intelligence on

2    such.

3           MR. GAVIN:  I have no other questions, Judge.

4           THE COURT:  All right.  Do you have any

5    redirect?

6           MS. GILBERT:  Very briefly, Your Honor.

7                    **REDIRECT EXAMINATION**

8    BY MS. GILBERT:

9    Q    Lieutenant McWilliams, Mr. Gavin was asking you just

10   now, among other questions, about statements you made to

11   OIG -- that's Office of the Inspector General -- the

12   Department of Justice, Special Agent Steve Orloff.  Do you

13   recall giving an interview to OIG SA Steve Orloff in the

14   days following the May 10, 2018, incident?

15   A    Yes.

16   Q    And on May 10, 2018, you explained that you came into

17   work that night.  You weren't planning to be there.  You

18   worked late.  What did you do the next day?

19   A    I was called and told to come back in early so we

20   could transport Inmate Lemagne to Butner.

21   Q    How far is Butner from Petersburg?

22   A    Butner is two hours.

23   Q    And so did you drive there and back that day?

24   A    I was a passenger in the van that transported

25   Mr. Lemagne.

Heather McWilliams - Redirect                183

1  Q     When did you speak with OIG Special Agent Steve

2  Orloff?

3  A     It was after the transport.  So after I had returned

4  back to FCC Petersburg component.

5  Q     How were you feeling at the time that you spoke with

6  him?

7  A     I was tired.

8  Q     Do you remember that interview very well?

9  A     I did not.  It was a very stressful incident.

10             MS. GILBERT:  Thank you, Lieutenant McWilliams.

11  No further questions.

12             THE COURT:  All right.  Lieutenant, you can step

13  down.  Thank you for your testimony.

14             THE WITNESS:  Thank you.

15             THE COURT:  I'm going to instruct you that

16  you're not to talk about your testimony with anybody until

17  this trial is over.  Okay?

18             THE WITNESS:  Thank you, Your Honor.

19             THE COURT:  Thank you again for being here.

20             (Witness stood aside.)

21             THE COURT:  Folks, I think what we're going to

22  do now is we are going to give you your first break here

23  of what is going to be a long afternoon.  So we'll take --

24  we'll take about -- we'll come back at 2:25, and then

25  we'll pick up from there.  Okay?

```
 1              So all rise for the jury, please.

 2              (The jury exited the courtroom.)

 3              THE COURT:  All right.  Ms. Gilbert, just so you

 4  and I are on the same page going forward, we're not going

 5  to debate my rulings on objections going forward.  Okay?

 6  You got that?

 7              MS. GILBERT:  I apologize, Your Honor.

 8              THE COURT:  I rule.  That's it.  We move on.

 9  Got that?  Okay.

10              (Recess from 2:13 p.m. until 2:28 p.m.)

11              THE COURT:  Sir, you can have a seat.  Well,

12  he's got to wait until the jury comes in first.

13              CSO SPIVEY:  Okay.

14              THE COURT:  So the witness will have a seat.

15  You'll bring the jury in.

16              CSO SPIVEY:  Yes, sir.

17              THE COURT:  And, actually, we'll all rise for

18  the jury.  So stand up right now while the jury is coming

19  in.

20              (The jury entered the courtroom.)

21              THE COURT:  All right.  Everybody can have a

22  seat.

23              You can have a seat, sir.

24              Everybody still doing okay?

25              A JUROR:  Yes.
```

1          THE COURT:  Okay.  All right.  Who's up?

2          CSO SPIVEY:  Your Honor --

3          THE COURT:  She's going to call the witness.

4          MS. GILBERT:  The government calls Brandon

5   Lemagne.

6          THE COURT:  All right.  Mr. Lemagne, do you want

7   to rise?

8          Swear in the witness.

9                    **BRANDON LEMAGNE,**

10     called by the government, first being duly sworn,

11                   testified as follows:

12          THE COURT:  You can have a seat.

13                  **DIRECT EXAMINATION**

14  BY MS. GILBERT:

15  Q    Good afternoon, Mr. Lemagne.

16  A    How you doing?

17  Q    Could you please speak into the microphone and state

18  and spell your name for the court reporter?

19  A    My first name is Brandon, B-R-A-N-D-O-N.  My last

20  name is Lemagne, L-E-M-A-G-N-E.

21  Q    Mr. Lemagne, where are you originally from?

22  A    Brooklyn, New York.

23  Q    Where do you grow up?

24  A    Newport News, Virginia.

25  Q    And where do you live now?

Brandon Lemagne – Direct                       186

1   A     Currently, I'm in a prison --

2           THE COURT:  You're in custody; is that right?

3   You don't have to say where you're in custody, but you're

4   in custody.  Is that a yes?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Okay.

7   BY MS. GILBERT:

8   Q     What is your release date, Brandon?  I'm sorry.

9   Mr. Lemagne.

10  A     My release date is, I believe, April 26th.  I

11  believe.

12  Q     Of this year?

13  A     Uh-huh.

14          THE COURT:  Is that a yes?

15  A     Yes, ma'am.

16          THE COURT:  You have to say yes or no --

17          THE WITNESS:  Okay.

18          THE COURT:  -- because we take everything down

19  here.  Okay?

20  BY MS. GILBERT:

21  Q     Before you were transferred to the facility where you

22  are currently housed, were you previously housed at

23  Petersburg, at the federal correctional institution there?

24  A     I was.

25  Q     I want to start by talking a little bit about your

1  life when you were living at FCI Petersburg.  Do you know

2  approximately when you got to Petersburg?

3  A    2016, towards the end.

4  Q    Were you working while you were there?

5  A    I was working.

6  Q    What were you doing for work while you were at

7  Petersburg?

8  A    I was tutoring, and I was working in recreation,

9  hanging flyers for the recreational department.

10 Q    What is the pay like for inmate jobs at Petersburg?

11 A    It depends on what you're doing.  On average, I think

12 most inmates make between 10, $20 a month.

13 Q    So that's per month?

14 A    Yes.

15 Q    Okay.  Why did you decide to go find a job that

16 involved working at Petersburg?

17 A    Prison is a community, you know.  You -- you -- you

18 have to do something.  You can't really sit around every

19 day and just like -- I mean, you can, but who wants to do

20 time like that?  It's about being productive.

21         So, you know, for me, it was just about staying

22 busy, you know, being productive and just doing something

23 with my time, doing something with myself.  So --

24 Q    Let's talk a little bit about your life at Petersburg

25 when you weren't working.  Did you have a cellmate?

1   A      Yes.

2   Q      What was his name?

3   A      Ronzell Jackson.

4   Q      What was the nature of your relationship with Ronzell

5   Jackson?

6   A      That was my boyfriend.

7   Q      Did you and Ronzell ever talk about what your life

8   together would be like after prison?

9   A      All the time.

10   Q      What kinds of plans did you guys have about life

11   after prison?

12   A      I was interested in human services, reentry possibly.

13   Maybe something involving nursing.  I wanted to work with

14   people, but I was, I guess, just -- we were trying to just

15   figure out a path where we could work in an industry that

16   I guess would be a little forgiving of our backgrounds and

17   the fact that we had records.  So a lot of times we would

18   just talk about our plans for the future.  Both of us had

19   had a lot of issues as far as just being in and out of

20   prison, you know.  So mid-30s, it was time to start

21   figuring things out.  So a lot of our time was spent just

22   figuring out what our future would be together.  So --

23   Q      Other than Ronzell, did you have a lot of other

24   friends at Petersburg?

25   A      No, not really.

1  Q     Why was that?

2  A     I guess prison is just like one of those places,

3  especially when you're somebody that people kind of tend

4  to view as a victim or a target.  People just have angles.

5  You know, you think that you're friends with somebody and

6  then you realize that they have intentions.  You know,

7  it's -- it's easier to keep your circle small and to keep

8  doors closed with people and not really allow people to

9  get too comfortable with you because when they do, things

10 start to happen.  Rumors start to fly.  People start to

11 try their hand to see what they can get out of you,

12 whether that would be something sexual or something

13 financial.  So it's easier just to stay close to, you

14 know, the people that you're close with and just be

15 cordial with everybody else.  So that's what I did.

16 Q     How does the Bureau of Prisons identify you in terms

17 of gender or gender identity?

18 A     They identify me as transgender.

19 Q     What does that term mean to you?

20 A     To me, transgender means somebody that's

21 transitioning from one sex to another.  So I guess that's

22 it, in its simplist form.

23 Q     Do you also identify as gay?

24 A     Yes.

25 Q     What are some of the challenges of being a gay or

1  transgender inmate at Petersburg or any prison?

2  A    I guess the same challenges that somebody would have

3  on the street.  It's just magnified, I guess.  You know,

4  you're dealing with a lot of ignorance.  A lot of people

5  haven't been exposed to certain things.  They just don't

6  know.  Even the people that work there, you know, some

7  people just haven't been exposed to people that don't

8  think and live like them.  So, you know, I would find

9  myself, I guess, trying to educate people about a lot of

10  things, but, you know, it can be difficult when people

11  don't understand.

12          I think the biggest challenge, like I said, was

13  just being feminine in that setting, regardless of how you

14  identify.  If you're somebody who's feminine, people kind

15  of tend to view you as -- like they don't get the

16  difference between transgender or gender fluid or gay.

17  Like, they don't get that.  To them, it's like you're

18  feminine, you're a girl, you know, and that's how they

19  view you.

20  Q    And what is the significance of other inmates viewing

21  you as feminine?

22  A    The significance of it?

23          MR. GAVIN:  Judge --

24          THE COURT:  I'll tell you what.  Let's just get

25  to the point here.  Let's start moving on to what the

1  issue is here in this case.

2  BY MS. GILBERT:

3  Q    Mr. Lemagne, are there ways that gay or transgender

4  inmates support one another at Petersburg?

5  A    Yeah.

6  Q    In your experience, do gay and transgender inmates

7  support each other by talking about officers?

8            MR. GAVIN:  Objection to the relevance.

9            THE COURT:  Where are we going with this?

10           MS. GILBERT:  Your Honor, Mr. Lemagne's

11  experience as a gay or transgender inmate at Petersburg is

12  central to this case.  It's central to why he was chosen

13  as a victim.  It's central to his experience at prison

14  that led him to his relationship with the defendant.

15           THE COURT:  All right.  I'm sustaining the

16  objection.  Let's get to the two incidents at issue here.

17           MS. GILBERT:  Before I do that, Your Honor, I'd

18  like to ask Mr. Lemagne about his prior record, if I may.

19           THE COURT:  Sure.

20  BY MS. GILBERT:

21  Q    Mr. Lemagne, let's talk about the convictions that

22  got you to Petersburg.  Were you convicted of aggravated

23  identity theft, bank fraud, and use of an unauthorized

24  access device in 2016?

25  A    Yes, I was.

Brandon Lemagne – Direct                     192

1  Q    And prior to that, you also have several state

2  convictions; is that correct?

3  A    Yes.

4  Q    I'm going to go through those and just ask you about

5  each of them.  In 2017, were you convicted of a felony

6  probation violation in Norfolk Circuit Court?

7  A    Yes.

8  Q    In 2013, were you convicted of misdemeanor identity

9  theft in Chesapeake Circuit Court?

10  A    Yes.

11  Q    In 2012, were you convicted of felony probation

12  violation in Fairfax County Circuit Court?

13  A    Yes.

14  Q    In 2011, were you convicted of four counts of felony

15  violation in Norfolk Circuit Court?

16  A    I believe so, yes.

17  Q    In 2010, were you convicted of felony making or

18  possessing forging instruments, and felony identity theft,

19  two counts?

20  A    Yes.

21  Q    In 2007, were you convicted of felony forging or

22  uttering; felony making, possessing tools for forgery;

23  felony failure to appear; and felony issuing bad checks in

24  Norfolk Circuit Court?

25  A    Yes.

1  Q      Also in 2007, were you convicted of felony public

2  records forgery in Fairfax County Circuit Court?

3  A      Yes.

4  Q      And in 2005, were you convicted of misdemeanor

5  identity theft in Norfolk General District Court?

6  A      Yes, I was.

7  Q      And in 2004, were you convicted of misdemeanor petty

8  larceny in Hampton General District Court?

9  A      Yes.

10 Q      So the convictions that took you to Petersburg, were

11 those your first federal convictions?

12 A      Yes, they were.

13 Q      Mr. Lemagne, I'd like to turn your attention now to

14 an officer named Chikosi Legins.  Did you know an officer

15 by that name?

16 A      Yes.

17 Q      How did you first meet Officer Legins, the defendant

18 in this case?

19 A      He was an officer that was manning a unit of somebody

20 that I would consider to be a friend, somebody I was close

21 to.

22 Q      Who was the person who was in his unit?

23 A      His name was Kevin Thorpe.

24 Q      What did you think of the defendant when you first

25 met him?

Brandon Lemagne – Direct                    194

1  A     I thought he was cool.

2  Q     What made you say that the defendant was cool?

3  A     He just treated you like a person.  A lot of times

4  when you're in that setting, you know, certain officers,

5  they treat you like trash, you know.  He just -- he was an

6  officer that treated you like a person.  He was known to

7  be cool with a lot of the inmates that were at Petersburg.

8  Q     And how did you get to know the defendant?

9  A     Just through conversation, through going over there.

10 He'd allow me to come in his unit and talk to Gucci.  That

11 was Kevin Thorpe.  And he was from New York.  I'm from New

12 York.  So we spent a lot of time kind of chopping it up

13 about that, talking about the city.  I lived in Richmond

14 for a while.  We talked about that.  So just, you know,

15 general building, just talking and getting to know one

16 another, I guess.

17 Q     So you said that you and the defendant talked about

18 being from New York.  How did those conversations start?

19 A     Generally, he'd be standing outside during a move.

20 You know, I'd come over there.  "Hey, you know, can I

21 holler at Gucci?"

22        "Yeah."

23        You know, I'd sit up there, talk to him for a

24 while, go in, hang out with Gucci.  I may leave on the

25 move.  I may stay over for a couple of moves, but

1  whatever.  I may go down to the office and ask him to look

2  something up for me.  Both Gucci and I may go down there.

3  We would just talk.

4  Q    What other things did the defendant tell you that he

5  knew about you?

6  A    Everything.  He knew my entire history.  He knew I

7  had spent time living in Florida.  He knew my mother's

8  profession.

9  Q    What is your mother's profession?

10 A    She's in nursing.  He knew basically everything that

11 was in the computer about my history.

12 Q    What, if anything, did he say that he knew about your

13 childhood?

14 A    He indicated that he knew I had been molested as a

15 child.

16 Q    And if I could pause you there, Mr. Lemagne.  Were

17 you public at the prison, at Petersburg, about the fact

18 that you were molested as a child?

19 A    It never came up.

20 Q    Why isn't that the kind of thing that you wanted to

21 be public about in a prison?

22 A    You don't want to talk about being victimized in

23 prison, you know.

24 Q    In your experience, what happens if you talk about

25 being victimized in prison?

1  A     Then you're viewed as a victim, and people are going

2  to continue to victimize you.

