1

1                  UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3 _____

4 UNITED STATES OF AMERICA     )
                         )
5 v.                       )   Criminal Case No.:
                         )   3:19 CR 104
6 CHIKOSI LEGINS            )
_____

7                         February 11, 2020
                        VOLUME IV

8

9    TRANSCRIPT OF OPENING STATEMENTS, ALL TESTIMONY, AND
      CLOSING STATEMENTS OF JURY TRIAL PROCEEDINGS
10         BEFORE THE HONORABLE DAVID J. NOVAK
        UNITED STATES DISTRICT COURT JUDGE

11 APPEARANCES:

12

13 Thomas A. Garnett, Esquire
OFFICE OF THE UNITED STATES ATTORNEY
919 East Main Street, Suite 1900
14 Richmond, Virginia 23219

15 Kathryn E. Gilbert, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
16 950 Pennsylvania Avenue NW, 4025 NYA
Washington, DC 20530

17
          Counsel on behalf of the United States
18

19
Charles A. Gavin, Esquire
20 CAWTHORNE DESKEVICH & GAVIN PC
1409 Eastridge Road
21 Richmond, Virginia 23229

22           Counsel on behalf of the Defendant

23

24             TRACY J. STROH, RPR
           OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT

1                        **I N D E X**

2                          WITNESSES

3   Examination By:                                      Page

4                      SARAH RAMSEY
    Direct    - MR. GAVIN                                 10
5   Cross     - MS. GILBERT                               13
                    JOHNNY LAVENDER
6   Direct    - MR. GAVIN                                 22
                      MARK SCOTT
7   Direct    - MR. GAVIN                                 26
    Cross     - MR. GARNETT                               30
8   Redirect  - MR. GAVIN                                 40
                   RICHARD FORNASH
9   Direct    - MR. GAVIN                                 41
    Cross     - MR. GARNETT                               44
10  Redirect  - MR. GAVIN                                 48
                   AJIBOLA EROGBOGBO
11  Direct    - MR. GAVIN                                 50
    Cross     - MS. GILBERT                               56
12  Redirect  - MR. GAVIN                                 71
                   KENNETH MIKIONIS
13  Direct    - MR. GAVIN                                 74
    Cross     - MR. GARNETT                               81
14                   DUANE FARMER
    Direct    - MR. GAVIN                                 88
15  JEAN CHEEK, DNP, RN, BS, SANE-A, CN V
    Direct    - MR. GAVIN                                 91
16  Cross     - MS. GILBERT                               98
    Redirect  - MR. GAVIN                                101

17


18                          EXHIBITS

19  Exhibit         Description                          Page

20  Defendant
    No. 17          Bureau of Prisons Health Services     13
21                  Clinical Encounter

22


23


24


25

```
 1                 (The proceeding reconvened at 9:27 a.m.)

 2              THE CLERK:  Criminal matter 3:19 CR 104,

 3     United States of America v. Chikosi Legins.  Mr. Charles

 4     A. Gavin representing the defendant.  Mr. Thomas A.

 5     Garnett and Ms. Kathryn E. Gilbert representing the

 6     government.

 7              Counsel, are we ready to proceed?

 8              MR. GARNETT:  The United States is ready,

 9     Your Honor.

10              MR. GAVIN:  The defense is ready, Your Honor.

11              THE COURT:  All right.  I'm understanding the

12     government is going to rest now.  Is that what's going to

13     happen?

14              MR. GARNETT:  That's correct, Your Honor.

15              THE COURT:  All right.  Have you moved in all

16     the exhibits and other evidence that you want to

17     introduce?

18              MR. GARNETT:  We have, Your Honor.

19              THE COURT:  Okay.  I'm going to let you rest in

20     front of the jury, but I thought we would just use this

21     time right --

22              MR. GARNETT:  I'm sorry, Your Honor.  My

23     co-counsel corrected me.  We do plan to offer the

24     stipulations into evidence, as we discussed previously.

25              THE COURT:  You want to publish them.
```

4

1          MR. GARNETT:  I'd publish them, Judge.  I'd like

2    the jury to be able to take a copy back to the jury room.

3          THE COURT:  I'm going to allow that.

4          MR. GARNETT:  Thank you, Your Honor.

5          THE COURT:  But what I thought we ought to do is

6    have you publish them.  So here's what we're going to do.

7    I'll bring the jury out in a second.  I want to deal with

8    whether or not they have any motions or not.

9          I'll bring the jury out.  You'll publish

10   whatever remaining stipulations.  I'll tell them they're

11   going to get a copy of that going back, and then you can

12   rest in front of the jury.

13         MR. GARNETT:  Thank you, Your Honor.

14         THE COURT:  Does that make sense?

15         MR. GARNETT:  Yes, sir.

16         THE COURT:  Okay.  Then -- so, Mr. Gavin, do you

17   have any motions at this time?

18         MR. GAVIN:  Judge, I'll have to make a motion

19   under Rule 29.

20         THE COURT:  All right.  That's going to be

21   denied.  In my view, the government has presented

22   overwhelming evidence of guilt.

23         MR. GAVIN:  As long as it's in the record.

24         THE COURT:  That's fine.  It's denied.

25         Mr. Legins, do you want to rise?

1            Mr. Legins, yesterday I talked to you about your

2    constitutional right to testify.  Has anything changed

3    since yesterday?

4            THE DEFENDANT:  No, Your Honor.

5            THE COURT:  And is it still your decision and

6    your decision alone not to testify?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  And I will ask you again, has

9    anybody threated you or made any promises to you to give

10   up this right?

11           THE DEFENDANT:  No, Your Honor.

12           THE COURT:  Okay.  You can be seated.

13           Is there anything else that we need to do at

14   this time before we bring the jury in?

15           MR. GARNETT:  No, sir.

16           THE COURT:  All right.  All rise for the jury.

17           Bring the jury in.

18           (The jury entered the courtroom.)

19           THE COURT:  All right.  Everybody can be seated.

20           Good morning, ladies and gentlemen.  Everybody

21   doing okay this morning?  All right.  Has everybody heeded

22   my instructions about not being contaminated by outside

23   influences?  All right.  That's fine.

24           All right.  The government.

25           I think they're going to present some final

1    stipulations to you.

2            Go ahead, Mr. Garnett.

3            MR. GARNETT:  Thank you, Your Honor.

4    Your Honor, at this point we'd move to publish the

5    stipulations, the joint stipulations that have come into

6    evidence at various points over this trial.

7            THE COURT:  Do you have any that you haven't

8    published to the jury?

9            MR. GARNETT:  We do not, Judge.

10           THE COURT:  Oh, that's fine.  Well, wait.  I

11   think your co-counsel wants to say you've done something

12   wrong here.

13           MR. GARNETT:  Oh, I'm sorry, Judge.  We have.

14   That's why they gave me backup, Judge.

15           Your Honor, at this point we'd move to publish

16   stipulations 8 and 9 to the jury.

17           THE COURT:  That's fine.

18           MR. GARNETT:  Stipulation 8 addresses venue.

19   "The parties jointly stipulate and agree that, at all

20   times relevant to the incident indictment, (1) the Federal

21   Correctional Institution, Petersburg (FCI Petersburg) was

22   a federal prison complex operated by the Bureau of

23   Prisons; (2) the alleged victim, B.L." -- Brandon

24   Lemagne -- "was a person within the Eastern District of

25   Virginia, specifically, as a federal inmate confined to

1  FCI Petersburg; and (3), the defendant, Chikosi Legins,

2  was a federal correctional officer employed by the Bureau

3  of Prisons at FCI Petersburg."

4        Stipulation number 9 addresses undisputed

5  elements.  "The parties jointly stipulate and agree that

6  the following elements have been proven beyond a

7  reasonable doubt:  (1), the second element of Count Two,

8  that the alleged offense was committed at a federal

9  prison; (2) the second element, Counts Three and Four,

10 that Brandon Lemagne was officially detained at FCI

11 Petersburg; and (3) the third element of Count Five, that

12 the defendant's statements to federal agents on June 5th,

13 2018, were made in a matter within the jurisdiction of the

14 executive branch."

15        Thank you, Your Honor.

16        THE COURT:  Ladies and gentlemen, you should

17 accept those facts as proven just like all the other

18 stipulations.

19        I'll tell you, the case is coming to an end here

20 pretty quickly, and when you go back to deliberate, I'm

21 going to give you the written stipulations so you'll have

22 that back there with you with all the other evidence.

23        Lastly, you heard Mr. Garnett talk about

24 elements of the offense.  When I instruct you as to what

25 the government's burden of proof is as to each one of the

1  crimes that have been alleged, they are going to be by

2  elements.  And so that's what he's talking about.  You'll

3  have those instructions with you, too, to figure out

4  exactly what it is that you're deciding here.  Okay?  Does

5  that make sense?  All right.

6          Now, do you have any other evidence to offer?

7          MR. GARNETT:  No, Your Honor.  The United States

8  rests.

9          THE COURT:  All right.

10         So, ladies and gentlemen, now the government has

11 concluded their case.  We're going to switch over to the

12 defense to see whether or not they have -- want to put on

13 evidence.  I'll remind you that the defendant never has

14 any burden to offer any evidence.  Of course, the

15 defendant has no responsibility to testify, and if the

16 defendant elects not to testify, you may not hold that

17 against him in any way because that is his constitutional

18 right to do so.  Does everybody understand that?  All

19 right.

20         Mr. Gavin, do you have any evidence to offer?

21         MR. GAVIN:  Yes, sir.

22         THE COURT:  All right.

23         MR. GAVIN:  Judge, the first issue would be

24 another stipulation that was a joint stipulation.

25         THE COURT:  That's fine.

1          MR. GAVIN:  It's number 7, which I'd like to

2     publish at this time.

3          THE COURT:  Sure.  Go ahead.

4          MR. GAVIN:  Joint stipulation number 7.  "The

5     parties jointly stipulate and agree that on April 25,

6     2018, defendant Chikosi Legins underwent a surgical

7     procedure (a mandibulectomy) at the Virginia Commonwealth

8     University (VCU) Medical Center.  The defendant was

9     discharged from VCU Medical Center on April 26, 2018."

10          That's the end of that stipulation.

11          THE COURT:  Okay.  You'll accept that as proven

12     then, too, just like all other stipulations.

13          MR. GAVIN:  Judge, the United States and the

14     defendant have also reached a stipulation as to testimony

15     of his wife with regard to that picture that we discussed.

16          THE COURT:  The defendant's wife?

17          MR. GAVIN:  Yes, sir.

18          THE COURT:  That's fine.

19          MR. GAVIN:  So I'd like to read that stipulation

20     of testimony, and it would be a stipulation of testimony

21     that if Ms. Legins had been called as a witness, she would

22     introduce a picture that she took of her husband's penis

23     with a scale at full erection and that Mr. Legins' penis

24     was measured at 7 inches in length.

25          THE COURT:  You should accept that as true.  I

1   will tell you, they submitted a picture to me.  I took a

2   look at it as well.  We're going to spare you from taking

3   a look at the picture.  You should accept this as true

4   that a photograph of the defendant's penis would show that

5   fully elected, it would be approximately 7 inches long.

6   All right?

7                MR. GAVIN:  Sarah Ramsey.

8                THE COURT:  Is somebody getting Ms. Ramsey?

9                        **SARAH RAMSEY,**

10  called by the defendant, first being duly sworn, testified

11                        as follows:

12                  **DIRECT EXAMINATION**

13  BY MR. GAVIN:

14  Q    Good morning, Ms. Ramsey.

15  A    Good morning.

16  Q    Could you state your name, please, and spell your

17  name for the court reporter?

18  A    Sarah Ramsey.  S-A-R-A-H, R-A-M-S-E-Y.

19  Q    Ms. Ramsey, how are you employed?

20  A    I'm a paramedic at the Federal Bureau of Prisons in

21  Petersburg.

22  Q    Were you employed there on May 10th, 2018?

23  A    Yes.

24  Q    Did you have occasion to see a gentleman by the name

25  of Brandon Lemagne?

Sarah Ramsey - Direct                    11

1  A    Yes.

2  Q    How did you come to see him?

3  A    I got a phone call -- I was in the medical

4  department -- that an inmate was going to be brought to me

5  for a PREA case.

6  Q    And was he brought to you?

7  A    Yes.

8  Q    And as part of your PREA examination, did you ask

9  Mr. Lemagne about anything he may have done since he got

10 to you?

11 A    I did ask the inmate.  You mean in reference to

12 like --

13 Q    Washing, cleaning.

14 A    Yes.  I did ask the inmate had he taken a shower, had

15 he had a bowel movement, had he eaten or drank anything.

16 Q    And did he answer all those questions?

17 A    He did.  He said he hadn't done anything.

18 Q    Okay.  Did you take a report of exactly what he

19 alleged to have happened?

20 A    I took a short report.  I didn't investigate or I

21 didn't ask in-detail questions.  I was mainly focused on

22 his well-being, if he had any immediately life-threatening

23 injuries.  But once he told me what happened, I knew that

24 it was higher than my level of care.

25 Q    Okay.  Ms. Ramsey, I'd like to show you something

Sarah Ramsey - Direct                    12

1   Ms. Brown is going to put on the screen.

2            THE COURT:  What exhibit?

3            MR. GAVIN:  It's her report.  It was previously

4   authenticated.  It's just the United States didn't

5   introduce it because they decided not to call Ms. Ramsey.

6            THE COURT:  Well, that's fine.  I still need to

7   know what number it is.

8            MR. GAVIN:  Seventeen.

9            THE COURT:  Okay.

10           MR. GAVIN:  Defendant's 17.

11           THE COURT:  Okay.  Do you have any objection to

12  this?

13           MS. GILBERT:  No, Your Honor.

14           THE COURT:  Okay.  Go ahead.  That's not a good

15  sign.  I'm not seeing it.  Okay.  Can you all see it?

16  BY MR. GAVIN:

17  Q    Do you recognize that document, Ms. Ramsey?

18  A    Yes.

19  Q    Is that the first page of your report?

20  A    Yes.

21           MR. GAVIN:  Ms. Brown, can you turn to the

22  second page of the report?

23  BY MR. GAVIN:

24  Q    Is that your assessment section?

25  A    Yes.

1  Q     All right.  I have underlined something in that

2  assessment section.  That's not your underlining.  But

3  could you read that to the jury?

4  A     "He finished in me.  He ejaculated in me."

5  Q     And you used an exclamation mark?

6  A     Yeah.

7  Q     Do you have any doubt that that's what he told you

8  when he gave you his version of what happened?

9  A     No.

10          MR. GAVIN:  Judge, I'd like to move that as

11 my 17.

12          THE COURT:  Okay.  You said no objection, right?

13          MS. GILBERT:  No, Your Honor.

14          THE COURT:  Okay.  It will be admitted.

15          (Defendant Exhibit Number 17 was admitted.)

16          MR. GAVIN:  No other questions for Ms. Ramsey.

17          THE COURT:  Any questions?

18          MS. GILBERT:  Yes, Your Honor.

19                    **CROSS-EXAMINATION**

20 BY MS. GILBERT:

21 Q     Good morning, Ms. Ramsey.

22 A     Good morning.

23          MS. GILBERT:  Your Honor, before I begin asking

24 Ms. Ramsey questions, I'd just like to clarify with you.

25 I'd like to ask her questions about the course of her

1 entire examination of Brandon Lemagne because defense

2 counsel asked her about the examination.  Is that

3 acceptable?

4          THE COURT:  Yeah.  Of course.

5 BY MS. GILBERT:

6 Q    Ms. Ramsey, we were just looking, just now, at your

7 medical report from that night, May 10th, 2018.  Excuse

8 me.  You said you were assessing Brandon Lemagne in the

9 medical unit, correct?

10 A    Yes.

11 Q    And when you first started speaking with Mr. Lemagne,

12 nobody else was present; is that right?

13 A    There was an officer that brought him to me, and I

14 recall that he stayed in the hallway.  And it was just

15 Inmate Lemagne and myself in the medical room.

16 Q    Okay.  And during the medical assessment, what were

17 you doing with Brandon Lemagne?

18 A    I was speaking with him.  He wouldn't sit down.  So

19 Lemagne was standing the entire time, and I asked him if

20 it was okay if I sat down so I could look on the computer.

21 And I checked his vital signs and just asked him if he had

22 injuries and --

23 Q    Were you typing up all of your notes there while

24 Brandon was talking, so far as you remember?

25          THE COURT:  Mr. Lemagne?

1          MS. GILBERT:  I'm sorry.

2    BY MS. GILBERT:

3    Q    While Mr. Lemagne was talking, so far as you

4    remember?

5    A    I always write their vitals on just a piece of paper.

6    So I probably just wrote, like, name -- his name, his

7    number, his vitals.  I always ask what time did it happen.

8    Write that down.  Where did it happen.  Write that down.

9    Because I know what I have to plug into the report.  So I

10   just write those key things.  And then I would have shred

11   that paper.  We have shredders everywhere.

12   Q    Okay.  And then you typed it up later?

13   A    And then I typed it up later.

14   Q    You said that Mr. Lemagne refused to sit down or

15   didn't want to sit down.  Did he say why he didn't want to

16   sit down?

17   A    He said he felt like there was something in him or --

18   that's when he said, "He ejaculated in me."  And he said,

19   "It's in there.  I feel like it's in there."

20   Q    Okay.  Did you observe anything about Mr. Lemagne's

21   physical appearance during the examination?

22   A    He wouldn't sit down.  I mean, he seemed anxious.

23   And I remember he was wearing, like, a gray T-shirt, and

24   it looked like the seam in the shoulder was ripped a

25   little bit.

1  Q    Why did that stick out to you?

2  A    Inmates aren't allowed to wear ripped clothing, and

3  if they have ripped clothing, we would investigate it that

4  possibly they were assaulted or in some kind of fight.

5  Q    So let's talk a little bit about what Mr. Lemagne

6  told you.  Just briefly, what was the nature of his

7  allegation?

8  A    He said that an officer raped him.  And I immediately

9  just said, "Have you told the lieutenant the name of the

10 officer?"  And he said yes.

11          And I didn't know the name of the officer

12 immediately.  I was just, you know, focused on the

13 inmate's well-being.  So he said that he was a recreation

14 orderly, that he went to Fox South.  He was going to go to

15 every unit to hang flyers.  He went to Fox South, hung a

16 flyer and then asked to go to the unit next door and -- do

17 you want me to just keep going?

18 Q    I'll ask you a question.

19 A    Sorry.

20 Q    Thank you for jumping in.

21 A    I'm sorry.

22 Q    So he said that he needed to go to the next unit to

23 continue hanging flyers.  And what happened next?

24 A    He said that Officer Legins let him through

25 the hallway.

1          MR. GAVIN:  Judge, I would object only because

2    this is way beyond the scope of my examination.

3          THE COURT:  No.  You opened the door.  I'm going

4    to let her do what she needs to do.

5          MR. GAVIN:  Okay.

6    A    I believe by that time, he might have said the

7    officer's name that led him through the door or he may

8    not.  He just said --

9    BY MS. GILBERT:

10   Q    Did he -- I'm sorry to interrupt you, Ms. Ramsey.

11   Did he, at some point, tell you what officer had sexually

12   assaulted him?

13   A    It probably wasn't until I got the phone call.

14   Q    Okay.  And we'll get to the phone call in a moment.

15   So I'm sorry.  So he said that an officer was taking him

16   between the units; is that right?

17   A    Uh-huh.

18   Q    In the hallway area there in F-South.  And what did

19   he say that the officer did after he took him between the

20   units?

21   A    He said, He grabbed me.  He pulled me against him.

22   He said, He, like, grabbed me by the butt, like, he was

23   holding me.  And he mentioned, like, he was rough.  And

24   then he said he forced him to perform oral, and then he

25   said he turned him around forcefully.  And he said that he

1  heard him, like, spit or something, and he penetrated him.

2  Q    Did Mr. Lemagne say whether this was consensual?

3  A    He said that it was rape, but he didn't use the word

4  consensual or nonconsensual.

5  Q    Okay.  Do you remember whether Mr. Lemagne reported

6  any physical sensations?

7  A    I'm not sure what you mean.

8  Q    Did he report any pain to you?

9  A    Oh, yes.  I asked if he was in any pain, and he said

10 that he was just sore, that his anus was sore.

11 Q    Do you remember what rating Mr. Lemagne gave his pain

12 on the pain scale?

13 A    I just briefly saw it, and it was 6 on that report.

14 Q    That's a scale out of 10, right?

15 A    Uh-huh.

16 Q    So also as part of your medical assessment, you took

17 Mr. Lemagne's blood pressure, correct?

18 A    Yes.

19 Q    And do you recall what his blood pressure was?  And I

20 can pull up your report for you, too, if you don't recall.

21 A    No, I don't recall.  I remember it was slightly

22 elevated.

23 Q    Okay.  You mentioned earlier that there was a call

24 that you received.  Can you please explain what the call

25 was that you received during the examination?

1  A    Lemagne was standing kind of like beside me.  I was

2  sitting in the chair writing either his vitals or what he

3  was telling me.  I was logged in.  I was probably starting

4  to type it into the report.  And I have a radio I wear at

5  all times, and I heard across the radio, "Fox South to

6  medical."  And I say, "Go for medical."  And they said,

7  "Phone extension."  And the phone in front of me was 1121.

8  So I said, "1121."  And then --

9  Q    And if I could just pause you there, Ms. Ramsey.  So

10 was it the case that someone was raising to you and asking

11 you what your telephone extension was in the medical unit?

12 A    Yes.

13 Q    So you gave your telephone extension.

14 A    Uh-huh.

15 Q    And what happened next?

16 A    A few seconds later, that phone rang.  And in those

17 few seconds, Lemagne was getting like antsy, and he said,

18 "That's him.  That's him.  That's the one.  He's the one

19 that raped me."

20            And I was like, "Okay.  Calm down.  Don't say

21 anything."

22 Q    What did -- what did the person on the phone say to

23 you?

24 A    I answered the phone, and I always identify myself,

25 and I said, "Medical, this is Ramsey."

1            And the person on the phone said, "Hey, this is

2   Legins.  I'm in Fox South.  And I just had a major surgery

3   on my neck, and I forgot my two medicines at home and --

4            And I said, "Okay.  I'm sorry.  We don't treat

5   staff."

6            And the person was like, "Oh, you don't treat

7   staff?"

8            And I was like, "No."

9   Q    So he repeated his question back to you?

10  A    Yeah.  It was --

11  Q    The way that you were just talking right now was

12  quite slowly.  Was the person on the phone speaking slowly

13  to you?

14  A    Yes.

15  Q    What was your impression of -- I won't ask you that.

16            You do not treat officers in the medical unit,

17  correct?

18  A    Only in life-threatening cases, if they're bleeding

19  or unresponsive or something.

20  Q    Other than that, you just treat inmates?

21  A    Correct.

22  Q    So you don't hand out pain medication to officers,

23  right?

24  A    No.

25  Q    Did the defendant just end the call after you

1  asked -- after you answered his questions?

2  A    I just remember there being an awkward pause, and I

3  was like -- I don't -- I don't recall how it ended.  I

4  probably said "okay" and hung up, but --

5  Q    Fair to say he was lingering on the line?

6  A    It felt like that, and I didn't know what to say.

7  So --

8  Q    In your experience as a correctional officer, was

9  that call unusual to you?

10 A    Yes, because that person rarely calls me.  I don't

11 recall him ever calling me, and the fact that the inmate

12 said, "That is the person that raped me," they called at

13 that time.

14         MS. GILBERT:  Thank you, Ms. Ramsey.

15         THE COURT:  Any redirect?

16         MR. GAVIN:  Your Honor, I don't have any

17 redirect.  I'd ask Ms. Ramsey be excused.

18         THE COURT:  Yeah.

19         Ms. Ramsey, thank you for your testimony.  You

20 can be excused.  I would ask you not to talk about your

21 testimony with anybody until our trial is over.  Okay?

22 Thank you again for being here.

23         (Witness stood aside.)

24         MR. GAVIN:  Next witness, Bruce Norman.

25         CSO SPIVEY:  Mr. Gavin, there's no Bruce Norman.

1           MR. GAVIN:  No Bruce Norman.

2           THE COURT:  Well, do you want to go out and

3   look?

4           MR. GAVIN:  I'll go to somebody else.

5           THE COURT:  Okay.

6           MR. GAVIN:  Mr. Lavender.

7           THE COURT:  Agent Lavender, for the third time,

8   you're going to hit the witness stand.  Go ahead.

9           SPECIAL AGENT LAVENDER:  Yes, sir.

10          THE COURT:  Agent Lavender, you can have a seat.

11  You remain under oath.  You've been put under oath before.

12  I will just ask you to state your full name again for the

13  record.

14          SPECIAL AGENT LAVENDER:  Yes, Your Honor.

15  Johnny Lavender, L-A-V-E-N-D-E-R.

16                      **JOHNNY LAVENDER,**

17   called by the defendant, having been previously sworn,

18                    testified as follows:

19                   **DIRECT EXAMINATION**

20  BY MR. GAVIN:

21  Q    Good morning, Special Agent Lavender.

22  A    Good morning, sir.

23  Q    I think we developed that you're the case agent

24  that's in charge of this investigation?

25  A    Yes, sir.

1  Q    All right.  At my request, did I ask you to produce

2  the commissary records for Mr. Lemagne's roommate?

