1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   RICHMOND DIVISION

 3   _____
                                     )
 4   UNITED STATES OF AMERICA        )
                                     )
 5   v.                              )    Criminal Case No.:
                                     )    3:19 CR 104
 6   CHIKOSI LEGINS                  )
     _____)
 7                                        June 29, 2020

 8
                     TRANSCRIPT OF PROCEEDINGS
 9           BEFORE THE HONORABLE DAVID J. NOVAK
              UNITED STATES DISTRICT COURT JUDGE
10
     APPEARANCES:
11
     Thomas A. Garnett, Esquire
12   OFFICE OF THE UNITED STATES ATTORNEY
     919 East Main Street, Suite 1900
13   Richmond, Virginia 23219

14   Kathryn E. Gilbert, Esquire
     UNITED STATES DEPARTMENT OF JUSTICE
15   950 Pennsylvania Avenue NW, 4025 NYA
     Washington, DC 20530
16
              Counsel on behalf of the United States
17


18
     Charles A. Gavin, Esquire
19   CAWTHORNE DESKEVICH & GAVIN PC
     1409 Eastridge Road
20   Richmond, Virginia 23229

21            Counsel on behalf of the Defendant

22

23                 TRACY J. STROH, RPR
                   OFFICIAL COURT REPORTER
24             UNITED STATES DISTRICT COURT

25
```

1                              **I N D E X**

2                              WITNESSES

3   Examination By:                                     Page

4
                         JOHNNY LAVENDER
5   Direct    –  MR. GARNETT                              10
    Cross     –  MR. GAVIN                                28
6   Redirect  –  MR. GARNETT                              38

7

8                              EXHIBITS

9   Government    Description                           Page

10  No. 1         Photograph                             17
    No. 2         Photograph                             17
11  No. 3         Photograph                             17
    No. 4         Photograph                             17
12  No. 5         Photograph                             17
    No. 6         Photograph                             17
13  No. 7         Photograph                             17
    No. 8         Photograph                             17
14  Defendant
    No. 1         Redacted version of interview          29
15                with Gregory Largent

16

17

18

19

20

21

22

23

24

25

```
 1                 (The proceeding commenced at 9:32 a.m.)

 2                 THE CLERK:  Criminal matter 3:19 CR 104,

 3      United States of America v. Chikosi Legins.  Mr. Charles

 4      A. Gavin representing the defendant.  Mr. Thomas A.

 5      Garnett and Kathryn E. Gilbert representing the

 6      government.

 7                 Counsel, are we ready to proceed?

 8                 MR. GARNETT:  The United States is ready,

 9      Your Honor.

10                 MR. GAVIN:  Defendant is ready, Your Honor.

11                 THE COURT:  Okay.  Before we get started,

12      obviously, we're in a new era since the time that we had

13      this trial in terms of wearing masks and such.  If you're

14      going to speak, counsel and Mr. Legins, you'll rise, take

15      your mask to the side so the court reporter can hear you.

16      When you're done speaking, put your mask back on and then

17      sit back down.  I'm obviously not wearing a mask because

18      I'm going to do a lot of speaking and because I'm also

19      six feet away.

20                 Everybody understand how we're going to do this?

21                 MR. GARNETT:  Yes, Your Honor.

22                 MR. GAVIN:  Yes, sir.

23                 THE COURT:  All right.  So, Mr. Garnett, as I

24      understand it, the government has no objections to the

25      presentence report; is that right?
```

1            MR. GARNETT:  That's correct, Your Honor, yes.

2            THE COURT:  All right.  So, Mr. Gavin, your

3    objection is to the guideline calculation, which we're

4    going to talk about here in a moment.  But there's no

5    other substantive objection to the presentence report; is

6    that right?

7            MR. GAVIN:  That's correct.

8            THE COURT:  I'm sorry?

9            MR. GAVIN:  Sorry.  That's correct.

10           THE COURT:  Okay.

11           MR. GAVIN:  And with regard to the family

12   history, factual information, there's no objection there

13   either.

14           THE COURT:  Okay.  Mr. Legins, do you want to

15   rise?  Take your mask off.

16           Mr. Legins, a presentence report was prepared

17   for you.  I gather Mr. Gavin brought that report to you;

18   is that right?

19           THE DEFENDANT:  That's right, Your Honor.

20           THE COURT:  Now, Mr. Gavin has some legal

21   objections to the calculation of the guidelines.  We're

22   going to be dealing with that today and then in July as

23   well.  But other than the guideline calculations, did you

24   think that there was anything else that was an error in

25   that report?

1           THE DEFENDANT:  No, Your Honor.

2           THE COURT:  Everything else is accurate, then?

3           THE DEFENDANT:  Nothing but the guidelines.

4           THE COURT:  Okay.  That's fine.  You can put

5   your mask back on and have a seat.

6           So other than the guideline calculation, I'm

7   going to accept the presentence report as is.

8           Now, as I understand it, the government -- and

9   I've already ruled on it -- is the government is going to

10  put on Agent Lavender; is that right?

11          MR. GARNETT:  Agent Lavender, yes, sir.

12          THE COURT:  Lavender.  Do you have any other

13  evidence you want to introduce other than that?

14          MR. GARNETT:  No, Your Honor.

15          THE COURT:  All right.  Are you going to want to

16  introduce any evidence now?  The concept of today is I

17  want to get the evidence done.  I'm going to tell you

18  where I am on the calculations, and then we're going to

19  have -- I'm going to have Officer Foote do another

20  calculation and give you some briefing to do here.  And

21  then we'll do the 3553(a) factors July 14th.  Is everybody

22  with me?

23          MR. GAVIN:  Yes, sir.

24          MR. GARNETT:  Yes, Your Honor.

25          THE COURT:  Somebody is raising their hand in

```
 1   the back.  Ma'am?

 2             MS. LEGINS:  Yes.  May I have my daughter sit

 3   next to me since this is the first time she's in a

 4   courtroom and she's under age?  I understand you all have

 5   the six feet rule, but I want to know if she could sit

 6   right next to me here.  We live in the same house, and we

 7   breathe the same air.

 8             THE COURT:  Are you --

 9             MS. LEGINS:  Yes.

10             THE COURT:  -- Mr. Legins' wife?

11             MS. LEGINS:  Yes.

12             THE COURT:  Yeah.  Why don't you just move

13   closer to her.  How does that sound?

14             MS. LEGINS:  Okay.  Thank you.

15             THE COURT:  Is that all right?

16             MS. LEGINS:  Yeah, that's fine.

17             THE COURT:  Is that your son over there, too?

18             MS. LEGINS:  Yes, that's my son, too.

19             THE COURT:  That's fine.  You guys can move

20   together.  That's fine.  Just move towards the wall.  How

21   is that?