3  Q     What was your reaction when you learned that the

4  defendant knew so much about you?

5  A     At the time -- well, up until the whole molestation

6  thing came up, I really didn't think much about it.  And

7  then when he asked me that, you know, I -- of course,

8  hindsight is 20/20.  I started reviewing, like, he kind of

9  knows everything about my history, like I said, from just

10 my family history to the states that I've lived in.  Just

11 everything.  Anything and everything that was in the

12 computer about me, he was very aware of it.  Like he had

13 done his due diligence.

14 Q     And if I may pause you there, Mr. Lemagne.  Did any

15 other officer ever tell you that he knew so much personal

16 stuff about you?

17 A     No.

18 Q     What other kinds of things did the defendant say to

19 you?

20 A     In reference to my history or just in general?

21 Q     Let me rephrase.  Did the defendant ever offer to

22 look out for you?

23 A     Yeah.  He was a -- yeah, he did.  He offered to look

24 out for me.  He told me that -- he told me, you know, to

25 just chill, that Petersburg was an easy place to do time.

1  And he said, "I got you.  Like, you're going to be good.

2  I'm going to look out for you.  Like, you can do your time

3  here."

4  Q    How did you feel when the defendant said that to you?

5  A    People say stuff like that all the time.  But I do

6  remember -- I'm just sketchy anytime somebody says

7  something like that.  But I do remember feeling just

8  reassured, like, okay, you know, somebody's got my back,

9  you know.  So --

10 Q    Did the defendant ever talk to you about himself?

11 A    He shared certain things.

12 Q    Did he ever talk to you about whether he was

13 divorced?

14 A    I don't remember him saying anything about being

15 divorced.

16 Q    Did he ever say anything to you about having been in

17 the military?

18 A    Yes.  He talked to me about being in the military.

19 He told me that he thought that the military saved his

20 life because he felt like he was going to end up in the

21 street.  You know, he indicated that he had a daughter,

22 that sort of thing.

23 Q    Did the defendant ever tell you anything about his

24 sex life?

25 A    He told me that he liked to pick up girls from Jeff

1    Davis Highway.

2    Q    What did you understand him to mean when he said

3    "pick up girls?

4    A    When I lived in Richmond, Jeff Davis was the place

5    that transgenders went to turn tricks, an escort.

6                MR. GAVIN:  Objection.  There's no foundation.

7                THE COURT:  Objection is sustained.  I don't

8    think you gave notice of this either, did you?

9                MS. GILBERT:  I'm sorry, Your Honor?

10                THE COURT:  Did you give notice under 404(b) for

11    this?

12                MS. GILBERT:  Did not, Your Honor.  This is a

13    prior statement by the defendant.

14                THE COURT:  All right.  We're not going to talk

15    about this again.

16                You're to ignore that whole line of questioning

17    about picking up girls.

18    BY MS. GILBERT:

19    Q    Mr. Lemagne, how did you feel when a federal

20    correctional officer volunteered information to you about

21    his life?

22    A    I thought it was cool.  I thought that -- I guess I

23    thought I had a friend.  I thought that I had an officer

24    who trusted me, and I think that I trusted him.

25    Q    Did the defendant ever give you any gifts?

1  A    He's given me things.  I don't know if I would

2  describe them as gifts.  He's given me food and, you know,

3  lotion.  Anything that you would bring in to an

4  institution to make your shift comfortable.  Like I said,

5  you know, lotion, food, a magazine here or there.  You

6  know, whatever he's got in his bag.

7  Q    Did the defendant ever give you cigarettes?

8  A    Yes.

9  Q    Do you smoke?

10  A    No, I don't.

11  Q    What good were cigarettes to you, then?

12  A    Cigarettes in prison are a way of survival.  You

13  can't have tobacco products in prison.  So if you've got

14  cigarettes, you've -- you've got a lot of money because

15  people are willing to pay for that.

16  Q    How did you go about selling the cigarettes the

17  defendant gave you?

18  A    I gave the cigarettes -- I would give them to Zell.

19  Q    I'm sorry.  Just for the record, is Zell the same

20  person you were referring to earlier, Ronzell Jackson?

21  A    Yes.  I would give them to Zell.  He would break the

22  cigarettes down, like open them up.  He'd take the tobacco

23  out and then, like, fold them up in, like, pieces of

24  magazine paper and sell them, like, bit by bit.

25  Q    Inmates typically can't carry cash, right?  So how

Brandon Lemagne - Direct                    200

1   would inmates buy cigarettes?

2   A    Inmates would buy cigarettes with postage stamps.

3   Postage stamps, that's like currency in prison.  So like

4   anything that you want -- food, clothes, a pair of

5   sneakers off of the yard -- you would use postage stamps

6   to purchase that stuff.

7   Q    How much is a pack of cigarettes approximately worth

8   at Petersburg?

9   A    If you're breaking it down like that, like if you're

10  breaking each cigarette down, you could probably get about

11  7 to $800 from a pack of cigarettes.

12  Q    We're talking about a pack of cigarettes that outside

13  of prison cost 5 or $6?

14  A    Right.  Pack of Newports.

15  Q    In terms of what prison inmates can buy with money,

16  how much does it cost to stay in touch with the outside

17  world by phone or by e-mail?

18  A    You're looking at about -- if it's a local call, if

19  you -- like, if it's a Richmond number, like, 3 or $4, I

20  believe, per phone call.

21  Q    And do e-mails also cost money?

22  A    E-mails cost money.  Everything cost money in prison.

23  I don't know.  I'm surprised they're not charging for air.

24  Like everything -- you have to pay for everything.  So if

25  you want to send an e-mail, you pay per minute to send

1  that.  They're called TRULINCS.  Like, you buy so many

2  units, and then, you know, you use that to send your

3  e-mails.  You use that if you'd like to purchase music for

4  your MP3 player.  So, yeah, you have to pay for

5  everything.

6  Q    What would happen to you as an inmate if you got

7  caught with cigarettes?

8  A    You're going to go to the hole.

9           MR. GAVIN:  Objection to relevance.

10          THE COURT:  What's the relevance?

11          MS. GILBERT:  Your Honor, by giving the victim

12  cigarettes, the defendant exercised power over him and put

13  him in a position where --

14          THE COURT:  Overruled.

15          MS. GILBERT:  Thank you, Your Honor.

16  BY MS. GILBERT:

17  Q    You said that if you were caught with cigarettes you

18  would go to the hole.  What do you mean by "the hole"?

19  A    The hole is like -- it's just an empty cell that you

20  go to with nothing in it.  No lotion.  Just nothing.  It's

21  just -- you're miserable.  There's no commissary there.

22  There's nothing back there.  You're just in a jumpsuit.

23  No TV.  Nothing.  It's -- it's the hole.

24  Q    How did the defendant give you cigarettes at first?

25  A    He's a heavy smoker.  He would come out of the unit

1   and, you know, talk to me.  He may light up, puff a

2   cigarette two times and drop it on the floor.  There's a

3   designated area for officers to throw cigarettes.

4   There's, like, a lockbox that, you know, they can toss

5   their cigarette out in so that inmates can't get to the

6   cigarettes, inmates can't get to the butts.

7             So, you know, like I said, he would take two

8   puffs off the cigarette.  You know, him and I would be

9   talking or discussing whatever.  He'd drop it on the

10  floor.

11  Q    How did you know that he was leaving them for you?

12  A    Why else would you do that?  Like, he was talking to

13  me.

14  Q    Where in the facility would this happen?

15  A    Generally in front of the unit, under the staircase

16  early in the morning.  It's dark.  Not a lot of people

17  generally go to breakfast.  So, you know, that would be

18  the time to chop it up.  I'd come over with my cup of

19  coffee.  He'd be out there.  It's the end of his shift.

20  He'd be out there smoking his cigarette.  We'd chop it.

21  He'd light one up, take two puffs, drop it, go back in the

22  unit.

23  Q    So even a partially smoked cigarette was valuable?

24  A    Absolutely.

25  Q    At the beginning, how many cigarettes at a time would

1  the defendant give you?

2  A    Maybe, like, one in the morning time.

3  Q    Did that number ever change?

4  A    Eventually, he started giving me whole packs.

5  Q    Did the defendant ever ask you for anything in

6  exchange for cigarettes?

7  A    No.  No.  He -- he never asked me for anything.  He

8  would ask me if I was good, as far as, like, you know,

9  "Are you good on everything?  You know, your books all

10  right?"

11  Q    You said earlier that at first the defendant talked

12  to you about things like your personal history and his

13  personal life.  Did the nature of the comments that he

14  made to you change over time?

15  A    Eventually, they did.  If we were having just a

16  normal, regular conversation, that's what it was.  But,

17  you know, he would, I guess, occasionally take a shot, you

18  know, and just kind of say something kind of crazy.

19  Q    What kind of crazy things would he say?

20  A    The first time he ever said anything out the way to

21  me, I was coming over to the unit again to hang out with

22  Gucci, and, you know, I was like, "Hey, can I go in there

23  and holler at Gucci?"

24           And he was, like, yeah, and I kind of like

25  walked away.  And as I was going into the unit, he said to

1   me, he was like, "Yo, you looking fat as shit in those

2   shorts."  And I was like -- I remember kind of looking

3   back and being like, you know -- I didn't really know how

4   to respond to somebody saying something like that -- to an

5   officer saying something like that.

6         Inmates say wild things all the time.  You know,

7   you ignore it.  You may clap back.  But, you know, I just

8   didn't expect him to say that.  So I really didn't know

9   what to think.

10  Q    After the defendant made that comment to you, how did

11  he act towards you in the days or weeks after?

12  A    Like he never said it.

13  Q    I'm sorry?

14  A    Like he never said it.  Like, the days following

15  that, he was just back to normal Legins, like --

16  Q    Okay.  So the defendant started acting like your

17  friend and then started making sexual comments.  At any

18  point did he engage in sexual behavior?

19  A    Yeah.

20  Q    The first time the defendant switched from sexual

21  talk to sexual behavior, what did he do?

22  A    I was leaving the dining hall.  He was the compound

23  officer that day.  I remember that it was a weekend and

24  they had biscuits.  So I usually go up there for that.  So

25  as I was leaving the dining hall, you know, he was

1  standing at the door as I was exiting.  He was like, "Hey,

2  you know, come up to the compound office on the next

3  move."  I remember him, like, winking at me.

4           So on the next move I went up to the compound

5  office and --

6  Q    And if I may pause you there, Mr. Lemagne.  What's

7  inside the compound office?

8  A    The compound office is the place that inmates that

9  are -- I guess they're kind of like the janitors or the

10 orderlies on the compound.  They pick up trash.  They

11 sweep the concrete.  They put, you know, salt out when

12 it's snowing.  That's where a lot of their maintenance

13 equipment is.  They breathalyze in that room, and that's

14 where, like, the officer that has the compound, that's the

15 officer that calls the moves every hour.  That's the

16 officer says, you know, it's time for a move or whatever.

17 That's generally the office that they handle their shift

18 in.  So that's what's in the compound office.

19 Q    And was the incident in the compound office the first

20 time the defendant behaved sexually in front of you?

21 A    No.

22 Q    Okay.  Let's talk about the first time.  What was the

23 first incident where the defendant switched from sexual

24 talk to sexual behavior?

25 A    I was -- usual position.  I was standing outside of

1  the door.  The move was over.  I was actually supposed to

2  be going to the lieutenant's office, and I was waiting on

3  Zell to come back from commissary because we were supposed

4  to go up there together.  I was standing outside of the

5  door, kind of waiting to see Zell go towards the

6  lieutenant's office.  So he's kind of standing inside the

7  corridor of his unit.

8  Q     And if I may pause you there, Mr. Lemagne.  Who are

9  you talking about when you say "he's standing inside the

10  corridor" --

11  A     Legins.

12  Q     Okay.  And what happened next?

13  A     We were having a normal conversation, and I thought

14  that -- I thought that he was, like, itching his groin.

15  Like, he kept, like, motioning down there, doing

16  something.  I was just looking at him talking.  I really

17  didn't think much of it.  Sometimes men adjust themselves.

18          And we just -- you know, we continued talking,

19  and he kind of exposed himself and just kind of like

20  started like playing with his penis.  Like, he, you know,

21  briefly masturbated.  And --

22  Q     And if I may pause you there, Mr. Lemagne.  How long

23  did he masturbate for?

24  A     Seconds.  It wasn't a long time.  I remember just

25  kind of, you know, looking down and being like, you know,

1  really, Legins?  Like, I was just shocked that -- that he

2  did that.

3  Q    And so you reacted by laughing a little bit and

4  saying, "Really, Legins"?

5  A    Yeah.  Like, I was just shocked that he did that.

6  Like I said, I just initially thought that he was, like,

7  scratching his groin or something.  But when I looked

8  down, his penis was out.  Like, he was masturbating.

9  Q    Was anyone else around for this?

10 A    No.  There was no move.

11 Q    Why did you react the way that you did?

12 A    I don't know how I was supposed to react.  I feel

13 like -- I didn't want to alienate him.  I didn't want to

14 upset him, you know.  It wasn't my intention to -- it

15 wasn't my goal to upset him or alienate him, you know.

16 But to be honest with you, I didn't know how to react to

17 that.

18 Q    Had any other officer ever behaved sexually in front

19 of you before?

20 A    No.

21 Q    After you kind of laughed and said, "Really, Legins,"

22 what did the defendant do?

23 A    He put his penis away.

24 Q    What happened next?

25 A    That day?

1  Q    Yes.  Where did you go after that happened?

2  A    I saw Zell dart out of commissary, and we went up to

3  the lieutenant's office together.

4  Q    And went about your business.  How did the defendant

5  act around you in the days and weeks after he masturbated

6  in front of you?

7  A    Normal, like --

8          THE COURT:  I'm sorry.  I can't hear you.

9          THE WITNESS:  I said normal, like it never

10  happened.

11  A    Regular.  "How's your mom, you know?"  "What's going

12  on?"  "Have you talked to your sister?"  Like just

13  regular, like it never -- like he just didn't do what he

14  did.

15  BY MS. GILBERT:

16  Q    Did you keep getting cigarettes from the defendant

17  after this?

18  A    Yes.

19  Q    Did the defendant ever masturbate in front of you

20  again?

21  A    Yes.

22  Q    Was this the incident in the compound office you were

23  about to describe?

24  A    Yes.  That was the incident in the compound office.

25  Q    Okay.  So can you please describe what happened

1  before you went to the compound office?

2  A    I was in the dining hall.  It was the end of lunch,

3  and I was walking out.  And as I was walking out, he was,

4  of course, standing by the door.  A lot of times officers

5  do that.  And, you know, he said to me, "On the next move,

6  come up to the compound office," and he winked at me.

7          If he tells me to come somewhere on the next

8  move, generally that means I have a pack of cigarettes for

9  you.  I have something to give you.  So I would come

10  wherever he was at and pick up my cigarettes.  And, you

11  know, that's what I did on the next move.

12  Q    So you went to the compound office after the

13  defendant ordered you to go there?