3  A    Yes, you did.

4  Q    And what was the name of that roommate?

5  A    Ronzell Jackson.

6           MR. GAVIN:  Ms. Brown, I'd ask you to introduce

7  what's already been admitted as Defense Exhibit 5.

8  BY MR. GAVIN:

9  Q    Is that the commissary report for Mr. Jackson?

10 A    I see a registration number listed.  It does not have

11 Mr. Jackson's name listed, but it appears to be the

12 report.

13 Q    Do you see any cleats that were ordered by

14 Mr. Jackson in the month of February 2018?

15 A    I see -- you're asking me do I see any cleats

16 ordered?

17 Q    Yeah.  Or is there any record on the commissary

18 report of cleats being ordered by Mr. Jackson during the

19 month of February 2018?

20 A    Sir, when I produced this report, I got on the

21 Internet and looked up some of these shoes, and under

22 oath, I can tell you -- I can't tell you if any of these

23 shoes were or were not cleats by the description and by

24 the pictures that I pulled up.

25 Q    Let me ask you another question.  Is there anything

1   ordered in the month of February 2018?

2   A     Yes, sir.

3   Q     And what is that?

4   A     According to what I'm seeing on 2/12/2018, I see a

5   SanDisk Clip Sport.

6   Q     So that would not have been on either February 17th

7   or February 19th; is that correct?

8   A     According to the document, it says 2/12 of 2018.

9   Q     When you Googled and researched this, did you Google

10  SanDisk Clip Sport?

11  A     We did, I believe.

12  Q     And is that a pair of shoes?

13  A     I can't recall at this time what the picture was.

14  Q     Does it have anything related, to your recollection,

15  to do with music?

16  A     The SanDisk Clip Sport?

17  Q     Yes, sir.

18  A     I don't recall.

19         MR. GAVIN:  I don't have any other questions,

20  Judge.

21         THE COURT:  Do you have any questions?

22         MR. GARNETT:  No, Your Honor.

23         THE COURT:  All right, Agent.  You can step

24  down.  Thank you for your testimony.  The same rules

25  continue to apply.

 1              THE WITNESS:  Yes, sir.

 2              (Witness stood aside.)

 3              MR. GAVIN:  Judge, I'd like to call Mark Scott.

 4  He's an inmate in the back.

 5              THE COURT:  Mr. Scott.

 6              Mr. Gavin, can you just give me a general idea

 7  how much longer you're talking about?  I'm not going to

 8  hold you to it, but can you give me an idea?

 9              MR. GAVIN:  This witness will be very short.

10              THE COURT:  But after this witness?

11              MR. GAVIN:  I have several other short

12  witnesses.

13              THE COURT:  Okay.  So you're thinking you're

14  going to be wrapped up in an hour?

15              MR. GAVIN:  A little bit more than an hour.

16  Probably an hour and a half.

17              THE COURT:  All right.

18              Folks, we are in a position of being able to

19  order lunch for you today if you didn't bring your lunch.

20  Does anybody want to do that?  Now is not the time to be

21  shy.  Raise your hand if you want us to order lunch.

22              Okay.  I'll tell you what we're going to do is

23  when we -- we'll take a break here before 11:00, and we'll

24  get your order for lunch.  As you can see, we're moving

25  pretty quickly.  This case is going to come to you today.

1   We're going to be a little bit chopped up on our breaks a

2   little bit because there's some legal things I have to do

3   with the lawyers, but we're going to -- the case is going

4   to be in your hands at some point today.   Okay?

5   All right.

6                            **MARK SCOTT,**

7   called by the defendant, first being duly sworn, testified

8                          as follows:

9                      **DIRECT EXAMINATION**

10  BY MR. GAVIN:

11  Q    Good morning, Mr. Scott.

12  A    Good morning.

13  Q    Mr. Scott, could you state your name for the record

14  and spell your name for the court reporter?

15  A    Mark -- Mark Haywood Scott.   M-A-R-K, H-A-Y-W-O-O-D,

16  S-C-O-T-T.

17  Q    Mr. Scott, are you currently an inmate at Petersburg

18  Medium?

19  A    Yes, sir.

20  Q    Were you an inmate on May 10th, 2018?

21  A    Yes, sir.

22  Q    Where were you housed?

23  A    F-South.

24  Q    Is that Fox South?

25  A    Fox South.   F-South.   Fox South.

27

1  Q    All right.  Were you in the common area?

2  A    I was coming into the unit, but that's where I'm

3  housed at.

4  Q    Okay.  All right.  I'll show you a video.  Okay?  And

5  I want to see if you -- do you remember us talking at

6  Petersburg?

7  A    Yes.

8  Q    All right.  And I was unable to really show you a

9  true video because I couldn't bring in a computer,

10 correct?

11 A    Correct.

12 Q    All right.  So I'm going to ask you to look at the

13 video and identify yourself in this video.  Okay?

14 A    Okay.

15 Q    It's going to be on your screen.

16          (Video Played.)

17          MS. TAYLOR:  Is this right?

18          MR. GAVIN:  Yeah.  You can let it play.

19          (Video Played.)

20 BY MR. GAVIN:

21 Q    Do you recognize yourself yet in this video?

22 A    It seem like that's me right there with the coat.

23 Q    All right.  Can you put your finger on that screen

24 and circle it?

25 A    Let me see.

Mark Scott – Direct                          28

1          MR. GAVIN:  Can you stop it, Ms. Taylor?

2   BY MR. GAVIN:

3   Q    Can you circle where you are in the coat?

4          CSO SPIVEY:  Touch the screen, yeah.

5   BY MR. GAVIN:

6   Q    Right there?

7          CSO SPIVEY:  Touch the screen.  It will circle

8   it.

9   A    Yeah, at the desk.

10  Q    All right.

11         MR. GAVIN:  Ms. Taylor, could you let it play?

12         (Video Played.)

13         MR. GAVIN:  Could you stop it right there,

14  Ms. Taylor?

15  BY MR. GAVIN:

16  Q    All right.  Mr. -- Mr. Scott, that shows you walking

17  towards the back, and there's an officer in front of you.

18  Do you recognize who that officer was?

19  A    Yes.

20  Q    Who was that?

21  A    Officer Legins.

22  Q    Okay.

23         MR. GAVIN:  Ms. Taylor, could you let it play?

24         (Video Played.)

25         MR. GAVIN:  Can you stop it right there,

Mark Scott - Direct                    29

1  Ms. Taylor?

2  BY MR. GAVIN:

3  Q    All right.  At that point in time, where did

4  Officer Legins go?

5  A    He went where the counselors and case manager's

6  office at.

7  Q    And do you know Mr. Lemagne?

8  A    Yes.

9  Q    Was he in that -- did he go through that same door as

10 well?

11 A    Yes.

12 Q    Were you right there in a position where you could

13 see through the two windows that was --

14 A    Yes, because you could see --

15 Q    -- in the doors?

16 A    -- you could see right through the glass --

17 Q    Okay.

18 A    -- two glasses.

19       MR. GAVIN:  Ms. Taylor, could you let it a play

20 a few minutes -- or a few seconds longer?

21       (Video Played.)

22       MR. GAVIN:  All right.  Can you stop,

23 Ms. Taylor?

24 BY MR. GAVIN:

25 Q    All right.  So you were there for several seconds,

1  right?

2  A     Right.

3  Q     And were you seeing what was happening in that

4  corridor?

5  A     I seen them going straight -- going, like, straight

6  across to the other side.  Because Mr. Lemagne, he came

7  in, and he always put up the flyers for, like, the events

8  that we have.

9  Q     Did you see them entering the office that's off of

10 that corridor where the secretary sits?

11 A     No, I didn't.

12             MR. GAVIN:  All right.  I have no other

13 questions.

14             THE COURT:  Go ahead.

15             MR. GARNETT:  Thank you, Your Honor.

16                    **CROSS—EXAMINATION**

17 BY MR. GARNETT:

18 Q     Good morning, Mr. Scott.

19 A     Good morning.

20 Q     Mr. Scott, just like you and Mr. Gavin, we also spoke

21 down at FCI Petersburg not too long ago; isn't that right?

22 A     That's correct.

23 Q     Okay.  And at no point during that discussion did you

24 mention anything about observing through the windows,

25 watching the defendant walk towards the other end of that

1  hallway, did you?

2  A    No, I didn't.  I just -- I just be looking through

3  there.  Because I'm trying to go to the computer, but so

4  many people on the computer.

5  Q    And prior to that, you spoke to federal agents,

6  didn't you?

7  A    Yes.  One.

8  Q    Okay.  And at no point during that interview did you

9  say anything about observing through the windows of that

10 unit team corridor doorway, did you?

11 A    I don't think so.

12 Q    That didn't seem relevant to you, that you were

13 watching the defendant go in through a corridor?

14 A    I mean, I seen him go in.  I seem him walk.  And I

15 turned around because I'm minding my own business because

16 I'm trying to use the computer, but so many people on the

17 computers, I just turned around.

18 Q    Okay.  When we talked a couple of weeks ago,

19 Mr. Scott, we walked through what you described as sort of

20 a timeline of what you saw that day; isn't that right?

21 A    Correct.

22 Q    Okay.  And you said that you had observed Brandon

23 Lemagne enter Fox South that unit -- that evening,

24 followed by Officer Legins; isn't that right?

25 A    Correct.

1    Q     And you watched Brandon Lemagne go to hang flyers,

2    right?

3    A     Correct.

4    Q     You said you watched Officer Legins go into his

5    office?

6    A     Correct.

7    Q     You said that you watched Brandon Lemagne enter

8    Officer Legins' office and ask for permission to use the

9    unit team corridor; isn't that right?

10   A     He asked -- he asking -- say he want to get to the

11   other side.

12   Q     Okay.  He went into the office to ask him that?

13   A     He went to the door, at the doorway.  He went to the

14   doorway, and he wanted to go into the other side because

15   that's the way the officers take them.  They just take

16   them to the other side and let them out on the other side

17   and come back.

18   Q     All right.  But you said Brandon Lemagne was standing

19   in the doorway to ask him this question, right?

20   A     Yeah.  He came to the door.

21   Q     And then Officer Legins got up and walked him through

22   the corridor?

23   A     Yes.

24   Q     Okay.

25              MR. GARNETT:  Ms. Taylor, can we go ahead and go

1   back to that same clip, Government Exhibit 2?  Around the

2   18:10 time stamp.

3                (Video Played.)

4                THE COURT:  When you get to where you want to

5   go, put the time stamp on the record.  Okay?

6                MR. GARNETT:  You can stop right there,

7   Ms. Taylor.

8                Okay.  The time stamp, Your Honor, is 18:09:32

9   at the top left hard corner there.

10               THE COURT:  Okay.  Go ahead.

11               (Video Played.)

12               MR. GARNETT:  Okay.  Ms. Taylor -- actually, let

13  me stop right there, Ms. Taylor.

14  BY MR. GARNETT:

15  Q    So, Mr. Scott, at this point Brandon Lemagne has

16  entered.  It appears Officer Legins is about to enter his

17  office.  Is that accurate?

18  A    Correct.

19  Q    Okay.

20               MR. GARNETT:  Ms. Taylor, can you please play?

21               (Video Played.)

22               MR. GARNETT:  You can stop right there,

23  Ms. Taylor.

24  BY MR. GARNETT:

25  Q    So, Mr. Scott, when I'm watching that video, I

Mark Scott - Cross                         34

1   don't see Brandon Lemagne approaching --

2           THE COURT:  You're not testifying.  Just ask

3   him.

4           MR. GARNETT:  I'm sorry, Your Honor.

5           THE COURT:  That's okay.

6   BY MR. GARNETT:

7   Q    Mr. Scott, do you see Brandon Lemagne walk into that

8   office?

9   A    No.

10  Q    Do you see him up front?

11  A    He at the corner.  He at the corner.

12  Q    He's in the corner, right.  Did you see him standing

13  in the doorway?

14  A    No.

15  Q    Okay.  So is it possible that your recollection of

16  that evening might not be that strong?

17  A    It might not be, but --

18  Q    All right.  Now, you earlier said that you didn't

19  think -- I think you said that you thought Brandon Lemagne

20  and Officer Legins were in the corridor for one or two

21  minutes; isn't that right?

22  A    Correct.

23  Q    Okay.  Were you wearing a watch at that time?

24  A    No.

25  Q    Is there a clock you were observing?

Mark Scott – Cross                    35

1  A    No.

2  Q    Okay.

3          MR. GARNETT:  Ms. Taylor, can you please go

4  ahead and advance it to 18:15, please, or thereabouts.

5          (Video Played.)

6          MR. GARNETT:  That's great, Ms. Taylor.  Thank

7  you.  You can stop right there, Ms. Taylor.

8  BY MR. GARNETT:

9  Q    So, Mr. Scott, the jury has already seen this video

10 so I'm not going to make them rewatch it.  Will you take

11 my word for it -- this is already in evidence -- that it's

12 now 18:14:58 on the time stamp, and neither Officer Legins

13 or Brandon Lemagne has reemerged from that unit team

14 corridor?

15         MR. GAVIN:  Judge, he can't testify to that.

16 He --

17         MR. GARNETT:  I'm asking if he's willing to

18 accept that, Your Honor.

19         THE COURT:  Say that again.

20         MR. GAVIN:  He can't --

21         THE COURT:  Hold on one second.

22         Officer Spivey, can you see why all those people

23 are outside of that door?  I was distracted by -- we've

24 got a line of people out there, and you'll reask the

25 question.

1          MR. GARNETT:  Thank you, Your Honor.

2          THE COURT:  It looks like they're a bunch of

3   students.  All right.

4          Mr. Garnett, I'm sorry.  I owe you an apology

5   because I was distracted.  Would you --

6          MR. GARNETT:  So, Your Honor, what I'm trying to

7   avoid doing is playing the entire video for the duration

8   of Mr. Scott's time on the stand.

9          THE COURT:  Just -- I didn't pick up the

10  question --

11         MR. GARNETT:  Sure.

12         THE COURT:  -- because I was wondering why we

13  had all these people out there.

14         MR. GARNETT:  Yes, Your Honor.

15         THE COURT:  Tell me what the question is again.

16         MR. GARNETT:  Sure.  I'm asking Mr. Scott,

17  Your Honor, whether he's willing to accept my proffer that

18  at no time between the start at 18:10:05 and now,

19  18:14:58, has either the defendant or Brandon Lemagne

20  reemerged from that set of doorways.

21         THE COURT:  You can't say your proffer.  You can

22  say do you agree that the tape shows the following.

23         MR. GARNETT:  Well, I don't know if he can,

24  Your Honor.  That's why --

25         THE COURT:  Well, then you can't ask your

1  question.

2           MR. GARNETT:  Okay.  Your Honor, then I'd ask to

3  go ahead and play the videotape.

4           THE COURT:  That's fine.

5           MR. GARNETT:  Okay.

6           Ms. Taylor, if you can go back to the beginning

7  of that, please.

8           MS. TAYLOR:  Starting?

9           MR. GARNETT:  18:10:04, or thereabouts.

10          (Video Played.)

11          MR. GARNETT:  That's fine.

12          THE COURT:  You started playing at what number?

13          MR. GARNETT:  I believe we started at 18:09:55,

14 Your Honor.

15          THE COURT:  Okay.

16          (Video Played.)

17          MR. GARNETT:  And if we could pause it right

18 there, Ms. Taylor.

19 BY MR. GARNETT:

20 Q    So, Mr. Scott, the time on that stamp is now 18:10

21 and 10 seconds; is that right?

22 A    Correct.

23          MR. GARNETT:  Okay.  You can go ahead and play

24 it, Ms. Taylor.

25          (Video Played.)

Mark Scott – Cross                    38

1  BY MR. GARNETT:

2  Q    And just to be clear, Mr. Scott, your testimony was

3  one or two minutes; isn't that right?  Or I'm sorry.  Your

4  earlier statement was one or two minutes?

5  A    Yes.

6              (Video Played.)

7              THE COURT:  All right.  How much longer do you

8  want to do?

9              MR. GARNETT:  I just want to go back to that

10  same side, Your Honor.

11              So we can fast-forward a little bit, Ms. Taylor.

12              (Video Played.)

13              MR. GARNETT:  A little bit more.

14              (Video Played.)

15              MR. GAVIN:  Judge, I'll stipulate that the time

16  was 5 minutes and 13 seconds, if that's what they're

17  trying to get to.

18              MR. GARNETT:  Go ahead and play that.

19              THE COURT:  I think he has a question, though,

20  about that in the meantime.

21              MR. GARNETT:  I do.  Thank you.

22              Go ahead, Ms. Taylor.

23              MS. TAYLOR:  I'm sorry?

24              MR. GARNETT:  You can hit play.

25              (Video Played.)

1           MR. GARNETT:  And you can pause it right there,

2   Ms. Taylor.

3   BY MR. GARNETT:

4   Q    So, Mr. Scott, is that Officer Legins reentering

5   Fox South?

6   A    Yes.

7   Q    Okay.  And where are you, Mr. Scott?  Are you down

8   there in the left-hand side of the screen leaning on that

9   blue contraption?

10  A    What, this?

11  Q    Can you circle yourself, please?

12  A    Where the blue podium at?

13  Q    Yes.  Can you please circle yourself with your

14  finger?

15  A    I don't think that's me.

16  Q    Where do you think you are?  Do you believe you're

17  leaning on that blue podium, Mr. Scott, on the far

18  left-hand side?

19  A    No.  That's ain't me.  I probably was in my cell.  I

20  probably went to my cell.

21  Q    Okay.  That's not you?

22  A    Not right here, not leaning.

23  Q    The individual wearing a sweater and a hat is not

24  you?

25  A    This here is a regular shirt.

1  Q     Okay.

2  A     I had on my coat.

3  Q     Would you agree with me that the difference -- the

4  time difference between when the defendant entered the

5  unit team corridor and when he emerged was more than five

6  minutes?

7  A     Well, the tape said he did.  So I guess so.

8  Q     Mr. Scott, you earlier, when speaking to federal

9  agents, said that you had observed Officer Legins, the

10 defendant, shortly after this; isn't that right?

11 A     I seen -- I seen Legins come back out.

12 Q     Okay.  Did you see Officer Legins sitting in his

13 office shortly after this?

14 A     Yeah.

15 Q     And what did you say that Officer Legins' demeanor

16 was at this pint?

17 A     I mean, he were just sitting there.  And then I guess

18 he had got a call or something because he put his head

19 down.  He ain't look like hisself.

20 Q     I think you -- did you say he looked very sad?

21 A     He looked like something was wrong, like something

22 wrong at home or something.

23         MR. GARNETT:  No further questions, Your Honor.

24         THE COURT:  Any redirect?

25                 **REDIRECT EXAMINATION**

1  BY MR. GAVIN:

2  Q    Mr. Scott, did the FBI ask you what you observed down

3  that hallway?

4  A    He asked me did I -- did I see -- see them go across.

5  I said I seen them go in there and go straight across.

6  Q    All right.  So you're sight was limited, though, to

7  the amount of time that you were there at those doors,

8  correct?

9  A    Correct.

10          MR. GAVIN:  I don't have any other questions.

11          THE COURT:  All right, Mr. Scott.  Thank you for

12  your testimony.  I'm going to instruct you not to talk

13  about your testimony with anybody until our trial is over.

14  Okay?

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  All right.  You can be excused.

17  Thank you.

18          THE WITNESS:  Thank you.

19          (Witness stood aside.)

20          MR. GAVIN:  Richard Fornash, Your Honor.

21                     **RICHARD FORNASH,**

22  called by the defendant, first being duly sworn, testified

23                      as follows:

24                  **DIRECT EXAMINATION**

25  BY MR. GAVIN:

1  Q     Good morning, Mr. Fornash.

2  A     Good morning.

3  Q     Could you state your name, please, for the record and

4  then spell it?

5  A     Richard Fornash.  R-I-C-H-A-R-D.  Fornash is

6  F-O-R-N-A-S-H.

7  Q     Mr. Fornash, are you currently an inmate at

8  Petersburg Medium?

9  A     I am.

10 Q     Were you an inmate on or around March of 2018?

11 A     Yes.

12 Q     Are you part of the LGBT community?

13 A     I am transgender, yes.

14 Q     All right.  Are you familiar with another inmate

15 named Brandon Lemagne?

16 A     Yes.

17 Q     Does the transgender community sort of hang out

18 together?

19 A     They hang out together.  So do -- well, everybody,

20 the whole LGBT, for the most part.

21 Q     And was it an occasion where you guys were hanging

22 out sort of on or around March of 2018 around a softball

23 diamond?

24 A     We hung out around the softball diamond a few times.

25 I can't tell you exact dates at this point.  It's been two

Richard Fornash - Direct                43

1  years.

2  Q    Okay.  Do you recall ever overhearing a conversation

3  or being part of a conversation with Mr. Lemagne when the

4  subject was pat-downs by officers?

5  A    Yes.

6  Q    Did Mr. Lemagne say anything about what he would do

7  if given the opportunity with improperly patted down?

8  A    Not if improperly patted down, no.

9  Q    What kind of comments did he make?  Did he make any

10 comments to you about setting up police officers?

11 A    He said if he had a chance to have sexual

12 relationships with a police officer, he would so that he

13 could use that, you know, for other means.

14 Q    All right.  And that was something that was out of

15 his mouth?

16 A    Yes.

17 Q    All right.  When you heard what had allegedly

18 happened with Mr. Legins, did you come forward?

19 A    I had -- I mentioned something to the guard working

20 my unit, because I didn't know if it was true or not.  But

21 I didn't know if -- we had heard something had happened.

22 We didn't know details.  So I brought something up.

23 Because after that comment, it seemed weird that, if the

24 rumors were true, that Legins had been arrested.

25 Q    So why did you believe that you needed to come

Richard Fornash - Cross                    44

1   forward with that comment?

2   A    Because the comment happened like a week before, or

3   so, before -- apparently the rumor was the FBI showed up

4   and started pulling people out.

5   Q    Did you think you'd get any reward or any reduction

6   in your sentence if you came forward?

7   A    No.

8              MR. GAVIN:  I don't have any other questions.

9              THE COURT:  Any cross?

10                    **CROSS-EXAMINATION**

11  BY MR. GARNETT:

12  Q    Good morning, Mr. Fornash.

13  A    Good morning.

14  Q    Mr. Fornash, you testified before a federal grand

15  jury in Richmond on May 8th of 2019; is that right?

16  A    Yes.

17  Q    And during that time, there was a court reporter

18  present who transcribed your testimony?

19  A    Yes.

20  Q    Okay.  And you were under oath at that time?

21  A    Yes.

22  Q    Okay.  Before we go too much further, I want to ask

23  you about your criminal convictions, Mr. Fornash.  Were

24  you convicted of production of child pornography in 2014?

25  A    I was.

Richard Fornash – Cross                    45

1  Q    Now, in regards to Brandon Lemagne, this case, just

2  to be clear at the outset here, you have no idea of what

3  actually happened in Fox South on May 10th of 2018, do

4  you?

5  A    I -- as I said, I was not there.  I did not see

6  anything.  I do not know what happened.  All I know, that

7  there was a coincidental timing of what I heard said and

8  what happened.

9  Q    And you haven't talked to the defendant, Officer

10 Chikosi Legins, about that evening?

11 A    I have not.

12 Q    You've never talked about this after May 10th with

13 Brandon Lemagne?

14 A    That situation -- no.  That situation -- or that

15 comment thing had never been brought up again after that,

16 no.

17 Q    So, Mr. Fornash, you were talking about the -- sort

18 of the social setting in which the comment was made.

19 You'd acknowledge that you were not particularly close

20 with Brandon Lemagne; isn't that right?

21 A    Correct.

22 Q    All right.  You'd acknowledge you only knew him

23 because you were sort of in the same general social circle

24 in prison?

25 A    Correct.

1 Q     You didn't share close personal details of your life

2 with him?

3 A     Correct.  And he did not share with me.

4 Q     Is it fair to say that your conversations with

5 Brandon Lemagne were just sort of casual prison gossip?

6 A     It was exactly prison gossip.  Like I said, the

7 comment that was made about -- what I repeated about, you

8 know, Lemagne saying that they would sleep with a guard.

9 It's the same as two people standing at the water cooler

10 or talking about if they won the lottery.

11 Q     So let's talk a little bit about that briefly, then.

12 Is this the kind of comment -- comment about setting up a

13 guard, is that the kind of comment you'd heard frequently

14 in this kind of social setting?

15 A     I've probably heard it about three or four times in

16 the last seven years.

17 Q     So it was not an unusual thing for inmates to banter

18 about?

19 A     The only thing that made it unusual was the timing.

20 Q     Now, Mr. Fornash, you would agree that if an inmate

21 was planning to set up a federal correctional officer, he

22 could face serious consequences if it was discovered that

23 he was lying?

24 A     That's correct.

25 Q     And you'd agree that sort of a general fact of prison

1  life, that the more people know about something, the more

2  likely it is to become public knowledge?

3  A    Yeah.  You can't keep a secret in prison.

4  Q    Is it fair to say that most inmates are looking to

5  collect information they can use to try to reduce their

6  sentence?

7  A    Some are.

8  Q    And are those inmates eager to report the information

9  they get to law enforcement?