22             MS. LEGINS:  Move towards the wall?  Okay.

23             THE COURT:  Yeah.  Is that all right?

24             MS. LEGINS:  Yeah, that's fine.

25             Did you want us over there out of the way from
```

1  them or --

2          THE COURT:  Well, that's the defense side.  Why

3  don't you go sit over there.

4          MS. LEGINS:  Okay.  Because you didn't have an X

5  there.  That's why we sat here.

6          THE COURT:  Well, I don't do Xs.  You want to

7  just stay away from everybody else.

8          MS. LEGINS:  Okay.  Thank you.

9          THE COURT:  All right.  Okay.  My --

10         MR. GAVIN:  Judge, to answer the question, I

11  won't have any evidence unless I have to introduce

12  something through Special Agent Lavender's cross.

13         THE COURT:  Okay.  You did submit a number of

14  letters from family members and friends, which I've

15  reviewed, and that will go into the 3553(a) factors.

16         What you're saying is to me, though, is you

17  don't intend to call them as witnesses; is that right?

18         MR. GAVIN:  No, sir.

19         THE COURT:  So the defendant will get a chance

20  to allocate in July.

21         MR. GAVIN:  Yes, sir.

22         THE COURT:  But I just wanted to make sure.  So

23  the only evidence that we're putting on now is Agent

24  Lavender; is that right?

25         MR. GARNETT:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. GAVIN:  Yes, sir.

3          THE COURT:  All right.  Let's do that first, and

4    then we're going to talk about the guidelines.  So -- oh,

5    and before we do that, let me ask you a couple questions

6    here.

7          So, Mr. Garnett, in your motion here, you kind

8    of told half the story on this.  You know, you were right

9    that I had originally ruled, under your 413 motion, you

10   could put on the testimony of G.L.  Then I reversed myself

11   in the middle of trial, but then I reversed myself again.

12         MR. GARNETT:  Yes, Your Honor.  I noted that --

13   I saw that in the transcript, Your Honor.  That was not my

14   intent was to somehow imply that Your Honor hadn't

15   given -- that's why I noted that we just did not call him

16   at trial.  I just wanted to cite to the two orders on the

17   docket.

18         THE COURT:  All right.

19         MR. GARNETT:  And that's why I noted that we

20   hadn't called him.

21         THE COURT:  Okay.  The point is it was your

22   decision not to call G.L. at trial.  Do you agree with

23   that?

24         MR. GARNETT:  Yes, Your Honor.

25         THE COURT:  Okay.  And was he here, present,

1    available?  Did you writ him in?

2           MR. GARNETT:  Yes, Your Honor.

3           THE COURT:  And is he still in custody now?

4           MR. GARNETT:  He is not -- oh, I'm sorry.  Yes,

5    Your Honor, he is.

6           THE COURT:  Okay.  But you didn't writ him in

7    today?

8           MR. GARNETT:  No, sir.

9           THE COURT:  Is there a reason for that?

10          MR. GARNETT:  Yes, Your Honor.  We believe that

11   Special Agent Lavender's testimony is sufficient to

12   present his account to the Court.  Mr. Gavin will be able

13   to cross-examine any weaknesses that he sees in the

14   account.  We didn't want to essentially do a mini-trial

15   with Mr. Largent as the victim in this case.  We felt we

16   could do that adequately through the special agent's

17   testimony.

18          THE COURT:  Well, I mean, you're certainly

19   permitted to do that.  I've already ruled that.  The

20   problem is is that I can't assess his demeanor.  I mean, I

21   can go off it by what Agent Lavender is going to say, but

22   I can't see the witness and make a decision.

23          I'm just pointing that out because while I'm

24   letting you put it on, I haven't decided the weight that

25   I'm going to give it because you, on your own, have made

Johnny Lavender – Direct                    10

1   the decision not to bring that witness in here.  You can

2   put the testimony on, but I'm not telling you I'm going to

3   give it any weight until I -- we're going to have some

4   briefing on this as we go forward.  Do you understand what

5   I'm saying to you?

6                MR. GARNETT:  Yes, Your Honor.

7                THE COURT:  All right.  Do you want to call

8   Agent Lavender?

9                MR. GARNETT:  Yes, Your Honor.  The

10  United States would call Special Agent Lavender.

11                    **JOHNNY LAVENDER,**

12      called by the government, first being duly sworn,

13                    testified as follows:

14                THE COURT:  All right.  Go ahead, Mr. Garnett.

15                MR. GARNETT:  Thank you, Your Honor.

16                    **DIRECT EXAMINATION**

17  BY MR. GARNETT:

18  Q    Good morning, Agent.  Could you please spell your

19  name for the court reporter?

20  A    My name is Johnny Lavender, J-O-H-N-N-Y,

21  L-A-V-E-N-D-E-R.

22  Q    And how are you employed?

23  A    I'm a special agent with the Federal Bureau of

24  Investigation.

25  Q    Were you involved in the investigation of this

11

1  particular case?

2  A    Yes.

3  Q    On February 13th of 2020, did you travel to FCI

4  Petersburg to interview a transgender inmate by the name

5  of Gregory Largent?

6  A    Yes.

7  Q    And why did you do that?

8  A    We just finished a trial involving Mr. Legins, and I

9  knew there would be a sentencing, and I wanted to speak to

10 Ms. Largent in person.

11 Q    Okay.  To that date, had you personally interacted

12 with Ms. Largent?

13 A    No, I had not.

14 Q    And did you understand, though, that Ms. Largent had

15 been incarcerated at FCI Petersburg between 2014 and May

16 of 2016?

17 A    Yes.

18 Q    In May of 2016, was Ms. Largent transferred to

19 another BOP facility?

20 A    Yes.

21 Q    Do you understand Brandon Lemagne to have been

22 incarcerated at FCI Petersburg from late November 2016

23 through May 11th, 2018?

24 A    Yes.

25 Q    Are you aware of any overlap between Ms. Largent and

1  Mr. Lemagne's incarceration at FCI Petersburg?

2  A    No, I am not.

3  Q    During that same time period, Agent Lavender,

4  focusing on the 2014 to 2016 for Ms. Largent, was the

5  defendant employed as a correctional officer at FCI

6  Petersburg?

7  A    Yes.

8  Q    And during your interview, to summarize briefly, did

9  Ms. Largent tell you that she had had sex with the

10 defendant while she was an inmate at FCI Petersburg?

11 A    Yes.

12 Q    And how did Ms. Largent explain that this came to

13 happen?

14 A    Ms. Largent indicated that she was out in the yard,

15 looking for a bird nest underneath the stairwell.  She

16 identified herself as being the bird lady of FCI

17 Petersburg.  She did a lot with the pidgeons and the birds

18 there.  And she was approached one day by Mr. Legins, and

19 Mr. Legins started asking her questions about the

20 transgender community.

21 Q    And did Ms. Largent have a subsequent conversation

22 with the defendant following that?

23 A    Approximately a day later, Ms. Largent was again

24 approached by Mr. Legins, and Mr. Legins indicated to

25 Ms. Largent that he had had a dream about having sex with

1   her and at that point was -- wanted to know if they were

2   to do something like that, would there be a place in which

3   they could actually have sex.  And then it came up to what

4   it would take in order for them to have sex.

5   Q    What do you mean by "what it would take"?

6   A    What in exchange, what could he give to Ms. Largent

7   in exchange for the sex.

8   Q    Did Ms. Largent say the defendant said anything to

9   her in regards to taking care of her?

10  A    Ms. Largent indicated that she was a little bit taken

11  aback by a guard making this proposition because she said

12  she had never been propositioned like this before or never

13  done anything like that before and it was something that

14  was new to her.

15  Q    Did the defendant say anything about watching out for

16  her?

17  A    Yeah.  The defendant also indicated that he would

18  take care of her or watch out for her.

19  Q    Did Ms. Largent tell you whether she did eventually

20  agree to have sex with the defendant?

21  A    She did.  She indicated that she had sexual

22  intercourse with Mr. Legins on approximately ten