14  A    Yes.

15  Q    Given the earlier incident where the defendant had

16  masturbated in front of you and then acted like things

17  were normal again, at that point were you worried about

18  meeting him in the compound office?

19  A    I wasn't.

20  Q    Okay.  I'm going to ask you to think back to this

21  incident and describe what happened once you got to the

22  compound office.

23  A    I remember sitting in the chair, casual conversation,

24  just kind of -- just kicking it, just talking.

25  Q    I'm sorry.  If I may stop you there.  When you got to

Brandon Lemagne - Direct                          210

1  the compound office, who was there?

2  A    Legins was there.  He was the compound officer that

3  day.

4  Q    Anybody else in the office?

5  A    No.  It was just him and I.

6  Q    And so you came in and sat down?

7  A    Yes.

8  Q    What happened next?

9  A    Like I said, we were just kind of talking about

10  nothing.  Again, the move is over.  The yard is clear.  So

11  it was pretty quiet.  It was just him and I talking in

12  there.  He was sitting behind the desk.  I can't really

13  see what his hands were doing.

14        When he got up, he was -- his zipper was open.

15  He was massaging himself.  His penis wasn't out, but he

16  was, like, rubbing his groin.

17        He got up.  He started saying sexual things.  He

18  said that I was a pretty boy.  And in prison, when

19  somebody says that -- boy is another term for homosexual.

20  If somebody is like, "Yo, that's a boy," they're saying

21  that's a homosexual.  He said I was a pretty boy.  He

22  asked me to see my butt.

23  Q    Did you show him your butt?

24  A    No, I didn't.  I just kind of kept laughing and

25  brushing it off, like, "Legins, get out of here.  You

1  know, like, seriously.  Like, chill."

2  Q    How were you feeling as he was making these sexual

3  comments and rubbing his groin?

4  A    Nervous.  Nervous.  Nervous.  I could, like, feel --

5  I always, like, blush whenever I'm nervous.  I could feel

6  heat on my face and heat on my neck.  Like, I was nervous.

7  Q    How did the defendant react to your embarrassment or

8  blushing?

9  A    He didn't -- he wasn't acknowledging anything I was

10 saying.  He just kept saying greasy stuff.  Like, he just

11 kept saying wild stuff.  Like, he kept talking.  He just

12 kept saying nasty stuff.

13 Q    Where was the defendant while he was saying all these

14 things?

15 A    At one point, he was standing looking out the door.

16 He walked back over towards his desk, and then he went and

17 started looking out the door again.  So he was kind of

18 like moving around in the room, and I was kind of sitting

19 down in the chair beside the wall.

20 Q    Was the defendant still masturbating as he moved to

21 go in front of the door?

22 A    Yes.  He was still massaging himself.

23 Q    At that point could you have just walked out of the

24 office if you wanted to?

25 A    Well, no.  He's the compound officer.  So he has to

1  call me out.  I can't just walk across the secure

2  compound.

3              And for a portion of the time, he was standing

4  by the door.  In addition to that, I was there to get a

5  pack of cigarettes, and that's what I kept asking him for.

6  He was just ignoring that question.  I was like, "Where is

7  the pack at?"

8  Q    You were trying to get out of there?

9  A    Right.

10 Q    How much -- how tall are you, Brandon, approximately?

11 A    I'm about five nine.

12 Q    And about how much taller than you was the defendant?

13 A    Much taller.  I -- I'm -- I don't know.  He has to be

14 at least six foot six.

15 Q    And how much -- in May -- or I'm sorry.  Back in

16 2018, about how much did you weigh?

17 A    I was probably about 160.

18 Q    How did this situation come to an end?

19 A    Somebody -- I'm assuming somebody coming out of the

20 lieutenant's office or one of the areas over there --

21 walked out.  He heard keys jiggling.  And he was standing

22 by the door, still massaging himself, and he said kind of

23 like almost to himself, "Oh, this isn't a secure area."

24 You know, he kind of walked away.

25 Q    Did the defendant say anything else to you?

1  A    He told me to come back on the next move.

2  Q    Did you come back on the next move?

3  A    No, I did not.

4  Q    Why didn't you go back?

5  A    He -- the situation kind of freaked me out.  I didn't

6  want to be -- the situation freaked me out, and it didn't

7  look like he had any cigarettes.

8  Q    Did the defendant ever talk to you about the fact

9  that you didn't come back to the office on the next move?

10  A    He never brought it up.

11  Q    Did you report the defendant at this point for

12  exposing himself to you?

13  A    No.

14  Q    Did you ever confront the defendant about exposing

15  himself to you twice?

16  A    No.

17  Q    Why didn't you ever confront the defendant or report

18  him for masturbating in front of you?

19  A    I didn't think that I would be believed.  Just in

20  general, when you're in that position, when you're an

21  inmate, saying something like that, nobody is going to

22  believe you.  They just don't.  I mean, that's just what

23  it is.  Stigma, stereotype, whatever you want to call it.

24  People just don't believe that stuff like that happens in

25  prison, you know.

1            I had been through things at Petersburg, and I

2    had reported it.  I had, you know, said something about

3    it, and I feel like -- I feel like I was ignored.  Nothing

4    came of it, you know.  So for me, it was just a situation

5    where it was just like I'm not --

6    Q    Let's talk about that earlier incident that you

7    reported.  Did this earlier incident that you reported

8    involve the defendant at all?

9    A    No.

10   Q    It involved a different officer?

11   A    Yes.

12   Q    And briefly, what was the earlier incident that you

13   reported the different officer for?

14   A    There was an officer who was working in laundry who

15   was making, like, gay and transgender people undress

16   unnecessarily under the guise of changing our clothes.

17            MR. GAVIN:  Judge, I guess I object to

18   relevance.

19            THE COURT:  I think she's asking to set up why

20   he had reported previous things.  Is that right?

21            MS. GILBERT:  That's right, Your Honor.  Thank

22   you.

23            THE COURT:  So it's overruled.  But we're going

24   to get to the point.

25   BY MS. GILBERT:

1  Q    Brandon, please continue briefly describing the

2  earlier incident that you reported.

3  A    There was an officer there who was harassing me.  You

4  know, just really nasty, really obnoxious.  He kept asking

5  me -- or making me come to laundry to change my clothes

6  because he said like he felt my clothing was

7  inappropriate.

8          He would come, view me undressing.  And he just

9  did it multiple times.  Several times he gave me the same

10  size pants back, but, you know, he would just come and

11  make me undress in front of him.  You know, it just got to

12  the point where I realized that it was weird and something

13  is wrong.  Like, I started asking other people on the

14  compound, you know, who are gay, like, "What happened" --

15  like, "Does Payne make you come up there?"  And almost

16  everybody who was gay or transgender said, "Yeah, he does.

17  He makes me do that."

18          THE COURT:  So you reported him?  You reported

19  that officer?

20          THE WITNESS:  Did I report him?

21          THE COURT:  Yes.

22          THE WITNESS:  Yeah, I did.

23          THE COURT:  And did you get any response out of

24  that?

25          THE WITNESS:  No, I didn't.  I wrote the OIG.  I

1   filed a PREA.  I filed a grievance.  I spoke with

2   psychology about it, and her response to me, she said,

3   "Oh, he's trying to gay shame you."

4              MR. GAVIN:  Objection to hearsay.

5              THE COURT:  Objection sustained.

6              When you say you filed a PREA against him, what

7   do you mean by that?

8              THE WITNESS:  A PREA is a complaint you file

9   when you're being sexually harassed or somebody is doing

10  something of a sexual nature to you.  So that's what I

11  filed.  Like I said, I filed the PREA.  I wrote the world.

12  I notified psychology about what this guy was making gay

13  people do, and, you know, psychology's response to me was,

14  "Oh, he's gay shaming you."

15             THE COURT:  Okay.  We're not going to worry

16  about what people told you.  But essentially, you got no

17  response out of it.  Is that what you're saying?

18             THE WITNESS:  Uh-huh.

19             THE COURT:  Is that a yes?

20             THE WITNESS:  Yes.

21             THE COURT:  Okay.  Let's move on.

22  BY MS. GILBERT:

23  Q   Mr. Lemagne, what options do you have for following

24  up on a report when you've made it as an inmate?

25  A   You don't really have options.

1 Q     Did you ever research the law or rules around PREA as

2 a result of what happened in the laundry room?

3 A     Yeah.  I was pretty upset about it.  I remember

4 looking on LexisNexis trying to find cases where there had

5 been litigation in reference to that type of stuff, making

6 inmates undress, sexually harassing inmates.

7 Q     What kinds of search terms did you use while you were

8 researching on LexisNexis?

9 A     Correctional officer sexual harassment, correctional

10 officer sexual assault.  Things similar to that.  I

11 probably searched a million different things, but things

12 similar to that.

13 Q     Okay.  And what was the goal of your research?

14 A     I felt like what he was doing was wrong.  I felt like

15 what he was doing was illegal, and I felt like with the

16 fact that he did it to so many of us, somebody would

17 listen.

18 Q     Did anyone help you with your research?

19 A     Not really, no.

20 Q     Did anyone ever ask you about your research?

21 A     Yes.

22 Q     And what would you tell people when they asked you

23 about your research?

24 A     I was writing a script for a movie.  I was writing a

25 book.  Like, just anything.  Just get out of my business.

1  A lot of times people would just, like, look over your

2  shoulder and try to see what you're looking at.

3          The reason behind that, I guess, is people have

4  weird charges in prison, you know.  So, you know, people

5  are always trying to look at what you're reading or figure

6  out what you've got going on.  So, yeah, people would

7  definitely ask me questions about it.

8  Q    What happens, generally, if you as an inmate tell

9  other inmates very personal things about yourself?

10 A    Nothing good.  People use it against you.  People

11 misconstrue facts.  People spread your business.  Nothing

12 positive is going to come from that.

13         THE COURT:  Let's kind of get to the point from

14 that.

15 BY MS. GILBERT:

16 Q    Did you ever think about filing a lawsuit over what

17 happened in the laundry room?

18 A    Yeah.

19 Q    Why did you think about filing a lawsuit about what

20 happened in the laundry room?

21 A    I wanted it to stop.

22 Q    Did you ever tell anyone else about what happened in

23 the laundry room in terms of other inmates?  Without

24 getting into what you told them, did you talk to other

25 inmates about it?

1  A    I did talk to other inmates about what happened in

2  the laundry room.

3  Q    And did they encourage you to report it?

4  A    Not really.  I think everybody else just kind of felt

5  like it's kind of what you go through in prison.  The

6  people that were asking about it was people like me, and I

7  just think their attitude about it was like, yeah, he did

8  that to me too.  What are you going to do about it?

9  People know that -- they just don't care.

10 Q    Okay.  So you never ended up filing a lawsuit about

11 that?

12 A    I tried contacting organizations that, you know, did

13 stuff like that, like nonprofits.  I didn't really get a

14 response.

15       You know, this is a guy that works in laundry

16 that's making people undress.  I don't know what the

17 reasoning was, but the people -- people just didn't care.

18 Like I said, even people who were like me, like, they were

19 just -- they didn't -- it really wasn't that big of a deal

20 to them.  People just ducked Payne.  If you were gay, you

21 just duck Payne.  Just stay away from him.

22 Q    So you just avoided him?

23 A    Right.

24 Q    Okay.  So going back to what happened where the

25 defendant got you alone in the compound office and

1  masturbated in front of you, you didn't report that

2  because you thought that nobody would believe you based on

3  what happened with the laundry room?

4  A    Yeah.  I knew nobody would believe me.

5  Q    Okay.  Those two times that you described where the

6  defendant masturbated in front of you, did he touch you?

7  A    No.

8  Q    At that point did he physically force you to do

9  anything?

10 A    No.

11 Q    At that time did you ever think that the defendant

12 would go farther and physically attack you?

13 A    No.

14 Q    Did the defendant's conduct toward you, in terms of

15 his sexual behavior, escalate?

16 A    Eventually, it did, yes.

17 Q    I'd like to turn your attention to the date of

18 March 16th, 2018.  Mr. Lemagne, what were you doing that

19 night?

20 A    Hanging flyers.

21 Q    Why were you hanging flyers?

22 A    It's my job in recreation.  So I was hanging flyers

23 for that week's movie.  I can't remember what else was

24 going on.

25 Q    Were you hanging flyers in every housing unit?

1  A    Yes.

2  Q    Was the defendant working that night?

3  A    Yes, he was.

4  Q    At the time you were hanging flyers and before you

5  got to his unit, did you know that he was working?

6  A    Yeah.  I think that I was aware that he was working

7  that particular day, yes.

8  Q    And back in March of 2018, what unit was the

9  defendant working?

10  A    I believe that unit was F-South.

11  Q    Okay.  So what happened when you got to F-South?

12  A    I remember walking into the unit.  Somebody that I

13  know immediately walks up named Fatal.  I was talking to

14  him.  I posted the flyers up.  I think that Legins went

15  into the office, and I kind of went over there like, hey,

16  what's up, you know.  We chatted for a little bit.  I

17  remember him saying that he was going to let me through.

18  Q    What did that mean to you, let you through?

19  A    The way the prison is set up, the units are

20  connected.  There was, like, a corridor that connects the

21  units in the back.  There's offices back there.  So

22  generally, if the yard is closed and you have to go into

23  another unit, what an officer will do is just kind of open

24  the door and walk you, escort you from one unit to the

25  other, or escort you to the elevator so that you can go to

Brandon Lemagne - Direct                      222

1  the downstairs units to do whatever it is you need to do.

2              So, you know, if you're passing flyers or if you

3  work for maintenance or anything like that and you're

4  headed to another unit, the officer will escort you that

5  way versus disturbing the compound if the yard is closed.

6  Q    Had the defendant walked you through that hallway

7  that connects F-South and F-North on other occasions?

8  A    Many times.

9  Q    Have there ever been any sexual issues on those other

10 occasions?

11 A    No.

12 Q    So when the defendant told you he was going to take

13 you through the unit team area hallway -- is that also

14 what that hallway is called? --

15 A    Yes.

16 Q    -- you followed his order?

17 A    Yeah.

18 Q    About what time of night was that?

19 A    It was during the evening.  I couldn't tell you.

20 Sometime between dinner and 7.  I have no idea.

21 Q    And right before the defendant said he would take you

22 through the unit team hallway, was he making sexual

23 comments to you or winking?

24 A    No.  He was completely -- he was normal.

25 Q    Back to acting like your friend again?

1  A    It had been months maybe.  It had just been a long

2  time ago that he had done that.  So I had seen him many

3  times.  I had gotten cigarettes from him many times, had

4  many conversations.  He had escorted me through that area

5  many times prior to that both before and after he exposed

6  himself to me.

7           MS. GILBERT:  If I may, Ms. Taylor, would you

8  please pull up Government Exhibit 1-A, which has already

9  been admitted into evidence?  And could you play it for

10 just a couple of seconds and then pause it?  Starting at

11 18:14:25.

12           MS. TAYLOR:  Do you want me to play it?

13           MS. GILBERT:  Yes, please.

14           (Video Played.)

15           MS. GILBERT:  If you could stop it there.  We

16 are stopped at 18:14:28.