10  A    If they're looking for a reward, yes.

11  Q    Now, would you agree as well, Mr. Fornash, that if

12  you had an inmate -- an inmate announcing that he had a

13  plan to frame a correctional officer would be something

14  that -- if overheard, would be something that a lot of

15  inmates would be eager to pass on to authorities?

16  A    I wouldn't say a lot, but there would be inmates

17  that -- certain ones that would, yes.

18  Q    And if you're planning to set up a plot to frame a

19  correctional officer, it wouldn't make much sense to sort

20  of casually announce that plan the week prior in a social

21  circle, would it?

22  A    No.

23  Q    And because that would be valuable information to law

24  enforcement, you'd think that if it was in a general

25  social setting, there would be other people to come

Richard Fornash – Redirect                    48

1  forward and report this to law enforcement?

2  A    As long as they didn't want to be labeled a snitch.

3  Q    What if they wanted to receive time off their

4  sentence?

5  A    Then, yes, they would.

6  Q    Now, Mr. Fornash, it has been approximately 20

7  months -- I'm careful with math as I stand here.  But if

8  Brandon Lemagne had been serious about the statement he

9  made to you in this sort of social circle, you'd agree

10 that if he was serious, he should have filed a lawsuit by

11 now looking for damages; is that right?

12 A    Right.

13         MR. GAVIN:  Judge, that would require

14 speculation.

15         THE COURT:  Yeah.  Let's not do that.

16         MR. GARNETT:  All right.

17         THE COURT:  That's going to be stricken.

18         MR. GARNETT:  Understood, Your Honor.

19         THE COURT:  Do you have anything else?

20         MR. GARNETT:  No, Your Honor.  Thank you.

21         THE COURT:  Do you have any redirect?

22                  **REDIRECT EXAMINATION**

23 BY MR. GAVIN:

24 Q    Mr. Fornash, do you know a gentleman by the name of

25 Ronzell Jackson?

1  A    Do they have a nickname?

2  Q    Zell.

3  A    Yes.

4        MR. GARNETT:  Your Honor, this is beyond the

5  scope of my cross.

6        MR. GAVIN:  Well, he wanted to know who was

7  around these conversations and whether it was a general

8  conversation.

9        MR. GARNETT:  I did not, Your Honor.  I asked if

10 anyone else -- I asked if whether he thought people would

11 come forward if they were present.

12       THE COURT:  Well, no.  You asked some questions

13 about who else was there.  Go ahead.

14 BY MR. GAVIN:

15 Q    Was Zell part of that conversation?

16 A    No.

17 Q    He was not?

18 A    He was not there, no.

19       MR. GAVIN:  Okay.  No other questions.

20       THE COURT:  All for nothing.  Okay.

21       Sir, thank you for your testimony.  You can step

22 down.  I'm going to instruct you that you're not to talk

23 about your testimony with anybody until our trial is over.

24 Okay?  Thank you again for your testimony.

25       (Witness stood aside.)

Ajibola Erogbogbo – Direct                    50

1          MR. GAVIN:  Keep going?

2          THE COURT:  What's that?

3          MR. GAVIN:  Do you want to keep going or --

4          THE COURT:  Absolutely.

5          MR. GAVIN:  Okay.  Ajibola Erogbogbo.

6                    **AJIBOLA EROGBOGBO,**

7  called by the defendant, first being duly sworn, testified

8                      as follows:

9                  **DIRECT EXAMINATION**

10  BY MR. GAVIN:

11  Q    Good morning, sir.

12  A    Good morning.

13  Q    Sir, I'm going to you ask you to pronounce your name

14  and then spell your name for the court reporter.

15  A    My name is Ajibola Erogbogbo.  First name is

16  A-J-I-B-O-L-A.  My last name is E-R-O-G-B-O-G-B-O.

17  Q    Sir, are you an inmate currently at Petersburg

18  Medium?

19  A    I am.

20  Q    Were you an inmate at Petersburg Medium beginning

21  January 2018?

22  A    I was.  Oh, I was there prior to that, but yes.

23  Q    You were still there in January --

24  A    I was there, yes.

25  Q    Did you have a job there?

1  A    I did.

2  Q    Were you interviewed by the FBI in this case around

3  April of last year?

4  A    I was.

5  Q    Were you also called before the grand jury?

6  A    I was.

7  Q    Did you provide truthful testimony to the grand jury?

8  A    I did.

9  Q    Any changes in your testimony that you recall between

10 the grand jury and your interview with the agents?

11 A    No.

12 Q    Where did you work at the facility?

13 A    Initially, I worked as an education tutor.  Then I

14 worked in the commissary.

15 Q    As an education tutor, what was your role?

16 A    My role was to tutor inmates who were studying to get

17 their GED.

18 Q    And did that include access to legal cases, the law

19 library?

20 A    It did.

21 Q    And what kind of research tools were available to you

22 in the law library?

23 A    In the law library, there's a compendium of legal

24 cases called -- it's a software called LexisNexis where it

25 compiles legal cases from all over the country, and it

1   shows the background, also the summary, and how it was

2   adjudicated.

3   Q    Are you familiar with a gentleman by the name of

4   Brandon Lemagne?

5   A    I am.

6   Q    How are you familiar with Mr. Lemagne?

7   A    Lemagne and I were really good friends, probably the

8   closest friend I had on the compound.

9   Q    At any point did you guys have an intimate

10  relationship?

11  A    We did.

12  Q    Did it end badly?

13  A    No.

14  Q    Okay.  In your course of working at the compound, did

15  Mr. Lemagne ask you to assist him with anything?

16  A    He did.

17  Q    What did he ask you to assist him with?

18  A    A few times Lemagne asked me to help him look up

19  cases on the LexisNexis document search.  Yeah, on the

20  computer.

21  Q    To your memory, was he familiar with how to use

22  LexisNexis?

23  A    To my memory, he wasn't really familiar on how to

24  navigate LexisNexis.

25  Q    Did you have to show him how to use LexisNexis?

Ajibola Erogbogbo – Direct                    53

1   A     I did.

2   Q     And did you show him how to use LexisNexis?

3   A     I did.

4   Q     So would you provide search tools or search subjects

5   or would he provide search subjects?

6   A     He would direct me to search certain things on the

7   LexisNexis software.

8   Q     All right.  On around early of 2018, were there any

9   particular topics that Mr. Lemagne was asking you to

10  research or help him research?

11  A     Yes, there were.

12  Q     And what was he asking you to help him research?

13  A     Specifically, inmate and staff misconduct at prisons.

14  It was specifically that.  And fraud -- general fraud

15  subjects and the disposition.

16  Q     And when you were doing that, were you sitting beside

17  him or did you just help him and tell him to go on his

18  own?

19  A     I sat literally right next to him.

20  Q     So you saw everything that was being entered?

21  A     Yes.

22  Q     You saw everything that was being produced?

23  A     At certain times, I was the one scrolling while he

24  was looking.

25  Q     All right.  When you were looking at the screen and

Ajibola Erogbogbo – Direct                    54

1  he was doing his research, did you get the impression that

2  he was looking for --

3          THE COURT:  Stay away from impressions.

4          MR. GAVIN:  All right.  Sorry.

5          THE COURT:  Just stick to what people said.

6          MR. GAVIN:  Sorry.

7  BY MR. GAVIN:

8  Q    Did you review with Mr. Lemagne tools to help him

9  gain an advantage in a Medicare health business after he

10 was released?

11 A    I did.

12 Q    Was that to help him set up a business or was it to

13 help him defraud the business?

14 A    It was to help him commit fraud.

15 Q    All right.  When he was researching items that dealt

16 with sexual assault by officers, did you look up

17 particular cases?

18 A    Not necessarily particular cases, but he would ask me

19 to look it up.  And when you look it up, there's a section

20 on the LexisNexis software where you can briefly scroll

21 through all the cases and see if it was a civil case or a

22 criminal case and what the disposition was.

23 Q    And was Mr. Lemagne interested in the dispositions?

24 A    Yes, he was.

25 Q    Did he ever ask you to print anything out?

1    A    Yes, he did.

2    Q    What did he ask you to print out?

3    A    I don't remember specifically all the things we

4    printed out, but there were several things we printed out.

5    And I remember one specific case was a New York City --

6    New York state correction officer.  It was a civil lawsuit

7    where I think the inmate won the lawsuit, and it was

8    settled.

9    Q    Do you remember what the amount was of the

10   settlement?

11   A    I don't remember exactly.  I want to say something

12   around $200,000, but I do not remember exactly.

13   Q    How did you relate this when you were asked by law

14   enforcement as to the time that these research requests

15   were taking place?

16   A    Well, I knew it was in the evening because I work

17   during the day, and I -- I take classes at the prison.

18   And at that time, I knew I was taking a bookkeeping class

19   because the bookkeeping class is only offered at a certain

20   time during the year.  So I -- I was able to say it was

21   when I was taking my bookkeeping class.

22   Q    Did Mr. Lemagne tell you how he was planning to use

23   the information that was researched?

24   A    Yes, he did.

25   Q    What did he say?

1  A    He said he was writing an urban fiction novel and

2  that he wanted to use that as some story lines.

3  Q    At some point, sir, did you become aware that the

4  allegations against Mr. Legins took place?

5  A    I was aware.  I became aware, yes.

6  Q    And what did you do?

7  A    I immediately contacted -- attempted to contact the

8  special investigative agent a few hours after I heard.  I

9  asked two officers if they could contact him, and they

10 attempted to, and he couldn't speak to me on the day of.

11 Q    And was that within days of the event taking --

12 A    No.  It was within hours of finding out what

13 happened.

14           MR. GAVIN:  No other questions, Your Honor.

15           THE COURT:  All right.  Any cross?

16                 **CROSS-EXAMINATION**

17 BY MS. GILBERT:

18 Q    Good morning, Mr. Erogbogbo.

19 A    Good morning.

20 Q    First, let's just establish.  You have no firsthand

21 knowledge about what happened or what didn't happen on

22 May 10th, 2018, in the unit secretary's office, right?

23 A    That is correct.

24 Q    You didn't see the defendant take Mr. Lemagne into

25 that area for a period of time?

1  A    That is correct.  I did not see that.

2  Q    And you didn't see them come out?

3  A    Did not see that.

4  Q    So you don't know if any physical evidence was

5  collected that night, right?

6  A    Do not know.

7  Q    But despite having no firsthand knowledge, you said

8  that you thought you had information about this case?

9  A    I said -- I believe I had information that could

10 possibly help the case or, I mean, fill in a part of a

11 puzzle apparently.  I didn't know what they were looking

12 for.

13 Q    So you came forward with that theory after you heard

14 rumors about why defendant Legins had been walked off at

15 Petersburg, right?

16 A    It wasn't a rumor.  I heard it directly from

17 Lemagne's boyfriend.

18 Q    You put together the information that you thought was

19 relevant, and you formed an opinion you wanted to share?

20 A    I wouldn't say it was an opinion.  I thought it was

21 very relevant after his boyfriend told me what happened.

22 Q    When an officer gets walked off, that means he's in

23 trouble, right?

24 A    Yes.

25 Q    And so you put that together, the rumors that you had

1   heard, plus some legal research that you said Brandon

2   Lemagne did.  And so you assumed that Brandon Lemagne

3   accused the defendant of having sex with him?

4   A    It wasn't a rumor.  This was because of what his

5   boyfriend/cellmate told me that afternoon.

6   Q    So just so the jurors understand, you reached out

7   actually not just to one correctional officer, but to

8   several correctional officers because you were very eager

9   to share the information that you had, right?

10  A    I reached out to two correction officers.

11  Q    Didn't you just say that you reached out to Officer

12  Hall, Officer Adajeffrey(phonetic) --

13  A    Yes.

14  Q    -- Mr. Norman and another SIS lieutenant?

15  A    No.  I reached out to Officer Hall and Officer

16  Adajeffrey to contact Special Investigative Agent Norman.

17  Q    You wanted those officers to know that you had

18  information that you thought would help out their

19  colleague, right?

20  A    No.  I wanted them to contact Norman so I could speak

21  to Norman.

22  Q    But it was because you thought you had information

23  that was going to help out an officer, right?

24  A    Well, not to help out the officer, but to help out

25  the case.  I wasn't specifically trying to help an

1    officer.  I felt like I knew something about what was

2    going on.

3    Q    And then after you talked to officers and you didn't

4    get any special treatment from them, you talked to federal

5    agents, right?

6    A    I wouldn't say that I was expecting special treatment

7    from them, but eventually, Norman spoke to me, yes.

8    Q    But you also talked to federal agents, right?

9    A    I did.

10   Q    And, in fact, when we sat down -- you and I and

11   federal agents -- to talk before a federal grand jury, the

12   very first thing you asked me was what benefit you would

13   get for coming forward with information in this case,

14   correct?

15   A    Yes.

16   Q    You thought that --

17              THE COURT:  I'm sorry.  I didn't hear what you

18   said.

19              THE WITNESS:  I said yes, sir.

20   BY MS. GILBERT:

21   Q    You thought you could get something out of me because

22   I also work for the federal government?

23   A    Oh, no.  I thought I could go to a halfway house

24   earlier because I think I made it clear to you that I felt

25   there were some security implications for me as an inmate

1  coming out in regards to this case.

2  Q     So you said you wanted to get time off your sentence,

3  right?

4  A     I said I wanted to go to the halfway house earlier.

5            THE COURT:  Does that mean you would be released

6  from prison to go to a halfway house --

7            THE WITNESS:  Yes.  Currently --

8            THE COURT:  Hold on.  Let me finish my question.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  My question is does that mean

11 that -- the halfway house is in the public as opposed to

12 being in a prison; is that right?

13           THE WITNESS:  Correct.  That's community

14 confinement.

15           THE COURT:  That's what you were trying to get

16 out of this?

17           THE WITNESS:  Yes.

18           THE COURT:  Okay.

19 BY MS. GILBERT:

20 Q     But then when you were asked in the grand jury just a

21 few minutes later if you hoped to get some kind of

22 reduction in the amount of time you had to live in prison,

23 you said no at first, right?

24 A     Well, because I wasn't considering it a reduction.  I

25 was considering it going to the halfway house a year

1 earlier, yes.

2 Q    You said no until we asked again, didn't you ask us

3 when we met earlier today whether you would get any

4 benefit from speaking with us, right?

5 A    Correct.

6 Q    And then you admitted to the grand jury that, yes,

7 you had asked for a benefit for coming forward with

8 information you thought was useful?

9 A    Correct.

10 Q    At the end of your grand jury testimony, didn't you

11 make clear that what you thought you deserved was 15

12 months off your sentence?

13 A    Correct.  Fifteen months in the halfway house, yes.

14 Q    Didn't you actually say, quote, I mean, I would love

15 like a 15-month time cut so my time would go to zero?

16 A    Correct.

17 Q    And then when we met a couple weeks ago, you again

18 said you wanted 12 months off your sentence at that point

19 so you could go to a halfway house, right?

20 A    Well, the last time we met, I mean, I was a few

21 months away from going to the halfway house.  Just like

22 I'm a month away from going to the halfway house now.

23 Q    But didn't you say that you wanted to go immediately

24 to the halfway house, that by coming forward with these

25 theories, you could walk out of prison?

Ajibola Erogbogbo – Cross

1  A    Correct.  And I also stated that there were security

2  implications for me as an inmate.

3  Q    Why are you in prison, Mr. Erogbogbo?

4  A    Interference with commerce is what I was charged

5  with.

6  Q    Is that the complete name of your offense?

7  A    I think interference with commerce by robbery or

8  interference with commerce.

9  Q    Let's talk about your relationship with Brandon

10  Lemagne.

11  A    Yes.

12  Q    When you first spoke with federal agents about your

13  theory of this case, you told the agents that you and

14  Brandon Lemagne were best friends, right?

15  A    Yes.

16  Q    Where was Brandon Lemagne originally from?

17  A    Virginia, and he lived in Florida prior to coming to

18  prison.

19  Q    Didn't you tell the grand jury you didn't know where

20  Brandon Lemagne was originally from?

21  A    Well, I mean, that -- I'm not sure if -- exactly what

22  I said, but I knew he was from Virginia and he lived in

23  Florida.

24  Q    But you don't know that he was from New York?

25  A    I don't know -- yeah.  I don't know if he's from

1  either.

2  Q     You said you spent time together every day, right?

3  A     Almost every day, yes.

4  Q     And the first time you spoke to federal agents, you

5  didn't say anything about being in a sexual relationship

6  with Mr. Lemagne, right?

7  A     Correct, because I didn't think it was relevant.

8  Q     You didn't think that in this case about sexual abuse

9  of an inmate, that your sexual relationship with the

10 person you came forward with information about was

11 relevant?

12 A     No.

13 Q     But then when we met before the grand jury, you said

14 for the first time that you did have a sexual relationship

15 with Brandon Lemagne, right?

16 A     Correct.

17 Q     How many times did you say you had sex with Brandon

18 Lemagne?

19 A     I don't remember how many times I said, but I think

20 it was around four or five times.

21 Q     Is that because what you said wasn't true?

22 A     It's because I don't remember.

23 Q     You actually said that Mr. Lemagne told you he wanted

24 to elope with you, right?

25 A     Yeah, like why couldn't we do something and get away.

1  Yes.

2  Q    Wasn't Brandon Lemagne in a relationship with Ronzell

3  Jackson during this time at Petersburg?

4  A    I guess you could say --

5  Q    Mr. Erogbogbo, it's a yes-or-no question.

6  A    I can't answer that with a yes-or-no question -- with

7  a yes or no.

8  Q    You can't say that Brandon was in a relationship with

9  Ronzell Jackson?

10 A    No, I can't, because his actions publicly were

11 different from his actions privately.

12 Q    You were never publicly in a romantic or sexual

13 relationship with Brandon Lemagne, right?

14 A    No, I was not.

15 Q    So the sexual relationship that you claim happened,

16 nobody knows about that except for you, right?

17 A    Correct.

18 Q    You claim that you were best friends with Brandon

19 Lemagne up until the day that he was segregated, right?

20 A    Correct.

21 Q    And you never saw him again before he got

22 transferred, right?

23 A    That is correct.

24 Q    You never got to say goodbye to the person that you

25 call your best friend?

1   A     Correct.

2   Q     And so the same day that your best friend got taken

3   to segregation, you learned that there was a rumor that he

4   had been sexually assaulted by the defendant, right?

5   A     Correct.

6   Q     And then that day, without having had a chance to

7   talk to your best friend and without knowing any

8   information personally about what actually happened, you

9   tracked down an investigator to say you had information to

10  share about your best friend, right?

11  A     Oh, no.  That's not correct.

12  Q     Didn't you just testify that you went forward to

13  officers and said that you had information --

14  A     No.  No.  No.  You said -- no.  No.  No.  You said

15  not having any information about knowing what happened.

16  His boyfriend, Ronzell Jackson, spoke to me that day

17  outside and alluded to the fact that something did happen.

18  So --

19  Q     Let's talk about what you had to say to authorities

20  about the person who was your best friend.

21  A     Okay.

22  Q     You jumped at the chance to tell the authorities that

23  you thought Brandon Lemagne was somehow framing the

24  defendant, correct?

25              MR. GAVIN:  Objection to the form of the

Ajibola Erogbogbo - Cross                66

1   question.   That's not what his testimony was.

2             THE COURT:   Overruled.

3   BY MS. GILBERT:

4   Q    You may answer the question.

5   A    Can you repeat the question, please?

6   Q    Sure.   You jumped at the chance to tell authorities

7   that you thought Brandon Lemagne was somehow framing the

8   defendant, right?

9   A    Yes.

10  Q    Even though you didn't know what the defendant had or

11  had not done to Brandon, you were eager to say that --

12            THE COURT:   Mr. Lemagne.   We're going to get

13  there.

14            MS. GILBERT:   Oh, I'm sorry, Your Honor.   I

15  apologize.

16            THE COURT:   Before you go farther, I just want

17  to ask one question.

18            THE WITNESS:   Yes, sir.

19            THE COURT:   You said in addition to talking to

20  officers, you wanted to talk to somebody called

21  Mr. Norman?

22            THE WITNESS:   Yeah.   The way the --

23            THE COURT:   Who is Mr. Norman?

24            THE WITNESS:   I'm sorry.

25            THE COURT:   Who is Mr. Norman?

Ajibola Erogbogbo - Cross

1          THE WITNESS:  Mr. Norman is the special

2   investigative agent of the prison.  So when something

3   sensitive happens and I need to speak to someone about the

4   information, I don't just tell the officers what's going

5   on -- what I have to say.  I ask them if they can contact

6   him, and then he contacts me, and then we speak privately.

7          THE COURT:  Okay.

8          THE WITNESS:  For my safety.

9          THE COURT:  All right.  Go ahead, Ms. Gilbert.

10         MS. GILBERT:  Thank you, Your Honor.

11  BY MS. GILBERT:

12  Q    So you were saying earlier that you jumped at the

13  chance to talk to authorities and say that you thought

14  Brandon Lemagne was framing the defendant.  You'd agree

15  that doesn't sound like something a person would do to a

16  best friend, does it?

17  A    Well, I think it sounds like something someone with a

18  conscience would do, yes, active conscience.

19  Q    You weren't actually best friends with Brandon, were

20  you?

21  A    I think I was.  I would consider myself, at that

22  time, best friends with Lemagne.

23  Q    Isn't it true that Mr. Lemagne tried to avoid you?

24  A    That's not true.

25  Q    Isn't it true that he rejected your sexual advances?

1  A     That's not true.

2  Q     Isn't it true that he found you creepy?

3  A     That's not true.

4  Q     You testified earlier about the computer research

5  that you said Brandon Lemagne was doing.  Isn't it true

6  that Brandon Lemagne was researching the Prison Rape

7  Elimination Act and --

8  A     At one point.

9  Q     -- sexual harassment?

10  A     Yes, he was.

11  Q     And isn't it true that he was researching those

12  things after he mentioned to you that he had been sexually

13  harassed in the laundry room?

14  A     That is true.

15  Q     But you told federal agents, and you testified here

16  today, that Mr. Lemagne was just asking you for help

17  researching sexual acts between inmates and officers?

18  A     Well, Lemagne asked me to research several things on

19  the computer, including fraud, including policy codes.  I

20  mean, that was one of them, yes.

21  Q     Didn't Mr. Lemagne work in the library?

22  A     No.  Lemagne did not work in the library.  He worked

23  as a clerk for an education staff member.

24  Q     Wasn't it literally his job to help people in the

25  library?

1  A     No, that was not his job.

2  Q     So just repeating the truth about Mr. Lemagne

3  researching the Prison Rape Elimination Act wasn't going

4  to get any benefits, right?

5  A     Can you repeat the question?

6  Q     I'll rephrase it.  Didn't you think that it would

7  interest the officers at the prison more if you said that

8  Mr. Lemagne was researching inmates and officers, as you

9  put it before the grand jury, messing around?

10  A     No, I didn't think either.  It would affect the

11  outcome either/or.

12  Q     Isn't that why you didn't tell them about Brandon

13  Lemagne's research of the Prison Rape Elimination Act and

14  sexual harassment after he said that an officer sexually

15  harassed him?

16  A     That's not true.  Lemagne and I researched several

17  things, like I said.  It's impossible for me to remember

18  every single thing we researched.

19  Q     And, in fact, you didn't tell federal agents about

20  the Prison Rape Elimination Act research, right?

21  A     They did ask me, and after they asked me, I recalled

22  and I said yes.

23  Q     Well, actually, so you met with the federal agents at

24  one point.

25  A     Yes.

1  Q    You didn't mention that.  But then later in grand

2  jury you, for the first time before a grand jury when you

3  were pointedly asked whether Mr. Lemagne ever told you he

4  had been sexually harassed, that was when you said that

5  you wanted to backtrack and admitted to the grand jury

6  that Mr. Lemagne had been researching the Prison Rape

7  Elimination Act and sexual harassment.

8  A    Again, Lemagne was my best friend, and we researched

9  several things.

10 Q    Let's talk a little bit more about you,

11 Mr. Erogbogbo.

12 A    Okay.

13 Q    You admitted in grand jury that you are a pretty

14 convincing liar, right?

15 A    I guess so, yes.

16 Q    You talked about how you always lied to Mr. Lemagne

17 about what you were in prison for?

18 A    Yes.

19 Q    You told him that you were in prison for credit card

20 fraud?

21 A    That is correct.

22 Q    But actually, you're in prison for robbery, correct?

23 A    Yes.

24 Q    You lied because it helped you create a false persona

25 in prison, right?

1  A     That is correct.

2  Q     And to be clear, persona was your word, not mine?

3  A     Probably yeah.

4  Q     You thought it was helpful to you to be known as a

5  credit card fraudster because, to use your words again,

6  credit card fraud was cool?

7  A     Yes.

8  Q     So you lied to Brandon Lemagne and others to create a

9  false persona to benefit yourself?

10 A     That is correct.

11 Q     You also boasted to the grand jury that you're good

12 at talking your way out of situations?

13 A     I don't know if I boasted.  But if they asked the

14 question, I probably said yes.

15 Q     You also said that you're good at wiggling out of

16 things, right?

17 A     Yes.

18           MS. GILBERT:  Thank you, Mr. Erogbogbo.

19           THE COURT:  Any redirect?

20           MR. GAVIN:  Yes.

21                    **REDIRECT EXAMINATION**

22 BY MR. GAVIN:

23 Q     Sir, when you approached the officers, did you use

24 the words Mr. Lemagne is trying to frame anybody?