23  occasions, five times orally, five times anally, with the

24  first couple of times being oral.

25  Q    Did Ms. Largent indicate whether she -- before this

1  took place, before the sexual acts took place, whether she

2  did, in fact, tell the defendant that she had a specific

3  price that she needed to have met?

4  A    After -- after the interaction in which Mr. Legins

5  indicated that he was interested -- or had had a dream

6  about having sex with Ms. Largent, approximately a week

7  later, she came back with a price of two to three packs of

8  cigarettes for engaging in sex.

9  Q    And did Ms. Largent say why cigarettes?  Did she

10  smoke?

11  A    In the prison setting, cigarettes are currency.  They

12  can exchange for stamps.  These stamps are used to go buy

13  commissary items or go buy items that are for sale in the

14  yard on weekends.

15             THE COURT:  So she's telling you this is

16  consensual sex in return for the payment of cigarettes; is

17  that right?

18             THE WITNESS:  Yes, sir.  Yes, Your Honor, you're

19  correct.

20             THE COURT:  No allegations of force.  It's just

21  consent?

22             THE WITNESS:  No allegations of force at all,

23  sir.

24             THE COURT:  Go ahead.

25  BY MR. GARNETT:

1  Q     So you've already mentioned the sex acts,

2  Agent Lavender.   Did -- and I hesitate to do this, but did

3  Ms. Largent say anything to you in terms of describing the

4  defendant's penis?

5  A     Yes.   Ms. Largent said that Mr. Legins had a seven-

6  to seven-and-a-half-inch penis.

7  Q     Where did Ms. Largent tell you that these sexual acts

8  took place?

9  A     In the E South fire escape.

10 Q     And did Ms. Largent tell you whether, as these acts

11 continued to take place, whether the defendant continued

12 to provide her with cigarettes?

13 A     Yes.   She said they continued to be supplied to her

14 by Mr. Legins.

15 Q     And your Honor has already touched on this, but did

16 Ms. Largent at any point during your interview express any

17 animus towards the defendant?

18 A     None.

19 Q     How did she say that she viewed the relationship?

20 A     She viewed it as a consensual relationship and kind

21 of like a business transaction.   She saw -- there was

22 nothing at all, any type of malice at all from her during

23 this interview.

24 Q     So in the course of your investigation,

25 Agent Lavender, have you had the opportunity to become

1   familiar with the layout of FCI Petersburg?

2   A    I have.

3   Q    And approximately -- in this past year, approximately

4   how many times would you say you have visited that

5   facility?

6   A    Approximately a dozen plus.

7   Q    Have you walked through the housing units that have

8   been at issue in this trial -- or in the previous trial?

9   A    Yes.

10  Q    And have you discussed the layout of those housing

11  units with prison staff?

12  A    I have.

13  Q    And have you reviewed blueprints and photographs of

14  those facilities?

15  A    I have.

16          MR. GARNETT:  Your Honor, we have a number of

17  exhibits that I'd like to hand up to Agent Lavender now.

18          THE COURT:  So I've got eight photos.

19          MR. GARNETT:  Yes, sir.

20          THE COURT:  Is that what you want to introduce?

21          You don't have any objection to these, do you?

22          MR. GAVIN:  No, sir.

23          THE COURT:  All right.  They will all be

24  admitted.

25          MR. GARNETT:  Thank you, Your Honor.

Johnny Lavender – Direct                    17

1              (Government Exhibit Number 1 was admitted.)

2              (Government Exhibit Number 2 was admitted.)

3              (Government Exhibit Number 3 was admitted.)

4              (Government Exhibit Number 4 was admitted.)

5              (Government Exhibit Number 5 was admitted.)

6              (Government Exhibit Number 6 was admitted.)

7              (Government Exhibit Number 7 was admitted.)

8              (Government Exhibit Number 8 was admitted.)

9              THE COURT:  I think I'm seeing FCI Petersburg in

10   my sleep.  So let's just go through this description real

11   quickly about what they are.

12             MR. GARNETT:  Yes, sir.

13             THE WITNESS:  Yes, Your Honor.

14   BY MR. GARNETT:

15   Q    So, Agent Lavender, the Court has already admitted

16   these.  Could you -- starting with Exhibit 1, could you

17   just walk quickly through, for the Court, what each of

18   those exhibits depict in sequence?

19   A    Government Exhibit 1 is a view of the F South/E South

20   building -- or the unit.

21   Q    Exhibit 2?

22   A    Government Exhibit Number 2 is the -- the first door

23   is a picture that was shown in Government Exhibit 1 as

24   you're walking toward the door.

25   Q    And, Agent Lavender, just to make it clear for the

1  Court, were these photographs taken in sort of a sequence

2  by the photographer?

3  A    Yes, they were, as if you were walking from the

4  starting location to the end location.

5  Q    So what does Government Exhibit 3 depict?

6  A    When you enter in Government Exhibit 2, the first

7  door, you see the second door in the background.  When you

8  exit out the second door in Government Exhibit Number 2,

9  you end up with a view from -- showing you in Government

10 Exhibit 3, which is looking to your left.

11          If you were to have looked right, it would have

12 been the unit team area that was in question during trial

13 with Mr. Lemagne.

14 Q    Exhibit 4?

15 A    Exhibit -- Government Exhibit Number 4 is just a

16 closer view of the door that's marked FE1.

17 Q    And FE1, to your knowledge, stands for what?

18 A    Fire Escape 1.

19 Q    Government Exhibit 5?

20 A    Government Exhibit 5 is a closer view of FE1.

21 Q    All right.  And as you're looking at that door,

22 Agent Lavender, FE1, would you need -- or would an officer

23 need a key to enter through that door?

24 A    Yes.  You would have been required to have a key to

25 open that door.

1  Q     So Government Exhibit 6?

2  A     Government Exhibit 6, if you were to have opened the

3  FE1 door that you saw in Exhibit Number 5, this is a view

4  you had of the room.

5  Q     Is this the fire escape room?

6  A     Yes, it is.

7  Q     And that door in the -- to the right side of the

8  picture there, where would that door lead?

9  A     It would lead outside.

10 Q     And would an officer need a key to enter from the

11 outside?

12 A     Yes.  If you -- on the exhibit, you'll see that there

13 is no way to open the door from the inside.  In order to

14 exit that door, you would have to have someone with a key

15 on the outside to open.

16 Q     Government Exhibit 7?

17 A     Government Exhibit 7.  When you would walk through

18 the door, this would be the stairwell to your left leading

19 upstairs to the F South unit.

20 Q     And what would be at the top of those stairs?

21 A     Another door similar to the one on the bottom.

22 Q     Would an officer need a key to enter the F South unit

23 through that door?

24 A     Yes, you would.

25 Q     And finally, Government Exhibit 8?

1  A    Government Exhibit 8 is the door that I mentioned

2  earlier from the previous exhibits, that you would need a

3  key from the outside to open to let someone out.

4  Q    Now, the -- the fire escape, we've been calling it

5  the E South fire escape.  Is it fair to say that the

6  E South fire escape services both the E South and the

7  F South housing units?

8  A    Yes.

9  Q    Would an E South officer have the keys necessary to

10 enter and exit the relevant doors in the E South fire

11 escape?

12 A    Yes.

13 Q    Would an officer assigned to the F South housing unit

14 have keys -- the keys necessary to access those doors?

15 A    Yes.

16 Q    Going back to Ms. Largent's account now,

17 Agent Lavender, did she explain -- Ms. Largent -- whether

18 she was, at some point, moved to the Special Housing Unit

19 on FCI Petersburg?

20 A    Yes.

21 Q    And approximately what dates did Ms. Largent say she

22 was incarcerated at the -- let's call it the SHU for

23 short?

24 A    She said approximately 45 days prior to her being

25 transferred out of the facility.

Johnny Lavender – Direct                    21

1  Q     To your knowledge, did that span essentially February

2  through May of 2016?