17 BY MS. GILBERT:

18 Q    Mr. Lemagne, do you recognize any of the people on

19 this video?

20 A    Yes.

21 Q    Have you seen this video before?

22 A    Yes.

23 Q    When was that?  Is that when I played it for you?

24 A    Yeah, during one of our conversations.

25 Q    So who do you recognize in the video?

1  A    I recognize myself.  I recognize Legins, and I

2  recognize a few other people.

3  Q    Okay.  If you actually reach over and put your finger

4  on the screen, you'll be able to circle things.  Can you

5  circle yourself first?

6         MS. GILBERT:  Let the record reflect that the

7  witness has circled the individual in the upper right

8  quadrant walking.

9  BY MS. GILBERT:

10 Q    Can you also please circle the defendant?

11        MS. GILBERT:  And the witness has circled the

12 individual walking on the right side of the video screen.

13        THE COURT:  So noted.

14        MS. GILBERT:  Thank you.  I'm going to clear

15 that now.

16        Ms. Taylor, if you could please play the video

17 until approximately 18:14:46.

18        (Video Played.)

19        MS. GILBERT:  We are paused at 18:14:46.

20 BY MS. GILBERT:

21 Q    Mr. Lemagne, it looked like you walked back into an

22 area in the back of the unit.  Do you know where you went

23 there?

24 A    There is a corkboard where I hang flyers over there.

25 There's an ice machine.  There's a table where I, you

Brandon Lemagne – Direct                        225

1   know, kind of gather my notes, take my flyers out, get my

2   stuff arranged to go into the next unit.

3           MS. GILBERT:  I'm going to ask Ms. Taylor to

4   please scroll ahead to 18:20:12, or as close to that as we

5   can get.

6           (Video Played.)

7           MS. GILBERT:  Perfect.  18:20:09.  If you could

8   please play until 18:20:27.

9           (Video Played.)

10          MS. GILBERT:  We are stopped at 18:20:27.

11  BY MS. GILBERT:

12  Q    Mr. Lemagne, what did you see yourself doing on the

13  video here?

14  A    Talking to Legins.

15  Q    Okay.

16          MS. GILBERT:  If you could, Ms. Taylor, please

17  continue playing until 18:21.

18          (Video Played.)

19          MS. GILBERT:  It's approximately where we were

20  going to pause anyway.  So we're stopped at 18:20:57.

21  BY MS. GILBERT:

22  Q    Mr. Lemagne, what were you doing at this part of the

23  video?

24  A    I'm waiting on him to let me through.

25  Q    And why were you waiting for him?

1  A    Because at this point the compound is closed.  So I

2  can't go back out onto the compound.

3  Q    Did he also tell you to wait there?

4  A    Yes, he did.

5         MS. GILBERT:  If it's possible to continue

6  playing the video.

7              (Video Played.)

8         MS. GILBERT:  We're trying to get up to

9  approximately 18:21:30.

10              (Video Played.)

11 BY MS. GILBERT:

12 Q    Mr. Lemagne, you've previously watched this video,

13 right?

14 A    Uh-huh.

15 Q    Where did the defendant take you after the part of

16 the video that we've just watched here?

17 A    He took me through the corridor.

18 Q    Also known as the unit team area hallway?

19 A    Correct.

20 Q    Okay.

21         MS. GILBERT:  We can leave off the video from

22 here.  Thank you.

23         MS. TAYLOR:  I have that.

24         MS. GILBERT:  I think we're okay, Ms. Taylor.

25         MS. TAYLOR:  Okay.

BY MS. GILBERT:

Q    What happened once you were in the hallway with the defendant?

A    I told me he was going to take me downstairs on the elevator.

Q    During your time at Petersburg, had you ever been alone in an elevator with an officer before?

A    Yeah.  Officers escort you in the elevator.

Q    And when you first got in the elevator, what did you think was going to happen?

A    I thought I was -- he was going to take me downstairs.

Q    What actually happened once you were alone in the elevator with the defendant?

A    I walked into the elevator.  He, you know, walked in behind me.  I kind of went and stood up, I guess, towards the center of the elevator.  And, you know, he just pulled up on me, and, you know, I remember the elevator doors closing.  He kind of pulled up on me and started nuzzling me.

Q    When you say he was nuzzling you, can you explain what you meant -- you mean?

A    Like how a guy would nuzzle his girlfriend.  He was kind of like putting his nose on the side of, like, my face.

1  Q     Did you try to hit the elevator buttons?

2  A    At that point I was trying to back away from him, and

3  I did.   And I kind of backed myself into the corner.   He

4  kept saying, "Do you know how bad I want to fuck you?"

5            Just saying a lot of really greasy stuff.   I

6  remember putting my hand up to push the elevator button,

7  and he smacked my hand down, and, you know --

8  Q     Do you remember any of the other things that the

9  defendant was saying to you at this time?

10 A    He asked me, "Do you know how bad I want to fuck

11 you?"  He said, "You have the most beautiful lips.   God, I

12 think you're beautiful.   That ass looks so soft."   Just

13 things that you would tell somebody when -- things that a

14 guy would say to -- those sort of things.

15 Q     Did he also say something like, "We don't have a lot

16 of time"?

17 A     Eventually.   He motioned for me -- he kind of like

18 put his hands on my shoulder and, like, pushed me down.

19 And I was resisting, and he was like, "Stop playing.   You

20 know, we don't have a lot of time."   And so he -- he kind

21 of pushed me down.

22 Q     If I may pause you there, Mr. Lemagne.   Before the

23 defendant pushed you down to the ground, could you have

24 gotten off the elevator if you wanted to?

25 A     No.

1  Q     Why not?

2  A     I can't really go around him.  He's not letting me go

3  around him.

4  Q     He was blocking the elevator door with his body?

5  A     Yes.  He's blocking me from moving.  At this point

6  I'm against the wall in the elevator.  I'm against the

7  wall, and he's, like, standing directly in front of me,

8  toe to toe.  So there's not really anywhere for me to go.

9  Q     Even if you had somehow gotten off the elevator,

10  where could you have gone once you were back out in the

11  hallway?

12  A     Nowhere.  All of the doors are locked.  So the area

13  that we're in, if I had broke away and ran off the

14  elevator, I wouldn't be able to get past the doors because

15  the doors, they're locked.

16  Q     What did the defendant do after he pushed you to the

17  ground?

18  A     He made me give him head.

19  Q     Were you on your knees at that point, Mr. Lemagne?

20  A     Uh-huh, I was on my knees.  He made me give him head.

21  Q     Where was your head while that was happening?

22  A     Against the wall.

23  Q     What was holding it against the wall?

24  A     He was.  His body.  He was, like, face fucking me

25  violently.

1   Q    Could you move your head from side to side?

2   A    It wasn't -- it wasn't a side-to-side motion.  Like,

3   he was, like, holding my head and moving my head back and

4   forth and thrusting his body, and my head was banging

5   against the wall.  It was violent.

6   Q    What happened to your flyers when the defendant

7   pushed you to the ground?

8   A    They were everywhere.  They were all over the floor.

9   Q    Did you want to perform oral sex on the defendant?

10  A    No, I did not.

11  Q    What were you feeling physically when your head was

12  pinned against the elevator wall?

13  A    Physical sensations.  It was repulsive.  Of course, I

14  was in pain.  Somebody was smacking my head against the

15  wall.

16  Q    What were you feeling emotionally while the defendant

17  was orally raping you in the elevator?

18  A    I think while everything was gone on, there was just

19  this feeling of like, is this really happening right now?

20  Like, is he really doing this to me?

21  Q    Did the defendant ejaculate?

22  A    Yeah, he did.

23  Q    Where did he ejaculate?

24  A    Everywhere.  All over my face, all over my clothes,

25  all over the floor, all over the wall.  Like, everywhere.

1  Q    What happened after the defendant ejaculated?

2  A    He zipped up, and he was like, "Get your stuff.

3  Get" --

4  Q    What did you do?

5  A    I wiped my face.  I gathered up my folder and my

6  flyers, and I walked out of the elevator.

7  Q    What were you thinking as you gathered up your

8  things?

9  A    I was just in shock.

10 Q    What happened after you left the elevator?

11 A    I remember him letting me out on the -- I remember

12 him letting me out on the other side, and I remember him

13 saying to me, "Bye, Magne."  You know, again, like, what

14 just happened didn't happen.  And --

15 Q    Let me just pause you there, Mr. Lemagne.  You said

16 that he said, "Bye, Magne"?

17 A    Uh-huh.

18 Q    Was Magne a nickname?

19 A    Magne is, yeah, like, short for my last name.

20 Q    Did other officers call you a nickname?

21 A    No.

22 Q    What did you do after that?

23 A    I went to the other side.

24 Q    Did you go back into the unit team area?

25 A    Yeah.  I went to the other side, and I just remember

1  being, like, really, really -- I just remember feeling

2  small, feeling dirty, feeling like somebody had just

3  trashed me.  And I remember being angry about it.

4          I walked out of the unit, and I remember

5  thinking to myself, he's not going to get away with this.

6  I'm not going to let him get away with what he just did to

7  me.  I went down into the unit downstairs.  There was

8  another officer working, and I said to her, "Hey, I need

9  to go upstairs."

10          She was like, "Okay."

11          She walks me to the back where the elevator is.

12 Q    And if I may pause you there, Mr. Lemagne.  How are

13 you acting when you interacted with that female officer?

14 A    I have no idea.  Probably -- I felt like I was trying

15 to be as normal as possible.

16 Q    Okay.  What happened after that conversation?

17 A    She let me into the back.  She let me into the unit

18 team area, and I got on the elevator that I was just on

19 with Legins.

20 Q    Why did you do that?

21 A    Because I was determined to turn him in.

22 Q    What did you do once you were on the elevator?

23 A    I wiped his semen off of the wall, and I wiped his

24 semen off of the floor.

25 Q    What did you wipe it with?

1  A    A paper towel that I had, a napkin.  Something that

2  was in my pocket.

3  Q    What happened after you wiped up the defendant's

4  semen in the elevator?

5  A    She radio me -- before she put me on the elevator,

6  she radioed me up.  So I didn't hear him, but she radioed

7  me, like, to the officer above.  So when the elevator went

8  up and the doors opened, he was there.

9  Q    What did you feel when you saw the defendant standing

10 there?

11 A    Scared.

12 Q    What did you say to him?

13 A    He was like, "What's up?  You know, like, why are you

14 back here?"

15        And I was like, "Compound wouldn't let me out."

16 Q    Was that true?

17 A    No.

18 Q    Why did you say that to him?

19 A    I wasn't going to tell him what I got back on that

20 elevator to do.

21        MS. GILBERT:  Ms. Taylor, would you please pull

22 up Government Exhibit 1-B, which has already been admitted

23 into evidence?  And could you please scroll ahead to

24 18:27:24?

25        (Video Played.)

Brandon Lemagne - Direct                    234

1              MS. GILBERT:  That's about as good as we can --

2   oh.  Perfect.  Thank you.  We are at 18:27:14.

3              (Video Played.)

4              MS. GILBERT:  If I could ask you to pause it

5   there, please.  We're at 18:27:37.

6   BY MS. GILBERT:

7   Q    Mr. Lemagne, what did that part of the video show?

8   A    I think it showed me hanging flyers.

9   Q    Okay.  So you came out of the unit team area hallway?

10  A    (Nodding head.)

11  Q    Did anyone come out with you, so far as you could

12  tell?

13  A    Legins.

14  Q    Did you see the defendant come out with you?

15  A    (Nodding head.)

16  Q    Do you remember what you all were doing in that back

17  area there?

18  A    There's a corkboard over there where you -- where I

19  hang the movie flyers and the other stuff.

20             MS. GILBERT:  Ms. Taylor, if you could please

21  scroll ahead to 18:27:51, if possible.

22             (Video Played.)

23  BY MS. GILBERT:

24  Q    Mr. Lemagne, you said that after what happened in the

25  elevator you were, at some point, hanging up flyers; is

Brandon Lemagne – Direct                    235

1   that right?

2   A      Uh-huh.  Yes.  Sorry.

3   Q      After -- thank you.  After everything that happened

4   to you in the elevator, how did it feel to go hang up

5   flyers just like you had been before?

6   A      I don't think I was processing anything at that

7   point.  I think that -- I think that I was on autopilot.

8   Q      You said earlier -- and I don't want to cut you off

9   there -- that right after it happened, you planned to

10  report the defendant for what he did to you in the

11  elevator because you didn't want him to get away with it;

12  is that right?

13  A      (Nodding head.)

14  Q      Why did you feel so determined to report the

15  defendant for raping you in the elevator?

16  A      I was angry.

17  Q      Did you end up promptly reporting the defendant

18  orally raping you in the elevator?

19  A      No.

20  Q      Why not?

21  A      I just remember going back to my cell and thinking

22  about everything that I had already been through and what

23  I would have to endure if I said something about it.  So

24  for me, it just -- I didn't think anybody would be

25  receptive to me.  I didn't think that anybody would listen

 1   to what happened to me.  I had already gone through the

 2   whole laundry thing, and, you know, I told you what

 3   people's attitude was about that.  So for me, it just --

 4   it didn't make sense to say anything.

 5            I think the other thing with that situation is

 6   that the FBOP is really weird when it comes to people like

 7   me, and there are a lot of prison politics.  Petersburg is

 8   one of the institutions where people like me are generally

 9   safe at.

10            MR. GAVIN:  Objection to relevance.

11   BY MS. GILBERT:

12   Q    When you say --

13            THE COURT:  Can we get just get to the point?

14   Why didn't you report it?

15            THE WITNESS:  I just said why I didn't report

16   it.

17            THE COURT:  No.  You were going off on something

18   else.  Why else didn't you --

19            THE WITNESS:  I didn't report it because I was

20   at an institution where I was fairly safe as far as there

21   was a big gay community there, and there was a chance that

22   I could end up at another institution where I wouldn't be

23   as safe and --

24            THE COURT:  So you were afraid of being moved to

25   another institution?

Brandon Lemagne – Direct                              237

1        THE WITNESS:  Right.

2        THE COURT:  Got it.  Okay.  Go ahead.

3   BY MS. GILBERT:

4   Q    What happens, in your experience, to transgender

5   inmates at other institutions or to gay inmates at other

6   institutions?

7   A    Everything and anything under the sun.  A lot of

8   times gay and transgender people become property for a

9   group of people.

10        MR. GAVIN:  Again, I object.  I'm not sure where

11   it's going.  It's not anything related to the facts.

12        THE COURT:  All right.  We're going to get this

13   answer, and then we're going to move on.

14        So essentially what you were saying is you're

15   afraid of what would happen at the other institutions.  Is

16   that what you're saying?

17        THE WITNESS:  Right.

18        THE COURT:  All right.  Let's move on.

19   BY MS. GILBERT:

20   Q    Were you also concerned about being transferred away

21   from your job and from your boyfriend, Ronzell Jackson?

22   A    Yeah.  I was definitely concerned about being

23   transferred from everything that I had built there.

24   Q    In your experience as a prison inmate, what happens

25   to prison inmates who report misconduct?