25 A     No.  I just said I need to speak to Mr. Norman

Ajibola Erogbogbo – Redirect                    72

1  because something happened, and I need to talk to him

2  about it.

3  Q    So you weren't jumping at the bit --

4  A    No, I wasn't.

5  Q    -- as it's been inferred to say somebody was framing

6  somebody?

7  A    Can I answer that in a long way, if that's --

8  Q    If it gets too long, we'll cut you off.

9  A    Well, the -- I think it wasn't made clear that the

10  reason that I went to the officers -- I went to the

11  officers immediately after Brandon Lemagne's cellmate,

12  Ronzell Jackson, told me that Officer Legins was walked

13  off the compound and alluded to the fact that my friend

14  had something to do with it.

15  Q    Is Officer Legins a personal friend of yours?

16  A    No.

17  Q    Do you know him well?

18  A    No.

19  Q    When you were talking with the United States about

20  trying to get into a halfway house early, is that because

21  you had security concerns?

22  A    I made that very clear, yes.

23  Q    What were your security concerns, and why?

24  A    Well, it's two-fold.  Number one, the fact that I'm

25  speaking to a special investigative agent about a case

Ajibola Erogbogbo - Redirect                    73

1  that occurred at the prison, I could face retribution from

2  the staff because they don't know whose side I'm on, and I

3  could also face retribution from the inmates because they

4  don't know whose side I'm on.  So being that they don't

5  know who -- what I'm saying, the danger comes -- could

6  potentially come from both sides.

7  Q    So the only thing you were asking the United States

8  was whether or not you could get to a different type of

9  incarceration other than staying there?

10 A    Correct.

11 Q    Matter of fact, did you tell me that you had security

12 concerns just by talking with me?

13 A    I told you, and I told the United States government,

14 a few weeks ago.

15          MR. GAVIN:  Okay.  I don't have any other

16 questions.

17          THE COURT:  All right, sir.  Thank you for your

18 testimony.  You can step down.  I'm going to instruct you

19 that you're not to discuss your testimony with anybody

20 until the trial is over.  All right?

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  You're excused.

23          (Witness stood aside.)

24          MR. GAVIN:  Judge, there are three inmates that

25 I don't need them for anything else, if the marshal wants

 1  to release them.

 2              THE COURT:  All right.  Did you hear what he

 3  said, the other inmates?

 4              Do you have any other evidence, then?

 5              MR. GAVIN:  Yes, sir.  Ken Mikionis.

 6              THE COURT:  Is someone going to get him?

 7                    **KENNETH MIKIONIS,**

 8  called by the defendant, first being duly sworn, testified

 9                      as follows:

10                  **DIRECT EXAMINATION**

11  BY MR. GAVIN:

12  Q    Could you state your name, sir?

13  A    Kenneth L. Mikionis.

14  Q    Mr. Mikionis --

15              THE COURT:  And spell your first and your last

16  name, please.

17              THE WITNESS:  First name K-E-N-N-E-T-H.  Last

18  name M-I-K-I-O-N-I-S.

19  BY MR. GAVIN:

20  Q    Mr. Mikionis, how are you employed now?

21  A    I'm a private investigator with the Commonwealth of

22  Virginia.

23  Q    Have you previously worked in law enforcement?

24  A    Yes.

25  Q    Where?

1   A    Special agent with the FBI for 28 years.

2   Q    When did you retire from the FBI?

3   A    End of 2007.

4   Q    And your -- when you retired, did you just enter into

5   the private practice as a private investigator?

6   A    Yes.

7   Q    All right.  Did I ask for your assistance in helping

8   me investigate this case?

9   A    Yes.

10  Q    And did you?

11  A    Yes.

12  Q    I'm going to show you --

13          MR. GAVIN:  Mr. Spivey, if I could, and ask

14  Ms. Brown to bring up what's already been admitted as

15  Defense Exhibit 4.

16  BY MR. GAVIN:

17  Q    That's a hard copy, Mr. Mikionis, but the evidence

18  copy is on the screen.  Do you recognize that document?

19  A    Yes, I do.

20  Q    What is that?

21  A    That is the Bureau of Prisons work history for

22  Mr. Legins.

23  Q    And does that reflect the days that Mr. Legins worked

24  and where he was assigned on any particular day?

25  A    Yes.

1  Q     And did I ask you to look at where he worked on two

2  particular days?

3  A     Yes, you did.

4  Q     And were those days February 17th and February 19th

5  of 2018?

6  A     Yes.

7  Q     I'd ask you to flip over to page 15 of the report

8  that's in front of you.  Does page 15 of that report

9  reflect Mr. Legins' work history on February 17th, 2018?

10 A     Yes.

11 Q     Does it indicate that at any point he worked in

12 C-South?

13 A     No.

14 Q     If you look at February 19th, 2018, does it indicate

15 where he worked?

16 A     Yes.  It's a day off.  It says "Day Off."

17 Q     So it doesn't indicate he was working in the compound

18 on February 19th?

19 A     Correct.

20 Q     That's his day off?

21 A     Yes.

22         MR. GAVIN:  I have no other questions on that

23 exhibit.

24         Ms. Brown, would you bring up D-8, the pictures?

25 BY MR. GAVIN:

1  Q    Mr. Legins(sic), you went with me to the Petersburg

2  Medium facility, did you not, several weeks ago?

3  A    Yes.

4  Q    Were we allowed to take in any type of recording

5  device?

6  A    No.

7  Q    Were we allowed to take in any type of photographic

8  device?

9  A    No.

10  Q    When we went there, what was our goal?

11  A    We were doing a time trial at the south -- Fox South

12  and the corridor between Fox South and Fox North.

13  Q    All right.  So were we accompanied to this area?

14  A    Yes.

15  Q    And who accompanied us?

16  A    Mr. Norman and two other staff members.

17  Q    Because we were not able to take in any recording

18  devices, did we ask one of those gentleman to use his

19  stopwatch to assist us?

20  A    Yes.

21  Q    And did he agree?

22          THE COURT:  Mr. Gavin, how about -- I understand

23  you went with him, but he's the witness, not you.  Let's

24  just ask him what he did.  Let's take you out of the

25  equation, because you're a lawyer here.  Not a witness.

1          MR. GAVIN:  Yes, sir.

2    BY MR. GAVIN:

3    Q    Was a stopwatch utilized?

4    A    Yes, it was.

5    Q    Was it your stopwatch or was it the facility member's

6    stopwatch?

7    A    It was a staff member's stopwatch.

8    Q    So did that staff member accompany us to this area?

9    A    Yes.

10   Q    All right.  Did I ask you and Mr. Norman to

11   participate in these measurements?

12   A    Yes.

13   Q    Do you remember what the first measurement was?

14   A    I believe it was -- oh, the measurement?  I'm sorry.

15   Q    Yes, sir.

16   A    Measurement was 49 feet.

17   Q    Okay.  That 49 feet is the distance between the one

18   corridor door and the other corridor door?

19   A    Correct.

20          MR. GAVIN:  Ms. Brown, could you pull up B?

21   BY MR. GAVIN:

22   Q    All right.  Do you recognize those doors?

23   A    Yes.

24   Q    Did we ask Mr. -- did you ask -- well, I asked the

25   questions.  Did you hear me ask Mr. Norman to open that

Kenneth Mikionis – Direct                    79

1  door, turn around, shut that down, and stop?

2  A    Yes.

3  Q    And did he do that?

4  A    Yes, he did.

5  Q    And did his recorder provide a time to you for that?

6  A    Yes.

7  Q    What was the time?

8  A    I'd like to refer to my notes for that.

9  Q    Okay.

10           MR. GAVIN:  Can he refer to his notes,

11  Your Honor?

12           THE COURT:  Of course.

13  BY MR. GAVIN:

14  Q    While you're doing that, Mr. Mikionis, are those

15  notes that you took down contemporaneously as the

16  gentleman was advising you of the time?

17  A    Yes.

18  Q    And what was the first measurement?

19  A    The first measurement was 11 seconds.

20  Q    What was the second measurement?

21  A    Describe the measurement?

22  Q    No.  What was the second distance that we tried to

23  determine?

24  A    It was between the exterior door and the interior

25  door of the office.

1  Q    And was that opening and closing or just to the door?

2  A    Just to the door.

3  Q    And what was that time?

4  A    It was nine seconds.

5  Q    Now, what was the next measurement?

6  A    It was unlocking the exterior corridor to the office,

7  walking through and closing that door.

8  Q    And what was that measurement?

9  A    Five seconds.

10 Q    All right.  What was the next measurement?

11 A    It was walking to the rear portion of the office, to

12 a pole in the office that was supporting the ceiling.

13 Q    And what was that measurement?

14 A    Three seconds.

15 Q    What was the next measurement?

16 A    It was walking into the bathroom, washing hands and

17 exiting, standing by the door.

18 Q    And what was that measurement?

19 A    Twenty seconds.

20 Q    What was the next measurement that we requested?

21 A    Walk to the exit door of the office, walk through it,

22 and then close the door and stand in the corridor.

23 Q    And how long did that take?

24 A    Seven seconds.

25 Q    And what was the last measurement?

1  A     Walking down the corridor toward the north -- Fox

2  North, walking through the door, exiting the door and then

3  closing the door and locking it.

4  Q     And what was the time for that?

5  A     Fifteen seconds.

6  Q     When we did these measurements, who was doing the

7  walking?

8  A     The staff investigator, Mr. Norman.

9  Q     Did you notice that he was walking at any particular

10 pace, whether fast, slow, normal?

11 A     I would say it was a normal -- normal pace.

12 Q     Was there any delays included in the time or was it a

13 direct path from A to B for each measurement?

14 A     A to B.  It was --

15 Q     All right.  So what was the total amount of time that

16 it took to take these measurements from the doors to the

17 other side of the doors, to the back room, to the

18 bathroom, to the exit?

19 A     Seventy seconds.

20        MR. GAVIN:  Judge, I don't have any other

21 questions.

22        THE COURT:  Any cross?

23                **CROSS-EXAMINATION**

24 BY MR. GARNETT:

25 Q     Good morning, Mr. Mikionis.

1  A    Good morning.

2  Q    Mr. Mikionis, during this measurement exercise, you

3  said you were walking at the pace of Bruce Norman; is that

4  right?

5  A    Yes.

6  Q    Okay.  You have no idea how fast the defendant may or

7  may not have been walking on May 10th; is that right?

8  A    No.

9  Q    You have no idea for how long the defendant may or

10 may not have washed his hands on May 10th; is that right?

11 A    That's right.

12 Q    Okay.  You have no idea whether or not the defendant

13 may or may not have actually unlocked the doors as were

14 timed in your measurements; is that right?

15 A    No, I don't know that.

16 Q    Okay.

17         MR. GARNETT:  No further questions, Your Honor.

18         THE COURT:  Do you have any redirect?

19         MR. GAVIN:  No, sir.

20         THE COURT:  All right, Mr. Mikionis.  You can

21 step down.  Thank you for your testimony --

22         THE WITNESS:  Thank you.

23         THE COURT:  -- being here today.  I'm going to

24 instruct you not to talk about your testimony with anybody

25 until the case is over.  Okay?

Kenneth Mikionis - Cross                          83

1           (Witness stood aside.)

2           THE COURT:  I think this is a good opportunity

3   for us to take a break so you can go order your lunch.

4   How does that sound?  All right.

5           So what we're going to do is everybody is going

6   to rise for the jury.  We're going to take a break

7   until -- let's give you until 11:15 because that will give

8   you five minutes to ponder your order.

9           (The jury exited the courtroom.)

10          THE COURT:  All right.  Is there -- how much

11  longer do you have?

12          MR. GAVIN:  One witness.

13          THE COURT:  One witness?

14          MR. GAVIN:  We need to discuss Mr. Norman.

15          THE COURT:  Well, let's -- everybody can sit

16  down.  We're going to discuss what else you need to do.

17          MR. GAVIN:  Mr. Norman was a witness that was

18  going to be a very short witness.  The only thing I was

19  going to ask him, because he didn't talk to me willingly

20  before trial, was whether or not he remembered anything

21  distinct about Mr. Lemagne's demeanor or the folder when

22  he walked right by him and looked at the folder when he

23  was exiting Fox North on March 16.

24          MS. GILBERT:  Is it Farmer?

25          MR. GARNETT:  Your Honor, I think there's

84

1  confusion.  I think we're talking about Officer Farmer, as

2  opposed to Bruce Norman.

3          MR. GAVIN:  Farmer.  Farmer.  I'm sorry.

4          MS. GILBERT:  He is here.

5          MR. GARNETT:  He is here, Your Honor.  I'm

6  sorry.  There was some confusion.  Officer Farmer has

7  been --

8          MR. GAVIN:  Okay.

9          MR. GARNETT:  He's here.

10         MR. GAVIN:  Well, then it would be two

11 witnesses, and they'd be very --

12         THE COURT:  Well, he was called the wrong name

13 before, then.

14         MR. GAVIN:  I must have.

15         THE COURT:  You called him Norman instead of

16 Farmer.

17         MR. GAVIN:  I must have.

18         THE COURT:  Officer Farmer is the guy that was

19 here at the end the day yesterday.

20         MR. GAVIN:  Yeah.  That's what I was thinking.

21 That's why I was surprised he wasn't here.

22         THE COURT:  Okay.  So you have Officer Farmer.

23 And then who else do you have?

24         MR. GAVIN:  My expert, Jean Cheek.

25         THE COURT:  Okay.  All right.  All right.

1           And do you expect rebuttal or no?

2           MR. GARNETT:  No, Your Honor.

3           THE COURT:  Okay.  All right.  The jury's lunch

4  is not going to get here until 1:00.  So you're probably

5  going to be about 11:30 or so.  I'm just going to give

6  them a really long lunch.  We'll deal with anything else

7  we need to deal with before closing arguments.

8           What I want to do is I want to go over the

9  exhibits to make sure we're all on the same page, and what

10  we're going to do is this.  So due to your numbering

11  challenges, I've assigned my law clerk to type up an

12  exhibit list for you, and I want you to go over it with

13  him.  Because I'm going to give the exhibits -- I'm going

14  to give the indictment, the jury instructions, the exhibit

15  list from both sides, and the stipulations, as well as the

16  exhibits, to the jury so that they have a roadmap, so if

17  they want to look for something, they can do that.  So I

18  want you to check to make sure the exhibit list that my

19  law clerk typed up reflects what you want to do.  You

20  check it to make sure you have no objections.  We used

21  generic language, but I want to make sure that there's no

22  objection.

23           Then for the government, what we're going to do

24  is we're going to take your -- Mr. Garnett, your list.

25  We'll redact any ones -- any exhibits that you did not use

1  so that -- instead of retyping it, and then we'll give the

2  redacted version of the government's exhibit list to the

3  jury.

4          So when we're done here, we're just going to

5  take a little extra time.  I'm going to explain to the

6  jury what's going on here, and then -- I don't think they

7  get their lunch until 1:00.  I actually have the duty at

8  1:00 anyhow.  So what I'll do is I'll probably bring them

9  back at 1:45.

10          And then, Ms. Gilbert, you'll open.  How long do

11  you think you're going to go in your opening argument?

12          MS. GILBERT:  It's about 35 minutes, Your Honor.

13          THE COURT:  All right.  And then -- all right.

14  So what I'm going to do is --

15          MS. GILBERT:  I'm sorry to interrupt,

16  Your Honor.  That doesn't include rebuttal.

17          THE COURT:  No.  That's okay.  That's fine.  I'm

18  not going to hold you to it.  I mean, I just want to keep

19  going here, right.  So I think what I'm going to do is

20  we'll start at 1:45.  We'll do her argument and then we'll

21  do your argument.  Then I'm going to recess.  We'll do the

22  rebuttal, and then I'll instruct the jury, and then we'll

23  kind of go from there.  Does that make -- everybody okay

24  with that plan?

25          MR. GAVIN:  Yes, sir.

1          THE COURT:  All right.  Okay.  Is there anything

2   else we need to deal with?

3          MR. GAVIN:  No, sir.

4          THE COURT:  So, Ms. Gilbert, I want to tell you,

5   you know, I've chewed on you a couple of times.  I don't

6   want to make you gun-shy, though, in doing your job.  I

7   appreciate you asking me today, but you still do your job.

8   Okay?

9          MS. GILBERT:  Thank you, Your Honor.

10          THE COURT:  I only yell when it's appropriate.

11   Okay.  All right.

12          MR. ROSENDAHL:  All rise.

13          THE COURT:  Oh, wait a minute.  We're -- yeah,

14   we'll take our recess until --

15          (Recess from 11:00 a.m. until 11:15 a.m.)

16          THE COURT:  All right.  Bring the jury in.

17          All rise.

18          (The jury entered the courtroom.)

19          THE COURT:  All right.  Everybody can be seated,

20   please.

21          Everybody doing okay?

22          A JUROR:  Yes.

23          THE COURT:  Did you order a Thanksgiving dinner

24   there for lunch?

25          All right, Mr. Gavin.

1          MR. GAVIN:  Duane Farmer, Your Honor.

2          THE COURT:  Mr. Farmer, do you want to come back

3    up here?  Why don't you have a seat.  Officer Farmer,

4    you're going to -- you were placed under oath yesterday.

5    It continues today.  Do you understand that?

6          MR. FARMER:  Yes, sir.

7          THE COURT:  Just please state your full name

8    again for the court reporter.

9          MR. FARMER:  Duane Farmer.

10          THE COURT:  All right, Mr. Gavin.

11                    **DUANE FARMER,**

12    called by the defendant, having been previously sworn,

13                    testified as follows:

14                **DIRECT EXAMINATION**

15   BY MR. GAVIN:

16   Q    Good morning, Mr. Farmer.

17   A    Good morning.

18   Q    Mr. Farmer, I'm sure you don't remember your work

19   schedule day by day.  So I'm going to show you a video of

20   a particular day, March 16th.

21          MR. GAVIN:  Ms. Taylor.

22          (Video Played.)

23          MS. TAYLOR:  Sorry.

24          THE COURT:  This is the video from March 16,

25   2018?

```
 1              MR. GAVIN:  Yes, sir.

 2              (Video Played.)

 3              MS. TAYLOR:  Mr. Gavin.

 4              MR. GAVIN:  Yes, ma'am.

 5              MS. TAYLOR:  Just let me know if this isn't the

 6   right --

 7              MR. GAVIN:  Okay.

 8              MS. TAYLOR:  Is that right?

 9              MR. GAVIN:  That's fine.  You can stop there.

10   I'm at time stamp 18:28:54.

11   BY MR. GAVIN:

12   Q    Mr. Farmer, do you recognize that door?

13   A    Based on the stencil on the wall, that's Fox North

14   unit.

15   Q    Do you recognize the person that's in the middle of

16   the picture to the right side?

17   A    That looks like Inmate Lemagne.

18   Q    Okay.

19              MR. GAVIN:  Ms. Taylor, can you let it play?

20              (Video Played.)

21              MR. GAVIN:  Can you stop it right there,

22   Ms. Taylor?

23   BY MR. GAVIN:

24   Q    Do you recognize that handsome gentleman?

25   A    That's me.
```

Duane Farmer - Direct                    90

1   Q     So I assume that you were working on that day?

2   A     Yes, sir.

3              MR. GAVIN:  All right.  Can you let it play,

4   Ms. Taylor?

5              (Video Played.)

6              MR. GAVIN:  Can you stop it there?

7   BY MR. GAVIN:

8   Q    Mr. Norman, were you looking -- Mr. Norman.

9              Mr. Farmer, were you looking at the file that

10  Mr. Lemagne had in his hand?

11  A     Yes.

12  Q     Did you notice anything unusual about it?

13  A     No.

14  Q     Did you notice any wetness about it, stains, anything

15  of that nature?

16  A     Don't remember anything like that, no.

17  Q     Do you remember anything that struck you as odd about

18  Mr. Lemagne's demeanor on that day?

19  A     I mean, on that particular day, it look like he was

20  being him.

21              MR. GAVIN:  Can you let it play, Ms. Taylor?

22              (Video Played.)

23              MR. GAVIN:  Thank you, Ms. Taylor.

24  BY MR. GAVIN:

25  Q    At any point during that interaction did you get the

1   impression that Mr. Lemagne was under stress?

2   A     No, sir.

3              MR. GAVIN:  I don't have any other questions.

4              THE COURT:  Any cross?

5              MR. GARNETT:  No cross, Your Honor.

6              THE COURT:  All right.  Mr. Farmer, now I can

7   tell you the truth.  You're excused.  You don't have to

8   come back.  We appreciate your testimony.  Please don't

9   talk about your testimony with anybody else until our

10  trial is over.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  I wish you well.

13             (Witness stood aside.)

14             THE COURT:  All right.  Mr. Gavin.

15             MR. GAVIN:  Jean Cheek.

16             **JEAN CHEEK, DNP, RN, BS, SANE-A, CN V,**

17  called by the defendant, first being duly sworn, testified

18                      as follows:

19                  **DIRECT EXAMINATION**

20  BY MR. GAVIN:

21  Q     Can you please state your name, ma'am?

22  A     Jean Anne Cheek.

23  Q     I also need you to spell it for the court reporter.

24  A     J-E-A-N, A-N-N-E, C-H-E-E-K.

25  Q     Ms. Cheek, how are you employed?

1   A      I am a forensic nurse at VCU Health.

2   Q      It looks like you're employed there today; is that

3   correct?

4   A      Yes.

5   Q      You have several suffixes to your title in your name.

6   What is a DNP?

7   A      A doctorate of nursing practice.

8   Q      And RN?

9   A      And registered nurse.

10  Q      SANE?

11  A      Sexual Assault Nurse Examiner, Adult/Adolescent

12  Certification.

13  Q      Is that what the A and the CN and the V stand for?

14  There's an A also.  Is that --

15  A      Yes.

16  Q      And the CN?

17  A      That's clinical nurse V.

18  Q      What's your -- how long have you been in this

19  industry?

20  A      Twenty years.

21  Q      And what is -- what have you been doing for the last

22  five?

23  A      I've been a forensic nurse for 20 years.  For the

24  last five years, I've been a full-time forensic nurse.

25  Q      Are you also engaged in teaching forensic nursing?

1  A    Yes.  I've been teaching different aspects of

2  forensics over the 20 years, but I do teach at a

3  university over the past year.

4  Q    Are you also involved in reviewing individual cases

5  yourself?

6  A    Yes.

7  Q    How many cases would you think that you've reviewed

8  over the last five years?

9  A    For --

10 Q    Sexual assault.

11 A    Yeah.  Is that like just related to my job or like

12 for the --

13 Q    Either.

14 A    Okay.  Hundreds.  500, more probably.

15 Q    Do they involve males?

16 A    Yes.

17 Q    Do they involve females?

18 A    Yes.

19 Q    Do they involve the use of a rape kit?  Are you

20 familiar with a rape kit?

21 A    Yes.

22 Q    Is that something you guys use routinely in your

23 examinations?

24 A    Yes, sir.

25           MR. GAVIN:  I ask that she be admitted as an

1   expert?

2            THE COURT:  And you're not challenging that,

3   right?

4            MS. GILBERT:  No.

5            THE COURT:  Just to be clear, she's an expert in

6   what?

7            MR. GAVIN:  Sexual assault examination.

8            THE COURT:  Okay.  So accepted.

9            Again, folks, you'll recall, experts can give

10  you their opinions.  She's just like all the other experts

11  you've heard from.  Okay?

12  BY MR. GAVIN:

13  Q    Ms. Cheek, for purposes of today, did you, at my

14  request, review several documents?

15  A    I did.

16  Q    Did you review Mr. Lemagne's affidavit?

17  A    I did.

18  Q    Did you review the case agent's summary?

19  A    I did.

20  Q    Did you review the records from St. Mary's?

21  A    I did.

22  Q    When you looked at situations where injury may be

23  evident in an exam, what are the factors that you're

24  looking for?

25  A    We look at -- what I look at is what the history of

1  the events were, what happened, positioning.  Other

2  factors that might be involved such as the person's

3  health, age, those kinds of things.

4  Q    Do you look at sphincter tone?

5  A    Yes.

6  Q    Do you look at size of the penis involved?

7  A    I don't look at the person -- it's hard for me to say

8  the size of the penis for the victim or --

9  Q    For the perpetrator.

10 A    Occasionally, I do.

11 Q    Have you seen pictures of that in this particular

12 case?

13 A    Yes.

14 Q    All right.  What other factors might weigh into your

15 conclusion on whether or not damage should have been

16 sustained by the victim?

17 A    Different things like was there lubrication involved,

18 the position of the assault, the duration, and the

19 description of the perpetrator in what was happening.

20 Q    Was it your understanding that the event was a

21 forceful event, based on your review of the records?

22 A    Yes.

23 Q    Was it your understanding, based on your review of

24 the records, that it lasted approximately five minutes?

25 A    Yes.

Jean Cheek – Direct                    96

1  Q      What was your understanding of the lubrication that

2  was used?

3  A      That there was saliva.

4  Q      Is saliva a particularly good lubricant?

5  A      It's not because it's -- it evaporates quickly.

6  Q      Did you have a chance to look at the St. Mary's

7  records?

8  A      I did.

9           MR. GAVIN:  Can you pull those up, please?

10  BY MR. GAVIN:

11  Q      Ms. Cheek, first, do you recognize these records as

12  the St. Mary's records that I produced to you?