3  A     Yes, it did.

4  Q     Did Ms. Largent say whether the defendant ever came

5  to visit her during that time period?

6  A     Yes.  She said that Mr. Legins came to visit her

7  approximately ten times.

8  Q     Did the defendant ever say anything to her about

9  trying to change his shift in order to have the ability to

10 visit her?

11 A     There was one indication that Mr. Legins changed a

12 shift from the mobile unit to the SHU.

13 Q     And that's what Ms. Largent told you?

14 A     Yes.

15 Q     Did Ms. Largent tell you anything out of -- I'm

16 sorry, Your Honor -- a specific instance wherein Mr. --

17 the defendant visited her and said something to her?

18 A     On one of the occasions, Ms. Largent indicated that

19 Mr. Legins had come by and asked her to show him her butt.

20 Q     Just to clarify, in terms of the visitation here, did

21 Ms. Largent tell you the defendant had been assigned to

22 work in her housing unit or simply that he came to visit

23 her there?

24 A     Nine of the ten times that she mentioned, she said he

25 just came by to visit.  The one time she mentioned that he

Johnny Lavender - Direct                           22

1   had changed his work schedule from the mobile unit to the

2   SHU.

3   Q    Okay.  Do officers not assigned to the SHU have the

4   ability to enter that facility?

5   A    They can enter, yes.

6   Q    Is that something, in your conversations with BOP

7   staff, that would raise a led flag, an unassigned officer

8   entering the SHU?

9   A    No, it would not raise any flags.

10  Q    Turning to an individual now, Agent Lavender, named

11  Raysean Davis.

12              THE COURT:  Before we do that --

13              MR. GARNETT:  Yes, sir.

14              THE COURT:  -- let me ask you this.  You said

15  that you interviewed Ms. Largent after the trial was over;

16  is that right?

17              THE WITNESS:  Yes, Your Honor.

18              THE COURT:  But as Mr. Garnett said, you all had

19  Ms. Largent here, ready to testify.  Had somebody else

20  interviewed her before?

21              THE WITNESS:  Yes, sir.  The FBI interviewed her

22  in February -- approximately February of 2019.

23              THE COURT:  Was the account of what she said

24  before the trial similar to the account that she gave

25  after the trial?

Johnny Lavender - Direct                    23

1          THE WITNESS:  Similar, but not as much detail.

2          THE COURT:  All right.  What differences were

3    there?

4          THE WITNESS:  As far as in some of the details

5    as far as in being the bird lady of Petersburg and talking

6    about -- you know, giving the size of the penis.  I'm not

7    sure if it was in the first interview or the second

8    interview.  The -- I don't think Raysean Davis came up in

9    the first interview, talking about him.

10         THE COURT:  How about the purchase of sex for

11   cigarettes?  Was that mentioned in the first one?

12         THE WITNESS:  It was mentioned, Your Honor.

13         THE COURT:  All right.  And is there -- other

14   than Ms. Largent's statements, is there any corroboration

15   at all, physical evidence that corroborates her

16   statements?

17         THE WITNESS:  Other than the penis size that was

18   put into evidence and her giving an account of that?

19         THE COURT:  I'm not talking about penis size.

20         THE WITNESS:  Okay.  I --

21         THE COURT:  Other than that, though, is there

22   anything about -- is there video showing them going into

23   that area?  As I understand it from the pleadings, there

24   is none; is that right?

25         THE WITNESS:  No, Your Honor, there are not.

Johnny Lavender – Direct                    24

1          THE COURT:  All right.  Is there any complaint

2   by Ms. Largent to any jail officials, before she was

3   transferred, about this?

4          THE WITNESS:  No, Your Honor.

5          THE COURT:  Is there any witnesses that observed

6   this?

7          THE WITNESS:  The sexual intercourse between

8   Mr. Legins and Ms. Largent?

9          THE COURT:  Yeah.

10         THE WITNESS:  Not to my knowledge, Your Honor.

11         THE COURT:  Is there any physical evidence?  So,

12  for example, with Mr. Lemagne, there was sperm on

13  sweatshirts and the anorectal swab that you all procured.

14  Is there anything like that that would corroborate

15  Ms. Largent?

16         THE WITNESS:  No, sir.  No, Your Honor.

17         THE COURT:  So essentially this boils down to

18  what Ms. Largent says; is that right?

19         THE WITNESS:  Ms. Largent's statements, yes,

20  Your Honor.

21         THE COURT:  Okay.  Go ahead.

22         MR. GARNETT:  Yes, Your Honor.

23         Your Honor, if we can turn to the video right

24  now, actually, Your Honor, since the Court mentioned that.

25  BY MR. GARNETT:

Johnny Lavender - Direct                    25

1   Q    In the course of your investigation, Agent Lavender,

2   have you been able to determine how long FCI Petersburg

3   maintained video surveillance in the period of 2014 to,

4   say, 2016?

5   A    Yes.  According to the information I was provided, it

6   really depended on the type of camera.  Sometimes it could

7   be 14 days, 30 days.  Although we did find one camera that

8   went back almost 60 days.  So that's kind of the time

9   range that it would be able to capture.

10              THE COURT:  So -- wait a minute.  Just to be

11  clear what you're saying is you're talking about the

12  retention time period of it, right?

13              THE WITNESS:  Yes, sir.  The recording of the

14  cameras.  Some of the cameras, they would maintain the

15  video -- depending on the camera, some would maintain

16  their video longer than other cameras.

17              THE COURT:  Okay.  I think what my question,

18  though, was -- and I'm glad you said what you just said,

19  but my question is this.  Were there videos in the -- what

20  is it, FE1 that you're --

21              MR. GARNETT:  The fire escape room, Your Honor?

22              THE COURT:  Fire escape area where this

23  allegedly occurred?

24              THE WITNESS:  No, sir.  To my knowledge, there

25  are no cameras in the fire escapes.

Johnny Lavender – Direct                 26

1         THE COURT:  All right.  And my recollection from

2    trial was, though, that you all put on evidence that the

3    guards know where the cameras are, right?

4         THE WITNESS:  Yes, sir.  That is something that

5    is extremely evident.

6         THE COURT:  Right.  Okay.

7    BY MR. GARNETT:

8    Q    Agent Lavender, if there's not a request -- because I

9    know the Court recalls the video surveillance that we

10   presented during trial.  If there's not a request for

11   video surveillance from a specific camera, does that

12   camera simply overwrite after the retention period the

13   Court mentioned?

14   A    Yes.

15   Q    And the Court has already touched on this, but did

16   Ms. Largent ever indicate to you that she did complain to

17   prison staff about the transactional relationship she had

18   with the defendant?

19   A    There was no complaints, to my knowledge.

20   Q    Okay.

21        THE COURT:  All right.  I cut you off.  You were

22   going to talk about Raysean Davis, I think it was.  Do you

23   want to talk about Raysean Davis?

24        THE WITNESS:  Yes, Your Honor.

25        MR. GARNETT:  Thank you, Your Honor.

1   BY MR. GARNETT:

2   Q    Did you have -- did you -- did Ms. Largent ever say

3   anything about having a relationship with an individual

4   named Raysean Davis at FCI Petersburg?

5   A    Yes.

6   Q    And did you have the opportunity to interview Raysean

7   Davis on January 31st of this year, of 2020?

8   A    Briefly, yes.

9   Q    And at this point, was it your understanding the

10  defense had already had the opportunity to meet with

11  Mr. Davis --

12  A    Yes.

13  Q    -- and counsel?

14       During your interview with Mr. Davis, did you

15  ask Mr. Davis about his relationship with various other

16  inmates and correctional officers at FCI Petersburg?

17  A    Yes.

18  Q    And how would you characterize Raysean Davis'

19  demeanor during that interview?

20  A    Mr. Davis' responses were extremely short and not

21  very forthcoming with any information.