Brandon Lemagne – Direct                    238

1  A    They are retaliated against.  You're harassed.

2  Q    Okay.  Thank you, Mr. Lemagne.

3         MS. GILBERT:  I'd like to ask, at this point,

4  for Officer Spivey to please bring Government Exhibit 10

5  up to the witness box.

6         THE COURT:  Do you have any objection to

7  Exhibit 10?

8         MR. GAVIN:  No, sir.

9         MS. GILBERT:  Just for the record, the parties

10 have already stipulated that Exhibit 10 contains the

11 sweatshirt later collected from Mr. Lemagne's cell by an

12 evidence technician, and the sweatshirt is authentic and

13 has been maintained through a proper chain of custody.

14        With the Court's permission, rather than ask the

15 witness to examine the sweatshirt that's inside the bag,

16 I'd like to ask Mr. Lemagne about a photograph.

17        THE COURT:  That's fine.  And you did this by

18 agreement with defense counsel, as I recall?

19        MS. GILBERT:  We did, Your Honor.

20        THE COURT:  So, folks, what they're doing is

21 this.  Instead of opening up the bag, because it's been

22 scientifically tested, they took photos of the item

23 itself, and we're just going to show you the photo instead

24 of taking it out of the bag.  Do you understand that?

25 Okay.

Brandon Lemagne - Direct

1          All right.  Do you have the photo?

2          MS. GILBERT:  Yes.  It's --

3          THE COURT:  Which exhibit?

4          MS. GILBERT:  What we're showing now is

5   Government Exhibit 10-A, which I would move to admit into

6   evidence.

7          THE COURT:  Any objection?

8          MR. GAVIN:  No, sir.

9          THE COURT:  It's admitted.

10         (Government Exhibit Number 10-A was admitted.)

11  BY MS. GILBERT:

12  Q    Mr. Lemagne, do you recognize what's in this

13  photograph?

14  A    Sweatshirt.

15  Q    Is that your sweatshirt?

16  A    I believe so, yes.

17  Q    When was the last time you saw this sweatshirt?

18  A    2017.  Something like that.

19  Q    A while ago?

20  A    A long time ago.

21  Q    Was this the sweatshirt you were wearing the night

22  that the defendant orally raped you in the elevator?

23  A    This is the shirt.

24  Q    What did you do with this sweatshirt after the

25  defendant orally raped you in the elevator?

1  A    I put it in a bag and put it in the back of my

2  locker.

3  Q    Was that your cell?

4  A    Uh-huh.

5  Q    Why did you do that?

6  A    Well, at the time, I felt like I was going to turn

7  him in.  At the time, I felt like I was going to say

8  something about it.  At the time, I felt like I was going

9  to report it.  So the shirt was, in my mind, really the

10 only evidence I had because nothing -- I didn't feel like

11 anything I said would be believed.  So for me --

12 Q    Thank you, Mr. Lemagne.

13        MS. GILBERT:  Ms. Taylor, if I could ask you to

14 please zoom in on the -- if possible -- on the sleeve of

15 the sweatshirt, the right sleeve of the sweatshirt.  I'm

16 asking you to do some pretty fancy stuff right now.  Thank

17 you, Ms. Taylor.

18 BY MS. GILBERT:

19 Q    Mr. Lemagne, do you recognize some of the markings on

20 this sweatshirt?

21 A    Some of them, yes.

22 Q    Some of them you've never seen before; is that

23 correct?

24 A    Right.

25 Q    Which markings do you recognize?

1  A    I recognize the black marker.

2  Q    The small black circles?

3  A    Uh-huh.

4  Q    Who made those marks?

5  A    I did.

6  Q    Why did you make those marks?

7  A    I thought that that was semen on my shirt.

8  Q    You were thinking that you wanted to have evidence to

9  document what the defendant did to you?

10         THE COURT:  Why don't you let him answer the

11  questions instead of you testifying.

12         MS. GILBERT:  I'm sorry, Your Honor.  I'm just

13  trying to move things along.

14         THE COURT:  That's all right.  We still want him

15  testifying and not you.

16  A    Yeah.  I was thinking that -- like I said, this

17  sweatshirt is the only evidence that I have.  I was

18  thinking that I was going to report this man, and I

19  thought that that was semen on my shirt.

20         MS. GILBERT:  Officer Spivey, may I ask you to

21  please bring out Government Exhibits 8 and 9?  I believe

22  they're in the same envelope.

23         THE COURT:  Any objection?

24         MR. GAVIN:  No, sir.

25         THE COURT:  All right.  They'll be admitted.

Brandon Lemagne – Direct                    242

1              MS. GILBERT:   Thank you, Your Honor.

2    BY MS. GILBERT:

3    Q    Mr. Lemagne, if you could, please go into that

4    envelope and pull out inside -- I believe there are two

5    plastic bags.   What I'm going to do is ask you to, one by

6    one, describe the exhibits.   I'll talk you through that.

7    And then I will ask Officer Spivey to pass them over to

8    the jury so that they can take a look at them.

9    A    Open this?

10   Q    No.   No.   Keep it closed for now.   You can see the

11   contents, right?

12   A    Uh-huh.

13   Q    Okay.   Let's start with Government Exhibit Number 8.

14   Do you see that one?

15   A    Uh-huh.

16   Q    What is that?

17              THE COURT:   You have to say yes or no, sir.

18   A    Yes.   I'm sorry.

19              It's a piece of paper.

20   BY MS. GILBERT:

21   Q    And do you recognize this piece of paper?

22   A    It's a piece of paper that I wrote stuff on, yes.

23   Q    What did you write on there?

24   A    I wrote, "Legins, D-South entryway exposed."

25   Q    What's the significance of that, "D-South entryway

1  exposed"?

2  A      That was when he exposed himself to me and

3  masturbated in the corridor.

4  Q      Okay.  What else is on the paper?

5  A      "Friday, March 16th, F-South elevator."

6  Q      What's the significance of those notations?

7  A      That was the assault that I just told you about.

8  Q      Why did you write those things down, Mr. Lemagne?

9  A      Because when I got back to my cell and I was thinking

10 about the situation, I was writing down everything that

11 had happened to me.  I was writing down everything that I

12 had experienced with him.  I was writing down everything

13 that had gone on between us, and I was trying to figure

14 out the dates that these things had happened.  I couldn't

15 remember what day he exposed himself in the entryway, but,

16 of course, I remembered the March incident because it had

17 just recently happened.

18 Q      So you wrote these things down after the March

19 incident?

20 A      Yeah.  Probably about over the course of the next two

21 days, two to three days following it.

22 Q      Okay.

23 A      I did a lot of going back and forth, I guess.

24 Q      Can I ask you to take a look at Government Exhibit 9?

25 What is that?

1  A    That's the day that he called me to the compound

2  office.

3  Q    That's -- there's a date and other notations written

4  on there?

5  A    Right.  It says, "2/17/18, Saturday, compound, 1 or

6  2 p.m. move."

7          Again, I couldn't remember specifically what

8  time.  I just -- this was me trying to go back and figure

9  out exactly what happened and when it happened.

10 Q    What, if anything, did you plan to do with these

11 notes?

12 A    I planned to turn them in.

13 Q    Okay.  Where were these notes the last time you saw

14 them?

15 A    I think I had them in a folder.

16 Q    Was that at Petersburg?

17 A    At Petersburg, yes.

18          MS. GILBERT:  Your Honor, at this time, with the

19 Court's permission, I'd like to ask Officer Spivey to pass

20 these to the jury.

21          THE COURT:  Sure.  Go ahead.  Circulate them.

22          MS. GILBERT:  And, Your Honor, I'm about to

23 transition to talking about the later assault.  I don't

24 know if Your Honor had in mind a break.

25          THE COURT:  We're going to take a break in a

Brandon Lemagne – Direct                    245

1  second, but I want to make sure that -- I don't want you

2  talking while they're looking.

3           MS. GILBERT:  Sure.

4           THE COURT:  I want them focused on the evidence.

5           MS. GILBERT:  Sure.

6           THE COURT:  All right.  Folks, what do you say

7  we take a ten-minute break this time, which will put us at

8  4:00.  Trying to get as much of that time back as I can so

9  we keep moving forward.  Okay?

10          Everybody is going to rise for the jury

11          (The jury exited the courtroom.)

12          THE COURT:  All right.  Mr. Lemagne, you're not

13 to talk about your testimony with anybody during the

14 break.  Okay?

15          THE WITNESS:  Okay.

16          (Recess from 3:53 p.m. until 4:01 p.m.)

17          THE COURT:  All right.  Bring in the jury.

18          All rise for the jury.

19          (The jury entered the courtroom.)

20          THE COURT:  All right.  Everybody can be seated.

21          Everybody still doing okay?  Are you hanging in

22 there with me?  All right.

23          All right.  Go ahead, Ms. Gilbert.

24          MS. GILBERT:  Thank you, Your Honor.

25 BY MS. GILBERT:

1  Q    Mr. Lemagne, in the days and weeks after the

2  defendant orally raped you in the elevator in March of

3  2018, how did he act towards you?

4  A    It was back to normal.

5  Q    How did he talk to you?

6  A    Like we were best friends.

7  Q    Was it a lot of sexual comments at that time?

8  A    No.  It was just regular, normal conversation.

9  Q    Did the defendant keep giving you cigarettes?

10 A    He did.

11 Q    How did you act toward the defendant after he raped

12 you in the elevator?

13 A    I remember feeling leery.  I remember if I got flyers

14 on a day that he was working, you know, I would try to

15 hold them until the next day.  I just remember being

16 uneasy about the situation.

17 Q    You testified earlier, before the break, that the

18 incident in the elevator in which the defendant orally

19 raped you was the first time that the defendant escalated

20 from sexual talk and exposing himself to physically

21 assaulting you.  Was the March elevator incident the only

22 time the defendant sexually assaulted you?

23 A    No.

24 Q    Let's talk about the evening of May 10th, 2018.  What

25 were you doing that night?

1   A     I was passing flyers.

2   Q     And, again, were you hanging flyers in all of the

3   units that night?

4   A     Yes, I was hanging flyers in all of the units.

5   Q     Did you, at some point, go to F-South to hang flyers?

6   A     I did.

7   Q     What happened when you got to the main entrance of

8   F-South?

9   A     I was rushing.  Just -- it was raining.  I was kind

10  of slipping and just not -- I was just in a rush.  I

11  remember wanting to get back to the unit to eat.  So I

12  really wasn't thinking about Legins or anything else.

13  Like, I was just thinking about getting these flyers done

14  and just getting back to the unit.  And when he -- I

15  remember getting to the unit.  He let me in.

16  Q     Officer Legins let you in?

17  A     Officer Legins let me in.  There's a guy named Fatal

18  in that unit who I'm really cool with, and he kind of

19  pulled up on me and started talking to be about something.

20            THE COURT:  Who is this again?

21            THE WITNESS:  His name is Fatal.  His -- I

22  think -- his real name is Christopher Matine.

23            THE COURT:  Is he an inmate or is he a guard?

24            THE WITNESS:  He's another inmate.

25  A     But as soon as I walked through the door, like, I

Brandon Lemagne – Direct                          248

1   remember, you know, he kind of ran up on me and started

2   talking.

3   BY MS. GILBERT:

4   Q    If I might pause you there, Mr. Lemagne.

5          MS. GILBERT:  I'm going to ahead and ask

6   Ms. Taylor to pull up Government Exhibit 2, which was

7   already admitted into evidence.  And then to please start

8   playing it up through 18:09:06.

9          (Video Played.)

10  BY MS. GILBERT:

11  Q    Who do you see there, Mr. Lemagne?

12  A    I see Officer Legins.

13  Q    Do you also see yourself?

14  A    I do.

15  Q    What were you wearing that night?

16  A    Shorts, a T-shirt, a poncho.

17  Q    You said earlier that it was raining?

18  A    It was raining, yes.

19         MS. GILBERT:  If I could please ask Ms. Taylor

20  to -- and we're stopped right now at 18:09:06.  If I could

21  ask Ms. Taylor to please play the next 45 seconds or so.

22         (Video Played.)

23         MS. GILBERT:  Pause it right here.  Thank you,

24  Ms. Taylor.  We're paused at 18:09:51.

25  BY MS. GILBERT:

1  Q    Mr. Lemagne, in the period of the video that we just

2  watched, what were you doing?

3  A    I was posting a flyer on one of the corkboards.

4  Q    Okay.  And it appears at this point in the video the

5  defendant went in the office and came back out.  Do you

6  recall him saying anything to you at this time?

7  A    "Come on.  I'll walk you through."

8  Q    So the defendant was instructing you to come into the

9  unit team area hallway with him?

10 A    Uh-huh.

11          THE COURT:  Is that a yes?

12          THE WITNESS:  Yes.

13 BY MS. GILBERT:

14 Q    What did you think would happen once you got into the

15 hallway?

16 A    I thought he was going to walk me through.

17 Q    Did you feel like you could say, no, I don't want to

18 go into the hallway?

19 A    No, not -- no.

20 Q    What happened once you were inside the hallway?

21 A    I remember when he nodded at me and told me that he

22 was going to walk me through, I just remember thinking --

23 the way he kind of gave me the nod, I just -- I thought

24 that he had a pack of cigarettes.  So I guess that was my

25 expectation, that he was going to give me a pack of

1  cigarettes.

2  Q    And what happened once you got through those doors

3  into the unit team area hallway?

4  A    He told me to go into one of the offices back there

5  that the counselors normally use.

6  Q    Did you follow that order?

7  A    Yeah.

8  Q    Did the defendant also go into the office?

9  A    He came into the office behind me.

10  Q    Okay.  What happened once you were inside the office,

11  Mr. Lemagne?

12  A    I turned around.  He was, like, on top of me.  I

13  remember sticking my hand out, like, and he was, like,

14  right there on top of me.  I remember him grabbing me.

15  Q    How did he grab you?

16  A    He grabbed my buttocks like -- like how a guy grabs a

17  girl.  Like, he grabbed me by the butt and just kind of

18  like walked me to the back of the room.  I don't know if

19  that makes sense.

20  Q    So just to clarify, the gesture that you're

21  describing, the defendant was pressing the front of his

22  body against you?

23  A    The front of his body was pressed against me.  His

24  arms were, like, cupping my butt.

25  Q    So he was reaching around behind you --

1  A     Right.

2  Q     -- and grabbing your butt?

3        And then you said that he was moving you into

4  the office?

5  A     Right.  Like -- yeah, he was moving -- like, moving

6  me backwards, almost like a dance.  Like, he was, like,

7  holding me, moving me backwards.  Like --

8  Q     What did you do when the defendant used his body to

9  push you further into the office?

10  A     "Stop.  Knock it off.  Like, what the fuck are you

11  doing?  Somebody is going to come back here.  Like" --

12  Q     Did you try to play it off?

13  A     Yes.

14  Q     Why did you do that?

15  A     Because I was scared of him.  I didn't want to have

16  sex with him, but I didn't want to piss him off.