13  A      I do.

14  Q      All right.  Do you have the screen in front of you

15  that shows page 4 of 8 of that report?

16  A      Yes.

17  Q      I'm going to refer you to the "alternative forensic

18  techniques" section.

19  A      Okay.

20  Q      Does that section indicate that additional measures

21  were taken to try to find damage?

22  A      Yes.  A colposcope was used to examine the patient.

23  Q      What is a colposcope?

24  A      It is a device that's used that magnifies the area

25  that is being examined so that any micro trauma can be

1    identified.

2    Q    When you say "micro trauma," what's micro trauma?

3    A    That's small trauma that would not be visual to the

4    eye.

5    Q    And what is a toluidine -- toluidine dye uptake test?

6    A    Toluidine blue dye is a dye that will go up into

7    freshly injured tissue, and the tissue will up-take it.

8    So when you wipe away the excess, you can see that there's

9    injured tissue that you might not have been able to see

10   with your naked eye.

11   Q    I'm going to -- so is it your opinion that there

12   isn't any damage of even a cell being broken?

13   A    Correct.

14   Q    All right.  I'm going to ask you to look at page 7

15   of 8.  Do you recognize that page?

16   A    I do.

17   Q    Do you recognize what's in the top section under the

18   "Anus" block?

19   A    Yes.

20   Q    What does it indicate was found?

21   A    It's saying that a white foreign material was noted

22   circumferentially, which means it was all the way around

23   the anus that was -- that's consistent with toilet paper.

24   Q    Was it your understanding that spit was used to rub

25   the anus?

**Jean Cheek – Cross**                    98

1   A    Yes.

2   Q    Based on all the factors, Nurse Cheek, do you have an

3   opinion on whether you would expect to find damage based

4   on the factors that you just laid out?

5   A    I would -- I would anticipate to find some injuries,

6   yes.

7   Q    Is there anything in particular that's important to

8   you to reach your conclusion about this toilet paper?

9   A    I would not anticipate to see the toilet paper if

10  there was saliva used and the anus was touched and there

11  was penetration for five minutes.

12  Q    So in your opinion, it wouldn't have a reason to be

13  there?

14  A    Correct.

15          MR. GAVIN:  No other questions.

16          THE COURT:  All right.  Any cross?

17          MS. GILBERT:  Yes, Your Honor.

18                **CROSS-EXAMINATION**

19  BY MS. GILBERT:

20  Q    Good morning, Ms. Cheek.

21  A    Good morning.

22  Q    You would agree that most rapes do not result in

23  anogenital injuries, correct?

24  A    Correct.

25  Q    And just now you testified that in assessing whether

1  you think there might be injuries in a rape, there are

2  many different factors, right?

3  A    Correct.

4  Q    And so one of the factors you talked about was

5  lubrication.

6  A    Correct.

7  Q    According to the victim in this case, there was

8  lubrication, correct?

9  A    Correct.

10 Q    Isn't another factor whether the object penetrating

11 the anus is a solid or hard object other than the penis?

12 A    You mean like an inanimate -- inanimate object?  Yes.

13 Sorry.

14 Q    But your understanding, in this case the penetrating

15 object was a penis, correct?

16 A    Correct.

17 Q    So that would mean there would be lower chances of

18 injury as compared with an inanimate object?

19 A    Most likely.

20 Q    One factor you didn't talk about is whether someone

21 has previously had anal sex before.

22 A    Yes.

23 Q    That's a factor that would reduce the chances of

24 injury in an anal rape case, correct?

25 A    It could potentially.

1  Q    And you don't know whether Mr. Lemagne has had anal

2  sex before, correct?

3  A    I do not know.

4  Q    Is another factor how relaxed the victim's sphincter

5  was during the rape?

6  A    It could be, yes.

7  Q    And so you don't know anything about how relaxed the

8  victim's sphincter was during this rape, correct?

9  A    I don't.

10 Q    Isn't another factor the angle of penetration?

11 A    Yes.

12 Q    And you don't know anything about the angle of

13 penetration in this anal rape case?

14 A    From what -- from what I understand, that he was

15 bending over and he was from behind, but as far as

16 specific angles, no.

17 Q    You and Mr. Gavin were talking just now about the

18 size of the penis in a rape case, but you're not aware of

19 any studies that have to do with penis size and injury,

20 correct?

21 A    Correct.

22 Q    Is it the case that in your practice you typically

23 use an anoscope?

24 A    We do.

25 Q    But there was no anoscope used in this exam, correct?

1    A    No.

2    Q    An anoscope can reveal internal injuries that aren't

3    visible on the outside of the body, correct?

4    A    Correct.

5    Q    So because an anoscope wasn't used in this case, it's

6    possible the victim had internal injuries that weren't

7    visible?

8    A    It's possible.

9    Q    And you did not examine the victim in this case,

10   correct?

11   A    I did not.

12           MS. GILBERT:  Thank you, Ms. Cheek.

13           THE COURT:  Any redirect?

14           MR. GAVIN:  Just a few.

15           Ms. Taylor, can you pull up 3 again?  Page 4

16   of 8.

17                    **REDIRECT EXAMINATION**

18   BY MR. GAVIN:

19   Q    Ms. Cheek, are you with me on page 4?

20   A    I am.

21   Q    All right.  I'm going to refer your attention to the

22   "anal exam" section.  Ms. Gilbert asked you about whether

23   or not an inmate having sex anally before would affect

24   your findings.  Does it have a finding in here about

25   the -- whether the sphincter tone was strong or soft?

1   A     It states that the sphincter tone was without laxity.

2   Q     What does that mean to you?

3   A     That means that the tone was tight and it wasn't

4   loose.

5              MR. GAVIN:  No other questions.

6              THE COURT:  All right.  Ma'am, thank you so much

7   for your testimony.  You're excused.  I would ask you not

8   to talk about your testimony with anybody until our trial

9   is over.  We appreciate you being here today.

10             (Witness stood aside.)

11             MR. GAVIN:  Judge, may Mr. Garnett and I

12  approach?

13             THE COURT:  Yes.

14             (The following was at the bench:)

15             MR. GAVIN:  Do you want to talk to Mr. Legins

16  one last time about his right to testify?

17             THE COURT:  No.  I think I've covered it.

18             MR. GAVIN:  Okay.  I just wanted to make sure.

19             THE COURT:  Do you have any reason to believe

20  he's changed his mind?

21             MR. GAVIN:  No.

22             MR. GARNETT:  I would ask, if we could, just out

23  of an abundance of caution, just colloquy him again.

24             THE COURT:  Just hold on one second.

25             Are you resting?

Jean Cheek - Redirect                      103

1          MR. GAVIN:  Yes, sir.

2          THE COURT:  I don't want to take the jury out,

3  and you're -- no rebuttal, right?

4          MR. GARNETT:  No, sir.

5          THE COURT:  I want to talk to you.  I'm going to

6  take the jury out anyhow.  So I'll do it one last time.

7          MR. GAVIN:  Okay.

8          MR. GARNETT:  Thank you, Judge.

9          THE COURT:  Okay.

10         (The following was in open court:)

11         THE COURT:  So Mr. Gavin, do you have any other

12  evidence?

13         MR. GAVIN:  No, sir.  The defense rests.

14         THE COURT:  All right.  Does the government have

15  any rebuttal evidence?

16         MR. GARNETT:  No, sir.

17         THE COURT:  All right.  Folks, you have now

18  heard all the evidence.  I'm going to ask you to step

19  outside for a few minutes.  I need to talk with the

20  lawyers, and then we're going to chart a path forward for

21  the rest of the day.  Okay?

22         So we're all going to rise for the jury.

23         We'll have you back in a couple minutes.  Okay?

24         (The jury exited the courtroom.)

25         THE COURT:  You all can have a seat.

1        So, Mr. Legins, do you want to rise again?  I'm

2   going to ask you for the last time.  I just want to make

3   sure before we get to closing arguments that you haven't

4   changed your mind.  Do you still wish not to testify?

5        THE DEFENDANT:  No, I do not, Your Honor.

6        THE COURT:  You don't want to testify; is that

7   right?

8        THE DEFENDANT:  I do not want to testify,

9   Your Honor.

10        THE COURT:  And I'll ask you again.  Has anybody

11   threatened you or made any promises to get you to give up

12   that right?

13        THE DEFENDANT:  No, Your Honor, they have not.

14        THE COURT:  It's your own decision; is that

15   right?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  All right.  You can have a seat.

18        So, folks, here's what I propose.  You know,

19   we're at -- it's 11:35.  Instead of giving them a 2-hour

20   and 10-minute lunch, here's my proposal, but I'll only do

21   it if you agree.

22        I want to make sure you do the closings after

23   lunch because I don't want to break up the closing

24   arrangements.  I don't think it's fair to either side.

25        But what I think I could do, if you want me to,

1  is I could instruct the jury right now and then you could
2  do the closing arguments.  And I would -- the only
3  instruction I would repeat is the last instruction about
4  picking a foreman and all that.  We would do it twice.
5  I'm told that in Alexandria this is the en vogue thing for
6  judges to instruct before the arguments.  I haven't had
7  that happen in any of my cases before, but I'm willing to
8  do it.

9            I'll tell you, the real benefit to this -- and I
10  might start doing this going forward -- is that instead of
11  you -- Ms. Gilbert or Mr. Gavin arguing that you're going
12  to hear the judge instruct this, you can say you've heard
13  the judge instruct this.  Then I could do the
14  instructions.  Then I'll give them the lunch.  We would
15  come back at 1:45.  You would do the arguments as we've
16  planned, and then I would just repeat the last
17  instruction.

18            So I'll ask the government.  Do you have any
19  objection to proceeding in that fashion?

20            MR. GARNETT:  No objection, Your Honor.  That's
21  fine with us.

22            THE COURT:  Mr. Gavin, do you agree?

23            MR. GAVIN:  No objection.

24            THE COURT:  All right.  So we changed the
25  instructions last night.  Instruction Number 17 was

1   intentionally -- we just put in intentionally omitted in

2   the table of contents and in the instruction.  That was

3   assessing the defendant's credibility.  But since he's not

4   testifying, that's no longer relevant.

5            Was there -- I believe the instructions are

6   appropriate as written.  I will -- if you all have any

7   objections, I want -- you know, I asked you yesterday, but

8   I'm going to ask you one last time like I just -- I think

9   I've gone over this three times with Mr. Legins about his

10  right to testify.

11           The only question I had was there is a 404(b)

12  instruction.  But having said that, I think there is a

13  little bit of 404(b) in terms of the evidence about

14  whether or not the defendant had exposed himself before

15  the first incident.  And I think -- there's an argument

16  whether or not that's intrinsic or not, but I think it

17  would be considered 404(b).  So I think we should leave

18  that instruction in.  I don't think it hurts anybody to

19  leave it in, but now is your time to tell me if you've got

20  any problems with the instructions.

21           MR. GARNETT:  We have no problem with that,

22  Your Honor.

23           THE COURT:  Okay.  Mr. Gavin?

24           MR. GAVIN:  Judge, I just noticed this, and I'm

25  not sure if this didn't get there or not, but when we were

1  talking about inconsistent statements, I had raised an

2  issue before about inconsistent statements made not under

3  oath and inconsistent statements under oath.

4          THE COURT:  What are we looking at?

5          MR. GAVIN:  Well, it looks like it's Number 16,

6  and I thought that we had added additional language about

7  statements that were made under oath that may be

8  inconsistent, and I don't see that there now.

9          MR. GARNETT:  It's the final sentence of that

10 instruction, Your Honor.  "If an earlier statement was

11 made under oath, then you can also consider the earlier

12 statement as evidence" --

13         MR. GAVIN:  That's fine.

14         THE COURT:  So we're all fine?

15         MR. GAVIN:  Yep.  We're good.

16         THE COURT:  All right.  The other thing is I

17 propose to give each member of the jury a copy of the jury

18 instructions so that they can follow along while I'm

19 reading to them.  Does the government have any objection?

20         MR. GARNETT:  No objection, Your Honor.

21         THE COURT:  Defense have any objection?

22         MR. GAVIN:  No, sir.

23         THE COURT:  All right.  So here's what we're

24 going to do.  I'm going to ask my law clerk right now to

25 put on each one of the chairs of the jurors a copy of the

1  instructions.

2          You have them all, right?

3          MR. ROSENDAHL:  Yes.

4          THE COURT:  Okay.  While he's distributing the

5  jury instructions -- you all have a set, right?

6          All right.  I understand, Mr. Gavin, you want to

7  withdraw Exhibits 1, 2 and 3 that were your exhibits?

8          MR. GAVIN:  Yes, sir.  For the record, those

9  exhibits are no longer necessary because of the Court's

10 ruling on the 413 witnesses.

11         THE COURT:  All right.  So what we'll do -- so

12 I'll grant your motion to withdraw.  I'm going to have --

13 when I'm done instructing the jury, I'm just going to tell

14 them to go eat lunch, not talk about the case yet.  But,

15 again, I want you guys to go over exactly -- we've got all

16 the right exhibits going in, okay, and then we'll

17 reconvene at 1:45.  Does that sound like a fair plan to

18 everybody?

19         MR. GAVIN:  Yes, sir.

20         THE COURT:  And what I'm going to do is when

21 everybody is -- when she's done with her rebuttal,

22 referring to Ms. Gilbert, I'm going to repeat just the

23 last instruction, which is the rules of the road, and go

24 over the verdict form then.  Okay?  So they'll hear that

25 one twice, just so we're all on the same page.

1          I also intend to tell them we'll stay as late

2   tonight as they want to stay.  So if they want to stay

3   until 8:00 tonight, we're going to stay until 8:00.  Okay?

4   They are going to drive the bus once the case is theirs.

5   Okay?

6          MR. GAVIN:  Judge, just for housekeeping, there

7   was one additional exhibit that I was going to introduce,

8   which was Number 7.  Based on the Court's ruling, I no

9   longer need to introduce that.  So it's just -- it doesn't

10  need to be withdrawn because it was never admitted, but

11  that's the reason why it's a blank there.

12         THE COURT:  Okay.  Just go over the list.  I

13  want to make sure everything is right going into the jury.

14  I don't want to have any drama about this.  Okay?

15         MR. GAVIN:  Yes, sir.

16         THE COURT:  So just go over it with

17  Mr. Rosendahl and Ms. Garner when they go back in, since

18  we've got extra time here.  You know, essentially,

19  everybody is going to have at least an hour and a half.

20  Okay.  Is there -- is there anything else we need to do

21  before I bring the jury in?

22         MR. GARNETT:  Not from the government,

23  Your Honor.

24         THE COURT:  All right.

25         MR. GAVIN:  No, sir.

1          THE COURT:  All right.  So, folks, what we're

2   going to do is we're going to lock the doors.  So if you

3   want to leave, you have to leave now because otherwise

4   we're going to lock the doors because nobody can go in and

5   out while I'm giving the instructions.

6          And, Mr. Spivey, do you want to lock the doors

7   and then get the jury?

8          Do you have another Rule 29 motion you want to

9   bring or not?

10         MR. GAVIN:  Yes, I do, just for the record.

11         THE COURT:  All right.  It's denied.  The

12  appellate court over here is just making sure I've done

13  everything right.

14         MR. GAVIN:  Thanks to the appellate court.

15         THE COURT:  All right.  We'll bring the jury in.

16         All rise.

17         (The jury entered the courtroom.)

18         THE COURT:  All right.  Everybody can have a

19  seat.

20         Everybody doing okay?

21         So, folks, you now have all the evidence.  So

22  what I'm going to do now is this.  I'm going to give you

23  my final instructions to you about what the law is.  You

24  have a hard copy of what those instructions are in front

25  of you so that you can follow along with me while I'm

1  giving you these instructions, and then you'll have a copy

2  that you can take with you, take your own copy back into

3  the jury room.

4         When I'm done with the instructions, we're going

5  to take our lunch break.  All right.  Now, your food, I

6  understand, is not going to be here until close to 1:00.

7  So you're going to have an extra long lunch break, and the

8  reason for that is this.  I don't want to break up the

9  closing arguments of the lawyers.  And so we're kind of

10 moving things around just a little bit.  So I'm going to

11 give you the instructions, which you need to pay very

12 close attention to.  We'll break.

13        While you're having lunch and just kicking back

14 and relaxing, you can't still talk about the case amongst

15 each other because we're not in deliberation mode.  Okay.

16 And that's particularly important because we still have

17 two alternates who although are vital to our mission, when

18 the case finally goes in, they're going to be excused and

19 not participate in deliberations at this time.  Okay?  So

20 it's important that you all not talk about the case during

21 this extended lunchtime.  Does everybody know that?

22        Okay.  Then when we come back, you're going to

23 hear from the government.  You'll hear from the defense,

24 and then you'll have rebuttal argument from the

25 government.  And then I'll go over the last instruction

1    for -- I'm going to repeat it, which is really the rules

2    of the road here for your deliberations.

3           Once I'm done, we'll excuse the two alternates,

4    and then you'll start your deliberations in accord with my

5    instructions.  And when you do that, the case becomes

6    yours, and how long you stay, how long you want to

7    deliberate is completely up to you.  And if you want to

8    deliberate past 5:00, if you want to deliberate until

9    midnight, we will stay here because you are driving the

10   bus once you start your deliberations.  All right?

11          Now, you'll see on the instructions here that we

12   first have a table of contents that are listed there.

13   That's really just to aid you in case you have any

14   questions.  But now what I'm going to do is I'm going to

15   start reading these instructions to you.  I would

16   encourage you to follow along, but most importantly, to

17   listen to what I have to say because this is the law

18   that's going to govern this case in your deliberations

19   when the arguments are over.

20

21                    * * * * * * * *

22          (The jury instructions were not ordered at this

23          time.)

24                    * * * * * * * *

25

1          THE COURT:  So what we're going to do now is I'm

2    going to excuse you all.  Now, I'm going to remind you.

3    We have two alternatives still with you, who are going to

4    be sitting in there.  Hopefully your lunch has arrived by

5    now.  I'll tell you what we're going to do is we're going

6    to recess until 2:00 because I'm not sure exactly when

7    your lunch is arriving, and then we'll pick up -- the

8    government will give you the first opening argument, then

9    the defense.  Then the government has an opportunity to do

10   a quick rebuttal to respond to what the defense says.

11   Then I'll go over the rules of the road one more time and

12   then the case will be yours.

13          I'm saying to you -- because you cannot

14   deliberate yet.  It's vitally important.  Talk about the

15   weather.  Talk about whatever you want.  I don't care what

16   you want to talk about.  Just don't talk about this case.

17   Okay?  Because when the argument is done, I'm going to

18   then excuse the two alternates, but I'm going to give them

19   instructions in case somebody -- you know, I don't know

20   how long you're going to deliberate.  What if you don't

21   finish today and you want to come back tomorrow and

22   suddenly 1 of the 12 become sick.  I then have to contact

23   the alternates and bring the alternates back.  I mean,

24   this is flu season, right.  You might have heard that.

25   Everybody is sick, right.  So it's very important that you

1  listen to my rules of the road because we don't know

2  what's going to happen yet, right.  So I want you to go

3  back and enjoy your lunch, and at 2:00, then, we're going

4  to reconvene and we are going to hear the arguments of

5  counsel.  Okay?

6             All right.  All rise for the jury.

7             (The jury exited the courtroom.)

8             THE COURT:  All right.  You can be seated.

9             I'll just ask, does the government have any

10 exceptions to what I gave to the jury?

11            MR. GARNETT:  No, Your Honor.

12            THE COURT:  Does the defense have any exceptions

13 to what I gave to the jury?

14            MR. GAVIN:  No, sir.

15            THE COURT:  All right.  Is there anything else

16 that we need to go over?  I want to make sure we have the

17 exhibits under control.  So just to be clear, what we're

18 going to give the jury.  We're going to give the jury the

19 jury instructions, the verdict form, the indictment, the

20 stipulations, the exhibit lists by each side, including

21 the redacted list of the government's, all the exhibits.

22 Anything else?

23            MR. GARNETT:  No, Your Honor.

24            THE COURT:  Mr. Gavin?

25            MR. GAVIN:  No, sir.

1        THE COURT:  All right.  All right.  Is there

2   anything else that we need to do?

3        I just want to say one additional thing to

4   Ms. Gilbert.  Your colleague, Mr. Garnett, in his opening

5   statement, described his argument as the difference

6   between two accounts.  Do you recall that?

7        MS. GILBERT:  Yes, Your Honor.

8        THE COURT:  It made me a little nervous then,

9   because as you'll recall, the defendant never has a burden

10  to testify, right.  If you do that -- use that same

11  nomenclature and you describe two accounts -- I'm not

12  saying you need to do this -- just be careful to say about

13  what he said when he was interviewed or before arrest.  I

14  don't want there to be any misunderstanding about a

15  defendant's failure to testify.

16       I know you're going to be careful, but I'm just

17  making sure -- I just don't want to have any drama on this

18  point, okay, because that's a pretty big issue.  Okay?

19       MS. GILBERT:  Yes, Your Honor.

20       THE COURT:  All right.  Is there anything else

21  we need to do?

22       MR. GARNETT:  No, Your Honor.

23       THE COURT:  I've got to tell you, this might be

24  referred to as the "Garnett method" going forward.  I

25  think I might start instructing the jury in future cases.

1  So you might want to tell your colleagues that, in fact,

2  I've named this the "Garnett method."  And I think I'm

3  going to use the instructions before closing arguments in

4  the future.  You've done so well.  You've earned a title

5  on this.

6           MR. GARNETT:  I need all the help I can get,

7  Your Honor.  Thank you.

8           THE COURT:  Okay.  All right.  We're going to

9  stand in recess until 2:00.  Okay?

10          (Recess from 12:51 p.m. until 2:02 p.m.)

11          THE COURT:  All right.  I think what I'm going

12 to do, before the jury comes in -- Officer Spivey, I have

13 to give you an oath here.  Do you want to come over here?

14 Raise your right hand.

15          Do you swear that you'll take all jurors

16 committed to your charge to the jury room, you shall make

17 no communication with the jurors, nor permitting anyone to

18 communicate with the jurors except as specifically

19 authorized by law, and you shall discharge all other

20 duties which shall -- which may devolve upon you as

21 bailiff to the best of your skill and power, so help you

22 God?

23          CSO SPIVEY:  I do.

24          THE COURT:  All right.  Here's what we're going

25 to do.  We are going to bring the jury out in a second.

1  I'm going to tell them that if they want to stay late

2  tonight, they need to let us know by 4:00 because we would

3  have to order them food, and we have to do the ordering

4  process all over again.

5            Is there anything else I need to do before we

6  get started?

7            MR. GARNETT:  Not for the government,

8  Your Honor.

9            MR. GAVIN:  No, sir.

10           THE COURT:  All right.  All rise for the jury.

11           We'll bring the jury in.

12           (The jury entered the courtroom.)

13           THE COURT:  Everybody can take a seat.

14           Officer Spivey, I'm going to ask you to turn the

15  lectern around facing the jurors.

16           All right.  The Court will recognize Ms. Gilbert

17  for your closing argument.  Go ahead.

18           MS. GILBERT:  Thank you, Your Honor.

19           When the defendant walked through the gates of

20  FCI Petersburg every day, he walked into a world where he

21  was in charge.  Outside, he was just another guy, but

22  inside, inside that prison, he was in control.  F unit was

23  his world, and in his world, he had the power.

24           We give correctional officers power and control

25  over inmates because we count on them to maintain order

1    and keep prisoners safe.  That's what officers like

2    Officer Farmer and Lieutenant Heather McWilliams do when

3    they go to work every day, but that's not what the

4    defendant did.  The defendant abused his power to abuse an

5    inmate for his own sexual gratification.  The defendant

6    picked a perfect target, Brandon Lemagne.  Someone nearly

7    200 pounds smaller and half a foot shorter.  Someone who

8    was just a prison inmate convicted of fraud who no one

9    would believe.  Someone powerless who couldn't just ask

10   for help by going to the authorities because the defendant

11   was the authorities.  The defendant used his position to

12   gain his target's trust.  He told Mr. Lemagne he knew

13   everything about him.  He said he'd look out for him.  He

14   used his position as an officer to smuggle in cigarettes

15   to give them to his target.  Every cigarette was worth a

16   fortune to an inmate like Mr. Lemagne.

17           And then the defendant started to test

18   Mr. Lemagne to see what he could get away with.  First, it

19   was sexual comments.  Then it was sexual behaviors, and

20   when he got away with that, he grew even bolder.  One

21   night the defendant cornered Mr. Lemagne alone in an

22   elevator, shoved him to his knees, slammed his head

23   against the wall and orally raped him, and then the

24   defendant sent Mr. Lemagne on his way like nothing had

25   happened.

1          That's how confident the defendant was that

2   Mr. Lemagne wouldn't say anything, and that was how

3   confident the defendant was that he would get away with

4   it.  The defendant had chosen the right place, an isolated

5   elevator away from cameras.  The defendant had chosen the

6   right time, after hours when staff were gone for the day.

7   He made sure there would be no video and no witnesses.

8          And so when the defendant got away with that, he

9   must have felt untouchable.  The next chance he had, he

10  took Mr. Lemagne into a deserted office behind two sets of

11  locked doors where no one could protect him.  He used his

12  370-pound frame to force Mr. Lemagne into a corner of the

13  office, pushed him to his knees, shoved his penis in

14  Mr. Lemagne's mouth, then turned Mr. Lemagne around and

15  anally raped him.  The defendant had every reason to think

16  he'd get away with it, just like he had the time before.