22  Q    Did you ask Mr. Davis if he had any idea why his

23  testimony could potentially be relevant to a trial in this

24  case?

25  A    Yes, I did.

Johnny Lavender - Cross                    28

1  Q    And what was his response?

2  A    He had no idea.

3         MR. GARNETT:  Your Honor, that's all the

4  questions I have for the special agent at this point.

5         THE COURT:  All right.  Do you want to put your

6  mask back on and have a seat?

7         MR. GARNETT:  Yes, sir.

8         THE COURT:  Mr. Gavin.

9         MR. GAVIN:  Yes, sir.  Thank you.

10                    **CROSS-EXAMINATION**

11  BY MR. GAVIN:

12  Q    Good morning, Special Agent Lavender.

13  A    Good morning, sir.

14  Q    You're going to have to forgive me because I'm going

15  to use the redacted version.  The first time that

16  Ms. Largent was interviewed was back in February; is that

17  correct?

18  A    February 2019, I believe.

19  Q    Yeah.  And some officers or agents from Atlanta

20  interviewed her at that point, correct?

21  A    Yes, sir.

22  Q    Okay.  I'm going to hand up to you, if I could,

23  something that I filed as --

24         THE COURT:  Do you want to mark that?

25         MR. GAVIN:  It's Exhibit A.

Johnny Lavender - Cross                    29

1              THE COURT:  Okay.  Why don't we mark it Defense

2    Exhibit 1.

3              MR. GAVIN:  Okay.

4              THE COURT:  Just for the record, what is it?  Is

5    that the 302?

6              MR. GAVIN:  Yes, sir.

7              (Defendant Exhibit Number 1 was admitted.)

8    BY MR. GAVIN:

9    Q    Now, unfortunately, Special Agent Lavender, this is

10   redacted, but is this a version of the interview that took

11   place with Ms. Largent on February 6, 2019?

12   A    Yes, sir.

13   Q    Can you point out in that document anywhere where she

14   indicates that there was an agreement to exchange sex for

15   cigarettes?

16   A    In this particular one?

17   Q    Yes, sir.

18              I'll save you from trying to read it because I

19   think it's redacted.  But if you look at the bottom of --

20   one, two, three, four -- the fourth paragraph, the only

21   reference that I see there, it says that, "Blank would

22   often receive cigarettes from Legins."

23              THE COURT:  What page are you on?

24              MR. GAVIN:  I'm on page 1, bottom of paragraph

25   four.

Johnny Lavender - Cross                     30

1  A    If you're referring to, "He stated she and Legins

2  began talking to one another"?

3  Q    That's correct.   The last sentence in that paragraph.

4         THE COURT:   Why don't you just read what it

5  says.

6         MR. GAVIN:   Okay.

7  BY MR. GAVIN:

8  Q    It says, "Blank" -- which I assume would be

9  Ms. Largent -- "would often receive cigarettes from

10 Legins" --

11 A    Okay.

12 Q    -- is that correct?

13        To your knowledge as the agent on the case file,

14 is there any other reference in this 302 that makes

15 reference to any deal or exchange of sex for cigarettes?

16 A    What you're reading here, you're saying that "would

17 often receive cigarettes from Legins," you're saying is

18 there anywhere else in here that talks about exchange --

19 Q    Anything else where she talks in-depth like she did

20 on February 20th of this year.   In her original statement,

21 did she say anything that would be consistent with what

22 she said in February of this year versus this statement in

23 2019?

24 A    No.

25 Q    If you go to the next page, which is -- has a Bates

Johnny Lavender – Cross

31

1   stamp 413 on it, and I'm just going to read this to you.

2   Down there, the third line from the very bottom, it said,

3   "Blank," which I assume means Ms. Largent, "listed the

4   following persons that has knowledge of her relationship

5   with Legins."  Do you know whether or not that statement

6   says Raysean Davis or she was referring to Raysean Davis?

7   A    I don't -- to my recollection, Raysean Davis' name is

8   not listed there.

9           THE COURT:  Did you not get an unredacted

10  version?

11          MR. GAVIN:  I did, but I was putting this

12  together quickly.  So I just used this because I thought

13  he would be familiar with the case file.

14          THE COURT:  All right.  Okay.

15  BY MR. GAVIN:

16  Q    Raysean Davis, was he mentioned at all in the second

17  interview that you took on February 20th, 2020?

18  A    Yes.  Raysean Davis was mentioned as being her

19  boyfriend.

20  Q    But when you went to speak with him, he had no idea

21  what you were talking about with Mr. Legins?

22  A    If I could ask you to repeat that, please.

23  Q    Yeah.  He had no idea why you would be interviewing

24  him with respect to a relationship between Ms. Largent and

25  Mr. Legins?

1  A    So you're referring to Mr. -- excuse me.  You said

2  "he."  I want to make sure I'm understanding.

3  Q    Mr. Davis.

4  A    Okay.  So when I spoke to Mr. Davis, I did not ask

5  Mr. Davis specifically about a sexual relationship.  No, I

6  did not.

7  Q    When you interviewed Mr. Largent on February 19th,

8  2020, he made reference to two other individuals that

9  would know specific or have specific knowledge with

10 respect to his relationship.  One was a gentleman named

11 Javon White; is that correct?

12 A    Yes.

13 Q    Did you interview Mr. White?

14 A    No.

15 Q    Another one was the name of an unidentified black

16 male known as Old School Dog.  Did you attempt to locate

17 or track down Old School Dog?

18 A    No.  Excuse me.  Let me rephrase that.  I did ask if

19 anyone -- I believe it was the SIA from Petersburg, if he

20 was familiar with someone by that name, but I did not find

21 anyone by that name or was not -- did not determine

22 someone by that name.

23 Q    Is there any -- let's go back to the Atlanta

24 interview, which is in your hand.  That interview makes

25 reference to Mr. Largent, or Ms. Largent, also having a

Johnny Lavender – Cross                    33

1   sexual relationship with another officer, does it not?

2   A    Yes, it does.

3   Q    All right.  Do you know whether that investigation

4   resulted in any corrective action against any other

5   officer or inmate?

6   A    I'm not familiar with what happened in this

7   investigation.  I was not part of it, and I have no

8   information to provide toward it.

9   Q    So he made a similar allegation against another

10  officer, but we don't know whether or not his information

11  was corroborated in that investigation or whether it was

12  not?

13  A    I'm not aware of anything to do with that case.

14  Q    Are you familiar that he has a record, or she has a

15  record?

16  A    Ms. Largent?

17  Q    Yes.

18  A    Yes.

19  Q    I'll summarize this, but would it be fair to say that

20  the record --

21          THE COURT:  I'm going to accept the record that

22  you summarized in your papers.  Is that all right?

23          MR. GAVIN:  Yes, sir.

24          THE COURT:  I don't want to get into this whole

25  other trial about G.L.

Johnny Lavender - Cross                    34

1          MR. GAVIN:  I understand.

2          THE COURT:  I get significant criminal history

3   dealing with sexual offenses and deceit.

4          MR. GAVIN:  Yes.

5          THE COURT:  That's why she's in jail.

6   BY MR. GAVIN:

7   Q    So then I'll narrow it down.  For purposes of trial,

8   and I think I shared a summary with you, I summarized the

9   days on which Mr. Legins worked in the E unit versus the

10  days that she actually resided in the E unit.  Are you

11  familiar with that summary?

12  A    I know you provided a summary, yes.

13  Q    All right.  Based on my summary, is it fair to say

14  that Mr. Legins only worked in the E unit for ten days?

15  A    From my recollection -- we went over this in

16  Mr. Garnett's office, and to my recollection, I believe

17  that is correct.

18  Q    And is it fair to say that of those ten shifts, six

19  of them were day watch?

20  A    To my recollection, from the -- from Mr. Garnett --

21  Q    One was morning watch, which would have been from

22  midnight to 8?

23  A    Again, going off of memory, but I don't have any

24  reason not to believe what you're saying.

25  Q    All right.  So based on these pictures, if there was

1   any sexual activity that occurred in the fire escape on