17  Q     Did you try to get away from him?

18  A     He eventually got me to the back of the room, like

19  towards the rear of the office.  He was doing his little,

20  like, nuzzling thing.  I remember saying like, you know,

21  "Knock it off," and I snatched away from him.

22  Q     What happened when you snatched away from the

23  defendant?

24  A     He yanked me back.

25  Q     What did he yank you back by?

Brandon Lemagne - Direct                           252

1   A    I think at one point he had my shirt, my arm.  He --

2   he yanked me back.

3   Q    What did he say to you?

4   A    "Stop playing."

5   Q    What happened next, Mr. Lemagne?

6   A    I kept yanking away from him.  I yanked away again.

7   He yanked me back.  I remember him saying, "Stop fucking

8   around."  Like, know you, "Stop playing.  You know what's

9   up.  Stop playing."

10           At this point I'm, like, in the back of the

11  office.  There's, like, a little -- I don't know.  Like a

12  closet or an opening, like, towards the side of the

13  office, and I'm almost, like, in a blind spot.  I remember

14  him saying, "Give me some head."  And --

15  Q    What did he do when he said, "Give me some head"?

16  A    Like, pulling me down.

17           So I did it.  I didn't feel like I had a choice.

18  Q    When you say, "I did it," what do you mean?

19  A    I did what he told me to do.

20  Q    Did he push you to the ground?

21  A    Yes.

22  Q    Okay.  Even if you had managed to break away from the

23  defendant at that point, where could you have gone?

24  A    To the hallway.  Again, the doors were locked.

25  Q    What if you had tried to call for help?

1  A    There wasn't an area where anybody would hear you.

2  Q    What, if anything, did the defendant say to you as he

3  put his penis in your mouth?

4  A    "I want to fuck you."

5  Q    What was the defendant doing with his hands at that

6  point?

7  A    Holding my head.

8  Q    How did you feel physically while the defendant was

9  holding your head and forcing his penis in your mouth?

10 A    Degraded.

11 Q    How long did the oral part of this go on?

12 A    Probably less than a minute.  Maybe a little more

13 than a minute, give or take.

14 Q    What did the defendant do next?

15 A    He told me to stand up.

16 Q    Did you stand up?

17 A    I did.  And --

18 Q    Why did you do what he said?

19 A    I didn't have a choice.

20 Q    What happened once you stood up?

21 A    He told me to turn around, but he -- like how you

22 kind of move somebody, like turn around.

23 Q    He turned you around?

24 A    Right.

25 Q    Okay.  What happened then?

1  A     He penetrated me.

2  Q     I'm sorry to have to ask you these difficult

3  questions, Mr. Lemagne.  When you say that he penetrated

4  you, can you please explain what you mean?

5  A     He put his penis in my rectum.

6  Q     Thank you.  Did he at any point put his hands in your

7  mouth?

8  A     Yes.  While he was inside of me, he was, like -- I'm

9  bent over.  He, like, has his hand, like, holding my

10 mouth, kind of like maneuvering me, pulling me back to

11 him, like -- I guess almost like a horse with a bit, if

12 you will.  He was grabbing my shirt, holding the back of

13 my shirt with his other hand.

14 Q     Did the defendant use any kind of lubrication when he

15 penetrated you?

16 A     He was spitting.  I felt him spit, like --

17 Q     Did he, at some point, spit on his hand?

18 A     I felt him spit in between my cheeks.  I heard him

19 and felt the motion of him spitting in his hand and, like,

20 wiping it in my anal area.

21 Q     Did the defendant ejaculate?

22 A     He did.

23 Q     Where did he ejaculate?

24 A     He ejaculated in his hand.  I remember him saying,

25 "Catch this.  Catch this.  Catch this," and, like, he

1  pulled out of me.  And when I turned around, like, he was

2  ejaculating in his hand.  Like, he was, like, coming in

3  his hand.

4  Q    What did the defendant do after he ejaculated into

5  his hand?

6  A    He walked into the bathroom.  I just remember kind of

7  sitting there, looking crazy, feeling crazy.  Like, I

8  just -- I just kind of remember sitting there.

9  Q    Could you hear anything happening in the bathroom?

10  A    Water.  I heard the toilet flush.

11  Q    Mr. Lemagne, what were you thinking at that point?

12  A    Get the fuck out of here.  Just leave.

13  Q    Were you trying -- I'm sorry.

14  A    I was thinking everything.  I wanted to run away.  I

15  remember again feeling like did this really just happen.

16  Almost like déjà vu.  Stunned.

17  Q    Were you feeling anything physically at that point?

18  A    Yeah.  Of course, somebody doing that to you so

19  forcefully, I was in pain.

20  Q    Where were you in pain?

21  A    My rectal area was hurting.

22  Q    Okay.

23  A    I remember him coming out of the bathroom.  I guess I

24  wasn't moving fast enough, you know.  He was like, you

25  know, "Clean yourself up.  Clean up."  So, again, I'm

1   trying to get myself together.  The poncho that I had on

2   is, like, twisted around.  I just remember trying to

3   adjust my clothes and trying to get myself -- like, just

4   get myself together and get out of that office.

5   Q    Did you eventually leave the office?

6   A    I did.  Both of us walked out.  He escorted me -- he

7   escorted me to the other unit.

8   Q    When you say "the other unit," do you mean Fox North?

9   A    The unit directly across from his, yes, Fox North.

10  Q    Where did you go after he let you out into Fox North?

11  A    I remember feeling shaky.  I remember stopping at the

12  corkboard and, I guess, kind of pausing, and then I just

13  walked out.

14  Q    Where did you go once you left the unit?

15  A    I went back to my housing unit and --

16  Q    Was anyone there when you got back to your housing

17  unit?  Did you go back to your cell?

18  A    Yeah.  I remember waiting outside of the door for

19  what seemed like a really long time, and --

20  Q    I'm sorry, Mr. Lemagne.  When you say you were

21  waiting outside of the door, do you mean the door to go

22  into the unit?

23  A    Yeah.  I was waiting outside of the door to go into

24  the unit for what seemed like a really long time.  And

25  eventually the officer came and let me in.

1  Q    What happened after the officer let you in?

2  A    I think that I went to my room first.  I think I

3  looked in the TV rooms.  I might not have been there.  I

4  just remember going to my room.  I think somebody brought

5  me a salad or it may have already been in there, but I

6  tried to eat a salad at night from the dining hall.

7          And this guy came to talk to me.  His name is

8  R2.  And I don't remember what he was saying.  I was just

9  feeling, like, just, you know, get away from me.  And I

10 remember saying to him, "Can you go get Zell for me?"

11         And I don't know if he could tell something was

12 wrong with me, but he went to get Zell.  And --

13 Q    Did Zell come back to the cell?

14 A    Yeah, Zell came back to the cell.  And --

15 Q    Did you tell Zell what happened right away?

16 A    Yeah.  I just -- I broke open, and I -- I just -- I

17 told him what happened.

18 Q    Did you tell him every detail of what had happened?

19 A    No.  I just told him what Legins did to me.  And I

20 said, you know, "It's not the first time he did it."  And

21 I remember just crying and just telling him everything

22 that happened.

23         And he kept asking me why I didn't say anything.

24 He told me that I needed to go to the lieutenant's office.

25         MR. GAVIN:  Objection.  Hearsay.

Brandon Lemagne - Direct                    258

1          THE COURT:  I don't think it's offered for the

2     truth of the matter asserted.  Overruled.

3     BY MS. GILBERT:

4     Q    After you spoke with Zell, what did you decide to do?

5     A    I didn't -- I went to the lieutenant's office that

6     day.  He told me that I needed to say something.  He said,

7     "I don't know if I'm going to see you again.  I don't know

8     what's going to happen after this, but you need to go to

9     the lieutenant's office.  You need to say something."

10    And --

11    Q    And I'm sorry.  Just to pause you there, Mr. Lemagne.

12    You're talking about what Zell said to you?

13    A    This is what Zell is telling me.  He said that I

14    needed to go to the lieutenant's office.  He said I needed

15    to say something.  He started crying.  He said, "I don't

16    think that" -- he said, "I don't know when I'm going to

17    see you again, but you have to go up there and say

18    something.  Like, you can't" -- "you can't let that ride.

19    You can't let that go."

20          He was really upset that I didn't say anything

21    to him before.  He told me that everything would be okay.

22    He said I was smart enough to handle any compound that I

23    ended up on.  He told me that he loved me.  He told me

24    that he would never lose contact with me.  He said not to

25    worry about anything.  He was going to pack my stuff up.

1  He just told me everything would be okay.

2  Q    What did you do after that conversation with Zell?

3  A    I walked up to the lieutenant's office.

4  Q    On your way out of the unit, did you hear anything?

5  A    I heard knocking on a window.

6  Q    Where was the knocking coming from?

7  A    It sounded like it was coming from my unit.

8  Q    Did you look back to see what was making the sound?

9  A    I didn't want to look back.

10 Q    Why didn't you want to look back?

11 A    Because I felt like it was him at the window.

12 Q    When you say "it was him," what do you mean?

13 A    I feel like it was probably Zell at the window saying

14 bye to me.

15          MR. GAVIN:  Judge, objection.  This is

16 speculation.

17          THE COURT:  All right.  So you heard the

18 knocking.  What happened next?  Let's just move on.

19 A    I walked to --

20          MS. GILBERT:  I'm sorry, Your Honor.  I'm asking

21 Mr. Lemagne why he didn't look back when he heard a

22 knocking sound.  Can I just let him finish that answer?

23          THE COURT:  No.  I'm sustaining it, the

24 objection that he just raised, and we're going to move on

25 to the next point.

1          MS. GILBERT:  Okay.

2          THE COURT:  She's going to ask you a question.

3    So -- I just sustained an objection.

4    BY MS. GILBERT:

5    Q    After everything that the defendant had done, why did

6    you decide to report the defendant's rape in the office

7    area in May of 2018?

8    A    I just think when I walked into that room after that,

9    something snapped.  No amount of money is worth going

10   through that.  No favor, no -- no nothing.  You're not

11   going to do that to me.  And I didn't really have a way of

12   fighting back.  I couldn't -- I can't beat him.

13          So for me, I didn't -- something snapped in me

14   that day.  Something broke in me that day, and I just felt

15   like whatever happens happens, but I wasn't going to stay

16   on a compound and at an institution with somebody that was

17   doing that to me.

18   Q    How did you feel about reporting to other

19   correctional officers and staff what the defendant did to

20   you in the unit secretary's office?

21   A    I was terrified.

22   Q    What were you scared of?

23   A    No one is going to believe anything like that.  They

24   are -- just no one is going to believe anything like that.

25          I didn't know what they would do to me.  I --

Brandon Lemagne - Direct                    261

1  everything was going through my mind.  Of course, you have

2  this -- you know what the stigma is.  You know, you're an

3  inmate.  You go and report something like that, it's like,

4  get out of there.  That's a family man.  That's, you know,

5  an honest man.  You know, you're in prison.  You know,

6  like, who's going to believe that?

7            And, of course, at the same time, I'm not really

8  in a position to where -- I can't fight these people back.

9  I can't do anything to them.  Like, these people can make

10 my life miserable.  You know, they can transfer me to the

11 worst penitentiary this side of -- they can do anything

12 that they want to me.

13           So, you know, all of these things, of course,

14 were going through my mind, but I knew that if I didn't go

15 up there, I probably wasn't going to go up there.

16 Q    Did you eventually get to the lieutenant's office?

17 A    I did.

18 Q    What did you do once you got there?

19 A    I cannot remember the name of the lieutenant there.

20 I lost it.  I started crying.  There was another officer

21 in the room.  He kept asking me what happened, what

22 happened, what happened.  And I was just sitting in the

23 chair crying.  And he said to me -- he said to the

24 officer, "Step out for a minute."  So the officer that was

25 in the room left, and I told him what happened.

1  Q     What did you say?

2  A     I said that Legins took me into a counselor's office

3  and raped me.

4  Q     What happened after you told the lieutenant that the

5  defendant raped you?

6  A     He asked me to step outside the room.  And I can't

7  remember how long I was there, but two guys showed up, and

8  they walked me to medical.

9  Q     What happened once you got to the medical unit?

10 A     The nurse asked me what happened, and I told her.  I

11 told her what happened.  She typed everything up.  She was

12 writing everything down.

13        And during the course of that, a phone call came

14 in.  And I'm standing behind her.  She's in front of me

15 typing on the computer.  And I just heard a baritone, like

16 a deep male voice, and I just remember, like, my heck was

17 kind of going up, like -- and I was like, "Is that him?"

18        And I heard the person talking, the person

19 talking.  She kept going like this, like shaking her head.

20 But I remember her saying, "Um, we don't provide medical

21 services for staff.  So not" -- "not right now."

22        And I kept, you know, kind of screaming, "Is

23 that him?  Is that him?  Is that him?  Don't let him come

24 up here."

25        And I remember kind of like looking at her.  I'm

Brandon Lemagne – Direct                    263

1    standing at, like, rear to her, and her whole face was red

2    like, you know, she was nervous or scared or both.   I

3    don't know.   She hung up the phone and continued typing.

4    Q    Do you remember whether you were sitting or standing

5    while you were talking to the nurse?

6    A    There was, like, one of those examination tables

7    behind her -- I mean -- yeah, behind her, and I was kind

8    of like standing up.

9    Q    At some point did you say something about being

10   worried that something was going to leak out of you?

11   A    Yeah, I did.

12   Q    What were you talking about?

13   A    I was concerned about his saliva.   I was concerned

14   about his semen.

15   Q    Why were you concerned about those things?

16   A    For everything under the sun.   I just remember

17   feeling dirty and violated.   I'm standing here trying to

18   talk to you and somebody's DNA is, like, leaking -- it's

19   disgusting.   So, you know, for all of the reasons above.

20   Like, I didn't want to make a mess.   I didn't want to

21   embarrass myself any more than I already was.   So I stood

22   up.

23   Q    Were you also thinking about evidence collection at

24   that point?

25   A    Yeah, I was.

Brandon Lemagne – Direct                   264

1  Q     Were you concerned that nobody would believe you

2  without evidence?

3  A     Yes, I was.

4  Q     Did they come collect your clothes before you left

5  the medical unit?

6  A     They collected my clothing.  They took me across to

7  an office to speak with a psychologist named Dr. Wolf.

8  Q     Okay.  And before we talk about your conversation

9  with Dr. Wolf, can you just briefly describe the process

10 of having your clothes collected?

11 A     They put on gloves.  They make you stand on this long

12 roll of paper, and they make you take off your -- each

13 article of clothing one by one and, like, shake the

14 clothes out, and then they, like, roll them up.

15 Q     So after everything that happened to you in that

16 office, you took off your clothes and stood naked in front

17 of the officers who were collecting your clothes?

18 A     Yeah.

19         MS. GILBERT:  At this time I'm going to ask

20 Officer Spivey to please bring Exhibits 11, 12, 13 and 14

21 up.

22         THE COURT:  Any objection?

23         MR. GAVIN:  No, sir.

24         THE COURT:  All right.  They'll be admitted.

25         MS. GILBERT:  Thank you, Your Honor.

1              And, again, the parties have stipulated that

2   these items are authentic and were collected from the

3   crime scene and have been maintained through a proper

4   chain of custody.