17         His victim had every reason to keep his mouth

18  shut.  And just like the last time, the defendant made

19  sure no video and no witnesses.  This time the defendant

20  even thought he had gotten rid of the most important

21  evidence, the DNA evidence, by ejaculating into his hand

22  and washing it down the drain.

23         But once the defendant realized that he was

24  caught, he lost control.  He was out of control when he

25  frantically called the lieutenant's office over and over

1   again while Mr. Lemagne was there reluctantly reporting

2   the assault.  He was out of control when he called the

3   medical unit for a bogus reason while Mr. Lemagne was

4   there being examined after he reported the assault.  The

5   defendant was out of control when he yelled across the

6   empty, silent compound as Mr. Lemagne was escorted across

7   it, and by the time the defendant asked Officer Farmer to

8   write a false report, he was desperate.

9        The defendant tried to control the situation

10  when he agreed to sit down with federal agents.  He was

11  used to being in charge.  And no doubt he believed that as

12  a federal correctional officer he could control his

13  situation and talk his way out of this.  So first, the

14  defendant said he didn't do it.  But when that didn't get

15  rid of the agents, he had to come up with something else.

16  So he said he had erectile dysfunction.

17       But then the agents started asking about DNA.

18  So the defendant made up a ridiculous story.  He said that

19  the day before, he took an inmate named Brandon Lemagne

20  into an unmonitored hallway for over five minutes.  It

21  just so happened he had taken Viagra, but only to have sex

22  with his wife.  He had come to work with an erection.  And

23  so he left his post and over 100 inmates unattended to

24  relieve himself in a bathroom.

25       With that absurd story, which is contradicted by

1  a wealth of evidence which we'll discuss, the defendant

2  was caught.   The defendant lost his control of this case

3  when he left his DNA on Brandon Lemagne's anus, his DNA on

4  Brandon Lemagne's shorts, his DNA on Brandon Lemagne's

5  jock strap, his DNA on Brandon Lemagne's sweatshirt.   And

6  now with this trial, you have the power to hold the

7  defendant accountable.

8          The defendant is charged with five federal

9  crimes for raping Mr. Lemagne and lying to federal agents

10  to cover it up.   Underlying those crimes are three basic

11  rules.   One, it's against the law for an officer to rape

12  an inmate, of course.   Two, it's also against the law for

13  an officer to even have sex with an inmate the officer is

14  supposed to be protecting and caring for, of course.

15  And three, it's against the law to lie to federal agents

16  about doing those things, of course.

17          Judge Novak has already instructed you about

18  what the laws in this case are, and I'll explain later

19  about how the charges and the evidence line up with the

20  rules that I've just described.   But before we get into

21  the law, let's be clear.   Most of this case comes down to

22  one question, how do you know that the defendant sexually

23  abused Brandon Lemagne.   You know that for four key

24  reasons.

25          First, DNA.   Second, Brandon Lemagne told you

1   so, and what he told you makes sense and was backed up at

2   every step of the way.  Three, the defendant's explanation

3   to federal agents was, on its face, ridiculous, and four,

4   the defendant's bizarre, out-of-control actions after he

5   realized he had been caught for what he did are the

6   actions of someone desperate.

7           First, DNA.  DNA analyst Kara Gregor testified

8   that the DNA found on Mr. Lemagne's jock strap, on his

9   shorts, and on Mr. Lemagne's body, all collected after the

10  attack in the office, was a match for the defendant.

11  Ms. Gregor testified that her results allowed her to

12  identify the defendant's DNA in every one of those places

13  with the highest level of confidence the FBI laboratory

14  offers.

15          Here's what that means.  Take the anal-rectal

16  swab.  The odds are 1 in 29 sextillion that this DNA was

17  not the defendant's.  A million has six zeros.  A billion

18  has nine zeroes.  A sextillion has 21 zeroes.  A

19  sextillion is more people than exist on this planet.  In

20  other words, the DNA was a match.

21          Second, you know that the defendant raped

22  Mr. Lemagne because Mr. Lemagne told you so.  His account

23  makes sense and is backed up by evidence at every step of

24  the way.  Mr. Lemagne told you that the defendant twice

25  took him into a deserted area of the prison.  You saw the

1  surveillance footage that showed that that was true.  And
2  every officer who testified about this told you there's no
3  good reason for an officer to use his power to unlock
4  those doors and take Mr. Lemagne back there at that time
5  of night.

6          What Mr. Lemagne didn't say is almost as
7  important as what he did say.  He didn't get up here and
8  tell you that the defendant was a monster who attacked him
9  out of nowhere.  He didn't get up here and deny accepting
10 contraband cigarettes in contravention of prison policy
11 and the law.  Instead, he told you that he went along with
12 the defendant's sexual behavior until he couldn't take it
13 anymore.  And, in fact, he told you that at first he
14 thought the defendant was his friend.  And Mr. Lemagne
15 didn't have a lot of those.  Mr. Lemagne was surprised
16 when this officer took an interest in him, said he knew
17 where he was from, even said he knew about Mr. Lemagne's
18 childhood victimization.

19         Not only that, but the defendant talked about
20 himself to Mr. Lemagne, too, and that led Mr. Lemagne to
21 believe that he trusted the defendant and the defendant
22 trusted him.  So when the defendant said he'd look out for
23 him, Mr. Lemagne, as a transgender person who stuck out in
24 a male prison, was grateful.  Maybe it would help keep him
25 safe while he served his sentence.

124

1         When the defendant started giving Mr. Lemagne

2    cigarettes, he was really grateful because remember, these

3    weren't just cigarettes.   These, in prison, are money, and

4    a lot of money.   Hundreds and hundreds of dollars.   That

5    money bought calls home to mom.   That money bought a

6    connection to the outside world.   The defendant gave

7    Mr. Lemagne gifts so Mr. Lemagne would like him.   But not

8    just that, so Mr. Lemagne would owe him.   And not just

9    that, so that the defendant would have something to hold

10   over Mr. Lemagne so that Mr. Lemagne could get in trouble

11   for the very contraband the defendant gave him.

12         Once the defendant abused his authority to

13   smuggle in those cigarette, he started testing Mr. Lemagne

14   again and again to see what he could get away with.   After

15   the comments like, "You look fat in those shorts," the

16   defendant exposed himself to Mr. Lemagne in the corridor.

17   He acted like it was a joke.   And when he got away with

18   that, the defendant took it a step further, inviting

19   Mr. Lemagne into an office with the promise of cigarettes,

20   but then the defendant started masturbating, and only the

21   jingle of an officer's keys and the risk of getting caught

22   was enough to snap him out of it.

23         Mr. Lemagne candidly admitted to you at that

24   point that he thought he could deal with the defendant's

25   harassment.   For one thing, it meant cigarettes, and for

1  another thing, Mr. Lemagne was used to sexual comments and

2  sexual harassment.  He never thought the defendant would

3  attack him, and the defendant let him think that.  Every

4  time he crossed the line, he walked it back and acted like

5  nothing happened.

6          And then one night in March of 2018, the

7  defendant lured Mr. Lemagne into an elevator and orally

8  raped him.  You saw the surveillance footage that showed

9  them disappearing into an unmonitored, unstaffed area for

10 nearly five minutes.  Mr. Lemagne told you that he walked

11 out of that elevator determined to report what the

12 defendant had done to him, but then he thought about it

13 more.  When he was trapped in the elevator with the

14 370-pound defendant, there were no witnesses.  There was

15 no camera.  The defendant made sure of all that.  And

16 Mr. Lemagne thought back to the laundry room incident he

17 had reported where nobody took him seriously.  Nobody did

18 anything.  And during that incident, there had been other

19 people present.  With the defendant choosing the time and

20 the place for the sexual assault, Mr. Lemagne felt

21 powerless.

22         So his choices were this.  He could report it.

23 No one would believe him.  He'd be labeled a snitch, get

24 thrown in the SHU, and live the rest of his sentence in

25 fear of retaliation, or he could stay quiet.  Maybe now

1   that the defendant got what he wanted, Mr. Lemagne figured

2   it would stop.  And the defendant again let Mr. Lemagne

3   think that.  He acted like nothing had happened, and he

4   kept the cigarettes coming with no strings attached.

5           So in May of 2018 when the defendant finally

6   took Mr. Lemagne into that office where no one could see

7   him struggle and brutally, orally and anally raped him, he

8   was confident he'd get away with it again because the

9   defendant had shut Mr. Lemagne up before.

10          That was when Mr. Lemagne realized it wasn't

11  going to stop.  If he came forward, he would be

12  transferred, and that meant losing everything.  Not only

13  his job, not only his partner with whom he hoped to start

14  a new life.  A transfer meant that he would end up

15  somewhere where an inmate like him could be passed around

16  like property.  It meant losing his safety, but he felt he

17  had no other choice, and he decided to come forward.

18          Mr. Lemagne has never wavered in this account.

19  He told you the same facts he told Lieutenant Arrant

20  minutes after the attack, the same facts to Officer

21  McLaughlin minutes after, the same facts to the paramedic,

22  Sarah Ramsey, minutes after that, the same facts to Nurse

23  Womble.

24          The medical evidence is also consistent with

25  Mr. Lemagne's account.  Nurse Womble told you that most

1  rape victims do not have anogenital injuries.  The expert

2  called by the defense agreed with that.  Nurse Womble also

3  told you that sexual assault victims react in all

4  different ways to sexual assault, and the officers who

5  knew Brandon Lemagne and knew his demeanor told you that

6  something was off that night.  They testified that the

7  usually cheerful, respectful Brandon was shut down, blank

8  and distraught.

9        But speaking of demeanor, here's what Brandon

10 Lemagne didn't do.  He didn't come into court and sob.

11 And he didn't sob that night either.  He wasn't trying to

12 draw attention to himself or exaggerate.  He didn't deny

13 to you that he's made mistakes.  He admitted to you that

14 he's been convicted of crimes.  He admitted to you that he

15 accepted those cigarettes and he wanted them.  He even

16 said that he thought the defendant was a good guy at

17 first.  If Brandon Lemagne was going to make up a lie

18 about the defendant, it wouldn't be this one.

19        Now, that takes us to the third reason that you

20 know that the defendant sexually abused Mr. Lemagne.

21 Because he lied about it to federal agents.  I'm going to

22 talk later about the lies that form the basis of the fifth

23 count of the indictment, but for now, let's just talk

24 about a few of the defendant's stories and how the

25 evidence proved that they are false.  When the defendant

1  had to cook up a story for what he was doing with

2  Mr. Lemagne in that part of the prison for well over five

3  minutes, he said he took Mr. Lemagne to the secretary's

4  office to print cop-out forms, and when he couldn't print

5  out any cop-out forms, he obtained cop-out forms later

6  that night from the officer in Fox North.  Then he said he

7  went back to the unit secretary's office to use the

8  bathroom, but left after he saw another officer in there

9  with an inmate shredding papers.  But you know that those

10 claims aren't true.

11          First, you heard from IT expert Darryl Strausser

12 that not a single person, not the defendant, not anybody

13 tried to log on to that computer that night.  Second, you

14 heard from Officer Farmer's mouth.  The defendant never

15 asked him for cop-out forms or any other forms that night.

16          Third, you saw the surveillance footage.  The

17 defendant didn't run in, see somebody in the office and

18 run out.  He was gone for 70 seconds.  And not only that,

19 but the only other officer in F unit, Officer Farmer,

20 testified that he's never taken an inmate alone into the

21 unit secretary's office after hours when the staff aren't

22 there.  Not on that night.  He wasn't shredding papers

23 back there.  He's never done that.

24          Even the defendant can't keep his story

25 straight.  Consider how his explanation evolved over the

1  course of his interview with federal agents.  First, it

2  wasn't me.  Simple.  Then it was erectile dysfunction.  A

3  little bit more complicated.  And then it became the very

4  complicated account that I described earlier.  And that

5  only happened after the agents asked what if there was

6  DNA.  That's when he panicked.  Because remember, he

7  thought he got rid of that.  He thought that by

8  ejaculating outside of the victim's body and washing the

9  evidence away, that nobody would find the DNA.  So he had

10  to make up a new story to explain out the unexplainable,

11  how his DNA ended up inside the victim's clothing and on

12  his body.

13        The defendant started rambling on, telling

14  federal agents about how he took Viagra and how he was

15  going to have sex with his wife, but she was menstruating

16  so he went to work with an erection and to take care of

17  the erection, he went into an officer's bathroom and

18  masturbated at work.  That is absurd.

19        But it got worse.  The next day when the

20  defendant talked to Officer Parker, the story changed

21  again, and he added a detail.  This time he said that

22  later he saw Brandon Lemagne and another inmate unattended

23  in that bathroom.

24        So let's get this straight.  The defendant saw

25  the person that he says falsely accused him in exactly the

1 same place the crime occurred and he forgot to tell the

2 FBI and OIG about it?  I don't think so.

3         It's not just that the defendant can't keep his

4 story straight.  It's that his story, in any of the many

5 versions he's told it, does not make any sense.  First,

6 you know the defendant never masturbated in that bathroom.

7 It's not just weird.  It's not just disgusting.  It's

8 dangerous.  Officers don't leave 100 inmates unattended to

9 masturbate in a prison bathroom.

10         You know that even if the defendant did

11 masturbate in that bathroom, he wouldn't leave his semen

12 all over the place for the world to see.  He wouldn't want

13 to get caught doing that.  You know that Mr. Lemagne was

14 never in that bathroom because every officer who testified

15 about this told you there's no way for an inmate to get

16 into that bathroom, which is only for officers, behind

17 three sets of locked doors without an officer.

18         You know that if Mr. Lemagne had super powers

19 that allowed him to get through all those doors, he could

20 not possibly have known that someone masturbated in that

21 bathroom and left semen out in the open to collect.

22         You know that even if Mr. Lemagne somehow got

23 into the bathroom and somehow knew that there was semen in

24 there, there's no way he could have known it was the

25 defendant's.  And you know that the defendant never saw

1    Mr. Lemagne or any other inmate unattended in that office.
2    Every officer who testified about this told you when
3    you're a correctional officer, you don't just let inmates
4    wander around unauthorized areas.  You yank them out.  You
5    discipline them.  You write a report.  You do something
6    about it.  And Lieutenant Heather McWilliams testified
7    that she reviewed the reports, and there wasn't a report
8    like that.

9          Not one part of the defendant's story makes
10   sense.  Officer after officer took the stand and, through
11   their testimony, communicated that to you.  You don't have
12   to be a DNA scientist to know that the defendant's story
13   is nonsense.  You can rely on your common sense.  You know
14   that the defendant's DNA was found in places on and in
15   Mr. Lemagne where it had no good reason to be, and the
16   defendant's DNA got there onto and into Mr. Lemagne on a
17   day when the defendant happened to have taken Mr. Lemagne
18   into an unstaffed, unmonitored office area for long enough
19   to rape him.  Mr. Lemagne told you, just like he told
20   correctional staff, that he was raped.  The defendant,
21   meanwhile, said he was doing some paperwork.  You can use
22   your common sense to know what really happened in that
23   office.

24          And that brings us to the fourth reason you know
25   that the defendant sexually abused Mr. Lemagne.  Compare

1  Mr. Lemagne's behavior after the attack with the

2  defendant's behavior.  While Mr. Lemagne was cooperating

3  with every official, standing naked in front of

4  correctional officers on butcher paper, being poked and

5  prodded by nurses, and then being shipped out, scared and

6  alone thinking about everything he had just given up, what

7  was the defendant up to?  Panicking.  He tried to think of

8  everything.  He figured there was no way Mr. Lemagne would

9  report the assault.  But at some point he saw the

10  taped-off office, and he lost control.

11          Officer after officer told you there was nothing

12  normal about the defendant's behavior after the May

13  assault.  First, he frantically called and radioed all

14  over the facility.  Wherever Mr. Lemagne went, calls by

15  the defendant followed.  Officer McLaughlin told you that

16  the defendant called the lieutenant's office asking about

17  an inmate that didn't even exist at Petersburg.

18          Lieutenant Arrant testified that the defendant

19  called the lieutenant's office asking about Mr. Lemagne

20  while Mr. Lemagne was there reporting the rape by the

21  defendant.  He told you that was odd.

22          The defendant called Officer Coleman and asked

23  if Mr. Lemagne was back in the defendant's own housing

24  unit, and Officer Coleman told you he's never gotten a

25  call like that.

1          Then the defendant approached Officer Farmer

2    three times to say things like, "I just escorted him.  I

3    hope they don't be tripping."  If he didn't do anything

4    wrong, what was he so worried about?  Officer Farmer told

5    you that wasn't normal behavior and it troubled him.

6          The defendant called the medical unit supposedly

7    for Advil while Mr. Lemagne stood there listening to his

8    attacker linger on the line.

9          And just to pause for a moment, the defendant

10   told the FBI the reason he called the medical unit was

11   because his lieutenant told him to call the medical unit

12   for aspirin, but the lieutenant he says did that wasn't

13   even working that day.

14         Finally, the yelling.  Brandon Lemagne -- and

15   I'm sorry.  Wasn't even working that night.

16         Finally, the yelling.  Brandon Lemagne, Officer

17   McLaughlin and Officer Coleman all heard yelling across

18   the compound yard.  You've seen pictures of FCI

19   Petersburg.  You heard Lieutenant Heather McWilliams

20   testify that going to work there every day is like going

21   to work at Walmart.  It's a professional place where

22   people aren't just yelling across the compound yard,

23   particularly at that time of night, particularly when

24   there's not an inmate move.  That's what other

25   correctional officers thought of the defendant's actions.

1   But the strange behavior didn't end there.

2          A couple days after the incident, the defendant

3   approached Officer Farmer and asked him to write a

4   statement about that night.  And not just any statement,

5   but a statement that is, at best, misleading.  The

6   statement was to say that the defendant had been in the

7   hallway with Mr. Lemagne for only a short time, but

8   Officer Farmer didn't know how long they had been in the

9   hallway.  You saw the diagrams.  The hallway has doors on

10  both ends.  Officer Farmer saw the defendant come out, but

11  he didn't see him come in.

12         Then the defendant also wanted Officer Farmer to

13  say that Officer Farmer had taken inmates alone into that

14  office area at that time of night.  But that wasn't true,

15  and Officer Farmer wasn't going to say that it was.

16  Someone who's in trouble asks another person to write a

17  fake report and asks them to lie when he's done something

18  wrong.

19         The simplest explanation is the right one.  The

20  evidence in this case points one direction, away from the

21  defendant's implausible, ever-changing story and straight

22  to this.  The defendant sexually abused Brandon Lemagne,

23  and he lied to try to cover it up.

24         You know what happened in this case because you

25  heard the evidence.  The evidence backs up Mr. Lemagne and

1  proves that the defendant was lying and proves the

2  charges.

3           We're going to talk now about the law that

4  Judge Novak already instructed you on and how that

5  evidence supports each of the five counts in this case.

6  The first three counts relate to the defendant's violent

7  rape of the victim, Brandon Lemagne, in the office in May

8  of 2018.  There are three different counts because the

9  defendant violated three different laws with that attack.

10           First, he penetrated Mr. Lemagne's body without

11  his consent.  That's Count One.

12           Second, he used force to do that in the federal

13  prison.  That's Count Two.

14           And three, he violated someone who was in his

15  custody and control.  That's Count Three.

16           The fourth charge is for the time the defendant

17  raped Mr. Lemagne in the elevator in March of 2018.

18           And the fifth and final count is for lying about

19  all this to law enforcement officers to try to cover it

20  up.

21           So we'll go count by count.  First, the

22  defendant is charged in Count One with violating the

23  United States Constitution by sexually abusing

24  Mr. Lemagne.  That crime has three elements.  First, that

25  the defendant acted under color of law.  Second, that the

1  defendant violated Mr. Lemagne's constitutional rights,

2  and third, that the defendant acted willfully.  So let's

3  talk through those, starting with the first element that

4  the defendant acted under color of law.

5        This is an easy one.  Judge Novak instructed you

6  that if you find the defendant was a correctional officer

7  and he acted as a correctional officer at the time of the

8  attack, then he acted under color of law.

9        The second element is that the defendant

10 deprived Mr. Lemagne of a constitutional right.  The right

11 in this case is the right not to be subjected to cruel and

12 unusual punishment.  Judge Novak told you that sexual

13 abuse of a prison inmate by a correctional officer is

14 cruel and unusual punishment, period.  That means that if

15 the defendant forced Mr. Lemagne to have oral sex, anal

16 sex or both, the element is met, and the evidence in this

17 case shows that the defendant did both.

18       That brings us to the third element,

19 willfulness.  Judge Novak told you that a person acts

20 willfully if he acts voluntarily and intentionally with

21 the specific intent to do something that the law forbids.

22 This was no accident.  The defendant was acting very

23 intentionally when he took Mr. Lemagne into an unstaffed,

24 unmonitored area, raped Mr. Lemagne, tried to wash away

25 the evidence and did everything he could to cover it up

1  afterwards.  You don't accidentally rape someone.  You

2  don't accidentally lie about it to try to get away with

3  it.

4          Judge Novak let you know that if you find the

5  defendant guilty of Count One, you have to do two more

6  things.  First, you have to decide whether the offense

7  involved bodily injury, and second, you have to decide

8  whether the offense involved aggravated sexual abuse or

9  attempted aggravated sexual abuse.  You'll see from your

10  instructions, and you heard already, that the law holds

11  that pain alone is enough to prove bodily injury.  You can

12  use your common sense here, too.  Being violently raped is

13  painful.  You also heard Mr. Lemagne describe the pain he

14  felt in his anus after the defendant forcibly penetrated

15  him.

16          You heard Nurse Susan Womble, Lieutenant Heather

17  McWilliams and Paramedic Sarah Ramsey testify that

18  Mr. Lemagne told them the same thing.  You also heard

19  Nurse Womble and the defendant's own expert testify that

20  most rape victims do not have anogenital injuries after a

21  rape.

22          But the United States does not need to prove

23  that Mr. Lemagne had anogenital injuries to satisfy this

24  element of the crime.  Pain alone counts as an injury.  So

25  do bruises.  You also heard the victim testify that the

1  defendant's forceful attack in the office caused bruises

2  to Mr. Lemagne's body.  And you heard Nurse Ruffin testify

3  that when she examined Mr. Lemagne after he was

4  transferred to FCI Butner, she saw the bruises, too.  That

5  evidence proves beyond a reasonable doubt that there was

6  bodily injury.

7          And the next thing that you have to decide is

8  whether the defendant engaged in aggravated sexual abuse

9  during the assault in Count One.  Aggravated sexual abuse

10  means knowingly causing another person to engage in a

11  sexual act, such as oral or anal sex, by using force

12  against that person.  We talked about that already.  You

13  know there was sex because of the DNA.  You know there was

14  force because you heard about the manhandling and the

15  bruises.  The evidence shows that the defendant is guilty

16  of Count One, and that he caused bodily injury, and that

17  the offense involved aggravated sexual abuse.

18          Count Two charges the defendant with aggravated

19  sexual abuse and attempted aggravated sexual abuse for the

20  May 2018 office assault.  That crime has two elements.

21  First, that the defendant knowingly caused Mr. Lemagne to

22  engage in a sexual act by using force against him or

23  attempted to do so, and second, the offense was committed

24  at a federal prison.  In other words, if you find that the

25  defendant pushed, hit, restrained or overcame Mr. Lemagne

1  in order to penetrate Mr. Lemagne's mouth or anus with his

2  penis and he did all of that in a federal prison, then you

3  may find the defendant guilty.

4           For all the reasons we just discussed, that's

5  exactly what you should find.  You know that the

6  defendant's attack was forceful because Mr. Lemagne told

7  you so.  You saw the ripped shirt.  You heard about the

8  bruises.  You saw the defendant.  You saw Mr. Lemagne.

9  You heard that the defendant had nearly 200 pounds and

10 half a foot of height over Mr. Lemagne, and you heard that

11 the defendant used that heft to shove Mr. Lemagne around,

12 push him to the ground, yanked him up, bent him over, and

13 held him in place to rape him.  Every push, every pull and

14 every shove was force.

15          And finally, the parties have stipulated to the

16 second element.  That means we all agree that this offense

17 happened at FCI Petersburg, a federal prison.

18          Now we're at Count Three, which charges the

19 defendant with sexual abuse of a ward for the office

20 attack.  Counts Three and Four are easiest because they go

21 back to the rule that I talked about earlier.  It's

22 illegal for a correctional officer to have any kind of sex

23 with an inmate.  This offense has three elements.  The

24 defendant knowingly engaged in a sexual act with

25 Mr. Lemagne or attempted to do so.  At the time,

1   Mr. Lemagne was officially detained at FCI Petersburg, and

2   at the time, the defendant had custodial, supervisory or

3   disciplinary authority over Mr. Lemagne.  I'm not going to

4   go over the sexual acts again.  They are the same sexual

5   acts that we've been talking about, penetration of

6   Mr. Lemagne's anus and mouth by the defendant's penis in

7   the unit team secretary's office area in May of 2018.  The

8   parties have stipulated that Mr. Lemagne was officially

9   detained at FCI Petersburg.