2   day watch, it would have been in broad daylight, correct?

3   A    If there was a sexual activity and it was during the

4   day, it would be in -- it could be during the day, yes.

5   Q    And there's windows -- on both sides of those doors

6   to the fire escape, there are windows where anybody from

7   the outside could see in, correct?

8   A    If I can make sure, there are about a 3-inch window

9   with a sliver.  You can see partial of that area.  You

10  cannot see the entire area in there at all.

11  Q    All right.  So there are cameras, however, on the

12  compound that would show that outer door, right?

13  A    There are cameras inside and outside of that

14  facility.

15  Q    So if there had been a preservation of these tapes up

16  until current day, then we would have able to see both

17  them going in that door from the outside or from the

18  inside, correct?

19  A    Again, we're referring to Mr. Largent -- Ms. Largent?

20  Excuse me.

21  Q    Yes.

22  A    If it would have been preserved?

23  Q    Yes.

24  A    There could have been -- I'm not familiar with the

25  camera angle for that particular door on the outside.  I

Johnny Lavender - Cross                    36

1  know the inside.  I've seen the footage from that area.

2  It could show someone walking into that room.

3  Q    All right.  If Mr. Legins is the commanding officer

4  for that particular floor, how many officers are on a

5  floor, based on your investigation?

6  A    Excuse me.  Ask me that one more time.

7  Q    How many officers work the floor on any given shift

8  on a particular day?  One?  Two?  Three?

9  A    My understanding, one.

10 Q    All right.  So if Legins were to leave F South and go

11 downstairs for a sexual encounter in E South, he would

12 essentially leave his entire floor unattended?

13 A    Very similar to what he did with Mr. Lemagne, yes.

14 Q    It was mentioned by the judge, but I'm just going to

15 confirm.  Is there any corroborative evidence other than

16 Ms. Largent's version that any of what she said actually

17 took place?

18 A    Ask that again, please.

19 Q    Is there any corroborative information, whether it's

20 physical, camera, medical or otherwise, that what

21 Ms. Largent said actually happened did, in fact, happen

22 other than what she told you and the agents in Atlanta?

23 A    I would draw to the similarities between

24 Mr. Lemagne's account of how he was groomed to how

25 Ms. Largent was groomed.

Johnny Lavender – Cross                 37

1           THE COURT:  That's what this is about, right?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  This is a grooming case; isn't that

4  right?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  And grooming relates to consensual

7  sex, doesn't it?

8           THE WITNESS:  Yes, sir.  Yes, Your Honor.

9           THE COURT:  That's the whole notion.  The notion

10  is you groom somebody who you're not supposed to have sex

11  with to convince them to have sex with you; isn't that

12  right?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  And that's different than forcible

15  rape, isn't it?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  All right.

18           MR. GAVIN:  I don't have any other questions,

19  Judge.

20           THE COURT:  All right.

21           I'm going to ask you to put your mask back on

22  before you sit down.  There you go.

23           As soon as he's done, you can redirect.

24           MR. GARNETT:  Yes, sir.

25           Just very briefly, Your Honor.

Johnny Lavender – Redirect                    38

**REDIRECT EXAMINATION**

1

2  BY MR. GARNETT:

3  Q    Agent Lavender, the word allegations came up.  How

4  did Ms. Largent come to the FBI's attention?  Did she

5  reach out to investigators?

6  A    No, she did not.  She was actually referred to us by

7  another transsexual who -- well, she was referred to us by

8  another transsexual with knowledge.

9            MR. GARNETT:  That's all, Your Honor.  Thank

10  you.

11            THE COURT:  All right.  Thank you, Agent.  You

12  can step down.  I appreciate your testimony.  Do you want

13  to put your mask back on before you step down?

14            (Witness stood aside.)

15            THE COURT:  Okay.  I'm going to ask the

16  government, then, do you have any other evidence?

17            MR. GARNETT:  No, Your Honor.

18            THE COURT:  Do you have any other evidence that

19  you want to put on other than -- the defendant is going to

20  have to chance to allocute in July.  Is there anything

21  else you want to put on?

22            MR. GAVIN:  No, sir.

23            THE COURT:  All right.  Now, let's talk about

24  the guideline calculation here.  I'm going to tell you

25  where I am, and I'm going to allow you to do some

1    supplemental briefing.   The -- as you know, after the

2    trial, I went back and I looked at the maximum punishment

3    for 1001 and determined that it should be eight years

4    imprisonment because the underlying offenses that the

5    defendant was convicted of lying about involved

6    Chapter 109A.   So because of that, necessarily, the

7    guideline provision is 2J1.2.   You start with a base

8    offense level of 14.   It's increased by four levels, then,

9    due to the violation of Chapter 109A.

10           The objection, as I understand it by Mr. Gavin,

11   is really threefold dealing really with what is the

12   cross-reference.   And as I understand your objections

13   here, first is that the jury found no sexual act.   I beg

14   to differ with you on that because due to the -- their

15   finding on the lie -- and we had separated the two lies.

16   So we have a special finding by the jury, which is what

17   *Apprendi* calls for, in terms of whether or not the lie

18   involved a sexual act.   So I differ with you on that.   And

19   for that reason also, your other argument about *Apprendi*

20   and the Sixth Amendment I think is wrong because they

21   necessarily found a sexual act.

22           You also talk about the *Pearson* case, saying

23   that the accessory provision doesn't apply.   I think

24   that's been overruled, and that's really not applicable

25   here anyhow.   We'll write a little bit about that.

1           The real issue in my mind is the
2    cross-reference, and you apply the accessory after the
3    fact guideline 2X3.1, but the question is to what offense.
4    And the probation officer, Officer Foote, who's sitting
5    over here, applied the aggravated sexual abuse one for
6    that, and I think you object to that, which I think is the
7    major objection.  Now, I can use acquitted conduct to
8    support that under the *Watts* case, but I'm not willing to
9    do that here.

10           I will say this.  I personally found Mr. Lemagne
11   to be credible.  Having said that, the jury clearly
12   rejected his testimony as it relates to force.  And I am
13   not -- and there is no corroboration beyond his testimony
14   that force was used.  And so to the extent that you object
15   to the cross-reference on that, I'm sustaining the
16   objection.

17           But here's where I think the calculation needs
18   to occur, and I intend to -- for me to find beyond a
19   preponderance of the evidence, I'm essentially looking at
20   what the jury found and whether there is evidence to
21   corroborate Mr. Lemagne's account.  So on -- there were
22   two episodes.  The first episode was in March of -- March
23   the 16th of 2018.  And there is corroboration that there
24   was sexual intercourse between the defendant and
25   Mr. Lemagne at that time because we have the sweatshirt

1    that even though you argued contamination, Mr. Gavin, to

2    the jury, there was no evidence of contamination as it

3    relates to the sweatshirt, as to that, and, of course, we

4    have the prison video that puts them in that room.  And I

5    think that's sufficient corroboration.

6            Now, the question then becomes is what was the

7    sexual contact.  And there is a difference between there

8    was penetration, however slight, in the defendant -- in

9    the victim's mouth or whether or not it was masturbation.

10   You ran the old hand job defense in your closing argument.

11           Now, because their only evidence that it would