5              (Government Exhibit Number 11-A was admitted.)

6              MS. GILBERT:  With defense counsel's agreement

7   and with the Court's permission, I'd like to ask the

8   witness to look at some photographs taken of these

9   exhibits.

10             THE COURT:  Folks, we're going to do it the same

11  way we did the last time.  These are photos instead of us

12  taking the actual clothes out.  Okay?

13             MS. GILBERT:  Ms. Taylor, could I ask you to

14  please pull up Exhibit 11-A?

15  BY MS. GILBERT:

16  Q    Mr. Lemagne, could you take a look at that

17  photograph?

18  A    Uh-huh.

19  Q    Do you recognize --

20             THE COURT:  I need you both to keep your voices

21  up.  You're starting to trail off, and he --

22  A    Yes, I recognize that photograph.

23             MS. GILBERT:  I apologize, Your Honor.

24  BY MS. GILBERT:

25  Q    What does this photograph show?

1   A     My sneakers, a pair of ankle socks, and my T-shirt.

2   I also see the rec stapler and a poncho.

3   Q     And is this a fair and accurate depiction of the

4   shirt, poncho, shoes you were wearing that night,

5   May 10th, 2018?

6   A     Yes.

7   Q     Can you please describe for the record how your

8   T-shirt looks in this photograph?

9   A     My T-shirt is ripped.

10  Q     Can you explain to the jury how your T-shirt got

11  ripped?

12  A     I would guess that that happened during the tussle

13  when he was snatching me back and I kept trying to walk

14  out of the office.

15  Q     But you're not sure?

16  A     I don't wear ripped clothes.  That's the only time it

17  could have happened.  I wouldn't wear a shirt that was

18  ripped like that on the collar.

19  Q     Okay.

20          MS. GILBERT:  I'd like to ask Ms. Taylor to

21  please pull up Government Exhibit 12-A.

22          (Government Exhibit Number 12-A was admitted.)

23  BY MS. GILBERT:

24  Q     Mr. Lemagne, do you recognize some of these items?

25  A     That's my jock strap, a pair of shorts, Carmex.  I

1  don't know what the other item is in -- some sort of --

2  Q    It's kind of hard to see that other stuff.

3  A    Yeah.  I don't know what that stuff was.

4  Q    Were you wearing this jock strap on the night of

5  May 10th, 2018?

6  A    Yes.

7  Q    Were you wearing these shorts on the night of May

8  10th, 2018?

9  A    Yes.

10 Q    Is anything about them different than you remember

11 when you last saw them?

12 A    The writing, the stains.

13 Q    You didn't do that writing on there?

14 A    No.

15 Q    Okay.  All right, Mr. Lemagne.  We're going to move

16 on from these photographs and go back to what you were

17 just about to tell us about your conversation with

18 Dr. Wolf.  Who is Dr. Wolf?

19 A    She's a psychologist in charge of the drug program at

20 Petersburg.

21 Q    Did you know her from before this incident?

22 A    I did know Dr. Wolf.

23 Q    How did you know her?

24 A    She had transferred me into her program, and I

25 declined it.

1  Q     So you left the program?

2  A     Right.  Her and I had some long conversations.  So I

3  was pretty familiar with her.

4  Q     She's somebody that you generally trusted?

5  A     Yeah.  I think -- yeah.  She -- I think she was --

6  she was cool.  I liked Dr. Wolf.

7  Q     Where did you speak with Dr. Wolf?

8  A     I spoke with her in the office across from the

9  medical examination room.

10  Q     And roughly what did you tell her?

11  A     She asked me what happened.  I told her, you know,

12  what had happened, and I said that it's something that had

13  been going on.  And I remember getting really angry.  I

14  remember saying to her, "I tried to tell you guys about

15  what was going on here.  I tried to tell you guys about

16  Payne.  I tried to tell you guys.  I tried to tell you

17  guys."

18  Q     Let me pause you there, Mr. Lemagne.  When you said

19  that you were trying to tell them about Payne, are you

20  referring to an officer whose name is Payne?

21  A     Right.  I was referring to the whole laundry incident

22  and what happened with Officer Payne in laundry.  Of

23  course, she wasn't the psychologist that I told that stuff

24  to and she really didn't have any knowledge about that,

25  but she was, like, the first person that I guess I came

1  into contact with that I was, I guess, kind of familiar

2  with.

3  Q     What were you feeling when you were meeting with her?

4  A     Anxiety, anger, fear.  I remember saying to her, you

5  know, "I don't know if I'm doing the right thing."  I just

6  remember being uncertain about everything that I was doing

7  and everything that could potentially happen to me.

8  Q     In particular, what were you worried about happening

9  to you as a result of reporting this?

10  A     Just retaliation and harassment, just afraid I would

11  disappear under somebody's prison.  The FBOP can send you

12  anywhere.  I mean, they can say, You know what.  We're

13  going to send you to Alaska.  Good luck.

14           So there's also that fear of ending up, again,

15  at an institution where, you know, I end up somebody's

16  property.  There's always that fear of being harassed,

17  chastised, anything, you know.  So, you know, I'm

18  reporting something like that, and I'm terrified that

19  these people are going to dog me, like I'm --

20  Q     After you finished meeting with Dr. Wolf, where did

21  you go?

22  A     I went back into the examination room.  And when I

23  got back in the examination room, I noticed that the nurse

24  was still typing up the statement.  And, you know, I

25  remember saying to her, "I thought we finished that."

1              And she said, "Well, I deleted it by mistake."

2              So she was retyping the statement I guess from

3  her memory.

4  Q    I'm sorry, Mr. Lemagne.  Can I go backwards?

5  A    Sure.

6  Q    Do you remember the defendant calling the room where

7  you were or radioing when you were with Dr. Wolf?

8  A    I remember his voice on the radio.  I can't remember

9  what he was saying.

10 Q    Okay.  And so after you finished that meeting with

11 everyone in the medical unit, where did you go?

12 A    I was in a white -- I don't know what you call those

13 suits.  You see them when people are working with asbestos

14 and -- you know, like one of those white kind of surgical

15 moon suits.  I don't know.  I had one of those on, and

16 they were taking me back to the lieutenant's office.

17 Q    What, if anything, happened while -- and when you --

18 I'm sorry.  When you say they were taking you, are you

19 referring to correctional officers?

20 A    This was two correctional officers that -- the same

21 two cops that had changed me out and I guess did the DNA

22 collection, they were escorting me from medical back to

23 the lieutenant's office.

24 Q    And what, if anything, happened while you were being

25 escorted back to the lieutenant's office?

1  A     We exited onto the compound.  It was a closed move.

2  It was dark.  Everything was quiet.  And I hear somebody

3  scream, "Don't believe anything he tells you.  He's

4  lying."

5  Q     Could you tell who that was?

6  A     I saw a figure standing --

7  Q     Did you -- I'm sorry.  Go ahead.

8  A     I saw Legins' figure, like, standing outside of his

9  unit, basically screaming across the compound.  Like --

10 Q     Did you recognize his voice?

11 A     Yes.

12 Q     Could you make out everything he was yelling?

13 A     No.  He said other things.  I couldn't make out

14 exactly what he said, but I just heard the part about,

15 "Don't believe anything he tells you."

16 Q     What, if anything, did the officer escorting you do

17 as the defendant yelled at you across the compound?

18 A     He said, "Don't look, and don't say anything."

19 Q     How did you feel when you heard the defendant yelling

20 across the compound as you went to report the rape?

21 A     Terrified, just scared.  I remember thinking, is he

22 nuts?

23 Q     So did you eventually get over to the lieutenant's

24 office?

25 A     I got over to the lieutenant's office, yes, and

Brandon Lemagne - Direct

1  Lieutenant McWilliams was there.

2  Q    At this point, this was going to be maybe the third

3  or fourth person that you'd had to talk to about being

4  raped?

5  A    Uh-huh.

6  Q    What were you feeling at that point knowing that you

7  had to describe the rape again?

8  A    Dread.  I just wanted to get it over with.

9  Q    Did you speak with Lieutenant McWilliams?

10 A    I did.  She put me into -- she put me into the

11 office.  She had come from home.  By now, I think it had

12 been a couple of hours maybe.  It felt like a couple of

13 hours, and, you know, she was like, "We need to do an

14 affidavit.  You have to tell me what happened."  And --

15 Q    I'm going to pause you there.  And without getting

16 into your conversation with Lieutenant McWilliams, what

17 did she do while you were with her in that office?

18 A    She wrote an affidavit.

19 Q    What was your understanding of the purpose of the

20 affidavit that she wrote?

21 A    Basically to document what had happened to me.  I

22 was, you know, of course, talking fast and, like, trying

23 to get all of this stuff out, and she's, like, typing,

24 typing, typing.

25 Q    Was she typing while you were talking?

1  A     Yeah.  She would type while I was talking.  You know,

2  she might stop and look something on the computer up.  I

3  don't know what she was looking up, and then she would

4  start typing again.

5  Q     And without getting into exactly what Lieutenant

6  McWilliams asked you, did she ask you all the questions

7  that I've asked you today about what happened to you?

8  A     Did she ask me all of the -- no, not all of the

9  questions that you've asked me.  Absolutely not.

10 Q     What did you do once she finished typing up the

11 statement?

12 A     She asked me to initial it.

13 Q     Did you choose all the words that she put into that

14 statement?

15 A     No, and I said that to her.  She said that it doesn't

16 have to be exact.

17            MR. GAVIN:  Objection.  Hearsay.

18            THE COURT:  Overruled.

19 A     I said to her, you know, "This isn't what I said."

20            And she said, "Well, it doesn't have to be

21 exact.  We just need to" -- "you know, it's, like, the

22 idea of what happened.  We need to just document what

23 happened to you."

24            And then --

25 BY MS. GILBERT:

1  Q    And have you had a chance -- I'm sorry to interrupt

2  you, Mr. Lemagne.

3  A    Uh-huh.

4  Q    Have you had a chance to review that affidavit?

5  A    I did review it.

6  Q    Is it basically accurate?

7  A    It's basically accurate, but it's not my words.

8  Q    What happened after you gave your statement to

9  Lieutenant McWilliams and you initialed it?

10 A    I told her, I said, "You know this isn't the first

11 time that this had happened."

12          And I remember her saying, "What?"  She said,

13 you know, "Look.  We have to get you to the hospital to do

14 a DNA.  Like, we have to do a rape kit on you."

15          So I initialed it, and they ended up taking me

16 to -- I can't remember the hospital.  One of those

17 hospitals in the West End of Richmond.

18 Q    Okay.  What was your understanding of why you were

19 going to the hospital?

20 A    For a rape kit.

21 Q    Do you remember which staff members took you to the

22 hospital?

23 A    It was Lieutenant McWilliams and the two correctional

24 officers that did the DNA collection on me.

25 Q    What were you thinking about on your way to the

Brandon Lemagne – Direct

1   hospital?

2   A    What have I done and what's going to happen to me

3   now.

4        She was on the phone talking to somebody.  I'm

5   assuming it was Mr. Norman.

6        THE COURT:  We don't assume around here.  So

7   let's go past it.  She was on the phone.  After that, what

8   happened next?

9        MS. GILBERT:  Yes, sir.

10  A    She was on the phone talking to --

11       THE COURT:  Okay.  We're not -- I don't want you

12  to go into who she was talking to.

13       THE WITNESS:  Okay.

14       THE COURT:  After that conversation is done,

15  what happens next?

16       THE WITNESS:  We went to the hospital.

17       THE COURT:  Okay.

18  BY MS. GILBERT:

19  Q    What happened once you got to the hospital?

20  A    They put me in a room with the two officers,

21  Lieutenant McWilliams and a nurse -- two nurses.  Excuse

22  me.  They asked me questions about what happened and did a

23  rape kit.

24  Q    Did you tell the nurses every detail of what the

25  defendant did to you in the office area?

1   A    No.

2   Q    Why not?

3   A    It didn't feel like it was that space.  I don't know

4   if that makes sense.

5   Q    Did you give them a rough approximation of what had

6   happened?

7   A    Yeah, I told them what happened to me.  I didn't

8   mention every single graphic detail of my assault, no, but

9   I told them the gist of what happened to me.

10  Q    Mr. Lemagne, what was the physical part of the rape

11  examination like?

12  A    More uncomfortable than a strip search.  She asked me

13  to open my rectum.  She took a picture of every cavity, my

14  groin, my mouth.  She took pictures of everything.  It was

15  probably one of the most invasive things I've ever

16  experienced.

17  Q    Why did you agree to have the rape kit performed?

18  A    I felt like that rape kit was the only thing that

19  would prove that I was telling the truth.

20  Q    What did you think would happen if you reported that

21  the defendant raped you but you didn't have a rape kit

22  performed?

23  A    Nobody would believe anything that I said.

24  Q    And what would happen if you had reported it but

25  nobody believed you?  What would the consequences of that

1  have been?

2  A    I definitely -- definitely -- I mean, anything could

3  have happened.  They could have filed street charges on

4  me.  I could have ended up with a whole nother case in

5  prison.  I was definitely going to spend some time in the

6  hole while everything was investigated.  It would have

7  been pretty miserable.

8  Q    What happened after the rape kit was performed at the

9  hospital?

10 A    I remember -- I feel like after he screamed that

11 across the compound, I think everybody was scared.  I

12 think everybody was on pins and needles.

13            MR. GAVIN:  Objection to the conclusion.

14            THE COURT:  Sustained.

15 BY MS. GILBERT:

16 Q    Mr. Lemagne, if you'll just talk about what --

17            THE COURT:  Disregard that, folks.

18            MS. GILBERT:  Apologies, Your Honor.

19 BY MS. GILBERT:

20 Q    If you could just talk about what you did when you

21 got back to Petersburg or where you went.

22 A    I remember walking out of the hospital, and I

23 remember Lieutenant McWilliams saying he knows that we

24 were going to bring him here.  I remember her surveying

25 the parking lot and making sure that he wasn't out there

1  waiting.

2        MR. GAVIN:  Same objection.  It's hearsay from

3  Lieutenant McWilliams.

4        THE COURT:  All right.  Sustained.

5  A    I was --

6        THE COURT:  Just tell us what happened, not what

7  everybody else said.  Just what happened.  What you did

8  after that.  Okay?

9  A    I got back to Petersburg.  They immediately put me in

10 the SHU.  They put me in the hole.

11       THE COURT:  Is that segregation, basically?

12       THE WITNESS:  Yeah, the hole, the SHU, Special

13 Housing Unit.  That's the hole.  So --

14 BY MS. GILBERT:

15 Q    Mr. Lemagne -- I'm sorry.

16 A    Go ahead.

17 Q    What were you thinking about while you were in the

18 hole?

19 A    I just remember thinking, you did it now.  Like --

20 Q    What did you think was going to happen next to you?

21 A    I didn't know what was going to happen next to me.  I

22 didn't know how long I was going to be there.  I was

23 fairly certain that they would transfer me, but I just

24 remember being terrified.  I must have peed, like, six

25 times that night.  Like, I like was just scared.