10          The third element is also simple but crucial.

11   It's that the defendant, a federal correctional officer,

12   had custodial, supervisory and disciplinary authority over

13   Mr. Lemagne.  The defendant had the power.  The defendant

14   had the control.  He could tell Mr. Lemagne what to do and

15   where to go.  He could throw him in the SHU.  He could

16   take him to secret places where no one was watching and

17   abuse that power.

18          One important point here.  The evidence shows

19   that the defendant penetrated Mr. Lemagne's mouth and

20   anus, but for the first three counts, you don't have to

21   find that the defendant penetrated both Mr. Lemagne's

22   mouth and anus.  So long as you unanimously agree that the

23   defendant penetrated one or the other, that's enough for

24   that part of the offenses.

25          That takes us to Count Four, which charges the

1  defendant with sexual abuse of a ward for the March 2018

2  elevator rape.  I won't go over the facts of that attack

3  again because they are unforgettable.  Mr. Lemagne

4  described in excruciating detail the defendant's violent

5  oral rape in the elevator.  This sexual act is one the

6  defendant committed while Mr. Lemagne was officially

7  incarcerated at FCI Petersburg and under the defendant's

8  authority as a correctional officer.

9          And, again, the physical evidence, the DNA,

10  shows that what Mr. Lemagne said happened, in fact,

11  happened.  In this March assault, as in the May assault,

12  there's the defendant's DNA on the victim's clothing.  FBI

13  analyst Kara Gregor testified that she tested the

14  sweatshirt that Mr. Lemagne told you he was wearing during

15  this incident, and once again, to the highest confidence

16  level to which she can testify, found that the defendant's

17  DNA profile matched.

18          Through his questioning, Mr. Gavin made a big

19  deal of the fact that Mr. Lemagne didn't report this

20  assault right away.  But it's not hard to understand.

21  Mr. Lemagne had every reason to stay silent.  The first

22  time Mr. Lemagne reported sexual harassment at Petersburg,

23  nothing happened.  He had no reason to think that anyone

24  would take it seriously this time, especially when the

25  defendant's actions were so brazen.  The defendant

1  repeatedly exposed himself, left his post to rape

2  Mr. Lemagne, and walked past other officers like nothing

3  had happened.   To Mr. Lemagne, the defendant seemed

4  untouchable.   And it seems from his actions, the defendant

5  thought so too.   But the government has proven beyond a

6  reasonable doubt that the defendant is guilty of this

7  offense.

8           We are now at the last count, Count Five.

9  Count Five charges the defendant with knowingly and

10 willfully making a material false statement to the FBI and

11 OIG.   There are four elements to this offense.   The first

12 element is that the defendant made a false statement.   The

13 defendant told many lies during that interview, but the

14 indictment focuses on two.   First, the defendant said that

15 he never engaged in any sexual act with any inmate at any

16 time at FCI Petersburg.   The DNA says otherwise.   I won't

17 belabor the point, but you know how the DNA got where it

18 did.   Inside the victim's jock strap, inside the victim's

19 shorts and on the victim's anus.

20           Mr. Lemagne and a half dozen federal

21 correctional officers say otherwise.   Those officers told

22 you that in their experience, normal officers don't act

23 how the defendant acted.   Normal officers don't

24 frantically call around to office after office after a

25 rape has been reported.   Normal officers don't shout

1  across the prison compound yard at an inmate who is

2  reporting a rape.  Normal officers don't pressure other

3  officers to write false reports.  Normal officers don't

4  tell stories that change from one day to the next that

5  involved Viagra masturbation and inmates simply

6  materializing past three locked doors.

7          The second lie the indictment describes is that

8  when asked what he was doing with that inmate in that

9  office, the defendant said just conversation and claimed

10 he was using a computer and printer.  But, again, the

11 facts you heard in this trial prove beyond a reasonable

12 doubt that the defendant lied to cover up his crimes.  The

13 computer records prove that the defendant gave false

14 information to the FBI in a desperate attempt to provide

15 some reason for going into that cameraless office with

16 that inmate at that time of night.

17         But the computer expert just confirms what you

18 already knew.  It wasn't just conversation.  It wasn't

19 just paperwork.  The defendant took Brandon Lemagne into

20 that office for one reason, to sexually abuse him.

21         The second element requires that the defendant

22 have known his statement was false and have made it

23 willfully.  You heard the defendant's own voice.  You

24 heard the federal agents warning him about lying to

25 federal agents and that it was a criminal offense.  You

1  then heard the defendant twist and turn and try to explain

2  away what no one can explain, the presence of his DNA on

3  an inmate's anus.  The defendant knew he was lying, knew

4  he was making up a false story, and he told those lies on

5  purpose because he desperately didn't want to get caught.

6        The third element is that the defendant's

7  statement was made in a matter within the jurisdiction of

8  the executive branch, and the parties have stipulated or

9  agreed to that one.

10        The final element is that the lie was material.

11  That just means that the lie was important because it

12  could influence this federal criminal investigation.  This

13  element is easy.  The defendant said he didn't have sex

14  with an inmate so he could get away with raping an inmate.

15  The defendant said he was using a computer to cover up

16  what he was really doing, raping an inmate.  That's what

17  this investigation was about.  The very goal of the

18  defendant's lie was to make the case go away.

19        The defendant thought that he could make this

20  case go away, and he thought that he could get away with

21  it because he was used to getting away with it.  But he

22  didn't count on two things.  He didn't count on Brandon

23  Lemagne coming forward to say what happened to him, and he

24  didn't count on leaving damning evidence of his crimes

25  behind.  His DNA on the victim's jock strap, his DNA on

1  the shorts, on the sweatshirt, and on the victim's anus.

2  You heard Mr. Lemagne's compelling testimony.  You saw the

3  surveillance footage.  You heard officer after officer

4  stand up and tell you there was nothing normal about the

5  defendant's behavior on that night.  And then you heard

6  the defendant's ridiculous lies laid out one after the

7  other.

8          Now you have the power to follow that evidence

9  and hold the defendant accountable for the abuse of the

10  power he was granted as a federal correctional officer.

11  You have the power to find the defendant guilty beyond a

12  reasonable doubt.

13          THE COURT:  All right.  Mr. Gavin.

14          MR. GAVIN:  Good afternoon, ladies and

15  gentlemen.  Thank you for your patience.  This is the last

16  time that I'll get to speak to you.  I'm the defendant.

17  We have one last opportunity.  They get a chance to rebut

18  whatever I tell you.  Please remember that, you know, as

19  we said in the beginning, that whatever I say is not

20  evidence.  It's just my spin on the evidence, and I have

21  an obligation to tell you what a spin on the evidence is

22  even if you might find my spin ridiculous.  I think what's

23  going to happen here is that you're going to have to rely

24  on the fact that you believe Brandon Lemagne was telling

25  the truth at every turn to convict Mr. Legins.

1          In cases like this, I find that when an
2    accusation is made like this, people tend to jump to
3    conclusions.  You know, it's a serious allegation.  Wow,
4    somebody got raped.  And then what the law enforcement do
5    is they try to backfill the allegation.  When they have to
6    try to backfill the allegation, that's when people start
7    piling on.  When people start piling on, that's when you
8    get three different versions of the same comment that was
9    supposedly made across the courtyard.  "Don't believe
10   anything he has to say."  "You've got to be kidding me."
11   "Where are you going?"  Those three versions came from
12   three different people from the same conversation that was
13   80 yards away which everybody had the same opportunity to
14   hear, and when there's no camera footage that says that
15   Mr. Legins even went out the exit door and there's no
16   explanation for why they don't have footage to show that
17   Mr. Legins even went out the exit door to make those
18   comments.
19          When people start backfilling, they start
20   thinking about, well, what's demeanor like.  So that's
21   when you get "he's blank."  How many times did you hear
22   "blank"?  Do you think that these defendants' testimony
23   was all that it was blank or maybe -- maybe that was, you
24   know, a common theme that was shared.
25          What do you think when somebody says, well, he

1  was sad or he was quiet?  I mean, that's all backfilling.

2  It's backfilling to support the original allegation versus

3  looking at the facts to reach the conclusion.  That's why

4  I say to you that the United States has put you guys in a

5  very difficult spot.  And the reason I say that is because

6  they basically elicited a lot of testimony from

7  Mr. Lemagne that was far beyond just facts.  It was how

8  were you treated in prison, what's your life like as an

9  LBGTI person, how are you perceived in there, do you have

10 to worry about your protection, have you lost your

11 soulmate, things like that.  Emotion.  They infused

12 emotion into this questioning to the point where when I

13 went home Friday afternoon, I said those jury members are

14 going to have to convict him because if they don't, they

15 are going to feel guilty.

16         It's not your job to figure out whether or not

17 Mr. Lemagne is a victim in jail.  It's not your job to

18 find out whether or not he has friends.  It is not your

19 job to find out whether he lost his soulmate.  It is your

20 job to find the truth.  In these walls, we seek the truth.

21 This is not a district court.  It's not a traffic court.

22 The United States has to prove their case.

23         So what do you do?  You've got to look at

24 Mr. Lemagne's version, and then you've got to look and see

25 what backs it up.  So I'm going to rely on my notes a

1   little, but I think what you have to do is put

2   Mr. Lemagne's version in one box and then figure out

3   whether or not it's supported by another box.  And I would

4   almost note that because there's going to be emotion

5   involved in your decision, if you believe any of these

6   arguments, you should not be bullied by another juror

7   member.  You should stand strong in your beliefs.  It's

8   going to be possible that there will be disagreements, and

9   you should stand strong in your beliefs if you have one.

10          The first thing.  The United States indicated

11  that Mr. Legins lured Mr. Lemagne in with cigarettes.  You

12  don't have one shred of evidence for that other than

13  Mr. Lemagne.  Not one.  No camera footage.  No nothing.

14  No testimony of an infraction.  No testimony of a

15  write-up.  You have nothing.

16          The next thing.  Mr. Lemagne said that the first

17  event took place when Mr. Legins exposed himself in the

18  C-South corridor on February 17th, 2019(sic).  Mr. Legins

19  didn't work in the C-South corridor on 2/17/19(sic).  You

20  heard that from Mr. Mikionis looking directly at the work

21  schedule.

22          The next thing he said is I know it's that date

23  because my roommate ordered cleats from the commissary on

24  that date.  You don't have any evidence that Mr. Lemagne's

25  roommate ordered cleats from the commissary on that date.

1          Next thing.  The second time.  The second time

2 he says -- alleges happened in the compound office where

3 Mr. Legins supposedly masturbated in front of him while

4 just the two of them were there.  Well, if you remember,

5 Lieutenant McWilliams said to you that that compound

6 office is always manned by at least two people.  It's not

7 possible that Mr. Legins and him would have been in there

8 by himself with Mr. Lemagne masturbating in a compound

9 office manned by two people.  You saw the size of the

10 office and what it is.

11          Again, officers say camera footage.  Entrance,

12 exit.  They've got it.  Camera footage.  Entire compound.

13 They've got it.  Where is it?  You want to say that he

14 went in there.  Where is it?  There's no explanation for

15 why you don't have that.  We're relying exclusively on

16 Mr. Lemagne's testimony.  No confirmation at all.

17          March 16th.  March 16th you have the allegation

18 that they went into the elevator and that my client

19 forcefully ejaculated all over the defendant, his

20 paperwork, everything around there.  You have no DNA to

21 confirm that.  You have nothing to confirm that.  What you

22 do have is Mr. Lemagne walking out as if nothing had

23 happened with his folders in hand.  They were inspected by

24 Officer Farmer.  He saw nothing, as you saw here.

25          But most importantly, the day where the

1  prosecutors say that he was violently raped in his face,

2  he had no demeanor change at all.  So how can one have a

3  blank demeanor on May 10th when they were raped, but have

4  no demeanor at all change on March 16th when he was

5  violently raped?  There's a question there.

6          He says he went back because he felt so badly or

7  angry that he wanted to make sure that Mr. Legins wouldn't

8  get away with it, and he took a paper towel and he wiped

9  up the semen.  But he never could explain what happened to

10  the paper towel.  It made no sense.  That's the best piece

11  of evidence he could have had ever.  So he locked away the

12  sweatshirt, but he has no accountability for the paper

13  towel.  I suggest that there may be another explanation

14  for that.

15          Regardless, after that, he goes on his way.  He

16  doesn't report anything.  He doesn't know anything.  He

17  doesn't know when he's going to be back.  But then he gets

18  there again on May 10th.  And on May 10th they entered the

19  locked door on one side.  They exited the locked door on

20  the other side.  The entire time, from opening to opening,

21  was 5 minutes and 13 seconds.

22          You heard evidence that we did a time trial with

23  just point A to point B closing doors, locking doors,

24  cutting the timer off.  That time trial alone cut 70

25  seconds out.  Seventy seconds away from the five thirteen.

1  That means that everything that Mr. Lemagne swears

2  happened under oath took place in 4 minutes and 43

3  seconds.   That means that they had to go from the interior

4  door to the office door, unlock that door, go in that

5  door, relock that door, have a struggle as they went back

6  across the room to the back room, had oral sex for a

7  period of time, got dressed -- got undressed, got raped by

8  being bent over.  Mr. Legins then went to the bathroom,

9  washed his hands, flushed the toilet, returned to that

10 area, told him to clean up.  He did clean up.

11          They then had to go back to the door, unlock the

12 door, go to the other side, relock the office door, walk

13 down the hall, open that door, relock it.  Four minutes

14 and 43 seconds.  I'd ask you, in the jury room, to figure

15 out how much time it just takes you to go into the

16 bathroom and wash your hands.  I guarantee you it would

17 probably be at least 30 seconds.  It's virtually

18 impossible for him to -- to have happened what he says

19 happened.  And if you go beyond that, where is the support

20 for it?

21          You know, it's one thing to say that anogenital

22 rapes don't always produce injury, but it's another thing

23 entirely when you have a fact pattern like this fact

24 pattern.  In this fact pattern, you have a gentleman who

25 has a 7-inch penis at erection.  According to the

1   defendant(sic), there was a forceful rape for five

2   minutes.  That's under oath by his affidavit, five

3   minutes.  That period alone is longer than the time they

4   were in there the entire time.  Five minutes forcefully

5   with only spit as a lubricant.  He indicates that he takes

6   his spit and rubs his anus before he does it.  There's no

7   support for that at all in the medical record.

8           In the medical record, there is not one evidence

9   of one cell being torn.  Not much less one tear.  Not much

10  less one bruise.  Not swelling.  They did a microscopic

11  review of this gentlemen's person, and they did not find

12  one torn cell.  A tiny little cell.  Nothing.

13          So then my expert says, hey, something jumps off

14  the page at me here.  And I said, What's that?  If he has

15  rubbed his thumb or whatever -- finger -- with spit on

16  this gentleman's anus and then has raped him violently for

17  five minutes with a 7-inch penis, there is no way there's

18  going to be toilet paper there.  It's either going to be

19  in, out or gone.

20          So then you say, huh, well, how do you explain

21  that?  She said, well, that is up to you.  And it is up to

22  you, but I'm suggesting to you that it establishes that

23  Mr. Lemagne's version is not necessarily accurate.

24          So if you look at that, then you go to what

25  about the DNA.  The United States sort of took great

1  lengths to say semen was indicated, as if it was a

2  conclusory result.  I think we pretty well established

3  that it's not a conclusory result.  So this DNA is

4  different than semen, and the semen was not discovered

5  anywhere.  So we're not disputing at this point that his

6  DNA was there.  The question is how it got there.

7          So what I'd like for you to consider is a

8  hypothetical that doesn't necessarily involve you totally

9  relying on Mr. Lemagne's version but another possible

10  version.  And it may be that Mr. Legins wasn't entirely

11  truthful because he was embarrassed in front of God and

12  his wife.  I'm not sure.  But based on the evidence -- and

13  I'm allowed to comment on the evidence -- it's a

14  possibility, and I want you to hear it.

15          So let's say that what these other witnesses --

16  Mr. Erogbogbo and Mr. Fornash -- says is possible, what if

17  that's correct, and what if Mr. Lemagne did, in fact, have

18  an idea to essentially set up an officer for monetary

19  value?  It wouldn't be unusual.  He has seven convictions

20  in the last nine years.  The conviction he's in now

21  involves multiple frauds on multiple victims over the

22  course of a year.  That's what he does.

23          So let's just assume that he has this idea in

24  his mind that he'd like to do that.  And maybe in exchange

25  for cigarettes or something else, he goes into the

1  elevator or to that corridor with Officer Legins and he

2  says, Hey, Officer Legins, let me pay you back.  He gives

3  him a hand job.  Masturbates him with the hand.  Whatever.

4  Suppose that in that, in that elevator, he catches the

5  semen on a paper towel like he says.  Suppose he goes back

6  and says that is my ticket.  It's not a problem.  That's

7  why I'm not going to report it, because that's my ticket.

8         So if you remember, after that, he said at that

9  point I went back and generated the other documents.  I

10 generated the other documents for 2/17 and 2/19 to help me

11 with my story.  So let's assume he just basically then

12 does exactly what Mr. Erogbogbo says he did; he went and

13 started researching.  He went and started researching with

14 his assistant.  He started looking at research on fraud.

15 He started looking at research on how to set officers up

16 for monetary gain, for settlements.  He looked for

17 settlements, printed stuff off.

18        The United States says Mr. Erogbogbo was

19 incredible.  I found him to be totally credible.  I found

20 that he wanted to come forward and tell his story just

21 because he felt like he had a civil duty to do it.

22        What's important about that is that for whatever

23 reason, Mr. Lemagne acted like he didn't even know

24 Mr. Erogbogbo.  He certainly didn't say anything about a

25 sexual relationship.  He acted like he was just an

1  acquaintance, that you should totally disbelieve, you

2  should not even consider Mr. Erogbogbo's story because

3  maybe I know what's coming.

4          Mr. Fornash.  No ax to grind.  He says a week

5  before this happened, we were talking about it.  Hey,

6  we're going to find a way to set up the officer, make some

7  money or get out earlier.

8          So let's move forward.  Hey, May 10th.  We have

9  an opportunity.  Let's go in there.  I'll offer Legins the

10  same thing.  Let me give him a hand job.  Why not.  Four

11  minutes, five minutes.  That might fit the time.  Says he

12  gets that, and then he says, all right, I got what I need.

13  I'm out of here.

14          And if it's part of his plan, why would he look

15  like he's happy?  Why wouldn't he look like he's blank?

16  Why wouldn't he want to deceive the officers or everyone

17  else as to what's happening?

18          So let's move forward from there.  Where does he

19  go then?  He goes to medical.  What does he tell medical?

20  He told medical, Ms. Ramsey, that he ejaculated inside me.

21  Came inside me.  Not in my hand.  Inside me.

22          So they tell him, well, if that's the case,

23  you're going to have to go to the hospital and get a rape

24  kit.  So he says in his mind, well, there's nearly nothing

25  inside me.  So let me change the story a little bit under

1  oath to say that he pulled out and he came in his own hand

2  when he exhaled, but there also might be a little bit in

3  my right hand.  He never explained how in the world that

4  anything could end up in his right hand.

5          So you go from there, and he goes to the

6  hospital.  There's nothing found.  Nothing at all.  But

7  there's one thing that the government did not test.

8          Ms. Taylor, could you pull up 12-A?

9          Ladies and gentlemen, this was introduced as

10  12-A, and as I remember, I had a conversation with their

11  expert about the fact that all these items were jointly

12  put together in a bag and that a couple of them -- the lip

13  balm and the paper towels that weren't recovered -- that

14  were recovered from the shorts -- were not tested.

15          That's it.  Right there.  Paper towels, the

16  tissue, recovered from his shorts right after the

17  incident.  You want to know how his DNA got there?  There

18  it is.  I asked them if they tested it.  They didn't test

19  it.

20          It's right there.  Nobody seems to think that.

21  Nobody seems to wonder how toilet paper could have

22  appeared on Mr. Lemagne's anus despite having been

23  forcefully raped by a man with a 7-inch penis for five

24  minutes.  It's right there.  If Mr. Lemagne is trying to

25  set up the defendant, it's right there, and it's not even

1   tested.

2            So ask yourself when you go back, does this make

3   sense?  Because if it doesn't make sense that there's no

4   injury when you heard that there should have been injury,

5   ask yourself if there's DNA there but there's evidence

6   right here, they had tissue paper that wasn't tested in

7   his shorts, is he guilty?

8            If you have a question about the evidence and

9   whether or not the truth has been established, he's not

10  guilty.  If it doesn't make sense to you, whether you'd

11  like my version or whether you think there might be

12  another version, he's not guilty.  If you don't think that

13  he actually had sex with this man, whether in his mouth or

14  whether by the anal penetration, he's not guilty.  If you

15  don't think that, he didn't lie.

16           There's no other evidence that their DNA

17  examiner produced to you other than things that were

18  directly controlled by Brandon Lemagne.  Not one piece of

19  evidence on the floor.  Not one piece of the evidence on

20  the wall.  Not one piece of evidence anywhere else other

21  than the documents -- or other than the clothing articles

22  that were controlled directly by Brandon Lemagne.  Shirt,

23  shorts, jock strap, sweatshirt and the portion that was on

24  his rectum, which could have just as easily been put there

25  by Mr. Lemagne himself with a piece of toilet paper.  We

1  established in expert testimony that you can transfer DNA

2  with as little as a touch.  It doesn't take much.

3        If Mr. Lemagne's objective was to gain favor in

4  a fraud -- fraud case or to gain some type of monetary

5  settlement, that that would be an impossibility.  And if

6  that is remotely a possibility, and you don't have to

7  believe everything that Brandon Lemagne says because there

8  may be just another possibility that there's another

9  account, then Mr. Legins is not guilty.  Keep an open

10 mind.

11       It has to be troubling to you that not one

12 single cell of skin was broken in that incident as alleged

13 by Mr. Lemagne.  It has to bother you that everything that

14 he says took place just like it was yesterday, just like

15 it was clear as a bell, with emotion in his voice, took

16 place in 4 minutes and 43 seconds.  And that's being

17 essentially pretty gracious to the timeline.

18       Look at yourself when you look at the video if

19 you do that.  Ask yourself is that man that's walking

20 through the corridor at a slow, deliberate pace and

21 unlocking the door on the other side, does he look like a

22 person that's getting ready to have a forceful anal

23 penetration of somebody in the office.  There's another

24 side to the story.  You may never know what it is.  I may

25 never know what it is, but they haven't proved their side

1   of the story.  I'm going to ask you to find him not

2   guilty.

3            THE COURT:  Jurors, I just want to tell you that

4   during Mr. Gavin's argument, he mentioned that he

5   personally believed one of the witnesses.  I'm instructing

6   you that you're to ignore that.  Attorneys are not allowed

7   to give their personal opinions about the evidence, and

8   for good reason.  They weren't there at the crime, right.

9            It is up to you and you alone as to whether or

10  not you believe a witness, and I'm instructing you to

11  disregard that one comment from Mr. Gavin as we go

12  forward.  Okay?

13           This is what we're going to do.  We're going to

14  take a 15-minute break.  We're going to then have the

15  rebuttal argument of the government, and then I'm going to

16  give my final comments to you before you then begin

17  deliberating.

18           As to the two alternates, juror number 2 and

19  juror number 38, I believe -- do you want to raise your

20  hand?  Okay.  When you go back in the back, I'm going to

21  ask you to write down phone numbers -- we already have

22  those?  Okay.  I don't have to ask you to do anything.

23  But we want to be able to get in contact with you.  I'm

24  going to give you some furtherer instructions when we come

25  back out.  Okay.

1                 All right.  All rise for the jury.

2                 (The jury exited the courtroom.)

3                 THE COURT:  Is there anything I need to deal

4    with?

5                 MR. GARNETT:  No, Your Honor.

6                 THE COURT:  All right.  See you at 3:15 p.m.

7                 (Recess from 3:00 until 3:14 p.m.)

8                 THE COURT:  All right.  Are we ready to bring

9    the jury in?

10                All rise for the jury.

11                (The jury entered the courtroom.)

12                THE COURT:  Everybody can be seated.

13                Go ahead.

14                MS. GILBERT:  Thank you, Your Honor.

15                We all just heard for the first time a brand-new

16   story.  Mr. Gavin just wove an intricate prison caper plot

17   with Brandon Lemagne.  Instead of the powerless inmate

18   standing naked and afraid on a sheet of butcher paper, now

19   starring as a criminal mastermind in an elaborate movie.

20                But Brandon Lemagne isn't much of a mastermind.

21   If Mr. Lemagne was going to make up a story, he would have

22   described the defendant as an evil, sadistic guard, not

23   the cool guard he came to trust and came to consider as

24   his friend.  If Mr. Lemagne was trying to fool people, he

25   would have reported the rapes in sobbing dramatic fashion

1  just like you see on TV, not the stoic, blank-faced

2  demeanor that the nurses and officers described.  If

3  Mr. Lemagne was trying to pull a con, he would have

4  embellished.  He would have said the defendant strangled

5  him or threatened him, but he didn't say that.  He

6  described the force the defendant used to move him around

7  the office to get him into position to rape him, and at

8  the moment of penetration, there was no force.  The force

9  all occurred before that.  If Mr. Lemagne was running a

10  scheme, he wouldn't have told some random inmate about it,

11  not in a gossip circle like Mr. Fornash described.

12         The inmates in this case told you that many

13  inmates are desperate to come forward with information

14  about federal cases so that they can get time off.