12   have been penetration came from Mr. Lemagne, I'm going to

13   accept that as to that incident, that it was masturbation

14   that resulted in the -- in the semen that was found in the

15   sweatshirt.  But that is a violation of Section 2244,

16   which involves sexual contact.  And sexual contact is

17   defined, then, in Section 2246(3), defining sexual contact

18   involving touching of anyone of genitalia with the intent

19   to arouse or gratify.  I'm paraphrasing.  And that would

20   include the manual masturbation here that you -- the

21   so-called hand job that you said, Mr. Gavin, is what

22   occurred here.

23           So -- and under the law, I can find, by a

24   preponderance of the evidence, for uncharged conduct.  So

25   I'm finding, based upon the defendant's statements -- or

1  I'm sorry -- the victim's statements, Mr. Lemagne's

2  statements, the sperm on the sweatshirt for which there is

3  no evidence of contamination and the prison videos, that

4  there is a preponderance of the evidence establishing the

5  masturbation of the defendant by the victim as to the

6  March 16th account.

7          As to the March 10th -- or I'm sorry -- the

8  May 10th account, I'm going to remind you that the jury

9  found that there was a sexual act, and because the

10 government elected ultimately not to put on the 413

11 witnesses, the only evidence that's in the -- that was

12 before the jury was sex with Mr. Lemagne, right.  And

13 that -- and they found a sexual act, as opposed to sexual

14 contact, which means either a penetration by mouth or by

15 anus.

16         And as to that incident, there is corroboration

17 beyond Mr. Lemagne's testimony that it was sexual contact

18 at least in his anus, as demonstrated by the anorectal

19 swabs, for which there was no evidence introduced of

20 contamination.  To me, there is beyond any doubt that this

21 defendant had sex in Mr. Lemagne's rectal area on that

22 day, further corroborated by the prison tapes.  So I'm

23 finding, by a preponderance of the evidence, that that was

24 sexual abuse of a ward.

25         How do I reconcile these findings with the jury

1  verdict?  One is that they did find a sexual act.  The

2  problem lies this.  The government made a serious error

3  here, which is the only way I can reconcile it, and that's

4  this.  If you go back and look over the jury instructions,

5  jury instructions that the government asked me to give, on

6  Counts One and Two, you properly state that as to consent,

7  the government has the burden of establishing that this

8  was nonconsensual as to those two offenses.  But as to

9  sexual abuse of a ward, an inmate cannot consent to sex,

10  and you all never told the jury that.  You should have

11  asked for an instruction that delineated the difference

12  between Counts One and Two and Counts Three and Four.

13           And what I believe the jury found, which is

14  similar to the evidence that -- which is put forth by

15  Agent Lavender, was that this was a consensual trading of

16  sex for cigarettes.  You all put on all this evidence

17  about grooming.  You built a defense of consent for them.

18  Yet you never told the jury that an inmate cannot consent

19  to sex with a prison official due to the uneven

20  relationship, right.  And I think that is why the jury got

21  confused between -- Counts One and Two are different than

22  Counts Three and Four, and I think that's the way to

23  resolve it.

24           So the question then becomes what the guideline

25  calculation is.  So if we were to take just the guideline

1    calculation for the May offense using the 22 -- the

2    violation of 2243(b), sexual abuse of a ward, my

3    calculation comes out to offense level 18, Criminal

4    History Category I, with a range of 27 to 33 months.

5          However, what I have not done is the grouping

6    analysis that because it's two offenses involving the same

7    victim and they are different offenses based upon my

8    findings, you then turn to the grouping provisions in

9    3D1.1 et seq. into the guidelines.

10          So what I propose to do is this is I'm going to,

11   first of all, give you each a chance to be heard about

12   this, but this is kind of where I'm at.  But then I was

13   going to have the probation officer do a recalculation of

14   the guidelines by Wednesday, to do an addendum that

15   recalculates based on my findings here beyond a

16   preponderance, and also to do the grouping analysis,

17   because the grouping is very complicated and I'd rather

18   have a probation officer take a swing at it first before I

19   look at it.

20          Then I am allowing you all, then, to brief this

21   by Monday.  And you're going to do two things.  One,

22   you're going to tell me -- you're going to preserve any

23   objections.  You're going to -- I guess both sides are

24   probably going to object to this today, although I think

25   I'm going along with much of what Mr. Gavin has submitted

1   in his objection.  You can add any additional objections

2   that you want on the guidelines.  You're going to also

3   tell me whether you agree with Officer Foote's

4   recalculation, particularly -- I think I'm right on the 18

5   offense level for the May offense.  But the grouping.  I

6   want -- because grouping is complicated, and I want you

7   each to tell me whether you agree with the grouping

8   analysis that Officer Foote does.  Okay?

9           Then -- now, let's assume, just for the sake of

10  argument -- and I'm not saying this is going to be the

11  outcome -- the range is then 27 to 33 months.  You've

12  asked for a downward variance when you thought the

13  guideline was going to be 96.  You can still do any other

14  variances that you want, but so can the government.  So

15  the government may say -- and I'm putting you on notice,

16  referring to the defense, that I'm considering an upward

17  departure based upon multiple actions.  Not just involving

18  this defendant, but also with G.L., the testimony that

19  Agent Lavender put on.  I'm going to decide the weight.  I

20  want to see what you all say, but there's a basis now, I

21  think, for an upward variance based upon multiple

22  instances.

23          And in particular, what I want to go back to is

24  the grouping.  So if the -- if the March offense is

25  grouped, there's no reason, on that basis alone, to do an

1  upward variance, right.  But if it is not grouped, there

2  is a reason for variance.  In other words, if it is

3  grouped, the guidelines are taking into account the other

4  event, right.  But if it is not grouped, the guidelines

5  are not taking it into account.  That, in and of itself,

6  is a basis for an upward variance.

7          Additionally, as I said, Agent Lavender's

8  testimony about the interview of G.L. is possibly a basis.

9  I'm going to decide what the weight is to affix that for a

10  variance, as well as his primary disciplinary action with

11  the Richmond sheriff's department where he was disciplined

12  also for sexual conduct in relation to inmates.  The

13  government may have any other reasons they want for an

14  upward variance.

15          My point is the government didn't ask for a

16  variance before because we were at the top level, right.

17  I've now changed the analysis on the guidelines.  So

18  you're free to make a variance.  You don't have to, but

19  you may.  I'm giving notice to the defense procedurally

20  that I'm inclined to do that, but I want to have everybody

21  brief it.

22          But you're still free to do whatever variances

23  or departures, Mr. Gavin, that you want to raise.  I think

24  you should refile what you've said before because now

25  we're in a different area if my guideline calculation is

1  right.

2         So with that -- and then -- then I'll deal with

3  the 3553(a) factors.  So what I want you to do is I want

4  you to do guidelines first, whether you agree or not with

5  what Officer Foote is going to calculate based on my

6  ruling, particularly the grouping.  I want you to then

7  tell me what your variances are and then any other

8  arguments that you want to do under 3553(a), and I'm going

9  to address those in July.

10        So, Mr. Gavin, I'll turn to you first since it

11 was your objection that I sustained.  I'll give you an