1 Q     Were you, in fact, transferred after you were placed

2 in the hole?

3 A     The next morning, they put me on a van and took me to

4 Butner Correctional Center.  It's in Raleigh.

5 Q     When you arrived at Butner, how did the other inmates

6 treat you?

7 A     Like I had leprosy.  They brought me on the compound

8 at about 4:00 in the evening.  They brought me on the

9 compound at lockdown.

10 Q     When the officers brought you onto the compound, did

11 they bring you as part of a prison transport?

12 A     No.  It was an obvious emergency transfer.  People

13 are -- in prison are familiar with how things work.  They

14 don't have anything to do but look around and see what's

15 going on.  So they brought me on the compound during

16 count, and inmates were immediately suspicious of how I

17 ended up there, why I came on that particular date.  There

18 was no transport.  They know that I didn't come from

19 Oklahoma.  Like, everybody knew it was an emergency

20 transfer, and nobody really knew why.

21 Q     How did the officers at Butner treat you?

22             MR. GAVIN:  Judge, I guess I --

23             THE COURT:  Yeah.  What's the relevance?

24             MR. GAVIN:  Relevance.

25             MS. GILBERT:  Your Honor, all of the

1   consequences that the victim feared from reporting the

2   rape, in fact, have come true.

3               THE COURT:  Well, I understand that, but you've

4   made this point that he reported it under very serious

5   concern about what was going to happen to him.  But what

6   happens after that is really irrelevant.  So unless you

7   have something else to say about the episode, let's finish

8   this up.

9   BY MS. GILBERT:

10  Q    Mr. Lemagne, were you, at some point, examined in the

11  medical unit at Butner?

12  A    Yes, I was.

13  Q    Do you recall anything about that examination?

14  A    I remember the nurse -- excuse me.  I remember the

15  nurse seeming very shaky and uncomfortable with me.  I

16  remember her calling another person into the room for what

17  was just a normal examination.  I was new on the compound.

18  You know, a little tuberculosis test.  She felt it

19  necessary to have somebody else in the room, and I

20  remember asking her why.  I was like, "Why is somebody

21  else present for my examination?"

22              And she said to me --

23              MR. GAVIN:  Objection.

24              THE COURT:  What's the point of this?

25              MS. GILBERT:  The point, Your Honor, is that the

Brandon Lemagne - Direct                    281

1  victim of the rape --

2          THE COURT:  I'm talking.  This is a standard, as

3  he just testified to, exam when you go to a new facility.

4  Are you going to put on additional evidence that was

5  obtained from Butner?

6          MS. GILBERT:  Yes, Your Honor.

7          THE COURT:  Okay.  Let's get to that.

8  BY MS. GILBERT:

9  Q   Mr. Lemagne, do you remember the nurse commenting on

10  physical bruises that you had on your body?

11  A   Yes, I do.  I remember --

12  Q   What caused those bruises to your body?

13  A   Officer Legins.

14  Q   When did Officer Legins cause those bruises to your

15  body?

16  A   By grabbing my arm during the last encounter.  There

17  was a handprint on my upper arm.

18  Q   Mr. Lemagne, what impact has the defendant's attack

19  had on you in terms of your mental health?

20  A   I just feel like I'm falling apart some days,

21  especially right after the attack.  Just scared for no

22  reason.  I don't want to go to the dining hall.  I'm weird

23  with crowds.  Somebody can just be doing their job and I

24  find myself thinking, like, you know, did this guy just

25  try me?  Like, is he -- everything weirds me out.  I --

1  Q     I'm sorry to interrupt you.

2  A     Go ahead.

3  Q     Have you received any counseling or mental health

4  support?

5  A     Nothing adequate.  Nothing that's been effective.  I

6  haven't really been on an institution that has had a

7  mental health staff that provides, I guess, real therapy

8  to help people deal with stuff like that.  And it's kind

9  of difficult when you're dealing with all of those issues,

10 I guess, in that setting.

11 Q     Have you taken any steps to try to get some mental

12 health support for yourself?

13 A     I've reached out to psychology.  At one point -- I

14 mean, I was on suicide watch.  You know, they know that

15 I've had a lot of issues in relationship to, I guess,

16 anxiety.  I've done everything, I guess, to try to get

17 them to provide me with some type of adequate services

18 besides, you know, well, why don't you use the mental

19 health library.

20         I started reaching out to attorneys and

21 nonprofits and somebody who would make these people

22 provide me with some type of services for, you know,

23 what's happened to me.

24         I remember talking to the psychologist that was

25 assigned to my case, and I told him what happened to me.

Brandon Lemagne - Direct                    283

1   And he said, "Yeah, well, he's not here to defend

2   himself."

3           MR. GAVIN:  Objection.  Hearsay.

4           MS. GILBERT:  We can strike that part,

5   Your Honor.

6           THE COURT:  All right.  Stricken.

7   A    He didn't want me to talk about --

8           THE COURT:  Ignore that -- hold on a second.

9   Ignore that part of it.

10          Let's not talk about what other people said to

11  you.  What's important here -- what I think her question

12  is is what efforts have you gone through to get your

13  mental health assistance, right.  And you've said reach

14  out to attorneys, nonprofits and stuff like that.  That's

15  what she's asking you, not what other people have told

16  you.  Okay?

17          THE WITNESS:  Gotcha.

18  A    In certain instances, I wasn't allowed to talk about

19  what happened to me.  So it was a difficult situation as

20  far as getting mental health.  I got issues, you know.  I

21  know that.  But I know that the place where I was was not

22  normal.  Like, it's not normal for me to feel suicidal.

23  It's not normal for me to feel that sense of anxiety.

24  It -- it wasn't normal for me to just be afraid.  It

25  wasn't normal for me to hold up in my cell or have

1  nightmares.  None of that stuff was normal, and I was

2  definitely trying to get some assistance with, you know,

3  making them help me with that.

4  BY MS. GILBERT:

5  Q    Mr. Lemagne, have you heard rumors about yourself

6  since you were transferred away from Petersburg?

7  A    Many.

8            THE COURT:  Why is that not hearsay?

9            MS. GILBERT:  I'm not going to elicit the

10 rumors, Your Honor.  I apologize.  Let me rephrase the

11 question, if I may.

12 BY MS. GILBERT:

13 Q    Without getting into what the rumors are, have you

14 heard rumors about yourself?

15 A    Absolutely.

16           MR. GAVIN:  Objection to the relevance.

17           THE COURT:  Go to the next step.  What's this

18 for?

19           MS. GILBERT:  I'd like to ask, Your Honor, about

20 a particular incident in which an officer refused to give

21 Mr. Lemagne a job because he believed that Mr. Lemagne had

22 lied about a fellow federal correctional officer.

23           THE COURT:  That's not relevant to this issue.

24 That's stricken.

25           You are to ignore her comments to me about that.

Brandon Lemagne – Direct                    285

1  BY MS. GILBERT:

2  Q    Mr. Lemagne, do you see the person who raped you in

3  the courtroom today?

4  A    I do.

5  Q    I'm going to have to ask you to please identify him

6  by what he's wearing and where he's sitting.

7  A    He's wearing a cream suit and a cream colored tie,

8  bald head with glasses.

9            THE COURT:  The record will reflect he's

10 identified the defendant.

11           MS. GILBERT:  Thank you, Your Honor.  No further

12 questions for this witness.

13           THE COURT:  All right.  I gather, Mr. Gavin, you

14 have extensive cross-examination?

15           MR. GAVIN:  I do.

16           THE COURT:  All right.  So, folks, it's 5:00.

17 The next piece of this case is going to take some time.

18 So what we're going to do is we're going to end for the

19 week.  You're going to be back here no later than 9 a.m.

20 because we're going to start promptly at 9:30 hopefully

21 with no technological issues.

22           But I'm going to remind you -- and this is

23 incredibly important because now we're over the weekend.

24 So you've got a couple free days, right.  You cannot talk

25 to anybody about the case.  You cannot do any research.

1  No tweeting, posting and all that stuff that people do on

2  blogs and all that kind of stuff.  This case is about what

3  you hear in this courtroom and nowhere else.  Okay?  I

4  need you to remember that.  All right?

5           So what you're going to do is you're going to go

6  back here to the jury room, and then we'll see you at

7  9 a.m. in the jury assembly room on Monday.  I wish you a

8  good weekend.  Okay?

9           All rise for the jury.

10          (The jury exited the courtroom.)

11          THE COURT:  Okay.  Mr. Lemagne, you're still a

12  witness in this case.  I'm going to instruct you you're

13  not to talk about your testimony with anybody over the

14  weekend until you get here on Monday.  Do you understand

15  that?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  Marshals, you can remove

18  Mr. Lemagne.

19          (Witness stood aside.)

20          THE COURT:  You all can be seated for a second.

21          Ms. Gilbert, we have twice had this debate about

22  objections.  We're not going to have a third time on that.

23  Are we clear on that?

24          MS. GILBERT:  Understood, Your Honor.  I don't

25  think I understood the extent of --

287

1          THE COURT:  All right.  Just -- I'm running this

2    place.  I've had more than my share of trial experience.

3    We're going to get this -- you're doing a fine job, but

4    you're not going to argue with me.  That's the way this

5    goes.

6          MS. GILBERT:  I apologize.

7          THE COURT:  Okay.  Mr. Legins, please rise.

8          Mr. Legins, do you agree to appear here no later

9    than 9 a.m. on Monday?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Now, Mr. Legins, as I recall, I

12   released you into the custody of your mother, and you have

13   an electronic monitor on; is that right?

14         THE DEFENDANT:  That's right, Your Honor.

15         THE COURT:  And your mother is here; is that

16   right?

17         THE DEFENDANT:  Yes.

18         THE COURT:  I want to remind you that you are to

19   be in the custody of your mother at all times, and you're

20   to be at the residence with her when you're not here.  If

21   there's ever a time in your life that you want to make

22   sure you behave yourself, particularly after the testimony

23   I've heard here today, you better make sure it's this

24   weekend.  If I have the slightest drama, you're going into

25   custody.  Are we on the same page?

1          THE DEFENDANT:  That's right, Your Honor.  I

2   understand.

3          THE COURT:  Now, counsel, this is what I want

4   you to do.  I'm going to leave the bench here, but I want

5   you all to -- both sides -- to get with Ms. Garner and my

6   law clerk to go over precisely what the evidence is that's

7   been admitted to this point, because I don't want to have

8   any drama about what's been admitted and what's not.

9          You've all done a great job in terms of

10  stipulations and moving the case along.  So you're to be

11  commended for that.  I just don't want to have any drama

12  down the road.  Okay?  But we're going to do that each

13  day.  So Monday, you'll do the same thing.  You know, I

14  don't know how much longer we're going to go.  We have the

15  cross-examination of the alleged victim.  So I know that's

16  going to take a little bit of time, but how long -- how

17  many more witnesses do you anticipate?

18         MR. GARNETT:  Your Honor, I have to confer.  I

19  think we have eight or nine witnesses remaining.  I would

20  anticipate we would probably conclude sometime Tuesday

21  afternoon.

22         THE COURT:  All right.  That's fine.

23         Do you have your witnesses ready to go on

24  Tuesday?

25         MR. GAVIN:  Yes, sir.

```
 1              THE COURT:  And how long are you thinking about?
 2   A day?
 3              MR. GAVIN:  No more.
 4              THE COURT:  Okay.
 5              MR. GAVIN:  Maybe less.
 6              THE COURT:  All right.  Well, that's fine.  So,
 7   look, if you get done earlier on Tuesday, if you run out
 8   of witnesses, what I'm going to do is we'll go over the
 9   jury instructions one more time, and then I'll have you
10   close on Wednesday.  Okay?  So you be prepared to close on
11   Wednesday.  So if it's like 3:30, 4:00, I'm not -- we're
12   not going straight to closings.  I'm going to let them go
13   a little bit earlier.  We'll go over the instructions.
14   Because depending on whether or not the defendant
15   testifies, I'm going to have to remove at least one of the
16   instructions.  We'll go over it one last time, and then
17   I'll let you close in the morning fresh.
18              Does that make sense?
19              MR. GAVIN:  Yes, sir.
20              THE COURT:  Then I'll give the jury
21   instructions.  So what I'm saying is if you run out of --
22   if everybody gets done on Tuesday, don't get excited.
23   We'll just close on Wednesday morning.
24              Does that make sense?
25              MR. GAVIN:  Yes, Your Honor.
```

1          MR. GARNETT:  Yes, Your Honor.

2          THE COURT:  All right.

3          Okay.  We have an issue with one of the jurors

4    about Dr. Wolf.  So why don't you all have a seat.  We're

5    going to bring in one of the jurors here.

6          (The juror entered the courtroom.)

7          THE COURT:  All right, ma'am.  It's okay.  Just

8    have a seat.  Nothing is wrong here.  I just -- you need

9    to remind me what your juror number is.

10          A JUROR:  Eight.

11          THE COURT:  All right.  And, ma'am, you

12    recognize Dr. Wolf's name?

13          A JUROR:  I -- I do know a female Dr. Wolf that

14    is a psychologist.  I took a psychology class back in

15    2006 --

16          THE COURT:  Okay.

17          A JUROR:  -- from a Dr. Wolf.

18          THE COURT:  Okay.

19          A JUROR:  I don't know if it's the same one,

20    but --

21          THE COURT:  Are we anticipating Dr. Wolf

22    testifying?

23          MR. GARNETT:  Yes, Your Honor.  We expect her to

24    testify Tuesday afternoon.  Although it does not sound,

25    Your Honor, like this would be the Dr. Wolf Walker that --

1          A JUROR:  It was a Dr. Judith Wolf.

2          MR. GARNETT:  No.  It's Dr. Markita, Your Honor.

3  Dr. Markita Wolf --

4          A JUROR:  Okay.

5          THE COURT:  -- is our witness.

6          A JUROR:  Okay.

7          THE COURT:  Well, that's okay.  That's why we do

8  this.  We want to make sure we got it right.  I appreciate

9  you letting me know.

10          A JUROR:  Okay.

11          THE COURT:  And just because you did that, I'm

12  going to let you take the rest of the week off.  Okay?

13  Have a good weekend.  Okay?

14          A JUROR:  All right.  Thank you.

15          (The juror exited the courtroom.)

16          THE COURT:  All right.  Is there anything else

17  we need to do here?

18          MR. GARNETT:  No, Your Honor.

19          MR. GAVIN:  No, sir.

20          THE COURT:  All right.  Have a good weekend.

21  Okay?

22          (The proceeding adjourned at 5:07 p.m.)

23

24                 REPORTER'S CERTIFICATE

25      I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

1  the Commonwealth of Virginia at large, and whose

2  commission expires September 30, 2023, Notary Registration

3  Number 7108255, do hereby certify that the pages contained

4  herein accurately reflect the stenographic notes taken by

5  me, to the best of my ability, in the above-styled action.

6      Given under my hand this 21st day of February 2020.

7

8                    /s/
          _____
                Tracy J. Stroh, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25