15  Brandon is getting out next month.  Excuse me.

16  Mr. Lemagne is getting out next month.  He doesn't get a

17  lower sentence out of this case, but inmates like Fornash

18  and Erogbogbo still have a lot to gain.  If you're a

19  mastermind, why tell everybody about your plot?

20         And if this was a frame job, why not just do it

21  in March after you have that evidence?  Why wait?  If

22  Mr. Lemagne was trying to put one over, why would he admit

23  facts that weren't flattering to him, that he wanted those

24  contraband cigarettes, that he didn't report the defendant

25  at first and that he thought the defendant was his friend?

1  Common sense says that if Mr. Lemagne wanted to frame an

2  officer for rape, he would have done a better job.

3        That's one reason why you know he's telling the

4  truth, but it's not the only reason.  Mr. Lemagne had no

5  reason to falsely accuse the defendant of rape and many

6  reasons to stay silent.  Think of what he was giving up.

7  He had it good at Petersburg.  He had Ronzell Jackson.  He

8  had safety.  He had one of the few prisons friendly to

9  transgender inmates.  And what would he gain?  Nothing if

10 no one believed him.  He testified he was worried about

11 charges being brought against him for falsely accusing an

12 officer if there wasn't proof of the crimes.

13        He'd be transferred away to someplace where,

14 best case scenario, he'd be labeled a snitch and face

15 retaliation, and worst case scenario, he'd be victimized

16 again.  The evidence in this case shows that Brandon

17 Lemagne had every reason to stay quiet about what the

18 defendant did to him.  But Mr. Gavin argues to you that

19 somehow this powerless inmate thought that it would be a

20 good idea to try to come up with a scheme to plant

21 evidence, to frame a guard for rape.

22        And for what?  Money?  If this was about money,

23 Brandon Lemagne would have filed a lawsuit by now, two

24 years after the fact, but he hasn't.  He candidly and

25 frankly admitted to you that he reached out to

organizations like the ACLU and sought help for treatment for the trauma that he experienced, the kind of help he wasn't getting in prison and that he desperately needed. But he hasn't filed a lawsuit.

What other reasons would Mr. Lemagne have to fake a rape allegation?  Not time off.  Unlike Mr. Erogbogbo, who the first words out of his mouth when he sat down with federal authorities are, "What can I get out of this?"  There's no evidence that Mr. Lemagne asked for anything or expected anything.  He testified that nobody made him any promises for testifying or for reporting what happened to him.  That makes sense, too, because his release date is coming up in just a couple of months.  Mr. Lemagne had no reason to come up with a story to frame an officer for rape.

Mr. Gavin also argued to you that his client couldn't have raped Mr. Brandon Lemagne because he didn't have enough time.  You all sat here in the courtroom not once, but twice while we played that May surveillance video.  You saw how long it took.  You felt how long it took.  You felt that time passing.  You've also seen photographs of the unit team area hallway.  It's not long. You can time walking around.  You can time washing your hands.  It's just not that big of an area.  It's not that big, but the defendant is.  It wouldn't have taken him

1    long to muscle Mr. Lemagne away from the door, away from

2    the detection to do what he needed to do.

3         The defendant could move fast when he needed to.

4    He told Mr. Lemagne during the March 2018 elevator rape,

5    "Stop playing.  We don't have much time."  He meant the

6    longer I'm gone, the more red flags go up.  He meant I'm

7    going to do this as fast as I can.  He shoved Brandon to

8    the ground, grabbed his face and violently orally raped

9    him.  The defendant used force, and the defendant used

10   speed.

11        At bottom, Mr. Gavin's new theory asks you to

12   imagine that Brandon Lemagne was a powerful criminal

13   mastermind and that all the evidence that appears to be

14   pointing one way in this case is actually pointing the

15   other way to an elaborate conspiracy.  But you heard the

16   evidence in this case and the simplest explanation is the

17   right one.  The powerless prison inmate was the victim in

18   this case, and you should find the defendant guilty beyond

19   a reasonable doubt.

20        THE COURT:  All right.  So, folks, I'm going to

21   go over those final instructions, the last instruction,

22   Instruction Number 40, basically the job of how you do it.

23        But before I do that, I want to say something to

24   the alternates.  So I'm going to excuse you after we're

25   done doing this.  First of all, I want to thank you for

1  your service because it's incredibly important.  We all
2  know it's a sacrifice for all the jurors to be here, and
3  we don't know if somebody is going to get sick in the
4  middle of the trial or not, if there's some kind of
5  problems.  And without you, you know, we wouldn't be able
6  to function.  So I want to thank both of you.  But I also
7  want to ask you to do the following, and that's this.  It
8  ain't over till it's over.  Okay?  Which means that when
9  you leave here today, I would like you to keep following
10 my instructions about not talking to anybody about it --
11 and I know that's going to be hard because you're going to
12 go back to your family and they're going to say, oh, what
13 happened, right.  I need you not to do that.  We've got
14 your phone number, and you're going to get a call meaning
15 one of two things.  Either we need to reactivate you and
16 bring you in because the deliberations are taking longer
17 and somebody has fallen ill or we're going to tell you
18 you're relieved of your responsibilities not to talk to
19 anybody and you can do whatever you want to do, and we'll
20 tell you what happened.  Okay?
21          But I really need to do that because I don't
22 know how long the jury is going to deliberate, if they're
23 going to decide today, tomorrow or next week, and if, in
24 the intervening time, somebody gets sick, we're going to
25 have to call upon you.  Do you all understand that?  But

1   no matter what, I want you to know how thankful I am for

2   your service.  That's called being a good American.  Just

3   so you know that.  Okay?

4          Now, to everybody else, let's go over this

5   Instruction 40, and I'm going to ad-lib a couple other

6   things here, too, beyond the instruction.  The first thing

7   you're supposed to do when you go back there is to elect a

8   foreperson.  Okay.  That's the first thing you've got to

9   do.  All right.  And the foreperson's job is to preside

10  over your deliberations and be your spokesperson here in

11  court.  All right.

12         Your verdict, though, at the end must represent

13  the collective judgment of the jury.  It must be

14  unanimous.  And that's what you need to work towards,

15  okay, where you all are convinced one way or the other

16  about what's going on here.

17         It is your duty -- and I stress the word

18  "duty" -- as jurors to consult with each other and to

19  deliberate with one another with a view towards reaching

20  an agreement, if you can do so, without violence to your

21  individual judgment.  Treat everybody with respect, make

22  sure everybody gets a chance to be heard, and then figure

23  out how you can work together to do this.  You're in this

24  together.  Do you understand what I'm saying to you?

25         Each of you must decide the case for yourself,

1  but you do so only after an impartial consideration of the

2  evidence in the case with your fellow jurors.  That's

3  because you all bring different perspectives, right.

4  That's why it's not one person deciding.  It's 12, right.

5  So you can talk about it amongst yourselves to see, oh, I

6  didn't think about that before or I remember this, right.

7  That's kind of what you want to do here.  All right.

8          In the course of your deliberations, do not

9  hesitate to reexamine your own views and to change your

10  opinion if you're convinced it's erroneous.  However, do

11  not surrender your honest conviction solely because of the

12  opinion of your fellow jurors or for the mere purpose of

13  thereby being able to return a unanimous verdict.  I don't

14  want you to say I just want to go home so I'm going to

15  just agree with everybody else.  Do you know what I'm

16  saying to you?  Do your job.  We're counting on you.

17          As I just said to the alternates, your country

18  doesn't ask you to do too many things when you really

19  think about it.  We live in the greatest country in the

20  world.  We only ask you -- other than taking your money

21  during tax time, it's really two things, military service

22  and serving as a juror.  And I want you to go in there and

23  be proud and do your job that everyone in this room is

24  counting on you to do.  That's what your job is here as

25  citizens.

1          Remember at all times, you are not partisans.
2   You're like me.  We're neutral, right.  You're a judge, a
3   judge of the facts of this case.  Your sole interest here
4   is to seek the truth from the evidence received during the
5   trial.  Your verdict must be based solely upon the
6   evidence and only the evidence that's received in this
7   case.  Nothing you've seen or read outside the courtroom,
8   as I've told you ad nauseam, you can not consider that.

9          Nothing that I've said or done during the course
10  of this trial is intended to suggest what I think.  What I
11  think is what you think.  Okay.  My verdict is what your
12  verdict is.  All right.  And I want to be clear about
13  that.  So nothing said in these instructions or nothing
14  in -- or any form of the verdict which has been prepared
15  for your convenience should suggest to you what the
16  outcome here should be.

17         What the verdict shall be is the exclusive duty
18  and the responsibility of the juror -- jury.  As I've told
19  you many times, you alone are the sole jurors of the
20  facts.  Don't worry about the punishment.  That's my job.
21  I told you that before.  You just figure out whether or
22  not the government has met their burden of proof, whether
23  or not they have proved this defendant's guilt beyond a
24  reasonable doubt.

25         Now, here's what you should do.  You go back

1  into the jury room.  You select your foreperson.  All

2  right.  You start figuring out what the rules of the road

3  are.  I'm going to throw one other thing out to you, and

4  that's this.  If you want to stay past 5:00, it's totally

5  up to you.  Okay.  If you want to leave today at 5 and

6  come back and start tomorrow at 9:00, that's fine, too.

7  Okay.  But if you want to stay later -- and you should

8  talk amongst this about yourself.  One person's

9  inconvenience, that should end the discussion, right.

10 Because you want to be respectful of each other, right.

11 Decide whether or not you want to work past 5.

12          And the reason I say that, if you looked at my

13 waistline -- see, the reason I wear black is because of my

14 waistline here, right.  I'm concerned about food.  So if

15 you want us to feed you again, which we're prepared to do,

16 you've got to let us know by 4:00.  Okay?

17          So what you'll do is you'll communicate simply

18 to Mr. Spivey whether or not you want to stay past 5

19 tonight.  Okay.  And whether or not you want food.  I

20 mean, they are not mutually exclusive.  You could say you

21 want to work later and still not have food, right, and

22 just draw a line in your own mind about how late you're

23 willing to go without the food.  But if you want food,

24 you've got to let us know by 4:00 because we've got to get

25 that form into you and you've got to order the best food

1  in Richmond, right.  That's what you had for lunch, right.

2  So we've got to figure that out by 4:00.  All you do is

3  let Officer Spivey know whether or not you want food.

4  That's all we need to know.  I don't want you to say

5  anything else, though.  Okay.  Certainly don't want you to

6  tell us this is how far along we are.  The only question

7  is food.  Okay?

8          Next after that -- I understand some of you may

9  have some questions about different things.  I don't know

10 what they are.  I want you to try to work through it

11 yourselves first.  Okay.  Take the instructions -- pick

12 the jury -- or the foreperson of the jury, work amongst

13 yourselves, look at the instructions because I'm giving

14 you a written copy of the instructions, right.  Follow

15 those.  Talk about the evidence a little bit and kind of

16 see where you are.

17         If you have a question, you write it down.

18 You -- and this is the only way to communicate.  You write

19 it down.  The foreperson writes it down on the piece of

20 paper, signs the piece of paper and gives it to

21 Officer Spivey.  That's the only way there should be

22 outside communication beyond the 12 of you, and under no

23 circumstances are you to write down what your count is or

24 how far along you are.  Do you all understand that?  All

25 right.

1              Now, let's go to the jury form here for a

2    second.  I just want to make sure we're on the same page.

3    And whoever is selected as the foreperson, you're going to

4    be in charge of it.  So even though you all have a copy

5    attached to the instructions, Ms. Garner is going to give

6    you the official verdict form here that should be in the

7    custody of the foreperson, okay, whoever you select to be

8    the foreperson.  Okay.  And you just go down the line

9    here.

10             And the first -- your first question is

11   following my instructions, did the government prove the

12   defendant guilty beyond a reasonable doubt as to Count

13   One.  Okay.  If the answer is guilty, you write guilty in

14   that first underline.  If the answer is not guilty, you

15   write not guilty.

16             Now, if it's not guilty, you go straight to

17   Count Two.  But if it's guilty, you've got to answer these

18   other questions to see if the government proved beyond a

19   reasonable doubt the three questions there.  The first is

20   about whether the conduct included aggravated sexual

21   abuse.  Yes or no, beyond a reasonable doubt.  Did the

22   defendant's conduct include aggravated sexual abuse.  Yes

23   or no, you know, beyond a reasonable doubt.  Everything is

24   beyond a reasonable doubt here.  Okay?

25             And then did defendant's conduct result in

1  bodily injury.  Yes or no.  You check those off.  Okay?

2  One or the other, okay, depending upon whether you find

3  beyond a reasonable doubt.  But you only do that if you

4  first found him guilty beyond a reasonable doubt.  Because

5  if you found him not guilty, you don't have to answer A, B

6  and C.  Okay?

7          Then you go to Count Two.  Again, did they prove

8  aggravated sexual abuse beyond a reasonable doubt as

9  instructed in the instructions.  That's why I want you to

10  use these instructions.  That's why I gave them to you.

11  Okay?  You write guilty or not guilty.  You do the same

12  thing for Count Three and Count Four.  Okay.

13          But then when you get to Count Five, Count Five

14  is similar to Count One.  You've got to answer additional

15  questions.  That's about which lie if you find him guilty,

16  right.  So if you find him guilty -- that the government

17  has proved his guilt beyond a reasonable doubt, you write

18  guilty, and then you have to answer which lie or both did

19  they prove beyond a reasonable doubt.  But if they didn't

20  meet their burden and he's not guilty, you just write not

21  guilty, and we end.

22          And when you've got through all the counts and

23  you're unanimous about your decision, that's when the

24  foreperson signs, dates it, and you let Officer Spivey

25  know, and I bring you back into the courtroom.  Is

1  everybody on the same page?  All right.

2          So this is what we're going to do.  You're going

3  to now retire to the jury room.  Again, start off with

4  selecting a foreperson, start getting some rules of the

5  road amongst yourselves, and then by 4:00, just let us

6  know what your appetite situation is for later in the day.

7  Again, if you all want to stay until midnight, we will

8  stay until midnight.  Okay.  You are driving the bus now.

9  Okay?  If you want to end at 5:00, we'll end at 5 and

10 you'll come back at 9.  Okay?

11         No matter what, I see you at the end of the day

12 and in the morning, no matter what, just to make sure

13 you're all behaving yourself.  Okay.  And I don't want you

14 getting lonely.  All right.

15         So with that in mind, everybody is going to

16 rise, and the alternates will be discharged with my

17 undying gratitude, and everyone else is going to start

18 getting to work.

19            (The jury exited the courtroom.)

20            THE COURT:  Take the evidence back.  What should

21 be going back is the jury instructions, the verdict form,

22 the indictment, the stipulations, exhibit list, and

23 exhibits.

24            THE CLERK:  Yes, sir.

25            THE COURT:  Okay.  Good.

1            All right.  You all can be seated.

2            All right.  So I added some things, obviously,

3    to the instructions just to make sure they understand

4    what's going on.  Did you have any exceptions from the

5    government?

6            MR. GARNETT:  No, Your Honor.

7            THE COURT:  Any exception from the defense?

8            MR. GAVIN:  No, sir.

9            THE COURT:  Okay.  So here's what we're going to

10   do.

11           Mr. Legins, you are to remain on this floor of

12   the courthouse.  You can stay in the room or you can go to

13   the restrooms, but you must stay on this floor of the

14   courthouse until we have a verdict.  Do you understand

15   that?

16           THE DEFENDANT:  I do, Your Honor.

17           THE COURT:  If they don't reach a verdict

18   tonight, you can obviously go home with your mother, and

19   you'll be back here before 9:00, then, tomorrow morning.

20   Do you understand that?

21           THE DEFENDANT:  I do, Your Honor.

22           THE COURT:  All right.  No drama.  We're at the

23   end.  No drama.

24           THE DEFENDANT:  No drama.

25           THE COURT:  Okay?

1           Mr. Gavin, you're going to have to stay in the

2   building, then.  If you go off this floor, make sure that

3   Ms. Garner can get you on quick notice.

4           I don't know if the government is going to go to

5   their office here in the building or if you're going to

6   stay here.  You can do whatever you want as long as

7   Ms. Garner can get you right away in case there's a

8   question or we've got a verdict or something like that.

9   Okay?

10           MR. GARNETT:  Yes, Your Honor.

11           THE COURT:  All right.  The last thing I'll tell

12   you, I want to commend both sides for doing a really good

13   job.

14           You know, Mr. Gavin, you and I go way back.  So

15   I expected nothing less than an extremely good job, and on

16   behalf of the Court, I want to thank you for taking this

17   appointment.  I hope Mr. Legins knows what a fine lawyer

18   that he received here, and you did nothing less than I

19   expected from my own experiences in the past.

20           MR. GAVIN:  Thank you.  Thank you, Your Honor.

21           THE COURT:  I also want to commend the

22   government.  This is a well-oiled machine.  I'm told that

23   this is your first jury trial.  Is that true?

24           MS. GILBERT:  Yes, Your Honor.

25           THE COURT:  Is that true for you, Mr. Garnett?

1          MR. GARNETT:  I think this is my third, Your

2    Honor.

3          THE COURT:  Oh, your third.  Oh, okay.  Well,

4    look, no matter if it's first, third or tenth, I thought

5    you did a really good job.  You ought to be proud of

6    yourselves very much.  And, of course, you've got this

7    exceptional paralegal, one of the greatest on the planet.

8    We all know that.  So -- but listen, you ought to be proud

9    of yourselves.  And even when I was giving you grief, you

10   were doing a great job.  There was no hiccups in this

11   case.

12         And what my grief is I'm giving you -- and I'm

13   going to direct this really more to you, Ms. Gilbert,

14   because I've been in your shoes when you've got to come

15   from the big city and you go out in the field.  The

16   United States always take the high ground.  Always.

17   That's what the message is here, right.

18         And that's particularly true in your job.  When

19   you're accusing other members of the government of not

20   living up to their standard, you want to make sure you

21   do -- you live up to the standard everybody appreciates.

22   That's my message to you.  Just chalk it up as a learning

23   experience.

24         But you all did exceptional, and you ought to be

25   really proud of yourselves.  Okay.  So -- and, of course,

1  Mr. Garnett, you had Fort Lee experience.  No wonder

2  you're a master at this.

3           (Recess from 3:35 p.m. until 3:49 p.m.)

4           THE COURT:  All right.  I've received a note

5  from the jury.  I'm just going to go through it with you.

6  There's four parts of it.  Number 1, the jury requests a

7  whiteboard, dry eraser board, a large pencil or easel for

8  us to write on during our deliberations.

9           Can we give them that over there?

10          THE CLERK:  Yes, sir.

11          CSO SPIVEY:  Yes, sir.

12          THE COURT:  So we're going to give them that.

13 Any objection?

14          MR. GAVIN:  No, sir.

15          THE COURT:  All right.  Number 2 is they don't

16 want food.  They want to leave at 5:00, which is fine.

17 What I'm going to do is I'm going to tell them we're going

18 to reconvene at 5:00 just -- because I'm always going to

19 have them report here in the morning and at night so I can

20 remind them of their requirements not to discuss the case

21 with anybody.

22          Number 3, their question was do we convene in

23 the courtroom at 9:30.  I'm going to tell them to -- I'll

24 give them instructions about how they get here at 9:00.

25 You all be in place by 9:00.  As soon as everybody is

```
 1   assembled, I'll come out.  So it's not going to be 9:30.

 2   As soon as I have everybody in place, I'm going to greet

 3   them and then send them to their deliberations.  Okay?

 4            And then lastly, the question is is there a

 5   formal definition of reasonable doubt?  I'm going to

 6   simply point them to the instructions.  Instruction --

 7   let's see -- Number 9 is the instruction on reasonable

 8   doubt.  I'm not going to even repeat it.  I'm going to

 9   tell them just to go back to Number 9, and there's nothing

10   beyond that that I will ever give them.

11            Any objection from the government?

12            MR. GARNETT:  No, Your Honor.  That's fine.

13            THE COURT:  Any objection, Mr. Gavin?

14            MR. GAVIN:  No, sir.

15            THE COURT:  Okay.  All rise.  We'll bring in the

16   jury.

17            (The jury entered the courtroom.)

18            THE COURT:  All right.  Everybody can be seated.

19            Are we missing -- no.  I understand.  We're

20   missing our two alternates.

21            A JUROR:  Oh, sorry.  Whoops.

22            THE COURT:  It's okay.  It's an optical illusion

23   for me.  All right.  I've received a note.  First of all,

24   who is the foreperson?

25            Okay.  Mr. Foreperson, when you send me notes
```

1   from now on, if you could just sign your name and then

2   date it, or just sign your name and put foreperson on it

3   so I know it came from the foreperson.  Okay?

4           JURY FOREPERSON:  Will do.

5           THE COURT:  All right.  Now, as I understand it,

6   you have four -- I'm not going to say four questions.  Two

7   are statements, but number 1 is the jury requests a

8   whiteboard or dry eraser board.  We're going to give you

9   that over there, and the equipment that you need.  If that

10  doesn't work, you let us know.  Okay?

11          JURY FOREPERSON:  Okay.

12          THE COURT:  But we're going to give you what you

13  want.

14          Number 2 is you don't want any food.  You're

15  going to leave at 5:00 today.  Is that right?  So what

16  we're going to do is every morning and every night -- I

17  don't know how long this is going to last.  That's up to

18  you -- we reconvene in the courtroom and you leave in the

19  courtroom because I'm always going to remind you not to be

20  contaminated, right.  So at 5:00 today we'll reconvene

21  hearing in the courtroom.  I'll tell you to have a good

22  night and tell you, again, to remain free of outside

23  influence.

24          Number 3 is do we convene in the courtroom?

25  What you're going to do is you're going to do what you've

1    been doing every morning.  You've got to be in the jury

2    assembly room by 9:00.  Once they get you up here,

3    assembled, I got everybody in the courtroom -- I'm not

4    going to wait until 9:30 -- I'm going to bring you in and

5    I'm going to get you started as soon as I got everybody in

6    place.  So if you're here before 9, all of you guys are

7    here by 9, I get everybody else here, we might even start

8    at 9:00.

9              So -- and, again, I'm just going to bring you

10   in, ask if you had a good night and say did you remain

11   free of outside influences, because that's the big issue.

12   You already know that by now for me.  So everybody

13   understand that?  All right.

14             Lastly, is there a formal definition of

15   reasonable doubt?  There is.  It's in the jury

16   instructions.  It's Jury Instruction Number 9.  That's

17   what you are to turn to.  I cannot give you any further

18   instruction beyond that.  That's it.  Okay?

19             So my only comment of reasonable doubt is what

20   I've already given you in Instruction Number 9, and that's

21   where you should turn to.  Okay?  All right.  We're all

22   satisfied?  All right.  Get back to work, then.  Okay?

23             All rise for the jury.

24             (The jury exited the courtroom.)

25             THE COURT:  There's a sticker on this side.  Do

1  you see that, Tim?  There's a blue sticker.

2         THE CLERK:  Yeah.  It says "dry eraser only."

3  They can't use the permanent markers.

4         THE COURT:  Okay.  Anything else?

5         MR. GARNETT:  No, Your Honor.

6         MR. GAVIN:  No, sir.

7         THE COURT:  Okay.

8         (Recess from 3:54 p.m. until 4:58 p.m.)

9         THE COURT:  Do I have anything to address before

10 I bring the jury in?

11        MR. GARNETT:  No, Your Honor.

12        MR. GAVIN:  No, sir.

13        THE COURT:  All right.  All rise for the jury.

14        We can bring the jury in.

15        (The jury entered the courtroom.)

16        THE COURT:  All right.  Everybody can be seated.

17        All right.  Folks, we're going to let you go

18 home for the evening.  I'm going to remind you again,

19 you've got to be free of any external influences,

20 particularly during this time period when you're

21 deliberating.  So report tomorrow at the jury assembly

22 room by 9, and we'll start promptly thereafter.

23        I will tell you, I'm told that the clerk's

24 office is going to have some kind of menu for you at that

25 time to take your lunch order so everything is ready for

182

1   you.  So you can just work as hard as possible tomorrow.

2   Does that make sense?  All right.  I'm going to wish you,

3   then, a good night, and I'll look forward to seeing you at

4   9:00 a.m. tomorrow.  And, again, reminder to be free from

5   external things.  Okay?  Thank you.

6               All rise for the jury.

7               (The jury exited the courtroom.)

8               THE COURT:  All right.  Everybody is going to

9   have to be in place, then, tomorrow by 9:00.

10              Mr. Legins, then, so you're going to have to be

11  in the building no later than 8:45, then, so we can get

12  started.  Okay?

13              THE DEFENDANT:  I understand, Your Honor.

14              THE COURT:  All right.  Anything else we need to

15  do?

16              MR. GARNETT:  No, Your Honor.

17              MR. GAVIN:  No, sir.

18              THE COURT:  I look forward to seeing everybody

19  tomorrow.

20              (The proceeding adjourned at 5:00 p.m.)

21

22                    REPORTER'S CERTIFICATE

23       I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

24  the Commonwealth of Virginia at large, and whose

25  commission expires September 30, 2023, Notary Registration

1  Number 7108255, do hereby certify that the pages contained

2  herein accurately reflect the stenographic notes taken by

3  me, to the best of my ability, in the above-styled action.

4      Given under my hand this 17th day of February 2020.

6                    /s/
                Tracy J. Stroh, RPR