12 opportunity to say anything you want.

13        MR. GAVIN:  No, Judge.  I understand your

14 rulings, and I think that we'll have to brief it to give

15 the Court more information on where we ultimately end up.

16        THE COURT:  Okay.  All right.  Mr. Garnett or

17 Ms. Gilbert, do you want to come up here?

18        MS. GILBERT:  Sure.  Thank you, Your Honor.

19        The *Greer* case that's cited in our brief sets

20 out what I think our position would be on this issue,

21 which is that it is the scope of the investigation that

22 controls the cross-reference rather than what the

23 underlying acts were.  So, in other words, at the time

24 that the defendant lied to federal agents, he knew that

25 their investigation was of the 2241.  He knew that they

48

1   were investigating allegations of a forcible,

2   nonconsensual rape.  And so that's the obstruction

3   cross-reference that should operate.  It should be 2241

4   because it's not necessarily about what the jury found or

5   the verdict.  It's about what the defendant was lying to

6   cover up, what he understood the scope of the

7   investigation to be.

8          And that makes sense that the guidelines would

9   contemplate a higher offense level when someone is lying

10  about a more serious allegation, whether or not the

11  allegation is true.  It's more important to tell the truth

12  because it's higher stakes.  And so the -- the *Dickerson*

13  case is the Fourth Circuit case that talks about the

14  2J1.3, I believe, which is somewhat comparable in the

15  perjury context.  But there's a First Circuit case that

16  explains that perjury is a little bit different.  You

17  might need to inquire more into what the prosecution is

18  doing there because there's more of an over or

19  undercharging concern at that point before the grand jury.

20  That's the *Conley* case, and I can include that in the

21  briefing that we'll submit to Your Honor by Monday.

22          But essentially, the cross-reference has --

23  contemplates looking at what the investigation was all

24  about.  And the *Greer* case out of the Sixth Circuit, the

25  *Conley* case out of the First Circuit, they're comparable

1   with the *Dickerson* case, but they're a little bit more

2   helpful because they actually address the scenario here

3   more directly.

4           THE COURT:  Okay.  For that to happen -- I mean,

5   I've read what you wrote, but for that to happen, when the

6   defendant was interviewed -- and we had the interview that

7   was introduced, it's not my recollection -- you tell me if

8   I'm wrong and I'll go back and look at this.  And I want

9   you to put this in your brief -- whether he was

10  specifically told that he was being investigated for rape

11  versus having sex with inmates.  And I think it's the

12  latter, he was being investigated for sex with inmates.

13  And if that's true, then the -- it is the -- the sexual

14  abuse of a ward.

15          Look, I'm going to say again, I believe Brandon

16  Lemagne.  I was surprised by the verdict.  But I think you

17  made a mistake here, a significant mistake in relaying the

18  concept of consent to them, and particularly in your

19  rebuttal.  In your rebuttal, you should have stood up and

20  said, "What he just said, he's guilty."  You know, the old

21  hand job defense that he just pulled out of the air when

22  there was really nothing to support it, right.  You're

23  learning, and I'm not trying to be critical of you.

24          I'm just trying to tell you, having looked at

25  this and being stuck with the jury verdict, if I had been

1    the judge, I would have convicted him.  If I would have

2    been a fact finder, I would have convicted him across the

3    board because I think that's what occurred here.  But

4    that's not my job here, right.  They found a sexual act,

5    and the only way that I can figure out what they did was

6    that they found consent.

7              And all that grooming evidence that you -- you

8    wanted to put on more, too.  Remember, I prevented it.

9    You built that defense of consent.  The more you put on,

10   the more that they had this consent argument.  Are you

11   seeing that now?

12             MS. GILBERT:  Yes, Your Honor.

13             THE COURT:  All right.  So that's why I think

14   they landed with the, yeah, they had sex, it was consent.

15             To me, there's no way to get around the rectal

16   swab that occurred here.  And there was no evidence of

17   contamination.  While he threw that up, in the rebuttal

18   you also didn't respond to that.

19             And there were two pieces of evidence for which

20   there was no suggestion at all that there was

21   contamination.  One was the sweatshirt from the first

22   incident, and the other is the rectal swab from the second

23   one, which, to me, gives me preponderance on those two.

24             So, look, I'll be glad to look at what you have

25   to say, but I don't think your argument fits, the case law

1  that you're suggesting, unless you can show me factually

2  that he was told we're investigating rape as opposed to

3  sexual conduct.  Does that make sense to you?

4         MS. GILBERT:  Yes, Your Honor.  And I'll find

5  those citations.

6         THE COURT:  So, look, as you know, I'm not -- it

7  doesn't prevent me from revisiting my rulings.  I've

8  already done that during the trial, but this is the way

9  I'm going to rule for now.  If there's a reason to change,

10 I'll let you all know, but that's kind of where I'm at on

11 this.

12        What I want to focus on now -- I mean, you can

13 raise that argument.  I'll take a look at it, but I want

14 you to focus on this grouping issue because grouping is

15 complicated here, and there's going to be a direct

16 interaction between whether or not it's grouped and an

17 upward variance.  Of course, I gather now you're going to

18 argue for the upward variance also on Agent Lavender's

19 testimony, and also this Richmond sheriff's department

20 thing as well, and any other reason that you want.

21        But to me, we've got to figure out the grouping.

22 I thought about taking a shot at it, but because it's so

23 complicated, I think Officer Foote, who I have a lot of

24 confidence in, I think he should take the first shot.  And

25 I asked him to get it done by Wednesday, to prepare an

52

1  addendum that's just going to address the guideline

2  calculation, and that will give you all until Monday,

3  then, to respond.  Does that sound fair?

4          MS. GILBERT:  Yes.  Thank you, Your Honor.

5          THE COURT:  All right.  Is there anything else

6  you wanted to say?

7          MS. GILBERT:  No thank you, Your Honor.

8          THE COURT:  I know you're preserving your

9  objection on my calculation.  I know you don't like it,

10  but that's the way life works, right.  So you're

11  preserving your objections for the record.  I will -- if

12  you want me to reconsider, you can show me.  But, to me,

13  that's the key thing, and if you show me that, I'll take a

14  another look at it.

15          MS. GILBERT:  Thank you, Your Honor.

16          THE COURT:  Okay.  All right.  Did you have

17  anything else, Mr. Gavin?

18          MR. GAVIN:  No, sir.

19          THE COURT:  All right.  Is there anything else,

20  then, we need to do today?  We're going to reconvene on

21  July the 14th, but is there anything else we need to do,

22  Mr. Garnett?

23          MR. GARNETT:  No, sir.

24          THE COURT:  Mr. Gavin?

25          MR. GAVIN:  No, sir.

1        THE COURT:  All right.  Mr. Legins, you've heard

2   my rulings.  I'll look forward to seeing you on July the

3   14th, then.

4            (The proceeding concluded at 12:27 p.m.)

5                    REPORTER'S CERTIFICATE

6       I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

7   the Commonwealth of Virginia at large, and whose

8   commission expires September 30, 2023, Notary Registration

9   Number 7108255, do hereby certify that the pages contained

10  herein accurately reflect the stenographic notes taken by

11  me, to the best of my ability, in the above-styled action.

12       Given under my hand this 28th day of September 2020.


13

14  _____
              /s/
         Tracy J. Stroh, RPR

15

16

17

18

19

20

21

22

23

24

25